1  G. DAVID ROBERTSON, ESQ.
   California State Bar No. 111984
2  MARILEE BRETERNITZ, ESQ.
   California State Bar No. 12563
3  Robertson, Johnson, Miller & Williamson
   50 West Liberty Street, Suite 600
4  Reno, Nevada  89501
   Telephone No. (775) 329-5600
5  Facsimile No.  (775) 348-8300
   Attorneys for JOSEPH HARDESTY
6  and YVETTE HARDESTY

7

8

9              **UNITED STATES DISTRICT COURT**

10            **EASTERN DISTRICT OF CALIFORNIA**

11                 **SACRAMENTO DIVISION**

12  JOSEPH HARDESTY, et al.,          Case No.  2:10-cv-02414-KJM-KJN

13              Plaintiffs,

14        vs.

15  SACRAMENTO METROPOLITAN AIR
    QUALITY MANAGEMENT DISTRICT,
16  et al.,

17              Defendants.

18  ─────────────────────────────    [Partially consolidated with]
                                     Case No. 2:12-cv-2457-KJM-KJN
19  JAY SCHNEIDER,

20              Plaintiff,

21        vs.

22  COUNTY OF SACRAMENTO, et al.,

23              Defendants.

24

25        __THE HARDESTYS' STATEMENT OF DISPUTED FACTS__

26
        COME NOW Joseph Hardesty and Yvette Hardesty, by and through their counsel, the
27
   law firm of Robertson, Johnson, Miller & Williamson, and hereby file this Statement of Disputed
28
   Facts ("Statement") pursuant to Local Rule 260(b).   The facts contained in this Statement

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 1

demonstrate all of the material facts which present a genuine issue precluding summary judgment or adjudication in this matter.

| MATERIAL FACT | EVIDENTIARY SUPPORT |
|---|---|
| 1. Plaintiffs Joseph and Yvette Hardesty own and operate Hardesty Sand and Gravel ("HSG"), a sand and gravel operation in the eastern portion of the County of Sacramento ("Sacramento County" or "County.") | JH Declaration at 2 |
| 2. Their facility is located on property used for mining since at least the early 1900's ("Mine"). | JH Declaration at 3 |
| 3. The Mine is owned by Jay Schneider and his family ("Schneider"). | JH Declaration at 4 |
| 4. The Hardestys lease the Mine from Schneider, and are authorized by that agreement to mine and process aggregate material from the Mine. | JH Declaration at 5 |
| 5. Pursuant to their contract, the Hardestys have exclusive control of the Mine areas and processing. | JH Declaration at 6 |
| 6. The Hardestys operated the Mine continuously since the early-1980's. | JH Declaration at 7 |
| 7. In nearly 30 years of operation - up until the very day that the political corruption in this case started – the Hardestys never experienced any notable complaints or violations regarding their operation of the Mine. | JH Declaration at 8 |
| 8. Once a powerful multi-billion-dollar mining competitor unleashed its lobbyists and politicians from all levels of government, however, a torrential deluge of false accusations and regulatory "violations" immediately rained down upon the Hardestys. | JH Declaration at 9 |
| 9. This continued until the Mine was completely shut down in the fall, 2010. | JH Declaration at 10 |
| 10. There is no question that Senator Cox's letter was written at the request of a billion-dollar competitor who regularly contributed to Senator Cox's campaign (and made a large donation shortly after issuance of the letter on 10/28/08 and 10/30/08). | EX. 1 (DE 33); KH Declaration, Page 9 of Ex. 2 |
| 11. Senator Cox's letter contains numerous false statements – including that the Hardestys' mining facility was operating without necessary permits and requests that multiple state agencies suddenly undertake a "coordinated review" of the Hardesty operations to see what violations they can find. | EX. 1 (DE 33) |

Robertson, Johnson, Miller & Williamson 50 West Liberty Street, Suite 600 Reno, Nevada 89501

| 12. | Because of this exemption, "vested" mines are extremely valuable because they do not incur the many regulatory costs that "non-vested" mines face, which can run into the tens of millions of dollars. | EX. 2 |
|---|---|---|
| 13. | The Mine at issue here is unquestionably a "vested" Mine.  In 1994, the County, after an exhaustive investigation of the Mine's previous mining history over the last one-hundred or more years, issued statements acknowledging the vested right to mine the Property.  Sacramento County wrote a letter in 1994 confirming Schneider's "vested" right to mine the property without the need for a surface mining permit under SMARA or a conditional use permit under the County's zoning laws.  This letter acknowledges that the Mine's history was "accepted as evidence of vested interest and therefore . . . a use permit for the mining operation [would not be required]." | EX. 3 (DE 118); EX. 4 (DE 119); and EX. 5 (DE 120) |
| 14. | When the County held multiple hearings to adopt the Mine's Reclamation Plan, the County Board of Supervisors made a finding as part of those noticed hearings that the Mine was "vested" and therefore did not need to comply with the County's zoning laws. | EX. 6 at 14 (DE 202); EX. 7 (DE 334); and EX. 8 at 1 and 4 (DE 337) |
| 15. | In response to a Writ of Mandate before the California Superior Court, the County admitted in its answer to such Writ that the right to mine the Schneider property was a "vested right" covering the entire property. | EX. 9 |
| 16. | Multiple ancillary documents prepared by the County also acknowledge over a period of many years that the Mine is vested. | EX. 3 (DE 118); EX. 4 (DE 119); EX. 5 (DE 120); EX. 10 at 2 (DE 135); EX. 11 at 3 (DE 140); EX. 12 at 2 (DE 164); and EX. 13 at 9 (DE 350) |
| 17. | After October 3, 2008, the common thread running through those documents is a clear desire to suddenly abolish the Mine's vested rights and force both Schneider and the Hardestys to comply with the extremely onerous and highly expensive regulations applicable to non-vested mines. | See e.g. EX. 14 (DE 160); EX. 15 (DE 173); and EX. 16 (DE 319) |
| 18. | Multiple documents clearly lay out Teichert's plan to use politicians and regulatory agencies to drive the Hardestys out of business because Teichert could not compete with the Hardestys' lower prices. | Diane Anderson Declaration; EX. 17 (DE 7); EX. 18 (DE 77); EX. 19 (DE 281); and EX. 20 (DE 358) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 3

| | |
|---|---|
| 19. The Schneider Motions and accompanying supporting documents explain in detail how the Mine's vested right was legally recognized by Sacramento County through two different processes: 1) an investigation into the Mine's history conducted in the early 1990's culminating in the issuance of a letter by Sacramento County dated August 23, 1994 confirming that the Mine was vested. | EX. 4 (DE 119) and EX. 5 (DE 120) |
| 20. In connection with the Sacramento County Board of Supervisors' public hearings in 2002 regarding the Mine, the County repeatedly confirmed the Mine's vested right, that no use permit was required for mining on the property, and, ultimately, on November 12, 2002, approved the Mine's 100-year Reclamation Plan. | EX. 6 at 14 (DE 202); EX. 7 (DE 334); EX. 8 at 1 and 4 (DE 337) |
| 21. The Hardestys have leased the Mine operation for nearly 30 years ("Lease") and have relied upon its vested right throughout that time. | JH Declaration at 11 |
| 22. Although no mining is currently occurring under the Lease due to the Defendants shutting down the Mine, the Lease is still in place and the Hardestys have the right to resume operations under the Lease if the regulatory issues currently preventing operation are resolved. | JH Declaration at 12 |
| 23. "The reclamation plan is for activities *to be carried out after the mining operation is complete* (by segment) or abandoned. When the mining operator determines that the mining operation is complete upon a particular area or segment of the overall operation, *such that the completed segment will not be subject to further disturbance*, then such information will be reflected in the annual report, and reclamation will commence on that identified segment, *and the reclamation activities conducted within that area will then be subject to the requirements of the reclamation plan*." | EX. 6 at 15 (DE 202) |
| 24. The Reclamation Plan does not in any way govern *operation* of the Mine because that operation is vested. | EX. 21 (Storelli Deposition) at 54; EX. 6 at 13-15 (DE 202) |
| 25. The Plan only governs *reclamation* of the Mine *after operations are completed* on any particular area or segment. | EX. 6 at 13-15 (DE 202) |
| 26. *It does not apply to the mining operation*, which is vested under the provisions of SMARA." | EX. 21 (Storelli Deposition) at 54; EX. 6 at 13-15 (DE 202) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 4

| 27. | The Mine can continue to operate as it has historically without any need to comply with the SMARA statutes enacted in 1975, except for the requirements of a reclamation plan and financial assurances. | EX. 6 at 13-15 (DE 202); EX. 22 (PRC Section 2776) |
|---|---|---|
| 28. | This is only logical as reclaiming an area where the mining operator plans to continue excavation would obviously be both fruitless and nonsensical. | EX. 23 (Moffitt Deposition) at 86 |
| 29. | Once an area or segment is completed and not subject to further excavation, then that area becomes "subject to the requirements of [R]eclamation [P]lan" and the operator must commence to implement the provisions of that Plan to reclaim the land. | EX. 6 at 15 (DE 202) |
| 30. | The Reclamation Plan does not assume or require that the land be restored to how it appeared before the mining occurred. | EX. 6 at 30-33 (DE 202) |
| 31. | Exhibits  I, J, K and L to the Reclamation Plan depict how the land will look after reclamation. | EX. 6 at 30-33 (DE 202) |
| 32. | Exhibits I, J, K and L show that mined material has been removed during the excavation process and no other material – except a small amount of topsoil – is replaced back into the pits during the reclamation process.  Rather, the pits are allowed to remain in place after reclamation is complete.  These Exhibits clearly show that reclamation of the pits occurs when the steep slope created by the mining operation is "pulled back" and then "blended" to conform to the surrounding topography and re-seeded. | EX. 6 at 30-33 (DE 202) |
| 33. | Once mining in an area is complete then the steep slope is pulled back to an angle which does not exceed a 2-1 ratio, "blended" (i.e. contoured) into the surrounding topography, 12 inches of topsoil applied and the area is then seeded "each fall" until 75% of the area is covered with a minimum of six (6) designated plant species. | EX. 6 at 17, 18, 30-33 (DE 202) |
| 34. | These Exhibits refer to land which is being reclaimed to its "primary use" under the Plan, i.e., to graze livestock on the reclaimed land. | EX. 6 at 16 (DE 202) |
| 35. | These secondary uses include "picnicking, swimming, hiking and jogging, nature study, photography, target shooting, dog training, hunting, fishing, fox hunting (without a live fox), falconry, hang gliding, horse and cattle events and relic hunting." | EX. 6 at 16 (DE 202) |
| 36. | Reclamation to either primary or secondary uses is allowed under the Plan. | EX. 6 at 16 (DE 202) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 37. At least two of these secondary uses, swimming and fishing, obviously anticipate that the reclaimed mining areas would become lakes or ponds rather than grazing land. | EX. 6 at 16 (DE 202) |
| 38. To create ponds or lakes, all the mining operator needs to do is reduce the slopes to an angle not to exceed 2-1, contour those slopes and then either allow the pit to fill with groundwater naturally or obtain a water source to keep the pond or lake filled with water because, obviously, no topsoil or reseeding requirements would apply to the submerged areas.  Once the slopes are pulled back and contoured – and that portion of the slopes above the water line covered in 12 inches of topsoil and successfully reseeded – then the reclamation for that area is complete. | JH Declaration at 13 |
| 39. Turning aggregate mining pits into ponds after the mining activity is completed is a common occurrence, and one that is both recognized and recommended by the California Office of Mine Reclamation. | JH Declaration at 14 |
| 40. OMR provides aggregate miners with a graphic description of how to reclaim their aggregate pits into a lake or pond. | JH Declaration at 15; EX. 24 (DE 139) |
| 41. Many of the top award winners for aggregate reclamation projects throughout the United States are often sand and gravel operators who ultimately reclaim their mining pits as lakes or ponds. | *See, e.g.,*  http://www.aggman.com/photos-reclamation-photo-contest-entries-showcase-post-mining-opportunities/ |
| 42. The Hardestys believed that their two aggregate pits along the Cosumnes River should be best reclaimed into small lakes or ponds and then utilized for the anticipated secondary uses, such as nature study or waterfowl habitat. | JH Declaration at 16 |
| 43. The pits in question here were re-sloped and allowed to both naturally fill with groundwater and revegetate with native grasses. | JH Declaration at 17 |
| 44. The end result is exactly what was anticipated under the Plan – two beautiful ponds which could be used for virtually all of the listed secondary and end uses set forth in the Reclamation Plan. | GDR Declaration (Photos); and JH Declaration at 18 |
| 45. Indeed, the mining pit areas now look almost exactly like the ponds at the Cosumnes River Preserve. | GDR Declaration (Photos); and JH Declaration at 19 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 6

| | |
|---|---|
| 46. In addition to the reclamation work required under the Plan to occur once mining in an area or segment is completed, the Plan also anticipates that the mining operator may conduct certain interim "reclamation activities" as the operator deems appropriate, such as re-sloping and re-seeding.  This is true even though an area or segment has not yet been completed. | EX. 6 at 15 and 17 (DE 202) |
| 47. This is true even though an area or segment has not yet been completed.  *Id.*  But, under the Plan, this only needs to occur "wherever practical," and such activity is rarely "practical" in an area if ongoing mining is likely to subject the slope to further disturbance | EX. 23 (Moffitt Deposition) at 86; EX. 6 at 17 (DE 202) |
| 48. The Plan's opening paragraph states such "reclamation activities" are not "subject to the requirements of the reclamation plan" until the mining is done "such that the completed segment will not be subject to further disturbance." | EX. 6 at 15 and 21 (DE 202) |
| 49. The operator may decide to re-slope and reseed areas on an annual basis which are still part of an active mining segment if same is practical, but there is no *requirement* that the operator do so because the Reclamation Plan provisions only provide for mandatory re-sloping and reseeding once mining in a particular area or segment is "completed." | EX. 6 at 15 (DE 202) |
| 50. The Reclamation Plan depicts where mining is legally approved to occur over the next 100 years. | EX. 6 at 26-28 (DE 202) |
| 51. The pace of excavation at the Mine during this 100-year period is primarily controlled by "market demands." | EX. 6 at 16 (DE 202) |
| 52. At the time the Reclamation Plan was created in 2002, the area "scheduled to be mined first" was primarily south of Meiss Road and was expected to take approximately 20 years to complete based upon available projections of both the amount of material available to be mined in the first mining area and anticipated market demand. | EX. 6 at 16 and 26 (DE 202) |
| 53. In 2002, anticipated market demand was tepid since the United States was in a recession during 2001 - 2003. | JH Declaration at 20 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 7

| | |
|---|---|
| 54. This was followed, however, by a real estate boom from approximately 2003 – 2008 when construction proceeded at a frenetic pace as real estate prices shot upward and builders churned out homes, apartments and commercial developments as fast as they could build them. | JH Declaration at 21 |
| 55. The projected amount of aggregate in the area to be mined first was overly-optimistic. | JH Declaration at 22 |
| 56. A combination of inadequate material in the area to be mined first, combined with the dramatic market demand increase starting in 2003, caused the area to be mined first to become significantly depleted in about 5 years rather than the 20 years originally projected. | JH Declaration at 23 |
| 57. Under the Reclamation Plan, once the area scheduled to be mined first became substantially depleted the mining was to be transitioned to the area to be mined second, which was primarily north of Meiss Road as shown on Exhibit F. | JH Declaration at 24; EX. 6 at 16 and 27 (DE 202) |
| 58. The Exhibit F colored map clearly shows beyond any doubt that the Mine's operators were approved to conduct vested mining excavations right up to the bank of the Cosumnes River, which is located along the northern boundary of the area to be mined shown in red on Exhibit F. | EX. 25 (DE 89); EX. 6 at 27 (DE 202) |
| 59. The Reclamation Plan was created over a two-year period from 2000-2002. | EX. 6 at 1 (DE 202); JH Declaration 25 |
| 60. During this period, Jay Schneider initially worked with representatives of Sacramento County to craft the Plan. | EX. 26 at 3 (DE 157) |
| 61. The County, however, had no experience in creating reclamation plans for "unusual" vested mines and therefore the County requested by letter dated June 21, 2000 to OMR employee Pam Ceccarelli that OMR become involved in the process of creating the reclamation plan. | EX. 27 (DE 322) |
| 62. The next day, a meeting was held at OMR's offices at Jay Schneider's request wherein Ms. Ceccarelli's noted that OMR's Reclamation Unit would "help in completing the reclamation plan requirements." | EX. 28 (DE 323) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 8

| | | |
|---|---|---|
| 63. | Further, in an email dated the day after this meeting, i.e., June 23, 2000, an OMR staff member, John Amodio, wrote to Jim Pompey, the Manager of OMR's Reclamation Unit, stating that Sacramento County requested the Department of Conservation, which includes OMR, assist the County "in both reviewing the draft reclamation plan and providing guidance on needed changes to make it adequate. Glenn agreed to both."   The email also goes on to state that OMR staff should work directly with Jay Schneider to arrange to visit the Mine site, and that "Mr. Schneider is very eager for both the assistance and the site visit." | EX. 29 (DE 324) |
| 64. | For example, an August 2000 meeting was held at the Mine site with OMR staff members Karen Wiese and Mike Sandecki, County planner Robert Burness, Jay Schneider and his attorney Pat Mitchell, and Mr. Hardesty. | EX. 30 (DE 328) |
| 65. | On August 24, 2000, OMR provided County planner Burness with recommendations for the draft reclamation plan based upon that site visit.  Included in those recommendations were many suggestions ultimately incorporated into the final Reclamation Plan, including, but not limited to: 1) adding maps showing areas disturbed before 1975 and areas proposed to be disturbed in the future; 2) provisions stating that reclamation would commence after "completion" of each mining phase; 3) requirements to add topsoil back to areas being revegetated; and 4) multiple reseeding issues, including a list of plant species observed during the site visit. | EX. 31 (DE 330) |
| 66. | These suggestions were adopted because Mr. Burness included many of OMR's recommendations in his letter to Jay Schneider dated September 28, 2000 discussing proposed amendments to the draft reclamation plan, which letter was copied to three OMR employees, i.e., Mike Sandecki, Karen Wiese and Pam Ceccarelli. | EX. 32 (DE 331) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 9

| | |
|---|---|
| 67. After Mr. Burness's September 28, 2000 letter to Jay Schneider, another meeting was then held at the Mine site on November 6, 2000.  Again, OMR staff met with Mr. Schneider to discuss the draft reclamation plan and suggestions for improving same.  After the meeting, OMR's Karen Wiese sent several pages of information to Mr. Schneider and suggested that he could "cut and paste" this information into the draft reclamation plan. | EX. 33 (DE 333) |
| 68. A comparison between the information she sent and the final Reclamation Plan shows that Mr. Schneider did indeed incorporate most of her suggestions verbatim into the Plan. | Compare EX. 6 (DE 202) with EX. 33 (DE 333) |
| 69. The next involvement by OMR appears to have occurred on March 7, 2001 when Jim Pompey wrote to Mr. Burness asking that the draft reclamation plan be revised because it was not complete, required reorganization and contained redundancies. The letter requests that Sacramento County address these issues and then submit a more complete reclamation plan for review. | EX. 34 (DE 335) |
| 70. Approximately 4 months later, on July 8, 2008, the County did exactly that by sending a revised draft of the reclamation plan to OMR. | EX. 35 (DE 336) |
| 71. This revised draft was faxed to OMR exactly one month in advance of the first hearing before the County Board of Supervisors to consider the reclamation plan. | EX. 26 at 1 (DE 157) |
| 72. OMR employee Karen Wiese then appeared at that hearing and provided testimony in support of the reclamation plan. | EX. 26 at 18-24 (DE 157) |
| 73. Nowhere in her testimony did she criticize the draft plan but, rather, she simply discussed appropriate slope angles for the draft plan and advised the Supervisors that they were free to choose any slope angle for the plan that would be consistent with the surrounding topography. | EX. 26 at 21-23 (DE 157) |
| 74. Significantly, under PRC ???, OMR had 30 days to comment upon the revised draft plan sent by the County on July 8, 2002. | EX. 36 (DE 234) at 11; JH Declaration at 26 |
| 75. OMR never issued any such comments within that 30-day period and thus waived its right to comment. | JH Declaration at 27; EX. 36 (DE 234) at 11 |
| 76. Ms. Wiese, however, did appear at the Board of Supervisors hearing on 31st day after the draft plan was sent to OMR by facsimile on July 8, 2002. | EX. 26 at 18 (DE 157) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 10

| | |
|---|---|
| 77. Allowing that her comments should have be accepted despite being one day late, she provided no negative comments about the proposed plan whatsoever. | EX. 26 at 18-24 (DE 157) |
| 78. This does not represent a singling out of a specific project proponent.  Rather, it reflects a greater role by the OMR in project review and an enhanced effort by the County to ensure that reclamation plans meet state requirements." | EX. 8 at 5 (DE 337) |
| 79. For mines located in Sacramento County, the "lead agency" is the County itself. | EX. 37 (DE 130) |
| 80. The point of these financial assurances is to provide a sum of money for the County to perform the reclamation in the event that the land owner fails to do so after the mining is concluded. | EX. 36 at 7 (DE 234); EX. 22 (PRC 2773.1) |
| 81. In order to determine if the Mine was being operated in accordance with all applicable laws, and to evaluate the amount of financial assurances which should be posted each year, the County performed annual inspections of the Mine and also reviewed a "financial assurance cost estimate" ("FACE") usually prepared by an engineer hired by Schneider. | JH Declaration at 28 |
| 82. The County's annual Inspection Report and recommendation regarding the amount of the financial assurances were then sent to OMR for review. | JH Declaration at 29 |
| 83. Although that agency has no authority to change the Inspection Report or control the financial assurance amount, it can provide comments to the County if it disagrees with any of the statements or conclusions in either the inspection report or the financial assurance recommendation. | EX. 38 (Testa Deposition) at 88-105 |
| 84. As noted above, because the Mine's pits did not need to be filled in during reclamation – only pulled back and topsoil added - the amount of work needed to reclaim those pits was expected to be fairly minimal. | JH Declaration at 30; EX. 6 at 32 (DE 202) |
| 85. In addition to re-sloping and adding topsoil, one small area of the pits was greater than 30' deep and needed to be filled in to 30' since the pit depths following reclamation could not exceed 30' deep. | JH Declaration at 31 |
| 86. In addition, the other reclamation work was also minimal since haul roads and the pond used for the processing plant were to be left in place for secondary uses. | JH Declaration at 32 |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 87. Thus, out of the 16 financial assurance cost estimates prepared by three different engineering firms for the Mine over an eight-year period between May 2005 and May 2013, all but two of those FACE reports calculated that reclamation of the Mine would cost less than $200,000. | EX. 39 (Docket #202) at 3 |
| 88. Indeed, even the engineering firm hired by the County to conduct several FACE analyses of the Mine, Geocon, concluded in both December 2009 and April 2010 that the proper financial assurance amount for the Mine was less than $200,000. | EX. 39 (Docket #202) at 3 |
| 89. Following Teichert's continued political pressure on the County, however, Geocon's FACE calculation for the Mine suddenly increased 500% from $164,227 on April 2, 2010, to $835,303 on December 16, 2010. | EX. 39 (Docket #202) at 3 |
| 90. During this brief 6-month time period, from April to December 2010, no substantial physical changes occurred at the Mine. | JH Declaration at 33 |
| 91. Still worried that Schneider and Hardesty might be able to come up with this larger $835,303 FACE amount and thus not be forced out of business, however, the County then upped the ante by providing Geocon with different instructions regarding how to calculate the FACE amount. | EX. 21 (Storelli Deposition) at 78 |
| 92. Using the County's revised instructions, Geocon's November 27, 2012 reclamation estimate suddenly increased another 1,000% from its December 2010 analysis and became $8,817,074. | EX. 40 (DE 300) |
| 93. During the time period between these two FACE calculations (i.e, December 2010 and November 2012), no substantial physical changes occurred at the Mine. | JH Declaration at 34 |
| 94. In 2014, Don Olsen, an engineer with substantial experience in calculating financial assurances for mines, prepared a report analyzing all of the 16 FACE calculations for the above-referenced 8-year period. | EX. 39 (Docket #202) at 1-2 |
| 95. In preparing his report, Mr. Olsen performed a thorough review of documents, reports, and photographs relating to the Mine, spoke with other engineers and geologists knowledgeable about the Mine, performed his own personal site inspection of the Mine, reviewed topographic maps, performed relative elevation field measurements at the Mine, and prepared a table to compare the results of various FACE analyses. | EX. 39 (Docket #202) at 1-2 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 96. The result of these efforts led Mr. Olsen to conclude that the FACE analyses performed by Mr. Schneider (dated May 2005 and July 2005), Holdrege & Kull (dated June 2007, June 2008, March 2009, October 2009, February 2010, May 2010, May 2011, January 2012 and February 2012), Geocon (dated December 2009 and April 2010), and Youngdahl (dated May 2013) all reflected appropriate engineering and geologic analyses establishing that the correct FACE amount for the Mine was at all times less than $200,000. | EX. 39 (Docket #202) at 1-2 |
| 97. Mr. Olsen also prepared a spreadsheet with a summary of these FACE analyses | EX. 39 (Docket #202) at 3 |
| 98. Based upon his analysis, Mr. Olsen concluded that the FACE calculations performed by Geocon in December 2010 and November 2012 are "shocking outliers." | EX. 39 (Docket #202) at 2 |
| 99. Mr. Olsen also determined that these outliers are "highly suspicious" because they are completely unsupportable using standard engineering and geologic principles and practices. | EX. 39 (Docket #202) at 2 |
| 100. Section 20.04.080 of the Sacramento County Code indicates that FACE calculations are to be prepared by a California licensed engineer "retained by the operator." | EX. 39 (Docket #202) at 2; EX. 22 (Sacramento County Code Section 20.04.080(D)) |
| 101. The County, however, did not follow this law, but, rather, retained its own engineer, i.e., Geocon, to perform the FACE calculations. | EX. 21 (Storelli Deposition) at 70-71 |
| 102. Additionally, when updating a previous FACE amount already in existence, the Code requires that the FACE be adjusted to account for 3 factors: 1) new lands disturbed by surface mining operations (i.e., an upward adjustment if new lands are disturbed); 2) inflation (also an upward adjustment); and 3) a downward adjustment for any reclamation of lands accomplished since the prior FACE amount. | EX. 22 (Sacramento County Code Section 20.04.080(G)) |
| 103. The County's revised FACE amount, however, increased over 1,000% even though no new lands were disturbed, there was no inflation and the land had been partially reclaimed, which should have resulted in a downward adjustment from the prior FACE amount. | JH Declaration at 35; EX. 39 (Docket #202) at 2-3 |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 104. Mr. Olsen concluded that the two written FACE caluations were "highly suspicious" "for at least four primary reasons: A) The analyses do not comply with the law regarding financial assurances (including, without limitations, Sacramento County Code Section 20.04.080); B) They drastically increase the financial assurances required despite no significant changes occurring on the Property; C) They erroneously rely upon a wholly inapplicable theory known as "Pit Capture" which has no utility in relation to the [the Mine] since mining is not occurring in the river channel and the adjacent river banks to the north are lower than those to the south; and D) The calculations appear to deliberately include unnecessary and artificially inflated costs designed to intentionally increase the FACE amount, while simultaneously ignoring appropriate and available restoration methods which would dramatically reduce that FACE amount." | EX. 39 (Docket #202) at 2 |
| 105. At no time should the FACE amount have ever exceeded $200,000. | EX. 39 (Docket #202) at 1-3 |
| 106. Beginning in 2001, Schneider filed annual reports with OMR regarding the mine. | EX. 41 (DE 339); EX. 42 (DE 340); EX. 43 (DE 341); EX. 44 (DE 345); EX. 45 (DE 348); EX. 13 (DE 350); EX. 46 at 3-9 (DE 352) |
| 107. Additionally, Schneider forwarded to OMR the County's reports detailing its inspections of the Mine for compliance with the mining laws. | EX. 45 (DE 348); EX. 13 (DE 350); EX. 46 (DE 352) |
| 108. Schneider's 2002 Annual Report was received by OMR on July 3, 2003. | EX. 42 (DE 340) |
| 109. The comments to this report note that the Mine's Reclamation Plan was approved by Sacramento County as the lead agency on November 6, 2002. | EX. 42 at 4 (DE 340) |
| 110. The comments to both the 2002 and 2003 annual reports also note that reclamation of the Mine will begin pursuant to the Reclamation Plan as soon as an area is complete and not subject to further excavation. | EX. 42 at 4 (DE 340); EX. 43 at 4 (DE 341) |
| 111. No objection was ever voiced by OMR to either the adopted Reclamation Plan or that reclamation would not commence until an area was completed - until after the political corruption began five years later in 2008. | JH Declaration at 36 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 14

| | |
|---|---|
| 112. Similarly, subsequent annual reports also comment that required reclamation under the Plan has not yet commenced because no mining areas were completed, but note that voluntary reclamation is occurring on areas not yet deemed complete and "substantial areas have been fully reclaimed" with regard to re-sloping and revegetation. | EX. 44 (DE 345); EX. 45 (DE 348); EX. 13 (DE 350) ; EX. 46 (DE 352) |
| 113. The 2005 Annual Report also attaches Sacramento County's "Surface Mining Inspection Report" containing the results of its inspection on March 21, 2005. | EX. 45 (DE 348) |
| 114. The Inspection Report shows that no permit for the Mine is required, i.e., permits are noted as "N/A" because the Mine is vested | EX. 45 (DE 348) |
| 115. In addition, the inspector found that the Mine was in full compliance in all regulatory categories, notably including revegetation, stream protection, backfilling, regrading, slope stability, recontouring, drainage, diversion structures, waterways and erosion control. | EX. 45 (DE 348) |
| 116. Finally, the inspector noted no corrective action was required, and found that there were no violations at the Mine. | EX. 45 (DE 348) |
| 117. Similarly, the 2006 Annual Report also attaches the County's 2006 Inspection Report. | EX. 13 (DE 350) |
| 118. This inspection was conducted on December 27, 2006. | EX. 13 (DE 350) |
| 119. The inspection form at this point is slightly revised, and therefore under section IV regarding whether the Mine needs a permit the inspector noted "N/R" meaning "not required," again due to the Mine's vested right. | EX. 13 (DE 350) |
| 120. In addition, section VIII of the 2006 Annual Inspection Report specifically notes that the Mine is "a vested mine – no use permit required." | EX. 13 (DE 350) |
| 121. Just like the 2005 Report, the 2006 Inspection Report again finds the Mine to be in full compliance in all regulatory categories, including revegetation, stream protection, backfilling, regrading, slope stability, recontouring, drainage, diversion structures, waterways and erosion control. | EX. 13 (DE 350) |
| 122. Also like in 2005, the inspector noted no corrective action was required, and found that there were no violations at the Mine. | EX. 13 (DE 350) |
| 123. The Mine was not inspected in 2007 due to a "scheduling error" by Sacramento County | EX. 46 (DE 352) at section VIII |
| 124. The next inspection therefore occurred on June 25, 2008. | EX. 46 (DE 352) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 15

| 125. The 2008 Inspection Report was issued by Sacramento County the next day, June 26, 2008. | EX. 46 (DE 352) |
| 126. Again, the Mine is noted as "N/R" under required permits because the Mine is vested and does not need a permit. | EX. 46 (DE 352) |
| 127. Also, just like the 2005 and 2006 Inspection Reports, the Mine was found to be in full compliance with all regulatory categories, including revegetation, stream protection, backfilling, regrading, slope stability, recontouring, drainage, diversion structures, waterways and erosion control. | EX. 46 (DE 352) |
| 128. Finally, again just as in 2005 and 2006, the inspector noted no corrective action was required, and found that there were no violations at the Mine. | EX. 46 (DE 352) |
| 129. Thus, as of June 26, 2008, the Mine had been inspected by the lead agency without a single violation being found. | EX. 46 (DE 352) |
| 130. It is important to note that besides the County being on notice as to what was occurring at the Mine through its inspections and subsequently-issued Inspection Reports, OMR was also on notice of events at the Mine through receiving the Inspection Reports, the Annual Reports and also the FACE reports filed with the County and then sent on to OMR. | See, e.g., EX. 47 (DE 343); EX. 48 (DE 349); EX. 46 (DE 352) |
| 131. Thus, for example, in the 2005 FACE report, received by OMR on May 11, 2005, the Mine owner, Schneider, describes in detail both what has occurred at the Mine during the past year and also what is expected to occur in the next year. | EX. 47 (DE 343) |
| 132. The report notes that the operator (Hardesty) has begun excavation in "Area 4" north of Meiss Road approximately 1 mile northwest of the primary stockpile/processing area. | EX. 47 (DE 343) |
| 133. This "Area 4" is located on the property designated to be mined second under the Reclamation Plan, and was thus notice to both the County and OMR that mining operations were beginning to slow down in the area to be mined first and were thus being transitioned to the area to be mined second under the Plan. | EX. 6 at exhibit F (DE 202); EX. 47 (DE 343); JH Declaration at 37 |
| 134. In addition, the 2005 FACE reported details to both the County and OMR that Hardesty would be setting up a processing plant and pond in Area 4. | EX. 47 (DE 343) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 135. The report further states that in Area 5 (also on property to be mined second under the Plan), "sand is being excavated from a terrace deposit along the Cosumnes River. This pit, covering @8 acres, will be excavated to a depth of approximately 30 ft. and will proceed in a generally southerly direction.  Pit walls are steep and would require contouring to meet final requirements." | EX. 47 (DE 343) |
| 136. Thus, both the County and OMR knew by, at the latest, May 11, *2005* that the Hardestys had begun excavating along the southern bank of the Cosumnes River to a depth of approximately 30 feet – and that all of this was occurring in the second area allowed to be mined as shown on Exhibit F to the Reclamation Plan. | EX. 6 at exhibit F (DE 202); EX. 47 (DE 343) |
| 137. The next FACE report for the Mine was received by OMR on June 27, 2007. | EX. 48 (DE 349) |
| 138. This report notes under Area 4 that since the prior report "the processing plant has been relocated to this area." | EX. 48 (DE 349) |
| 139. Under Area 5, the report for excavation along the Cosumnes River is identical to the prior report except that the pit had at that point grown from 8 acres to 15 acres. | EX. 48 (DE 349) |
| 140. In addition, the report notes that "haul roads and ponds will be left in place as part of secondary use." | EX. 48 (DE 349) |
| 141. The next year, on June 30, 2008, the County and OMR received a FACE report dated June 2008 sent along with the County's 2008 inspection of the Mine. | EX. 46 (DE 352) |
| 142. The FACE report states that in Area 5 "sand is excavated from a terrace deposit along the Cosumnes River.  This pit, covering @30 acres, will continue to be excavated to a depth of approx 30 ft and will proceed in a generally easterly direction." | EX. 46 (DE 352) |
| 143. The County's annual inspection of the Mine, which also occurred in June, 2008, showed that the Mine was full compliance with all required inspection categories, including those categories obviously relevant to the pit being excavated along the river such as backfilling, regrading, slope stability, recontouring, drainage and "waterways." | EX. 46 (DE 352) |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 144. Once again, despite obviously knowing about it, neither Sacramento County nor OMR registered any objection to the Hardestys continuing to excavate along the river to a depth of approximately 30 feet as clearly described in all three of the 2005, 2007 and 2008 FACE reports. | JH Declaration at 38 |
| 145. In response to an email inquiry from Supervisor Roger Dickenson's office to Sacramento County's Code Enforcement on October 31, 2008 about a possible code enforcement violation at "Hardesty Mining" on Meiss Road, Jeff Gamel, who was then in charge of aggregate mines for Sacramento County, thought there had been some type of mistake. | EX. 12 (DE 164) |
| 146. Mr. Gamel wrote back suggesting that they were probably talking about another person, a miner named Steven Hardesty rather than Joe Hardesty, because Joe Hardesty "is vested to mine on Jay Schneider's property which is located on Meiss Road" and, as far as Mr Gamel knew, there was "no active Code enforcement case on the Meiss Road property." | EX. 12 (DE 164) |
| 147. These regulators include Jana Affonso at the U.S. Fish and Wildlife Service, who refused to manufacture Fish and Wildlife violations – such as Endangered Species Act allegations - which could be used to shut down the Mine despite pressure from Congressman Lungren's Office to do so. | EX. 49 (DE 26) |
| 148. This is because he admitted being initially tasked by his boss to pursue alleged violations against the Hardestys and write a letter dated June 2, 2008 which ordered the Hardestys to "cease and desist" their mining operation without even first visiting the property or giving them any notice, a hearing or right to appeal. | EX. 51 (DE 1) |
| 149. Later, however, Mr. Simmons came to realize that the Hardesty investigation was "political" in nature. | EX. 50 (Simmons 1st Deposition) at 81:12-82:21 |
| 150. This became pretty obvious when both Congressman Dan Lungren's office and Teichert kept repeatedly contacting him to discuss the status of the investigation. | EX. 50 (Simmons 1st Deposition) at 69:10-19; EX. 52 (DE 2); EX. 53 (DE 3); EX. 54 (DE 10); EX. 55 (DE 12) |
| 151. As a result, Mr. Simmons chose to honestly tell Congressman Lungren's staff that if there were any potential wetland violations at the Mine they were minor and "did not impact a large number of waters of the United States similar to those proposed by the other mining companies whom have complained about Hardesty." | EX. 52 (DE 2) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 152. This comment obviously referred to Teichert's attempt to permit a mine across Meiss Road from the Hardesty Mine which would have negatively impacted over 60 acres of wetlands. | EX. 56 (DE 4); JH Declaration at 84 |
| 153. Mr. Simmons determined that if any Army Corp permit was needed by the Hardestys at all due to an alleged creek impoundment potentially affecting a tiny area (i.e, less than one-sixth of an acre), that, rather than shut down the Mine, an "after the fact" permit should simply be offered to the Hardestys if they would remove the small impoundment. | EX. 50 (Simmons 1st Deposition) at 06:3-8; 47:10-13; 72:1-23 |
| 154. Mr. Simmons thereafter refused to further investigate any alleged violations against the Hardestys -- even though Defendant Gay Norris tried mightily to entice him into pursuing the unsubstantiated "violation" asserted in the June 2, 2008 letter. | EX. 57 (DE 106) |
| 155. Defendant Norris also encouraged Mr. Simmons to participate in a joint "task force" with other agencies to find violations against the Hardestys, which he refused to do. | EX. 57 (DE 106) |
| 156. As a result of all these facts, the Army Corps' recognized that the cease and desist letter drafted by Mr. Simmons on June 2, 2008 should be retroactively rescinded, and this was done by a subsequent letter dated August 29, 2012. | EX. 58 (DE 51) |
| 157. Teichert was so brazen about its plan to put the Hardestys out of business that they even put that plan in writing and shared it with others. | Diane Anderson Declaration; EX. 59 (DE 215) |
| 158. The plan called for convincing the California Air Resources Board to repeal its air quality permit issued to Hardesty or, if that failed, to convince Sacramento County to revoke the Mine's vested right. | Diane Anderson Declaration; EX. 59 (DE 215) |
| 159. To implement this plan, Teichert put pressure on politicians and regulators alike through constant telephone calls, letters, emails and meetings demanding that the Hardestys be found in violation of *some* law in order to eliminate their vested right to mine. | EX. 19 (DE 281) – see also EX. 17 (DE 7); EX. 20 (DE 358); EX. 60 (DE 360) |
| 160. Teichert even hired Congressman Dan Lungren's brother, Brian Lungren, a professional lobbyist, to lobby his own brother to put Hardesty out of business. | JH Declaration at 39; EX. 18 (DE 77); EX. 61 (DE 241) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 19

| | |
|---|---|
| 161. As a result of all these efforts, Teichert was successful in having Congressman Lungren, state Senator David Cox and Roger Dickenson, Chairman of the County Board of Supervisors, all put pressure on regulators to find or create regulatory violations at the Mine. | JH Declaration at 40; EX. 62 (DE 58) |
| 162. Lungren's staff pressured the U.S. Fish and Wildlife Service and the Army Corp of Engineers, Cox pressured the California Department of Conservation ("DOC" - which includes the Department of Fish and Game ("DFG"), the State Mining and Geology Board ("SMGB") and OMR), and Dickerson pressured the Sacramento County staff. | See, e.g., EX. 52 (DE 2); EX. 17 (DE 7); EX. 54 (DE 10); EX. 1 (DE 33) |
| 163. In exchange, Teichert provided financial contributions to each of their campaigns. | KH Declaration |
| 164. Indeed, Teichert's largest donation to Senator Cox's campaign came within 30 days of him writing a letter dated October 3, 2008 to the Department of Conservation urging a "coordinated review" by multiple state agencies into false violations against the Hardestys set forth in the letter. | KH Declaration |
| 165. The Senator Cox letter immediately set off a firestorm of regulatory activity, including hundreds of emails discussing how to go about finding violations against the Hardestys. | See, e.g., EX. 63 (DE 30); EX. 64 (DE 31); EX. 65 (DE 32); EX. 66 (DE 34); EX. 67 (DE 35); EX. 68 (DE 36); EX. 69 (DE 37); EX. 70 (DE 39); and EX. 71 (DE 40) |
| 166. One of the first steps taken in response to the Cox letter was to decide to inspect the Mine to find violations, even though as of October 29, 2008, the Department of Fish and Game already had "7 or 8 folks visit the site and they've found nothing at the site to warrant them doing anything further." | EX. 72 (DE 41) |
| 167. Not letting this fact stand in the way of appeasing Senator Cox, DOC requested that the Hardestys allow a search of the Mine. | EX. 73 (DE 43) |
| 168. The Hardestys's lawyer, Scott Morris, indicated that an inspection could only occur if DOC was first willing to answer his questions about "who's putting you all up to this" and to "find out who's behind this." | EX. 73 (DE 43) |
| 169. Rather than answering those questions and disclosing that the inspection was at the behest of a politician acting on behalf of Hardestys' competitor, DOC – acting through Dennis O'Bryant – instead chose to obtain an administrative search warrant to inspect the Mine. | EX. 73 (DE 43) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 20

| | |
|---|---|
| 170. This search – which Scott Morris later described as more of a "raid" since at least 7 regulatory agents and 2 California Highway Patrol law enforcement officers showed up at the site - was conducted on December 23, 2008. | EX. 75 (Morris Deposition) at ???; EX. 62 (DE 58) |
| 171. In the Raid Report, Mr. Koehler orders (without any jurisdiction to do so) that the Hardestys: 1) "must cease and desist" their primary mining operations indefinitely because of the alleged potential for "pit capture" to occur; 2) drastically increase the Mine's financial assurances; 3) amend the Mine's Reclamation Plan "to reflect current site conditions in compliance with all SMARA statues and regulations" (i.e., require a reclamation plan like those applicable to non-vested mines); and 4) re-slope and reseed the pit walls even though mining in the pit area was not yet complete. | EX. 74 (DE 222) |
| 172. In truth, Mr. Koehler had no authority whatsoever to order any of these actions because OMR was not the lead agency for the Mine. | EX. 76 (Koehler Deposition) at 44:15-45:6 |
| 173. For example, there never was any danger of "pit capture" at the Mine, and this was made clear to OMR when a Superior Court Judge threw out OMR's request for a TRO relying upon that absurd theory. | EX. 62 (DE 58) |
| 174. Attorney Scott Morris, who is also an engineer and was formerly in charge of overseeing the integrity of all levees in Sacramento County for the Army Corp of Engineers, called the pit capture theory "ridiculous" and further stated that the natural bank between the pits and the river was stronger than any levee in all of Sacramento County. | EX. 75 (Morris Deposition) at 11-12; 49-52; 98; EX. 62 (DE 58) |
| 175. Further, engineer Don Olsen's report points out that the entire theory of "pit capture" is wholly inapplicable here because it only applies when mining is actually occurring in the river channel, not outside the river banks. | EX. 39 (Docket #202) at 2 |
| 176. Even if the theory could be applied, however, the pits are located on the south side of the river banks, which are on the inside of a curve in the river, and the north river banks on the outside of the curve are 6 feet lower than the inside banks. | EX. 39 (Docket #202) at 2 |
| 177. Thus, in the event of a flood, the water will naturally overtop the north banks rather than be captured on the inside of the curve. | EX. 77 (Olsen Deposition) at ?? |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 21

| | |
|---|---|
| 178. Finally, Dennis O'Bryant effectively admitted that OMR abandoned this pit capture theory because they never further pursued it after the Court denied their TRO. | EX. 78 (O'Bryant Deposition) at 117-120 |
| 179. Next, the Raid Report claimed that the financial assurances for the Mine must be drastically increased because the amount of area disturbed was 180 acres rather than the 40 acres covered by the existing financial assurance. | EX. 74 (DE 222) |
| 180. Setting aside for a moment that the existing financial assurance had already been received by OMR without objection. | EX. 79 (DE 355) |
| 181. the revised acreage calculation was simply false -- only a few months earlier Sacramento County had determined that the disturbed acreage was only 39 acres, and the Mine had not significantly changed since that June 2008 calculation occurred. | JH Declaration at 41; EX. 46 (DE 352) |
| 182. Finally, the Raid Report claims that the Reclamation Plan must be amended since it was improperly adopted because "[t]he County failed to send the draft reclamation plan to OMR for comment as required by Public Resources Code (PRC) Section 2774(c)." | EX. 74 (DE 222) |
| 183. Despite this fact, the Raid Report further finds the Hardestys in violation of the allegedly-defective Reclamation Plan because the pit slopes were not yet re-sloped and reseeded, completely ignoring that such re-sloping and reseeding were not required under the Reclamation Plan until mining in the pit area was deemed complete and no further disturbance was anticipated. | EX. 6 at 15 (DE 202); EX. 74 (DE 222) |
| 184. What is perhaps most shocking about the Raid Report is that OMR had all of the information which it claimed constituted "Violations" already in its files. Obviously, OMR had both the draft Reclamation Plan and even the final approved Plan in its files, along with many documents showing that OMR worked closely with the County on developing that Plan. | EX. 27 (DE 322); EX. 28 (DE 323); EX. 29 (DE 324); EX. 80 (DE 325); EX. 81 (DE 326); EX. 82 (DE 327); EX. 30 (DE 328); EX. 83 (DE 329); EX. 31 (DE 330); EX. 32 (DE 331); EX. 35 (DE 336); EX. 42 (DE 340) at 4 |
| 185. As also noted above, several FACE reports filed with OMR prior to the raid informed them that excavation was occurring along the south river bank with steep pit walls in the exact location where the pits were found, and these reports were previously received by OMR without any objection. | EX. 47 (DE 343); EX. 48 (DE 349); EX. 46 (DE 352); JH Declaration at 42 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 22

| | | |
|---|---|---|
| 1 2 3 | 186. It was only after OMR sought to placate a powerful Senator that these previously-known facts suddenly became the alleged "Violations" set forth in the Raid Report under Heading 2.0. | JH Declaration at 43; EX. 74 (DE 222) |
| 4 5 | 187. The laundry list of false allegations from the Raid Report next appears in a Memo dated March 3, 2009 prepared by Dennis O'Bryant. | EX. 84 (DE 46) |
| 6 7 8 9 | 188. OMR was "thwarted" in its efforts to inspect the Mine in November by the operator (false – OMR could have obtained the operator's approval for an inspection if it had simply been willing to tell the operator's lawyer, Mr. Morris's, who was "behind" the investigation, but OMR chose to keep that information secret and instead obtain a search warrant) | EX. 73 (DE 43) ; EX. 84 (DE 46) |
| 10 11 12 13 14 15 16 | 189. The approved Reclamation Plan "failed to meet any of the mandatory reclamation standards adopted in 1992 by the State Mining and Geology Board" (false – the Reclamation Plan was prepared with OMR's assistance and OMR even drafted portions of the Plan, OMR did not timely object to the draft reclamation plan and thus waived any objections, and OMR even testified to the County Board of Supervisors in support of the Plan, so any alleged Plan deficiencies being raised by OMR 6 years later are clearly either false or pre-textual | JH Declaration at 44 |
| 17 18 | 190. The mining pits are "50 – 60 feet deep" (false – the pits were only 30 feet deep except for in one small area, where the depth was still less than 35 feet | JH Declaration at 45; EX. 85 (DE 289) |
| 19 20 | 191. Water was entering the pits from the river (false – water entering the pits was natural groundwater – there was no hydrologic connection between the pits and the river) | JH Declaration at 46 |
| 21 22 23 | 192. the risk of "pit capture" in any "high water event" was "imminent and substantial "(false – pit capture was never a risk – this was simply a pre-text to try to shut down the Mine) | EX. 62 (DE 58); EX. 39 (Docket #202) at 2 |
| 24 25 26 27 | 193. The "[p]it depth in the approved plan is limited to a maximum of 30 feet" and that pit walls needed to be re-sloped and reseeded under the Reclamation Plan (false – the pit depth limit of 30 feet refers only to pits being reclaimed under the Plan and has nothing to do with depths of the pits during operation of the mine since such operations are not controlled by the Plan) | EX. 6 at 15-16 (DE 202) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 23

| | |
|---|---|
| 194. Mandatory re-sloping and reseeding requirements had not been met (false – those mandatory requirements only apply under the Plan until an area is complete and no further mining will occur; until then the operator only needs to re-slope and reseed when "practical") | EX. 6 at 15 (DE 202) |
| 195. To be included on the AB3098 list, a mine needs be current on its annual reports and have a reclamationplan and financial assurances in place which have been approved by the lead agency. | EX. 86 (DE 315); JH Declaration at 47 |
| 196. As of late 2008 and early 2009, when the Hardestys were selling material to EBMUD, they met all three of these requirements. | JH Declaration at 48 |
| 197. First, their 2008 annual report had been filed and accepted by OMR. | EX. 46 (DE 352); EX. 87 (DE 353); JH Declaration at 49 |
| 198. Second, their Reclamation Plan had been approved by the lead agency, i.e., Sacramento County. | EX. 6 (DE 202); JH Declaration at 50 |
| 199. Third, their financial assurances were in place and approved by the lead agency. | JH Declaration at 51; EX. 75 (Morris Deposition) at ???; EX. 79 (DE 355) |
| 200. Thus, there is no doubt that the Hardestys should have been confirmed on the AB3098 list back in June, 2008, and no explanation has ever been found as to why OMR did not have them on the list.  Once this oversight was discovered, however, and upon the request of Mr. Morris, OMR did confirm on February 4, 2009 that the Mine was on the list | JH Declaration at 52; EX. 88 (DE 307) |
| 201. Of course, OMR made certain that did not last long.  Six weeks later, on March 18, 2009, Dennis O'Bryant wrote to the Hardestys removing them from the AB3098 list effective immediately. | EX. 89 (DE 64); JH Declaration at 53 |
| 202. This letter relies on the same laundry list of false accusations created in the Raid Report and, in particular, stating that an amended reclamation plan would need to be submitted *by the County* and approved by OMR before the Hardestys would be considered for reinstatement to the list. | EX. 89 (DE 64) |
| 203. The Hardestys were never afforded any hearing or other due process rights before being removed from the AB3098 list. | JH Declaration at 54; EX. 89 (DE 64) |
| 204. Meanwhile, other mines in Sacramento County were allowed to remain on the AB3098 list for many years even though they had no FACE on file at all, had failed to update their FACE amounts, or failed to post their financial assurances mechanisms. | DE 63 |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 205. And, when OMR finally decided to take action regarding these other mines, it advised Sacramento County on February 10, 2009 [letter erroneously dated 2008] that it would give all of these other mine operators 30 days to cure these issues before removing them from the AB3098 list. | Trott Deposition at ???; DE 63 |
| 206. This is because it was OMR's policy to give at least 30 days' notice to a mine operator to allow them to rectify any potential problem before being removed from the list. | Trott Deposition at ???; DE 63 |
| 207. OMR points to a letter where another operator was alleged removed from the list effective immediately as evidence that Hardesty was not treated differently than other operators, but, in that instance, the operator had already been afforded a hearing on the alleged violation in question and thus had an opportunity to rectify the problem. | EX. 86 (DE 315) |
| 208. Five weeks later, however, OMR did not follow that same policy when it came to the Hardestys, or offer them the same due process opportunity to cure given to all of the other mines. | EX. 89 (DE 64) |
| 209. On March 18, 2009, the same day as the Hardestys were taken off of the AB3098 list, their attorney, Scott Morris, wrote a letter to Stephen Testa, the Executive Officer of the State Mining and Geology Board, appealing the decision to remove the Hardestys from the list. | DE 316 |
| 210. Despite the fact that Mr. Testa knew the Hardestys had been removed from the list effective immediately and without any prior due process as afforded other miners, he instructed Dennis O'Bryant to deny the request for an appeal. | EX. 38 (Testa Deposition) at 71-101 |
| 211. Mr. Testa also did this knowing how serious removal from the list can be, and that such removal could result in the Hardestys going out of business if they could not sell to public agencies. | EX. 38 (Testa Deposition) at 73 |
| 212. Teichert never even tried to hide this fact, and, as one regulator, Jason Marshall, wisely recognized, the issue raised by Senator Cox's letter "***isn't just about compliance with the law***; Senator Cox's letter is also about ***competitive advantage*** and, potentially, ***terminating a contract between one operator and a public agency*** because of their noncompliance." | EX. 72 (DE 41) |

Robertson, Johnson, Miller & Williamson 50 West Liberty Street, Suite 600 Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 25

| | |
|---|---|
| 213. Further, as Scott Morris, a highly respected lawyer and engineer at the Kronick Moskovitz firm, stated at his deposition, the regulators were obviously trying to put the Hardestys out of business because they kept moving the goalposts no matter what steps the Hardestys took to meet their demands. | EX. 75 (Morris Deposition) at ??? |
| 214. Mr. Morris's October 28, 2009 letter to OMR cogently sums up the situation:<br><br>   "In conclusion, I hope you can see how and why Hardesty feels betrayed by an agency of the very government they support.  I certainly feel that way.  This entire situation has been an epiphany for me.  Being someone who once worked for the U.S. Army Corps of Engineers, I have generally supported governmental agency actions, typically explaining their position to clients and usually being successful in bringing the client around to the agency point of view, or at least much closer.  This is far different.  For the first time I have seen firsthand what the abuse of power of government can do; how a politically motivated attack ordered from the highest levels can ruin lives and cost people hundreds of thousands of dollars, if not more.  Frankly, you should be ashamed of being a part of such a thing.  I can only hope that you will take this opportunity to re-evaluate your position and put an end to this whole shameful series of events." | EX. 62 (DE 58) |
| 215. To further this goal of putting the Hardestys out of business, Defendant Gay Norris actually followed trucks leaving the Hardesty Mine in hopes of finding one delivering material to a public entity. | Norris Deposition at 12; 101-106, 121, 151; JH Declaration at 56 |
| 216. When she did find one, she immediately went to the job engineer at that site and told them it was illegal to buy material from Hardesty. | Norris Deposition at 106-109; JH Declaration at 55-56 |
| 217. This conduct was, of course, in furtherance of exactly what Mr. Marshall realized Senator Cox was requesting – to terminate a public contract between the Hardestys and a public agency. | EX. 72 (DE 41); JH Declaration at 55 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 218. And, it is almost certainly no coincidence that Ms. Norris was attempting to break that particular contract between EBMUD and the Hardestys, since it was a multi-million dollar contract for replacement of a "huge" sewer line which ran directly in front of the Teichert facility, but Teichert did not win the bid on that project because their price was too high. | Norris Deposition at 106-108,112 -121; JH Declaration at 55, 57 |
| 219. The Hardestys had all their documents in place to be on the AB3098 list, i.e., financial assurances and an approved Reclamation Plan from the lead agency, and a current annual report accepted by OMR.  Why they were not on the list is apparently a mystery.  But, we do know for certain is that Gay Norris reviewed the Mine's OMR, its reclamation plan and its financial assurances before December 23, 2008. | Norris Deposition at 33, 112-114, 115-121 |
| 220. In doing so, she checked to see if the Hardestys had all of the necessary documents on file in order to be on the AB3098 list. | Norris Deposition at 33, 112-114, 115-121 |
| 221. Accordingly, when she discovered 2 weeks later that the Mine was somehow not on the AB3098 list, she should have immediately realized this was a mistake since all the required documents were on record. | Norris Deposition at 33, 112-114, 115-121 |
| 222. Rather than seeking to correct this error, however, so that OMR's records would be accurate and the Hardestys could legally sell their material, she instead chose to capitalize on her agency's mistake by threatening the EBMUD job engineer with civil penalties – *all while knowing from her review of the file that the Hardestys should have been on the AB3098 list.* | Norris Deposition at 33, 106-109 |
| 223. Finally, about 3 weeks after her first discussion with the EBMUD engineer, Ms. Norris became aware that OMR issued a letter confirming the Hardestys were on the AB3098 list. | Norris Deposition at 150-153, 115, 150 |
| 224. Despite this fact, she never conveyed this information to the EBMUD engineer. | Norris Deposition at 150-153 |
| 225. Using false statements to support an Affidavit submitted to the California Superior Court on , Sacramento County obtained a criminal search warrant for the Mine on May 13, 2009. | EX. 50 (Simmons 1st Deposition) 1st Deposition at 196, 213-216,218-219; Taras Deposition 80; DE 27 |
| 226. In performing that search, the County asked Curt Taras of the Central Valley Flood Protection Board ("CVFPB") to assist in executing the warrant. | Taras Deposition 79-81; DE 274; DE 275 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 227. Indeed, the most powerful person in the County, i.e., Chairman of the County Board of Supervisors Roger Dickenson, personally called Mr. Taras's boss, Jay Punia, and requested that Mr. Punia provide Mr. Dickenson with regular updates on the status of Mr. Taras's investigation. | Taras Deposition at 115, 83-84 |
| 228. Mr. Punia passed this information on to Mr. Taras and requested such regular updates so that Mr. Punia could respond back to Mr. Dickenson. | Taras Deposition at 114-115 |
| 229. As a result of Mr. Taras's cooperation in the County's search, he issued a letter to Mr. Hardesty dated May 28, 2009 alleging that various water code regulations had been "violated" at the Mine, and simultaneously issued an identical letter to Mr. Schneider. | DE 296 at Ex. A; DE 278 |
| 230. This entirely deceitful letter specifically ordered that the Mine "cease and desist" all work at the site, including all "excavation work" being performed at the Mine (the "Cease and Desist Letter"). | DE 278 |
| 231. The Cease and Desist Letter, however, is littered with lies. First, it claims that "open mining pits have been made in the Cosumnes River designated floodway." | DE 278 |
| 232. Not only is this statement outrageously dishonest, but Mr. Taras knew it was false and tried to support this deceit by deliberately manipulating the floodway maps in order to create an exhibit which placed even the tiniest sliver of the mining pits within the designated floodway. | DE 284 |
| 233. The truth is that the official CVFPD floodway maps clearly show no portion of the mining pits were ever within the designated floodway. | Taras Deposition at 144-149; DE 286; DE 287 |
| 234. After this lawsuit was filed, Mr. Taras submitted a Declaration to this Honorable Court in support of a motion to dismiss filed on his behalf ("Declaration"). | DE 296 - Docket #91 |
| 235. At page 2 of that Declaration, Mr. Taras dropped all pretext and admitted that the mining pits were never in the designated floodway but, rather, that they were simply *near* the floodway, i.e., "During that inspection we documented the mining site *and its proximity to* the Cosumnes River Designated Floodway." | DE 296 - Docket #91 - emphasis added |
| 236. Further, on the next page, Mr. Taras's Declaration states that during his inspection he observed "two mining pits *adjacent to* the Cosumnes River Designated Floodway." | DE 296 - Docket 91 - emphasis added |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 28

| | |
|---|---|
| 237. Mr. Taras stated that the pits were "50 feet deep" when he inspected them. | DE 278 |
| 238. As to the eastern pit, Mr. Taras did not measure the pit depth from the surface level of the ground but, rather, he measured the pit depth *in relation to the top of the river bank,* which was 30 feet tall. | DE 273 |
| 239. The actual depth of the eastern pit was only 20 feet below ground level. | DE 273 |
| 240. As to the western pit, at deposition Mr. Taras admitted that *he never measured that pit at all* and thus had no idea how deep it was. | Taras Deposition at 60-65 |
| 241. This is a far cry from his statement in the Cease and Desist Letter that the "excavation pits are 50 feet deep." It is an even farther cry from his statement to this Honorable Court in his Declaration, where he swore that the pit depths exceeded "50 feet below *the surface of the river.*" | DE 296 – emphasis added |
| 242. At a hearing before the CVFPB on March 25, 2011, Mr. Taras admitted that there is only questionable authority in the California Water Code [Title 23] for him as a flood official to issue a notice of violation. | DE 292 |
| 243. Perhaps this explains why Mr. Taras lied to his own Board at a hearing held on September 23, 2010 when he stated that the Cease and Desist Letter he issued was only a notice of violation, and specifically told the Board that "a cease and desist was not issued." | DE 276 |
| 244. Mr. Taras knew that it was against the CVFPB's protocol for him to communicate with lawyers for Teichert - a competitor of the Hardestys - while he was investigating the Mine. | Taras Deposition at 109 |
| 245. Despite this fact, he told Teichert's lawyers on Ausust 23, 2010 that "he would be interested in sitting down with [them]" to discuss the Hardesty situation. | Taras Deposition at 118; DE 279 |
| 246. Teichert's lawyers wanted to speak with Mr. Taras about making a presentation on behalf of the CVFCB to the Sacramento County Board of Supervisors at the September 14, 2010 hearing (on whether the Mine was in violation of the County's zoning code). | DE 279 |
| 247. The meeting was then set for Wednesday, September 8, 2010, i.e., six days before the hearing. | DE 280 |
| 248. Mr. Taras then met with Teichert's lawyers and also its lobbyist, Brian Lungren. | Taras Deposition at 119; DE 279 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 249. They discussed the upcoming County hearing, although Mr. Taras believed the date and time for the hearing at that point was uncertain. | Taras Deposition at 122; DE 279 |
| 250. Mr. Taras then did appear at the County hearing, where he told the Board of Supervisors that the CVFPB had discovered multiple violations of the California Water Code (which was, as noted above, untrue). | Taras Deposition at 67; DE 274 |
| 251. When the CVFPB heard about this testimony, however, they called Mr. Taras on the carpet and questioned him about why he provided this testimony to the County without approval from the Board. | DE 276 |
| 252. Mr. Taras responded that he did so because the Mine was within the designated floodway, which, as noted above, was not true. | DE 276 |
| 253. The Board then asked why he did not obtain their prior approval, to which Mr. Taras responded that he did not know about it until the day of the hearing when a clerk from Sacramento County called him at the last minute. | DE 276 |
| 254. This was, again, untrue because he had discussed the County hearing and its date with Teichert's attorneys weeks earlier on August 23, 2010, and promised to be there in person or have a staff member attend. | DE 279 |
| 255. Frustrated by the fact that they had not yet been able to shut down the Hardestys' operation, Teichert and Congressman Lundgren's Office decided to hold a meeting with all of the federal regulators to discuss alleged non-compliance at the Hardestys' Mine. | EX. 49 (DE 26); JH Declaration at 58 |
| 256. Although the Hardestys were not invited to attend a meeting about their own Mine, Teichert was, of course, invited. | JH Declaration at 59; Dadey Deposition at 24-28; DE PP-1 |
| 257. As Jana Affonso's notes of that meeting show, the primary topic was trying to figure out which regulatory agency had the "biggest handle" to shut down the Hardestys and then have all the other agencies "pile on top of it." | EX. 49 (DE 26) |
| 258. Significantly, right before this statement, is a note that in another case in Ventura California it was the County that became the "central cohesive entity bringing in the Fed and state agencies." | EX. 49 (DE 26) |

Robertson, Johnson, Miller & Williamson 50 West Liberty Street, Suite 600 Reno, Nevada 89501

| | |
|---|---|
| 259. Similarly, in this case, it obviously became apparent that the County had "the biggest handle" to shut down the Mine because not long after this meeting the County changed its tactics and issued a "Notice of Violation" to the Schneiders ultimately setting them up for large daily penalties that, if not paid, would become a lien against their property and allow the County to seize the Mine. | EX. 14 (DE 160); DE 364 |
| 260. It is not surprising that Teichert was able to have the County do this bidding given its contributions to Roger Dickerson's campaign (noted above) and the extensive meetings between Teichert's attorneys and multiple County employees, including all of the members of the Board of Supervisors, the Planning Department and the District Attorney's Office. | EX. 18 (DE 77); EX. 19 (DE 281); EX. 20 (DE 358) |
| 261. Cindy Storelli was a principal planner at the County during the 2008 – 2010 time period and overseeing the aggregate resources manager, Jeff Gamel, even though she had no mining experience or training except three to five hours of coursework overviewing SMARA. | EX. 21 (Storelli Deposition) at 21-37; ; JH Declaration at 60 |
| 262. She had discussions with representatives of Teichert about the Mine and also understood that Congressman Lungren had made complaints about the Mine.  She incorrectly claimed that even though the Schneider Mine was vested it still had to meet all of the County's zoning laws. | EX. 21 (Storelli Deposition) at 16-20 |
| 263. Despite the County Code noted above that the mine operator is to prepare the FACE amount, she was one of the people involved who decided to hire David Bieber to prepare the FACE. | EX. 21 (Storelli Deposition) at 70-71; JH Declaration at 60 |
| 264. This was the only time that the County ever hired anyone to prepare a FACE amount. | EX. 21 (Storelli Deposition) at 70-71 |
| 265. Mr. Bieber's charges for this work were quite expensive, but the County simply sent the bills to Mr. Hardesty and Mr. Schneider for payment so this was no concern for the County. | JH Declaration at 61 |
| 266. Ms. Storelli attended the Mine inspections in both 2009 and 2010. | EX. 21 (Storelli Deposition) at 51-54, 63-66 ; ; JH Declaration at 62 |
| 267. In fact, despite having no training or experience in mining, she signed the 2010 inspection report where she allegedly found 11 violations at the Mine. | EX. 37 (DE 130); JH Declaration at 63 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS

| | | |
|---|---|---|
| 1 | 268. Many of these alleged violations are highly technical, clearly beyond the expertise of someone with no background or education in mining, and, even worse, patently false -- such as that reclamation was required under the Plan even while mining was still occurring in the area, that no ponds were allowed under the Reclamation Plan, that moving the processing plant area constituted a "substantial deviation" from the Reclamation Plan, that the current status of the Mine required its FACE amount to be increased from $164,223 to $830,490, and that mining was occurring illegally without a required permit from the County (despite the fact that she knew the Mine had a vested right). | EX. 21 (Storelli Deposition) at 16; EX. 37 (DE 130) |
| 9 | 269. She further also allegedly determined in this report that the disturbed acreage of the Mine which needed to be reclaimed was 176 acres when, in fact, it was far less than that amount. | JH Declaration at 64 |
| 12 | 270. Ms. Moffitt's conduct fares no better. Again, like Ms. Storelli, although Ms. Moffitt oversaw mining personnel and administration for the County, she had no experience, training or background in the field of mining or SMARA and therefore relied upon Mr. Gamel as the aggregate resource manager to have that knowledge. | EX. 23 (Moffitt Deposition) at 18-21; EX. 37 (DE 130) |
| 16 | 271. As a result of her lack of SMARA knowledge, she believed that a vested mine is the same thing as a non-conforming use, she never bothered to research if this was true, and thought the Mine's historical operations were simply recognized by the County as a regular non-conforming use which could not be expanded. | EX. 23 (Moffitt Deposition) at 23-28; EX. 37 (DE 130) |
| 20 | 272. Despite lacking any background in SMARA, vested mining rights, interpreting reclamation mining plans or the differences between a vested mining right and a non-conforming use, Ms. Moffitt sent a letter to Mr. Hardesty dated January 24, 2011 claiming that 10 "violations" existed at the Mine (it was actually 10 since one was repeated twice) and, as a result, ordered him to "cease all mining activity" effective immediately. | EX. 23 (Moffitt Deposition) at 72; DE 133 |
| 26 | 273. At deposition, Ms. Moffitt was asked about each of these 10 alleged violations in detail, but she was unable to explain in even basic terms or otherwise justify how she determined that these 10 violations existed at the Mine. | EX. 23 (Moffitt Deposition) at 68-97; DE 133 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 32

| | |
|---|---|
| 274. The proper procedure that was to be followed if the County believed that the Mine was not in compliance with the law was to send a notice to the **operator** by personal service or certified mail.  The Hardestys were the "operator" of the Mine. | JH Declaration at 65 |
| 275. Had we received such a notice we would have appeared at the hearing to protect their vested rights. | JH Declaration at 69 |
| 276. The County asserts that we potentially had "actual notice" even if they were not properly served.  We do not recall ever receiving any such actual notice before the time to object or appeal would have expired. | JH Declaration at 67-68 |
| 277. It is beyond any dispute that the Mine was vested, and we were operating under a contract with the Schneiders which was based upon that vested right. | JH Declaration at 70 |
| 278. The net effect of all the coordinated attacks upon us as set forth above is that the Defendants (and Teichert) were ultimately successful in driving us out of business. | JH Declaration at 71 |
| 279. Because Mr. Schneider was being fined daily by the County, he forced us to stop mining under our contract. | JH Declaration at 72 |
| 280. This was devastating to us. | JH Declaration at 73 |
| 281. We worked for nearly 30 years to build up that business and create the potential for a nice retirement. | JH Declaration at 74 |
| 282. Instead, what we have to show for our 30 years of work building up our business is heartache and legal fees. | JH Declaration at 75 |
| 283. At this point in our lives approaching retirement age, we do not have 30 more years to start another business. | JH Declaration at 76 |
| 284. The net effect is that the Defendants not only took away our livelihood and plans for retirement, they also took away our hopes and dreams. | JH Declaration at 78 |
| 285. In a February 18, 2009 letter from Sacramento County's Robert Sherry to mine operators that were listed in the earlier letter from OMR, Sherry stated that the OMR letter's allegations that nine mines were missing adequate financial assurances and two were missing annual inspection documentation had been mistaken | DE 63 |

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 33

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 286. In another specific example of removal from the list only after advance notice, OMR informed mine operator Pacific Rock of its removal effective April 8, 2008, after an order to comply had been issued on February 20, 2008, and a public hearing held on March 27, 2008. | EX. 86 (DE 315) |
| 287. And a July 20, 2011 letter from OMR informed Lehigh Southwest Cement Company that it had 30 days to cure alleged reclamation plan non-compliance before being removed from the AB 3098 list. | DE 53 |
| 288. After years of government officials including O'Bryant working with Lehigh, the July 20, 2011 letter from OMR notified Lehigh that it had an additional 30 days to cure its non-compliance with its reclamation plan. | DE 53 |
| 289. Pacific Rock was given notice at least 36 days before a public hearing was held, allowed a hearing, and not removed from the list until 12 days after the hearing, at least 48 days from the initial notice. | EX. 86 (DE 315) |
| 290. Mr. Hardesty testified that at least one contractor told him that Norris threatened to sue the contractor | Hardesty Deposition at 254:25; 255:1-25; 256:1-12 |
| 291. Mr. Morris has testified that Testa told him that the SMGB would not hear any appeal from the Hardestys. | EX. 75 (Morris Deposition) at 22:18-24; 23:1-12 |
| 292. It is undisputed that the water level of the Cosumnes River remained low throughout the several years at issue here. | EX. 75 (Morris Deposition) at 59-60 |
| 293. The river ran only a couple feet deep in 2009 due to the drought, with a maximum depth for the last several years of only 5-6 feet. | EX. 75 (Morris Deposition) at 126:7-25 |
| 294. Testimony from a professional engineer, attorney and former Army Corps of Engineers in charge of overseeing the integrity of the levees in Sacramento County explained that the distance between the river and the excavation pit was wider than any levee protecting Sacramento. | EX. 75 (Morris Deposition) at 124:6-14 |
| 295. The distance between the water level and the corresponding point on the land-side wall was between 140 and 150 feet. | EX. 75 (Morris Deposition) at 127:8-19 |
| 296. Defendants tried to shut down the Hardestys' mine with a TRO alleging risk of flooding, but a court denied the attempt as there was no danger of flooding. | EX. 75 (Morris Deposition) at 50-52; O'Bryant depo at 117-120; **Cite** |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 297. Taras also asserted that the mine increased risk of flooding to the Highway 16 Bridge in Rancho Murrieta, while acknowledging that the bridge was actually two miles *upstream* of the Hardesty mine. | DE O |
| 298. Rather than feeling pressure of a flooding emergency, Taras issued the cease and desist letter in May 2009 and then did not notify the Flood Board of this notice of violation until sixteen months later. | DE 276 at 69-70 |
| 299. At a minimum, it is a hotly contested issue of fact whether Taras was motivated by political pressure to shut down the mine of a competitor rather than an emergency requiring immediate action making pre-deprivation process impractical. *See Hardesty*, 935 F. Supp. 2d 968, 984 (E.D. Cal. 2013) ("Defendants have provided nothing suggesting that predeprivation process was impractical."); | Morris depo at 132:8-25 (existence of other mines closer to their respective rivers where the Flood Board initiated no enforcement actions against them) |
| 300. Taras used this letter in his appearance at the Schneider appellate hearing on the vested right to mine, and the unilateral decree forced the Hardestys to hire attorneys and pay for additional reports. | DE 275 at 25-26; EX. 75 (Morris Deposition) at 74-75; 108-110 |
| 301. As a threshold matter, the text of the regulation itself makes clear that this waiver clock only begins running from the receipt of the "notice of enforcement proceeding," which defendants admit they never sent. (*Id.*); | DE 276 at 69-70 |
| 302. She never took action to make sure the Hardestys were put on the list or to correct her misstatements to customers, instead choosing to threaten customers with civil penalties | Noris Deposition at 33, 103-115, 118-121 [see HSDF 290] |
| 303. Moreover, he ordered the County to increase the Hardestys' financial assurance amount to over $733,000, which he had no authority to do. | *See* EX. 76 (Koehler Deposition)., Ex. 225 (3/20/09 letter from O'Bryant ordering the County to set a financial assurance amount of $733,784) |
| 304. Taras was not authorized to conduct such an investigation, and ultimately the Central Valley Flood Protection Board concluded it had no jurisdiction. | DE 292 |
| 305. On September 8, 2008, Gregory, in her capacity as a public officer employed by the California Department of Fish and Game ("DFG"), conducted a warrantless search at Hardesty Sand and Gravel ("HSG"), which is owned by plaintiffs. | DE 143 |

Robertson, Johnson, Miller & Williamson 50 West Liberty Street, Suite 600 Reno, Nevada 89501

| | |
|---|---|
| 306. When confronted about her presence on the property, defendant claimed that she was conducting an investigation "to check streams, wetlands, and [the] Consumes River," pursuant Cal. Fish & G. Code §1600, which imposes permitting requirements with respect to the diversion of riverbeds. | Gregory Deposition at 43; DE 143 at 2 |
| 307. Defendant also claimed that her warrantless search was proper pursuant to the "emergency" exception of Cal. Fish & G. Code §857, which allows warrantless searches by DFG wardens in the event of a "clear and imminent danger." | DE 143 at 2 |
| 308. Since the warrantless search, the Hardestys have never been charged with any violation of DFG regulations, including Cal. Fish & G. Code §1600. | Lucero Deposition at 77-78 |
| 309. At the time of her search, defendant had minimal to non-existent training concerning §1600, consisting of a single-day class, and no training at all as §1600 relates to mining. | Gregory Deposition at 15, 55 |
| 310. When Gregory entered the HSG premises, she was accompanied by Zachary | DE 22 |
| 311. Who two months earlier, on July 8, had been on the HSG premises to conduct an inspection related to a cease-and-desist letter issued by ACE. | EX. 50 (Simmons 1st Deposition) Deposition at 144-46 |
| 312. When Simmons demanded to see portions of the premises that were outside the scope of the ACE letter, Hardesty suspected that the inspection was part of a "witch hunt" orchestrated by competitors and requested that Simmons leave the property. | EX. 50 (Simmons 1st Deposition) Deposition at 144-46 |
| 313. Thereafter, as a means to continue his search, Simmons contacted a DFG representative because he believed DFG could provide access to the site through the "open-fields doctrine." | Simmons 2d Deposition at 70-71 |
| 314. Simmons has no training concerning §1600. | Simmons 2d Deposition at 169-70 |
| 315. In preparation for their warrantless search, Simmons provided "the background and the evidence" of his previous visit, including the fact that he visited two locations, but had been unable to inspect a final third location on the premises. | DE 22 |
| 316. Defendant also has claimed that she became "upset" with Simmons and told him that she would not have brought him to the property if she had known of his previous eviction. | Gregory Deposition at 73, 146 |
| 317. That fact though is not contained in defendant's report. | DE 143 |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 318. When confronted by Hardesty, Gregory invoked the "emergency" exception found in Cal. Fish & G. Code §857 as the sole basis for her search. | Gregory Deposition at 134-35; DE 143 at 2 |
| 319. When Simmons first spoke with a DFG representative and was told that the matter had been assigned to Gregory, Simmons believed "They [DFG] may not be interested." | EX. 50 (Simmons 1st Deposition) Deposition at 160; DE 20 |
| 320. Even after Simmons sent Gregory his photos of the site on which areas of "concern" had been circled | Gregory Deposition at 46; DE 78 |
| 321. Gregory took no further action for over two weeks until August 29 when she forwarded the photos to Carolyn Doody, explaining that "I have been playing phone tag with Mr. Simmons" and admitting that "I do not know if we have a 1600 violation." | DE 78 |
| 322. But neither civil nor criminal proceedings were ever brought against the Hardestys for violations of any DFG regulation, including §1600. | Lucero Deposition at 77-78 |
| 323. In addition, in assessing whether a "clear and imminent danger" existed before her search, defendant admitted in her deposition that "I did not have any fact that it was." | Gregory Deposition at 144-45 |
| 324. At most, she believed there was "possibly" a danger. | Gregory Deposition at 144 |
| 325. Lacking any facts or evidence that a "clear and imminent danger" in fact existed, Gregory decided to enter the property to satisfy her curiosity, accompanied by Simmons. | Gregory Deposition at 144-45 |
| 326. When during his July 8 visit Simmons insisted on inspecting areas that were outside the scope of the cease and desist letter, Hardesty told Simmons that he believed the visit was part of a "witch hunt" orchestrated by a competitor. | EX. 50 (Simmons 1st Deposition) Deposition at 145-46 |
| 327. Simmons recorded in his notes that Hardesty was "upset." | DE 19 |
| 328. Simmons was then instructed to leave the property. | EX. 50 (Simmons 1st Deposition) Deposition at 176-77 |
| 329. As Simmons explained in his deposition, "game wardens have access to sites as described to me what was said [sic] the open-fields doctrine". | Simmons 2d Deposition at 70-71 |
| 330. At the time, Simmons' job duties did not include enforcement of §1600 violations, for which in any event had no training. | Simmons 2d Deposition at 169-70 |
| 331. Defendant's §1600 training was also virtually non-existence, consisting of a single one-day class | Gregory Deposition at 15 |

Robertson, Johnson, Miller & Williamson 50 West Liberty Street, Suite 600 Reno, Nevada 89501

| | |
|---|---|
| 332. without any training as §1600 relates to mining. | Gregory Deposition at 55 |
| 333. Prior to returning to the property on September 8 with Gregory, Simmons provided a briefing to her of his earlier visit. | DE 22 |
| 334. According to Simmons' notes, they discussed Gregory's "authority to enter the property" (*id.*), which Gregory identified as the Fish and Game Code. | EX. 50 (Simmons 1st Deposition) Deposition at 195 |
| 335. Simmons also identified to Gregory the first two locations he had visited, using an aerial photograph, and gave her "the background and evidence" that he had collected. | DE 22 |
| 336. In her deposition, Gregory confirmed these details | Gregory Deposition at 63-71 |
| 337. except for her implausible claim that Simmons did not disclose his confrontation with Hardesty in which Simmons had been told to leave the property. | Gregory Deposition at 72 |
| 338. Further, claims Gregory, as part of a conversation she and Simmons had as they were leaving the property in her truck, she was "very upset that I brought someone that was ordered not to be on the property" and "would not have brought him on the property if I had known that." | Gregory Deposition at 73, 146 |
| 339. To begin with, according to Simmons' notes, he expressly advised defendant that he had been unable to reach the third site on his previous visit. | DE 22 |
| 340. That omission from Gregory's otherwise detailed report strongly suggests that the conversation never occurred and that in fact defendant knew all along that Simmons had been barred from the property. | DE 143 |
| 341. According to defendant's report of the visit, Hardesty advised her that Simmons "was using me" to break the law. | (*Id.* at 2.) |
| 342. Tellingly, Gregory never rebutted that claim, either directly to Hardesty or in her report. | EX. 50 (Simmons 1st Deposition) Deposition at 147 |
| 343. Nor did she tell Hardesty that Simmons' presence was an innocent mistake on her part. | Simmons Deposition at 147 |
| 344. Defendant has sought to justify Simmons' presence on the basis that she needed his knowledge of the site from his previous visit. | Gregory Deposition at 128 |
| 345. Defendant never asked Simmons if he had any experience with §1600 investigations | Gregory Deposition at 129 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | |
|---|---|
| 346. The nature of his assistance to her investigation is dubious, despite (and in contradiction to) her representation to Hardesty that he was present "to assist in the investigation." | DE 22 |
| 347. On that same morning, at 9:47 a.m. (just a few minutes before the search started at 9:57 a.m.), Carolyn Doody sent an email to Mark Lucero, a DFG patrol captain, forwarding ACE photos of the mine site and stating that an attorney (mistakenly identified as an attorney for property owner Schneider) had limited where the "Corps. rep. [Simmons] could look at the property, saying he did not have jurisdiction." | DE 81 |
| 348. As part of the multi-agency scheme set in motion by the political motives of Teichert's favored politicians, Gregory engaged in a warrantless search of the Hardestys' business. | (*See* Gregory Declaration ¶ 17 ("I conducted my September 8, 2008 inspection of the Schneider Historic Mine property without a warrant.").) |
| 349. Even more egregiously, she allowed Simmons to accompany her during that warrantless search despite Simmons previously being told to leave the property. (*See* Gregory Decl. ¶ 6 (describing entering the mine with Simmons) | C. Doody Depo., Exh. 81 (9/8/08 email from C. Doody, copying Defendant Gregory, and noting "[a]pparently the attorney limited where the Corps rep could look at the property, saying he did not have jurisdiction").) |
| 350. The excuse Gregory gave for this egregious conduct—that Simmons' participated in the search to help her look for §1600 violations | Gregory Deposition at 129:22-25 |
| 351. Is directly contradicted by Simmons' own testimony that he had no training with regard to §1600 violations, nor were such violations part of his job duties | Simmons 6/1/15 Deposition at 169:24-170:4 |
| 352. Here, the Hardestys mined the property for decades without government complaint (*see* HSDF 7), had an approved reclamation plan and FACE | DE 202; DE 315; JH Declaration at 8, 17 |
| 353. and then suddenly and abruptly defendants changed course | DE16; DE 364 (see also HSDF 8-10) |
| 354. stripped the Hardestys of their mining rights and dramatically increased their FACE | See DE 160; See also HSDF 89, 92, 96, 385 |
| 355. Gregory was aware of this political pressure, as Simmons told her about Congressman Lungren's involvement. | Gregory Deposition at 65:11-23; Simmons Deposition, Ex. 22 |
| 356. And in dutifully proceeding with the scheme, she conducted a warrantless search with no emergency circumstances and improperly allowed an unauthorized government agent to accompany her, abusing her authority. | *See* Gregory Deposition At 111:25-112:6; C. Doody Depo., Exh. 81 (9/8/08 email copying Defendant Gregory, Doody wrote that Hardesty "attorney limited where the Corps rep could look at the property, saying he did not have jurisdiction") |
| 357. Gregory improperly used her power to conduct a warrantless search when there were no exigent circumstances. | Gregory Deposition at 111:25-112:6. |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 39

| 358. Gregory improperly allowed an unauthorized person to piggyback off of her improper warrantless search | C. Doody Deposition, Ex. 81 |
| 359. Teichert was frustrated that the Hardestys' operating costs were lower due to their vested mine status and sought to put them out of business as a result, with Teichert's preferred politicians giving marching orders and defendants dutifully complying. | *See* W. Mowrer Deposition, Ex. 41 ("Senator Cox's letter is also about competitive advantage and, potentially, terminating a contract between one operator and a public agency . . . .") |
| 360. The Hardestys have demonstrated that Gregory knew that the investigation was motivated by political pressure from a competitor and that competitor's favored politicians to put the Hardestys out of business. | Diane Anderson Declaration; EX. 17 (DE 7); EX. 18 (DE 77); EX. 19 (DE 281); and EX. 20 (DE 358); Gregory Deposition at 65:11-23 |
| 361. She likely knew that her companion on her search had been kicked off the Hardestys' mine previously. | DE 22; DE 143; Summons Deposition at 144-146 |
| 362. The circumstances of her search did not justify warrantless entry onto the Hardestys' mine. | *See* Gregory Deposition At 111:25-112:6; C. Doody Depo., Exh. 81 (9/8/08 email copying Defendant Gregory, Doody wrote that Hardesty "attorney limited where the Corps rep could look at the property, saying he did not have jurisdiction") |
| 363. Frustrated by the fact that they had not yet been able to shut down the Hardestys' operation, Teichert and Congressman Lundgren's Office decided to hold a meeting with all of the federal regulators to discuss alleged non-compliance at the Hardestys' Mine. | EX. 49 (DE 26) |
| 364. Although the Hardestys were not invited to attend a meeting about their own Mine, Teichert was, of course, invited. | JH Declaration; Dadey Deposition at 24-28 |
| 365. As Jana Affonso's notes of that meeting show, the primary topic was trying to figure out which regulatory agency had the "biggest handle" to shut down the Hardestys and then have all the other agencies "pile on top of it." | EX. 49 (DE 26) |
| 366. Significantly, right before this statement, is a note that in another case in Ventura California that it was the County that became the "central cohesive entity bringing in the Fed and state agencies." | EX. 49 (DE 26) |
| 367. Similarly, in this case, it obviously became apparent that the County had "the biggest handle" to shut down the Mine because not long after this meeting the County changed its tactics and issued a "Notice of Violation" to the Schneiders ultimately setting them up for large daily penalties that, if not paid, would become a lien against their property and allow the County to seize the Mine. | EX. 14 (DE 160); DE 364 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | | |
|---|---|---|
| 368. | It is not surprising that Teichert was able to have the County do this bidding given its contributions to Roger Dickerson's campaign (noted above) and the extensive meetings between Teichert's attorneys and multiple County employees, including all of the members of the Board of Supervisors, the Planning Department and the District Attorney's Office. | EX. 18 (DE 77); EX. 19 (DE 281); EX. 20 (DE 358) |
| 369. | Cindy Storelli was a principal planner at the County during the 2008 – 2010 time period and overseeing the aggregate resources manager, Jeff Gamel, even though she had no mining experience or training except three to five hours of coursework overviewing SMARA. | EX. 21 (Storelli Deposition) at 21-37 |
| 370. | She incorrectly claimed that even though the Schneider Mine was vested it still had to meet all of the County's zoning laws. | EX. 21 (Storelli Deposition) at 16-20 |
| 371. | Despite the County Code noted above that the mine operator is to prepare the FACE amount, she was one of the people involved who decided to hire David Bieber to prepare the FACE. | EX. 21 (Storelli Deposition) at 70-71 |
| 372. | This was the only time that the County ever hired anyone to prepare a FACE amount. | EX. 21 (Storelli Deposition) at 70-71 |
| 373. | Mr. Bieber's charges for this work were quite expensive, but the County simply sent the bills to Mr. Hardesty and Mr. Schneider for payment so this was no concern for the County. | JH Declaration at 61 |
| 374. | Ms. Storelli attended the Mine inspections in both 2009 and 2010. | EX. 21 (Storelli Deposition) at 51-54, 63-66 |
| 375. | Despite having no training or experience in mining, she signed the 2010 inspection report where she allegedly found 11 violations at the Mine. | EX. 37 (DE 130) |
| 376. | Many of these alleged violations are highly technical, clearly beyond the expertise of someone with no background or education in mining, and, even worse, patently false -- such as that reclamation was required under the Plan even while mining was still occurring in the area, that no ponds were allowed under the Reclamation Plan, that moving the processing plant area constituted a "substantial deviation" from the Reclamation Plan, that the current status of the Mine required its FACE amount to be increased from $164,223 to $830,490, and that mining was occurring illegally without a required permit from the County (despite the fact that she knew the Mine had a vested right). | EX. 21 (Storelli Deposition) at 16; EX. 37 (DE 130) |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 41

| | |
|---|---|
| 377. She further also allegedly determined in this report that the disturbed acreage of the Mine which needed to be reclaimed was 176 acres when, in fact, it was far less than that amount. | JH Declaration at 64 |
| 378. Like Ms. Storelli, although Ms. Moffitt oversaw mining personnel and administration for the County, she had no experience, training or background in the field of mining or SMARA and therefore relied upon Mr. Gamel as the aggregate resource manager to have that knowledge. | EX. 23 (Moffitt Deposition) at 18-21; EX. 37 (DE 130) |
| 379. As a result of her lack of SMARA knowledge, she believed that a vested mine is the same thing as a non-conforming use, she never bothered to research if this was true, and thought the Mine's historical operations were simply recognized by the County as a regular non-conforming use which could not be expanded. | EX. 23 (Moffitt Deposition) at 23-28; EX. 37 (DE 130) |
| 380. Despite lacking any background in SMARA, vested mining rights, interpreting reclamation mining plans or the differences between a vested mining right and a non-conforming use, Ms. Moffitt sent a letter to Mr. Hardesty dated January 24, 2011 claiming that 11 "violations" existed at the Mine (it was actually 10 since one was repeated twice) and, as a result, ordered him to "cease all mining activity" effective immediately. | EX. 23 (Moffitt Deposition) at 72; DE 133 |
| 381. At deposition, Ms. Moffitt was asked about each of these 10 alleged violations in detail, but she was unable to explain in even basic terms or otherwise justify how she determined that these 10 violations existed at the Mine. | EX. 23 (Moffitt Deposition) at 68-97; DE 133 |
| 382. Storelli herself testified at her deposition that this was the only time that the County had ever hired anyone to prepare a FACE amount. | EX. 21 (Storelli Deposition) at 70-71 |
| 383. Those defendants' discriminatory conduct occurred after the meeting orchestrated by Teichert and Congressman Lundgren's Office where it was determined that the County had the "biggest handle" to shut down the Hardestys. | JH Declaration at 64 |
| 384. Storelli and Moffitt then took actions like signing inspection reports, declaring that the FACE amount should be drastically increased, and ordering the Hardestys to "cease all mining activity" effective immediately despite having no background, knowledge, or experience qualifying them to make such judgment calls. | EX. 23 (Moffitt Deposition) at 72; DE 133 |

Robertson, Johnson, Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 42

| | |
|---|---|
| 385. Sacramento County and Sherry stripped the Hardestys of their vested right to mine without providing them any notice or hearing | JH Declaration at 54, 67-71 |
| 386. prohibited the Hardestys from continuing mining operations during the pendency of a conditional use permit application approval (while allowing others to continue operating) | JH Declaration at 72, 80-83 |
| 387. Storelli had discussions about the mine with Teichert and understood that powerful politicians were intervening on their behalf | Ex. 21 at 16-20. |
| 388. was one of the decision makers responsible for taking the unprecedented (and legally unauthorized) step of hiring an outside engineer to prepare the FACE | Ex. 21 at 70-71. |
| 389. and signed an inspection report (despite having no background, knowledge, or experience in mine inspections) riddled with inaccuracies | Ex. 21 at 16; Ex. 37; JH Declaration at 64 |
| 390. Moffitt likewise lacked any background in SMARA, sent a letter to the Hardestys chronicling purported violations, and ordered the mine shut down | Ex 23 at 18-21, 23-28, 72; Ex. 37; DE 133 |
| 391. Revoking the vested right and entering into the MOU were express, written edicts by the County's Board of Supervisors. | Ex 129 |
| 392. It is undisputed that defendants only sent the April 2010 letter requiring all mining cease to the landowner, Schneider, and never to the operator, the Hardestys. | JH Declaration at 67-69 |
| 393. When asked in his deposition, Mr. Hardesty denied being aware of the 2010 letter *to* Schneider or that he knew about Schneider's appeal. | Hardesty depo at 189:24-190:2; 185:14-186:10 |
| 394. The claim that the Hardestys received actual notice of this post-deprivation hearing is a hotly contested issue that defendants have not established and precludes summary judgment. | JH Declaration at 67-69 |
| 395. In fact, the Hardestys have invested several decades of effort into this business, which is now gone. | JH Declaration at 73-78 |
| 396. They cannot start a new aggregate business, because obtaining the CUP that the County insists upon can take 10 years or more and cost millions of dollars just for permitting. | JH Declaration at 76-77 |
| 397. Instead of following the mandate that the County "shall follow" the specified procedures, the County and Sherry proceeded to claim that the Hardestys lost their vested mining rights as a pretext in order to proceed under zoning laws instead of SMARA. | JH Declaration at 9-10, 71; *see also* Ex. 1-20 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 43

| | |
|---|---|
| 398. Gamel had no working knowledge of SMARA prior to 2008 and no relied on county counsel for interpretations and application of the county code and SMARA. | Gamel's Deposition at p. 28:17-21 and 29:5-19 |
| 399. The County allowed the Pilliken mine to operate while applying for a conditional use permit within the County. | JH Declaration at 80 |
| 400. The mine is located across the street from Hardestys' Mine and was operated by Mike Kennefick. | JH Declaration at 81 |
| 401. Mike Kennefick was hauling dredger tailing from the mine and Sacramento County told him to get a conditional use permit. | JH Declaration at 82 |
| 402. Mike Kennefick applied for a conditional use permit and was permitted to continue hauling/mining through the permitting process, until the permit was ultimately granted. | JH Declaration at 83 |
| 403. Despite all of the regulatory activity undertaken by Defendants, there is no evidence that the Hardestys Mine or operation caused any environmental harm. | Docket #180-6 at p. 7 |
| 404. Liz Gregory and Zack Simmons inspected the area just east of the processing facility containment pond, which is not visible from any public road. | JH Declaration at 79 |
| 405. The purpose of Liz Gregory's inspection was entirely without merit from the start because her own boss stated there was no connection between water on the property and state waters. | Lucero Depo. at  63-10 - 64:17 |
| 406. Similar relocations at other mines were not considered "substantial deviations." | Testa Deposition at pp. 112:9-113:25; Cheryl Bly-Chester Report Docket 180-1at p. 13 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 44

| | |
|---|---|
| 407. As defendant Stephen Testa, the Executive Officer of the State Mining and Geology Board, testified in his deposition and also told Cheryl Bly-Chester in conversation, a mine moving a processing area to a new location "would not be cause for [him] to consider it a substantial deviation simply based on it being moved," and he cannot recall any mine where a lead agency (such as Sacramento County) "required an amended [reclamation] plan simply for the relocation of the processing area." | Testa Deposition at pp. 112:9-113:25; Cheryl Bly-Chester Report Docket 180-1 at p. 13 |

DATED this 4th day of December, 2015.

                                ROBERTSON, JOHNSON,
                                MILLER & WILLIAMSON
                                50 W. Liberty Street, Suite 600
                                Reno, NV 89501


                                By:  _/s/ G. David Robertson_____
                                     G. David Robertson, Esq.

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 45

1

## **CERTIFICATE OF SERVICE**

2

 Pursuant to FRCP 5(b) and Local Rule 5-4, I hereby certify that I am an employee of

3

Robertson, Johnson, Miller & Williamson, over the age of eighteen, and not a party to the within

4

action.  I further certify that on the 4th day of December, 2015, I electronically filed the **THE**

5

**HARDESTYS' STATEMENT OF DISPUTED FACTS** and thus, pursuant to LR 135(a),

6

caused same to be served by electronic mail on the following:

7

Jeffrey P. Reusch, Esq.
Carolyn Nelson Rowan, Esq.

8

Office of The Attorney General
1300 I Street, Room 1520-25

9

Sacramento, CA 95814
*Attorneys for Defendant Liz Gregory*

10

11

Mark O'Dea, Esq.
Longyear, O'Dea and Larvara, LLP
3620 American River Drive, Suite 230

12

Sacramento, CA 95864
*Attorneys for Defendant County of Sacramento*

13

14

Richard M. Ross
Law Office of Richard M. Ross

15

8081 North Forbes Road
Lincoln, CA 95648

16

*Attorneys for Jay Schneider, et al.*

David G. Alderson, Esq.
Office of The Attorney General
P.O. Box 70550
Oakland, CA 94612
*Attorneys for Defendants Dennis O'Bryant,
Gay Norris, Steve Testa and Curt Taras*

Sharon Sanner Muir, Esq.
Ryan P. Harley, Esq.
Collins, Muir & Stewart, LLP
1999 Harrison Street, Suite 1700
Oakland, CA  94612
*Attorneys for David Bieber*

Glenn W. Peterson, Esq.
Millstone Peterson & Watts, LLP
2267 Lava Ridge Court, Suite 210
Roseville, CA  95661
*Attorneys for Jay Schneider, et al.*

17

18

 */s/ Teresa W. Stovak*
An Employee of Robertson, Johnson,

19

Miller & Williamson

20

21

22

23

24

25

26

27

28

1

## LIST OF EXHIBITS

| 1 | 10/03/08 | Letter from Senator Cox to Mike Chrisman (10/3/08) Letter to Hardesty from Michael Jewell (6/2/08) | 4 |
|---|----------|----|----|
| 2 | 07/08/10 | Letter from John Taylor | 10 |
| 3 | 08/05/92 | Letter from Thomas Hutchings to Toby Johnson | 3 |
| 4 | 07/27/94 | Letter from Robert Ryan to Richard Maddox | 2 |
| 5 | 08/23/94 | Letter to Jay Schneider on behalf of Richard Maddox | 1 |
| 6 | 08/09/11 | Jeff Gamel/Community Planning and Development memo to Board of Zoning Appeals re: Schneider Rec Plan | 38 |
| 7 | None | Burness application of Rec Plan to Board of Supervisors | 3 |
| 8 | 08/07/02 | Burness request; Rec plan for Schneider sent to Board of Supervisors | 11 |
| 9 | 03/29/02 | Answer by County of Sacrament to Petition or Writ of Mandate | 4 |
| 10 | 11/18/02 | Letter from Cindy Turner to Planning and Community Development memo | 23 |
| 11 | 09/08/08 | An account of an investigation by a Fish and Game Warden along with Zack Simmons and Joe Hardesty | 4 |
| 12 | 10/31/08 | Email chain from Dana Booth to Mike Winter Re: 15000 Meiss | 3 |
| 13 | 06/27/07 | 2006 Mining Operation Annual Report | 10 |
| 14 | 04/14/10 | Violation Notice to Jay Schneider | 2 |
| 15 | 04/02/09 | Letter to Joe Hardesty from Robert Sherry | 47 |
| 16 | 04/02/09 | Letter to Joe Hardesty from Jeff Gamel Sac County Planning | 3 |
| 17 | 03/07/07 | Email chain from John Lane of Teichert to Justin Cutler of US F&W and another to Michael Finan from ACE who forwards it to Kathleen Dadey and William Ness from ACE. | 4 |
| 18 |  | Regulatory Enforcement Contact #'s | 3 |
| 19 | 10/28/10 | "Strategy Matrix" re meetings with federal agencies, state agencies, county agencies; plans and meeting to discuss Hardesty operations and regulations, violations etc. | 12 |
| 20 | 05/04/10 | Meeting with Senator Cox talking points | 1 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| | | | |
|---|---|---|---|
| **21** | | Deposition Transcript Pages<br>16-37<br>51-54<br>63-66<br>70-71<br>78 | |
| **22** | | State and County Codes | |
| **23** | 06/05/15 | Deposition Transcript Pages<br>18-21<br>23-28<br>68-97 | |
| **24** | 10/03/00 | Letter from Robert Burness to Jay Schneider re: Schneider Reclamation Plan | 3 |
| **25** | 11/17/00 | Reclamation map - Scheduled to be mined second | 1 |
| **26** | 08/08/02 | Meeting of Board of Supervisors | 93 |
| **27** | 06/21/00 | Letter to Ms. Pam Ceccarelli | 1 |
| **28** | 06/22/00 | Meeting notes between OMR, and Sac County plus Schneider | 1 |
| **29** | 06/23/00 | Email from John Amodio to Jim Pompy | 1 |
| **30** | 08/22/00 | Handwritten notes re not sure | 2 |
| **31** | 08/24/00 | Email from Karen Wiese to Burness | 6 |
| **32** | 09/28/00 | Letter to Jay Schneider | 3 |
| **33** | 11/06/00 | Letter to Jay from Karen Wiese | 5 |
| **34** | 03/07/01 | Letter to Robert Burness from OMR James Pompy | 2 |
| **35** | 07/08/02 | Fax of Rec Plan from Rob Burness to Mike Sandecki | 21 |
| **36** | 05/05/14 | Public Resource Code Print out/Section 2770-2779 | 18 |
| **37** | 12/16/10 | Letter from Cindy Storelli to Joe Hardesty | 9 |
| **38** | 07/01/15 | Deposition Transcript Pages | |
| **39** | | Expert Olson Report (Docket 202) | 6 |
| **40** | 11/27/12 | Letter to Sarah Britton from Geocon Consultants and David Bieber - SMARA compliance inspection summary report for 2012 | 33 |
| **41** | 04/03/02 | 2001 Mining Operation Annual Report (OMR) | 4 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 48

| 42 | 04/02/03 | 2002 Mining Operation Annual Report (OMR) | 4 |
|---|---|---|---|
| 43 | None | 2003 Mining Operation Annual Report (OMR) | 4 |
| 44 | None | 2004 Mining Operation Annual Report | 4 |
| 45 | None | 2005 Mining Operation Annual Report to OMR | 6 |
| 46 | 06/30/08 | Letter from Jay Schneider | 21 |
| 47 | 05/11/05 | Letter from Michael Wineter to Ms Sareeram | 12 |
| 48 | 06/25/07 | Mike Winter letter to Ms Luther Director OMR | 12 |
| 49 | 01/27/10 | Handwritten notes from meeting | 2 |
| 50 | | Deposition Transcript | |
| 51 | 06/02/08 | Cease and Desist Letter by Michael Jewel of USACOE with cc to US F&W, Sac Co., CVRWQCB, State Water Resources, EPA, F&G contact person in letter is ZS | 2 |
| 52 | 02/12/09 | Conversation Record | 1 |
| 53 | 03/25/09 | Handwritten notes of ZS | 2 |
| 54 | 09/09/08 | Email from ZS to Kevin Leonard | 1 |
| 55 | 09/15/08 | Memorandum for Record of ZS | 1 |
| 56 | 12/22/08 | ZS Email to Mark Lucero and Gay Norris (cc'd to Kate Dadey and Lisa Clay of ACE) | 1 |
| 57 | 10/14/09 | Email from Gay Norris to Ken Trott | 6 |
| 58 | 08/29/12 | Letter from Michael Jewell, Army Corps of Engineers to Mr. Hardesty | 2 |
| 59 | 02/11/09 | Email from Joan Mahon to Jay | 5 |
| 60 | 08/03/10 | Email from D. O'Bryant to Kate Wheatley | 1 |
| 61 | 06/26/10 | Email from Sandra Morey to Kris Vyverberg | 1 |
| 62 | 10/28/09 | Letter from Scott Morris to Kenneth Trott | 5 |
| 63 | 10/07/08 | Email from Jason Marshall to Wendy Hamon | 2 |
| 64 | 10/07/08 | Email from Chris Mowrer to Karen Scarborough | 1 |
| 65 | 10/07/08 | Email from Jason Marshall to Chris Mowrer | 1 |
| 66 | 10/16/08 | Email between Jason Marshal and Chris Mowrer | 2 |
| 67 | 10/17/08 | Email between Jason Marshal and Chris Mowrer | 4 |
| 68 | 10/1708 | Email between Kevin Bassett and Chris Mowrer | 1 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| 69 | 10/24/08 | Email between Chris Mowrer and Jason Marshall | 4 |
|---|---|---|---|
| 70 | 10/20/08 | Email between Jason Marshall and Wendy Harmon | 4 |
| 71 | 10/27/08 | Email from Wendy Harmon to Jason Marshall and Dennis O'Bryant | 1 |
| 72 | 10/29/08 | Email between Jason Marshall and Chris Mowrer | 2 |
| 73 | 11/12/08 | Email between Jason Marshall and Todd Ferrara | 2 |
| 74 | 12/23/08 | Mine inspection Report Department of Conservation prepared by Bret Koehler | 24 |
| 75 | | Deposition Transcript | |
| 76 | | Deposition Transcript | |
| 77 | 07/09/15 | Deposition Transcript | |
| 78 | 07/14/15 | Deposition Transcript | |
| 79 | 06/26/08 | Letter to April Balestreri from Mike Winter | 1 |
| 80 | 06/28/00 | Rec Document Routing sheet | 1 |
| 81 | 07/01/00 | Rec Plan Checklist | 6 |
| 82 | None | Email from Michael Sandecki to Pam Ceccarelli, | 1 |
| 83 | None | Fig 1 A gravel pit reclaimed to waterfowl habitat | 1 |
| 84 | 3/3/2009 | Memo | 4 |
| 85 | Unknown | Gonzales Surveys, Inc as built survey of the North and West Banks surveyed October 2, 2009 | 6 |
| 86 | 04/08/08 | Letter to Tom Staben Pac Rock; removal of AB3098 List (from Dep of Conservation, OMR) | 2 |
| 87 | 07/10/08 | OMR has received 2007 Annual Report --Acknowledgement | 1 |
| 88 | 02/04/09 | Letter from Debby Mayberry to Mr. Hardesty | 1 |
| 89 | 03/18/09 | Letter from Dennis O'Bryant to Mr. Hardesty | 3 |
| 90 | 02/18/09 | Jeff Gamel letter to Greg Morrison | 1 |
| 91 | 05/20/15 | Deposition Transcript | |
| 92 | 03/18/09 | Letter to Stephen Testa from Scott Morris | 2 |
| 93 | | Deposition Transcript | |
| 94 | 05/19/09 | Search Warrant and Affidavit of Brian Mahoney of Sac Co. District Attorney's Office | 43 |
| 95 | 07/08/15 | Deposition Transcript | |
| 96 | 09/14/10 | Board of Supervisors Meeting minutes/transcript | 4 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

| 97 | 09/14/10 | Board of Supervisors Meeting minutes/transcript | 35 |
|---|---|---|---|
| 98 | 09/08/10 | Declaration of Curt Taras in Support of Cal Def. Anti-Slapp Motion; Motion to Dismiss | 7 |
| 99 | 05/28/09 | CVFPB -- Letter to Schneider from Curt Taras | 2 |
| 100 | None | Designated Floodway Map with Western Pit and Eastern Pit locations | 1 |
| 101 | None | Map of River Designated Floodway prepared by Department of Water Resources (2-28-75) | 1 |
| 102 | None | Sac County River Designated Floodway (floowat line and Arkansas Creek | 1 |
| 103 | None | Dam drawing | 1 |
| 104 | 03/25/11 | Meeting CVFPB open session minutes/transcript | 4 |
| 105 | 09/23/10 | Meeting State - CVFPB Open session | 12 |
| 106 | 08/24/10 | Email from John Lane to Kate Awheatley | 2 |
| 107 | 09/07/10 | Email from John Lane to Kate Wheatley | 2 |
| 108 | | Deposition Transcript | |
| 109 | 01/27/10 | Agenda Hardesty Sand & Gravel meeting with Federal Agencies office of Congressman Lungren | 1 |
| 110 | 03/30/10 | Admin. Penalty Order; Sac County sent by Tammy Derby | 7 |
| 111 | 07/20/11 | Letter from Kenneth Trott, Department of Conservation, to Scott Renfrew | 3 |
| 112 | | Deposition Transcript | |
| 113 | | Deposition Transcript | |
| 114 | 03/28/09 | Letter from Curt Taras to Hardesty re Mine encroachment into the Cosumnes River | 3 |
| 115 | 09/08/08 | An account of an investigation by a Fish and Game Warden along with Zack Simmons and Joe Hardesty | 4 |
| 116 | | Deposition Transcript | |
| 117 | 05/21/15 | Deposition Transcript | |
| 118 | 09/09/08 | Memorandum for Record of ZS and Liz Gregory's site visit on 9/08/2008 | 3 |
| 119 | | Deposition Transcript | |
| 120 | | Notes | 1 |
| 121 | 08/30/08 | Email from Carolyn Doody to Liz Gregory | 1 |
| 122 | 07/10/08 | Memorandum for Record by ZS | 2 |
| 123 | 09/08/08 | Email from Carol Oz to  Carolyn Doody, et al | 1 |
| 124 | 05/21/15 | Deposition Transcript | |
| 125 | | Deposition Transcript | 115 |
| 126 | 01/24/11 | Letter from County of Sacramento to J. Hardesty | 3 |

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501

THE HARDESTYS' STATEMENT OF DISPUTED FACTS
PAGE 51

| | | | |
|---|---|---|---|
| **127** | 06/04/15 | Deposition Transcript | |
| **128** | 07/14/15 | Deposition Transcript | |
| **129** | 10/06/10 | Fifth Amendment Memorandum of Understanding | 10 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robertson, Johnson,
Miller & Williamson
50 West Liberty Street,
Suite 600
Reno, Nevada 89501