# EXHIBIT "21"
# (Part 1 of 2)

# EXHIBIT "21"
# (Part 1 of 2)

```
                                                                    1
 1                 UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF CALIFORNIA
 3                       SACRAMENTO DIVISION
 4
 5    JOSEPH HARDESTY, et al.,        )
 6          Plaintiffs,               )
 7       vs.                          )
 8    SACRAMENTO METROPOLITAN AIR     )
 9    QUALITY MANAGEMENT DISTRICT,    ) Case No. 2:10-cv-02414-KJM-KJN
10    et al.   Defendants.            )
11    _____  )
12                                    )
13    JAY SCHNEIDER,                  ) [Partially consolidated with]
14          Plaintiff,                ) Case No. 2:12-cv-2457-KJM-KJN
15       vs.                          )
16    COUNTY OF SACRAMENTO, et al.,   )
17          Defendants.               )
18    _____  )
19
20            RECORDED DEPOSITION OF CINDY STORELLI
21                    Taken on June 4, 2015
22                 At DIEPENBROCK ELKIN, LLP
23                       At 3:16 p.m.
24               400 Capitol Mall, 27th Floor
25                    Sacramento, CA 95814
```

e-depositions LLC                         5151 California Avenue, Suite 100
775.240.0186                                     Irvine, California 92617

```
                                                            2
 1   APPEARANCES:
 2   For the Plaintiffs: G. DAVID ROBERTSON, ESQ.
 3                       ROBERTSON, JOHNSON, MILLER & WILLIAMSON
 4                       50 West Liberty Street, Suite 600
 5                       Reno, Nevada 89501
 6                       Attorneys for Joseph and Yvette Hardesty
 7
 8                       RICHARD M. ROSS, ESQ.
 9                       LAW OFFICE OF RICHARD M. ROSS
10                       770 L Street, Suite 950
11                       Sacramento, CA 95814
12                       Attorneys for Jay Schneider, et al.
13
14                       GLENN W. PETERSON, ESQ.
15                       MILLSTONE PETERSON & WATTS, LLP
16                       2267 Lava Ridge Court, Suite 210
17                       Roseville, CA 95661
18                       Attorneys for Jay Schneider, et al.
19
20   For the Defendants: RYAN E. PALUMBO, ESQ.
21                       COLLINS, COLLINS, MUIR & STEWART, LLP
22                       1900 Harrison Street, Suite 1700
23                       Oakland, CA 94612
24                       Attorneys for David Bieber
25
```

```
                                                                    3
 1              MARK O'DEA, ESQ.

 2              LONGYEAR, O'DEA and LAVARA, LLP

 3              3620 American River Drive, Suite 230

 4              Sacramento, CA 95864

 5              Attorneys for Defendant County of Sacramento

 6

 7              JEFFREY P. REUSCH, ESQ.

 8              OFFICE OF THE ATTORNEY GENERAL

 9              1300 I Street, Room 1520-25

10              Sacramento, CA 95814

11              Attorneys for Defendant Liz Gregory

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
                        INDEX
Witness                 Direct      Redirect    Followup
Ms. Storelli            Page 6
(By Mr. Robertson)
Ms. Storelli                        Page 89
(By Mr. Palumbo)
Ms. Storelli                        Page 94
(By Mr. Peterson)
Ms. Storelli                        Page 105
(By Mr. Reusch)
```

Cindy Storelli, on 6/4/2015

5

EXHIBITS

| Number | Description | Page |
|--------|-------------|------|
| 129 | Schneider letter | 32 |
| 130 | Hardesty letter | 94 |
| 131 | Board of Supervisors summary | 94 |
| 132 | Photo | 103 |

A: I do recall knowing that, yes.

Q: Okay. And do you recall how you learned that?

A: It would have been just through general research on my own and that in talking to county council.

Q: Okay. In your experience as a planner with Sacramento County, did you have occasion to work on any other mines in Sacramento County that were allegedly vested besides the Schneider Mine?

A: No, I don't believe so.

Q: Okay. And you do understand that, at least, Mr. Schneider contends that his mine is vested because it predated SMARA and was approved by the county as a vested mine? Do you understand that?

A: I understand that he believes that, yes.

Q: Okay. When did you first learn that he believed that?

A: I'd say in 2009, 2010 timeframe.

Q: Okay. Do you recall back in 1992 that Mr. Schneider was contending that he had vested rights?

A: I know that now. I didn't know it in 1992.

Q: Okay. Can I see Exhibit 119, please? Can you take a look at what was marked during Mr. Gamel's deposition as Exhibit 119? And I'd give you a minute to look that over, but mostly, I just wanted to direct your attention to the first page under the summary, and then also, the cc's, if you could tell me

1   if you were cc'd on this correspondence?
2       A:   I was not cc'd on this.
3       Q:   Okay, that's -- well.  Sorry, wrong exhibit.
4       A:   That's okay.
5       Q:   Okay.  Looking on Page 1 under where it says
6   vested rights, do you see what it says, where it says in the
7   second sentence, "From this information, it appears that Mr.
8   Schneider may have vested rights to continue his mining
9   operations."  Do you see that?
10      A:   No, I do not see anything.
11      Q:   Okay.  Right down here in the vested--
12      A:   Oh, I'm sorry, down below.  From the -- okay, I
13  see it.
14      Q:   All right.  And this was cc'd to you, correct?
15      A:   Yes, it was.
16      Q:   Okay.  So, assuming you received this document,
17  you may have known as far back as 1992 that Mr. Schneider was
18  contending he had vested rights with respect to his mine.  Is
19  that right?
20      A:   Assuming that I read this when I got it.
21      Q:   I take it you don't recall the memorandum.
22      A:   I do not.
23      Q:   Okay.  But having seen this memo, would it be fair
24  to say that, that you may have known back in the '90s about Mr.
25  Schneider's claim that he had vested rights?

18

1  MR. O'DEA: Objection, lacks foundation, calls
2  for speculation.
3  Q: You can answer the question, anyway. He's just
4  making a record.
5  A: I don't remember this memo.
6  Q: Okay. But as you sit here today, you deny that
7  you may have known about Mr. Schneider's vested rights back in
8  1990s?
9  MR. O'DEA: Objection, lacks foundation, calls
10  for speculation.
11  A: I would have to speculate. I don't, I mean, I --
12  Q: You just, so you just don't know one way or the
13  other?
14  A: I don't.
15  Q: Okay. So, other than hearing about Mr.
16  Schneider's claim that he had vested mining rights, do you have
17  any recollection of performing any research into what it meant
18  to have a vested mining right?
19  A: No.
20  Q: Back in the 2008 through 2010 time period, did you
21  have any understanding of the significance of having a vested
22  mining right?
23  A: Yes.
24  Q: And what was the significance?
25  A: That you could mine pursuant to what you have

1  vested.
2       Q: Okay. And how would you determine what you had
3  vested?
4       A: In general?
5       Q: Okay. You just said you could mine in accordance
6  with what you have vested. I'm just trying to understand how
7  the mine owner would know what they had vested according to your
8  definition.
9       A: One way, you look at what operation was being done
10 prior to the time of the rules changing that required the use
11 permit and you look to see if they're still operating in that
12 same general manner.
13      Q: Okay. So, let's start with size, for example.
14 How would Mr. Schneider know how many acres of his mining
15 operation would be vested?
16      MR. O'DEA: Objection, lacks foundation, calls
17 for speculation.
18      A: And actually, I didn't work on figuring it out, so
19 I can't answer that question.
20      Q: And that's a perfectly legitimate response. If
21 you don't know the answer, just say you don't know. That's
22 fine. How, in your mind, in the 2008 through 2010 time period,
23 would the county's regulatory authority over a vested mine
24 differ from the county's authority over a non-vested mine?
25      MR. O'DEA: Incomplete hypothetical, lacks

1 foundation.
2     A: I don't understand the question.
3     Q: Okay. You said that you understand that Mr.
4 Schneider claimed that his mine was vested, correct?
5     A: Correct.
6     Q: And what I'm trying to get at is, in your mind,
7 how does that make Mr. Schneider's mine different than a mine
8 that's not vested? What are the differences in your mind?
9     A: I'm not sure I can articulate that. I mean your
10 land as a mine, as far as whether or not they are mining
11 correctly, you still have to meet SMARA regulations and the
12 county zoning regulations.
13     Q: So, even if Mr. Schneider's mine was vested, in
14 your mind, he would still have to meet all the SMARA
15 requirements and all the county zoning requirements?
16     A: Yes.
17     Q: And that would be also the same for a mine that
18 was not vested, correct?
19     A: For a mine that is not vested, it will not be
20 operating legally, so I don't --
21     Q: Okay, fair enough. So, he would have to comply
22 with all the same requirements under SMARA and the county code
23 as a mine that was permitted after the beginning of SMARA. Is
24 that right?
25     A: I believe so.

1  Q: Do you have any training with respect to mining?
2  A: I don't know how to mine, if that's what you're
3  asking me.
4  Q: I'll ask it a different way. Do you have any
5  training at all with respect to mines and mining other than the
6  three to five hours of coursework you took with an overview of
7  the SMARA law?
8  A: If you're asking about training, then no.
9  Q: Okay. In the 2008-2010 timeframe when you were a
10 principal planner, and Mr. Gamel was working under your
11 supervision, was he the aggregate manager for the county?
12 A: Yes.
13 Q: Have you ever held that title of aggregate
14 manager?
15 A: No.
16 Q: Has anyone else under your supervision ever held
17 that title besides Mr. Gamel?
18 A: Yes.
19 Q: Who else?
20 A: Mike Winter and John Lundgren.
21 Q: And did Mr. Winter hold the title after Mr. Gamel?
22 A: No, before.
23 Q: Before? And then Mr. Gamel, and then Mr. Lundgren
24 after Gamel?
25 A: Yes.

22

1   Q: Mr. Gamel, I believe, became the aggregate manager
2   in approximately 2008, is that correct?
3   A: That sounds right.
4   Q: And who made the decision to replace Mr. Winter
5   with Gamel?
6   A: It was a joint decision between myself and the
7   planning director at the time, Robert Sherry.
8   Q: And what was the reason for Mr. Gamel replacing
9   Mr. Winter?
10  A: It was due to performance issues with Mr. Winter.
11  Q: What background training and experience did Mr.
12  Gamel have that qualified him to be a better aggregate manager
13  than Mr. Winter?
14       MR. O'DEA: Objection, misstates her testimony,
15  lacks foundation.
16  Q: You can still answer the question.
17  A: They have the same background or similar.
18  Q: Okay. Did you have sufficient background in
19  education to perform the aggregate manager position?
20  A: Repeat the question.
21  Q: Did you have sufficient background and training to
22  perform the aggregate manager position?
23  A: Yes. I could have done it.
24  Q: And what background and training do you think are
25  necessary to perform the aggregate manager position?

1  A: A planning degree.
2  Q: I'm sorry?
3  A: A planning-related degree.
4  Q: Anything else?
5  Q: How about training with respect to SMARA?
6  A: I don't believe you need to have that training
7  prior to having that job.
8  Q: And then, does that mean that once someone becomes
9  the aggregate manager, then they do receive some specialized
10 training?
11 A: Yes.
12 Q: And what specialized training did Mr. Gamel
13 receive?
14 A: He went to numerous. I couldn't tell you how many
15 but probably almost yearly SMARA training given through either
16 OMR or other agencies, private firms that often give the
17 training.
18 Q: Was the same true for Mr. Winter?
19 A: Yes.
20 Q: Were Mr. Winter's performance issues in any way
21 connected to allegations by OMR that Sacramento County was not
22 appropriately administering SMARA as the lead agency?
23 A: No.
24 Q: You said earlier that you first became aware of
25 Mr. Schneider's contentions or contention that he had a vested

mine in 2009. Do you recall that?

A: Yes.

Q: And how was it you became aware of Mr. Schneider's contention in 2009? What were the circumstances?

A: It would have been conversations with the planning director and Jeff Gamel?

Q: And tell me about those conversations with the planning director and Jeff Gamel?

A: I don't remember word for word any of that information. I just recall that experience of having those conversations.

Q: Okay. What were the conversations in the context of? For example, had there been a complaint about Mr. Schneider's mine or Mr. Hardesty's mining operation?

A: Yeah. I think there had, I believe, not a formal complaint, but yes, there had been some questions.

Q: And do you recall who raised the questions?

A: The party that raised the questions, I believe, it was Teichert.

Q: And do you recall whether Teichert was taking the position that Mr. Hardesty's operation had an unfair competitive advantage because Mr. Hardesty was not being required to comply with all the same laws as Teichert?

A: I remember them raising that concern, yes.

Q: Okay. And in your mind, did that, in any way,

1  relate to the fact that the Schneider Mine, that Mr. Hardesty
2  was operating was vested as opposed to the Teichert mine not
3  being vested?
4          A:  I'm not sure I understand the question.
5          Q:  Okay.  Teichert was complaining that, "Hey, those
6  folks over there at Hardesty operation, they aren't complying
7  with all the rules that we have to comply with.  They're not
8  jumping through all the hoops.  They're not paying for the truck
9  traffic, you know, the cost for the trucks.  They're not doing
10 all these things that we have to do."  Is that right?
11         A:  They did raise those concerns.
12         Q:  Right.  And what I'm asking is did you ever look
13 into whether the reason that Hardesty did not have to pay those
14 things is because his mine was vested as opposed to Teichert's
15 mine which was not vested?
16         A:  I guess -- I don't know how to answer it if you're
17 not using word I would choose.
18         Q:  Well, answer in any way that you're comfortable.
19         A:  Okay.
20         Q:  I'm not trying to put words in your mouth.  I'm
21 just asking.
22         A:  Okay.  But I feel like that's what you're doing.
23         Q:  Okay, I'm not.
24         A:  Okay.
25         Q:  I'm just asking -- wait a minute.  We're talking

26

1  over each other. I'm asking the question in the way I'm asking
2  it because those are the words I'm using. If you can't relate
3  to those words and you need to use different words to answer the
4  question, that's fine. Okay.
5        A: So, I guess, my answer is -- my answer is that,
6  yes, we had to - you know, there was no conditions on Schneider
7  or the Hardesty Mine because it was a vested operation and it
8  did not have a use permit. I think that's what you're asking
9  me.
10       Q: Yes. And do you know why it was the Hardesty Mine
11 did not have a use permit?
12       A: Because they were operating under a vested right.
13       Q: And so, they did not need a use permit, correct?
14       A: Correct.
15       Q: And if they did not need a use permit, then for
16 example, they would not have to pay a per-ton fee for their
17 trucks driving on the road. Is that correct?
18       A: Well, paying a per-ton fee has nothing to do
19 whether you're vested or not.
20       Q: Okay. Well, let's explore that for a second. The
21 charge to, for example, Teichert, to haul their material on the
22 roads is a charge that's imposed upon Teichert as a part of
23 getting a permit for the mine, is that correct?
24       A: For one of their mines, yes.
25       Q: For one of their mines, correct?

e-depositions LLC                           5151 California Avenue, Suite 100
775.240.0186                                       Irvine, California 92617

Cindy Storelli, on 6/4/2015

27

1         A: Uh-huh. Which it actually is an operation, yes.

2         Q: I'm sorry?

3         A: Which if that mine is not operating, so--

4         Q: Are you talking about the Barton-Mosher,

5 Sacramento Ranches, and White Rock Road Properties Mine?

6         A: I'd have to see what you're looking at. Yes.

7         Q: So, if I understand you correctly, because

8 Hardesty did not need a use permit, the county could not make a

9 condition of the use permit that Hardesty pay a per-ton fee to

10 use the roads. Is that correct?

11         A: If there's no use permit, so there would be no

12 condition.

13         Q: Correct. So, to make sure we're clear, if

14 Hardesty had to obtain a use permit, then the county could have

15 impose the per-ton fee upon Hardesty. Is that correct?

16         A: Possibly.

17         Q: Okay. As a condition, correct?

18         A: It's actually not a condition.

19         Q: Okay. And explain that to me because--

20         A: It's a development agreement provision.

21         Q: Which is entered into as part of the process to

22 obtain the permit for the mine?

23         A: A development agreement is a voluntary agreement

24 between the county and the owner of the property.

25         Q: Okay. And this mine that we talked about a second

1  ago and you said you didn't recognize it at first, and then, you
2  looked at it. What do you refer to this mine as?
3       A: The Teichert Quarry.
4       Q: I'm sorry?
5       A: The Teichert Quarry.
6       Q: Teichert Quarry, okay. And I called it Barton-
7  Mosher because that was the name of the applicant that owned the
8  property where the Teichert Quarry was located, correct?
9       A: I believe that's what it says.
10      Q: As part of the permitting process for the Teichert
11 Quarry was Teichert to contribute approximately $400,000 to be
12 used by the county for among other things, hiring park rangers?
13      A: I do know that they had to contribute $400,000, I
14 don't recall if that was in the documents.
15      Q: Okay. As part of obtaining its permit, correct?
16      A: Yes, that was agreed to in the development
17 agreement.
18      Q: And there was also an additional $250,000 that
19 Teichert was to pay under that agreement. Do you recall that?
20      A: I'd have to look at the agreement to remember the
21 numbers.
22      Q: Okay. Do you recall any additional amounts that
23 Teichert was to pay besides the $400,000?
24      A: In addition, other than, since that time, I only
25 remember the $400,000. I do not remember the $250.