# EXHIBIT "93"
# (Part 1 of 2)

# EXHIBIT "93"
# (Part 1 of 2)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

JOSEPH HARDESTY, ET AL.,
          )
          PLAINTIFF,          )
          )
VS.          )  2:10-CV-02414-KJM-KJN
          )
SACRAMENTO METROPOLITAN AIR QUALITY)
MANAGEMENT DISTRICT, et al.,          )
          )
          DEFENDANTS.          )
_____)
          )[Partially consolidated with]
AND RELATED CROSS-ACTIONS          ) 2:12-cv-2467-KJM-KJN
_____)

DEPOSITION OF GAY NORRIS

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 26, 2015

REPORTED BY:

MARY JO SAUL

CSR No. 8820, RPR, CLR

```
 1        DEPOSITION of GAY NORRIS, taken on behalf of the

 2        Plaintiffs, at 5757 W. Century Boulevard, 7th Floor,

 3        Los Angeles, California, on Tuesday, MAY 26, 2015, at

 4        10:10 a.m., before MARY JO SAUL, CSR 8820, RPR, CLR,

 5        pursuant to Notice.

 6

 7

 8   APPEARANCES:

 9

10        FOR THE PLAINTIFFS:

11             ROBERTSON, JOHNSON, MILLER & WILLIAMSON
               BY:  G. David Robertson, Esq.
12             50 West Liberty Street
               Suite 600
13             Reno, Nevada 89501
               775.329.5600
14             gdavid@nvlawyers.com

15        FOR THE DEFENDANTS DENNIS O'BRYANT, GAY NORRIS, STEVE
          TESTA and CURT TARA:
16
               OFFICE OF THE ATTORNEY GENERAL
17             BY:  David G. Alderson, Esq.
               P.O. Box 70550
18             1515 Clay Street, Fl 20
               Oakland, California 94612
19             510.622.2243
               david.alderson@Doj.ca.gov
20
          FOR THE DEFENDANT LIZ GREGORY (Telephonic):
21
               OFFICE OF THE ATTORNEY GENERAL
22             BY:  Tracy Winsor, Esq.
               1300 I Street, Room 125
23             Sacramento, California 95814
               916.324.5372
24

25
```

```
 1  APPEARANCES (Continued):

 2      FOR THE DEFENDANT DAVID BIEBER (Telephonic):

 3          COLLINS, MUIR & STEWART, LLP
            BY:  Ryan E. Palumbo, Esq.
 4          1999 Harrison Street, Suite 1700
            Oakland, California 94612
 5          510.844.5100

 6

 7  FOR THE PLAINTIFFS SCHNEIDER family(Telephonic):

 8

            MILLSTONE, PETERSON & WATTS, LLP
 9          BY:  Glenn W. Peterson, Esq.
            2267 Lava Ridge Court, Suite 210
10          Roseville, California 95661
            916.780.8222
11

12  FOR THE DEFENDANT COUNTY OF SACRAMENTO (Telephonic):

13

            LONGYEAR, O'DEA and LARVARA, LLP
14          BY:  Mark O'Dea, Esq.
            3620 American River Drive, Suite 230
15          Sacramento, California 95864
            916.974.8500
16

        ALSO PRESENT:
17

            Mr. Dan Tankersley
18

19

20

21

22

23

24

25
```

1                    I  N  D  E  X

2   WITNESS              EXAMINATION            PAGE

3   GAY NORRIS

4                   BY MR. ROBERTSON             6

5                   BY MS. WINSOR               184

6

7                      EXHIBITS

8   EXHIBIT NO.                          PAGE NO.

9    89    Schnedier Historic Mine Reclamation    38
           Plan, one page, color
10
     90    Memo to Warden Liz Gregory from Kris   42
11         Vyverberg dated September 14, 2008

12   91    E-mails, September 17, 2008 through    46
           October 30, 2008
13
     92    E-mail from Liz Gregory to Bret        52
14         Koehler, Kris Vyverberg, dated
           November 1, 2008
15
     93    E-mail from Gregory Tenorio to Dennis  53
16         O'Bryant and others

17   94    Site visit report dated 12-23-08       97

18   95    E-mail from Gay Norris to Ken Trott,   98
           forward:  APN Numbers
19
     96    E-mail from Debby Mayberry to April   100
20         Balestreri dated January 8, 2009

21   97    E-mail from April Balestreri to Gay   101
           Norris dated January 5, 2009
22
     98    E-mail from Gay Norris to Ken Trott   138
23         dated June 15, 2011

24   99    E-mail from Bret Koehler to Gay Norris 146
           dated January 22, 2009
25

1                   I   N   D   E   X (Continued)

2

3                          EXHIBITS

4   EXHIBIT NO.                                    PAGE NO.

5     100   E-mail from Gay Norris to Kevin           148
            Doherty dated February 17, 2009
6
      101   E-mail from April Balestreri to Bret      150
7           Koehler and others dated February 4,
            2009
8
      102   Notice, Schneider Historic Mine from      153
9           Zebra Room

10    103   E-mail from Gay Norris to Kevin           154
            Doherty dated February 17,  2009
11
      104   E-mail to Michael Luksic from Gay         157
12          Norris dated July 15, 2009

13    105   E-mail from Gay Norris to Michael         161
            Luksic and April Balstreri dated
14          August 9, 2009

15    106   E-mail from Gay Norris to Ken Trott       170
            dated October 14, 2009
16
      107   E-mail from Gay Norris to Ken Trott       179
17          dated June 15, 2011

18

19

20

21

22

23

24

25

1   LOS ANGELES, CALIFORNIA; TUESDAY, MAY 26, 2015

2                    10:10 A.M.

3

4                    GAY NORRIS,

5            having first been duly sworn, was

6            examined and testified as follows:

7

8                    EXAMINATION

9

10  BY MR. ROBERTSON:

11     Q.   Good morning, Ms. Norris.  How are you?

12     A.   I'm fine.  How are you?

13     Q.   Fine, thanks.  My name is David Robertson,

14  and I represent the Hardestys in this matter.  And I

15  think what we ought to do is have the attorneys

16  identify themselves so the record will be clear.

17          MR. ALDERSON:  I'm David Alderson.  I'm

18  representing defendants Gay Norris, Dennis O'Bryant,

19  Steven Testa.  I'm with the California Attorney

20  General's office.  Those on the phone?

21          MS. WINSOR:  This is Supervising Deputy

22  Attorney General Tracy Winsor on behalf of defendant

23  Liz Gregory.  I'm with the Sacramento Office of the

24  Attorney General.

25          MR. PALUMBO:  Ryan Palumbo, Collins, Muir &

```
 1   Stewart on behalf of David Bieber.
 2             MR. O'DEA:  This is Mark O'Dea on behalf of
 3   the County of Sacramento and county-related
 4   defendants.
 5             MR. PETERSON:  Glenn Peterson, Millstone,
 6   Peterson & Watts on behalf of the Schneider family
 7   plaintiffs.
 8             MR. ROBERTSON:  Is Rich going to be on the
 9   call?
10             MR. PETERSON:  No.
11             MR. ROBERTSON:  Okay.  I think we have
12   everybody.
13   BY MR. ROBERTSON:
14        Q.   Ms. Norris, have you ever had your
15   deposition taken before?
16        A.   Yes.
17        Q.   On one or more than one occasion?
18        A.   More than one.
19        Q.   Approximately how many times?
20        A.   Two.
21        Q.   When was the most recent time you had your
22   deposition taken?
23        A.   I don't remember.
24        Q.   A while ago?
25        A.   A while ago.
```

1      Q.   Have you had a chance to confer with
2  Mr. Alderson before this deposition to talk about
3  what would occur here today?
4      A.   Yes.
5      Q.   I will review some of the basic rules of
6  the deposition process, and then if you have any
7  questions of me, you can ask those before we get
8  started.
9           The primary rule of a deposition is that
10 even though we are in an informal environment here
11 in a conference room in Los Angeles, the oath that
12 you just took is the exact same oath that you would
13 take in a court of law.
14          Do you understand that?
15     A.   Yes, I do.
16     Q.   You are sworn to tell the truth here today
17 just as if you were in a courtroom with a judge and
18 a jury present.
19          Do you understand that?
20     A.   Yes, I do.
21     Q.   My questions and if anyone else asks
22 questions, their questions will be typed up by the
23 court reporter, and your answers to those questions
24 will be put into a booklet and given to you
25 following the deposition and you will have a chance

1   to review your testimony.

2           Are you aware of that?

3       A.   Yes.

4       Q.   When you do review your testimony, you're

5   entitled to make changes to your answers.  Please

6   don't change our questions.  And if you want to

7   change your answers, you are fully free to do that

8   at the time you review your deposition transcript.

9           However, I want to caution you that should

10  you make a change to your answers later, that change

11  could be commented upon at the time of trial because

12  there may be some question as to why there was a

13  change made, so it is important that you give us

14  your full and truthful testimony here today.

15          Do you understand that?

16      A.   Yes.

17      Q.   Is there any reason you can think of why

18  you are not able to have your deposition taken today

19  such you are on medication that affects your memory

20  or some other reason?

21      A.   No.

22      Q.   The ground rules -- you are doing great so

23  far, but the ground rules are that we can't talk at

24  the same time.  It's tough enough for the court

25  reporter to take down one person at a time let alone

1  two.

2      Do you understand that?

3   A.  Yes.

4   Q.  You have to avoid shakes of the head, nods

5  of the head, "uh-huh," "huh-uh," things like that.

6  Make sure you answer audibly so the court reporter

7  can take that down; all right?

8   A.  Yes.

9   Q.  Do you have any questions of me before we

10  begin?

11  A.  No.

12  Q.  Did you review any documents before this

13  deposition?

14  A.  Yes.

15  Q.  What documents did you review?

16  A.  There was an e-mail that I sent to Bret

17  Koehler and Dennis O'Bryant.

18  Q.  Okay.

19  A.  And I reviewed an entry to the SMARA

20  database that I had created.

21  Q.  You are not saying you created the SMARA

22  database.  You are saying you created the entry;

23  correct?

24  A.  Correct.

25  Q.  I am not planning on marking this yet, but

1   would you take a look at the document and tell me if

2   this is the SMARA database you are talking about?

3           MR. ALDERSON:  Can she look at the other

4   pages?

5           MR. ROBERTSON:  Yes.  She can look at

6   whatever pages she wants.  I just turned to the page

7   where 042 starts.

8           THE WITNESS:  This must be a specialized

9   printout because I don't recognize it.

10  BY MR. ROBERTSON:

11      Q.   I wasn't so concerned about whether you

12  recognize it as whether you can find the entry on

13  there that you were referring to that you reviewed.

14      A.   Yes.

15      Q.   Let me see which entry it was.  Did you

16  just review the one entry?

17      A.   It's the last one.

18           MR. ALDERSON:  Take a look at it to make

19  sure that's right.

20           THE WITNESS:  There is some of it that I

21  didn't read.  It doesn't look like the one that I

22  saw.

23  BY MR. ROBERTSON:

24      Q.   Okay.  Let me suggest to you that's an

25  Excel spreadsheet, so it may have looked differently

1    than the format that you looked at.  But what I am

2    wondering is whether you recognize the entry as

3    containing the contents of what you reviewed before

4    the deposition?

5        A.   For the most part what I reviewed before

6    the deposition didn't contain everything that's

7    listed here on your Excel spreadsheet.

8        Q.   That's fine.  I don't want to mark this

9    whole document because it's a long document.  We

10   will come back to this.  Before I move on, did you

11   review the one entry then?

12       A.   Yes.

13       Q.   So over the lunch hour we will copy these

14   two pages, and then we will attach the two pages

15   rather than attaching this big, long document.

16       A.   Okay.

17       Q.   Do you remember the contents of the e-mail

18   that you reviewed?

19       A.   Yes.

20       Q.   What did that e-mail say?

21       A.   It was an e-mail from me to Bret Koehler

22   and Dennis O'Bryant where I -- yes, I remember.

23       Q.   What did the e-mail say?

24       A.   The e-mail was basically saying that while

25   I was standing there talking to Mr. Hardesty, that I

1    noticed a number of trucks leaving, and he had told

2    me that they were going to a Corps of Engineers

3    project.

4         Q.   I understand.  We will get to that e-mail.

5    I have got it here in my stack.

6              Any other e-mails that you reviewed or any

7    other documents?

8         A.   Well, there is a series of e-mails that

9    went beyond that where Dennis O'Bryant responded to

10   me.

11        Q.   That's part of this string?

12        A.   Yes.

13        Q.   I have that in my stack, and we will go

14   through that.

15             Any other documents that you reviewed

16   before your deposition?

17        A.   No.

18             Hold on a second, Counsel.  I am reviewing

19   the entry that she pointed out in the log.

20             MS. WINSOR:  This is Tracy Winsor.  Is

21   there a Bates number on the document?  That would be

22   extremely helpful to us.

23             MR. ROBERTSON:  In response to the question

24   about the Bates number, the document that I showed

25   her does not have Bates numbers.

1          MS. WINSOR:  Tracy Winsor.  We are

2     beginning to have static.

3          MR. ROBERTSON:  This document that I showed

4     to the witness is not -- does not contain any Bates

5     numbers, but when we photocopy it, we will make it

6     an exhibit and you can look at it then.

7     Unfortunately, it is in the produced documents.

8     It's just that it's a spreadsheet, so when it is

9     printed out, the pages don't show a Bates number.

10         MS. WINSOR:  Thank you.  That's helpful.

11    If there are Bates numbers on the document, it would

12    be very helpful if you don't mind reading them into

13    the record.  I would appreciate that.

14         MR. ROBERTSON:  We will.

15    BY MR. ROBERTSON:

16    Q.    The cell at the top of the next page is a

17    different entry than the first one, so if you were

18    reading the cell at the top of the first one --

19    A.    That's why it didn't look familiar.

20    Q.    -- that's an entirely different entry.  You

21    looked at this one (indicating).

22    A.    Yes.

23    Q.    We will get back to that.

24          Are you currently employed?

25    A.    No.

1      Q.   Are you retired?

2      A.   Yes, I am.

3      Q.   How many years did you put in before you

4   retired?

5      A.   19 and a half with the state.

6      Q.   With the state of California.  Very good.

7   How long ago did you retire?

8      A.   I retired in April 2011.

9      Q.   What was your job title when you retired?

10      A.   Engineering Geologist.

11      Q.   Is that the title you held during the

12   entire 19 and a half years you were with the state?

13      A.   No.

14      Q.   Can you tell me what other titles you held

15   with the state?

16      A.   Environmental Manager.

17      Q.   Start with the very first title you held.

18      A.   That was Engineering Geologist.

19      Q.   When was that?

20      A.   From 1992 through 2005.

21      Q.   Then what next?

22      A.   Then I went to work for the state of

23   Georgia.

24      Q.   Okay.

25      A.   As an engineering geologist.  Excuse me.

1   They don't use engineering.  They just use

2   geologist.

3       Q.   Okay.

4       A.   And as an environmental scientist.

5       Q.   What were the dates of that employment?

6       A.   From 2005 until 2006.

7       Q.   Okay.  Then did you come back to

8   California?

9       A.   Yes.

10      Q.   Was this arrangement in Georgia, was this

11  some sort of arrangement with the state of

12  California for you to go to Georgia?

13      A.   No.

14      Q.   It's the actual severance of your

15  employment in California and then you came back?

16      A.   I retired.

17      Q.   You retired and came back.  What was your

18  title when you came back in 2006?

19      A.   Environmental manager.

20      Q.   How long did you have that title?

21      A.   Until 2007.

22      Q.   And then what did your title become?

23      A.   Engineering geologist.

24      Q.   That's the title you retired with, the

25  second time?

1     A.   Yes.

2     Q.   What is your educational background?

3     A.   I have a BS in the sciences with a geology

4  major.

5     Q.   What school?

6     A.   The University of Texas at El Paso formerly

7  the Texas College of Mines.

8     Q.   Any other education besides your Bachelor

9  of Science in geology from the University Of Texas

10 in El Paso?

11    A.   I took various courses.  Secondary

12 colleging in Louisiana at Louisiana Tech.

13    Q.   Did you take any courses which trained you

14 with respect to mines or mining?

15    A.   Yes.

16    Q.   Can you describe those for us, please.

17    A.   Everything that led up to my degree, all my

18 geology courses were all what we call hard rock, so

19 mining related.

20    Q.   My question wasn't clear, I guess.  After

21 you got your Bachelor of Science, you said you took

22 various courses.  Did any of those various courses

23 deal specifically with mining issues?

24    A.   No.

25    Q.   What training did you receive from the

1  state of California with respect to understanding

2  and interpreting and applying SMARA?

3       A.   I had job-related training on the job.

4       Q.   On-the-job training?

5       A.   Yes.

6       Q.   Would it be fair to say you did not receive

7  any specific training in how to apply SMARA law to a

8  mining operation other than just what you learned

9  during the course of your -- ordinary course of your

10 job?

11      A.   I spent time with my supervisor during the

12 year that I was on probation and we did mining

13 inspections together.

14      Q.   Who was that supervisor?

15      A.   I'm sorry.  I don't remember his name.

16      Q.   Maybe we will come across it.  That would

17 have been in 2006?

18      A.   2007, 2008.

19      Q.   2007 to 2008?

20      A.   Yes, sir.

21      Q.   In the 2007 to 2008 time period when you

22 say that was a probation period, was that just a

23 normal one-year probation for that position so that

24 you learned the position, or was that some sort of

25 probationary period that was special to you?

1    A.    No.  The state requires a one-year

2    probationary period whenever you are a new hire for

3    a change of jobs, so it is a one-year period during

4    which you learn the job and its requirements.

5    Q.    So would it be fair to say that your

6    training with respect to application of SMARA law to

7    mines and mining was learned primarily during this

8    one-year probationary period in 2007 to 2008; would

9    that be correct?

10   A.    As far as SMARA, yes.  And my supervisor's

11   name was Paul Marshall.

12   Q.    Did Mr. Marshall have you read any books

13   about SMARA law and the application of the law to

14   mines?

15   A.    The regulations are online.

16   Q.    Did you sit down at some point in the

17   probation period and read through all of the SMARA

18   regulations?

19   A.    Yes, I did.

20   Q.    At some point in your training did you

21   become aware that there are mines in the state of

22   California which predated SMARA and, therefore, they

23   are vested mines and are treated differently under

24   SMARA?

25   A.    Yes.

1     Q.   When did you become aware of that?

2     A.   When I read the regulations.

3     Q.   Were you aware of that before you started

4   working on the Schneider mine?

5     A.   Yes.

6     Q.   What did you understand to be the

7   difference between a vested mine and a nonvested

8   mine with respect to SMARA?

9     A.   That these mines, this predated SMARA, were

10   exempt.

11     Q.   Exempt from SMARA except with respect to

12   having a reclamation plan and financial assurances?

13     A.   Exactly.

14     Q.   Did you understand that before -- I think

15   you said this, but I want to make sure it is clear,

16   did you have that understanding before you started

17   working on the Schneider mine case?

18     A.   Yes.

19     Q.   As an engineering geologist starting in --

20   I'm a little unclear.  My notes say you came back to

21   California in 2006, but you didn't start back to

22   work with California until 2007; is that right?

23     A.   No.  In 2006 I went to work for Caltrans as

24   an environmental planner.

25     Q.   I see.  Just for one year?

1      A.   It was a little longer than a year.

2      Q.   So then you started your job as an

3   engineering geologist with the Office of Mine

4   Reclamation in 2007?

5      A.   Yes.

6      Q.   Were you in the compliance division or

7   compliance section?

8      A.   Yes.

9      Q.   Can you describe for me what the compliance

10  section of the Office of Mine Reclamation does?

11     A.   We ensured that the mines that were subject

12  to SMARA were compliant with the regulations.  We

13  also reviewed financial assurance, cost estimates

14  that were submitted by the mines.

15     Q.   And, also, the annual reports?

16     A.   No.  We did not review annual reports.

17     Q.   Did you just make sure that annual reports

18  were filed and you did not review them, or that was

19  not part of --

20     A.   That was in another section.

21     Q.   What section was that?

22     A.   Reporting.

23     Q.   So Reporting reviewed the annual reports,

24  and Compliance reviewed the financial assurances?

25     A.   Yes.

1     Q.   What did Compliance look for to make

2   certain that the financial assurances were in proper

3   order?

4     A.   Well, we looked to see if there had been a

5   sign and to see if the cost estimate was reasonable

6   for the amount of disturbance that had occurred.

7     Q.   In the case of the county of Sacramento,

8   the county was the lead agency to enforce SMARA;

9   correct?

10     A.   Correct.

11     Q.   So normally the financial assurances would

12   be set by the county under those circumstances;

13   correct?

14     A.   The financial assurances was, my

15   understanding -- maybe I shouldn't speak.

16     Q.   We are all here to understand your

17   understanding.

18     A.   Okay.

19     Q.   What we are trying to figure out was in

20   your mind did the Office of Mine Reclamation set the

21   financial assurance amount, or did the county of

22   Sacramento set the financial assurance amount, for

23   example, on the Schneider mine?

24     A.   It was my understanding that --

25         MS. WINSOR:   Objection.

1          MR. ROBERTSON:  Did we have an objection?

2          MS. WINSOR:  This is Tracy Winsor.  The

3    question lacks foundation of knowledge of the

4    witness.

5          MR. ROBERTSON:  Thank you.

6    BY MR. ROBERTSON:

7      Q.  Go ahead.

8      A.  It was my understanding that the compliance

9    section reviewed all of the financial assurances for

10   all the mines.  That was my understanding.

11     Q.  Fair enough.  So you know lawyers might

12   jump in and state an objection.  We just have to

13   wait and listen to what they say, and then we just

14   keep going.  They are just doing their job.

15     A.  Okay.

16     Q.  I think I understand what you are saying is

17   that the Office of Mine Reclamation reviewed all the

18   financial assurances, so what I am trying to get at

19   is something slightly different.  Do you know

20   whether the financial assurance amount for a mine

21   would be set by the Office of Mine Reclamation or by

22   the county if the county was the lead agency?

23     A.  I really couldn't say.

24     Q.  That's fine.  If you don't know, just say

25   you don't know.  That's fine.  Okay?

1          In the 2008 to 2009 time frame, what would

2     you say were your primary job duties in the

3     compliance section?

4          A.   We were -- we stopped reviewing -- there

5     were four geologists, and three geologists were

6     doing FACE reviews, and we did -- we focused simply

7     on compliance.  Dealing with the lead agencies,

8     making sure that they enforced SMARA, and when they

9     didn't, we would write them letters or, in my case,

10    I visited counties and instructed them on how to

11    enforce SMARA and what we expected them to do.

12         Q.   Do you remember about how many counties

13    there are in the state of California?

14         A.   I have no idea.

15         Q.   Was your office in charge of all of them or

16    just some of them?

17         A.   All of them.  With some exceptions.  There

18    were some that were overseen by the State Mining and

19    Geology Board.

20         Q.   In some instances the State Mining and

21    Geology Board was the lead agency and other

22    instances the county was the lead agency; correct?

23         A.   Correct.

24         Q.   As best you recall, how many of the

25    counties were lead agencies as opposed to -- how

1   many lead agencies or how many counties administered

2   their own SMARA law as the lead agency versus the

3   State Mining and Geology Board administering the

4   SMARA laws for that county?

5       A.   I don't remember.

6       Q.   In your mind, was it mostly the counties,

7   or was it mostly the state or do you recall?

8       A.   Mostly the state.  You mean mostly OMR?

9       Q.   Yes.

10      A.   Lead agencies.

11      Q.   I was asking whether the State Mining and

12  Geology Board was generally the lead agencies or the

13  county were the lead agencies?

14      A.   Generally the counties.

15      Q.   Can you estimate for me approximately how

16  many counties that you worked with regarding their

17  enforcement of SMARA?

18      A.   I really couldn't say.  I don't remember.

19      Q.   Would it be more than five?

20      A.   Yes.

21      Q.   More than ten?

22      A.   It depended.  We were assigned certain

23  areas, and that changed and changed again.  So I

24  would say less than ten was my first assignment,

25  Southern California, and some of those counties were

```
 1   rather large with many mines, so somebody else might
 2   have had more than I did, but I think I had less
 3   than ten.
 4        Q.   Would it be fair to say that during your
 5   first three years in the OMR compliance division
 6   during that time you would have had less than ten
 7   counties?
 8        A.   No.  There were times that I had more than
 9   ten.
10        Q.   During that time period, which would be
11   let's just say 2007 to 2010, approximately.
12        A.   Uh-huh.
13             THE COURT REPORTER:  Is that "yes"?
14             THE WITNESS:  Yes.  Sorry.  Pardon me.
15   BY MR. ROBERTSON:
16        Q.   You're doing fine.  It's okay.  We'll catch
17   you, if you say anything.  Just to clear up the
18   record, from 2007 to 2010 there were times when you
19   had less than 10 counties and times that you had
20   more than 10 counties that you were working with to
21   enforce SMARA; is that correct?
22        A.   That's correct.
23        Q.   Can you give them to me, please?  I assume
24   Sacramento?
25        A.   At one time.
```

1      Q.   Keep going with the list.

2      A.   Los Angeles, Ventura, Riverside, San

3  Bernardino, San Diego, Imperial, Santa Barbara.  I

4  would have to look at a map to give you more, but

5  those are the ones I recall at the moment.  You want

6  to know all the counties from that time period?

7      Q.   Right.  That you were working with on SMARA

8  compliance.

9      A.   Okay.  I spent most of the time during that

10  time frame working on the mines that I gave you.

11  There was a very short period of time in which I had

12  another assignment, and I really couldn't say what

13  those are.  I don't remember, but that was during

14  the time period that Sacramento County -- that I was

15  assigned to Sacramento County.

16          I had an injury during that time that I

17  went from Southern California to another assignment

18  that included Sacramento County, and then I went

19  back to Southern California.

20      Q.   All of the counties you listed besides

21  Sacramento in Southern California, was your office

22  in Southern California?

23      A.   No.

24      Q.   Where was your office located?

25      A.   Sacramento.

```
1       Q.   You said you were working with Sacramento
2    County at one time.  So apparently that wasn't a
3    permanent assignment; is that correct?
4       A.   It was permanent and then it became
5    temporary.
6       Q.   And then did it cease altogether?
7       A.   Yes.
8       Q.   Can you describe the circumstances under
9    which you went from a permanent assignment to a
10   temporary assignment and then ceased altogether?
11          MR. ALDERSON:  Do you need to talk with me?
12   BY MR. ROBERTSON:
13      Q.   You can just describe the circumstances
14   generally, if you like.
15      A.   Okay.
16      Q.   You seem perplexed, so describe them
17   generally.
18      A.   I had a health issue.
19      Q.   It wasn't related to your work performance;
20   is that correct?
21      A.   No.
22      Q.   Any other counties that you were assigned
23   to that ultimately you were removed from working on
24   that county besides Sacramento?
25      A.   Yes.
```

1      Q.   What other counties?

2      A.   I don't remember.

3      Q.   Okay.

4      A.   That's when I had more than ten.  It was a

5  very short time frame, and I really don't remember

6  what they were.

7      Q.   Very good.  So I think you were saying that

8  your primary duty during the 2007 to 2010 time frame

9  was working with the lead agency in this case, a

10  series of counties, to assist them in their SMARA

11  compliance.  Would that be fair?

12      A.   Yes.

13      Q.   Can you describe for me basically what did

14  that entail?  How did you go about doing your job on

15  a daily basis?

16      A.   There were times when the counties would

17  call for assistance on how to enforce SMARA, or they

18  had a particular mine that they had an issue with

19  and they would call and ask for our opinion on how

20  to proceed.

21           There were other times when we would review

22  the county's performance, make sure that they were

23  doing all of the site inspections as they should,

24  and we would write letters to them giving them

25  certain time periods in which to come back into

1  enforcing SMARA the way that we thought they should.

2      Q.   Okay.

3      A.   And we would assist them in site

4  inspections, if they asked.

5      Q.   Did you ever sit down and figure out

6  approximately how many mines there were in all these

7  counties that you were working on?

8      A.   Yes.

9      Q.   About how many mines were you involved in

10 with all these counties, L.A., Ventura, Riverside,

11 San Bernardino, San Diego, Imperial, Santa Barbara

12 and the other ones you can't remember?

13     A.   Can I give you an estimate?

14     Q.   You sure can.

15     A.   Approximately 500.

16     Q.   Did there come a time when the Schneider

17 historic mine was brought to your attention?

18     A.   Yes.

19     Q.   How did that occur?

20     A.   A geologist from Fish and Game named Kris

21 Vyverberg visited our office and told us about the

22 problems at the mine.

23     Q.   Was this during the time that you were

24 permanently assigned to Sacramento, temporarily

25 assigned to Sacramento or not assigned to Sacramento

1   at all?

2      A.   I was assigned to Sacramento.  Whether it

3   was permanent or temporary, I don't recall.

4           MR. ALDERSON:  Were you going to say

5   something else?

6           THE WITNESS:  I was going to say something

7   else.  I don't think I was permanently assigned to

8   Sacramento County.  I think it was always a

9   temporary assignment.

10  BY MR. ROBERTSON:

11     Q.   Fair enough.

12          Did you ever see a letter from Senator Cox

13  asking that the Schneider mine be investigated?

14     A.   No, I did not.

15     Q.   Do you know who Senator Cox is?

16     A.   No, I do not.

17     Q.   How about Dan Lungren?  Have you heard that

18  name?

19     A.   Yes.

20     Q.   Did you know who Dan Lungren was during the

21  time period 2007 to 2010?

22     A.   No, I did not.

23     Q.   Where have you heard his name, are you able

24  to place it?

25     A.   I have seen him run ads on television.

1      Q.    Were you aware at any time that a

2   competitor of Hardesty Sand & Gravel by the name of

3   Teiker had initiated a complaint against the

4   Hardesty mine?

5      A.    No.

6      Q.    How in your mind did this mine come to the

7   attention of regulators?

8      A.    Through Kris Vyverberg.

9      Q.    You don't know how Kris Vyverberg became

10  involved with the mine; is that correct?

11     A.    She said that a warden came across the mine

12  and was concerned and got her involved.

13     Q.    Okay.  You said Kris Vyverbrg visited your

14  office, and did you meet with her on the first

15  visit?

16     A.    I met her in the hallway.

17     Q.    Did you two discuss the Schneider mine at

18  that time?

19     A.    Yes, we did.

20     Q.    What did she tell you about the mine?

21     A.    She was very concerned about the mine being

22  so close to the river.

23     Q.    Anything else?

24     A.    Not that I recall at this point.

25     Q.    Why was she so concerned about the mine

1   being close to the river?

2       A.   If it broke to the levy, the river would

3   then go into the mine, and there would be a

4   fishkill.

5       Q.   Was that the extent of your first

6   conversation with her?

7       A.   That's all that I recall.

8       Q.   What did you do in response to

9   Ms. Vyverberg's concerns?

10      A.   We planned to make a site inspection.

11      Q.   When you say "we," is that something that

12  you decided yourself, or was that something that was

13  decided in the chain of command above you?

14      A.   It was something that I decided myself.

15      Q.   Before you decided to perform a site

16  inspection, did you do any research regarding the

17  mine?

18      A.   Yes.

19      Q.   What research did you do?

20      A.   Reviewed the mine file, reviewed SMARA

21  database, looked at their reclamation plan, reviewed

22  the FACE, the Financial Assurance Cost Estimate.

23      Q.   Anything else?

24      A.   I recall that we looked at aerial

25  photographs.

1      Q.    Do you know where you got the aerial

2   photographs?

3      A.    I think it was Google Earth was the program

4   that we had.

5      Q.    So they weren't photographs bought by

6   somebody else.  You just looked at the computer and

7   saw some satellite images?

8      A.    Yes.

9      Q.    Anything else?

10     A.    Not that I recall.

11     Q.    After doing all of this research, why did

12   you believe a site inspection would be appropriate?

13     A.    Because of Kris Vyverberg's concerns.

14     Q.    So let me make sure I have got this

15   straight.  Kris Vyverberg came to you, expressed

16   some concerns and then you went and performed the

17   research that we just talked about; correct?

18     A.    Right.

19     Q.    After performing that research, did you

20   have your own concerns at that point, based upon the

21   research, or at that point were you simply

22   responding to her concerns?

23     A.    I was "prepping" for a site inspection.

24   And that would be my normal preparation is to review

25   the file, look at the area photographs, look at the

1   reclamation plan.

2       Q.   What I am trying to get at is whether at

3   the end of prepping for the site inspection or

4   whether there was anything that you saw in the

5   documents that you reviewed that caused you concern

6   about the mine as opposed to just the concern

7   expressed by Kris Vyverberg.

8       A.   No.

9       Q.   So the record is clear, you didn't see

10  anything that caused you concern; correct?

11      A.   No.

12      Q.   I mean, that is correct?

13      A.   That's correct.

14      Q.   Thank you.  I want to talk about this plan

15  that you reviewed before you went on the site

16  inspection.  I have noticed that there are some

17  indication in the documents that I reviewed that the

18  reclamation plan on file at OMR might have been

19  different from the reclamation plan on file at

20  Sacramento County.  Did you ever have any kind of

21  understanding in that regard whether the reclamation

22  plan you had on file is the same as the one that

23  Sacramento County has on file?

24      A.   I do not.

25          MS. WINSOR:  Objection.  Vague and

1   compound.

2   BY MR. ROBERTSON:

3       Q.   You can answer the question.

4       A.   I did not know that.

5       Q.   If there is a difference -- and I am not

6   saying that there is, but if there was a difference,

7   you didn't look at whether the Sacramento County

8   version was the same as OMR's; correct?

9       A.   That's right.

10      Q.   When you went through OMR's file, you did

11  find the reclamation plan in the OMR file; correct?

12      A.   Yes.

13      Q.   Did you see the rather extensive

14  documentation leading up to the adopting of the

15  reclamation plan?

16          MR. ALDERSON:   Objection.  Vague and

17  ambiguous.

18          You can answer.

19          THE WITNESS:  I can answer?

20  BY MR. ROBERTSON:

21      Q.   I can rephrase it if the question is not

22  clear to you.

23      A.   If you could repeat it, that would be

24  great.

25      Q.   When you were going through the OMR file,

1    did you see the extensive documentation leading up

2    to the reclamation plan?

3        A.   I read whatever documents were there.

4        Q.   For example, did you see that drafts of the

5    reclamation plan had been submitted to OMR, and that

6    OMR had commented back on those drafts and, in fact,

7    OMR provided some of the language and tables and

8    things that were ultimately put into the 2002

9    reclamation plan?  Did you see that?

10       A.   I don't recall.

11           MS. WINSOR:  Compound.  Assumes facts.

12           MR. ALDERSON:   Join.

13   BY MR. ROBERTSON:

14       Q.   After reviewing the OMR file, did you come

15   away with the impression that OMR was unaware of the

16   reclamation plan for the Schneider mine that had

17   been adopted?

18       A.   I don't understand your question.

19       Q.   Based upon your review of OMR's files, did

20   it appear to you that OMR was aware of the

21   reclamation plan for the Schneider mine?

22       A.   That OMR was aware of the reclamation plan?

23       Q.   Yes.

24       A.   Yes.

25       Q.   Because it's in the files; right?

1    A.    Right.

2    Q.    Back in 2002; correct?

3    A.    I don't know the date.

4    Q.    As you sit here today, can you remember one

5  way or the other whether you saw drafts of the

6  reclamation plan in the OMR file?

7    A.    I don't remember.  I wouldn't have gone by

8  a draft.

9    Q.    You would have found the actual adopted

10 reclamation plan and gone from that; correct?

11   A.    Exactly.

12   Q.    Was there anything -- did you notice in the

13 reclamation plan that it called for mining to occur

14 on the Schneider Ranch right up to the edge of the

15 Cosumnes River?

16   A.    I do not recall.

17   Q.    That's the river that runs north of the

18 Schneider property.  Do you remember that river?

19   A.    I remember that river.

20        MR. ROBERTSON:  I believe we are on Exhibit

21 89.  Does everybody agree with that before I mark

22 this one?

23             (The document referred to was marked by

24             the CSR as Exhibit 89 for identification

25             and made a part of this deposition.)

1          MR. ROBERTSON:  This document does not have

2     a Bates number, but it is Exhibit F to the

3     reclamation plan, and this copy that I am showing to

4     the witness is a color copy.

5     BY MR. ROBERTSON:

6          Q.   I will represent to you, Ms. Norris, that

7     this is a page from the Schneider Ranch Reclamation

8     Plan, and I ask if you recall seeing this when you

9     looked at the reclamation plan in OMR's file?

10         A.   No, I do not recall.

11         Q.   Assuming that the representation is correct

12    that this is from the reclamation plan and also

13    assuming that the areas shaded in pink are areas to

14    be mined, does it appear to you that the mining is

15    slated to take place right up to the edge of the

16    river that runs across the top of the page?

17         MR. ALDERSON:  Objection.  The document

18    speaks for itself.

19         You can go ahead and answer.

20         THE WITNESS:  According to this --

21         MS. WINSOR:  Based on the prior response of

22    the witness about this document, it calls for an

23    expert opinion.

24    BY MR. ROBERTSON:

25         Q.   Why don't you put the document down so we

1   can both see it.  Assuming the pink area, assuming

2   that's the area to be mined, runs right up to where

3   the river is that runs across near the top of the

4   page?

5          MR. ALDERSON:  Same objection.

6          You can go ahead and answer.

7          THE WITNESS:  According to this document it

8   does appear that way, yes.  In certain areas it

9   looks like it is going right up to the river or into

10  the river.

11  BY MR. ROBERTSON:

12     Q.   Okay.  When you say in certain areas, you

13  are talking about the pink areas where the pink

14  areas meet the black line of the river; correct?

15     A.   Yes.  Where did this document come from?

16     Q.   Received November 17, 2000, Planning

17  Department, County of Sacramento.  That is part of

18  the reclamation plan that was ultimately adopted for

19  the Schneider Ranch in 2002.

20     A.   So I may not have seen this document

21  because it went to the Planning Department of the

22  County of Sacramento.

23     Q.   That goes back to your testimony, you are

24  not sure this reclamation plan in OMR is the same

25  one on file with Sacramento?

1      A.   Correct.

2           MS. WINSOR:  So the representation -- you

3   are representing that this is the document from the

4   file of the County of Sacramento?

5           MR. ROBERTSON:  Its stamp on it says

6   received November 17, 2000, Planning Department,

7   County of Sacramento.

8           MS. WINSOR:  So that's the representation?

9           MR. ROBERTSON:  Yes.

10          THE WITNESS:  We don't know if this is part

11  of an improved or part of a draft because I don't

12  have the rest of the document.

13  BY MR. ROBERTSON:

14      Q.   Fair enough.  As you sit here today, do you

15  recall anything jumping out at you when you reviewed

16  the reclamation plan for the Schneider mine prior to

17  the site inspection?

18          MR. ALDERSON:  Objection.  Vague and

19  ambiguous.

20          Go ahead and answer.

21          THE WITNESS:  I don't remember.

22  BY MR. ROBERTSON:

23      Q.   Did there come a time that Kris Vyverberg

24  actually prepared a memorandum that was circulated

25  to you regarding the Schneider mine?

1      A.   Yes.

2           MR. ROBERTSON:   This will be Exhibit 90.

3           (The document referred to was marked by

4           the CSR as Exhibit 90 for identification

5           and made a part of this deposition.)

6           MR. ROBERTSON:   That is Bates LG000968.

7  BY MR. ROBERTSON:

8      Q.   Has it been a while since you have seen

9  this document?

10          Rather than have you read the entire thing,

11 I will direct your attention to the last page, and

12 it appears at the bottom of the third page that this

13 is cc'd to you; correct?

14     A.   Yes.

15     Q.   It says it has two attachments, but the

16 document that we received I don't believe had the

17 attachments.  I apologize for that.  This appears to

18 be a memorandum from Kris Vyverberg to Warden Liz

19 Gregory, and it is cc'd to you; correct?

20     A.   Yes.

21     Q.   Do you understand why it was that you were

22 being cc'd, why it is you were in the loop on this

23 memo?

24     A.   Yes.

25     Q.   What was the reason for that?

1     A.   I had a temporary assignment to Sacramento
2  County.

3     Q.   The temporary assignment to Sacramento
4  County, was it for the entire county or just for the
5  Schneider mine?

6     A.   The entire county.

7     Q.   Now, this memo is dated 14 September 2008,
8  and the first sentence says, "I reviewed the
9  Reclamation Plan for the Schneider Historic Mine,"
10  and it has the Mine ID, "and found, just as
11  Mr. Schneider stated during your site visit, the
12  current plan places almost no limits on the mining
13  activities within defined mining boundaries
14  (Attachment 1)."

15          Do you see that?

16     A.   Yes.

17     Q.   This seems to suggest that you had a visit
18  out on the site before September 14, 2008.  Do you
19  see that?

20     A.   No.

21     Q.   It says "just as Mr. Schneider" -- so that
22  would be just Liz Gregory, then?

23     A.   Yes.

24     Q.   At this point you had not visited the site;
25  is that correct?

1     A.    No.

2     Q.    You mean you had not; correct?

3     A.    No, I had not.

4     Q.    Did you review this document before you

5  went out to visit the site?

6     A.    Yes, I did.

7     Q.    Kris Vyverberg goes on to say on the first

8  page, "One of the few pertinent limits included the

9  following," and it refers to page 3(d), paragraph 3,

10  "limits slopes to 30 feet or less.  This

11  functionally constrains the maximum depth of

12  excavation to 30 feet (in the unlikely case they

13  could maintain a vertical slope in sand and gravel.)

14  So contrary to Mr. Schneider's contention the

15  excavation cannot be for whatever depth he likes."

16          Did I read that correctly?

17    A.    Yes.

18    Q.    Did you look into this to see if the

19  reclamation plan placed a limit on the depth of the

20  pit during mining or if the reclamation plan only

21  placed a limit on the depth of the pit after

22  reclamation?

23    A.    I don't remember.

24    Q.    Did you ever form an opinion on that,

25  whether it could be deeper than 30 feet during

1  active mining?

2     A.   I reviewed the reclamation plan, and

3  whatever requirements were in the reclamation plan,

4  these went into my pre-site visit document.

5     Q.   Let me show you what has been marked as

6  Exhibit F.  Your counsel should have a copy from

7  prior depositions.  I will represent to you that

8  this has been represented to us by the defendants

9  that this is the reclamation plan for the Schneider

10  mine.  And I just want to point out that "Page 3(d)"

11  that is referred to in Kris Vyverberg's memo, and I

12  just want to ask you if that paragraph 3(d) is

13  referring to resloping in the context of

14  reclamation?

15         MR. ALDERSON:  Objection.  The document

16  speaks for itself.

17         THE WITNESS:  What it says here is at the

18  end of each mining season.

19  BY MR. ROBERTSON:

20     Q.   Okay.  At the end of each mining season

21  that paragraph would apply; correct?

22     A.   Well, section (d) has four paragraphs.  I'm

23  reading only the first paragraph.  So according to

24  what the first paragraph says, at the end of each

25  mining season, wherever practical reslope and

1  broadcast.

2      Q.   Thank you.  So this paragraph (d) is

3  talking about a resloping that will be done at the

4  end of the mining season where practical; is that

5  right?

6          MR. ALDERSON:  Objection.  The document

7  speaks for itself.

8          THE WITNESS:  That is what is written

9  there.

10  BY MR. ROBERTSON:

11      Q.   I think what we are going to do now is work

12  through a series of e-mails, I think, that will be

13  helpful for you because you will have something

14  there to look at because I realize this is about

15  seven years ago now, so hopefully this will help to

16  refresh your recollection?

17          MR. ALDERSON:  Could we take a break?

18          MR. ROBERTSON:  Off the record.

19          (There was a recess from 11:22 a.m. to.

20          11:36 a.m.)

21          (The document referred to was marked by

22          the CSR as Exhibit 91 for identification

23          and made a part of this deposition.)

24          MR. ALDERSON:  She has one clarification

25  she wants to make.

1           MR. ROBERTSON:  We are back on the record,

2    and we understand the witness wishes to clarify her

3    testimony.

4           Go ahead.

5           THE WITNESS:  I wanted to reiterate that

6    page 3, paragraph (d), that Kris Vyverberg referred

7    to in the reclamation plan is only the first of four

8    paragraphs.

9    BY MR. ROBERTSON:

10       Q.   Fair enough.  Now we have copied the page

11   out of the OMR mine, the mine database.

12       A.   It's called SMARA 2.

13       Q.   In studying it during the break, it looks

14   like this is cut off.  It doesn't seem to end at the

15   end of a sentence.  It has a comma, and then

16   apparently there is some more to it.  Maybe that's

17   why you seemed a little confused when you were

18   reading earlier.

19       A.   Correct.

20       Q.   Unfortunately, I don't have a copy here

21   that would contain the rest of the text.  But at the

22   point where it gets cut off it's talking about a

23   conversation between you and Mr. Hardesty over the

24   telephone; correct?

25       A.   Yes.

1     Q.   It says, "I asked Joe to please listen to
2   me for a minute.  If you follow the law, as he said
3   he had, mined according to his Reclamation Plan, on
4   a vested mine," and then it ends.
5          Do you remember -- or either from
6   refreshing your memory before the deposition or from
7   your recollection from the conversation itself, do
8   you remember what else it was you were telling him
9   in that conversation?
10    A.   What I told him was we were only interested
11  in whether or not he was mining according to his
12  reclamation plan, and if he was as he said that he
13  was, then he really had nothing to -- I don't think
14  I used fear in my language, but basically what I was
15  saying to him was we wanted to come out, not look at
16  his operation per se as the kind of machinery he was
17  using or whatever, but we wanted to come out there
18  and make sure that he was mining according to his
19  reclamation plan.  That it would be good if he would
20  invite us to come rather than having to have us get
21  a warrant and have the CHP and so on.
22         And we talked about what day would be good
23  for him to invite us, and I asked him if it was all
24  right if we e-mailed back and forth.  And he said
25  "yes" and gave me his e-mail address.

```
1        Q.   And in the part that's cut off, does it
2   contain the e-mail address?
3        A.   Yes.
4        Q.   Did he seem to you to be cooperative at
5   this point?
6        A.   Yes.
7        Q.   Did he seem to you that he wanted to comply
8   with his reclamation plan?
9        A.   Yes.
10            MS. WINSOR:  Calls for speculation.
11  BY MR. ROBERTSON:
12       Q.   Did he indicate that to you?
13       A.   Yes.
14       Q.   Anything else that you recall about the
15  conversation?
16       A.   From the language that he used -- well, I
17  don't want to speculate on what he was feeling.
18       Q.   Okay.  That's fair.
19       A.   My intent was to establish a relationship
20  with him that was not so --
21       Q.   Confrontational?
22       A.   Exactly.  And just a site inspection that
23  was not confrontational, and at the end of our
24  conversation he was willing.
25       Q.   Okay.  Fair enough.  You used your southern
```

1  charm.

2      A.   I did.  I had lots of practice.

3      Q.   Let me make sure I am capturing the flavor

4  of the conversation exactly.  You are saying we want

5  to see if you are following the reclamation plan,

6  and he was saying as far as we know we are following

7  the reclamation plan, and I would like to work with

8  you to come out and see if we were.  Would that be

9  fair?

10         MS. WINSOR:  Objection.  Misstates the

11  testimony of counsel as compound, vague and

12  misstates the testimony, which speak for itself.

13         MR. ROBERTSON:  I am asking the witness to

14  summarize the conversation.

15         Would you like the question read back?

16         THE WITNESS:  No.

17  BY MR. ROBERTSON:

18      Q.   Go ahead.

19      A.   He didn't say he would like for us to come

20  out there.  But he was willing, when I suggested

21  that our relationship would be improved if he would

22  invite us rather than have to have us come in there

23  and serve him a warrant and have all the attorneys

24  present and so on, that it would be -- if he was, in

25  fact, doing what he said that he was doing, then he

1    had nothing to fear from us.  We were just coming

2    out to make sure that he was doing what he said he

3    was doing.

4         Q.   Did he indicate to you that he believed he

5    was in compliance with his reclamation plan?

6         A.   Yes, he said he was.

7         Q.   Did he indicate that he was open to the

8    invitation?

9         A.   He was open to making the invitation?

10        Q.   Correct.  Ultimately did he ever invite you

11   to come out and look at the mine?

12        A.   No.

13        Q.   Do you know why?

14        A.   Yes.

15        Q.   Why?

16        A.   Because Bret Koehler the following day

17   began going through the steps to get the warrant and

18   have the CHP and inform the attorney.

19        Q.   Okay.

20        A.   Mr. Hardesty's attorney.

21        Q.   So the wheels were set in motion to obtain

22   a search warrant shortly after your conversation

23   with Mr. Hardesty; is that fair?

24        A.   The next morning before I got to work.

25        Q.   Before you had a chance to arrange for this

1  cooperative inspection, there was already a plan in

2  place to obtain a warranted inspection; is that

3  correct?

4          MR. ALDERSON:  Objection.  Misstates

5  testimony.

6          Go ahead.

7          THE WITNESS:  Mr. Koehler asked me to call

8  Mr. Hardesty and make an attempt to have a

9  nonconfrontational site inspection, which I did.

10  But Mr. Koehler did not read my entry into the SMARA

11  database and put the wheels in motion.

12          MR. ROBERTSON:  Thank you for being patient

13  with me as I go through these e-mails.

14          We will mark this next as Exhibit 92.

15          (The document referred to was marked by

16          the CSR as Exhibit 92 for identification

17          and made a part of this deposition.)

18  BY MR. ROBERTSON:

19    Q.   Showing you what has been marked as Exhibit

20  92, and you don't need to read all this because I

21  just want to point your attention -- counsel on the

22  phone, it's OMR004062.

23          I wanted to point out that there was a

24  reference to a PowerPoint presentation in this

25  e-mail.  I am wondering if you have any recollection

1    of working on a PowerPoint presentation regarding

2    the Schneider mine.

3        A.   Where is the reference?

4        Q.   Right below the black line, and there are

5    other e-mails as well that indicates that you were

6    apparently involved in creating a PowerPoint.  I am

7    wondering if you have any memory of that PowerPoint

8    or creating that PowerPoint?

9            MR. ALDERSON:  Objection.

10           THE WITNESS:  The e-mail is from Liz

11   Gregory, and she says attached to the second part of

12   the PowerPoint, so apparently it's her PowerPoint.

13           MR. ROBERTSON:  Okay.  I will show you this

14   one, then, Exhibit 93.

15           (The document referred to was marked by

16           the CSR as Exhibit 93 for identification

17           and made a part of this deposition.)

18   BY MR. ROBERTSON:

19       Q.   Showing you what's been marked as Exhibit

20   93, which is OMR007190, at the bottom of the page

21   there is an e-mail, apparently, sending a couple of

22   PowerPoint presentations.  Do you remember anything

23   about those?

24       A.   No, I do not.

25           MR. ALDERSON:  I ask you to read the whole

1  document including the second page to make sure.

2  BY MR. ROBERTSON:

3     Q.   If you don't remember the PowerPoint,

4  that's fine.

5     A.   I don't remember, and the site visit report

6  to Jeff, I had not made a site visit at that time.

7     Q.   Right.  Do you remember the first site

8  visit?

9     A.   The first and only one that I went to, yes.

10    Q.   Was that on December 23, 2008?

11    A.   Yes.

12    Q.   Do you recall what role you were supposed

13 to play at the December 23, 2008 site visit?

14    A.   Yes.

15    Q.   What was that role?

16    A.   I was in charge of putting the site visit

17 together, assembling all the documents that would be

18 needed in the field.

19    Q.   Do you recall what documents those were?

20 Would it be the same list you gave us earlier that

21 you had looked at in preparation for a site

22 inspection?

23    A.   No.

24    Q.   Can you tell us what documents you

25 assembled?

1      A.   The document that I assembled was a page

2   divided into two columns.  The first column had the

3   points of the reclamation plan, and the second

4   column were empty lines where the person that was

5   doing the inspection to fill in what their

6   observances were.

7           There were also excerpts from the

8   regulations and the same empty lines for the

9   inspector to enter their findings.

10     Q.   Who asked you to prepare that document?

11     A.   No one.

12     Q.   Is that a standard form, or is this

13   something you created it?

14     A.   I created it especially for the Hardesty

15   mine because there was going to be a team.  Normally

16   I would just create a document, we called it a hot

17   sheet where you create a document of the points of

18   the reclamation plan.

19           The object is to make sure that the mining

20   operation is complying with the reclamation plan.

21   So I found it better to take the valid points or the

22   appropriate points out of the reclamation plan and

23   put it in a separate document so I could focus

24   instead of taking the reclamation plan out as a

25   whole.

1     Q.   You created it specially for the Hardesty

2  mine inspection?

3     A.   In that format.

4     Q.   You said you did that because it was going

5  to be a team as opposed to just you as an individual

6  inspector; is that correct?

7     A.   Correct.

8     Q.   Do you recall ever using that format in any

9  other mine inspection you ever performed?

10    A.   No.  This is the only inspection that I

11 performed with a team where OMR was in charge, and I

12 wanted to make sure each point was covered and

13 matched each point in the reclamation plan with what

14 the findings were.  I didn't want to miss anything.

15    Q.   You said you normally created a hot sheet

16 when you would go out and perform inspections by

17 yourself; do you recall?

18    A.   Yes.

19    Q.   What would be a good term to use to

20 describe this sheet that you created for this

21 particular inspection?

22    A.   It was a hot sheet.

23    Q.   But it was a team hot sheet?  Would that be

24 a good way to describe it?

25    A.   No one ever used that format before, and I

1  never saw it again.  It was just what I did to make

2  it easier for the team.

3      Q.   I am not trying to put words in your mouth.

4  I am just trying to get you to tell me how would you

5  distinguish that hot sheet from the normal hot

6  sheet?

7      A.   I wouldn't.

8      Q.   It was divided into columns, and the other

9  ones were not.  Is that the difference?

10     A.   When I would leave space for myself so that

11 I could write underneath, and it just occurred to me

12 that it might be easier to have it divided in half

13 and give someone more room to write on the

14 right-hand side, but I did the same thing.  I would

15 always go through the reclamation plan and pick out

16 every single point that should have been observed

17 during a site inspection.

18     Q.   Had you been on site inspections before

19 where there was a team but someone else was in

20 charge of the inspection besides OMR?

21     A.   Yes.

22     Q.   On one or more than one occasion?

23     A.   Just one.

24     Q.   Can you describe this other occasion where

25 you went out on a team inspection?

1      A.   It was OMR, the county of Ventura, their
2   environmental section and their compliance section,
3   the fire marshal.
4      Q.   Do you recall the name of the that mine?
5      A.   Yes.
6      Q.   What was it?
7      A.   Pacific Rock.
8      Q.   Pacific Rock?
9      A.   Yes.
10     Q.   In Ventura County?
11     A.   Yes.
12     Q.   Do you recall what types of violations or
13   potential violations were being investigated at the
14   Pacific Rock mine?
15     A.   Yes.
16     Q.   What were they?
17     A.   Mining beyond their boundaries and selling
18   rock when they were off the AB3098 list.  Gravel.
19     Q.   When you say mining beyond their
20   boundaries, do you mean mining beyond the boundaries
21   of the reclamation plan or mining beyond the
22   boundaries of a permit?
23     A.   Mining beyond the boundaries of a
24   reclamation plan.
25     Q.   In the Pacific Rock case did you determine

1   that, in fact, they had mined beyond the boundaries

2   of the reclamation plan?

3       A.   Yes.

4       Q.   In the Schneider case did you ever look at

5   whether Schneider or Mr. Hardesty was mining beyond

6   the boundaries of the reclamation plan?

7       A.   Yes.

8       Q.   What did you conclude in that regard?

9       A.   I don't recall.

10      Q.   Do you recall --

11      A.   I would like to change my statement if you

12  don't mind.

13      Q.   Go ahead.

14      A.   I really don't recall if he was mining

15  beyond the boundaries.  There was a question of -- I

16  mean, when you reclaim a site, there has to be a

17  two-to-one slope.

18      Q.   Fair enough.

19      A.   And he had exceeded that two-to-one slope.

20  Exactly the same in the Pacific Rock mine case.

21  They had exceeded that two-to-one slope, so it would

22  be almost impossible to reclaim at that point.

23      Q.   Do you know if Mr. Hardesty was able to

24  reclaim that slope back to two-to-one?

25      A.   I don't know that.

1     Q.   Do you know whether Mr. Hardesty would have

2   been required to reclaim that slope back to

3   two-to-one before the end of the mining season?

4     A.   I don't know that.  I don't remember.  I

5   believe the mining regulations do not allow slopes

6   greater than two-to-one unless there has been an

7   engineering study that states that that would be a

8   safe condition to go beyond two-to-one.

9     Q.   Would that be under SMARA?

10    A.   Yes.

11    Q.   Do you have an opinion whether that applies

12  to a vested mine or not?

13    A.   I don't know.  I don't remember would be a

14  better response.

15    Q.   Did you ever have any interactions with

16  Mr. Schneider?

17    A.   No.  Not to my recollection.

18    Q.   Would it be fair to say that when you

19  contacted Mr. Hardesty, you were advocating for a

20  meeting on site that would be to perform a mine

21  inspection, which would be by consensus or agreement

22  of everyone rather than pursuant to a warrant; is

23  that correct?

24       MR. ALDERSON:  Objection.  Misstates

25  testimony, vague and ambiguous.

1          You can go ahead and answer.

2          MS. WINSOR:  Compound.  Join.

3          THE WITNESS:  Yes.

4   BY MR. ROBERTSON:

5     Q.   Did you ever indicate to anyone that

6   besides the entry that you made in the SMARA 2

7   database, did you ever indicate to anyone that you

8   thought it would be a better approach to go out and

9   have a mine inspection that was by consensus of

10  everyone rather than by warrant?

11    A.   That was always my feeling with every mine.

12    Q.   Did you ever express that to anyone with

13  respect to the Schneider mine for the Hardesty

14  operation?

15    A.   Yes.

16    Q.   Do you recall who you mentioned that to?

17    A.   Bret Koehler.

18    Q.   Do you recall Mr. Koehler's response?

19    A.   To call Mr. Hardesty.

20    Q.   Okay.  Then you called him, and you made

21  your entry into the SMARA 2 database.  And you said

22  the next morning the wheels were set in motion for a

23  warrant.  Did you have any more discussions with

24  Mr. Koehler from that point forward as to whether

25  the inspection should be scheduled by agreement

1   rather than by warrant?

2          MR. ALDERSON:  Objection.  Misstates

3   testimony.

4          Go ahead and answer.

5          THE WITNESS:  My response to Mr. Koehler

6   was, I wish that you had read this entry into SMARA

7   because Mr. Hardesty agreed to invite us, but it was

8   too late.  He had already taken steps, and I thought

9   it was too bad that it happened that way.  But

10  Mr. Koehler said he did not believe that I would

11  ever be able to talk Mr. Hardesty into inviting us

12  rather than having us go through the steps that we

13  had to take, eventually took.

14  BY MR. ROBERTSON:

15     Q.   Would it be fair to say you thought

16  Mr. Hardesty should be given a chance to invite you

17  first?

18     A.   Yes.  That's why I suggested to him that he

19  invite us.

20          MR. ROBERTSON:  For everyone on the phone,

21  we are planning to work until 12:15, if that's okay.

22  Hearing no objection, we will keep on trucking.

23          MS. WINSOR:  That's fine.

24  BY MR. ROBERTSON:

25     Q.   You said Mr. Koehler didn't think that

1  Mr. Hardesty would voluntarily agree to an

2  inspection, but did Mr. Koehler ever tell you that

3  Mr. Hardesty had specifically refused to agree to an

4  inspection?

5       MR. ALDERSON:  Objection.  Misstates

6  testimony.

7       You can go ahead.

8       THE WITNESS:  I don't know the

9  conversations that Mr. Hardesty had with Bret

10  Koehler.

11  BY MR. ROBERTSON:

12  Q.  That's really not what I am asking you

13  about.  It seems like I am splitting hairs.  I am

14  really asking if Mr. Koehler told you that he had

15  spoke to Mr. Hardesty, and Mr. Hardesty refused to

16  cooperate in an inspection?

17  A.  I don't know who he spoke to, Mr. Hardesty

18  or Mr. Hardesty's attorney, but Bret Koehler did

19  tell me that Mr. Hardesty was not going to

20  voluntarily allow us access to his mine operation.

21  Q.  Was that before or after you spoke to

22  Mr. Hardesty?

23  A.  Before.

24  Q.  Did Mr. Koehler or anyone else ever

25  indicate to you a reason why Mr. Hardesty might not

1   have agreed to a voluntary mine inspection?

2     A.   No.

3     Q.   Did you ever hear anyone indicate that

4   Mr. Hardesty believed the coordinated inspections

5   that were being requested of his operation were due

6   to pressure from political or politicians?

7     A.   No.

8     Q.   What are you looking at?

9     A.   In relation to your last question where you

10  asked me if anybody had told me that Mr. Hardesty

11  had complained of political intervention, I wondered

12  if it was Mr. Hardesty that had said that to me

13  himself, but I don't believe he did at that point.

14    Q.   Okay.  So somewhere in the deep, dark

15  recesses of your memory, you think somebody may have

16  said something about the inspections being requested

17  at the behest of politicians.  Is that what you are

18  saying?

19    A.   I did hear that, but it wasn't until many

20  years later.

21    Q.   Fair enough.  I want to go back for a

22  minute.  Since we are going back looking at old

23  exhibits, can you find Exhibit 90?  And I want to

24  direct your attention to the first paragraph where

25  it says "Warden Gregory"?

1      A.   Yes.

2      Q.   And I think we looked at the sentence

3 before, but I want if ask you a question about it.

4 The very first sentence says -- this is from Kris

5 Vyverberg to Liz Gregory -- "I reviewed the

6 Reclamation Plan for the Schneider Historic Mine" --

7 and it has the mine number -- "and found just as

8 Mr. Schneider stated during your site visits the

9 current plan places almost no limits on the mining

10 activities within defined mining boundaries."

11 Do you see that?

12     A.   Yes.

13     Q.   With respect to active mining activities as

14 opposed to post mining reclamation, would you agree

15 with that statement from Kris Vyverberg?

16         MR. ALDERSON:  Objection.  The reclamation

17 plan speaks for itself.

18         MS. WINSOR:  Objection.  The document is

19 incomplete and lacks Attachment 1 to which the text

20 that you are asking the question about refers, calls

21 for speculation, lacks foundation.

22         THE WITNESS:  Now do I get to answer?

23 BY MR. ROBERTSON:

24     Q.   Now you get to finally answer.

25     A.   I really couldn't say because I don't

1   remember the reclamation plan to compare it to.

2       Q.   Getting back to your preparation for the

3   December 23, '08 site inspection, one of the things

4   you created is what I will call the delineated "hot

5   sheet" because it had two columns.  And I think we

6   have established that that's the only time you ever

7   created this type of a hot sheet because it was the

8   only time where you were on the team inspection

9   where OMR was in charge; is that right?

10      A.   Correct.  I thought it was an improvement

11  over the way the hot sheet was normally created.

12      Q.   Okay.  You didn't choose to use that format

13  in the future for your own personal mine

14  inspections; is that correct?

15      A.   No.  I did not ever use that format again.

16  It was the only time that I went on a team

17  inspection.

18      Q.   Other than the Pacific Rock inspection?

19      A.   Where OMR was in charge.  OMR was not in

20  charge of Pacific Rock, so I did not prepare a

21  document.

22      Q.   So in the inspection in Pacific Rock, OMR

23  was just invited to come along; is that correct?

24      A.   Yes.

25      Q.   Whereas in this inspection of the Hardesty

1   operation, OMR was actually in charge of the team

2   investigation?

3       A.   Yes.

4       Q.   To be clear, in your 19 and a half years of

5   experience -- and I wanted to ask you that.  When

6   you said you had 19 and a half years, were you

7   referring to 19 and a half years with California?

8       A.   Yes.

9       Q.   Or Georgia and California combined?

10      A.   I did not combine them, no.

11      Q.   So the 19 and a half years with California.

12  In your 19 and a half years with the state of

13  California, was that the only team inspection that

14  you were on where OMR was in charge?

15          MS. WINSOR:  Objection.  The question is

16  vague and assumes facts that she was in a capacity

17  to conduct such investigations for this whole time.

18  BY MR. ROBERTSON:

19      Q.   You can answer the question.

20      A.   Where OMR was in charge?

21      Q.   Yes.

22      A.   To the best of my recollection that was the

23  only time I went on a site inspection that involved

24  a team where OMR was in charge.

25      Q.   And now we will drill down into the

1   objection, and would it be fair to say that --

2        A.    I would like to make a correction to that

3   statement.

4        Q.    Go ahead.

5        A.    There were other times where there was a

6   team involved where OMR was in charge.

7        Q.    That you were on the inspection?

8        A.    Yes.

9        Q.    Okay.  Can you recall any of those?

10       A.    I recall one instance during my

11   probationary period, and the reason there was a team

12   was because it was my supervisor, and I, as part of

13   training -- as part of my training, accompanied Mike

14   Luksic on a site inspection.  So that would have

15   been a team.

16       Q.    That's a team call from OMR?

17       A.    Right.

18       Q.    I am glad you made the distinction.  What I

19   was talking about, an interdisciplinary team, in

20   other words, multiple agencies.  Let's go back and

21   ask that question.  Other than the Pacific Rock

22   inspection and the Hardesty inspection, is it fair

23   to say you do not recall any other team inspections

24   with other agencies that you participated in?

25            MR. ALDERSON:  Objection.  Assuming facts

1    not in evidence and misstates testimony.

2              You can go ahead and answer.

3              THE WITNESS:  Every site inspection -- let

4    me correct that statement.  The majority of the site

5    inspections that I do were at the invitation of the

6    county or were in preparation to say that this

7    reclamation was complete.  And those inspections

8    were performed with local agency personnel.

9    BY MR. ROBERTSON:

10      Q.   Now I think I am beginning to understand

11   you.  The other inspections just had one person from

12   OMR, that being you.  These inspections being

13   multiple people from OMR?

14      A.   Yes.

15      Q.   That's what you are calling a team

16   inspection is a team from OMR?

17      A.   Correct.

18      Q.   So there was one during your training, the

19   probationary period where you went to observe

20   Mr. Luksic; correct?

21      A.   Yes, with my supervisor.

22      Q.   Was that due to the alleged egregiousness

23   of the potential violations, or was that just

24   because it was an opportunity for you to observe

25   Mr. Luksic performing an inspection?

1      A.    That was an opportunity for me to observe

2   Mr. Luksic performing a site inspection of a mine

3   that had asked for the return of their financial

4   assurance mechanism because they had completed the

5   reclamation.

6      Q.    Fair enough.   That was a buttoning up

7   situation?

8      A.    Exactly.

9      Q.    Pacific Rock, was this a team approach

10  because of the alleged severity of the allegations,

11  or was it a team approach for some other reason?

12         MR. ALDERSON:   Objection.   Calls for

13  speculation.

14         You can go ahead and answer.

15         THE WITNESS:   There were multiple

16  violations of their reclamation plan.

17  BY MR. ROBERTSON:

18     Q.    You believe that's why it required a team?

19     A.    Yes.

20     Q.    Do you know why there was a team being put

21  together for the Hardesty inspection?

22     A.    Yes.

23     Q.    Why?

24     A.    There were multiple agencies that had

25  concerns.   The confrontational aspect looked -- we

1   wanted to have a team of experts out in the field,

2   so we called upon the people from the reclamation

3   unit to accompany us out to the site to say they

4   were the ones who approved the reclamation plan, and

5   it was a large site.

6        Q.   You said there were multiple agencies

7   involved in the Hardesty inspection; correct?

8             MR. ALDERSON:  Objection.  Misstates

9   testimony.

10            Go ahead and answer.

11            THE WITNESS:  I don't recall specifically.

12   BY MR. ROBERTSON:

13        Q.   Okay.

14        A.   But they were invited to participate.  I

15   don't recall that they did.

16        Q.   Who invited them?

17        A.   I did.

18        Q.   Did you do that at the request of

19   Mr. Koehler or who?

20        A.   No.  I invited them because I thought that

21   an agency inspection was warranted based on what I

22   had read in this case file.  There were other

23   enforcement issues, and I thought that they might

24   want to take advantage of our being out there to do

25   a site inspection to accompany us.

1     Q.   Kris Vyverberg wanted to go out there on

2   the site and have OMR there as well; correct?

3     A.   Yes.

4          MS. WINSOR:  Objection.  Assumes facts.

5          MR. ROBERTSON:  It's 12:15.  Why don't we

6   take a half-hour lunch break.

7          (There was a lunch recess from 12:15 p.m.

8            to 12:50 p.m.)

9   BY MR. ROBERTSON:

10    Q.   So switching gears for a second to a mine

11  inspection that you would normally perform by

12  yourself, if you noted something that was out of

13  compliance on that mine inspection, how would you

14  handle that situation, or if there is multiple ways,

15  explain to me the different options that you had.

16         MR. ALDERSON:  Objection.  Vague and

17  ambiguous.

18         You can go ahead and answer.

19         THE WITNESS:  Normally I would call the

20  county and talk to them and check the mine

21  inspection reports that were in the case file to see

22  if it had been noted before and talk to the county

23  and see if they had seen it.  But I rarely -- I

24  don't recall any time that I went out by myself.

25

1  BY MR. ROBERTSON:

2      Q.   Normally you went out with somebody from

3  the county; correct?

4      A.   Somebody with the county.  So if I saw

5  something that didn't meet the requirements in the

6  reclamation plan, then I would talk to the county

7  and see if it was something they had noticed before

8  and what they had been doing to deal with the issue

9  to bring the mine back into compliance.

10     Q.   What if the county was the lead agency, and

11  the county disagreed and thought that the mine was

12  in compliance with the reclamation plan, but you

13  thought the mine was out of compliance with the

14  reclamation plan?  How would you handle this type of

15  situation?

16          MR. ALDERSON:  Objection.  Calls for

17  speculation.  Incomplete hypothetical.

18          You can go ahead and answer.

19          THE WITNESS:  It was never my experience

20  that they disagreed.  It was most of the people from

21  the county were not familiar with mines.  They were

22  mostly planners.  And so when I would go out into

23  the field with one of these representatives from the

24  county, invariably they saw us as the expert, and

25  normally we would be called in by the county for our

1   expertise, and if they didn't follow -- most of the

2   time they followed our suggestions.  If they didn't,

3   then we would send them a letter saying you must

4   have the mine correct this deficiency.

5   BY MR. ROBERTSON:

6       Q.   What authority does OMR have, to your

7   knowledge, to require a county that has lead agency

8   status to follow OMR's recommendations?

9       A.   I really don't recall, but there is

10  language that OMR is ultimately responsible.  I

11  couldn't tell you.  I don't remember exactly.  I

12  used to know the regulations backwards and forwards.

13      Q.   Do you know if the methodology which OMR

14  can follow if a county fails to follow OMR's

15  recommendations is to recommend to the State Mining

16  and Geology Board that the county's lead agency

17  status would be revoked?

18           MR. ALDERSON:  Objection.  Vague and

19  ambiguous.

20           Go ahead and answer.

21           THE WITNESS:  There is a process, yes.  And

22  it had happened on a couple of occasions that I knew

23  about.  I can't tell you which counties they were,

24  but the State Mining and Geology Board became the

25  state agency, either they didn't want to participate

1   in SMARA or they failed to implement SMARA.

2   BY MR. ROBERTSON:

3        Q.   What about situations where the lead agency

4   was implementing SMARA but OMR disagreed with the

5   way the county was implementing SMARA?  Do you

6   recall situations like that ever occurring?

7        A.   Yes.

8        Q.   Do you recall any situation like that where

9   the county indicated that it disagreed with OMR's

10  interpretation of the law?

11       A.   They never disagreed.

12       Q.   So if Sacramento County disagreed in this

13  instance, if that's true -- let me back up.

14            Do you know whether in the case of the

15  Hardesty mine, that Sacramento County indicated that

16  it disagreed with OMR's position that certain

17  violations had occurred at the Hardesty mine?

18       A.   I do not know.  I don't remember.

19       Q.   Would it be true in your experience if

20  Sacramento County disagreed with OMR about whether

21  violations occurred at the Hardesty mine, that would

22  be the only case that you know of where the county

23  did not agree with OMR?

24        A.   That would be the only case where the

25  county didn't follow OMR's direction, if that was

1   the case that happened.  I'm not sure that that did

2   happen.

3      Q.  So I'm trying to understand as the

4   compliance unit or compliance section you would not

5   issue some sort of notice of violation to the minor

6   directly but rather you would ask the county to do

7   that; is that correct?

8      A.  Yes.

9      Q.  Is that something that you have done on

10  many occasions or did on many occasions during your

11  career on OMR?

12     A.  Yes.

13     Q.  Do you recall if after the site visit on

14  December 23, 2008 whether you wrote a letter to the

15  county indicating that the county should issue a

16  notice of violation to Hardesty?

17     A.  I did not write a letter, no.

18     Q.  Why not?

19     A.  My participation ended soon after.  The

20  focus of our efforts was to create a site inspection

21  report and go to the judge to seek an injunction.

22     Q.  Okay.  Now I understand.  Did you ever

23  participate in any other inspection when you were at

24  OMR where the purpose of the site inspection was to

25  generate a report to use to give to a judge to seek

1   a TRO?

2          MR. ALDERSON:  Objection.  Misstates

3   testimony.

4          Go ahead and answer.

5          THE WITNESS:  No.  I was going to expound,

6   or maybe I shouldn't?

7          MR. ALDERSON:  If you need to clarify a

8   response in any way.

9          THE WITNESS:  Okay.  It was my experience

10  at OMR that a letter to the local agency was usually

11  enough to get the mine to come into compliance.  If

12  it wasn't, then OMR would take over the compliance

13  aspect for this particular mine, and we would send

14  out a notice of violation and so forth.  Usually the

15  notice of violation was enough to get the mine to

16  come into compliance.  Never did have to proceed to

17  the point where I anticipated going before a judge.

18  BY MR. ROBERTSON:

19     Q.  It sounds like you are saying two things.

20  It sounds like you don't recall any other situation

21  besides the Hardesty situation where you were

22  forming a site inspection in anticipation of going

23  before a judge; is that correct?

24     A.  As I told everybody in the compliance unit,

25  based on my experience, you always handle all your

1    dealings with the mine as though you are going to be
2    sued.  So always be professional; always document.
3    So I always proceeded as though that was going to be
4    the end result.  However, I never had a mine
5    operator that did not comply either with the county
6    or once we got involved with OMR.  So I never had to
7    take that last step and go before a judge.
8        Q.   We are talking across each other a little
9    bit.  So let me try to be a little clearer.  Usually
10   when the witness and I are talking across each
11   other, it's because I'm asking poor questions, so
12   let me try to ask better questions.
13          Focusing now just on the Hardesty site
14   inspection, you said a minute ago something to the
15   effect that the purpose of that inspection was to
16   prepare a mine inspection report to be used to go to
17   a judge to get a temporary restraining order; is
18   that correct?
19       A.   No, that's not correct.  The purpose of the
20   mine inspection, the site inspection was to either
21   verify or not Kris Vyverberg's concerns that she
22   raised.
23          So we prepared -- that was the purpose, was
24   going to do the site inspection to make sure that
25   the Hardesty mine was complying with the reclamation

1   plan.  Once we got on site, there were significant

2   concerns raised about the possibility of a

3   breakthrough.  And we felt as though we needed to go

4   before a judge and get an injunction to stop it

5   because it was an imminent threat.  So after the

6   mine inspection, that's when the report became the

7   focus.

8        Q.   Okay.  The original purpose of the mine

9   inspection was to consider whether the mine was in

10  compliance with the reclamation plan and address the

11  concerns raised by Kris Vyverberg?

12       A.   Right.

13       Q.   Once you got on site, the focus turned to

14  documenting what someone apparently viewed as a

15  potential threat that the river could, in a flood,

16  be captured in the pit; is that correct?

17            MR. ALDERSON:  Objection.  Misstates

18  testimony.

19            Go ahead.

20  BY MR. ROBERTSON:

21       Q.   Is that correct.  Yes?

22            MS. WINSOR:  Objection.  Compound.

23            THE WITNESS:  What?

24  BY MR. ROBERTSON:

25       Q.   She said objection.  Compound.

1      A.   That's correct.

2      Q.   Do you know whether, in fact, a request for

3   a temporary restraining order was made to a judge?

4      A.   Yes.

5      Q.   Do you know the outcome of that request?

6      A.   Yes.

7      Q.   What was the outcome?

8      A.   It was not granted.

9      Q.   Do you know why the judge did not grant it?

10      A.   Because it took too long between the site

11   inspection, the report and the presentation to the

12   judge.  And that because it took so long -- it is my

13   understanding -- because it took so long, the judge

14   said it didn't appear to be an imminent threat after

15   all.

16      Q.   Do you know whether the state continued to

17   pursue that lawsuit to get an injunction before the

18   next rainy season occurred?

19      A.   No, I do not.

20      Q.   Do you know whether the state dismissed

21   that lawsuit or not?

22      A.   No, I do not have any knowledge of that.

23      Q.   Do you know if any court ever found there

24   was any threat of any imminent harm from the pit?

25      A.   I do not know that.

1    Q.   Now, you're a geologist; correct?

2    A.   Yes.

3    Q.   There are all kinds of studies and analyses

4 can perform on a riverbank like this one to

5 determine its integrity; is that correct?

6    A.   Yes.

7    Q.   Did you ever perform any of these tests or

8 analyses?

9    A.   No.

10    Q.   Did you measure the width of the natural

11 riverbank from the water level in the pit to the

12 water level in the river?

13    A.   No.  Not me personally.

14    Q.   Did you determine whether the water level

15 in the pit would rise and fall with the water level

16 in the river?

17    A.   My function during the site inspection was

18 more as a coordinator distributing documents, making

19 sure that all of the blanks had been filled in and

20 as an observer, so the answer is no.

21    Q.   If I can summarize what you're saying, your

22 function during the December 23, 2002 site

23 inspection was not to reach an expert opinion

24 regarding the stability of the riverbank; is that

25 correct?

1          MR. ALDERSON:  Objection.  Misstates the

2   testimony.  You got the date wrong.  You said 2002.

3          MR. ROBERTSON:  I will restate the

4   question.

5   BY MR. ROBERTSON:

6      Q.   Would it be fair to say your role doing the

7   December 23, 2008 inspection was not to render an

8   opinion as an expert geologist as to the stability

9   of the riverbank; is that correct?

10          MS. WINSOR:  I object to the form of the

11   question as violating Rifkin Superior Court.  Calls

12   for a legal contention from a percipient expert.

13          MR. ROBERTSON:  The objection is noted.

14          MR. ALDERSON:  I join.

15          THE WITNESS:  Can you repeat the question?

16          MR. ROBERTSON:  Let me withdraw the

17   question and make it easier on everybody.

18   BY MR. ROBERTSON:

19      Q.   Were you out there to perform tests and

20   inspections and analyses to come up with an expert

21   opinion on the integrity of the bank, or were you

22   out there for other purposes?

23          MS. WINSOR:  Objection.

24          THE WITNESS:  The team was out there to

25   make sure that the operation at the mine complied

 1   with the reclamation plan.

 2   BY MR. ROBERTSON:

 3        Q.   It wasn't out there to determine the

 4   integrity of the riverbank.  It was out there to

 5   determine whether the mining operation complied with

 6   the reclamation plan; is that right?

 7             MR. ALDERSON:  Objection.  Misstates the

 8   testimony.

 9             MS. WINSOR:  Join.

10             THE WITNESS:  Correct.

11             MR. ROBERTSON:  The witness wants to go off

12   the record to ask counsel a question.

13             (There was a recess taken from 1:12 p.m. to

14             1:18 p.m.)

15             MR. ROBERTSON:  Back on the record.  The

16   witness indicated while we were off the record she

17   wishes to further clarify her last answer.

18             THE WITNESS:  You were mentioning

19   geological testing.  That was normally done or

20   always done in my experience by the mine operator.

21   If we saw that the slope was greater than

22   two-to-one, then it was allowed if there was

23   geological testing and a report submitted that

24   showed that it would not affect the river.  So it

25   was not our intent to go out and -- well, we didn't

1   know what we were going to see before we got there.

2           So it was only once we got out there that

3   we saw the situation, and it became apparent that

4   there was some connection between the river and the

5   pit because water was leaking into the pit.

6   BY MR. ROBERTSON:

7       Q.  How did you or whoever determine that the

8   water that was going into the pit was coming from

9   the river?

10          MR. ALDERSON:  Objection.  Misstates

11  testimony.

12          Go ahead and answer.

13          THE WITNESS:  We could see the water coming

14  in.

15  BY MR. ROBERTSON:

16      Q.  I understand there is water coming in.

17      A.  You have got the river and empty pit, and

18  the water is flowing into this empty pit.  It is

19  obvious it was coming from the river.

20      Q.  Did you notice that water was coming in on

21  banks from the opposite?  In other words, you have a

22  pit next to the river, and the pit has four sides;

23  right?

24      A.  Right.

25      Q.  Did you notice the seepage was also coming

1    in the other side?  In other words, the side to the

2    south, which was away from the river?

3         MS. WINSOR:  Assuming facts.  No

4    foundation.

5    BY MR. ROBERTSON:

6    Q.   You can answer the question.

7    A.   I don't recall seeing any water seeping

8    into the pit from anyplace other than along the edge

9    of the river.

10   Q.   I will represent to you that in reports

11   that have been prepared, that water has been

12   referred to repeatedly as ground water coming into

13   the pit.  Do you disagree?  Are you saying that it

14   is not ground water; it is river water?

15        MR. ALDERSON:  Objection.

16        MS. WINSOR:  Object to the form.  Calling

17   for a retained expert opinion.

18        MR. ROBERTSON:  That objection had merit.

19   Let me ask a different question.

20   BY MR. ROBERTSON:

21   Q.   As a result of your involvement in this

22   case, did you ever reach the point where you felt

23   like you had sufficient information, that you could

24   render an opinion as to whether the water that was

25   coming into the pit was coming directly from the

1   river as opposed to from ground water or from some

2   other source?

3       A.   I did not have that opinion.  It was the

4   opinion of the expert that I was traveling -- that I

5   was accompanying during the site inspection.

6       Q.   Who was that?

7       A.   John Wesley.

8       Q.   Did Mr. Wesley reach this opinion while you

9   were out there --

10      A.   Yes.

11      Q.   -- before performing any testing?

12      A.   We wouldn't have performed the testing

13  ourselves.

14      Q.   Let me stop you for a second.  You have to

15  really listen to my questions before you are

16  answering questions I'm not asking, and that's going

17  to make this drag on all afternoon.  I will try to

18  be really clear from my questions.  If you don't

19  understand it, say you don't understand it.

20          Let's go back.  What I am trying to find

21  out is did Mr. Wesley reach this opinion without him

22  performing any testing?

23          MR. ALDERSON:  Objection.  Calls for

24  speculation.

25          Answer to the extent you know.

1          THE WITNESS:  Did he make that assessment

2    before performing any geological testing?

3    BY MR. ROBERTSON:

4        Q.   Exactly.  You got it.

5        A.   Yes.

6        Q.   And did he also make that assessment before

7    performing any tests to see if the water was coming

8    from the river as opposed to a different source?

9          MR. ALDERSON:  Objection.  Calls for

10   speculation.

11         Go ahead.

12         THE WITNESS:  John Wesley did not perform

13   any tests while I was accompanying him during the

14   site inspection.

15   BY MR. ROBERTSON:

16       Q.   Fair enough.  So you said that normally if

17   you have a situation I think you said like this, but

18   if you had a situation where some additional

19   analysis needed to be performed about the slope

20   stability, or whether the riverbank is too narrow

21   and allowing water to come through, that these are

22   the kinds of things that the operator would engage a

23   consultant.  Did I get that right?

24         MR. ALDERSON:  Objection.  Misstates

25   testimony.

1          Go ahead and answer.

2          THE WITNESS:  Yes.

3  BY MR. ROBERTSON:

4     Q.   Do you know if in this case regarding the

5  Hardesty operation whether Mr. Hardesty was allowed

6  to obtain an opinion from his consultant regarding

7  whether there was any imminent danger of pit capture

8  before a petition was made to the court for a

9  restraining order?

10         MS. WINSOR:  Objection.  Vague.  Calls for

11 speculation.

12         THE WITNESS:  I don't know.

13 BY MR. ROBERTSON:

14    Q.   I'm just trying to understand what you are

15 saying.  I think -- let's take it one piece at a

16 time.

17    A.   Okay.

18    Q.   Would it be fair to say that normally in a

19 situation like that where there are slopes steeper

20 than two-to-one and the potential for collapse of a

21 riverbank in this situation, would you normally ask

22 the operator to get their consultant out there and

23 perform some testing?

24         MR. ALDERSON:  Objection.  Calls for

25 speculation.

1          Go ahead.

2          THE WITNESS:  Normally we would say that

3     you must -- if the reclamation plans calls for one

4     thing, and they are performing something else, then

5     they have to correct it back to the reclamation plan

6     requirements, or they can submit an amendment to

7     their reclamation plan to the reclamation unit that

8     would allow for something different than a slope of

9     two-to-one.  And in order to have a slope that was

10    steeper than two-to-one, then it would have to be

11    supported by engineering studies.

12    BY MR. ROBERTSON:

13       Q.   I think we got the first piece down.  Now

14    the second piece.  Was Mr. Hardesty given an

15    opportunity to have engineering studies done to tell

16    OMR whether the slopes needed to be revised or

17    whether the plan needed to be amended or whatever?

18          MR. ALDERSON:  Objection.  Vague and

19    ambiguous.

20          THE WITNESS:  I don't know.

21    BY MR. ROBERTSON:

22       Q.   Do you recall whether the reclamation plan

23    had anything in it that said how close or conversely

24    how far away the mine should be from the river?

25       A.   I don't remember.

1    Q.   Was there any discussion that you are aware

2    of regarding whether to ask Mr. Hardesty to have his

3    consultants perform some engineering studies with

4    respect to the banks of the pit?

5    A.   And I am probably not answering your

6    question correctly, but the normal procedure would

7    be to notify the county that the reclamation plan

8    was not being met and to tell the county you must

9    correct it, and we would have discussions with the

10   county on how to go about doing that.  You can have

11   a new reclamation plan, or they can do a geological

12   study.  Even though they are not following the

13   reclamation plan, it is all right, but they still

14   would have to amend the reclamation plan if they

15   have slopes that were steeper than two-to-one, but

16   they could support it without having to go back to

17   two-to-one.

18        But in this case it appeared as though

19   there was an imminent possibility of pit capture,

20   and so steps were taken to try to correct that as

21   soon as possible.

22   Q.   Do you know who brought the lawsuit to seek

23   the restraining order?  What agency?

24   A.   No, I don't know.  I thought it was OMR

25   requested the restraining order from the judge.

1       Q.   Do you know why it was that Sacramento
2   County did not request a restraining order, and OMR
3   requested it instead of the lead agency?
4       A.   No, I don't know why.
5       Q.   Can you think of any other instance where
6   OMR went straight to court rather than asking the
7   lead agency to correct a situation?
8           MS. WINSOR:   The question is compound and
9   assumes facts.
10          THE WITNESS:   Normally the only time that
11  OMR would take over would be if the county did not
12  respond to our notices for them to take care of the
13  issue.
14  BY MR. ROBERTSON:
15      Q.   Do you know whether if in this situation
16  the county refused to respond to notices from OMR
17  that the operation was not in compliance with the
18  reclamation plan?
19      A.   I really don't remember.  If it was in the
20  file, I reviewed it, but I don't recall.
21      Q.   Just to be clear, you can't recall any
22  other instance where OMR bypassed a lead agency and
23  went directly to a court to seek a restraining
24  order; is that correct?
25          MR. ALDERSON:   Objection.  Misstates

1   testimony.  Go ahead.

2          MS. WINSOR:  The question assumes facts.

3          THE WITNESS:  I'm not aware of any other

4   cases where it happened like that.

5   BY MR. ROBERTSON:

6      Q.   Okay.

7      A.   But then I never saw another situation that

8   was considered that dire.

9      Q.   Okay.  So you reached an opinion, you

10  personally reached an opinion, that the situation

11  was dire?

12     A.   Not me personally.  I assembled the

13  information from the other members of the team, and

14  there were, you know, the expert opinion.  What I

15  considered the expert opinion was that it was a dire

16  situation that needed to be handled as soon as

17  possible.

18     Q.   Who told you that?

19     A.   John Wesley and Bret Koehler.

20     Q.   You said that was right during the time of

21  the inspection; correct?

22     A.   Yes.

23     Q.   You understood that the situation was so

24  dire that it warranted bypassing the normal

25  procedure of allowing the mine operator to perform

1   technical analyses through their consultant; is that

2   correct?

3         MR. ALDERSON:  Objection.  Vague and

4   ambiguous.  It assumes facts.

5         Go ahead.

6         THE WITNESS:  Yes.

7   BY MR. ROBERTSON:

8     Q.   And that it also was so dire that it

9   warranted bypassing the lead agency and going

10  directly to court; correct?

11        MR. ALDERSON:  Same objections.  Go ahead.

12        THE WITNESS:  Since it was -- since that's

13  how it proceeded, it reinforced what we talked about

14  in the field, that it was a dire situation and OMR

15  took steps.  But once the inspection was over, I

16  wasn't privy to what happened between the report

17  that I submitted and what was submitted to the

18  judge.  I was not privy to those conversations or

19  meetings.

20  BY MR. ROBERTSON:

21    Q.   Do you have any knowledge about the average

22  width of levies in Sacramento County, levies that

23  protect the homeowners and property owners from

24  flooding from rivers?

25        MR. ALDERSON:  Objection.  Vague and

1   ambiguous.

2        Go ahead.

3        THE WITNESS:  No.

4   BY MR. ROBERTSON:

5    Q.   Did you ever perform any analysis of levy

6   widths and compare those levy widths to a width of

7   the bank at the Hardesty operation?

8        MR. ALDERSON:  Objection.  Vague and

9   ambiguous.

10       Go ahead.

11       THE WITNESS:  No.

12  BY MR. ROBERTSON:

13   Q.   Do you know if before Mr. Wesley and

14  Mr. Koehler reached their opinions that this was a

15  dire situation?  They performed any comparison of

16  the bank width here with other bank widths in the

17  county and levy widths?

18       MR. ALDERSON:  Objection.  Vague and

19  ambiguous, calls for speculation.

20       You can go ahead, if you can.

21       THE WITNESS:  I don't know.

22  BY MR. ROBERTSON:

23   Q.   If I understand you correctly, Mr. Wesley

24  and Mr. Koehler reached their opinions on site about

25  the dire nature of the circumstances; is that right?

1           MR. ALDERSON:  Objection.  Calls for

2    speculation.

3           You can go ahead.

4           THE WITNESS:  Yes, that's right.

5    BY MR. ROBERTSON:

6      Q.   Have you performed inspections of other

7    mines that are extracting minerals near a stream or

8    a river?

9           MR. ALDERSON:  Objection.  Vague and

10   ambiguous.

11          Go ahead.

12          THE WITNESS:  No.

13   BY MR. ROBERTSON:

14     Q.   To the best of your knowledge, was

15   Mr. Hardesty given an opportunity to reslope the pit

16   banks before OMR sought a restraining order from the

17   judge?

18     A.   I was not involved once I submitted my

19   report, so I have no knowledge of that.

20     Q.   Mr. Hardesty and two of his consultants

21   were out there on the site visit, Chuck Koehl and

22   Ken Williams; correct?

23     A.   I don't recall their names, but there were

24   two consultants.

25     Q.   For Mr. Hardesty?

1    A.   Yes.

2    Q.   And Mr. Hardesty was there as well?

3    A.   Yes.

4    Q.   At any time during the inspection did you

5    ever hear anyone from OMR say to Mr. Hardesty or the

6    consultants that Mr. Hardesty would be given an

7    opportunity to reslope the pit banks?

8    A.   I never -- I never heard that, but that

9    doesn't necessarily mean -- Mr. Hardesty was mobile

10   that day.  We had several teams that were out

11   working, so I would have not have seen -- I didn't

12   keep track of Mr. Hardesty and who he had

13   discussions with.

14   Q.   You compiled the report; correct?

15   A.   Yes.

16   Q.   Did you see anywhere in the report or in

17   the notes that you used to compile the report that

18   anyone had indicated to Mr. Hardesty that he could

19   reslope the bank to solve the problem?

20   A.   No.  The report -- the report was

21   specifically addressed the existing site conditions.

22   Reports don't contain -- don't usually contain what

23   needs to be done to be corrected.  It's just a

24   report of the site as they were.

25   Q.   All I'm trying to figure out -- and I will

1   try to ask it at simply as I can.  I am trying to

2   figure out whether you know if anyone from OMR said

3   to Mr. Hardesty, Look, unless you reslope these pit

4   walls, we are going to have to go to court and seek

5   an injunction?

6           In other words, please fix this, and if you

7   don't fix this, we are going to have to seek an

8   injunction.  Do you recall anyone ever saying that

9   to Mr. Hardesty, to your knowledge?

10      A.   Not to my knowledge.

11           MR. ROBERTSON:  Showing you what we will

12  mark as Exhibit 94, and for counsel on the phone

13  this is a four-page document, OMR 003517.

14           (The document referred to was marked by

15           the CSR as Exhibit 94 for identification

16           and made a part of this deposition.)

17  BY MR. ROBERTSON:

18      Q.   Showing you that document, Ms. Norris, is

19  this a report related to a site visit on 12-23-08?

20           MR. ALDERSON:  Take your time in looking at

21  it.

22           THE WITNESS:  These are Kevin Doresty's

23  notes.

24  BY MR. ROBERTSON:

25      Q.   Inspection notes, Kevin Doresty; correct?

1     A.   Yes.

2     Q.   These were the -- some of the notes that

3   you used to help create the report; is that correct?

4     A.   Yes.

5          MR. ROBERTSON:  95.

6          (The document referred to was marked by

7          the CSR as Exhibit 95 for identification

8          and made a part of this deposition.)

9   BY MR. ROBERTSON:

10    Q.   Taking a look at Exhibit 95, which for

11   counsel on the phone LG001220, can you glance

12   through this and tell me if it appears to be a

13   report of the inspection dated December 23, 2008?

14    A.   Yes.

15         MR. ALDERSON:  Take your time in looking

16   through it.

17         THE WITNESS:  Here is the date right here

18   (indicating).

19   BY MR. ROBERTSON:

20    Q.   It says on the first page it was prepared

21   by Bret Koehler.  My question is did you compile

22   this and have Mr. Koehler sign it or did he compile

23   it or how was it prepared, if you know?

24    A.   He compiled it.

25    Q.   So when you said earlier that you

1   prepared -- I thought you said you prepared the

2   report from the notes that you gathered from other

3   people at the inspection.  Were you talking about

4   this Exhibit 95 or something else?

5        A.   Something else.

6        Q.   What did this report look like?

7        A.   Very similar to this one.

8        Q.   Would it have been something that you gave

9   to Mr. Koehler and then he took that and prepared

10  this final report from what you prepared or do you

11  know?

12       A.   Yes.

13       Q.   Would it be fair to say the opinions stated

14  in Exhibit 95, if there are any, are the opinions of

15  Mr. Koehler as opposed to your opinions?

16       A.   Yes.

17            MS. WINSOR:  The question is vague and

18  compound to the extent it encompasses an entire

19  document which speaks for itself.

20  BY MR. ROBERTSON:

21       Q.   During the inspection -- did you need to

22  look at it?

23       A.   If you are going to ask me questions about

24  it.

25       Q.   No, I am done with it.  Is there something

1  about the document you wanted to clarify or not?

2      A.   Just brings back old memories.

3      Q.   Now, you said earlier that you were only on

4  one inspection and that was December 23, 2008;

5  correct?

6      A.   Correct.

7           MR. ROBERTSON:  This will be Exhibit 96.

8           (The document referred to was marked by

9           the CSR as Exhibit 96 for identification

10          and made a part of this deposition.)

11  BY MR. ROBERTSON:

12      Q.   Showing you what has been marked as Exhibit

13  96, does that appear to be an e-mail from Debby

14  Mayberry to April Balestreri dated Thursday, January

15  8, 2009, with a copy to you?

16      A.   Yes.

17      Q.   And this e-mail says to April, "Gay shared

18  with me that the two of you are going on a site

19  visit tomorrow (Friday) to the Schneider Historic

20  Mine Site.  The trip is approved."

21           Do you recall, did you have a second visit

22  to the mine site in January of '09?

23      A.   No, that's not true.

24      Q.   So if this trip was approved, as far as you

25  know, it never occurred?

1    A.   It wasn't a site visit.

2    Q.   Okay.  Going on a site visit.  So was it

3  a -- did you go out to the Schneider mine on the

4  next day, January 9th but you are just saying it

5  wasn't a site visit?

6    A.   No, we didn't go to the mine.  We were down

7  the street from the mine.

8    Q.   Were you down the street from the mine in

9  relation to the Schneider mine or for some other

10  business?

11    A.   For the Schneider mine.

12    Q.   What were you doing down the street from

13  the Schneider mine?

14    A.   We were going to follow the trucks that

15  were leaving the Schneider mine to see where they

16  were going.

17         (The document referred to was marked by

18         the CSR as Exhibit 97 for identification

19         and made a part of this deposition.)

20         MR. ROBERTSON:  Off the record.

21         (There was a recess taken from 1:47 p.m.

22         to 1:55 p.m.)

23  BY MR. ROBERTSON:

24    Q.   Showing you what has been marked as Exhibit

25  97, looking at page 2, this appears to be an e-mail

1   from you to Bret Koehler and Dennis O'Bryant; is

2   that correct?

3       A.   Yes.

4       Q.   It looks like you have inserted a legal

5   authority in there, section 20676.  And then below

6   that I can't tell if this is something you have

7   written them, their e-mails, or this is something

8   that you copied from some other location?

9       A.   Oh, no.  I wrote that.

10      Q.   Okay.

11      A.    It was Christmas Eve.  I was trying to make

12  light of the subject.

13      Q.   Okay.  Then you indicate that it might be

14  interesting to figure out where the trucks are

15  going, and Mr. O'Bryant writes back to you at the

16  bottom of the first page, "What can we do?  We can

17  do what we used to do, which is to follow some of

18  their haul trucks to see where they are going."

19           Do you see that?

20      A.   Yes.

21      Q.   Then you asked April if she would like to

22  take a ride.  She says "yes."  And then the two of

23  you agree to go out following the trucks the next

24  week; correct?

25      A.   Yes.

1     Q.   Is this the site visit that Debby referred
2   to in the prior e-mail, Exhibit 96?
3     A.   Yes.
4     Q.   Your testimony was that on January 9, 2009,
5   you didn't actually go to the Hardesty site.  You
6   stopped a ways back from the site on Meiss Road; is
7   that correct?
8     A.   Yes.
9     Q.   Did you interact with any of the truck
10   drivers or are you surreptitiously following them?
11         MR. ALDERSON:  Objection.  Misstates the
12   testimony.
13         Go ahead and answer.
14         THE WITNESS:  We followed them.  We were
15   out in the open and followed them.  And yes, I did
16   speak to one of the truck drivers.
17   BY MR. ROBERTSON:
18     Q.   Was it on that day, January 9th, 2009, or a
19   different day?
20     A.   It was on this date.
21     Q.   Was that a gentleman with Mannley Trucking?
22     A.   I don't remember.
23     Q.   You don't remember the name of the trucking
24   company?
25     A.   No, I do not.

1      Q.   Tell me about your conversation with the
2   truck driver.
3      A.   I asked him where he was coming from and
4   asked him if that was his stop for delivery, and he
5   told me where he was going to make the delivery.
6      Q.   Okay.  So you asked him whether he had
7   picked up some material in Hardesty?
8      A.   Yes.
9      Q.   And he indicated yes, that that's where he
10  had picked up his material?
11     A.   Yes, he showed me his -- I can't remember
12  what they call it, a bill of lading something, but
13  he had a piece of paper that showed where it came
14  from.
15     Q.   And you asked him where he was taking it
16  to?
17     A.   Yes.
18     Q.   Do you remember what he said about that?
19     A.   He was taking it to the construction that
20  was going on right across the street.
21     Q.   Right across the street at Meiss Road?
22     A.   Where the truck stops, and we got out after
23  we had the discussion with the truck driver, he said
24  he was going to where they were doing the
25  construction, and it was right across the street.