<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
 2

     Hardesty, et al.,
 3          Plaintiffs,              Sacramento, California
     vs.                            No. CV.  S-10-2414
 4   Sacramento Metropolitan        Fri., Jan. 22, 2016
     Air Quality Management         10:13 a.m.
 5   District, et al.,
            Defendants.
 6   _____/
     Jay Schneider, et al.,
 7          Plaintiffs,              Sacramento, California
     vs.                            No. CV.  S-12-2457
 8   County of Sacramento, et       Fri., Jan. 22, 2016
     al.,                           10:13 a.m.
 9          Defendants.
     _____/
10
                      TRANSCRIPT OF HEARING
11      BEFORE THE HONORABLE KIMBERLY J. MUELLER, DISTRICT JUDGE
                         ---oOo---
12   APPEARANCES:

13    For the Schneider Family     Millstone Peterson & Watts,
      Plaintiffs:                  LLP
14                                 2267 Lava Ridge Court, Suite
                                   210
15                                 Roseville, CA  95661
                                   By:  Glenn W. Peterson
16                                 Attorney at Law

17    For the County of Sacramento Longyear, O'dea & Lavra, LLP
      Defendants:                  3620 American River Drive,
18                                 Suite 230
                                   Sacramento, CA  95864
19                                 By: Mark Peter O'Dea
                                   Attorney at Law
20
      (Appearances continued on following page)
21
      Official Court Reporter:     Kimberly M. Bennett,
22                                 CSR, RPR, RMR, CRR
                                   501 I Street
23                                 Sacramento, CA 95814
                                   (916) 442-8420
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription
</pre>

```
 1                        APPEARANCES CONTINUED

 2     For the Schneider Family      Law Office of Richard M. Ross
       Plaintiffs:                   8081 North Forbes Rd.
 3                                   Lincoln, CA  95648
                                     By: Richard M. Ross
 4                                   Attorney at Law

 5     For the Defendants Joe &      Robertson, Johnson, Miller &
       Yvette Hardesty:              Williamson
 6                                   50 West Liberty Street, Suite
                                     600
 7                                   Reno, NV  89501
                                     By: George David Robertson
 8                                   Marilee Breternitz
                                     Attorneys at Law
 9
       For the Defendant Liz         Office of the Attorney
10     Gregory:                      General
                                     1300 I Street,
11                                   Sacramento, CA  94244
                                     By: Jeffrey Reusch
12                                   Deputy Attorney General

13     For the Defendants O'Bryant,  California Department Of
       Norris, Testa & Taras:        Justice
14                                   1515 Clay Street, Suite 2000
                                     Oakland, CA  94612
15                                   By: David G. Alderson
                                     Deputy Attorney General
16
       For the Defendant Bieber:     Collins, Collins Muir &
17                                   Stewart, LLP
                                     1722 Milan Avenue
18                                   South Pasdena, CA 91030
                                     BY:  Sharon Muir
19                                   Attorney at Law

20     For the Defendant Bieber:     Collins, Collins Muir &
                                     Stewart, LLP
21                                   750 The City Drive, S
                                     Orange, CA 92868
22                                   BY:  Ryan Eric Palumbo
                                     Attorney at Law
23

24

25
```

1          (Call to order of the court, 10:13 a.m.)

2               THE CLERK:  Calling Civil Case Number 10-2414,

3     Hardesty, and Civil Case 12-2457, Schneider versus Sacramento

4     Metropolitan Air Quality Management District.

5          This is on for a motion hearing.

6               THE COURT:  Good morning.  Appearances, please.

7               MR. PETERSON:  Good morning, Judge Mueller.  Glenn

8     Peterson, Millstone, Peterson & Watts, for the Schneider Family

9     plaintiffs.

10               MR. ROSS:  Good morning.  Richard Ross, also for the

11     Schneider Family plaintiffs.

12               THE COURT:  Good morning to each of you.

13               MR. ROBERTSON:  Good morning, Your Honor.  David

14     Robertson on behalf of Joe and Yvette Hardesty.

15               MS. BRETERNITZ:  Good morning, Your Honor.  Marilee

16     Breternitz on behalf of Joe and Yvette Hardesty.

17               THE COURT:  Good morning to each of you.

18               MR. REUSCH:  Good morning, Your Honor.  Jeffrey

19     Reusch from the Attorney General's Office on behalf of

20     defendant Liz Gregory.

21               MR. O'DEA:  Good morning, Your Honor.  Mark O'Dea,

22     Longyear, O'Dea and Lavra, on behalf of the County of

23     Sacramento and all county-related defendants.

24               MR. ALDERSON:  Good morning, Your Honor.  David

25     Alderson with the California Attorney General's Office

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   appearing on behalf of four state defendants, defendants Dennis

2   O'Bryant, Gay Norris, Steven Testa and Curt Taras.

3                   THE COURT:  Good morning to you.

4                   MS. MUIR:  Good morning, Your Honor.  Sharon Muir,

5   Collins, Collins, Muir and Stewart, on behalf of individual

6   David Bieber.

7                   MR. PALUMBO:  Good morning.  Ryan Palumbo of Collins,

8   Collins, Muir and Stewart, and on behalf of David Bieber.

9                   THE COURT:  All right.  Good morning to all of you.

10      This is on for cross-motions.  I do have several questions.

11  As is my practice, I'd like to work through those.  They're

12  generally organized by claim, which is why I wanted to wait for

13  Mr. Alderson.

14      And I'm assuming you've divided up -- to the extent there

15  are two of you on -- two of you representing certain clients,

16  you've divided up the arguments, so I'll just leave it to you

17  to tell me who is responding to a question.

18      Once we work through my questions, I think once we get to

19  the end of a set of questions based on a claim, then I'll ask

20  for any brief wrap-up.  So I think that will organize the

21  hearing in the most orderly fashion.  And then at the very end,

22  if there is additional wrap-up you think not covered by the

23  discussion or prior argument, or the briefing, the fairly

24  voluminous briefing, I'd give you a brief opportunity to

25  provide that argument.

1          So first, just clarifying, Mr. Robertson, Ms. Breternitz,

2     it is the case that all the -- all the claims are covered by

3     all the motions, correct?

4          The entire case is put at issue by all the motions before

5     the Court; do you agree with that?

6               MR. ROBERTSON:  Yes, Your Honor.

7               THE COURT:  Do you also agree with that,

8     Mr. Peterson, Mr. Ross, as to the Schneiders?

9               MR. PETERSON:  Yes.

10              THE COURT:  All right.  Does anyone here disagree

11    with that?  Any defendant disagree with that?  All right.

12         So let's start with search and seizure.

13         For either Mr. Robertson or Ms. Breternitz, thinking about

14    the open fields doctrine, doesn't that doctrine apply here?

15    And doesn't that mean there wasn't a search?

16         Looking at the Supreme Court cases of Oliver, Wattenburg,

17    and also the Ninth Circuit's case, Patel.

18              MR. ROBERTSON:  Thank you, Your Honor.

19              THE COURT:  If you want to start by clarifying the

20    facts for me, isn't this really equivalent to an open field

21    setting?

22              MR. ROBERTSON:  I don't believe that's correct, Your

23    Honor.

24              THE COURT:  All right.

25              MR. ROBERTSON:  I believe the --

1          THE COURT:  What facts make that not so?

2          MR. ROBERTSON:  I think that we have to look at the

3     purpose for the search, and the improper motive of the search,

4     is where we should start.

5          THE COURT:  Well, I understand that's your argument,

6     but how does the case law help you in that regard?

7          MR. ROBERTSON:  Well, I believe that if the purpose

8     of the search was not as stated, to gather evidence, as alleged

9     by Liz Gregory, then she can't take advantage of the open

10    fields doctrine because she wasn't there trying to perform a

11    search.  And that's number one.

12      Then, number two, she also searched areas that were not

13    visible from any public location.

14      And the issue of an open field doctrine, if you look at the

15    Pearl Mushroom Farm case, in that case it was clear that there

16    were parts of the -- parts of the commercial enterprise that

17    were not visible from any public location, and that the public

18    wasn't granted access to those locations, and the Court held

19    that searches should be made from observations from strategic

20    viewpoints, and the proper course for the agent is to secure a

21    warrant from what they've seen from the public's vantage point.

22          THE COURT:  If it's going to be a search.

23          MR. ROBERTSON:  If it's going to be a search.

24          THE COURT:  Private -- private property -- private

25    commercial property --

1          MR. ROBERTSON:  Correct.

2          THE COURT:  -- is not covered by the Fourth

3   Amendment.  Agreed?

4      It's not one of the -- just looking at Patel, Ninth Circuit

5   case, August 18th, 2015, private commercial property, not one

6   of the enumerated items the Fourth Amendment protects.  Patel

7   is a case involving a Galleria Motel.

8          MR. ROBERTSON:  Well, the Fourth Amendment protects

9   people, not places.  And the allegation here is that our

10  clients' individual rights were violated by the searching of an

11  area that is not -- is not open to the public.

12         THE COURT:  Do you concede at least -- would you

13  concede at least a part of the area is -- can be seen from

14  public view, accessed by a road?

15         MR. ROBERTSON:  Yes.  I concede part of it can.

16  That's correct, Your Honor.

17         THE COURT:  All right.

18         MR. ROBERTSON:  And part of it cannot.

19         THE COURT:  What exactly are the parts that cannot be

20  seen at all from any...

21         MR. ROBERTSON:  There are quite a few areas that

22  can't be seen from any public area -- from a public road, or

23  any area where --

24         THE COURT:  That Ms. Gregory invaded inappropriately.

25         MR. ROBERTSON:  Right.

1   There are two areas that she visited that are not capable

2   of being viewed from either a public road or from the areas

3   where the public are allowed within the mine when they come in

4   to pick up material.

5   The first area is the area below the dam.  It's not --

6   technically it's not a dam, it's just a levy that is located on

7   the holding pond.  There is a holding pond that is used to keep

8   the water that's used in the operation on-site, so that none of

9   the water that has -- that's being used to wash material gets

10  off-site.  And she visited at a location that is just

11  immediately northeast of that holding pond, she and

12  Mr. Simmons, and there is about a 30-foot levy there.  And that

13  30-foot levy prevents anyone from being able to see that from a

14  road.

15          THE COURT:  That's a private levy?

16          MR. ROBERTSON:  Yes.

17          THE COURT:  So -- and how did she get there?  She

18  drove in?

19          MR. ROBERTSON:  Yes.

20          THE COURT:  In a truck?

21          MR. ROBERTSON:  Yes.

22          THE COURT:  She didn't have to open any gates?

23          MR. ROBERTSON:  That's correct.

24          THE COURT:  There were areas where there was barbed

25  wire, but she -- did she drive past any big signs?

 1              MR. ROBERTSON:  She drove past a sign -- that's a

 2     disputed issue of material fact.

 3         We claim there was a sign there that says, you know, all

 4     persons must stop here.  That's at the weigh station.  She

 5     drove past that sign to get down to this area I've just

 6     described, which is just northeast of the holding pond.

 7         One of the reasons for having --

 8              THE COURT:  So how, exactly, are you distinguishing

 9     Patel?

10         Are you conceding that Patel would make much of what

11     Ms. Gregory did permissible and not a search?

12              MR. ROBERTSON:  No.  Because I don't -- again, I

13     don't believe she was there to perform a search.  She was there

14     for an ulterior motive.  She was there strictly to provide

15     access to Mr. Simmons, which was, quite frankly, illegal

16     access.

17         If you take a look at her claim, if you look at her memo,

18     which is Exhibit 115, she says that she went there under the

19     guise of claiming that there was an emergency; which there,

20     obviously, was not.  And then she secondly said, I was there as

21     a peace officer under California Penal Code 830.2 and Fish and

22     Game Section 857(b)(2).

23         But if you look at 857(b)(2), it says that a peace officer

24     can go on private property, but -- and that they can also take

25     someone else with them, but it can only be someone from their

1   department.  And, obviously, Mr. Simmons was not from their

2   department.  So she had no authorization under either of those

3   provisions to be out there.

4              THE COURT:  Doesn't she also say she didn't know that

5   he had previously been told not to?

6              MR. ROBERTSON:  She claims that, but the facts are

7   pretty clearly otherwise.

8              THE COURT:  So that's a credibility determination

9   only a jury can make.

10             MR. ROBERTSON:  It is, Your Honor.

11      Both Exhibits 115 and 118 refute that, as well as the

12   e-mail that was sent that morning from Carolyn Doody, at

13   8:57 a.m., which stated that -- let me see if I've got an

14   exhibit number for you on that.  It's deposition Exhibit 81 to

15   the Doody deposition.  I don't know if it's in the exhibits,

16   but it's a -- it's an e-mail from Carolyn Doody, on that exact

17   same morning, to her supervisor, Captain Lucero, indicating

18   that she was aware -- Carolyn Doody is Liz Gregory's supervisor

19   -- indicating that she was aware that Mr. Simmons was

20   prohibited from going out to certain locations before.

21      And Ms. Gregory, in her report, Exhibit 115, she states,

22   right at the beginning of the report, that -- I'm sorry.  If

23   you look at Mr. Simmons' Exhibit 118, that's his report of the

24   investigation, he states that he talked to Ms. Gregory about

25   his prior visit, and that he had only been allowed to visit two

1    of the locations on the prior visit.

2        They also had a discussion because -- about Congressman

3    Lungren during that time, before they went out on the site.

4        And it's pretty clear that Ms. Gregory had no background in

5    1600 violations.  She tried to claim at deposition --

6            THE COURT:  I understand all that.  I think the --

7    what I want to focus on is whether or not this was actually a

8    search.

9        So, for that purpose, I want to ask Mr. Reusch what he has

10   to say.

11           MR. REUSCH:  Yes, Your Honor.  Do you have a

12   preference as to whether I speak from the podium?

13           COURT REPORTER:  I can't see him.

14           THE COURT:  I guess the court reporter would prefer

15   that you come forward.

16       So, focusing just on the areas Mr. --

17           MR. REUSCH:  Robertson?

18           THE COURT:  I'm sorry.  I have to keep you all

19   straight here.  Yes.

20       Mr. Robertson concedes part of this -- part of the ranch,

21   the area around the mining, would have been subject to plain

22   view but part not.  So focus just on the areas he argued cannot

23   be subject to the open fields doctrine.

24           MR. REUSCH:  Yes, Your Honor.

25       So addressing that question first, and setting aside the

1   question of intent or motive for the moment, I think the Oliver

2   v. U.S. case is particularly informative.  In that case you had

3   a marijuana field that was entirely encircled by an embankment,

4   by woods, by fences, by no trespassing signs, by locked gates,

5   all of which completely prevented anyone from having any view

6   of the marijuana field from any public area, whether it be a

7   public road or any other public property, and, nonetheless,

8   that marijuana field was held by the U.S. Supreme Court to be

9   an open field that was not subject to Fourth Amendment

10  protection.

11      So U.S. Supreme Court precedent is clearly on point that an

12  area that is not at all visible from any public location may

13  still be an open field.

14      As to the areas that Warden Gregory inspected, the area

15  that Mr. Robertson was describing as being northeast of the

16  settling pond, the undisputed evidence in this case is that

17  area was a cow pasture.  There are photographs demonstrating

18  that.

19      The other area that Warden Gregory inspected, the area that

20  Mr. Robertson concedes was visible from Meiss Road, was a field

21  with a pond in it, again, adjacent to a public road.

22      The plaintiffs have never produced any evidence, or even

23  made any argument, explaining why they feel that they have a

24  reasonable and objectively reasonable expectation of privacy in

25  either of those areas, instead relying on their Pearl Meadows

1   case, which itself relies upon Seventh Circuit authority for

2   the proposition that there is such a thing as business

3   curtilage.  And that is a proposition that has not been adopted

4   -- expressly not adopted -- by the U.S. Supreme Court in the

5   Dow Chemical case.  It runs contrary to -- or appears to run

6   contrary to a number of U.S. Supreme Court cases that we've

7   cited, including Oliver and including Dunn.

8        In Dunn, the officers entered private property, had to

9   cross five different fences on that private property to get to

10  the commercial barn that they were going to inspect, stopped

11  midway between the home of the person who lived on the property

12  and the barn that they were going to inspect before proceeding

13  to the barn.  The plaintiffs didn't have any home on the

14  property in this case, so there is no issue of curtilage of a

15  home.  In Dunn, the officers walked right up to the edge of

16  that barn, commercial structure, and peered in, and still were

17  held by the U.S. Supreme Court not to have violated the Fourth

18  Amendment because all of the areas that they accessed were open

19  fields, and it did not matter that what they were looking at

20  from the open field was commercial property.

21       In addition, there --

22            THE COURT:  Let me just ask Mr. Robertson one

23  follow-up question, and then I'd take wrap-up on this.  I think

24  I have what I need.

25       Just on the facts, clarifying the facts, first of all, this

1   property could have been subject to a flyover, aerial view?

2          MR. ROBERTSON:  Yes, Your Honor.

3          THE COURT:  So everything that Ms. Gregory was

4   inspecting could be seen from the air?

5          MR. ROBERTSON:  No.  Because some of the things that

6   she was looking at, Your Honor, would be things that are too

7   detailed to be able to be seen from the air.

8          THE COURT:  But no home?  There is no home site

9   anywhere near?

10          MR. ROBERTSON:  There is no home site there.

11          THE COURT:  All right.

12          MR. REUSCH:  Your Honor --

13          THE COURT:  I have nothing else on this.  But just

14   brief wrap-up, Mr. Reusch?

15          MR. REUSCH:  Your Honor, did you want to hear from me

16   at all on the motive and intent issue?

17          THE COURT:  I don't have specific questions.  If

18   there is something you would like to say that you think is not

19   fully covered by the briefing.  If you want to respond, for

20   example, to the argument about Ms. Gregory's purpose in being

21   there --

22          MR. REUSCH:  Yes.

23          THE COURT:  -- briefly, I'm happy to hear that.

24          MR. REUSCH:  Yes, Your Honor, very briefly.

25      The credibility argument that the plaintiffs raise is a red

1   herring.  It is irrelevant.  The Ashcroft v. Al-Kidd case makes

2   it pretty clear that under almost all circumstances, subjective

3   intent is irrelevant to the Fourth Amendment issue.  And the

4   exceptions that it lists are not relevant here because Warden

5   Gregory is not relying on the administrative search exception

6   to the warrant requirement.

7        Although the plaintiffs confidently state that they don't

8   believe that Warden Gregory was telling the truth when she said

9   that she did not know that the plaintiffs did not want Simmons

10  on the property, that, itself, takes a level of speculation to

11  reach.  But even if assuming for the purposes of argument that

12  they're right, that she wasn't telling the truth, and that she,

13  in fact, knew that Simmons was not wanted on that property,

14  that, itself, is irrelevant because it takes an incredible

15  speculative leap to go from that to the proposition that is the

16  foundation of the plaintiffs' case on both Fourth Amendment and

17  Fourteenth Amendment that Liz Gregory was out there not to

18  inspect for Fish and Game Code purposes, as is established by

19  the extensive paper trail that was submitted to the Court,

20  starting with Simmons' e-mail with photos and captions, but

21  instead was out there purely to get Simmons out on the property

22  for the purpose of driving the plaintiffs out of business in

23  service to a legislator and a competitor with whom it's

24  undisputed that Warden Gregory never had any contact, and about

25  whom it is undisputed that Warden Gregory never had any

1    information outside of right before she was about to go on the

2    property Simmons telling her that he had received a voicemail

3    from Congressman Lungren, without providing any substantive

4    details about that voicemail, or giving Warden Gregory any

5    information about what the Congressman said or what his

6    interest was.

7              THE COURT:  Mr. Robertson, do you dispute that timing

8    of Gregory's learning that a Congressman was interested?  It

9    was after she was already at the property?

10             MR. ROBERTSON:  It was before they entered the

11   property, Your Honor.  They had a discussion in the truck.

12   Mr. Alderson [sic] -- perhaps he's not recalling correctly.

13   What occurred, is that --

14             THE COURT:  But it wasn't before she got in the

15   truck?  It wasn't...

16             MR. ROBERTSON:  It was before they entered the

17   property, that's correct.

18      And what happened is there was a message from Congressman

19   Lungren.  Mr. Simmons returned the call from Congressman

20   Lungren.  Because of the Congressman's involvement --

21             THE COURT:  But it's not disputed that Gregory did

22   not know that until she had already made the plans and had

23   traveled towards the property?  That is not disputed?

24             MR. ROBERTSON:  We don't have evidence that she knew

25   about the Congressman's involvement before she drove out to

 1   meet Mr. Simmons, but we do know that she knew about

 2   Congressman Lungren's involvement before she entered the

 3   property.

 4        And, in fact, she called her supervisor and talked to her

 5   supervisor about Congressman Lungren's involvement before she

 6   entered the property.  And --

 7             THE COURT:  All right.  I have what I need on this.

 8        We have a lot to cover.  If there is something you need to

 9   say on this, at the very end of the hearing we'll come back to

10   it.

11             MR. ROBERTSON:  I just wanted to say, all inferences

12   should be drawn in our favor, Your Honor.

13             THE COURT:  I know the law on summary judgment.

14        Let's move on to Monell.  And for the county defendants,

15   I'd like some assistance in understanding what the Ninth

16   Circuit advises the Court on what it takes to not just plead

17   but prove up a Monell claim.

18             MR. O'DEA:  Your Honor --

19             THE COURT:  So, on the one hand there is some --

20   there is some authority, for example, Federation of African

21   American Contractors v. Oakland, that suggests that there needs

22   to be a clear --

23             MR. O'DEA:  Right.

24             THE COURT:  A pattern.  But then you look at Evers v.

25   Custer and Bateson v. Geisse, single decision by a

1    policy-making body is policy.

2           MR. O'DEA:  You're right, Your Honor.  And we raised

3    that issue because, in our opinion, the Monell claim was not

4    properly pled.  It clearly isn't anywhere in the Hardesty

5    complaint.

6       However, as you point out, and as we concede, you know, the

7    action of the board did constitute an action by the final

8    policy-making body of the County of Sacramento.  That's not

9    disputed.

10          THE COURT:  So Bateson would control here?

11          MR. O'DEA:  Absolutely.

12          THE COURT:  All right.

13          MR. O'DEA:  Okay.

14          THE COURT:  That was very helpful.  I think that's

15   all I need to know on that, having read the cases.

16      Given that we have so much to cover, I'm just going to move

17   on to equal protection.

18      This really would be for all of the defendants, and we'll

19   just go one-by-one to the extent there is a defendant on the

20   hook for equal protection.

21      I don't see that any defendant has addressed the

22   requirement that defendants acted intentionally.  So is that

23   element conceded?

24          MR. REUSCH:  Your Honor, just for the record, there

25   is no equal protection claim against Warden Gregory.

1          THE COURT:  That's my reading of my checklist here as

2     well.

3        Mr. O'Dea?

4          MR. O'DEA:  It depends on what you mean by

5     "intentionally," Your Honor.

6          THE COURT:  To the extent it's the element that needs

7     to be established.

8          MR. O'DEA:  I mean, certainly the county did what it

9     did in enforcing its zoning code and the provisions of SMARA

10    because it's required to do so.  It's the lead agency for

11    purposes of enforcement of SMARA in Sacramento County.

12       So to the extent that anyone may have acted intentionally,

13    they were acting pursuant to their obligation to enforce the

14    law, to regulate the mine, and to fulfill their job duties.

15       More than that, you know, there is no -- certainly there is

16    no evidence that anyone acted with ill will, malice or spite,

17    or as part of any kind of a conspiracy.  These are all folks

18    that were just doing their jobs, responding to the situation

19    that was unfolding as it did.

20          THE COURT:  It's just, for an equal protection claim,

21    the defendant need only act intentionally.  So that -- to the

22    extent that's what the element is, that's conceded?

23          MR. O'DEA:  Sure.

24          THE COURT:  Mr. Alderson, are your clients...

25          MR. ALDERSON:  For my clients, the same, Your Honor.

1    They clearly intended to take the actions that they did take.

2    And they, obviously, do not agree that they intended to run the

3    Hardestys out of business, or any ill will like that.

4             THE COURT:  That's a separate question.

5        Same as, Ms. Muir?

6             MS. MUIR:  Your Honor, I believe we're not involved

7    with equal protection.

8             THE COURT:  All right.  You're for Mr. Bieber.  All

9    right.

10       On conspiracy, for the plaintiffs, all of the plaintiffs,

11   there is no longer a conspiracy claim in the case, correct?

12            MR. ROBERTSON:  There never was, Your Honor.  A

13   conspiracy claim is brought under USC 1985, Subsection B.  We

14   never alleged that, we only alleged 1983.

15       All we've alleged is that it's a coordinated -- it was a

16   coordinated attack upon us.  And, let's see now --

17            THE COURT:  So I understand correctly, that you must

18   show -- you must establish that there is no dispute, for

19   purposes of this hearing, that each defendant individually

20   violated equal protection rights, that's the...

21            MR. ROBERTSON:  Yes, Your Honor.  They individually

22   did so and they did it in a coordinated manner.

23       If the Court looks at the order you issued on March 25,

24   2013, docket number 145, you even used that same -- those same

25   words:  Plaintiffs argue and included these allegations to

1    illustrate Norris is part of a coordinated attack in an attempt

2    to drive plaintiffs out of business.

3              THE COURT:  But that's not the same as conspiracy.

4              MR. ROBERTSON:  It is not.  We have not alleged a

5    1985 action.

6              THE COURT:  Mr. Peterson?  Mr. Ross?

7              MR. ROSS:  We never alleged conspiracy in the

8    complaint, Your Honor.  They certainly all work together, but

9    we did not allege a conspiracy.

10             THE COURT:  All right.  Then also for plaintiffs,

11   focusing, narrowing it down, what are -- for each of you, what

12   portions of the record, with cites, best show pretext or

13   animus?

14        Let's start with O'Bryant.  What's the best evidence of

15   record that he wasn't just doing his job at OMR?

16             MR. ROBERTSON:  Your Honor, I think -- if I may, I

17   think we have to start the equal protection analysis by looking

18   at two cases, the Del Monte Dunes case, which was cited

19   extensively in the pleadings, and also the Benigni versus Hemet

20   case.

21        In the Del Monte Dunes case, the Ninth Circuit held, in

22   this type of action, where the property owner contends that it

23   has been unconstitutionally deprived of property through

24   government regulation, motions to dismiss and motions for

25   summary judgment must be viewed with particular skepticism.

1        "The importance of the specific facts and circumstances

2    relating to the property and the facts and circumstances

3    relating to the governmental action militate against summary

4    resolution in most cases."

5               THE COURT:  So let's -- for sake of argument, you can

6    assume I'm a skeptic.  I'm looking for help with the factual

7    record here.

8               MR. ROBERTSON:  So, we'll start with --

9               THE COURT:  What's the evidence?

10              MR. ROBERTSON:  We'll start with Mr. O'Bryant.

11       Mr. O'Bryant testified at deposition that when he first

12   became involved in the case he went and read the OMR file.  If

13   he had done so, he would have seen that OMR was involved in the

14   preparation of the reclamation plan.  And, in fact, not only

15   did OMR draft portions of the reclamation plan, OMR sent a

16   representative to the hearing before the Sacramento County

17   Board of Supervisors to speak in favor of adoption of the

18   reclamation plan.

19              THE COURT:  What year?  What year?

20              MR. ROBERTSON:  2002 is when they -- when it was

21   adopted and when OMR appeared.

22              THE COURT:  So preceding any ramped up activity that

23   might have been triggered by interest from above.

24              MR. ROBERTSON:  Right.

25              THE COURT:  Or the legislative branches.

1          MR. ROBERTSON:  Right.

2      Mr. O'Bryant writes repeated letters saying that this

3  reclamation plan is wholly deficient, doesn't meet state law,

4  should have never been adopted, that the county was in total

5  error in adopting this, when his own files that he claimed to

6  have reviewed show the opposite, show that OMR approved this

7  plan.

8      In fact, we've cited to a portion of the record where

9  Sacramento County says this is one of the more comprehensive

10  reclamation plans that have been adopted, and extra effort was

11  put into it, including involvement from OMR.  Of course OMR

12  disowns that when it comes time to try to find violations.

13          THE COURT:  All right.  So statements at odd with

14  what the file actually says.

15          MR. ROBERTSON:  Right.

16          THE COURT:  So what else?

17          MR. ROBERTSON:  Well, we -- we have an inspection

18  that occurs June 25, 2008 by the lead agency, Sacramento

19  County.  The Sacramento County, in response -- and that is

20  exhibit --

21          THE COURT:  This is for O'Bryant?

22          MR. ROBERTSON:  This is leading up to O'Bryant.

23      But that is -- I think it's undisputed that we had an

24  inspection in June of 2008 that said there was zero violations

25  at this point.

1     And then there is an e-mail, December -- I'm sorry,

2  October 31, 2008, from Jeff Gamel, the aggregate resources

3  manager for Sacramento County, who says there are no violations

4  going on out there.  And yet, six weeks later -- although

5  nothing changed at the mine, we had had three annual

6  inspections with no violations in a row, nothing changed at the

7  mine, we have an affidavit to that effect, six weeks later

8  Mr. O'Bryant's group goes out there and they allegedly find

9  many, many violations, all these violations.

10     Well, because the facts have to be construed in our favor

11  at this point, the Court has to assume that we're correct there

12  are no violations because we have an inspection that says there

13  are no violations.

14          THE COURT:  And you're --

15          MR. ROBERTSON:  This is all pretext.

16          THE COURT:  Your position is the evidence shows that

17  Mr. O'Bryant directed that inspection to reach those results?

18          MR. ROBERTSON:  Yes.  And he wrote a letter shortly

19  after the inspection claiming that there were all these

20  violations that were all pretextual.  They were -- they were

21  entirely fabricated violations.  And he should know that

22  because if he looked at the file, one of the first things that

23  it stated in his letter shortly after the inspection, he says,

24  I think in March of 2009, that the big problem here is that we

25  should not have been mining along the river, and that our

1    reclamation plan was wholly inadequate.  He knew those things

2    were false.

3              THE COURT:  All right.  Let's go -- I want a bullet

4    point.

5        So, Norris?

6              MR. ROBERTSON:  For who?  Norris?

7              THE COURT:  Norris.

8              MR. ROBERTSON:  For Gay Norris, she also was working

9    at OMR.  She knew, or should have known, from her own files

10   that Mr. Hardesty had submitted all the documents to be

11   eligible for the AB 3098 list.

12      Despite knowing that, or being reckless in not knowing that

13   -- because it's right in the file that he had submitted his

14   annual report, he'd submitted his financial assurances, and he

15   had his inspection showing that there were no problems at the

16   mine, therefore he should have been on the AB 3098 list.

17   Despite that, she followed the trucks.

18      I find it ironic that OMR argues they didn't have

19   sufficient manpower to read the financial assurance reports or

20   the annual reports that were filed, they claim, Well, gee, we

21   just didn't read those things because we don't have the

22   manpower, but they have the manpower, apparently, to follow our

23   trucks.

24      So she goes and follows our trucks and goes to --

25             THE COURT:  She was advised to do that.

1              MR. ROBERTSON:  She was by Mr. O'Bryant.

2     Mr. O'Bryant told her to, that's correct.  Then she went --

3              THE COURT:  Is it -- it's not the case -- does the

4     record show that it was only plaintiffs' trucks that were

5     followed?

6              MR. ROBERTSON:  Yes, Your Honor.

7              THE COURT:  All right.  Of all the persons who might

8     either be on, or wish to be on, the AB 3098 list, they were the

9     only ones followed?

10             MR. ROBERTSON:  That's correct.

11             THE COURT:  That wasn't a standard practice?

12             MR. ROBERTSON:  No.

13             THE COURT:  Right?

14             MR. ROBERTSON:  No.  Not a standard practice at all.

15             THE COURT:  In any event, Ms. Norris was --

16             MR. ROBERTSON:  Ms. Norris follows the truck --

17             THE COURT:  -- was advised to do that by a

18    supervisor.

19             MR. ROBERTSON:  By Mr. --

20             THE COURT:  O'Bryant.

21             MR. ROBERTSON:  -- O'Bryant.  She then goes and talks

22    to the manager at the job site, tells the manager at the job

23    site that it's illegal to buy material from Mr. Hardesty

24    because he's not on the list.

25        Then Ms. Norris admitted at deposition that, you know, as

1  soon as Mr. Hardesty found out about this problem, he

2  immediately said I need to be put on the list.  So three weeks

3  later he gets the letter from OMR saying you're put on the

4  list.  And Ms. Norris admits that she became aware that

5  Mr. Hardesty had submitted his documents and it was just an

6  oversight, essentially, that he had not been put on the list.

7  She knows now that he's not -- that he's on the list and she

8  doesn't go back to the manager and say, I'm sorry, I misled

9  you, you can buy material now.

10         THE COURT:  I understand all that argument.

11      She worked -- what was the exact time frame?  She was in

12  Sacramento for a very short period of time, ending in

13  January '09.

14         MR. ROBERTSON:  She was there on the -- on the raid

15  in December of '08, and I believe she left in January or

16  February of '09.

17         THE COURT:  All right.  What about Testa?

18         MR. ROBERTSON:  Mr. Testa.  He received a request

19  that -- we had been removed from the AB 3098 list without any

20  notice, that was not the standard.  The standard was clearly

21  that they had to give us notice, an opportunity to cure.  They

22  did not, they just removed us --

23         THE COURT:  What does the evidence show about

24  Mr. Testa specifically?

25         MR. ROBERTSON:  So he --

 1              THE COURT:  In bullet point form.

 2              MR. ROBERTSON:  He received a request to have that --

 3    to review the fact that we've been taken off the AB 3098 list

 4    without any opportunity to be heard or cured, any due process.

 5    He received that request.  He had the power to honor that

 6    request and to look into this error or this -- this

 7    deliberate -- deliberate oversight, or whatever it is, and he

 8    refused to do it.

 9              THE COURT:  What's the evidence of pretext or animus

10    and not just exercise of discretion?

11              MR. ROBERTSON:  Well, he was aware of the request

12    from Senator Cox for the investigation, and knew that Senator

13    Cox had wanted to pursue this --

14              THE COURT:  So the best evidence is the timing?

15              MR. ROBERTSON:  Yes.

16              THE COURT:  Of his knowing of Cox -- of --

17              MR. ROBERTSON:  Knew of Cox's letter, and then

18    shortly thereafter, when he was asked to review this improper

19    decision to take us off the list without notice and opportunity

20    to be heard, he refused to provide us any remedy.

21              THE COURT:  And the county defendants?  Again, bullet

22    point.  Just specific evidence of pretext or animus.

23              MR. ROBERTSON:  Okay.  So Storelli and Moffitt, Your

24    Honor --

25              THE COURT:  The planners.

1          MR. ROBERTSON:  Yes.  So with respect to Storelli and

2     Moffitt, Cindy Storelli conducted an inspection of the mine,

3     even though she wasn't qualified to do that.  She was aware

4     of -- she admitted at deposition she was aware of Roger

5     Dickinson being involved, and Senator Cox being involved, and

6     there being political pressure --

7          THE COURT:  So, again, it's timing?

8          MR. ROBERTSON:  Again, timing.

9          THE COURT:  She did something after knowing of that?

10         MR. ROBERTSON:  She did.  She allegedly tried to

11    inspect a mine when she had absolutely no expertise or

12    experience or any knowledge at all about mines.

13        And then she issued an inspection report saying that we

14    had, I believe, 12 violations, when she admitted at deposition

15    -- I went through them one at a time with her, she had no idea

16    about -- anything about those violations because she had no

17    knowledge of mining law.

18         THE COURT:  Is it the same for Moffitt, Gamel,

19    Sherry, Dickinson --

20         MR. ROBERTSON:  I --

21         THE COURT:  That it's timing?

22         MR. ROBERTSON:  I have not sued Gamel, Dickinson --

23         THE COURT:  All right.

24         MR. ROBERTSON:  So you'll have to --

25         THE COURT:  Then who else have you sued?

1          MR. ROBERTSON:  -- ask Mr. Peterson or Mr. Ross about

2   that.

3          THE COURT:  Is there anyone else you have sued?

4          MR. ROBERTSON:  Moffitt and --

5          MR. O'DEA:  Your Honor, the Hardestys have also sued

6   Robert Sherry.

7          MR. ROBERTSON:  Yes.

8          THE COURT:  Sherry?

9          MR. ROBERTSON:  I just said we haven't sued Gamel

10  or --

11         THE COURT:  But for any other county defendants,

12  Moffitt and Sherry?

13         MR. ROBERTSON:  Yes.

14         THE COURT:  Is it the timing?  It's the timing of

15  when they learned of Senator Cox's, Supervisor Dickinson's

16  interest?

17         MR. ROBERTSON:  Yeah.  And then Moffitt sends us a

18  letter shutting us down, with no basis whatsoever, saying you

19  have to stop work out there.  Moffitt admitted she didn't know

20  anything about the law or whether it was appropriate to shut us

21  down or not.

22         THE COURT:  All right.

23         MR. ROBERTSON:  Same with Sherry.

24         THE COURT:  So just a Pavlovian response to an

25  elected official?

1              MR. ROBERTSON:  I'm sorry?

2              THE COURT:  A Pavlovian response to an elected

3    official?

4              MR. ROBERTSON:  Apparently.

5              THE COURT:  I thought bureaucrats only knew how to

6    say no.  Now you're telling me that's not the case.

7              MR. ROBERTSON:  Unless it's a fellow bureaucrat, Your

8    Honor.

9              THE COURT:  All right.  I think I understand your

10   argument.

11       So let me ask Mr. Peterson or Mr. Ross, can you also just

12   bullet point the evidence of pretext or animus.

13             MR. PETERSON:  Well, everything --

14             THE COURT:  Is it also this timing issue?  So if I

15   look at the record, I verify that -- that the evidence shows

16   there was knowledge of the electeds' interest, and then there

17   is action following that, is that the basic position of the

18   Schneiders?

19             MR. PETERSON:  It is.  I mean, I prefer -- rather

20   than timing, I prefer chronology, because I think, you know,

21   every case has a certain chronology, and the chronology of this

22   case is very illustrative of the animus and the -- the bad

23   faith.

24       And you asked about the evidence against Mr. Gamel and, I

25   believe, Mr. Simpson, who we've also sued.  And the best

1    evidence, Your Honor, with respect to those two men, comes from

2    their own deposition testimony, which we've cited in our

3    separate statements.

4         Taking Gamel, trying to stay bullet point format here,

5    Gamel acknowledged that the county staff had concluded that

6    his -- that the decision in '94 confirming vested rights was

7    faulty, and that they began changing terminology in

8    September 2010, referring to Schneider's rights as a, quote,

9    legal nonconforming use instead of a vested right.  He also

10   testified that Schneider was never told of that fact.

11        He also testified the reason why they did that.

12        The reason why they did that is they wanted to circumvent

13   the Schneider vested rights which had been acknowledged, time

14   and time again, over the years.  That's part of the chronology.

15        The Schneider mine was vested.  It gets an approved

16   reclamation plan in 2002; significantly, for the entire

17   approximately 3,600 acres, not select parcels as the county's

18   papers would argue.  But they don't have any issues out there

19   until the letter comes from Cox, then everything starts to

20   happen.

21        And Gamel also testified that he was part of a team, that

22   county council was part of that team, that Simpson, Storelli,

23   Moffitt were part of the team, as was Sherry.  So the way that

24   they worked together, and the way that the key county

25   representatives have acknowledged in their own testimony, the

1     blatant way that they tried to sidestep the vested rights is

2     just appalling.

3              THE COURT:  We'll get to vested rights when I have

4     some questions about due process.

5         Let me --

6              MR. PETERSON:  We can come back to that if you want.

7     I'm trying to stick to your bullet point format.

8              THE COURT:  Right.

9              MR. PETERSON:  And --

10             THE COURT:  So here is the question:  Isn't it --

11    isn't it possible that the record shows that the county,

12    perhaps, had not been as attentive as it could have been or

13    should have been, even, under the SMARA framework, got poked by

14    the legislators' interest, but that there was still a rational

15    basis for the treatment to which they were subjecting the

16    Schneiders?

17             MR. PETERSON:  I hate to answer a question with a

18    question, but if that were the case, why sidestep the vested

19    rights?  Why did their own representatives, at the top of the

20    planning department, acknowledge that they were trying to

21    sidestep vested rights?

22        If that was the case, Your Honor, where maybe --

23             THE COURT:  So does that mean that there is then no

24    rational basis?

25             MR. PETERSON:  Yes.  It means that.  And it means, I

1   might add, that -- I'm responding to the Court's question

2   about, you know, is the evidence susceptible to the

3   interpretation that the county just needed a little prodding,

4   that they were somehow lax in the years preceding, you know,

5   April 2008 -- excuse me, April 2009.

6        The only way the evidence would be susceptible, in my mind,

7   to that interpretation is if the county would have come forward

8   and said, okay, for years you've been operating under vested

9   rights, but we think you've expanded beyond what's allowed by

10  the current vested rights so we're going to go through the

11  proper lawful process dictated by SMARA and determine that.

12  And if we think, by the way, that you're operating outside the

13  vested rights, we're going to do what the Hansen case says, and

14  we're going to go get an injunction not to shut down the mine

15  but to curtail the mining operation to the prior level.

16       So I -- that's my answer, is there is no way you can look

17  at all the evidence and subscribe to the notion that the county

18  just was kind of lax and they needed a little prodding.  You

19  have all this other evidence of ulterior motive, political

20  pressure, favoritism to a large competitor named Teichert, and

21  that's all in the mix.

22             THE COURT:  So let me hear from Mr. O'Dea at this

23  point.

24       If that's a possible story to be told based on the record,

25  doesn't that mean that there is a jury question there?

1          MR. O'DEA:  Absolutely not, Your Honor.  And --

2          THE COURT:  So what supports there being no -- a

3    rational basis for the difference in treatment?  No question

4    about there being a rational basis?

5          MR. O'DEA:  Well, you know, each of the bullet points

6    that they make about the defendants is either taken out of

7    context or greatly exaggerated to try to prove their point.

8    Let me give you a couple of examples.

9       You know, Ms. Storelli, she went on an inspection that she

10   allegedly was not qualified for.  She was a senior planner in

11   the Department of Planning.  The department has the obligation

12   of conducting the mining inspections.  There is no reason that

13   she could not have attended the inspection.  And certainly

14   there is no damage that occurred because of the fact that she

15   did.

16      You know, the fact that she was aware that Roger Dickinson,

17   who is a member of the board of supervisors, was aware and was

18   interested in this, what does that mean?  That has absolutely

19   nothing to do with what she did, or her intent, or whether or

20   not she acted inappropriately.

21      They mentioned that Ms. Moffitt --

22          THE COURT:  What if you -- do you agree that I should

23   view the facts through the most skeptical lens possible?

24          MR. O'DEA:  Absolutely.  Their facts, Your Honor.

25      What you said earlier is exactly what happened.  The county

1    had been lax in its inspections and in its enforcement of this

2    mine for years, and all of a sudden things heated up and the

3    mine became more of a focus as a result of the political

4    pressure, and the fact that there was a complaint received

5    specifically by the planning department from Teichert

6    challenging those vested rights.

7        The folks who began to review the issue of the vested

8    rights in the late 2008-2009 time frame were not involved in

9    what happened back in 1994 in terms of that limited recognition

10   of a vested right.

11       And this notion that the county began using different words

12   in an effort to take away their vested rights, there is no

13   evidence that that ever occurred.

14       What actually happened was, when staff looked back at what

15   had occurred in 1994, they recognized that there had been no

16   formal recognition by the board that there was any sort of

17   vested right.  The decision was made by a low-ranking staff

18   member, and it was very limited in terms of what he did

19   recognize, and it was limited to specific parcels, which were

20   not the parcels that were being mined in 2008 and 2009 --

21              THE COURT:  I understand that argument.

22       As long as we're delving into the vested rights, is the

23   county's position that the Schneiders never possessed a vested

24   right?

25              MR. O'DEA:  I think I would have to agree that in the

1     1990s, because the county sent Mr. Schneider a letter and said

2     we're recognizing that you may have a vested interest, that he

3     has a right to rely on that.  And that we did recognize that

4     there was a limited vested right.  But, again, it's limited in

5     scope, it's limited in scale --

6              THE COURT:  But it continued until 2009?

7              MR. O'DEA:  I'm sorry?

8              THE COURT:  That continued through to 2009?  You

9     would concede some vested right continuing until that time,

10    even if it's more limited?

11             MR. O'DEA:  No, I would not.  Because --

12             THE COURT:  At what point was it extinguished?

13             MR. O'DEA:  In approximately 2005.  In the 2005-2006

14    time frame, the Hardesty operation completely abandoned those

15    portions of the property that they had been mining since the

16    mid-nineties, no longer did any mining there.  They dismantled

17    the processing plant that they were using in that area and

18    moved it a mile to the north in order to begin mining these

19    pits that they were doing adjacent to the river.

20             THE COURT:  All right.  I understand that.

21        So that's when the vested right was distinguished, by

22    virtue of that activity?

23             MR. O'DEA:  As the Public Resources Code establishes,

24    a vested right continues so long as no substantial changes are

25    made to the operation.  When they abandoned what they had been

1   doing in the nineties and moved the operation, and stopped

2   mining there, that was a significant, substantial change in the

3   operation.  The vested right ceased at that point.

4      The county never recognized a vested right to mine any

5   other portion of the property.  And they certainly have not

6   demonstrated the existence of objective evidence of their

7   intent to expand into that area, which is required by the case

8   law --

9          THE COURT:  I understand that issue.

10     So did the county only figure this out, though --

11         MR. O'DEA:  Yes.

12         THE COURT:  -- that the vested right was

13  extinguished --

14         MR. O'DEA:  Yes.

15         THE COURT:  -- in 2009?

16         MR. O'DEA:  Yes.

17     What they haven't told you is that there is an inspector,

18  another county employee by the name of Mike Winter, who was in

19  charge of the inspections in the mid-2000s.  He was ultimately

20  taken --

21         THE COURT:  Is that --

22         MR. O'DEA:  -- out of his job duties --

23         THE COURT:  -- in the record here?

24         MR. O'DEA:  That might not be in the record.

25         THE COURT:  If it's not in the record --

1           MR. O'DEA:  But it was a totally different individual

2    who was doing the inspections.  He is not a defendant in this

3    case.  He was the person doing the inspections.

4        The folks that have been accused of suddenly changing their

5    mind about what was going on out there were not involved at all

6    in the 2000s and doing inspections out there.  So they had no

7    knowledge of what was going on out there until these issues

8    came up in 2008, in 2009, and different staff members were

9    assigned to the matter.  They did their own inspections.  They

10   reviewed what had gone on in '94.  They made their own

11   conclusions.

12          THE COURT:  All right.  Let me just ask if

13   Mr. Alderson has anything to say based on the bullet points he

14   was hearing earlier.

15          MR. ALDERSON:  I do, Your Honor.

16          THE COURT:  All right.  Briefly.

17          MR. ALDERSON:  Your Honor, my understanding is that

18   the bullet points had to do with -- regarding evidence of

19   purported pretext by Mr. O'Bryant, Ms. Norris and Mr. Testa, so

20   I will quickly address the bullet points that plaintiffs'

21   counsel raised.

22          THE COURT:  Fundamentally this timing, or chronology,

23   whatever the word is you use --

24          MR. ALDERSON:  Right.

25          THE COURT:  -- why doesn't that raise a factual

1   question?

2            MR. ALDERSON:  Right.

3        So with respect to Mr. O'Bryant, plaintiffs' counsel raised

4    two points.  One, he complains that Mr. O'Bryant misrepresented

5    the OMR file.  And two, that he somehow instructed his staff to

6    find SMARA violations.

7        With respect to the first point regarding the OMR file, in

8    his deposition, Mr. O'Bryant actually said that he didn't

9    review the entire file, he only reviewed part of the file.

10       And with respect to the specific issue as to what the -- I

11   guess whether the -- the state had approved the 2002

12   reclamation plan, he actually stated that he obtained that

13   information from his staff.  That is, he obtained it from

14   Mr. Jim Pompey, who is the head of the reclamation unit.

15       I will refer the Court to page 48, lines 7 to 13 of his

16   deposition regarding that.

17            THE COURT:  All right.

18            MR. ALDERSON:  Sorry.  I just want to make sure I

19   have the page number right.  I do.

20       So I don't think that can be evidence of any sort of

21   pretext or an improper basis because he had obtained that

22   information from his staff.

23       I think it's also important to note with respect to the

24   state's review of the county's reclamation plan in 2002, that,

25   yes, OMR absolutely did try and help the county and help

1   Mr. Schneider with that reclamation plan.  They had been

2   working on it together since -- in 2000, in 2001.

3       And at one point in time the state didn't think that

4   Mr. Schneider and Mr. Hardesty and the county were, frankly,

5   making sufficient progress and they issued an administrative

6   penalty against Mr. Schneider and Mr. Hardesty for not having a

7   reclamation plan in place.

8       The superior court ultimately refuted OMR's contention in

9   that regard on procedural grounds.  And right after that,

10  that's when the -- that's when Mr. Schneider presented a new

11  reclamation plan.  And the evidence shows that --

12            THE COURT:  I'm clear on that history.

13            MR. ALDERSON:  Okay.

14            THE COURT:  I have the chronology clear in my mind.

15            MR. ALDERSON:  Just wanted to make sure.

16            THE COURT:  What about Norris and Testa?

17            MR. ALDERSON:  For O'Bryant, the other bullet point

18  was that he had instructed his staff to find SMARA violations

19  --

20            THE COURT:  And contrasting the June 2000 date

21  finding of no violations within a slew of violations.

22            MR. ALDERSON:  Right.

23      So the June 2008 was an inspection by the county, it was

24  not an inspection by the state.  The state didn't -- that is,

25  the Department of Conservation Office of Mining Reclamation

1  didn't actually go out there until December of 2008.  They went

2  out there after they had received the letter from state Senator

3  Cox, notifying them that -- saying, Hey, there are potential

4  violations out there, natural resources agency, I think you

5  should coordinate with your underlying agencies and review

6  these.

7          THE COURT:  I understand all that.  So the state is

8  just better at finding violations?

9          MR. ALDERSON:  That's what they're charged with

10  doing.  That's what OMR's role is.

11    So they got that information.  Then they got information

12  from the Department of Fish and Game folks in October 2008

13  saying, hey, we've been out there and we think there is

14  potential pit capture, we think there are other issues.  You

15  guys need to go out and look.

16    So what happened after that --

17          THE COURT:  Just on Fish and Game, Fish and Game

18  wasn't prompted by any legislative intervention; conceded?

19          MR. ROBERTSON:  No, Your Honor, not conceded.

20          THE COURT:  All right.  Does the evidence show that

21  that -- that Fish and Game knew about legislative interests?

22          MR. ROBERTSON:  Oh, yeah.  Senator Cox's letter

23  was immediately --

24          THE COURT:  Copied to Fish and Game.  All right.

25          MR. ROBERTSON:  -- copied to Fish and Game.  And then

1    of course we had the discussion about Liz Gregory talking to

2    Congressman --

3              THE COURT:  When she was already --

4              MR. ROBERTSON:  I mean --

5              THE COURT REPORTER:  I'm sorry.  One at a time.

6              THE COURT:  Mr. Alderson.

7              MR. ALDERSON:  This is standard practice, right?  I

8    mean, politicians send administrative regulators letters all

9    the time saying, hey, you need to go take a look at X property.

10             THE COURT:  I don't -- so Norris and Testa.

11             MR. ALDERSON:  So, anyway -- so then O'Bryant -- so

12   they get this -- they get all this information, they decide

13   they need to do an inspection.  They go out in December 2008,

14   they do the inspection.  Then it takes a period of time before

15   OMR's geologists actually complete their reports regarding

16   SMARA violations.  They don't complete their reports

17   until mid-February --

18             THE COURT:  Again, I've got the chronology down.

19             MR. ALDERSON:  But I just want to -- there is a

20   little nuance there.

21       In early February 2009, Mr. -- the DOC actually put --

22             THE COURT:  I know.

23             MR. ALDERSON:  -- plaintiffs on the list.

24             THE COURT:  I know all that.  Really, I've got the

25   chronology down.

1          MR. ALDERSON:  All right.  Just want to make sure.

2          THE COURT:  I'm really focusing on this pretext --

3          MR. ALDERSON:  So for that reason I don't think it

4    can be said that Mr. O'Bryant directed his staff to find SMARA

5    violations because he didn't put SMARA violations in any type

6    of letter until he got the reports from his geologists.  And he

7    is not a geologist.  He's not a -- he's not qualified,

8    scientifically or technically, to be able to come up with those

9    determinations.  I mean, he's a high-level administrator in

10   charge of the office.  He relied on his staff for that stuff.

11         THE COURT:  He could have told them to make stuff up,

12   but...

13         MR. ALDERSON:  But if that's the case then it doesn't

14   make sense why the department put plaintiffs on the AB 3098

15   list in early February.

16         THE COURT:  I understand that argument.

17      So Norris and Testa.

18         MR. ALDERSON:  With respect to Norris --

19         THE COURT:  The following trucks.

20         MR. ALDERSON:  Right.  So, following trucks.

21      Plaintiffs made -- well, okay.

22      First, the one that -- Mr. Robertson, frankly, completely

23   misrepresented the record by telling the Court that the

24   department had never followed trucks to any other mining

25   operations.  That is absolutely not true.  In fact, it's an

1   undisputed fact.

2       I'll point the Court to the defendants' separate statement

3   of facts number 178.  And that statement, it basically says

4   Mr. O'Bryant had instructed other staff to follow trucks for

5   many other mining operations in the state.  It's undisputed.

6       In terms of whether Ms. Norris somehow should have known

7   that the plaintiffs should have been on the AB 3098 list when

8   she went out to follow the trucks, this -- plaintiffs'

9   contention ignores that Ms. Balestreri, in the fall of 2008,

10  had found problems with plaintiffs' financial assurances.  And

11  in fact had sent letters to the -- had sent a letter to the

12  county, cc'ing plaintiffs, in November 2008, pointing to

13  substantial defects with their financial assurances, yet the

14  county and plaintiffs never responded until after Ms. Norris

15  and Ms. Balestreri went and followed the trucks.  Frankly, it

16  wasn't Ms. Norris' job to say, oh, yeah, plaintiff should be on

17  the list.  That was Ms. Balestreri's role, someone completely

18  different, and she had found problems there.

19          THE COURT:  I understand that.

20      Testa.

21          MR. ALDERSON:  Finally, I get to Testa.

22          THE COURT:  In one minute.

23          MR. ALDERSON:  There is absolutely zero evidence of

24  any pretext by him.  There is no right of appeal to the State

25  Mining and Geology Board for a mining operator who has been

1    removed from the AB 3098 list.  There is no evidence that any

2    mining operator has ever received such an appeal.  There is

3    just no authority.  So to the extent he allegedly informed

4    plaintiffs that they had no right of appeal, he was stating

5    what the law actually is.  That can't be evidence of pretext.

6              THE COURT:  Is that agreed, that that's all he did?

7              MR. ALDERSON:  As far as I know.

8        Oh, I'm sorry, they -- in their opposition, plaintiffs

9    contended that Mr. Testa instructed Mr. O'Bryant to deny their

10   right of appeal, or to deny them an appeal, and they cite

11   Mr. Testa's deposition testimony.  In fact, they cite just 30

12   pages of his deposition testimony.

13       Nowhere in his deposition testimony does Mr. Testa say that

14   he somehow instructed Mr. O'Bryant to deny plaintiffs the right

15   of appeal.  But, anyway, no such right of appeal exists.

16             THE COURT:  All right.  Let me ask another question

17   on equal protection.

18       This is a class-of-one claim, so I'm thinking about the

19   elements:

20       Intentionally; we've discussed that.

21       Without a rational basis; we've covered that.

22       Treated the person differently than other similarly

23   situated persons.  And so I need the plaintiffs now to just

24   clarify for me who or what is similarly situated to the

25   plaintiffs.

1          MR. ROBERTSON:  Well, first, Your Honor, we are not

2    required to show similarly situated.  Would you like to hear

3    that first or would you like to hear the evidence that we do

4    have comparable -- comparable persons?

5          THE COURT:  Tell me who are the similarly situated.

6      I know Kennefick.  You argue Kennefick.  Kennefick actually

7    had applied for a conditional use permit, right?  Is that your

8    argument?

9          MR. ROBERTSON:  No.  My argument -- I was the

10   attorney who handled the Squaw Valley case, so I'm very

11   familiar with it.  And in the Squaw Valley case, the Ninth

12   Circuit actually found that we had not established that there

13   was anyone similarly situated.  They agreed with the defendants

14   that Squaw Valley was more complicated and had a longer

15   history, bla, bla, bla.  In Squaw Valley, they said that there

16   wasn't someone else who was identically similarly situated.

17     But then the Squaw Valley case went on to say that doesn't

18   matter because -- and I'll read from the opinion:

19     In this circuit it's clearly established that a plaintiff

20   may pursue an equal protection claim by raising a triable issue

21   of fact as to whether the defendants' asserted rational basis

22   was merely a pretext.

23     And then it goes on to say:

24     On summary judgment, an equal protection plaintiff may show

25   pretext by creating a triable issue of fact that either:  One,

1    the proffered rational basis was objectively false; or, two,

2    the defendant actually acted based on an improper motive.

3        And we have very substantial evidence in this case of both,

4    that the proffered rational basis was objectively false, there

5    was no pit capture, that was a complete -- they made that up

6    out of thin air.  And Dennis O'Bryant --

7              THE COURT:  So assume -- assume I find you have to --

8    to survive, you need to satisfy similarly situated.

9              MR. ROBERTSON:  Very good.  Then let's take it one at

10   a time.

11       On the AB 3098 list, they cannot point to anyone else

12   besides Mr. Hardesty in Sacramento County who has ever been

13   removed from the AB 3098 list without 30 days' notice.  And, in

14   fact, the testimony was very clear, Mr. Trott's testimony in

15   particular, he said, The rule is we give them 30 days' notice.

16   And Mr. Trott even said in his deposition -- I asked him, Why

17   do you give people 30 days' notice before you remove them from

18   the AB 3098 list?  He said, Because it's internal due process.

19   And so --

20             THE COURT:  When were they removed actually?

21             MR. ROBERTSON:  It was in April of 2009.

22             MR. ALDERSON:  March 2009.

23             MR. ROBERTSON:  May have been March 2009.  I think it

24   was about five or six weeks after they received the letter

25   confirming that they'd been put on the list.

1           THE COURT:  Right.  They were on for a month.

2           MR. ROBERTSON:  Yeah.

3           THE COURT:  But then prior to that, when was the last

4    time they were on the list?

5           MR. ROBERTSON:  I don't think they had ever been put

6    on the list before, even though they had complied with all of

7    the requirements before that, but OMR had just simply never put

8    them on the list as far as we can tell.

9       And I -- I don't know if you want me to address it, but I

10   disagree --

11          THE COURT:  That was -- I was -- so that -- that -- I

12   can accept that as an undisputed fact, that they were never on

13   the list except for that month?

14          MR. ROBERTSON:  I think that's right.

15          THE COURT:  All right.  All right.  All right.

16          MR. ROBERTSON:  I think it was an oversight.

17          THE COURT:  All right.  So 3098 list.

18          MR. ROBERTSON:  Okay.  So with respect to the AB 3098

19   list, everyone else was treated differently than us and there

20   is no basis for treating us differently.

21       Mr. O'Bryant tries to claim, well, I didn't give 30 days'

22   notice to --

23          THE COURT:  Just identify for me the other, again,

24   bullet point, similarly situated --

25          MR. ROBERTSON:  All right.  With respect --

1          THE COURT:  -- persons or entities.

2          MR. ROBERTSON:  Okay.

3          THE COURT:  Is it just about the 3098 list?

4          MR. ROBERTSON:  No.  The following the trucks.  I

5    disagree with what Mr. Alderson said.  Mr. -- Mr. O'Bryant has

6    never identified a single other person or party that he ordered

7    trucks to be followed.  He claims that he ordered trucks to be

8    followed, but he's never identified any other person or entity

9    where the trucks were followed.  There is certainly none other

10   in Sacramento County that we know of.

11       And, again, there are -- there are certainly other parties

12   who were not on the AB 3098 list who were selling material.

13   That's evident from the February letter sent from OMR to the

14   county saying there are multiple miners out there who are

15   mining without being on the AB 3098 list, but in none of those

16   cases did they go follow the trucks.

17          THE COURT:  So that's it, 3098 list --

18          MR. ROBERTSON:  3098 list and following the trucks.

19       And then I think the third one, Your Honor, had to do with

20   the county.  We identified another mine, immediately in the

21   vicinity of our mine, where that miner was offered the

22   opportunity to continue to operate the mine while they applied

23   for a CUP.  We were not.  We were told, You stop right now.

24   That's it.  And you have to apply for a CUP, which is a process

25   that takes ten years and costs millions of dollars, and it was

1     just pretext to put us out of business.

2             THE COURT:  I'm sorry, which mine was that?

3             MR. ROBERTSON:  I will have to look at the name of

4     that mine, Your Honor.  Can I respond to that --

5             THE COURT:  You may.

6         Weren't the Hardestys given numerous messages they should

7     obtain a permit?

8             MR. ROBERTSON:  They had a permit.

9             THE COURT:  The conditional use permit?

10            MR. ROBERTSON:  No.  They had the vested right to

11    mine.

12            THE COURT:  But that doesn't -- that only excuses

13    them from one requirement of SMARA.

14            MR. ROBERTSON:  It's the equivalent -- if you read

15    the Calvert case, Your Honor, it says in Calvert that the

16    vested right to mine is the equivalent of a SMARA permit.  It's

17    the same thing.  You either have a vested right to mine or you

18    have a SMARA permit.  Either one suffices.  You don't need a

19    permit --

20            THE COURT:  It's the reclamation plan.

21            MR. ROBERTSON:  Right.  It's the reclamation plan,

22    correct, Your Honor.  And we did have that.

23        That reclamation plan, contrary to what Mr. O'Dea said,

24    showed at Exhibit F that the exact area where we're mining is

25    an area to be mined.  It sets it forth right in the reclamation

1   plan.  Mr. O'Dea tries to say we were supposed to just mine in

2   this one place, the county only had this limited vested right.

3   Well, then why in 2002 did they approve a reclamation plan that

4   showed mining exactly where we were mining in Exhibit F, right

5   up to the edge of the river?

6        Plus, in 2005, in 2006, in 2007 we sent reports -- we had

7   an inspection from the county, but we also sent reports to OMR

8   every one of those years saying we've moved the processing

9   plant, we're now mining up here by the river, here is the size

10  of the mine.  It's all transparent.  We're not trying to hide

11  anything.  We tell OMR, we're up mining by the river,

12  everything is fine.  Everything is fine for years --

13              THE COURT:  Sir, I understand that.

14              MR. ROBERTSON:  -- until the letter comes.

15              THE COURT:  I understand that characterization of the

16  record.

17       Did any other mine in the county claim a vested right?

18              MR. ROBERTSON:  No.

19              THE COURT:  We'll get into this more -- we'll take a

20  short break in just a few minutes.

21              MR. ROBERTSON:  That's irrelevant for those -- those

22  items I mentioned.  The AB 3098 list, the following the trucks,

23  those have nothing to do with whether you're a vested mine or

24  not.

25              THE COURT:  I understand that.

1          But just -- I'm thinking about it now, on the FACE, if

2     that's what you call the financial assurance --

3               MR. ROBERTSON:  Cost estimate.

4               THE COURT:  -- bond, is there a record cite for the

5     county telling the mine that the $177,000 figure in 2012 was

6     official?

7               MR. ROBERTSON:  Oh, yeah.  Sure.  They --

8               THE COURT:  What's the record cite?

9               MR. ROBERTSON:  That I'll have to get for you during

10    the break, Your Honor.  I'll get you both of those things, the

11    name of the other miner and the record cite.

12              THE COURT:  All right.  Just final question, the

13    Engquist case, Supreme Court, Engquist v. Oregon Department of

14    Agriculture, which discusses, it seems to me, the type of

15    context we're dealing with here, how do you deal with that

16    case?  It at least posits a traffic officer who stops one of

17    many speeders randomly.

18              MR. ROBERTSON:  Um --

19              THE COURT:  The --

20              MR. ROBERTSON:  The cite you were looking for, Your

21    Honor, if you want that now?

22              THE COURT:  I'll take it if you have it very handy,

23    but I'm asking you a different question.

24              MR. ROBERTSON:  I realize that, Your Honor.

25         It's ECF 110-10 at page 126.

1              THE COURT:  All right.  Still get me the mine name

2     after the break.

3              MR. ROBERTSON:  Getting back --

4              THE COURT:  So Engquist.

5              MR. ROBERTSON:  I would respond to that question by

6     citing the Court to the Benigni case, Ninth Circuit case

7     decided, 879 F.2d 473.  In the Benigni case, it's exactly like

8     this case.  It's almost exactly identical.  In that case the --

9     the defendants overregulated a particular bar in order to drive

10    them out of business.  That's exactly what the -- what was

11    alleged, is that they intentionally and unreasonably directed

12    their regulatory efforts towards Benigni's bar to force him out

13    of business.

14       What they did is the police officers just -- they focused

15    their attention on this bar.  They would walk through the bar

16    several times a day.  They would park their car across the

17    street, trying to drive him out of business.

18       There isn't any allegation in the Benigni case that they

19    did anything that -- other than their job.  In other words, the

20    police officers are doing their job.  But the fact that they

21    focused all that attention on this one bar created an issue of

22    fact as to whether the purpose of that was to drive the bar out

23    of business.  And, in fact, I believe the jury in that case

24    found that that's exactly what they did.

25       And so it's identical to here.  You have regulatory

1  conduct.  The regulatory conduct, like Mr. O'Dea said, they're

2  just doing their job, well, the police officers were just doing

3  their job, but by focusing their efforts on this one bar, they

4  did so in a way that was pretextual.  In other words, they were

5  trying to put them out of business --

6         THE COURT:  I understand the argument.

7         MR. ROBERTSON:  Okay.

8         THE COURT:  All right.  Just finally, from

9  Mr. Peterson, are there equal protection arguments the

10  Schneiders are making that the Hardestys do not?  Or is -- do

11  your arguments track those?  Or Mr. Ross?

12         MR. ROSS:  Richard Ross for the Schneiders.

13     There are some class-of-one allegations in the Schneider

14  complaint.  According to the reclamation plan when it was

15  adopted, the Schneider mine is the only vested mine in

16  Sacramento.  Whether that is true or not now, I don't know, but

17  that's what was stated in the reclamation plan.

18     We have also alleged that the board of supervisors, when

19  they affirmed the violation notice and said that the mine had

20  to shut down, treated us as a class-of-one because in all prior

21  instances that we're aware of where somebody was found to need

22  a conditional use permit, they were allowed to continue in

23  business if they applied for a permit.

24     And county council noted that on the record in the

25  transcript of the September, I think it was, 14, 2010 hearing,

1    that it was -- and I think that's probably alleged in our

2    third-amended complaint as well --

3              THE COURT:  So the same argument Mr. Robertson was

4    making?

5              MR. ROSS:  Right.

6        And we were shut down.  We were probably the only mine,

7    since we were the only vested mine to be shut down, without any

8    sort of notice and hearing.

9        I'd like to make a little clarification of the earlier

10   comments by Mr. Peterson and Mr. Robertson.

11       We represent the Schneiders.  The Schneiders own the

12   Schneider Historic Mine.  They own the ranch.  They do not

13   operate the mining operation.  They -- Mr. Jay Schneider worked

14   very hard for a couple of years to acquire that reclamation

15   plan.  The comments by the attorney general with regard to the

16   dispute and how it had gone to court, that was over 20 years

17   ago.  I don't think that that's really relevant today.

18       What's relevant today is that the Schneiders owned the

19   permit, the vested right, if you would.  They created and, if

20   you would, owned the reclamation plan, and the Financial

21   Assurance Cost Estimate was calculated to ensure that the

22   Schneiders' home, that their ranch, would be reclaimed in

23   accordance with the reclamation plan that was adopted by the

24   county in 2002.

25       So if we take a look at the sequence, we have all of these

1    people coming out of the woodwork with regard to the -- to the

2    Hardesty mining operation, but let's focus, if we may, on the

3    Schneider family.  They live on the ranch.  They own the ranch.

4    They own the reclamation plan, if you can own it.  And the FACE

5    is to pay to clean up their ranch.

6        In June -- June 25th of 2008, that's ECF 222-32 at page 28,

7    the inspection report from the county noted that there were no

8    violations.  Permit was marked as "NR" for not required because

9    they were vested --

10              THE COURT:  I'm sorry, what date are you referring

11   to?

12              MR. ROSS:  This is June 25th of 2008.

13              THE COURT:  So it's -- I've also heard about that.

14              MR. ROSS:  All right.

15       Reclamation plan is in place.  Adequate financial

16   assurances.  Permit not required.  Everything is copacetic.

17       October 31st there are county e-mails.  Those are at

18   document 110-4.  And this person named Dana Booth says, Gee,

19   Roger Dickinson -- and this is within weeks of the Cox letter

20   --  Roger Dickinson on the board of supervisors is concerned

21   about violations out at 15000 Meiss Road.  What's the nature of

22   the violation?

23       So, Dana -- excuse me, Tammy Derby, who is one of the

24   defendants here, says, Oh, there is a code violation out there,

25   and we've issued a notice of violation, and we're supporting

1  planning staff and Mr. Gamel is the lead.  These are e-mails of

2  October 31, '08.

3       Within hours, Mr. Gamel responds and says, What are the

4  nature -- what's the nature of the violations?  We don't have a

5  copy of anything.

6       And then there is a follow-up from Mr. Winter, who had

7  performed the most recent inspection --

8            THE COURT:  All right.  So what is different?  I

9  understand the different posture --

10           MR. ROSS:  Okay.  Well, the --

11           THE COURT:  What's different compared to the

12  Hardestys' arguments?

13           MR. ROSS:  The county does an inspection in the

14  summer and Jay Schneider gets the inspection report.  No

15  problems.  There is a series of e-mails in October, and they

16  say there are no problems.

17       Then, on April the 2nd of 2009, we have the Sherry letter,

18  210-22, and it just simply says you no longer have a permit.

19       There were no existing violations, no notice to the

20  Schneiders that there was anything out of place, no question

21  about their financial assurance or about the reclamation plan,

22  just says you no longer have -- and I sent a letter to him and

23  I said, You cannot by fiat revoke a vested right, that's a

24  permit.  And apparently he threw it away because the next

25  December then, at the next -- November 3, excuse me --

1    November 5 county inspection, that's file number 110-10, the

2    county again notes at 110 -- that's also at ECF 197-2, December

3    of that year they again say, no violation, no --

4              THE COURT:  So, this is due process, right?

5              MR. ROSS:  Well, we get into that, but we were going

6    into the --

7              THE COURT:  Is there anything about equal protection

8    that I -- that is not covered by the briefing or that differs

9    from the Hardestys' --

10             MR. ROSS:  No.  Other than what I mentioned when I

11   first got up here.

12             THE COURT:  All right.  We're going to take a

13   ten-minute break, and then we'll come back and go until 12:15.

14   But we will be done at 12:15.

15        (Recess taken, 11:29 a.m.- 11:43 a.m.)

16             THE COURT:  You may be seated.  I have a few more

17   questions I want to ask to clarify, in my mind, my burning

18   questions.  There, obviously, are many questions that could be

19   clarified.  My thought is we're going to get through these in

20   the next half hour, then we'll adjourn.  And as I've thought

21   about it, I think it would make more sense to give each party

22   the chance to submit any wrap-up argument in written form,

23   maximum five pages.  Again, not duplicating what's in the

24   briefs, but rather than have you all -- I don't think we have

25   the time to do it properly, assuming that there is some

1   argument you'd like to make.  So I would give you seven days to

2   just make those arguments in a five-page supplemental filing.

3       So here are my -- the burning questions I have for now.  I

4   do reserve the right to have a followup hearing once I have a

5   final draft order, because that may further identify some

6   questions.

7       So for Mr. Ross, I think you're the person who would answer

8   this question, there has been repeated reference to the vested

9   right, but is there also -- are you also arguing that there is

10  a more fundamental right that is constitutionally protected,

11  that is, the right to mine separate and apart from the vested

12  right, or is it complete reliance on the vested right?

13          MR. ROSS:  I think that constitutionally there is a

14  protection for one's livelihood.  There is a protection for the

15  utilization of one's property and home.  So we have a

16  constitutional right there.  That is manifested, I think, here

17  in the form of what is, in effect, a permit.

18      As Mr. Robertson noted, the vesting under SMARA -- and

19  SMARA's statute is very express, it says that if you are

20  existent before January 1 of 1976, you are deemed to be vested.

21  And the California -- or, excuse me, the Sacramento County

22  ordinance, which we have cited, states expressly that if you

23  are vested under SMARA, so long as you continue to operate

24  within the confines of SMARA, you do not need a permit from the

25  County of Sacramento.  So we have a de facto permit.

1    And if you look at the cases like Calvert and Hansen, they

2    come out and they say the -- I think we even quoted in our

3    pleadings, the vested right is sort of the fulcrum of SMARA.

4    That serves the same purpose that a conditional use permit

5    would.  So, that's our manifestation, but yes, we believe there

6    is a constitutional right to pursue one's livelihood and to

7    make utilization of their property.

8              THE COURT:  That's broader, even, than the vested

9    right?

10             MR. ROSS:  Yes.

11             THE COURT:  I think this next question -- well, I

12   think it would be for you.

13       With respect to that vested right, and what was

14   contemplated in, say, 1976, what in the record allows me to

15   conclude that the digging of the big pits was contemplated,

16   planned, envisioned early on?

17             MR. ROSS:  If I might have Mr. Peterson bring up

18   Exhibit F to the reclamation plan.  That would be document

19   248-1, page 53.

20             MR. PETERSON:  Bring it up, you mean put it on the

21   monitor?

22             MR. ROSS:  Put it on the monitor.

23             THE COURT:  I don't know if I'm really set up to --

24   as long as I have the page cite I'll check it.  Tell me how you

25   read that.

1           MR. ROSS:  All right.  We have the county coming in

2     citing, like, 1956 ordinances.  Nobody has produced them.

3     Nobody remembers where they were.  60 years ago.

4        What we have before us that is the clearest is that in

5     2002, the board of supervisors, after lengthy negotiations -- I

6     would note that this Exhibit F is date stamped from the

7     planning department November of 2000, the reclamation plan was

8     adopted November of 2002, that shows how long the county

9     planning staff and supervisors worked on this reclamation plan.

10    This map shows the entire area being mined from the river all

11    the way to south of Meiss Road as identified -- it says

12    scheduled to be mined second.

13       Now, we can debate what --

14          THE COURT:  What's the earliest that that was

15    contemplated?

16          MR. ROSS:  Well, I don't know that we can say what

17    the earliest was.

18       What we can say is that the board of supervisors, in 2002,

19    adopted that as being the extent of the vesting that they

20    recognized.  To say that a reclamation plan is just cleanup is

21    nice, but that would infer that the board of supervisors was

22    adopting a reclamation plan for land that they did not think

23    could legally be mined.  And I don't think that the board of

24    supervisors was doing that.

25       If we take a look at the introduction comments on the

1    reclamation plan, we have the lead for the Department of

2    Planning and Development stand up and say, this vesting is for

3    the entire -- and, again, it's available to put up if we only

4    had a way to do it --

5              THE COURT:  What's the page cite, the record cite?

6              MR. ROSS:  Do you have a page cite on the 3,000

7    acres?

8              MR. PETERSON:  It's document 219-19 at page 39.

9              MR. ROSS:  So you have the board of supervisors

10   expressly saying that this reclamation plan covers all of that

11   property.

12       We have this distinction of only two parcel numbers are

13   listed on a letter back 20 some years ago, because the genesis

14   of that letter was a notice of violation sent to the Schneiders

15   saying, Gee, we hear you're mining on this little piece of

16   ground over here and you don't have a permit.  Jay went back

17   and said, No, we have been mining, we are vested.  It went back

18   and forth, again, for a couple of years.  But the only reason

19   those APA number -- APN numbers are on that document is it was

20   the way of closing that file.

21       If we look at the history of the mining, where they were

22   mining when they were shut down, there are pictures from the

23   inspections of people standing on the old cobblestones along

24   the river which were clearly dredged.  That land has all been

25   dredged.  And all that documentation went to the county in '94.

1    The Sherry letter admits that they had lots of documentation in

2    '94.  If we go to the Hansen case, it says --

3                THE COURT:  About the area to be mined second, going

4    back to '94?

5                MR. ROSS:  There were -- there was mining scattered

6    throughout this property from the time of the gold rush.  The

7    Schneiders started mining more intensively in the 1930s.  All

8    that documentation, test bores, samples, income tax returns,

9    was provided to the county.

10        As the --

11               THE COURT:  Okay.  I think I have what you're going

12   to tell me about that.

13        Let me ask about the zoning violation notice.  April 14,

14   2010.

15               MR. ROSS:  We had operated --

16               THE COURT:  The county says -- now, here is my

17   question --

18               MR. ROSS:  I'm sorry.

19               THE COURT:  The county says, yes, you got the notice,

20   but it didn't make a difference because Schneiders -- the mine

21   continued, the mining continued.

22               MR. ROSS:  I'm sorry?

23               THE COURT:  Do you disagree with that?

24               MR. ROSS:  I don't understand the question.

25               THE COURT:  That there was no practical -- the notice

 1   of the zoning violation had no practical impact.

 2              MR. ROSS:  Are we talking --

 3              THE COURT:  Because the mining didn't cease.

 4              MR. ROSS:  Are we talking about the April of 2010

 5   letter?

 6              THE COURT:  Yes.  Yes.

 7              MR. ROSS:  They ordered us to shut down and we

 8   appealed to the board of supervisors, which was an interesting

 9   exercise.  But we continued to operate while we were on appeal

10   before the board of supervisors.  When they came down with the

11   gavel, we stopped all mining, as we were ordered to do, or

12   Hardesty did.

13       Hardesty did continue -- and, again, I'll draw a

14   distinction between --

15              THE COURT:  So as a practical matter, no deprivation

16   of a right while the appeal was -- appeal was pending?

17              MR. ROSS:  With regard to the zoning.

18              THE COURT:  All right.

19              MR. ROSS:  But after that, I think their allegation

20   of continued mining is that Hardesty was selling stockpiles of

21   material that had been mined before the April 2010 letter.

22              THE COURT:  All right.  Let me just ask Mr. O'Dea if

23   he has focused response.

24              MR. O'DEA:  Yes, Your Honor.

25              THE COURT:  Particularly with respect to what was

1    contemplated early on.  And did the county's adoption of

2    something in 2002 --

3             MR. O'DEA:  As I understand your question, Your

4    Honor, you asked if there was anything in the record that

5    confirmed that there was an objective intention to mine those

6    areas that were being mined adjacent to the river back in 1976.

7    Counsel just admitted there was not.  Instead he's talking

8    about a map prepared in 2002 which contains an area that they

9    were going to start mining 20 years after approval of the

10   reclamation plan.  So they actually started mining in that

11   area, even if they had been permitted to, at least 15 years --

12   17 years before they even informed the county that they would

13   even go into that area.

14       So there is no evidence --

15            THE COURT:  Was there some retroactivity -- some

16   retroactive effect of the county adopting that map in 2002?  Is

17   that a possibility?

18            MR. O'DEA:  Your Honor, the adoption of the

19   reclamation plan was an approval of the reclamation plan only.

20   And, again, this addresses only how the lands are going to be

21   restored after mining is completed.

22       The law says that the lead agency's review of a reclamation

23   plan is limited to issues identified in the reclamation plan

24   itself.  It has nothing at all to do with vesting, or permits,

25   or any other issue.

1          And the Sherry letter of April 2009 specifically states,

2     Mr. Schneider, you never provided us with any evidence that you

3     intended to mine those areas that we are looking at right now.

4          So it's clear that they haven't fulfilled their

5     requirements to establish the existence of a vested right

6     within the meaning of SMARA, and the case law, which indicates

7     that you must demonstrate objective intent to mine those areas

8     as of the time that the land use restriction came into effect,

9     which in this case would be the original zoning code in 1956

10    which made mining without a permit and a zoning overlay illegal

11    under the zoning code.

12              THE COURT:  I understand that argument.

13         A question for Mr. Robertson or Ms. Breternitz on the

14    Taras, or Tauris (phonetic), cease and desist letter.

15              MR. ROBERTSON:  Yes, Your Honor.  May I --

16              THE COURT:  Just what property interest did the

17    Hardestys lose as a result of that letter?

18              MR. ROBERTSON:  Would you like those citations that I

19    promised you earlier?

20              THE COURT:  You can do that at the end.

21              MR. ROBERTSON:  Okay.  Mr. Taras' conduct didn't just

22    consist of sending a cease and desist letter he wasn't

23    authorized to send --

24              THE COURT:  Just answer my question.  What property

25    interest did the cease and desist letter deprive the Hardestys

1  of?

2          MR. ROBERTSON:  The cease and desist letter, by

3  itself, I don't believe deprived any property interest other

4  than costing us money to have to defend against that.  It was

5  Mr. Taras' conduct in appearing before the Sacramento County

6  Board of Supervisors is where we were -- we were injured.

7          THE COURT:  All right.

8          MR. ROBERTSON:  He provided false testimony to the

9  board of supervisors in support of the elimination of the

10  vested right.

11          THE COURT:  All right.  That's all I need on that.

12     Let me ask about First Amendment retaliation for the

13  Schneiders.

14     Mr. Peterson or Mr. Ross, I don't see that you've opposed

15  that motion.  Do I have that right?  The county's motion for

16  summary judgment with respect to First Amendment.

17     Do you think you're conceding that motion?  You can address

18  that in follow-up briefing if you aren't prepared to answer it

19  now, but I don't think it's there.  But I could be missing it.

20          MR. PETERSON:  Is that the -- the motion as to

21  Counts 2 and 5?

22          THE COURT:  I think it's the fourth claim, isn't it?

23  I think it's your fourth claim.

24     Well, let me ask you this question:  Specifically with

25  respect to Bieber, just thinking about Bieber, is this also a

1    timing, or as you say chronology, question?  Are you relying

2    solely on chronology to establish that Bieber would not have

3    prepared his report the way he did without the civil rights

4    action having been brought?

5              MR. ROSS:  No, Your Honor.

6              THE COURT:  What other evidence is there to support

7    retaliation?

8              MR. ROSS:  We have alleged more than that it was

9    retaliation with regard to this lawsuit.  I think the

10   third-amended complaint, paragraph 7, specifies that -- if I

11   can find it --

12             THE COURT:  I'm asking at this point what evidence.

13             MR. ROSS:  The evidence of his action to keep us from

14   being able to petition to the courts or administrative hearings

15   are his exaggerated, in particular -- and we can go into his

16   fabrication of violations of the reclamation plan, it's

17   virtually impossible to violate a reclamation plan because it

18   doesn't come into effect until you're out of business and it

19   says how you'll reclaim it.  So if you're actively mining,

20   there is a lot of bogus stuff.  What we have focused on for the

21   purpose of today is the $9 million Financial Assurance Cost

22   Estimate.

23             THE COURT:  I understand those facts.  But what -- so

24   what evidence shows that he knew about the complaint?

25             MR. ROSS:  I don't know that we need to show that he

1  knew about this complaint.

2      He alleges from the beginning that he was retained to work

3  with litigation.  When he was hired, there was no litigation

4  against us.  There has never been anything filed against the

5  Schneiders by the county.  They, apparently -- I think the

6  inference from this series of facts is that his job was to

7  sufficiently cripple the Schneider family so that they could

8  not petition for redress, be it administratively, through the

9  courts, or whatever.

10      When you have a ranch out there and he increases the

11  FACE -- and, again, we can go through the litany, but he

12  testifies at the Board of Zoning Appeals that $177,000 is

13  adequate to reclaim the mine.  And if they do have reclamation

14  and don't disturb more ground, they'll get some of the 177,000

15  back.  Okay.

16      We haven't disturbed anything because we're out of

17  business.  There has been some reclamation.  There is no

18  inflation.  Those are the only standards set forth in SMARA.

19  SMARA says these are the criteria for adjusting a Financial

20  Assurance Cost Estimate.

21      On October the 9th of 2012, the county notifies

22  Mr. Schneider by letter that the $177,000 is final and it's

23  been, you know, run by the state.  The very next day,

24  Mr. Bieber does an inspection, and the inspection -- oh and, by

25  the way, on September 27th, couple of weeks before we filed the

1  civil rights action.  But we had also had this series of

2  attempts --

3              THE COURT:  A couple of weeks before?

4              MR. ROSS:  Pardon?

5              THE COURT:  A couple of weeks before?

6              MR. ROSS:  September 27, 2012, we filed our civil

7  rights action.  On --

8              THE COURT:  But your theory -- the -- the -- the

9  narrative is that he said it would be 8 to 9 million dollars to

10 drain any funds for litigation?  To prevent litigation?  Is

11 that what you just said a few minutes ago?

12             MR. ROSS:  To prevent us from petitioning for

13 redress, they did everything they could to financially cripple

14 us.

15             THE COURT:  But the $8 million was an alternative

16 number?

17             MR. ROSS:  I don't understand it to be alternative at

18 all, Your Honor.

19             THE COURT:  Wasn't it if the fill has to be trucked

20 in --

21             MR. ROSS:  No.

22             THE COURT:  -- it's 8 million plus, if it -- if the

23 fill -- if the material on the property can be used, it's less

24 than a million, but close to a million, right?

25             MR. ROSS:  Well, a million is still a lot.  So

1   let's --

2              THE COURT:  Well --

3              MR. ROSS:  Let's look briefly at this little litany,

4   because --

5              THE COURT:  So you do agree it was -- he was giving

6   two numbers?

7              MR. ROSS:  The second number, Your Honor, was not

8   to -- not to take material that was on the premises.  This is a

9   3500-acre ranch.  There are lots of hills and dales.  There is

10  lots of dirt on the premises.

11      He specifically said he would lower the amount if we took

12  our inventory, our stockpiled inventory, and reburied it.  This

13  is aggregate that has already been excavated and processed and

14  is in stockpiles.  And if that isn't sort of vicious on its

15  own, I don't know what is.  It's not, Oh, you can go scrape up

16  dirt around the ranch and fill the pits, which there is no

17  justification for because the Board of Zoning Appeals hearing

18  that he was at said, Yes, your pits are nonconforming, you

19  ought to change your rec plan, but that same Board of Zoning

20  Appeals order, if you can call it an order, they do, expressly

21  states that those ponds shall be filled to not greater than 30

22  feet.  That is the standard that had been in place since the

23  reclamation plan was adopted in 2002.

24      The Board of Zoning Appeals expressly said, Fill the 30

25  feet.  And Mr. Bieber, in his annual report, then, that he

1   wrote the inspection following a week or so from our filing of

2   this action, he states that the Board of Zoning Appeals ordered

3   that the pits be refilled.  That is outright false.  They

4   didn't do that.  We have presented the Board of Zoning Appeals'

5   transcript and their orders.

6       So he says, Oh, I had to fill it up.  He has then

7   alternatively said, Oh, well, gee, they said fill it up, and I

8   came up with this idea that if we filled this to match, sort

9   of, surrounding topography, that would be good enough and so I

10  saved -- I saved the Schneiders a lot of money.

11      Well, the Board of Zoning Appeals said leave it at 30, so

12  why is this?  And then we had the county council as being to

13  blame.  But to say that --

14          THE COURT:  Let me ask -- I think I understand your

15  argument.

16      Let me ask Ms. Muir or Mr. Palumbo to respond to what

17  you've just heard.

18          MR. PALUMBO:  Thank you, Your Honor.

19      So as an initial point, we heard a lot of argument up here

20  from Mr. Ross a second ago, but if you take a look at their

21  opposition, none of their argument is supported by any evidence

22  cited in their opposition.  They have not filed a response to

23  our separate statement.  And they have not filed a statement of

24  additional facts which they believe -- of any facts they

25  believe need to be presented to the jury.

1      So, you know, our position is that they have not presented

2  a single triable fact to the Court that would necessitate the

3  denying of our motion.

4      When you called Mr. Ross up here --

5          THE COURT:  What about the theory, if I understood it

6  correctly, that it's not that Bieber knew about the complaint

7  in terms of any retaliation, it was trying to preclude, in

8  fact, the ability to contest?

9          MR. PALUMBO:  You asked Mr. Ross to explain how

10  Mr. Bieber could have retaliated against the Schneiders when he

11  had no knowledge that the complaint has been filed.  And

12  Mr. Ross essentially conceded that they have absolutely no

13  evidence that Mr. Bieber knew of the lawsuit at the time he was

14  preparing his report.

15      In fact, if you look at the third-amended complaint, it

16  shows that the basis of their First Amendment retaliation cause

17  of action is that Bieber's new FACE, adopted by the other

18  defendants, was solely motivated by personal animus and anger

19  towards plaintiffs for filing their lawsuit against them.

20  That's the third-amended complaint, paragraph 286.

21      So plaintiffs are required to show that Mr. Bieber had some

22  sort of knowledge about the litigation that was filed in order

23  for him to be able to retaliate.  You can't retaliate against

24  something that you have no knowledge about.

25      In their opposition they come up with a theory that because

1    Mr. Bieber was hired as a potential litigation expert, that

2    perhaps he was retaliating against some future action that they

3    may take.  Again, you can't retaliate against something that

4    has not happened.

5        Knowledge of whether or not the Hardesty lawsuit had been

6    filed is completely irrelevant.  The Schneiders have sued

7    Mr. Bieber.  He's not retaliating against the Hardestys.  And

8    the Schneiders have no recourse to say that, Hey, he's

9    retaliating against somebody else.  They're coming up here and

10   suing him for retaliating against them filing their lawsuit, so

11   knowledge of the Hardestys lawsuit is completely irrelevant

12   here.

13       If you look at the requirements for a First Amendment

14   retaliation claim, it says that the defendant's adverse action

15   was substantially motivated in response to the plaintiff's

16   exercise of constitutionally protected conduct.

17       Mr. Bieber had no knowledge that the plaintiffs had engaged

18   in constitutionally protected conduct.

19       Furthermore, they've given absolutely zero evidence that he

20   was motivated to retaliate against them.

21       All of the facts that Mr. Bieber put forward as to why his

22   actions were both professional and reasonable have been

23   undisputed by plaintiffs.

24       He was asked by the county to perform a calculation for

25   backfilling the pits.  He performed that calculation in a

1  reasonable and conscientious manner, and there is absolutely no

2  evidence to the contrary.

3           THE COURT:  All right.

4           MR. PALUMBO:  Thank you.

5           THE COURT:  I have no other questions.

6      I'll allow Mr. Robertson just to read into the record -- it

7  was the name of the mine I was waiting for.

8           MR. ROBERTSON:  Yes, Your Honor.  It is document 247,

9  page 9 of 10, at paragraphs 80 through 84.  The Pilliken,

10  P-I-L-L-I-K-E-N, Mine and the Kennefick, K-E-N-N-E-F-I-C-K,

11  Mine.

12           THE COURT:  All right.

13           MR. ALDERSON:  Your Honor, if I may, this is David

14  Alderson.  I didn't get a chance to respond to some of your

15  questions to Mr. Robertson regarding the similarly situated

16  parties with respect to the equal protection claim.  I'd be

17  happy to do so now if you'd like, otherwise I'll just put it in

18  my papers.

19           THE COURT:  Let me just ask, is there anyone else who

20  thinks they must say something today yet to either correct

21  something they've previously said or to very briefly clarify

22  something?

23           MS. MUIR:  Your Honor, I just have a question about

24  what you're allowing once we leave here today, the supplemental

25  papers.  I just wanted to ensure that there is no evidence

1    that's permitted to be offered?

2            THE COURT:  There is no evidence.  It's argument

3    only.  And it's taking the place of any argument you might

4    offer now.  So rather than taking another half hour, 45 minutes

5    for all of you to wrap up, it really is just a closing

6    argument, five pages maximum.  Don't repeat the briefing or

7    anything we've discussed here today, but that gives you a

8    chance to address anything you think is not covered based on

9    our discussion.

10       Mr. Reusch.

11           MR. REUSCH:  Your Honor, I was only going to say, as

12   long as we have the opportunity to rebut arguments that were

13   made here today, that we might otherwise have rebutted orally,

14   in the papers, I'm fine with leaving it with the papers.

15       Thank you.

16           THE COURT:  Mr. Alderson, two minutes, and then you

17   can follow up in closing argument.

18           MR. ALDERSON:  So you had asked plaintiffs' counsel

19   with respect to identifying similarly situated parties

20   regarding Mr. O'Bryant's removal of plaintiffs from the AB 3098

21   list.  Mr. Robertson said that there are no similarly situated

22   parties in Sacramento County.  However, the state is,

23   obviously, governed statewide, and there are two other mining

24   operations that have been removed immediately just in the year

25   prior to removal of plaintiffs.  That is the Pacific Rock Mine

1    and the Truck Village Drive Quarry.  Both of those are

2    explained in defendants' papers.

3        Also, Mr. Robertson alluded to Mr. Trott's explanation of

4    the department's AB 3098 policy.  However, Mr. Trott wasn't

5    hired by the department until mid-2009.  And that's at page 16

6    of his deposition.

7        He also said at pages -- about 80-81 of his deposition that

8    he was rather unsure of the department's policy at the time,

9    especially before his hiring, that he thinks that the definite

10   30-day policy didn't occur until after Mr. O'Bryant left.

11       In any event, I want to point the Court to the defendant's

12   separate statement of facts numbers 148 and 149.  This is a

13   recitation of the department's complete removal policy when

14   Mr. O'Bryant was in charge.  And, in fact, those statements of

15   fact are undisputed by plaintiffs.

16           THE COURT:  All right.  Anything else on following

17   trucks?

18           MR. ALDERSON:  In terms of following trucks --

19           THE COURT:  I think you said O'Bryant testified --

20           MR. ALDERSON:  Mr. O'Bryant has already testified

21   that he has instructed many other mining -- many -- other

22   members of his staff to follow trucks leaving from many other

23   mining operations.  And plaintiffs haven't identified any

24   specific mine that they believe is similarly situated.

25       Finally, you asked plaintiffs' counsel about the Engquist

 1  case, and he replied with a discussion of the Benigni case.  I

 2  just point out to the Court that the Benigni case was decided

 3  in 1988, about 20 years prior to the Supreme Court decision in

 4  Engquist.  And the Engquist court has -- the rule on that just

 5  regarding the discretion has been followed by numerous other

 6  courts.  And there is a case cited in defendants' reply

 7  memorandum that lists a bunch of those cases.

 8          THE COURT:  All right.  All right.  Thank you very

 9  much.

10          MR. ALDERSON:  You're welcome.

11          THE COURT:  The matter will be submitted once I

12  receive any closing argument.  You have until the end of the

13  day next Friday to submit those filings.

14      And, again, I'll let you know if I need more.  I may have a

15  followup hearing just to ask final focused questions.  But this

16  is helpful in helping me move the ball forward.

17      Thank you very much.

18              (Proceedings adjourned, 12:12 p.m.)

19                      ---oOo---

20  I certify that the foregoing is a correct transcript from the

21  record of proceedings in the above-entitled matter.

22

23              /s/ Kimberly M. Bennett
            KIMBERLY M. BENNETT
24          CSR No. 8953, RPR, CRR, RMR

25