UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH HARDESTY and YVETTE HARDESTY,<br><br>            Plaintiffs,<br><br>      v.<br><br>SACRAMENTO METROPOLITAN AIR QUALITY MANAGEMENT DISTRICT, et al.,<br><br>            Defendants. | No.  2:10-cv-2414-KJM-KJN |
| JAY SCHNEIDER, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>COUNTY OF SACRAMENTO, et al.,<br><br>            Defendants. | No.  2:12-cv-2457-KJM-KJN<br><br><u>ORDER</u> |

1

**Table of Contents**

I.     Introduction ........................................................................................................ **4**

II.    Evidentiary Objections ...................................................................................... **4**

III.   General Factual Background .............................................................................. **5**

A.    The Mine, Hardesty Sand and Gravel, and the Cosumnes River ........................... 5

B.    The California Surface Mining and Reclamation Act of 1975 ............................... 6

C.    A Review of the Relevant California Regulatory Bodies ....................................... 7

D.    The "AB 3098 List" .............................................................................................. 8

E.    A General Timeline of Events .............................................................................. 8

      1.    Early History through the 2000s ................................................................. 8

      2.    Mid-2008: Legislative Interest and Competitor Requests ............................ 13

      3.    July through December 2008: Inspections of the Mine ................................ 14

      4.    Early 2009: Reinstatement and Removal from the AB 3098 List .................. 16

      5.    March 2009 through June 2011: Further Inspections ................................... 18

      6.    April–September 2010: Notice of Zoning Violation and Hearings ................ 20

      7.    Developments in 2010–2012 ..................................................................... 20

IV.    Procedural Matters ........................................................................................... **22**

V.     Legal Standard ................................................................................................ **24**

VI.    *Monell* Claims .................................................................................................. **25**

VII.   Search and Seizure: Defendant Gregory .......................................................... **26**

A.    Undisputed Facts ............................................................................................... 26

B.    Discussion ......................................................................................................... 29

VIII.        Equal Protection ...................................................................................... **33**

A.    Class-of-One Claim ........................................................................................... 33

B.    The Hardestys' Second Claim Against O'Bryant, Norris, and Testa ..................... 37

      1.    Denial of Appeal and Selective Provision of Guidance ................................ 37

      2.    Norris and the Truck ................................................................................ 37

      3.    Removal from the AB 3098 List Without Notice ......................................... 38

2

    4.    Summary ................................................................................................ 47

C.   The Hardestys' Sixth Claim against Sacramento County and Sherry ..................................... 48

D.   The Hardestys' Seventh Claim Against Sacramento County, Storelli, and Moffitt .............. 49

E.   The Schneiders' Fifth Claim ..................................................................................... 50

**IX. Procedural Due Process** ................................................................................ **50**

A.   The Hardestys' Fifth Claim Against Curt Taras ...................................................... 51

B.   The Hardestys' Sixth Claim against the County and Sherry .................................. 53

C.   The Schneiders' Claims ........................................................................................... 55

    1.    Undisputed Facts ........................................................................................... 55

    2.    Claim and Issue Preclusion ......................................................................... 56

    3.    Whether Schneider Possessed a Vested Right to Mine ................................ 59

    4.    Whether the County Deprived the Schneiders of a Property Interest ........... 61

**X.   Substantive Due Process** ................................................................... **63**

A.   The Hardestys' Claims against Taras ...................................................................... 63

B.   The Hardestys' Claims against Gregory .................................................................. 63

C.   The Schneiders' Claims against Bieber ................................................................... 64

D.   Sacramento County Defendants ............................................................................... 65

E.   The Hardestys' Claims against O'Bryant ............................................................... 66

**XI. First Amendment Retaliation** .................................................................... **67**

A.   Bieber ........................................................................................................................ 67

B.   County Defendants .................................................................................................... 68

**XII. Conclusion** ..................................................................................................... **69**

1    I.        <u>INTRODUCTION</u>

2            Between 2008 and 2012, California and Sacramento County regulators

3 investigated reports that the Hardesty and Schneider families were operating a sand and gravel

4 mine illegally on the Schneiders' ranch. As a result, the mining operation was eventually closed.

5            The investigation followed a long period of regulatory disinterest. The Hardestys

6 and Schneiders allege the State and County were spurred into action not by their discovery of any

7 actual legal violations, but by their desire to appease competitors and legislators motivated by

8 campaign contributions. The Hardestys and Schneiders each filed a lawsuit in federal court,

9 claiming the County and State deprived them of constitutional rights under the First, Fourth, and

10 Fourteenth Amendments. The cases were partially consolidated, and are now before the court on

11 the parties' cross motions for summary judgment. The motions are granted and denied in part.

12    II.       <u>EVIDENTIARY OBJECTIONS</u>

13            In this order the court does not individually address the hundreds of evidentiary

14 objections listed by the parties in their separate statements of disputed and undisputed facts and

15 elsewhere. Many objections relate to evidence that is not material; these objections are overruled

16 as moot. Other objections are moot because the court does not consider the parties'

17 characterizations of the record, but the record itself. *See, e.g.*, Hardesty Resp. State Defs.' Stmt.

18 Undisp. Mat. Facts (Hardesty UMF) no. 22, ECF No. 233 (objecting to counsel's characterization

19 of evidence as a legal conclusion or argument). Many other objections are unsupported by

20 explanation or argument; the court overrules these objections summarily. *See, e.g.*, *id.* at 68;

21 Hardesty Resp. County Defs.' Stmt. Disp. Facts no. 1, ECF No. 231.

22            To the extent the discussion below relies on evidence the parties object to as

23 hearsay, the court has in most instances interpreted the evidence for its value beyond the truth of

24 the statements in question, for example, as reporting a person's or agency's conclusions rather

25 than the truth of those conclusions. *See, e.g.*, Wesling Decl. ¶¶ 8–9, ECF No. 222-5; *id.* Ex. A,

26 ECF No. 222-6. And in many instances, when the party who objects on the basis of hearsay is the

27 one who moves for summary judgment, the purported hearsay evidence could be presented in

28 admissible form at trial; these objections are overruled. *See, e.g.*, *Fraser v. Goodale*, 342 F.3d

1    1032, 1037 (9th Cir. 2003) (considering hearsay evidence offered by the non-moving party on

2    review of summary judgment when the underlying facts could be presented in admissible form at

3    trial).

4         Finally, many of the defendants' objections concern evidence the Hardestys and

5    Schneiders offer to show regulators were motivated by politics, not violations of the law.  *See,*

6    *e.g.*, Gregory Objections, ECF No. 254; State Defs.' Objections, ECF No. 256-3.  The court

7    reviews this evidence separately in detail below.

8    III.    GENERAL FACTUAL BACKGROUND

9         A.    The Mine, Hardesty Sand and Gravel, and the Cosumnes River[1]

10        Jay Schneider and his family own the Schneider Historic Mine, "the Mine" for

11   purposes of this order.  Joint Statement of Undisputed Facts (JSUF) no. 22, ECF No. 216.[2]  The

12   Mine consists of 3,691 acres in eastern Sacramento County on a ranch that has been in the

13   Schneider family since 1906.  JSUF no. 23; Schneider Decl. ¶ 1, ECF No. 219-2.  It includes land

14   adjacent to the south bank of the Cosumnes River.  JSUF no. 25.

15        The Cosumnes River is a tributary of the Sacramento River that runs from the east

16   in El Dorado County to the Sacramento and San Joaquin River Delta in the west.  *See* Taras Decl.

17   ¶ 17, ECF No. 222-11.  The River is one of the few undammed, free-flowing rivers on the

18   western slope of the Sierra Nevada Mountains.  In the 1980s and 1990s, it flooded up into part of

19   the Schneider's ranch.  *See* Schneider Dep. 225–27.

20        Until the fall of 2010, Joseph and Yvette Hardesty operated a surface mine on the

21   Schneiders' ranch, Hardesty Sand & Gravel (HSG), under an oral agreement between

22   Mr. Hardesty and the Schneiders.  JSUF no. 69; Hardesty Decl. ¶¶ 4–7, ECF No. 247; Hardesty

23   UMF no. 17.  Under this agreement, the Hardestys have exclusive control over the Mine and

24   related processing areas.  Hardesty Decl. ¶ 6.  They lease the Mine from the Schneiders.  *Id.* ¶ 5.

25        [1] In several record documents, "Cosumnes" is spelled using an epenthetic [n], reflective of
the common local pronunciation, i.e., "Consumnes."  *See, e.g.*, Balestreri Decl. Ex. U, at
26   OMR000280, ECF No. 222-17.  The court has not noted or changed this alternative spelling when
quoting from the record.

27        [2] Unless otherwise noted, electronic case file number citations are to the docket in the
28   *Hardesty* action, No. 10-2414.

1    The Hardestys do not own any of the real property at the Mine, and they do not have any home on

2    the Mine property.  JSUF no. 69.  Although mining operations have ceased, the Hardestys' lease

3    remains in place to date, and if the Hardestys could overcome the regulatory problems that are the

4    subject of this lawsuit, HSG could resume operations.  Hardesty Decl. ¶ 12.

5          B.    The California Surface Mining and Reclamation Act of 1975

6          One statutory regime sits at the center of this case: the California Surface Mining

7    and Reclamation Act of 1975 (SMARA), Cal. Pub. Res. Code § 2710 *et seq.*[3]  In general,

8    SMARA is meant to prevent or minimize the adverse environmental impacts associated with

9    surface mining, to allow mined spaces to be used again safely for other purposes after mining

10   operations cease, and to balance mining production with competing recreational, ecological, and

11   aesthetic concerns.  *See* Cal. Pub. Res. Code § 2712; *Calvert v. Cty. of Yuba*, 145 Cal. App. 4th

12   613, 617 (2006).  Under SMARA, a surface mine operator must do three things: (1) obtain a

13   permit, (2) operate under a reclamation plan, and (3) pledge sufficient financial assurances to

14   follow through on the reclamation plan.  *See* Cal. Pub. Res. Code § 2770(a); *People* ex rel. *Dep't*

15   *of Conservation v. El Dorado Cty.*, 36 Cal. 4th 971, 984 (2005).  A local agency or "lead agency,"

16   usually a city or county, is responsible for issuing the permit and approving the reclamation plan

17   and financial assurances.  *See* Cal. Pub. Res. Code §§ 2770(a), (d); *Calvert*, 145 Cal. App. 4th

18   at 618.  The County itself is the lead agency in Sacramento County.  Gamel Decl. ¶ 3, ECF

19   No. 218-8.

20         A reclamation plan must show how the mined area will be reclaimed, i.e., restored

21   and repurposed, after its operations have ceased.  *See Dep't of Conservation*, 36 Cal. 4th at 981

22   (citing Cal. Pub. Res. Code § 2770(a)).  The reclamation plan must clarify how the mined land

23   will be treated to minimize environmental impacts.  *Id.* (citing Cal. Pub. Res. Code § 2773[4]).

24         [3] After the events of this case, California passed Assembly Bill 1142, which amended
several of SMARA's provisions.  *See* 2016 Cal. Legis. Serv. Ch. 7 (West) (approved by the
25   Governor and chaptered by the Secretary of State on April 18, 2016).  The parties have not
suggested this amendment has retroactive effect, and the court assumes in this order that it does
26   not.  "Generally, statutes operate prospectively only."  *McClung v. Empt. Dev. Dep't*, 34 Cal. 4th
467, 475 (2004) (citation and quotation marks omitted).
27

28         [4] "The reclamation plan shall be applicable to a specific piece of property or properties,
shall be based upon the character of the surrounding area and such characteristics of the property

                                              6

1    Financial assurances are pledges of funds sufficient to pay for the reclamation

2    plan.  *Id.* (citing Cal. Pub. Res. Code § 2773.1(a)(1)).  Financial assurance cost estimates, or

3    "FACEs," are reports of a mine's operations that estimate the costs of remediation.  They may be

4    prepared by a third-party engineer engaged by the mine operator.  *See* Sacramento County Code

5    § 20.04.080(D); Storelli Dep. 70–71.  Financial assurance mechanisms, or "FAMs," are the

6    financial instruments themselves.

7    SMARA's permitting rule is subject to an exception.  If a person has obtained a

8    "vested right to conduct surface mining operations prior to January 1, 1976," SMARA does not

9    require that person to obtain a permit.  Cal. Pub. Res. Code § 2776(a).  A person has a "vested

10    right" if, "prior to January 1, 1976, the person has, in good faith and in reliance upon a permit or

11    other authorization, if the permit or other authorization was required, diligently commenced

12    surface mining operations and incurred substantial liabilities for work and materials necessary for

13    the surface mining operations. . . ."  *Id.*  This exception applies only "as long as no substantial

14    changes are made in the operation except in accordance with [SMARA]."  *Id.*  The vested rights

15    exception applies only to the permitting requirement.  *See* Cal. Pub. Res. Code § 2776(a);

16    *Calvert*, 145 Cal. App. 4th at 617.  That is, a surface mining operation with vested rights is not

17    relieved of its obligation to obtain approval of its reclamation plan and to provide approved

18    financial assurances.  *Calvert*, 145 Cal. App. 4th at 617.

19    C.    A Review of the Relevant California Regulatory Bodies

20    A gaggle of state regulatory bodies enforce SMARA.[5]  First, the State Mining and

21    Geology Board (the Mining Board) establishes policies and regulations to implement SMARA,

22    among other duties.  *See* Cal. Pub. Res. Code § 2755.  Second, the Mining Board is part of the

23    Department of Conservation (DOC), which is led by the Director of Conservation, an officer

24    appointed by the Governor.  *Id.* § 601.  Third, the Office of Mine Reclamation (OMR) is a

25    as type of overburden, soil stability, topography, geology, climate, stream characteristics, and
principal mineral commodities, and shall establish site-specific criteria for evaluating compliance

26    with the approved reclamation plan, including topography, revegetation and sediment, and
erosion control."  Cal. Pub. Res. Code § 2773(a).

27    [5] The California Supreme Court's decision in *People* ex rel. *Department of Conservation*

28    provides a summary of the relevant regulatory environment.  *See* 36 Cal. 4th at 983–86.

7

1  department within the DOC.  Cal. Pub. Res. Code § 607(d).  Fourth, the DOC is in the Natural

2  Resources Agency, along with about twenty other entities.  Cal. Gov't Code § 12805(a).  The

3  head of the Natural Resources Agency is its Secretary.  *Id.* §§ 12800(b), 12801.

4  Another entity within the Natural Resources Agency is the Central Valley Flood

5  Protection Board (the Flood Board).  Cal. Gov't Code § 12805(a).  It has several responsibilities

6  related to flood control in California's Central Valley.  *See* Cal. Water Code § 8520 *et seq.*  The

7  Flood Board has no direct connection to SMARA, but as the circumstances of this case

8  demonstrate, it may become involved with the regulation of surface mining.

9  Finally, the California Department of Fish and Wildlife (formerly the Department

10  of Fish and Game, or "DFG") is another member of the Natural Resources Agency.  *See* Cal.

11  Gov't Code § 12805(a).  Like the Flood Board, DFG has no direct responsibility over surface

12  mining, but its authority to enforce the California Fish and Game Code may bring it into contact

13  with surface mining operations, as was the case here.

14  D.  The "AB 3098 List"

15  The California Public Resources Code charges the DOC with maintaining a list of

16  surface mining operations that comply with SMARA.  *See* Cal. Pub. Res. Code § 2717(b).  This

17  list is commonly referred to as the "AB 3098 list" after California Assembly Bill 3098, its

18  enacting legislation.  *See* 1992 Cal. Legis. Serv. Ch. 1077 (West).  The California Public Contract

19  Code prohibits state agencies from purchasing materials produced by any operation that is not

20  included on the AB 3098 list.  *See* Cal. Pub. Cont. Code §§ 10295.5(a), 20676.  OMR is

21  responsible for maintaining, publishing, and otherwise administering the AB 3098 list.  JSUF

22  no. 54.

23  E.  A General Timeline of Events

24  1.  Early History through the 2000s

25  As noted above, the Mine has been in the Schneider family for a century.

26  Schneider Decl. ¶ 1, ECF No. 219-2.  The Mine's early history is the subject of a number of

27  disagreements among the parties to this case.  It is enough to say that Jay Schneider and his father

28  actively participated in mining operations on the Ranch throughout the 1970s and into the early

8

1   1980s, *id.*, and that at some time in the 1980s, HSG began its lease and surface mining operations

2   on the Mine under an oral contract, JSUF no. 69; Hardesty Decl. ¶¶ 5–6; Hardesty UMF no. 17.

3          In 1990, the Sacramento County Zoning Enforcement Office received a complaint

4   that illegal surface mining was taking place on the Schneider's ranch.  *See* Balestreri Decl. ¶ 7,

5   ECF No. 222-14; *id.* Ex. A, ECF No. 222-15; Schneider Decl. Ex. 3, ECF No. 219-5.  An

6   inspector visited the Mine and "verified" the complaint.  Schneider Decl. Ex. 3.  After the

7   inspection, the County determined that no use permit or reclamation plan had been approved for

8   the Mine, so it ordered the Schneiders to stop mining activity immediately.  *Id.*  Schneider

9   responded that the Mine was exempt from regulation because it was subject to a vested right.  *See*

10  Schneider Decl. ¶¶ 6–9.

11         Approximately two years later, the County asked Schneider to support his claim of

12  a vested right by submitting documentation that surface mining operations had been ongoing

13  since before 1976.  *See id.* ¶¶ 11–12; *id.* Ex. 8, at 2, ECF No. 219-10; *id.* Ex. 9, at 1, ECF

14  No. 219-11.  The record suggests Schneider first provided the requested documentation in 1994.

15  *See* Schneider Decl. ¶¶ 13–14; *id.* Exs. 10, 11, ECF Nos. 219-12, 219-13.  Schneider cited several

16  documents, including soil maps, topographical maps, aerial photos, and assessors' records.  *See*

17  *id.* Ex. 11, at 1–2.  He also sent declarations from two neighbors who reported their personal

18  knowledge that surface mining had been ongoing on the ranch since the 1940s.  *See* Schneider

19  Decl. ¶ 14; *id.* Ex. 11, at 7–8, ECF No. 219-13.

20         In August 1994, a Sacramento County Senior Planner informed Schneider the

21  County had received his information and had accepted it as evidence of a vested right.  Schneider

22  Decl. ¶ 17; *id.* Ex. 13, ECF No. 219-15; *see also* Balestreri Decl. ¶ 8; *id.* Ex. B, ECF No. 222-15.

23  The County specifically referred to a "Gravel Mining Operation" at "Parcel Nos. 128-0090-

24  035/037; Zone: AG-80."  Schneider Decl. Ex. 13.  These parcels were later divided and

25  renumbered as 128-0090-039 to 042.  Gamel Decl. ¶ 8.  The County did not require Schneider to

26  obtain a use permit, but it did require a reclamation plan and financial assurances for all mining

27  activities since January 1, 1976.  Schneider Decl. Ex. 13.  Schneider was allowed thirty days to

28  /////

1  submit a reclamation plan and financial assurances, and the County warned that his failure to

2  comply may result in legal action.  *Id.*

3          Despite the County's warning, it appears Schneider did not develop a reclamation

4  plan or obtain financial assurances, and no evidence suggests he requested more time.  Also, no

5  inspections or other enforcement actions occurred for several years.

6          In July 1999, OMR, the state agency, inspected the Mine and reported mining

7  operations were "very active."  Balestreri Decl. ¶ 9; *id.* Ex. C, ECF No. 222-15; *see also* JSUF

8  no. 31.  HSG was reportedly removing material from old dredge tailings without "rhyme or

9  reason," and "holes" and "pits" were found throughout a "large area."  Balestreri Decl. Ex. C.

10  According to the OMR report, the Mine had no reclamation plan or financial assurances, and the

11  Hardestys had told the inspector the Mine was "vested."  *Id.*

12          After the OMR inspection, Schneider submitted the Mine's annual reports to OMR

13  for the years 1995 through 1998.  JSUF no. 32; *see also* Balestreri Decl. ¶ 10; *id.* Ex. D, ECF

14  No. 222-15.  Each of these documents reported that (1) HSG operates the Mine; (2) the Mine is

15  active; (3) the site is vested; and (4) the County had not performed its annual inspection.  JSUF

16  no. 33.  The OMR's records also show Schneider's attorney expected to submit a reclamation

17  plan and financial assurances to the County by late 1999.  *See* Balestreri Decl. ¶ 12; *id.* Ex. F,

18  ¶ 10, ECF No. 222-15.  But as of June 2000, the County had received no reclamation plan or

19  financial assurances.  *Id.* ¶ 20.

20          In June 2000, the County sent Schneider a "Notice and Order Imposing

21  Administrative Penalty" of $10,000 for "failure to provide a lead agency approved reclamation

22  plan and financial assurance[s]."  *Id.* ¶ 12; *id.* Ex. F, at OMR008170.  The notice and order were

23  appealable to the State Mining and Geology Board.  *See id.* Ex. F, at OMR 8170-71.  Schneider

24  and Hardesty did appeal, and the Mining and Geology Board affirmed the penalty after a hearing.

25  *See generally id.* Ex. I, ECF No. 222-15.  The Sacramento County Superior Court, however,

26  granted Schneider's petition to set aside the penalty in June 2002, generally because the County

27  did not first give notice of the penalty or conduct a hearing.  *See* Balestreri Decl. ¶ 16; *id.* Ex. J,

28  ECF No. 222-15.

1          Schneider and Hardesty eventually submitted an application for a reclamation

2    plan.  The County requested assistance from the DOC during its review of Schneider's

3    application, Balestreri Decl. Ex. G, ECF No. 222-15, and OMR agreed to help, Hardesty Stmt.

4    Ex. 28, ECF No. 248-7.  Over the next few years, Schneider developed a reclamation plan.  JSUF

5    no. 34; Balestreri Decl. Ex. K, ECF No. 222-15.  The County Board of Supervisors reviewed a

6    draft plan in August 2002, *see generally* Hardesty Stmt. Ex. 26, ECF No. 248-6, and a final

7    reclamation plan was approved in November 2002.  *See* Balestreri Decl. ¶ 18; *id.* Ex. L, ECF No.

8    222-16; Hardesty Stmt. Ex. 6, ECF No. 248-1; Hardesty UMF no. 38.  The 2002 reclamation plan

9    has never been amended.  JSUF no. 67.

10          The reclamation plan describes the mining operation this way:

11          Material is excavated and classified, processed and stockpiled in
            anticipation of market demand and seasonal considerations.  When
12          the stockpiles are sufficiently diminished to justify further
            excavation or when there is an actual or anticipated market demand
13          for a particular material, then such material is excavated, classified
            or processed as necessary and prudent, thus avoiding unnecessary
14          excavation.

15    Balestreri Decl. Ex. L, at OMR007951, ECF No. 222-16.  The plan anticipated a "low annual

16    average of sand and gravel mined," so reclamation was determined to proceed in annual phases.

17    *Id.*  It also anticipated mining would proceed in three phases.  *Id.*  The first area would be mined

18    between 2003 and 2023, the second between 2023 and 2063, and the third after 2063.  *Id.*

19          At the time the reclamation plan was approved, demand for HSG's products was

20    tepid.  Hardesty Decl. ¶ 20.  But between 2003 and 2008, demand increased.  *See id.* ¶ 21.

21    Reports submitted to the OMR and Sacramento County show production volumes increased by a

22    factor of ten between 1995 and 2003, and by six between 2003 and 2008.  Gamel Decl. ¶ 11.  In

23    2005, HSG began excavating material from large pits in an area just south of the Cosumnes

24    River.  Hardesty Decl. ¶ 38; *see also* Hardesty Stmt. Ex. 47, at 3, ECF No. 248-8.  These pits are

25    found in the area that, according to the reclamation plan, would be mined between 2023 and

26    2063.  *See* Balestreri Decl. Ex. L, at OMR007962; Hardesty Stmt. Ex. 25, ECF No. 248-6.  The

27    parties dispute whether the Mine's reclamation plan foresaw excavation on this scale.  *See*

28    Hardesty UMF nos. 43, 46, 47; Reed Decl. ¶¶ 5–6.

1          The Mine's 2005, 2007, and 2008 FACE reports disclosed this new excavation.

2   Hardesty Stmt. Ex. 47, at 3, ECF No. 248-8; *id.* Ex. 48, at 3, ECF No. 248-8; Balestreri Decl.

3   Ex. U, at OMR000280, ECF No. 222-17.  In 2008, for example, HSG reported it was excavating

4   aggregate "from a terrace deposit along the Consumnes River," creating a thirty-acre pit about

5   thirty feet deep.  Balestreri Decl. Ex. U, at OMR000280.  Excavation was expected to continue

6   eastward.  *Id.*  The southern pit walls away from the river had been mostly resloped and covered

7   partially with vegetation, but other walls were steep and would need to be contoured before the

8   final reclamation plan requirements were satisfied.  *Id.*  The total estimated cost of recovery in

9   this report was less than $100,000.  *Id.* at OMR000289.

10          In the same time period, the County performed periodic inspections of the Mine

11   and reviewed the Mine's reports.  Hardesty Decl. ¶ 28; *see also* Hardesty Stmt. Exs. 47, 48, ECF

12   No. 248-8 (reports).  OMR's records indicate it also exchanged correspondence with Mr.

13   Hardesty about the Mine's annual reports and discussed issues with the Mine's FACE between

14   2003 and 2007.  *See* Balestreri Decl. ¶ 20; *id.* Ex. N, ECF No. 222-16.  For example, OMR's

15   notes show that in August 2007, an OMR representative noticed the Mine's report did not specify

16   the number of acres subject to the reclamation plan, so OMR corresponded with Schneider and

17   apparently then received this information within a few days.  *Id.* Ex. N.

18          No evidence suggests, however, that the County or State had any concerns about

19   the new excavations or the mushrooming demand for HSG's products.  Neither does the evidence

20   suggest that regulators questioned the Mine's compliance with its reclamation plan.  *See* Hardesty

21   Stmt. Ex. 45, at 6, ECF No. 248-8; *id.* Ex. 13, at 9, ECF No. 248-2.  The County took no issue

22   with the Mine's 2008 FACE report, which it found "adequate."  Balestreri Decl. ¶ 27; *id.* Ex. U,

23   at OMR000278.  As late as June 2008, OMR's staff also recommended approval of the Mine's

24   FACE reports.  Hardesty UMF no. 44; Reed Decl. ¶ 6; *id.* Ex. A, ECF No. 222-19.  An OMR

25   staffer responsible for reviewing the reports explains that he "missed" the reports' descriptions of

26   large excavations because his reviews are "quick and limited."  Reed Decl. ¶¶ 5–6.

27          Despite these reports and the absence of any enforcement action by the County or

28   the State, OMR's records showed the Mine was not on the AB 3098 list as of June 2008.

1   Balestreri Decl. ¶ 28; *id.* Ex. V, ECF No. 222-17.  OMR's files show HSG had not been on the

2   list since 1999.  Hardesty UMF no. 42; Balestreri Decl. ¶ 34.  It is unclear why not, and it is

3   unclear on this record whether the Hardestys or Schneiders asked for HSG to be placed on the list

4   or even knew the Mine was not on the list.

5                          2.       Mid-2008: Legislative Interest and Competitor Requests

6                  At least as early as 2007 or 2008, one or more of HSG's local competitors began

7   sending complaints to federal, state, and local regulators.  *See, e.g.*, Hardesty Stmt. Ex. 17, ECF

8   No. 248-3; Dadey Dep. 23–34.  The only competitor the parties refer to by name is "Teichert

9   Aggregates."  *See, e.g.*, Dadey Dep. 23–26.  Only a brief summary of these complaints and their

10  effects is necessary here; a more detailed description is included below.

11                 In 2006 or 2007, the U.S. Fish and Wildlife Service and the U.S. Army Corps of

12  Engineers began receiving complaints from representatives of Teichert Aggregates.  *See, e.g.*,

13  Hardesty Stmt. Ex. 17, at 1, 3–4, ECF No. 248-3.  In an apparent response to these complaints, in

14  June 2008, the Army Corps of Engineers sent HSG a cease-and-desist letter.  *Id.* Ex. 51, ECF

15  No. 248-10.  According to this letter, HSG had "discharged dredged or fill material into creeks

16  and wetlands tributary to the Consumnes River, without a . . . permit" in violation of Section 404

17  of the Clean Water Act.  *Id.* Ex. 51, ECF No. 248-10.

18                 In October 2008, former California State Senator David Cox sent a letter to the

19  Secretary of the Resources Agency.  Hardesty Stmt. Ex. 1, ECF No. 248-1.  He enclosed the

20  Corps' cease-and-desist letter.  *Id.* at 3–4.  According to his understanding, HSG had "expanded

21  both in size and scope in recent years and may have done so without necessary permits," and he

22  suggested HSG's activities were "impacting local creeks and wetlands."  *Id.* at 1.  He encouraged

23  an investigation, noting that if one mine operator could avoid compliance with federal, state, and

24  local regulation, others would stand at a "competitive disadvantage."  *Id.*  Senator Cox's letter

25  specifically cited the California Public Contract Code and the AB 3098 list, and he sent a copy to

26  the Director of the California Department of Transportation (Caltrans).  *Id.* at 2.  He suggested the

27  DOC, the Mining Board, and the California Department of Fish and Game (DFG) work together

28  /////

13

1  to investigate the Mine.  *Id.* at 1.  The cease-and-desist letter Senator Cox cited was rescinded in

2  2012, although it is unclear why.  Hardesty Stmt. Ex. 58, ECF No. 248-10.

3          Evidence also suggests that staff of former U.S. Congressman Daniel Lungren

4  arranged meetings about the Mine with the Army Corps of Engineers and Teichert

5  representatives.  *See, e.g.*, Dadey Dep. 23–26; Hardesty Stmt. Ex. 55, ECF No. 248-10.

6          The Hardestys have filed copies of publicly available records that suggest between

7  2001 and 2008, Senator Cox received campaign contributions from Taylor & Wiley, a law firm

8  the Hardestys allege represented Teichert.  *See* Hill Decl., ECF No. 230; *id.* Ex. 1.  Similar

9  records show that Congressman Lungren received campaign contributions from James Wiley,

10  John Taylor, and Suzanne Taylor between 2006 and 2012, *id.* Exs. 3–4, 6, and that Congressman

11  Lungren received campaign contributions from "Judson T. Riggs" of "Teichert" between 2004

12  and 2012, *id.* Ex. 5.

13          3.      July through December 2008: Inspections of the Mine

14          Zachary Simmons of the Army Corps of Engineers was assigned to investigate the

15  Mine, and after reviewing the file, he found what he believed were violations of federal law.

16  Simmons Dep. 13–15, 17.  He inspected the Mine in July 2008.  *Id.* at 26–27.  During this

17  inspection, Hardesty accused Simmons of being on a competitor's payroll and did not allow him

18  to inspect the last of three locations Simmons wanted to see.  *Id.* at 27, 172.

19          After the July inspection, Simmons and other Corps staff decided to bring the

20  California DFG into the investigation.  *Id.* at 70.  The Corps and DFG commonly work together,

21  and DFG wardens may be able to obtain access to private property without a warrant.  *Id.* at 70–

22  71.  Simmons contacted DFG Warden Liz Gregory, and the two scheduled a follow-up

23  investigation of the Mine for September 2008.  Gregory Dep. 39; Simmons Dep. 71; Gregory

24  Decl. ¶¶ 3, 6, ECF No. 217-3.  They did not obtain a warrant or schedule their inspection with

25  HSG.

26          Simmons and Gregory drove onto the Schneiders' ranch in Gregory's patrol truck,

27  and began investigating possible Clean Water Act and California Fish and Game Code violations.

28  Gregory Decl. ¶ 8.  Mid-way through the inspection, Hardesty and an HSG employee demanded

they leave.  *Id.* ¶ 15.  Only then did Gregory learn Hardesty had expelled Simmons from the Mine in July.  *Id.*

        After the joint inspection, neither Gregory nor the DFG issued any citations or orders to the Mine.  *Id.* ¶ 30.  Nevertheless, DFG sent OMR an email requesting a meeting to discuss operations at the Mine.  *See* Koehler Dep. 16–18 & Ex. 218.  A meeting was arranged for October 2008.  Hardesty UMF no. 52.  Before the meeting, as noted above, the Resources Agency also received a letter from Senator Cox, which described possible violations at the Mine.  JSUF no. 35.  The October 2008 meeting went forward as planned, Koehler Decl. ¶ 4, ECF No. 222-21, and OMR decided to conduct an inspection.

        OMR staff requested permission from HSG to visit and inspect the Mine.  *Id.* ¶ 5; Koehler Dep. Exs. 219–20.  Hardesty denied the request.  *See* Koehler Dep. 31–32 & Ex. 220; Hardesty Stmt. Ex. 73, ECF No. 248-11.  He was suspicious that some third party was behind the recent spate of inspections.  *See* Koehler Dep. Ex. 220; Hardesty Stmt. Ex. 73.  HSG decided it would not allow more inspections until the Resources Agency Secretary explained who or what was behind the increased regulatory interest.  Koehler Dep. Ex. 220.

        OMR obtained an administrative search warrant from the Sacramento County Superior Court, Koehler Decl. ¶ 5, and an inspection went forward in late December 2008, *id.* ¶ 6. According to a report prepared after that inspection, OMR concluded that the Mine's annual reports and its approved reclamation plan inaccurately described the excavations just south of the Cosumnes River.  *See id.* ¶ 7; *id.* Ex. A, ¶¶ 2.2–2.3, ECF No. 222-22.  OMR's report details several more specific findings:  Gravel pits just south of the Cosumnes River covered 180 acres, whereas the most recent reports had estimated the pits covered about thirty-nine acres.  *Id.* ¶ 2.2. The pits were deeper than thirty feet, the maximum depth approved by the reclamation plan.  *Id.* ¶ 2.3.  The water level in the pits was four to five feet below the water level in the Cosumnes River, and groundwater had seeped into the pits, which increased the possibility the river might flow into or "capture" the pit.  *Id.* ¶ 2.4.  The slopes of the pit walls exceeded the gradients foreseen in the reclamation plan.  *Id.* ¶ 2.5.  Finally, OMR found the Mine's FAM was inadequate
/////

1   because it had been calculated based on an estimate that forty acres would be disturbed, but OMR

2   staff believed 180 acres had been disturbed.  *Id.* ¶ 3.1.

3          The Hardestys and Schneiders dispute the accuracy of OMR's conclusions,

4   particularly with respect to the danger of pit capture.  They cite the April 2014 report of Donald

5   Olsen, an engineer, who concluded no danger of pit capture ever existed.  *See* Olsen Report at

6   OLS 02, ECF No. 202.  Olsen does not address Schneider's deposition testimony that in previous

7   years, the Cosumnes River actually had flooded up into the area near where HSG had excavated

8   the gravel pits.  *See* Schneider Dep. 226–27.

9          In any event, upon reviewing the results of the December 2008 inspection, Dennis

10   O'Bryant, OMR's Assistant Director, was worried about pit capture.  His concern arose in part

11   from an experience several years before on another California river, where a pit had been

12   captured and had cost the State several million dollars for remediation.  O'Bryant Decl. ¶ 18, ECF

13   No. 222-25.  He also recalled working for OMR's predecessor in the 1990s, when a large pit-

14   capture event occurred on the Russian River.  *Id.*  In this case, he worried that if the pits near the

15   Cosumnes River were captured, California would not be able to contribute much funding to

16   remediate damage to the River.  *Id.*

17          4.     Early 2009: Reinstatement and Removal from the AB 3098 List

18          As noted above, HSG was not on the AB 3098 list in December 2008.  But after

19   correspondence between HSG, its attorneys, and OMR, the Mine was placed on the AB 3098 list

20   in early February 2009.  JSUF no. 46, 50.

21          At the time HSG was placed on the list, OMR had completed its December 2008

22   inspection, but it had not finalized its inspection report.  Koehler Decl. ¶ 7, ECF No. 222-21.  The

23   report was finalized in late February 2009, *see* JSUF no. 51, and in consideration of that report,

24   OMR decided to remove the Mine from the AB 3098 list immediately, without prior notice.  *See*

25   O'Bryant Decl. ¶ 5; *id.* Ex. A, ECF No. 222-26.  The December 2008 inspection had led OMR to

26   conclude that the Mine's operation did not comply with its reclamation plan, that financial

27   assurances on file with the OMR were inadequate, and that the Mine's operation did not comply

28   with the Public Resources Code.  *Id.* Ex. A, at OMR007871.  Before the Mine could be reinstated

1    on the AB 3098 list, OMR concluded it would be required to submit a revised FACE, approved

2    by the County and DOC, post a FAM in the amount of a revised FACE, submit an amended

3    reclamation plan, and comply with the standards of Public Resources Code section 2773,

4    governing reclamation plans. *Id.* at OMR007871–72.

5            On the same day OMR removed the Mine from the AB 3098 list, it filed a lawsuit

6    against HSG, Hardesty, and Schneider in Sacramento County Superior Court. *See* Compl.,

7    *Luther v. Hardesty Sand & Gravel*, No. 34-2009-00038102 (Sacramento Cty. Super. Ct. filed

8    Mar. 18, 2009).[6] Two days later, OMR moved *ex parte* for a temporary restraining order (TRO)

9    enjoining the Mine from violating SMARA, arguing "the existing pits at the mine present [a]

10   hazard, warranting an injunction to compel the Defendants to reclaim the pits now to avoid risk of

11   pit capture, which would cause irreparable injury to Plaintiff on behalf of the public."  Ex Parte

12   App., *Luther v. Hardest Sand & Gravel*, No. 34-2009-00038102.  The Superior Court denied the

13   *ex parte* application the same day "on the merits of the papers presented to the Court."  Order

14   Determining Disposition of Ex Parte App., *Luther v. Hardesty Sand & Gravel*, No. 34-2009-

15   00038102.  After OMR's request for a temporary restraining order was denied, little more

16   happened in the lawsuit.  It was settled a few months later.  Alderson Decl. Ex. L, ECF No. 222-

17   32.  The settlement agreement reports the DOC believed any risk of pit capture had dissipated

18   with the conclusion of the 2008–2009 rainy season.  *Id.*

19           On the same day OMR moved for a TRO in Sacramento County Superior Court, it

20   sent the County a fifteen-day notice under Public Resources Code section 2774.1(f).[7]  O'Bryant

21   Decl. Ex. F, ECF No. 222-26.  The OMR's letter gave notice of OMR's conclusion that the Mine

22   was operating in violation of SMARA.  *Id.*  OMR expected that after receiving the notice, the

23   County would issue a notice of violation that, among other things, would require the Mine to post

24   ────────────────────

25           [6] The court takes judicial notice of the filings in this case, which are public records whose existence is subject to no reasonable dispute.  *See* Fed. R. Evid. 201.

26           [7] Under Public Resources Code section 2774.1(f), the DOC may initiate an enforcement action against a SMARA mining operation after the Director gives notice to the lead agency,

27   among other requirements.  In 2009, the notice period required by section 2774.1(f) was fifteen days, and in 2013 the period was lengthened to thirty days.  *See* 2013 Cal. Legis. Serv. Ch. 417

28   (West).

1    an interim FAM of $733,784, "the amount deemed adequate by the Department to reclaim the

2    estimated 180 acres disturbed based upon the site inspection of December 23, 2008, and pursuant

3    to the reclamation plan." *Id.* at OMR007389; *see also* Reed Decl. ¶¶ 7–8.

4            In response to OMR's letter, the County required the Mine to amend its

5    reclamation plan and post an interim FAM of $733,784. O'Bryant Decl. Ex. G, at OMR000429.

6    In addition to referencing the violations noted in OMR's letter, the County listed several other

7    concerns, including that the Mine did not appear to have a current business license, that it had not

8    submitted certain maps, that it appeared to be operating outside its reclamation plan, and that the

9    County had no record of building permits for structures found at the Mine. *See id.* at

10   OMR000430. The County required the Mine to file an application to amend its reclamation plan

11   within thirty days and warned that the Mine's failure to respond as requested could lead to an

12   enforcement action and administrative penalties. *Id.* at OMR000431.

13           The County also sent Schneider, Hardesty, and their attorneys a letter informing

14   them it had received complaints that suggested the Mine's operations had expanded beyond its

15   vested right. O'Dea Decl. Ex. A, ECF No. 218-5. Specifically, the County found that mining

16   operations in 1994 were "relatively small in scale" and "primarily confined to dredger tailings,"

17   whereas more recently "the mining appears to be focused on riverbed aggregates adjacent to the

18   Cosumnes River." *Id.* at 1. In light of this evidence, the County believed operations at the Mine

19   had expanded beyond their scope at the time land use restrictions were first enacted in 1956. *Id.*

20   at 1–2. The Mine's only recourse, according to the County, was therefore "to file for and receive

21   approval of a conditional use permit and rezone." *Id.* at 2.

22           5.      March 2009 through June 2011: Further Inspections

23           OMR geologists inspected the Mine again in March 2009, November 2009, June

24   2010, and November 2010. Wesling Decl. ¶¶ 12–13, ECF No. 222-5; Koehler Decl. ¶¶ 9–10,

25   ECF No. 222-21.

26           The OMR's inspection in November 2009 concerned only excavations near the

27   Cosumnes River. *See* Wesling Decl. Ex. D, at OMR004196, ECF No. 222-7. According to an

28   internal OMR memo, OMR staff determined five violations remained unresolved: (1) the pits'

18

depth exceeded the maximum allowable depth under the reclamation plan; (2) the pits had illegally impacted the "shallow groundwater aquifer," but the reclamation plan does not address groundwater; (3) the pits were located within the 100-year floodplain without proper notification; (4) the Mine's infrastructure (a processing plant, water ponds, settling basins, and stockpiles) were not at the locations noted by the reclamation plan; and (5) the Mine had not observed best practices for erosion and sediment control near the pits. *Id.* at OMR004197–99.  OMR also believed the risk of pit capture remained high. *Id.* at OMR004199.  A formal report was completed in June 2010.  Wesling Decl. Ex. E, ECF Nos. 222-8 to -10.

OMR also prepared an inspection report for its June 2010 inspection, which was completed in June 2011. *See* Koehler Decl. ¶ 9; *id.* Ex. B, ECF No. 222-23.  Unlike the March 2009 and November 2009 inspections, the June 2010 inspection had a broader scope. *See id.* at OMR004165.  OMR believed nine violations had occurred: (1) the possibility of pit capture endangered the public health and safety and the environment; (2) the pits had impacted groundwater in the area, but the reclamation plan did not address groundwater; (3) mining had exceeded allowable depths in the pits; (4) the pits' slopes were unstable; (5) the Mine's erosion controls were inadequate with respect to the pits; (6) mining waste had been deposited on top of wetlands; (7) the actual areas disturbed by mining operations were approximately 239 acres, but the County's reports had indicated about 112 acres were disturbed; (8) HSG's processing plant, processing ponds, settling basins, and stockpiles were not in the locations noted in the reclamation plan; and (9) mining adjacent to the banks of the Cosumnes River was occurring much earlier than allowed under the reclamation plan. *Id.* at OMR004170–74.

The Flood Board also conducted its inspections and negotiated remedial actions with the Mine and HSG between 2009 and 2011, both in conjunction with other regulators and independently. *See generally* Taras Decl., ECF No. 222-11.

Over the same period, the County's FACEs began to diverge from FACEs prepared for the Mine by its consultant.  In December 2009, a County contractor estimated the total costs of reclamation for the Mine would be $194,745. *See* Olsen Rep. at OLS 03.  In the same time period, the Mine's consultant calculated FACEs of between $100,000 and $140,000.

19

1   *See id.*; Balestreri Decl. Ex. EE, at OMR007788, ECF No. 222-17; *id.* Ex. FF, at OMR 008921.

2   Estimates for early 2010 differed somewhat, but were within the same order of magnitude. *See*

3   Olsen Rep. at OLS 03. But starting in mid-2010, the regulators' estimates were much higher. For

4   example, in June and December 2010, OMR estimated a $984,000 FAM was necessary. Koehler

5   Decl. Ex. B, at OMR004175, ECF No. 222-23. Similarly, in December 2010, the County's

6   consultant estimated total costs of reclamation for the Mine would be $835,303. *See* Olsen Rep.

7   at OLS 03. And in November 2012, the County's consultant estimated total costs of reclamation

8   for the Mine would be either $901,336 or $8,817,074, depending on whether material would be

9   imported to refill the gravel pits beside the river. Hardesty Stmt. Ex. 40, at OMR000851, ECF

10   No. 248-8. Over the same period, FACEs prepared by the Mine's consultant never exceeded

11   $200,000. *See* Olsen Rep. at OLS 03.

12           6.      April–September 2010: Notice of Zoning Violation and Hearings

13           In April 2010, the County sent a notice of violation to Schneider, charging the

14   Mine with zoning violations. O'Dea Decl. Ex. B, ECF No. 218-5; Schneider Decl. ¶ 3, ECF

15   No. 220-2. Schneider appealed the notice of violation to the County Board of Supervisors and

16   hearings were held between May and September of 2010. Gamel Decl. ¶ 19; Schneider Decl. ¶ 4;

17   Sacramento Bd. of Supervisors Meeting Trs. (May 26, July 13, Sept. 14, & Sept. 28, 2010), ECF

18   Nos. 220-3, 220-4, 220-6, 220-7. Jay Schneider and Richard Ross, the Schneiders' attorney in

19   this case, were both present at each hearing. *See generally* Sacramento Bd. of Supervisors

20   Meeting Trs. (May 26, July 13, Sept. 14, & Sept. 28, 2010).

21           On September 28, 2010, the Board of Supervisors upheld the notice of violations.

22   *See* Gamel Decl. ¶ 19; Sacramento Bd. of Supervisors Meeting Tr. 30 (Sept. 28, 2010), ECF

23   No. 220-7. Schneider initially pursued but then abandoned a petition for a writ of mandate in

24   California superior court. *See Schneider v. Bd. of Supervisors*, No. 34-2011-80000857

25   (Sacramento Cty. Super. Ct. filed May 12, 2011).

26           7.      Developments in 2010–2012

27           The Hardestys filed their complaint in this action in September 2010, midway

28   through the hearings on Schneider's appeal before the Board of Supervisors. *See* Hardesty

1  Compl., ECF No. 1.  They asserted several constitutional claims against both federal and state

2  defendants for alleged violations of their First, Fourth, and Fourteenth Amendment rights.  *See*

3  *generally id.*

4          In October 2010, after Schneider's appeal concluded, the County ordered

5  Schneider either to cease operations and begin reclamation or to apply for a conditional use

6  permit and rezoning.  Gamel Decl. ¶ 20.  The Schneiders and Hardestys have not applied for a

7  conditional use permit.  *Id.*  Mining ceased in Fall 2010.  *See* Hardesty Decl. ¶ 10.

8          In January 2011, the County issued a citation to Schneider for selling existing

9  mining stockpiles without a permit.  Schneider Decl. ¶ 100; Derby Decl. ¶ 10, ECF No. 218-5.

10  He appealed the citation.  Schneider Decl. ¶ 101; Derby Decl. ¶ 11.  The Board of Supervisors

11  denied the appeal and upheld the citation on May 4, 2011.  Schneider Decl. ¶ 108.  He filed a

12  petition for a writ of mandate with the Sacramento County Superior Court.  *Id.* ¶ 109.  As noted

13  above, he did not pursue the case to its conclusion.  *See* Order Vacating Hr'g, *Schneider v. Bd. of*

14  *Supervisors*, No. 34-2011-80000857 (Sacramento Cty. Super. Ct. filed Jan. 11, 2013).  In a

15  separate action, in March 2012, the Superior Court enjoined HSG from mining or removing

16  stockpiled materials from the Mine.  Order, *Schneider v. Hardesty*, No. 34-2012-00119889

17  (Sacramento Cty. Super. Ct. filed Mar. 5, 2012), Dkt. No. 17.

18          The County conducted another inspection in May 2011.  Derby Decl. ¶ 18.  It

19  found violations of SMARA and the reclamation plan and notified Hardesty and Schneider of

20  these findings in a June 2011 letter.  *Id.*  In December 2011, the Board of Zoning Appeals adopted

21  portions of the June 2011 Notice and Order.  *See* Hardesty Resp. County Defs.' Stmt. Undisp.

22  Mat. Facts no. 30, ECF No. 231; Schneider Resp. County Defs.' Stmt. Undisp. Mat. Facts no. 30,

23  ECF No. 240.

24          In the late summer of 2012, Schneider believed he would be unable to obtain

25  effective relief in California courts.  Schneider Decl. ¶ 117, ECF No. 220-2.  He filed an action in

26  this court in September 2012 to avoid the running of the statute of limitations.  *Id.* ¶ 119.  His

27  original complaint alleged several claims along the same lines as the Hardestys' complaint.  *See*

28  *generally* Compl., Case No. 12-2457, ECF No. 1.

1    IV.    PROCEDURAL MATTERS

2             As noted above, the Hardestys' original complaint was filed in September 2010.

3    Three rounds of motion practice have narrowed the case to the following claims, all under 42

4    U.S.C. § 1983:

5             • An equal protection claim against Dennis O'Bryant, Gay Norris (a geologist at

6               OMR), and Stephen Testa (the Mining Board's Executive Officer) related to

7               their allegedly selective enforcement of the AB 3098 list, Second Am. Compl.

8               (Hardesty Compl.) ¶¶ 116–28;

9             • A Fourth Amendment claim against Liz Gregory for conducting a warrantless

10              search of the Mine, *id.* ¶¶ 139–45;

11            • Substantive and procedural due process claims against Curt Taras (formerly of

12              the Flood Board) based on a cease-and-desist letter he sent to the Mine in

13              2009, *id.* ¶¶ 146–53;

14            • Due process and equal protection claims against Sacramento County and

15              Robert Sherry (the former Planning Director for the County) stemming from

16              the alleged revocation of the Hardestys' SMARA vested right, *id.* ¶¶ 154–62;

17            • An equal protection claim against Sacramento County, Cindy Storelli (a

18              principal planner for the County), and Leighann Moffitt (another principal

19              planner and later Planning Director) based on their alleged differential

20              treatment of the Mine's FACEs and FAMs when compared to other similarly

21              situated mining operations, *id.* ¶¶ 163–77; and

22            • A substantive due process claim against all the defendants based on their

23              alleged campaign to drive the Hardestys out of business, *id.* ¶¶ 192–204.

24             The Schneiders' pleadings also were the subject of motions to dismiss and

25    amendments, eventually arriving at a Third Amended Complaint, which includes the following

26    claims, all under 42 U.S.C. § 1983:

27            • A procedural due process claim against Sacramento County, Sherry, Storelli,

28              Moffitt, Roger Dickinson (a former member of the Sacramento County Board

                                              22

of Supervisors), Jeff Gamel (former Sacramento County Senior Planner and Aggregate Resources Manager), Tammy Derby (former Chief of the Code Enforcement Division of Sacramento County), and Carl Simpson (another former Code Enforcement Chief) related to the alleged revocation of land use entitlements, Third Am. Compl. (Schneider Compl.), ¶¶ 241–50, Case No. 12-2457, ECF No. 70;

- A substantive due process claim against Sacramento County, Sherry, Storelli, Moffitt, Dickinson, Gamel, Derby, and Simpson related to the revocation of the SMARA vested right, *id.* ¶¶ 251–62;

- A substantive due process claim against David Bieber (an engineer and consultant), arising from the alleged inflation of FACEs he calculated for the County, *id.* ¶¶ 263–80;

- First Amendment claims against all the defendants based on the allegedly retaliatory increase in FACEs, *id.* ¶¶ 281–90; and

- An equal protection claim against Sacramento County, Sherry, Storelli, Moffitt, Dickinson, Gamel, Derby, and Simpson based on their alleged selective treatment of the Mine, *id.* ¶¶ 291–305.

The *Hardesty* and *Schneider* cases were related in May 2013, Related Case Order, ECF No. 156, and in August 2014, the two actions were mostly consolidated with only the claims against David Bieber remaining in the unconsolidated *Schneider* case, *see* Order Aug. 15, 2014, ECF No. 186.

In October 2015, the parties filed several motions for summary judgment. As confirmed at hearing, these motions place the entirety of the *Hardesty* and *Schneider* cases before the court. The defendants move for summary judgment on all claims asserted against them in the two cases.[8] The Hardestys and Schneiders oppose these motions in total.[9] The defendants also

---

[8] *See* State Defs.' Mot., ECF No. 222; Gregory Mot., ECF No. 217; County Mot. Pt. 1, ECF No. 218-1; County Mot. Pt. 2, ECF No. 218-2; County Mot. Pt. 3, ECF No. 218-3; Bieber Mot., Case No. 12-2457, ECF No. 105.

1   each replied.[10]  In addition, the Schneiders move for partial summary judgment on their claim to a

2   SMARA vested right and for partial summary judgment that they were deprived of this right

3   without due process.[11]  A subset of the defendants opposes these motions,[12] and the Schneiders

4   replied.[13]  The court held a consolidated hearing on January 22, 2016 and allowed the parties to

5   file written closing arguments.[14]

6   V.      LEGAL STANDARD

7            A motion for summary judgment will be granted "if the movant shows there is no

8   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

9   Fed. R. Civ. P. 56(a).  A motion for summary judgment calls for a "threshold inquiry" into

10  whether a trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be

11  resolved only by a finder of fact because they may reasonably be resolved in favor of either

12  party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court does not weigh

13  evidence or assess the credibility of witnesses; rather, it determines which facts the parties do not

14  dispute, then draws all inferences and views all evidence in the light most favorable to the

15  nonmoving party.  *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

16  574, 587–88 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to

17  find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587

18  (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

---

19      [9] *See* Opp'n State Defs.' Mot., ECF No. 243; Opp'n Gregory Mot., ECF No. 236;
20  Hardesty Opp'n County Mot. Pt. A, ECF No. 234; Hardesty Opp'n County Mot. Pt. B, ECF
    No. 235; Schneider Opp'n County Mot. Pt. A, ECF No. 238; Schneider Opp'n County Mot. Pt. B,
    ECF No. 239; Opp'n Bieber Mot., Case No. 12-2457, ECF No. 108.

21      [10] *See* State Defs.' Reply, ECF No. 256; Gregory Reply, ECF No. 253; County Reply
22  Pt. 1, ECF No. 255-1; County Reply Pt. 2, ECF no. 255-2; County Reply Pt. 3, ECF No. 255-3;
    Bieber Reply, Case No. 12-2457, ECF No. 112.

23      [11] *See* Schneider Mot. Vested Right, ECF No. 219; Schneider Mot. Due Process, ECF
24  No. 220.

        [12] County Opp'n Vested Right, ECF No. 228; County Opp'n Due Process, ECF No. 228-
25  1; State Defs.' Joinder, ECF No. 237.

        [13] *See* Reply Vested Rights, ECF No. 258; Reply Due Process, ECF No. 257.
26
        [14] *See* Minutes, ECF No. 263; Hr'g Tr., ECF No. 268; State Defs.' Br., ECF No. 272;
27  Gregory Br., ECF No. 271; County Br., ECF No. 269; Schneider Br., ECF No. 270; Hardesty Br.,
    ECF No. 273; Bieber Br., Case No. 12-2457, ECF No. 118; Schneider Br., Case No. 12-2457,
28  ECF No. 119.

1    The moving party bears the initial burden of "informing the district court of the

2    basis for its motion, and identifying those portions of [the record] which it believes demonstrate

3    the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

4    (1986).  If the party opposing summary judgment bears the burden of proof at trial, the moving

5    party need only illustrate the "absence of evidence to support the non-moving party's case." *In re*

6    *Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The burden then shifts to the

7    nonmoving party to "go beyond the pleadings" and "designate specific facts showing that there is

8    a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted).  The non-moving

9    party "must do more than simply show that there is some metaphysical doubt as to the material

10   facts." *Matsushita*, 475 U.S. at 586.  "Only disputes over facts that might affect the outcome of

11   the suit under the governing law will properly preclude the entry of summary judgment."

12   *Anderson*, 477 U.S. at 248.

13   VI.    *MONELL* CLAIMS

14   The Hardestys and Schneiders assert several claims against the County of

15   Sacramento and its officers under 42 U.S.C. § 1983.  Municipal bodies are subject to liability

16   under 42 U.S.C. § 1983.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 & n.54

17   (1978).  The "touchstone" of a claim against a municipal government under § 1983 is the

18   plaintiff's allegation that the defendant's "official policy" deprived her of constitutional rights.

19   *Id.* at 690–91.  Thus a plaintiff may pursue relief under § 1983 against a municipal body to

20   address an unconstitutional decision a municipal government's officers officially adopted or

21   promulgated.  *Id.* at 690.

22   A municipality must be the "moving force" behind the plaintiff's injury.  *Bd. of*

23   *Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  "That is, a plaintiff must

24   show that the municipal action was taken with the requisite degree of culpability and must

25   demonstrate a direct causal link between the municipal action and the deprivation of federal

26   rights."  *Id.*  But "[w]here a plaintiff claims that a particular municipal action *itself* violates

27   federal law, or directs an employee to do so, resolving these issues of fault and causation is

28   straightforward."  *Id.* (emphasis in original).  "[P]roof that a municipality's legislative body or

1  authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right

2  necessarily establishes that the municipality acted culpably." *Id.* at 405.

3          Here, in its briefing, the County argued this case involves no allegedly

4  unconstitutional policy because the plaintiffs have produced no evidence of a longstanding

5  practice. *See* County Mot. Pt. 2 at 8–9. At hearing, however, counsel withdrew from this

6  position. As noted in the previous paragraph, the County may have adopted a "policy" despite

7  the absence of any longstanding practice or custom. *See, e.g.*, *Pembaur v. City of Cincinnati*, 475

8  U.S. 469, 480 (1986); *see also Hammond v. Cty. of Madera*, 859 F.2d 797, 803 (9th Cir. 1988)

9  (county board of supervisors subject to suit for both ratifying an official's misconduct and

10  "actively participat[ing] in the deprivation of [plaintiffs'] property rights"), *abrogated on other*

11  *grounds as noted in L.W. v. Grubbs*, 92 F.3d 894, 898 (9th Cir. 1996); *Evers v. Custer Cty.*, 745

12  F.2d 1196, 1198–1203 (9th Cir. 1984) (an official declaration that deprived a person of a real

13  property right, though a single act, could support a local government's liability under § 1983).

14  Indeed the parties generally refer not to the individual defendants' actions, but to the County's

15  actions. The claims against the County may proceed if not otherwise adjudicated in this order.

16  VII.    SEARCH AND SEIZURE: DEFENDANT GREGORY

17          The Hardestys claim DFG Warden Liz Gregory conducted an unconstitutional

18  search when she and Zachary Simmons of the Army Corps of Engineers inspected the Mine in

19  September 2008.

20          A.      Undisputed Facts

21          A more detailed review of the facts specific to this claim is first necessary to

22  explain the court's reasoning. In July 2008, Zachary Simmons of the Army Corps of Engineers

23  was assigned to the investigation of HSG and the Mine. Simmons Dep. 13–15. After reviewing

24  aerial and satellite photography and looking through the Corps' files, it appeared to him that HSG

25  possibly violated federal law or regulations. *See id.* at 15, 17. Simmons scheduled a visit for July

26  2008. *Id.* at 18–20, 25.

27          The inspection lasted several hours. *Id.* at 170. Hardesty seemed frustrated and an

28  HSG employee suggested Simmons was on the payroll of an unnamed competitor. *Id.* at 171–74.

1    Hardesty refused to allow Simmons to inspect one of three locations of interest and asked him to

2    leave.  *See* Simmons Interview 145 (Apr. 18, 2013)[15]; Simmons Dep. 68.

3          In a meeting after the investigation, Simmons and other Corps staff considered

4    how they could complete an inspection of the entire Mine.  Simmons Dep. 70.  Someone

5    suggested planning a joint inspection with the DFG.  *Id.*  This was unsurprising to Simmons, as

6    the DFG and the Corps typically work together on investigations and because DFG wardens may

7    be able to obtain access to private property.  *Id.*  The next step in Simmons' and the Corps'

8    investigation was therefore to contact their counterparts at the DFG.  *Id.* at 71.

9          When Simmons contacted DFG, he was routed to Liz Gregory.  Simmons Dep. 71;

10   JSUF no. 70.  This was the first Gregory had heard about the Mine.  Gregory Dep. 61.  Simmons

11   gave Gregory information about potential violations of the California Fish and Game Code at the

12   Mine.  *Id.*; Simmons Dep. 72–73; Doody Decl. Ex. 80, ECF No. 217-8.  At that time, Gregory

13   had some experience investigating streambed alteration issues under California Fish and Game

14   Code section 1600.  Gregory Decl. ¶ 2, ECF No. 217-3.  But none of her previous inspections

15   under those sections involved surface mining.  *Id.*  Simmons told Gregory he had been to the

16   Mine before, but he did not say with whom or how many times he had gone.  Gregory Dep. 61–

17   62.  She knew he had visited two locations and knew that he had information about a third

18   location, but she did not know Simmons had been prevented from inspecting the third site.  *Id.* at

19   70–72.

20         Simmons sent Gregory some pictures of the Mine, and Gregory passed these on to

21   a more experienced Fish and Game Warden, who agreed the Mine might have violated the Fish

22   and Game Code.  Doody Decl. ¶¶ 1–5, ECF No. 217-8.  Simmons and Gregory planned an

23   unannounced inspection of the Mine.  *See id.* Ex. 78, No. 217-8; *id.* Ex. 80, ECF No. 217-8.

24         Gregory and Simmons met at the Mine as planned.  Gregory Decl. ¶ 6.  Before

25   they entered the Mine, Simmons told Gregory he had received a message from a congressman's

26

27         [15] To the extent the court relies on this testimony here, Gregory's implied objection is
     overruled.  *See* Gregory Reply at 2 n.3.  The court's limited consideration of that testimony here
28   subjects Gregory to no prejudice.

1    office that morning.  *Id.*  This was the first either of them knew that any legislator had an interest

2    in the investigation.  *Id.*; Gregory Dep. 65; Simmons Dep. 76–77.  Gregory called her captain,

3    Mark Lucero, who told her to go ahead with the investigation.  Gregory Decl. ¶ 6.

4            Gregory and Simmons drove in Gregory's patrol truck onto the Mine through an

5    open gate on an access road.  Gregory Decl. ¶ 8.  Gregory did not have a warrant and did not

6    believe she needed one.  *Id.* ¶ 17.  The ranch is fenced by barbed wire in some places, including

7    on its border along Meiss Road near where Gregory and Simmons entered.  *Id.* ¶ 10; *see also id.*

8    Ex. VV-1, ECF No. 217-4 (photograph of the fence from Meiss Road).  Gregory parked her truck

9    on the access road and began inspecting a pond area in the middle of a wide-open, grassy field.

10    *Id.* ¶ 11; *see also id.* Exs. UU-1, WW-1, ECF No. 217-4 (photographs of the pond area and the

11    field).  The two then went back to the truck and continued north.  Gregory Decl. ¶ 12.  They

12    stopped briefly near a weigh station, then continued again.  *Id.*  Near a processing facility Gregory

13    turned east and drove past a settling pond, then parked on the shoulder of the road.  *Id.*  She and

14    Simmons left the truck and began walking south.  *Id.*  The area where they stood was a wide-open

15    field.  *Id.* ¶ 13; *see also id.* Ex. FF, at OMR003196–97 (overhead aerial photographs of the area);

16    *id.* Ex. SS-1, at LG00793, Photo 9 (ground-level photograph of the field).

17            While Simmons and Gregory were standing in the field, a Mine employee asked

18    them to go to the Mine's weigh station.  *Id.* ¶ 14.  They did, and met Hardesty.  *Id.* ¶ 15.  Hardesty

19    told them they had no right to be on the property, and Gregory disagreed, explaining she had

20    authority and had brought Simmons to show her where he believed there may have been damage

21    to waterways or wildlife.  *Id.*  Hardesty told her he had ordered Simmons off the property during

22    his July 2008 inspection, and Hardesty said something about suing Teichert.  *Id.*; Gregory

23    Dep. 72.  That was the first time Gregory had heard anything about Teichert.  Gregory Decl. ¶ 15.

24    Gregory left the property after she spoke to Lucero again on the phone, who told her to leave.  *Id.*

25    Gregory was upset that she had brought Simmons along and had not known he had been

26    forbidden from the property before.  Gregory Dep. 73.

27    /////

28    /////

1    Over the course of their joint inspection, Gregory and Simmons entered no

2    buildings.  Gregory Decl. ¶ 17.  They encountered no locked or closed gates and no other physical

3    barriers.  *Id.*  They went nowhere that appeared to be private.  *Id.*

4    After the inspection, Gregory received emails and participated in meetings about

5    the Mine, but she played no further role in any investigation or enforcement actions.  *See* Gregory

6    Decl. ¶¶ 18–27.  She never heard any state or county personnel say or imply they intended to put

7    the Mine out of business or harm HSG's business.  *Id.* ¶ 28.  In a declaration, she avers likewise

8    her goal was always to "identify and resolve violations of the California Fish and Game Code and

9    any related threats to the public or to fish and wildlife resources."  *Id.* ¶ 29.  Neither Gregory nor

10   the DFG issued any citations or orders to the Mine.  *Id.* ¶ 30.

11       B.       Discussion

12              "The Fourth Amendment safeguards '[t]he right of the people to be secure in their

13   persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *Atwater v.*

14   *City of Lago Vista*, 532 U.S. 318, 326 (2001) (quoting U.S. Const. amend. IV).  It applies against

15   states and state agencies.  *Elkins v. United States*, 364 U.S. 206, 223–24 (1960).  The Supreme

16   Court recently clarified its two-part interpretation of the words "searches and seizures."  *See*

17   *generally United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012).  First, by mentioning

18   "persons, houses, papers, and effects," the Amendment prohibits certain intrusions on a person's

19   property.  *See id.* at 949.  Second, because "the Fourth Amendment protects people, not places," it

20   prohibits searches and seizures that violate a person's "reasonable expectation of privacy," *id.*

21   at 950 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).  These two conceptions operate

22   independently.  A search or seizure may be unreasonable and violate the Fourth Amendment if it

23   concerns the type of property listed in the Fourth Amendment, regardless of the person's

24   expectation of privacy.  *See id.* at 949–53 (monitoring a person's location with a GPS tracker

25   attached to his car was a "search" because the car was an "effect").  Likewise a search may

26   violate the Fourth Amendment regardless of any trespassory intrusion if the search violates the

27   person's objectively reasonable expectation of privacy.  *See generally, e.g.*, *Kyllo v. United*

28   /////

29

1    *States*, 533 U.S. 27 (2001) (the government conducted a "search" of a person's home when it

2    used a thermal imaging camera from across the street).

3             Under these rules, the Fourth Amendment does not offer protection against

4    searches and seizures in "the open fields." *See Hester v. United States*, 265 U.S. 57, 59 (1924).

5    A field is not a person, house, paper, or effect, and an assertion of privacy in open fields "is not

6    an expectation that society recognizes as reasonable." *Oliver v. United States*, 466 U.S. 170, 179

7    (1984) (citations and quotation marks omitted). This is true even if the field is secluded,

8    demarcated by "No Trespassing" signs, and surrounded by a barbed wire fence. *See id.* at 181–

9    83. For example, in *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court held that the

10   police did not conduct a "search" for purposes of the Fourth Amendment when they shone a

11   flashlight into a barn on a private ranch in the middle of an open field, even though to reach the

12   barn they had first crossed several fences. *See id.* at 297–98, 303–05.

13            Here, although it is undisputed Simmons and Gregory had no warrant, the property

14   they searched was an "open field": grass and rolling hills, under wide blue skies. *See* Gregory

15   Decl. Exs. UU-1, VV-1, WW-1, ECF No. 217-4. No evidence suggests Gregory and Simmons

16   entered any private area, structure, or home. The Hardestys have no home on the Schneider

17   ranch. They can maintain no Fourth Amendment claim against Gregory because no "search"

18   occurred.

19            The ulterior motive the Hardestys ascribe to Gregory's inspection—providing a

20   back door for Simmons to snoop around the Mine without the Hardestys' or Schneiders'

21   permission—would not transform that inspection into a Fourth Amendment search. Opp'n

22   Gregory Mot. 6–11, ECF 236. Neither does the fact that the Mine was a private industrial

23   property. The Hardestys' arguments to the contrary rest on incorrect interpretations of several

24   decisions.

25            First, they cite the Ninth Circuit's decision in *Berger v. Hanlon*, 129 F.3d 505 (9th

26   Cir. 1997), *vacated and remanded*, 526 U.S. 808 (1999) (per curiam).[16] In that case, federal

---

[16] The Supreme Court vacated and remanded *Berger* in light of its intervening decision in *Wilson v. Layne*, 526 U.S. 603 (1999). The *Wilson* court held that police officers violated the Fourth Amendment by inviting media to record the execution of an arrest warrant inside a private

1    agents had obtained a warrant to search the plaintiff's Montana ranch for evidence he had

2    poisoned and shot endangered eagles.  129 F.3d at 508–09.  The Ninth Circuit concluded the

3    agents had run afoul of the Fourth Amendment by allowing news media to secretly record video

4    and audio during the search.  *Id.*  The Ninth Circuit rejected the agents' citation to the open-fields

5    doctrine because that doctrine "is not a license for the police to bring trespassers on to private

6    property."  *Id.* at 512.  Had the plaintiffs sued the agents for conducting a warrantless search of

7    the field, the doctrine would have removed the case from the Fourth Amendment's reach, but it

8    could not "immunize the officers from liability for conduct that has no law enforcement purpose."

9    *Id.*  Here, unlike in *Berger*, the Hardestys sue Gregory for conducting a warrantless search, and

10   although the parties dispute whether her inspection was a pretext for Simmons' continued

11   investigation, it is undisputed that both Simmons and Gregory meant to search the Mine for

12   violations of federal and state laws.  That is, the parties agree Simmons and Gregory had a "law

13   enforcement purpose," and the *Berger* court's reasoning does not apply.  *Berger* also is

14   distinguishable from this case in light of the *Berger* court's passing discussion of evidence, noting

15   "that the shed and other outbuildings that were a focus of the cameras were places in which the

16   [plaintiffs] did have a reasonable expectation of privacy."  *Id.* at 512–13.  No similar evidence has

17   been presented here.

18          Second, the Hardestys cite *Alexander v. City and County of San Francisco*,

19   29 F.3d 1355 (9th Cir. 1994).  In that case, officers stormed a man's home, intending to arrest

20   him, without first obtaining a warrant for his arrest.  *See id.* at 1357–59.  Rather, the officers had

21   obtained a warrant to investigate suspected health and safety violations on his property.  *Id.*  The

22   Ninth Circuit applied the longstanding rule that prevents police from using administrative search

23   warrants for criminal-law purposes.  *See id.* at 1360–61; *see also Ashcroft v. Al-Kidd*, 563 U.S.

24   731, 736–37 (2011) (reviewing rule that "Fourth Amendment reasonableness is predominantly an

25   objective inquiry" except when it comes to "administrative-search cases," where the officers'

26

27   home.  Because the Supreme Court vacated the Circuit's order, that order is non-precedential in
     total.  *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991).  It remains at most

28   persuasive.  *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1175–76 (9th Cir. 2005).

1   purpose "is not to attend to . . . the investigation for which the administrative inspection is

2   justified" (citations and quotation marks omitted)).  Here, by contrast, the purported search was

3   not of a home, but of an open field.  "The Government's physical intrusion on such an area . . . is

4   of no Fourth Amendment significance."  *Jones*, 132 S. Ct. at 953.  Moreover, Simmons and

5   Gregory did not use an administrative-law search for criminal-law purposes.

6   Third, the Hardestys cite *United States v. Dunn*, *supra*, 480 U.S. 294, for the

7   Supreme Court's discussion of a home's curtilage, "the area immediately surrounding a dwelling

8   house," which the Fourth Amendment protects from unreasonable searches and seizures.  *Id.*

9   at 300.  The Hardestys maintained no home on the Schneiders' ranch, and the Supreme Court has

10  not decided whether and how its decisions addressing the curtilage of a home may be applied to a

11  business.  *See, e.g.*, *United States v. Dow Chemical*, 476 U.S. 227, 239 n.7 (1986).  But the Court

12  has confirmed that "[p]lainly a business establishment or commercial or industrial facility enjoys

13  certain protections under the Fourth Amendment."  *Id.* at 235; *see also Marshall v. Barlow's, Inc.*,

14  436 U.S. 307, 312 (1978) ("[I]t is untenable that the ban on warrantless searches was not intended

15  to shield places of business as well as of residence."); *See v. City of Seattle*, 387 U.S. 541, 543

16  (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about

17  his business free from unreasonable official entries upon his private commercial property.").  And

18  a number of district and appellate decisions have found the areas immediately surrounding a

19  commercial or industrial facility receive some Fourth Amendment protection.  *See, e.g.*, *United*

20  *States v. Elkins*, 300 F.3d 638, 654 (6th Cir. 2002) ("There may be circumstances in which the

21  area adjoining a business structure is sufficiently private to enjoy a protection analogous to a

22  home's curtilage."); *United States v. Swart*, 679 F.2d 698, 702 (7th Cir. 1982) (adopting the

23  possibility a search took place "within the curtilage of the [defendant's] business buildings");

24  *Pearl Meadows Mushroom Farm, Inc. v. Nelson*, 723 F. Supp. 432, 440 (N.D. Cal. 1989)

25  ("[U]nder existing law, commercial curtilage is subject to the Fourth Amendment.").

26  If the traditional rules of curtilage could be extended to commercial and industrial

27  buildings, this is not the case for extension.  Four factors define the extent of a home's curtilage:

28  "the proximity of the area claimed to be curtilage to the home, whether the area is included within

1    an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps

2    taken by the resident to protect the area from observation by people passing by." *Dunn*, 476 U.S.

3    at 301.  Here, the evidence does not suggest Simmons and Gregory inspected any area near a

4    building.  They did not enter any buildings or any enclosure surrounding a building.  They

5    encountered no locked gates, and nothing suggested to them that the fields and gullies on the

6    Mine were private.  There is no evidence HSG used security cameras, guards, check stations, or

7    similar countermeasures to ward off intruders.  *Cf. Dow Chemical*, 476 U.S. at 241 (describing

8    Dow's "elaborate" security measures).  Simmons and Gregory drove onto the Mine on an open

9    road.  Considering that a person's "expectation of privacy in commercial premises . . . is different

10   from, and indeed less than, a similar expectation in an individual's home," *New York v. Burger*,

11   482 U.S. 691, 700 (1987), this evidence cannot support a finding that the inspection encroached

12   on any "industrial curtilage."

13            Gregory's motion for summary judgment is granted as to the Hardestys' Fourth

14   Amendment claim.

15   VIII.   EQUAL PROTECTION

16            The Hardestys and Schneiders allege the defendants deprived them of their right to

17   equal protection under the Fourteenth Amendment.  They contend the defendants singled them

18   out arbitrarily for more vigorous enforcement in an effort to drive the Mine out of business.  They

19   assert multiple claims analyzed below, following an introductory discussion of the nature of claim

20   asserted.

21            A.    Class-of-One Claim

22            The Equal Protection Clause can support the type of claim plaintiffs bring,

23   commonly referred to as a "class-of-one" claim.  *See, e.g.*, *Engquist v. Or. Dep't of Agr.*, 553 U.S.

24   591, 601–02 (2008).  A plaintiff can succeed in a class-of-one claim if she shows the defendants

25   intentionally and arbitrarily treated her differently than they treated others who were in the same

26   situation.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  In other

27   words, a class-of-one claim has three elements: the defendant acted intentionally, treated the

28   plaintiff differently than other similarly situated persons, and did so without a rational basis.

1    *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011).  Here, the first element, an

2    intentional act, is not in dispute.  The parties agree the defendants acted intentionally.  This leaves

3    the second and third elements.

4              As for the second element, the plaintiffs must show the defendants treated them

5    differently than other similarly situated persons.  *Willowbrook*, 528 U.S. at 564.  In this context,

6    "similarly situated" means that in all relevant respects, the comparators are "alike," *Nordlinger v.*

7    *Hahn*, 505 U.S. 1, 10 (1992), "arguably indistinguishable," *Ross v. Moffitt*, 417 U.S. 600, 609

8    (1974), or "identical," *Chico Scrap Metal, Inc. v. Raphael*, 830 F. Supp. 2d 966, 975 (E.D. Cal.

9    2011), *aff'd and remanded on unrelated question sub nom. Chico Scrap Metal, Inc. v. Robinson*,

10   560 F. App'x 650 (9th Cir. 2014).  In the land-use context, the First Circuit has found this to be a

11   "very significant burden," one to be enforced "with particular rigor."  *Cordi-Allen v. Conlon*, 494

12   F.3d 245, 251 (1st Cir. 2007) (quoting *Discovery House, Inc. v. Consol. City of Indianapolis*, 319

13   F.3d 277, 283 (7th Cir. 2003)).  Likewise the Second Circuit has described the plaintiffs'

14   "stringent" burden to "show an extremely high degree of similarity between themselves and the

15   persons to whom they compare themselves."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d

16   Cir. 2006).

17             As for the third element, if the plaintiffs show the defendants treated them

18   differently than others in the same situation, they must prove the defendants had no legitimate

19   reason to make this distinction.  *Willowbrook*, 528 U.S. at 564; *Gerhart*, 637 F.3d at 1023.  The

20   question is not whether the defendants' actions were themselves rational, but whether the

21   defendants had a valid reason to single the plaintiffs out.  *Gerhard*, 637 F.3d at 1023.  A

22   distinction is permissible if it "bears a rational relation to a legitimate state interest."  *Squaw*

23   *Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (citation and quotation marks

24   omitted), *overruled in part on other grounds*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 532

25   (2005).  The government does not necessarily act irrationally if it selectively enforces valid laws.

26   *Id.*  Some other evidence of the defendants' malice, arbitrariness, or irrationality is essential.  *See,*

27   *e.g.*, *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir. 2006); *Squaw Valley*,

28   375 F.3d at 944.

1          If a defendant offers a rational explanation for the distinctions, the case may

2   nevertheless go to trial to resolve factual disputes about whether that explanation is objectively

3   false or pretext for an underlying impermissible motive.  *See, e.g.*, *Valley Outdoor*, 446 F.3d at

4   955; *Squaw Valley*, 375 F.3d at 945–46.  For example, in *Valley Outdoor*, the plaintiffs offered

5   evidence that could have shown the government denied a permit application out of spite.  *See*

6   446 F.3d at 955.  And in *Squaw Valley*, the plaintiff cited evidence suggesting the defendants'

7   enforcement actions were motivated by personal animosity.  *See* 375 F.3d at 946–47.

8          The Hardestys argue incorrectly that a plaintiff is excused of her burden to show

9   the defendants treated her differently if she produces evidence of their false or pretextual

10  explanations.  *See, e.g.*, Hardesty Opp'n County Mot. Pt. A at 11.  The kernel of equal protection

11  is a comparative test: did the government discriminate?  *See, e.g.*, *Willowbrook*, 528 U.S. at 564

12  ("[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every

13  person within the State's jurisdiction against intentional and arbitrary discrimination . . . ."

14  (citation, alterations, and quotation marks omitted)).  Or in other words, "'[d]ue process'

15  emphasizes fairness between the State and the individual dealing with the State, regardless of how

16  other individuals in the same situation may be treated, [whereas] '[e]qual protection,' . . .

17  emphasizes disparity in treatment by a State between classes of individuals whose situations are

18  arguably indistinguishable."  *Ross*, 417 U.S. at 609.

19         Without exception, the Ninth Circuit and Supreme Court have required class-of-

20  one plaintiffs to show they were treated differently than others who were similarly situated.  *See,*

21  *e.g.*, *Engquist*, 553 U.S. at 601 (the Equal Protection clause "ensure[s] that all persons subject to

22  legislation or regulation are indeed being 'treated alike, under like circumstances and

23  conditions.'"); *Willowbrook*, 528 U.S. at 564 (a class-of-one claim must rest on the plaintiff's

24  allegation "that she has been intentionally treated differently from others similarly situated and

25  that there is no rational basis for the difference in treatment"); *Teixeira v. Cty. of Alameda*, __

26  F. 3d __, 2016 WL 2849245, at *4 (9th Cir. May 16, 2016) (same); *Gerhart*, 637 F.3d at 1022

27  (same); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (same); *Valley*

28  *Outdoor*, 446 F.3d at 955 (referring to "differential treatment"); *Squaw Valley*, 375 F.3d at 944

1    ("[A]ll persons similarly situated should be treated alike." (citation and quotation marks

2    omitted)).

3            To support their position on the question of similarly situated persons, the

4    Hardestys rely on *Squaw Valley Development Co. v. Goldberg*. *See* Hardesty Opp'n Sherry Mot.

5    at 11 (citing 375 F.3d at 944).  But in *Squaw Valley*, the defendants conceded they had "afforded

6    [the plaintiff] more oversight" and imposed "more formal regulatory and enforcement action" as

7    compared to similarly situated persons.  375 F.3d at 944.  The passages the Hardestys cite to

8    support their argument appear in the *Squaw Valley* court's discussion of the defendants' reasons

9    for singling the plaintiff out, not whether similarly situated persons could be found.  *See id.* at

10   944–45 (concluding the defendants had "articulated a rational reason for their actions").  The

11   Ninth Circuit discussed comparisons with other persons only to show why it believed the

12   defendants' explanation was rational: the comparators the plaintiff proposed were not similarly

13   situated.  *See, e.g.*, *id.* at 945 ("[T]he record does support that [the defendant] imposed harsher

14   penalties on [the plaintiff] . . . .  However, again, [the plaintiff] has simply not provided evidence

15   that these dischargers are similarly situated.").

16           The court does not read the Ninth Circuit's recent decision in *Erickson v. County

17   of Nevada* ex rel. *Board of Supervisors*, 607 F. App'x 711 (9th Cir. 2015), to conflict with *Squaw

18   Valley* in this respect.  The *Erickson* court's brief citation of *Squaw Valley* is best understood as

19   an analogy, as it is preceded by a "see also" signal and follows a citation to the Supreme Court's

20   decision in *Engquist*.  *See id.* at 712.  In any event, *Erickson's* unpublished interpretation of

21   *Squaw Valley* is not binding on this court, *see* Ninth Circuit Rule 36-3, and neither the *Erickson*

22   nor *Squaw Valley* panels could have overruled the Supreme Court's and Ninth Circuit's many

23   decisions that require a showing of similarity in any class-of-one claim.

24           With these rules in mind, the court now considers the specifics of the Hardestys'

25   and Schneiders' equal protection claims.

26   /////

27   /////

28   /////

36

       B.       The Hardestys' Second Claim Against O'Bryant, Norris, and Testa

       The Hardestys allege defendants O'Bryant, Norris, and Testa subjected the Mine to unusually harsh enforcement with respect to the AB 3098 list. *See* Hardesty Compl. ¶¶ 120–21.

       1.       Denial of Appeal and Selective Provision of Guidance

       First, the Hardestys allege they were selectively denied any appeal of OMR's decision to remove HSG from the AB 3098 list. But they have produced no evidence to show any other mine operator was allowed an appeal. This claim therefore cannot support their case. Similarly, the Hardestys argue OMR denied them an explanation of how they could be reinstated on the AB 3098 list, whereas it gave those instructions to another mining operation. Hardesty Opp'n State Defs.' Mot. at 48–49. But the Hardestys rely only on the unverified complaint to support this allegation. *See id.* at 48 (citing Hardesty Compl. ¶ 124). Allegations do not suffice in response to a motion for summary judgment. *See, e.g.*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

       2.       Norris and the Truck

       Second, the Hardestys allege OMR singled them out for unusually harsh enforcement when one of its staff, Gay Norris, followed a truck that left the Mine, then told a customer not to buy HSG's products.

       Norris participated in OMR's December 2008 inspection of the Mine. Norris Decl. ¶ 2, ECF No. 222-20. During the inspection, she saw loaded trucks leaving the Mine. *Id.* After the inspection, she checked OMR's records and found the Mine was not on the AB 3098 list. *Id.* ¶ 3. At O'Bryant's suggestion, she decided to follow a loaded truck as it left the Mine. Norris Dep. 101–02 & Ex. 97; Hardesty UMF no. 68; O'Bryant Decl. ¶ 26. Following trucks to delivery sites was one way the DOC enforced the AB 3098 list and SMARA. O'Bryant Decl. ¶ 26.

       The next month, Norris and another OMR staffer followed a truck as it left the Mine. JSUF no. 36. The truck stopped near a construction site. JSUF no. 37. Norris pulled alongside the truck and approached the driver. *Id.* She identified herself and asked the driver

1    where he was coming from and if the construction site was his delivery stop.  JSUF no. 38.  He

2    said he was coming from the Mine and that his destination was the construction site across the

3    street.  JSUF no. 39.  Norris went to the nearby construction office and spoke with a

4    representative of the construction project.  JSUF nos. 40, 41.  Norris learned the project was for

5    the East Bay Municipal Utility District (EBMUD), a California local government agency.  JSUF

6    nos. 42, 43.  Norris told the representative that HSG was not on the AB 3098 list and that

7    EBMUD should not buy gravel from HSG.  JSUF no. 44.

8            Norris's involvement in this case ended soon after she followed the truck.  JSUF

9    no. 53.  Although HSG was later temporarily reinstated on the AB 3098 List, Norris did not

10   inform EBMUD of this fact.  Norris Dep. 150–53.  That was just "not something [OMR] would

11   do."  *Id.* at 153.

12           This record could not allow a jury to find OMR's truck-following tactics were

13   unusual or arbitrary.  Following trucks to delivery sites was one way DOC enforced the AB 3098

14   list and SMARA; it had used the same tactic in the past.  O'Bryant Decl. ¶ 26.  More specifically,

15   aside from HSG, only two active California mining operations were not on the AB 3098 list: an

16   unidentified mining operation in Riverside County, and the Pacific Rock Mine in Ventura

17   County.  *See* JSUF nos. 55, 56.  Nothing suggests OMR treated these mines any differently than

18   HSG.  Norris also warned a state agency not to purchase materials from the unidentified

19   Riverside County operation.  JSUF no. 55.  When Norris learned the Pacific Rock Mine was not

20   on the AB 3098 list, she tried to follow its delivery trucks, but was unsuccessful.  JSUF no. 56;

21   Norris Dep. 136–37.[17]

22              3.      Removal from the AB 3098 List Without Notice

23           Lastly, the Hardestys allege OMR selectively denied them any notice before

24   removing HSG from the AB 3098 list.  It is undisputed both that OMR removed HSG from the

25   list without notice and that the removal was intentional.  The Hardestys must therefore show they

26

27   _____
          [17] The parties also refer to the Horseshoe Mine, but it is unclear what OMR did or did not
28   do about the Horseshoe Mine and whether the Horseshoe Mine is comparable to HSG.  *See*
     Hardesty Compl. ¶ 65; State Defs.' Mot. at 48; Norris Decl. ¶¶ 6–7.

1    were treated differently than other similarly situated persons.  They propose to compare HSG to

2    all California surface mining operations that were "at risk of being removed from the AB 3098

3    list by OMR."  Opp'n State Defs.' Mot. at 42.  The court agrees that for all relevant purposes,

4    another surface mining operation would be in an identical situation if (1) it was active, (2) in

5    OMR's view, it did not meet the listing requirements, and (3) OMR was considering whether to

6    remove the mine operator from the list.  The Hardestys bear the burden to point to evidence that

7    would allow a trier of fact to find OMR treated a surface mining operation in this situation

8    differently than it treated HSG.

9            OMR ordinarily gave thirty days' notice before removing a mining operation from

10   the AB 3098 list.  *See, e.g.*, O'Bryant Decl. ¶ 14.  As a matter of discretion, OMR also

11   occasionally gave a mine operator more than thirty days' notice.[18]  *See id.* ¶ 15; Koehler Decl.

12   ¶ 14, ECF No. 222-21; *see also* O'Bryant Dep. Ex. 356 (letter notifying the County of

13   Sacramento several mine operators were at risk to be removed from the AB 3098 list also sent to

14   those mine operators).  But HSG was removed from the list without prior notice.  A jury could

15   credit this evidence and find HSG was treated differently than comparable mining operations.

16   The focus therefore shifts to the defendants' explanation for their decision to treat HSG

17   differently.

18           The defendants cite evidence showing that if OMR believed a mine operator

19   would not or could not fix a problem, the operator was sometimes removed from the list without

20   notice.  O'Bryant Decl. ¶ 14.  This appears to have been the case with the Pacific Rock and Truck

21   Village Quarry mines, *see id.* ¶ 20; *id.* Ex. H, ECF No. 223-1; *id.* Ex. I, ECF No. 223-2, but not

22   the Lehigh Southwest Cement Company, *see, e.g.*, Pompy Decl. ¶¶ 5–9, ECF No. 222-27.  As for

23   HSG, defendant O'Bryant explains that he believed, after speaking to his staff, that Hardesty and

24

---

25           [18] Some courts have concluded that after the Supreme Court's decision in *Engquist*, any
     discretionary decision is incompatible with liability under a class-of-one theory.  *See, e.g.*,
26   *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013) (acknowledging this
     uncertainty); *Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 799 (8th Cir. 2009) (relying
27   on *Engquist* to conclude that a police officer's discretionary decisions are incompatible with a
     class-of-one claim).  Absent a binding decision from the Ninth Circuit or Supreme Court, this
28   court declines to grant summary judgment on this basis.

1    Schneider had no desire to correct problems that would require the Mine to be removed from the

2    AB 3098 list.  O'Bryant Decl. ¶ 16.  O'Bryant also believed the Mine would need far more than

3    thirty days to correct these problems.  *Id.* ¶ 17.  If, from OMR's perspective, HSG was unlikely to

4    comply and unlikely to correct problems within thirty days, removing the Mine without advance

5    notice would save time and effort and might spur the Mine into action.  This is a rational

6    explanation for treating the Mine differently.

7           The Hardestys contend this facially rational explanation hides an improper goal:

8    the defendants' desire to put HSG out of business at the behest of legislators and competitors.

9    Their presentation of evidence in support of this contention is haphazard at best.  The Hardestys

10   have filed a separate statement of 407 allegedly disputed facts.  *See* Hardesty Stmt., ECF No. 246.

11   Many include citations to page "????" of a deposition or section "???" of the Public Resources

12   Code.  *See id.* nos. 74, 170, 177, 199, 205, 206, 213.  Some documents are cited with cryptic

13   abbreviations.  *See, e.g.*, *id.* nos. 163, 164 (citing "KH Declaration").  Others are not facts, but

14   opinions or commentaries on the evidence.  *See, e.g.*, *id.* no. 214.  Many are not cited in the

15   Hardestys' briefs.  And attached to their separate statement are 129 exhibits.  Most are a

16   collection of letters, emails, memos, diagrams, or reports, which the Hardestys present without

17   explanation, authentication, foundation, or context.

18          Summary judgment is not a "disfavored procedural shortcut," but "an integral part

19   of the Federal Rules as a whole" that allows defendants to avoid wasteful trials by proving a

20   plaintiff's claims "have no factual basis."  *Celotex*, 477 U.S. at 327.  For this reason, when a

21   defendant moves for summary judgment and carries its initial burden to "inform the court of the

22   basis for its motion," the plaintiff must "designate specific facts showing that there is a genuine

23   issue for trial."  *Id.* at 324 (quotation marks omitted).  The Local Rules of this district require

24   citations to "particular portions" of the record to support the non-moving party's case.  E.D. Cal.

25   L.R. 260(b).  Separate statements of disputed facts must be both "concise" and supported by "all

26   evidentiary documents."  *Id.*  The court has no duty to "comb the record to find some reason to

27   deny a motion for summary judgment."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029

28   (9th Cir. 2001) (citation and quotation marks omitted).  "If a district court must examine reams or

40

1   file cabinets full of paper looking for genuine issues of fact, as though the judge were the adverse

2   party's lawyer, an enormous amount of time is taken away from other litigants."  *Id.*  Of course

3   some cases, like this one, call for the evaluation of decades and reams of documentary evidence.

4   But even in a complicated case, and especially in a complicated case, litigants must cite particular

5   portions of the record and explain those citations.

6          Moreover, evidence must be "presented in a form that would be admissible in

7   evidence."  Fed. R. Civ. P. 56(c)(2).  This Rule does not require a party who opposes summary

8   judgment to present its evidence in strict adherence with the Federal Rules of Evidence.  *See*

9   *Celotex*, 477 U.S. at 324; *Fraser*, 342 F.3d at 1037.  But a party presenting a document to the

10  court must convey it can satisfy basic foundational precursors:  Where did it come from?  When

11  was it created?  Who created it?  What does it mean?.

12          By presenting the Hardestys' evidence in the form before the court, counsel runs a

13  great risk that the court will be unable to verify his clients' interpretation of the facts.  In an effort

14  to resolve the pending motions on their merits rather than counsel's organizational shortcomings,

15  the court has reviewed the documents cited in the Hardestys' briefing to determine whether the

16  information in those documents could be presented in an admissible form at trial.  At the same

17  time, the court has taken pains to avoid doing counsel's job for them.  The documents the

18  Hardestys cite are as follows:

19          (*a*) As summarized above, *see supra* section III.E.2, page 13–14, on October 3,

20  2008, Senator Cox sent a letter to the Secretary of the Resources Agency.  Hardesty Stmt. Ex. 1,

21  ECF No. 248-1.  He expressed concern that HSG had secured a competitive advantage by flouting

22  federal, state, and local regulations.  *Id.*  This letter could be introduced in some form at trial.

23          (*b*) October 2008 emails between staff at the Resources Agency and DOC suggest

24  Senator Cox's letter motivated the agencies to move quickly.  *See* Hardesty Stmt. Ex. 72, at 2,

25  ECF No. 248-11 ("Given that Senator Cox is aware of, and has written to Sec. Chrisman, about

26  this issue, I (and the Secretary) want it resolved one way or another as quickly as possible.").  The

27  same email exchange suggests the agencies understood the investigation was more than "just a

28  question about compliance with the law," but rather "competitive advantage."  *Id.*  It appears

1    these emails could also be presented in admissible form, for example through the testimony of the

2    sender or receiver.

3           (*c*) Diane Anderson, who previously represented the Hardestys in this action, ECF

4    No. 72, submitted a declaration in support of the Hardestys' current opposition.  ECF No. 227.

5    She would testify at trial that in February 2009, she exchanged emails and spoke on the phone

6    with another attorney named John Williams.  *Id.* ¶¶ 3–4.  Williams suggested he was working

7    with one of HSG's competitors to convince state and federal regulators to begin enforcement

8    actions against the Mine.  *Id.* ¶ 4.  Anderson believes Williams contacted her under the mistaken

9    impression that she was "against" Hardesty.  *Id.* ¶ 5.  Anderson attached a string of emails she

10   received from Williams that explained his plan.  *Id.* Ex. 1.  "Plan A" was to convince state

11   regulators to revoke a permit they had granted HSG to use portable equipment on the Mine.  *Id.*

12   Ex. 1, at 3–4.  "Plan B" was to convince Sacramento County to revisit its decision to recognize a

13   vested right to mine.  *See id.* Ex. 1, at 4–5.  Williams also forwarded Anderson correspondence he

14   had sent to the U.S. Fish and Wildlife Service in 2007, which encouraged an investigation of

15   HSG and the Mine.  *See id.* Ex. 1, at 6–7; *see also* Hardesty Stmt. Ex. 17, at 1, ECF No. 248-3

16   (Mar. 7, 2007 letter from John Lane of Teichert Aggregates to Justin Cutler of the U.S. Fish &

17   Wildlife Service); *id.* Ex. 17, at 2 (internal Fish & Wildlife emails about a possible investigation

18   at the Mine in response to the letter); *id.* Ex. 17, at 3–4 (November 2007 emails between Lane and

19   Michael Finan of the U.S. Army Corps of Engineers encouraging an investigation of HSG and the

20   Mine).  Ms. Anderson's declaration lays an adequate foundation for this evidence, at least for the

21   court's consideration at this stage.

22          (*d*) A document titled "Strategy Matrix: Hardesty Sand and Gravel" includes a

23   table with rows for several state and federal regulatory agencies, including the U.S.

24   Environmental Protection Agency, the U.S. Army Corps of Engineers, the U.S. Fish & Wildlife

25   Service, OMR, the Flood Board, DFG, and Sacramento County.  *See generally* Hardesty Stmt.

26   Ex. 19, ECF No. 248-3.  One column is titled "Teichert Strategy & Updates" and contains

27   bulleted lists of past and future planned events or actions for each agency.  *See generally id.*  For

28   example, in the row for the OMR, the table includes the entries "Met w/DOC Chief Deputy

42

1    Director 3/30," "Met w/ Sen. Dave Cox's office," "Met w/Dennis O'Bryant and staff on Aug. 31,

2    2010," "OMR conducted investigation in 2009 of area near Cosumnes River," and the table notes

3    O'Bryant and Norris are named in this lawsuit.  *See id.* at 5–6.  The table is dated October 28,

4    2010.  *See generally id.*  The table is marked as Exhibit 281 to the deposition of Curt Taras.  *See*

5    *id.* at 1.  The Hardestys have not cited pages of Taras's deposition or other evidence to explain

6    who created or maintained the table or what its entries mean.  The court therefore does not

7    consider this document.

8             (*e*) A memo titled "Talking Points/Script" and "Meeting with Senator Dave Cox

9    May 4, 2010" including a bulleted paragraph that reads, "After significant pressure from

10   Teichert/others, the following agencies are conducting their own individual investigations," and

11   lists OMR, among other federal and state agencies.  Hardesty Stmt. Ex. 20, ECF no. 248-3.  The

12   memo suggests the Senator could help by arranging meetings, sending letters to the Attorney

13   General, and calling the heads of state agencies.  *Id.*  The memo is marked as Exhibit 358 to the

14   deposition of Dennis O'Bryant.  *See id.* at 1.  But the Hardestys have not cited to it or other

15   evidence to explain who created the memo, when, or why, or to explain its contents.  The court

16   therefore does not consider it.

17            (*f*) In an August 2010 email, Kate Wheatley of Taylor & Wiley, writing "[o]n

18   behalf of Teichert Aggregates," sent O'Bryant a request for a meeting "to discuss the County of

19   Sacramento's enforcement action for the Hardesty Sand & Gravel (Schneider Historic Mine)."

20   Hardesty Stmt. Ex. 60, ECF No. 248-10.  O'Bryant replied and confirmed a meeting date later

21   that month in his office.  *Id.*  It appears the Hardestys could likely lay a foundation for this

22   email's admission in some form at trial, although it is unclear whether a meeting actually went

23   forward as planned.  *See* O'Bryant Dep. 195–97.

24            (*g*) An undated memo lists names and contact information for officers in a number

25   of federal and California state agencies.  Hardesty Stmt. Ex. 18, ECF No. 248-3.  The memo

26   notes, "Highlighted names are those we've met with."  *Id.* at 1.  It includes Brett Koehler and Ken

27   Trott at the OMR, whose names are highlighted  *Id.* at 2.  In addition, two business cards are

28   copied on the first page: Brian Lungren of Platinum Advisors, and Kate Wheatley of Taylor &

                                                    43

1    Wiley.  *Id.*  Mr. Hardesty understands Brian Lungren is the brother of former Congressman Dan

2    Lungren and that Teichert hired Brian Lungren to advocate on its behalf.  Hardesty Decl. ¶ 39,

3    ECF No. 247.  The memo is marked as Exhibit 77 to the Lucero deposition.  *See id.* at 1.  But the

4    Hardestys have cited no part of that deposition or other evidence to explain who created the

5    memo, when, or why, or to explain its contents.  The court therefore does not consider this

6    document.

7            (*h*) Another of the Hardestys' former attorneys, Scott Morris, wrote to Kenneth

8    Trott in October 2009 to explain the Hardestys' belief that OMR was participating in a politically

9    motivated scheme to drive HSG out of business.  Hardesty Stmt. Ex. 62, ECF No. 248-11[19]; *see*

10   *also* Hardesty Decl. ¶ 40 (expressing the same belief).  Zachary Simmons of the Army Corps of

11   Engineers also appears to have believed that HSG did not present any regulatory concern, unlike

12   other mining operators who had complained about HSG's operations.  *See* Hardesty Stmt. Ex. 52,

13   ECF No. 248-10.  This evidence could be introduced in some form at trial.

14           (*i*) The Hardestys filed copies of publicly available records that suggest (i) several

15   times between 2003 and 2012, former Supervisor Roger Dickinson received campaign

16   contributions from Taylor & Wiley, the law firm they allege represented Teichert, *see* Hill Decl.,

17   ECF No. 230; *id.* Ex. 1; (ii) former Senator David Cox received campaign contributions from

18   Taylor & Wiley in 2001, 2002, 2003, 2007, and 2008, *id.*; (iii) Dickinson  received campaign

19   contributions from "A. Teichert & Sons, Inc." between 2001 and 2014, *id.* Ex. 2; (iv) Dan

20   Lungren received campaign contributions from James Wiley, John Taylor, and Suzanne Taylor

21   between 2006 and 2012, *id.* Exs. 3–4, 6; and (v) Dan Lungren received campaign contributions

22   from "Judson T. Riggs" of "Teichert" between 2004 and 2012, *id.* Ex. 5.  This evidence is

23   presented largely in compliance with Rule 56.

24           In addition to this evidence of alleged pretext, as noted above, a trial may be

25   necessary for a second reason: if the evidence could show the defendants' rational explanation

26   /////

27   _____

     [19] The Hardestys also cite Morris's deposition, and say he made the same observation, but
28   do not refer to a specific page.  *See* Hardesty Stmt. no. 213, ECF No. 246.

1   itself was false. *Squaw Valley*, 375 F.3d at 945–46.  Aside from the evidence of pretext reviewed

2   above, the Hardestys also argue the factual foundation of OMR's decision is in dispute.

3          OMR explains its decision not to give the Hardestys and Schneiders notice before

4   taking HSG off the AB 3098 list by citing the report of its December 2008 inspection. *See*

5   O'Bryant Decl. ¶ 5; *id.* Ex. A, ECF No. 222-26.  As a result of that inspection, OMR determined

6   (i) the pits just south of the Cosumnes River were larger, deeper, and more steeply sloped than

7   reported or permitted by the Mine's reclamation plan; (ii) the pits' depth had caused groundwater

8   to seep into them, which in turn undermined the integrity of the pits' walls and increased the

9   possibility the river might flow into the pits; and (iii) the Mine's FAM was inadequate because it

10  was prepared without knowledge of the pits' actual size. *See* Koehler Decl. ¶ 7, ECF No. 222-21;

11  *id.* Ex. A, ¶¶ 2.2–2.5, 3.1, ECF No. 222-22.  OMR geologists are prepared to testify about these

12  conclusions and their reasoning. *See generally id.*; Wesling Decl., ECF No. 222-5.

13         To contest these findings, the Hardestys point out that their former attorney, Scott

14  Morris, concluded that OMR's theory of pit capture was not viable.  Morris is an engineer and

15  formerly worked for the Army Corps of Engineers.  Morris Dep. 11.  As part of his

16  responsibilities, he worked to repair levees in the Sacramento area after they were damaged in a

17  1986 flood. *Id.* at 11–12.  He also helped write and obtain approval of SMARA reclamation

18  plans in Stanislaus, Merced, and Tuolomne Counties. *Id.* at 12–13.  Morris believes OMR

19  misclassified riverbanks as levees, falsified inspection reports, misused the SMARA process, and

20  invented its theory of pit capture or flood danger. *See id.* at 49–52.  In his opinion, the earthen

21  wall between the pits at the Mine and the Cosumnes River were thicker and more stable than most

22  levees in Sacramento. *See id.* at 98.

23         The Hardestys also rely on the opinion of engineer Don Olsen.  Olsen is a

24  Principal at Holdrege & Kull, an engineering consulting firm that has provided services to HSG

25  and the Mine.  Olsen reviewed documents, reports, topographical maps, and photographs,

26  interviewed engineers and others who knew about the Mine, visited the Mine, and drew on his

27  personal knowledge to conclude the pits were never in danger of being captured. *See* Olsen Rep.

28  at OLS 02, ECF No. 202.

In sum, before 2008, OMR and other state regulatory agencies made only sporadic attempts to require HSG and the Mine to comply with SMARA's provisions. OMR was not particularly concerned with HSG's operations. It seemed satisfied HSG was operating the Mine under a vested right and an approved reclamation plan. Then, after HSG's operations expanded significantly, competitors voiced concerns to legislators and regulators, who contacted several federal and state agencies. OMR abruptly began a series of inspections and enforcement actions. It moved more quickly than it would have if no legislator or competitor were involved. OMR decided to remove HSG from the AB 3098 list without notice, which was out of the ordinary, on the basis of its belief that the Schneiders and Hardestys would not fix problems at the Mine site. OMR also believed that even if the Schneiders and Hardestys did move quickly to address its concerns, they would need more than the thirty-day notice period to do so. But two experienced engineers believe OMR's conclusions were faulty.

On this record, a jury could find that OMR's enforcement decisions were a legitimate attempt to enforce the law in response to complaints. A regulator cannot always be said to have acted on improper motives by responding to complaints from legislators and voters. *Cf., e.g.*, *U.S.* ex rel., *Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1146 (9th Cir. 1998) ("[C]itizens are entitled to advocate the passage or enforcement of laws and members of Congress may seek to influence agency action."); *accord Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961); *Radio Ass'n on Defending Airwave Rights, Inc. v. United States Dep't of Transp.*, 47 F.3d 794, 808 (6th Cir. 1995); *Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C. Cir. 1981). A jury could also find HSG was operating outside its reclamation plan and was unable or unwilling to fix problems within the OMR's standard thirty-day notice period. But on the other hand, a jury could find that OMR's decision to treat HSG differently was motivated by politics, not reason, and that OMR intended its investigation to harm the Hardestys' business, not to remedy violations of SMARA. Because both conclusions are reasonable interpretations of this record, the motion for summary judgment cannot be granted on the basis of the state defendants' explanation for their decision to remove HSG from the 3098 list.

1    That said, no evidence connects defendant Testa to OMR's decision to remove

2   HSG from the AB 3098 list.  The same is true of defendant Norris.  The Hardestys' equal

3   protection claims therefore cannot proceed against these two defendants.

4    O'Bryant argues he is protected by his qualified immunity.  At summary

5   judgment, to resolve the question of qualified immunity, courts engage in a two-part inquiry.

6   *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1865 (2014) (per curiam).  A district court may

7   take either of these two parts first, *Pearson v. Callahan*, 555 U.S. 223, 242 (2009), but typically

8   the court first determines whether the facts, viewed in the light most favorable to the party

9   asserting an injury, show the defendant violated one or more of the plaintiffs' federally protected

10   rights.  *Tolan*, 134 U.S. at 1865; *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168

11   (9th Cir. 2013).  The discussion above answers this question in the affirmative: the Hardestys

12   have presented evidence that would allow a rational trier of fact to conclude that O'Bryant

13   arbitrarily removed HSG from the AB 3098 list without notice in violation of the Equal

14   Protection Clause.

15    The second part of the qualified-immunity inquiry tests whether the federal right

16   asserted was "clearly established" at the time of the alleged violation.  *Tolan*, 134 S. Ct. at 1866.

17   That determination hinges on whether the law as it was gave the defendants fair warning that their

18   conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Here, at the time OMR

19   removed HSG from the 3098 list, the Supreme Court had clearly confirmed that the Equal

20   Protection Clause prohibits government officers from intentionally and arbitrarily treating a

21   person differently than others in the same situation.  *See, e.g.*, *Willowbrook*, 528 U.S. at 564.

22   Likewise, it was clearly established that an officer in O'Bryant's situation may face liability if his

23   explanation for this differential treatment is objectively false or is pretext for an impermissible

24   motive, *see, e.g.*, *Valley Outdoor*, 446 F.3d at 955; *Squaw Valley*, 375 F.3d at 945–46, both

25   triable questions in this case.  O'Bryant is not entitled to qualified immunity.

26    4.    Summary

27    In conclusion, the state defendants' motion for summary judgment is granted with

28   respect to the equal protection claims against defendants Norris and Testa.  The motion is also

47

1    granted with respect to the claims (1) that O'Bryant selectively denied the Hardestys an appeal of

2    their removal, (2) that O'Bryant selectively ignored their requests for guidance on reinstatement

3    on the AB 3098 list, and (3) that O'Bryant selectively instructed OMR staff to follow trucks as

4    they left the Mine.  The motion is denied with respect to the claim that O'Bryant selectively

5    denied the Hardestys notice before removing HSG from the AB 3098 list.

6              C.      The Hardestys' Sixth Claim against Sacramento County and Sherry

7              The Hardestys propose three bases for this claim.  First, they argue "Sherry

8    allowed other mines to remain on the AB 3098 list despite outdated and completely misleading

9    FACE amounts, while hounding the Hardestys and raising their FACE amounts by 500% to

10   1000%."  Hardesty Opp'n County Mot. Pt. A at 11 (citing Hardesty Stmt. no. 205).  This

11   argument cannot apply to Sacramento County or Sherry because it is undisputed that state

12   agencies control membership on the AB 3098 list, not Sacramento County or its officers.  *See,*

13   *e.g.*, JSUF no. 54.

14             Second, the Hardestys argue another mine, which they refer to as the Kennefick or

15   Pilliken mine, was allowed to operate during the pendency of its application for a conditional use

16   permit, but they were not allowed to continue operations without a conditional use permit.  *See*

17   Hardesty Opp'n County Mot. Pt. A. at 12 (citing Hardesty Stmt. nos. 399–402).  They cite only

18   Mr. Hardesty's declaration to support this assertion.  *See* Hardesty Stmt. nos. 399–402 (citing

19   Hardesty Decl. ¶¶ 80–83).  Mr. Hardesty's declaration does not establish a foundation for his

20   assertions and does not clarify during what time period the Kennefick mine was allowed to

21   operate.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced

22   sufficient to support a finding that the witness has personal knowledge of the matter.").  Even if

23   his statements were admitted, they would not show HSG and the Kennefick mine were alike in all

24   relevant respects.  For example, it remains uncertain whether the two mines were a similar size,

25   whether they operated over a similar time period, and whether they operated under similar

26   permits.

27             Third, the Hardestys argue other mining operators were allowed to move their

28   processing plants without risking violation of their reclamation plans or permit status.  Hardesty

48

1   Opp'n County Mot. Pt. A at 12.  But they offer no evidence to show where these other mines

2   were located, when processing plants were moved, and how these unnamed mining operations

3   were otherwise similarly situated.

4           The motion for summary judgment is granted with respect to the equal protection

5   claims against Sacramento County and Sherry.

6       D.      The Hardestys' Seventh Claim Against Sacramento County, Storelli, and Moffitt

7           The Hardestys rely on three allegations to support this claim.  First, they allege

8   that "[u]nlike the other similarly-situated mining operators in Sacramento County, the Defendants

9   selected and hired an environmental inspector, Dan [sic] Bieber, to inspect the Plaintiffs' mining

10  operations and prepare a FACE."  Hardesty Compl. ¶ 168.  Second, they allege the defendants

11  substantially increased the amount of their required financial assurances and ordered HSG to halt

12  its operations, but allowed similarly situated competitors to continue operating for decades

13  without posting additional financial assurances.  *Id.* ¶ 169.  And third, they allege the defendants

14  inspected the Mine far more often than other surface mining operations.  *Id.* ¶ 172.

15          The record includes no evidence of another surface mining operation.  Rather, the

16  Hardestys impugn the defendants' failure to offer evidence or assert that other mines were

17  subjected to the same regulatory scrutiny.  *See* Hardesty Opp'n County Mot. Pt. B at 9.  This is

18  not the defendants' burden to carry.  The Hardestys, not the defendants, would be required to

19  prove at trial that HSG was treated differently than other similarly situated mine operators.  *See,*

20  *e.g.*, *Gerhart*, 637 F.3d at 1022.  On summary judgment, the defendants "need only prove that

21  there is an absence of evidence" to support the Hardestys' case.  *In re Oracle*, 627 F.3d at 387.

22  And the Hardestys must respond by "designat[ing] specific facts demonstrating the existence of

23  genuine issues for trial."  *Id.*

24          The Hardestys have not produced the evidence they would use to show a jury that

25  HSG and another competitor are, in all relevant respects, "alike," *Nordlinger*, 505 U.S. at 10,

26  "arguably indistinguishable," *Ross*, 417 U.S. at 609, or "identical," *Chico Scrap Metal*, 830 F.

27  Supp. 2d at 975, as they must in a class-of-one case.  If the jury is to make something of their

28  /////

49

1  case, it needs "grist" for the mill.  *See* Hardesty Opp'n County Mot. Pt. B at 8 (quoting *Cordi-*

2  *Allen*, 494 F.3d at 251).

3         The motion for summary judgment is granted with respect to the equal protection

4  claims against Sacramento County, Storelli, and Moffitt.

5        E.    The Schneiders' Fifth Claim

6         The Schneiders' equal protection claims are a subset of the Hardestys' claims

7  under the same Amendment.  *See* Schneider Compl. ¶¶ 296–302 (alleging the defendants required

8  higher-than-normal financial assurances and conducted an unusually large number of inspections

9  in an effort to drive the Mine out of business).  They offer no evidence in addition to that cited by

10  the Hardestys and in fact rely on the same briefing.  *Compare, e.g.*, Schneiders' Opp'n County

11  Mot. Pt. B, *with* Hardesty Opp'n County Mot. Pt. B.  Because only the claims against O'Bryant

12  will proceed to trial, and the Schneiders assert no claims against him or other OMR staff, the

13  motion for summary judgment is granted for the County defendants as to the Schneiders' equal

14  protection claim.

15  IX.    PROCEDURAL DUE PROCESS

16         The Schneiders and Hardestys claim the defendants deprived them of their

17  property interests in the Mine without due process.  The Due Process Clause prohibits the

18  government from depriving a person of life, liberty, and property rights without first undertaking

19  an adequate process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  A person

20  can therefore succeed in a § 1983 lawsuit against a government actor by showing (1) that she had

21  a liberty or property interest protected by the Constitution, (2) that the defendant deprived her of

22  that interest, and (3) that the process the defendant undertook, if any, was lacking, *see, e.g.*,

23  *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008).

24         First, the Constitution does not create the property interests it protects.

25  *Loudermill*, 470 U.S. at 538.  Those interests "are created and their dimensions are defined by

26  existing rules or understandings that stem from an independent source," for example, California

27  law.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Given a particular interest, "federal

28  constitutional law determines whether that interest rises to the level of a 'legitimate claim of

1  entitlement' protected by the Due Process Clause." *San Bernardino Physicians' Servs. Med. Grp.*

2  *v. Cty. of San Bernardino*, 825 F.2d 1404, 1408–09 (9th Cir. 1987) (quoting *Memphis Light, Gas*

3  *& Water Division v. Craft*, 436 U.S. 1, 9 (1978)).

4         Second, to succeed, the Hardestys and Schneiders must show not only that their

5  rights or interests are protected, but also that the defendants deprived them of those interests or

6  rights. *Shanks*, 540 F.3d at 1090.  If they cannot, then their claims may not proceed. *Guatay*

7  *Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 984 (9th Cir. 2011).

8         And third, the process itself—what "process" is "due" varies from one situation to

9  the next. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  But, generally speaking, "[t]he

10  fundamental requirement of due process is the opportunity to be heard at a meaningful time and

11  in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and quotation

12  marks omitted).  In most circumstances, the Constitution requires a hearing before the

13  government deprives a person of liberty or property. *Zinermon*, 494 U.S. at 127.

14         A.     The Hardestys' Fifth Claim Against Curt Taras

15         The Hardestys allege Curt Taras deprived them of due process "by issuing a cease

16  and desist letter demanding that Hardesty stop all work regulated by the California Water Code

17  and California Code of Regulations at the Mine without any notice, hearing, or opportunity for

18  appeal." Hardesty Compl. ¶ 150.  They allege the cease-and-desist letter prevented Hardesty

19  "from removing aggregate thereby depriving him of a legally cognizable property interest without

20  due process of law." *Id.* ¶ 151.  But the Hardestys have not supported these allegations with

21  evidence.

22         Curt Taras worked at the Flood Board beginning in February 2009.  JSUF no. 17.

23  He participated in an inspection of the Mine in May 2009.  Taras Decl. ¶ 6, ECF No. 222-11.  He

24  took measurements and pictures of the pits near the Cosumnes River. *Id.*  After his inspection, he

25  sent Hardesty and Schneider a letter summarizing his findings: (1) the pits were within a

26  designated floodway; (2) the pits were fifty feet deep and deeper than the surface of the river;

27  (3) water was seeping from the river into the pits; (4) the pits' slopes were steep and had failed in

28  some places; (5) a reservoir had been created illegally; and (6) stockpiles had been placed within

1    the designated floodway.  *Id.* Exs. C, D, at CVFPB 000013, 16, ECF No. 222-13.  The letter

2    directed Hardesty to "cease and desist all work regulated by the California Water Code and

3    California Code of regulations on your property," including "all excavation work, levee

4    alterations, reservoir filing, and dam construction."  *Id.* at CVFPB 000014, 17.

5           Scott Morris, the Hardestys' attorney, remembers receiving Taras's letter and

6    calling the Flood Board to say Mr. Hardesty did not believe the letter was binding.  Morris

7    Dep. 189.  Taras's superior told Morris the Flood Board would not enforce the letter and would

8    visit the Mine.  *Id.*  Taras visited the mine again, at Hardesty's invitation, on June 12, 2009.

9    Taras Decl. ¶ 8.  After the meeting, the Flood Board agreed Hardesty could continue mining, and

10   Hardesty volunteered to complete repairs, restore the terrain, move his stockpiles, and excavate

11   only beyond the regulatory setbacks.  *Id.*  The Mine was free to continue excavations.  Morris

12   Dep. 188–90.  Hardesty completed all the Flood Board's requests, even though he was under no

13   obligation to do so.  *Id.* at 100.

14          Flood Board staff visited the Mine again the next year, and in an April 27, 2011

15   letter, the Flood Board informed Schneider it would not pursue an enforcement action.  Taras

16   Decl. Ex. H, ECF No. 222-13.  Taras left the Flood Board in April 2015, and to his knowledge the

17   Flood Board had not received the information it requested in its previous letter but had not taken

18   any enforcement actions.  Taras Decl. ¶ 16.

19          This evidence cannot show the Hardestys were deprived of any right.  *See, e.g.*,

20   *Guatay*, 670 F.3d at 984 (local government did not deprive plaintiff of any protected property

21   interest by sending notice of violation and cease-and-desist letter because it never brought

22   enforcement action).  In response to Taras's argument that Hardesty was deprived of no right, the

23   Hardestys argue only that the letter forced them "to hire attorneys and pay for additional reports"

24   because "Taras used [the letter] in his appearance at the Schneider appellate hearing on the vested

25   right to mine."  Opp'n State Defs.' Mot. at 55.  They do not cite authority to support this position,

26   and the court has located none.

27          The motion for summary judgment is granted as to this claim.

28   /////

1    B.    The Hardestys' Sixth Claim against the County and Sherry

2          The Hardestys allege the County deprived them of due process by "initiating

3    proceedings to revoke —and revoking—the vested legal non-conforming use on the Mine without

4    providing any notice or a hearing to [them]."  Hardesty Compl. ¶ 157.  Generally speaking, in a

5    case like this, the Due Process Clause requires "notice reasonably calculated, under all

6    circumstances, to apprise interested parties of the pendency of the action and afford them an

7    opportunity to present their objections."  *Gallo v. U.S. Dist. Court For Dist. of Ariz.*, 349 F.3d

8    1169, 1181–82 (9th Cir. 2003) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.

9    306, 314 (1950)).

10         The County advances two arguments in favor of its motion.  First, it argues the

11   Hardestys are collaterally estopped from arguing they were denied due process because the

12   Sacramento County Superior Court already determined they lack a constitutionally protected

13   interest in any vested right.  County Mot. Pt. 2 at 9–11; O'Dea Decl. Ex. E, ECF No. 218-5

14   (transcript of proceedings on Friday, July 20, 2012 in *Hardesty v. Bd. of Supervisors of*

15   *Sacramento Cty.*, No. 34-2012-80001138 (Sacramento Cty. Super. Ct. 2012)).  The Superior

16   Court denied the Hardestys' motion for a preliminary injunction because "there is not a vested

17   property interest to Mr. Hardesty that [was] before [the court] in this lawsuit."  O'Dea Decl. Ex.

18   E, at 18.

19         In federal court, the preclusive effect of a previous state-court determination is

20   governed by that state's rules of preclusion.  *ReadyLink Healthcare, Inc. v. State Comp. Ins.*

21   *Fund*, 754 F.3d 754, 760 (9th Cir. 2014).  Collateral estoppel, or issue preclusion, bars the

22   relitigation of an issue that was argued and decided in prior proceedings.  *Lucido v. Superior*

23   *Court*, 51 Cal. 3d 335, 341 & n.3 (1990) (en banc).  A previous decision has preclusive effect

24   only if (1) the issue was identical to that decided in the previous proceeding; (2) the issue was

25   actually litigated; (3) the issue was necessarily decided; (4) the previous decision was final and on

26   the merits; and (5) the person against whom preclusion is sought was the same person as in the

27   earlier proceeding or is in privity with that person.  *Id.*  The party asserting preclusion bears the

28   burden of establishing each of these elements.  *Id.*

1      Here, the County has not borne its burden to establish the Superior Court's

2  decision was final.  The Superior Court's order denied a motion for a preliminary injunction.  "A

3  preliminary injunction is a *provisional* remedy, and the trial court possesses the inherent power to

4  modify its preliminary injunction which is of a continuing or executory nature."  *Huntingdon Life*

5  *Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1248 (2005)

6  (citation and quotation marks omitted; emphasis in original).  A preliminary injunction is binding

7  only if "it appears the court intended a final adjudication of the issue involved."  *Id.* (citation and

8  quotation marks omitted).  The County has presented no evidence to show the Superior Court

9  intended its decision to finally adjudicate the case.  Because the burden is the County's to bear,

10  the motion cannot be granted on the basis of issue preclusion.

11      The County's second argument concerns the actual notice the Hardestys had of the

12  mid-2010 hearings before the Board of Supervisors.  County Mot. Pt. 2 at 12–14.  It is undisputed

13  the Hardestys received the County's April 2, 2009 letter, which reported the County's finding that

14  the Mine was operating outside the scope of its vested right, *see* O'Dea Decl. Ex. A, ECF

15  No. 218-5.  But no evidence suggests the Hardestys received the County's April 2010 notice of

16  violation.  *See id.* Ex. B, ECF No. 218-5; Schneider Decl. ¶ 3, ECF No. 220-2.  Neither the

17  Hardestys nor their attorney attended the mid-2010 hearings before the Sacramento County Board

18  of Supervisors.  *See* Sacramento Bd. of Supervisors Meeting Tr. at 2 (May 26, 2010), ECF

19  No. 220-3; Sacramento Bd. of Supervisors Meeting Tr. at 2 (July 13, 2010), ECF No. 220-4;

20  Sacramento Bd. of Supervisors Meeting Tr. at 2 (Sept. 14, 2010), ECF No. 220-6; Sacramento

21  Bd. of Supervisors Meeting Tr. at 2 (Sept. 28, 2010), ECF No. 220-7.

22      The court disagrees that the Hardestys' complaint in this case, filed about three

23  weeks before the Board of Supervisors had made a decision on Schneider's appeal, shows the

24  Hardestys had actual notice of the proceedings before the Board of Supervisors and had an

25  opportunity to voice objections in those proceedings.  Although the Hardestys' original complaint

26  describes the pending appeal, *see* Compl. ¶¶ 52–53, the record does not allow the court to say

27  conclusively that the Hardestys knew about the status of the appeal or had a meaningful

28  opportunity to participate.  The County's motion cannot be granted on this basis.

54

1    The motion is denied as to the Hardestys' procedural due process claim against

2 Sacramento County and Sherry.

3    C.    The Schneiders' Claims

4    The Schneiders and the County defendants both move for summary judgment on

5 the Schneiders' claims that they owned a vested right in the Mine and that the County deprived

6 them of this right without due process.  Specifically, the Schneiders challenge the Board of

7 Supervisors' September 2010 decision upholding the County's April 2010 notice of violation.

8    1.    Undisputed Facts

9    On April 2, 2009, the County sent Jay Schneider, Joseph Hardesty, and their

10 attorneys a letter informing them the County had received a complaint challenging their vested

11 rights to mine.  O'Dea Decl. Ex. A, ECF No. 218-5.  After an investigation, the County

12 concluded that HSG's operations had expanded impermissibly since the time land use restrictions

13 were first enacted in 1956.  *Id.* at 1–2.  Therefore the County believed the Mine's operations were

14 not within the scope of the Mine's vested right.  *Id.* at 2.  The Mine's only recourse was "to file

15 for and receive approval of a conditional use permit and rezone."  *Id.*

16    In April 2010, the County sent a notice of violation to Schneider, charging the

17 Mine with violations of the Sacramento Zoning Code.  O'Dea Decl. Ex. B, ECF No. 218-5;

18 Schneider Decl. ¶ 3, ECF No. 220-2.  The letter warned that the County could seek to revoke any

19 applicable permits, declare the Mine a public nuisance, and prosecute in civil or criminal court.

20 *See* O'Dea Decl. Ex. B, at 1–2.  The County allowed Schneider fifteen days to request an

21 opportunity to appear before the County's Board of Supervisors and appeal the County's

22 determination.  O'Dea Decl. Ex. B, at 2.  Schneider appealed and hearings were held on May 26,

23 July 13, and September 14 and 28, 2010.  Gamel Decl. ¶ 19; *see also generally* Schneider Decl.,

24 ECF No. 220-2.  Schneider and his attorney were both present at the hearings, where they offered

25 evidence and made arguments against the County's decision.  *See generally* Sacramento Bd. of

26 Supervisors Meeting Tr. (May 26, July 13, Sept. 14, & Sept. 28, 2010).  On September 28, 2010,

27 the Board of Supervisors upheld the notice of violation and made detailed findings of fact.  *See*

28 Gamel Decl. ¶ 19; Sacramento Bd. of Supervisors Meeting Tr. 30 (Sept. 28, 2010).

1        In May 2011, Schneider filed a petition for a writ of mandate under California

2   Code of Civil Procedure section 1094.5.  *See* Pet. Writ of Mandate, *Schneider v. Bd. of*

3   *Supervisors*, No. 34-2011-80000857 (Sacramento Cty. Super. Ct. filed May 12, 2011).[20]  He

4   raised several claims: (1) the Board of Supervisors had acted in excess of its jurisdiction by

5   revoking their vested right; (2) they were denied a fair trial because they "were not advised of the

6   legal basis or evidence forming the basis of the decision to revoke their vested rights" and the

7   Board "engaged in *ex parte* communications with staff prosecuting the appeal as well as with

8   non-parties relative to the merits of the case," among other reasons; (3) the Board did not follow

9   SMARA's procedural requirements; (4) the Board improperly relied on evidence collected after it

10  determined a violation had occurred; (5) the County had already recognized that Schneider had a

11  vested right to conduct a surface mining operation; (6) the Board unconstitutionally denied them

12  of substantive and procedural due process rights; (7) the Board incorrectly determined they

13  possessed no vested right; (8) the Board made no effort to comply with the California

14  Environmental Quality Act; (9) the Board's decision was an unconstitutional taking; and (10) the

15  Board's decision was a breach of contract.

16       In July of the same year, Schneider moved *ex parte* for a temporary restraining

17  order, and the motion was denied.  *See* Minute Order, *Schneider v. Bd. of Supervisors*, No. 34-

18  2011-80000857 (Sacramento Cty. Super. Ct. filed July 25, 2011).  After the *ex parte* application

19  was denied, Schneider did not pursue the litigation.  *See* Order Vacating Hr'g, *Schneider v. Bd. of*

20  *Supervisors*, No. 34-2011-80000857 (Sacramento Cty. Super. Ct. filed Jan. 11, 2013) (noting

21  Schneider had filed no opening brief and vacating the hearing on their petition).  According to the

22  state court docket, the writ petition remains open.

23              2.      Claim and Issue Preclusion

24       The County first contends the Schneiders' claim is precluded by the results of the

25  proceedings before the Board of Supervisors and Sacramento County Superior Court.

26  /////

27  
28       [20] The court takes judicial notice of this document and the other filings in the same action, as they are public records whose filing can be subject to no dispute.  *See* Fed. R. Evid. 201.

1          Federal courts give preclusive effect to state-court judgments whenever that state's

2    courts would do the same.  28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980).  As

3    summarized above, in California, the doctrine of issue preclusion bars the "relitigation of issues

4    argued and decided in prior proceedings."  *Lucido*, 51 Cal. 3d at 341.  In addition, the doctrine of

5    "[c]laim preclusion prevents relitigation of the same cause of action in a second suit between the

6    same parties or parties in privity with them."  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813,

7    824 (2015).

8          An unreviewed state administrative decision can also preclude later litigation of a

9    repurposed § 1983 claim in federal court.  *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986).  If a

10    state agency, acting in a judicial capacity, resolves disputes of fact or law properly before it, and

11    the parties had an adequate opportunity to litigate those disputes, federal courts give the agency's

12    decision the same preclusive effect the state's courts would recognize.  *Id.*; *see also United States*

13    *v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966); *Avila v. L.A. Police Dep't*, 758

14    F.3d 1096, 1100 (9th Cir. 2014); *Wehrli v. Cty. of Orange*, 175 F.3d 692, 694 (9th Cir. 1999).

15    The idea is to promote comity between federal and state courts and to enforce repose, i.e., to

16    prevent state administrative proceedings from becoming dress rehearsals for follow-on

17    constitutional litigation in federal court.  *See Elliott*, 478 U.S. at 798; *Miller v. Cty. of Santa Cruz*,

18    39 F.3d 1030, 1038 (9th Cir. 1994).

19          The Ninth Circuit's decision in *Miller* illustrates how these rules operate in

20    practice.  In that case, the plaintiff, a former Sheriff's Deputy, had been terminated for allegedly

21    failing to report an overpayment of wages, among other disciplinary violations.  39 F.3d at 1032.

22    He contested the termination before the County's Civil Services Commission, which held a public

23    evidentiary hearing.  *Id.*  The deputy was represented by counsel at the hearing and was permitted

24    to present evidence and arguments.  *Id.*  After the hearing, the Commission sustained his

25    dismissal.  *Id.*  Although he had been notified of his right to appeal under California Code of Civil

26    Procedure sections 1094.5 and 1094.6, the deputy chose to file a lawsuit in federal court instead,

27    asserting claims under § 1983 for violations of his constitutional rights to equal protection and

28    substantive and procedural due process.  796 F. Supp. 1316, 1317 (N.D. Cal. 1992), *aff'd*, 39 F.3d

1    1030 (1994).  The district court granted the defendants' motion for summary judgment on the

2    basis of issue and claim preclusion, and the Ninth Circuit affirmed.  39 F.3d at 1031–32.  The

3    Circuit directly acknowledged the absence of any review by a state court.  *See id.* at 1033–34; *see*

4    *also Plaine v. McCabe*, 797 F.2d 713, 719 n.12 (9th Cir. 1986) ("If an adequate opportunity for

5    review is available, a losing party cannot obstruct the preclusive use of the state administrative

6    decision simply by foregoing her right to appeal.").[21]

7            Here, the County defendants argue that because Schneider has not pursued his

8    state mandamus action to its conclusion, the Schneiders are barred from challenging the Board of

9    Supervisors's 2010 determinations here.  For three reasons, the court disagrees.

10           First, the action before the Superior Court has reached no conclusion, and no

11   judgment has been entered.  Whether as a matter of issue or claim preclusion, that case has no

12   preclusive effect here.  A claim is precluded only after entry of "a final judgment on the merits in

13   the first suit," and an issue is precluded only if "argued and decided" such that it is resolved

14   conclusively by the "prior judgment."  *DKN Holdings*, 61 Cal. 4th at 824–25.

15           Second, the Schneiders challenge not just the Board of Supervisors' factual

16   findings and legal conclusions, but the procedure the Board followed.  The preclusion rules

17   described in *Miller* do not apply when a plaintiff raises a constitutional challenge to the

18   _____

19           [21] These preclusion doctrines are distinct from two other doctrines the court finds
     irrelevant, although they are raised in the parties' briefing: administrative exhaustion and
     ripeness.

20           First, by giving preclusive effect to a state agency's unreviewed decision, a federal court
     does not require administrative exhaustion.  *See Miller*, 39 F.3d at 1034 n.3.  Administrative
21   exhaustion is not a prerequisite to an action under § 1983.  *Patsy v. Bd. of Regents of State of Fla.*,
     457 U.S. 496, 501 (1982).  An aggrieved person may elect to pursue a claim under § 1983 in
22   federal court or obtain review in a state administrative agency proceeding, but she may not try
     again in federal court after unsuccessfully litigating an issue before an administrative body.
23   *See id.*

24           Second, because federal courts have no jurisdiction where there is no case or controversy,
     a claim must be ripe before litigation begins in federal court.  *See, e.g.*, *Nat'l Park Hosp. Ass'n v.*
25   *Dep't of Interior*, 538 U.S. 803, 807 (2003).  For this reason, when a plaintiff's § 1983 claims
     target a state agency's administrative actions, the agency must have reached a final decision.  *See,*
26   *e.g.*, *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172,
     186 (1985).  Finality is an element of both ripeness and preclusion, but for different reasons:
27   when it comes to ripeness, a court assures itself of its jurisdiction by testing that the dispute is
     real, whereas preclusion requires a final decision to avoid giving final effect to temporary
28   decisions.

1  administrative body's procedure itself.  *See Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*, 648

2  F.3d 986, 992 n.5 (9th Cir. 2011).  Neither can the court give preclusive effect to an unreviewed

3  administrative decision if the procedure the agency deployed gave the parties no adequate

4  opportunity to litigate.  *Utah Const.*, 384 U.S. at 421.  If, as the Schneiders argue, the proceedings

5  before the Board of Supervisors were poisoned by conflicts of interest and improper *ex parte*

6  communications, and if the Board never truly informed them of the legal or evidentiary basis of

7  its decision, the Board's decision can be given no preclusive effect.

8         Third, barring the Schneiders' due process claims would be inequitable given the

9  circumstances of this litigation.  The County defendants have waited far too long, more than two

10  years and after the close of discovery, to argue for issue or claim preclusion.  *See, e.g.*, *N.*

11  *Pacifica, LLC. v. City of Pacifica*, 366 F. Supp. 2d 927, 929 (N.D. Cal. 2005) (a defendant may

12  waive *Miller* preclusion by raising that defense too late in the litigation, citing, *inter alia*, *Kern*

13  *Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 735 (9th Cir. 1988)).  On a similar note,

14  although the County defendants argue now that Schneider should have litigated his state court

15  petition to its conclusion, in a related state court case, they argued that any state proceedings

16  should be stayed while this action is pending.  *See* Opp'n Mot. Prelim. Inj. 1–2, *Hardesty v. Bd. of*

17  *Supervisors*, No. 34-2012-80001138 (Cal. Super. Ct. Sacramento filed June 28, 2012).  The

18  County cannot have it both ways.

19         The Schneiders' due process claim is not barred by the Board of Supervisors'

20  September 2010 decision.  In this limited respect, their alternative motion for partial summary

21  judgment of the County defendants' fifth affirmative defense is granted, *see* Schneider Mot. Due

22  Process at 1, but as explained below, their motions are otherwise denied.

23             3.    Whether Schneider Possessed a Vested Right to Mine

24         The Schneiders request partial summary judgment that they possessed a vested

25  right to conduct surface mining operations on their ranch.  Specifically, they seek an order

26  declaring that "[a]t all times prior to April 2, 2009, the real estate parcels associated with the

27  Schneider Historic Mine were protected as a 'vested mine' within the meaning of the Surface

28  /////

1  Mining and Reclamation Act of 1975 (SMARA), Public Resources Code, Sections 2710–2796."

2  Notice of Motion at 2, ECF No. 219-1.

3  California Public Resources Code section 2776(a) provides,

4  No person who has obtained a vested right to conduct surface
mining operations prior to January 1, 1976, shall be required to
5  secure a permit pursuant to this chapter as long as the vested right
continues and as long as no substantial changes are made in the
6  operation except in accordance with this chapter. . . .

7  The same section defines "vested right":

8  A person shall be deemed to have vested rights if, prior to January
1, 1976, the person has, in good faith and in reliance upon a permit
9  or other authorization, if the permit or other authorization was
required, diligently commenced surface mining operations and
10  incurred substantial liabilities for work and materials necessary for
the surface mining operations. . . .

11

12  Cal. Pub. Res. Code § 2776(a).

13  In *Hanson Brothers Enterprises, Inc. v. Board of Supervisors*, 12 Cal. 4th 533

14  (1996), the California Supreme Court held that the "diminishing asset doctrine" applied to the

15  vested right to conduct mining operations as defined in Public Resources Code section 2776.

16  Under that rule, "[w]hen a mining or quarrying operation is a lawful nonconforming use,

17  progression of the mining or quarrying activity into other areas of the property is not necessarily a

18  prohibited expansion or change of location of the nonconforming use." *Id.* at 553. Rather,

19  "[w]hen there is objective evidence of the owner's intent to expand a mining operation, and that

20  intent existed at the time of the zoning change, the use may expand into the contemplated area."

21  *Id.* Thus, for example, "where increased population creates an increased demand for the

22  aggregate used in road construction, an increase in production to meet that demand would not be

23  construed as an enlargement or intensification of the use." *Id.* at 573.

24  Here, it remains unclear whether "no substantial changes [were] made in the

25  operation except in accordance with [SMARA]." Cal. Pub. Res. Code § 2776(a). Specifically, it

26  is undisputed that mining operations on the Schneiders' ranch expanded substantially between

27  1995 and 2009. A rational trier of fact could conclude on this record that the mining operation

28  that existed until 1994, which was the operation the County considered when its personnel

1   recognized the Schneiders' vested right, was significantly smaller.  A trier of fact could likewise

2   find that HSG began excavating large pits south of the Cosumnes River between 2002 and 2008,

3   and that this was a significant departure from the mining operations that had occurred before

4   2002.  If this were a jury's conclusion, the departure would likely represent a "substantial change"

5   within the meaning of Public Resources Code section 2776(a).  Neither have the Schneiders cited

6   evidence to show that as of 1976 or another earlier date, mining operations at the ranch were

7   expected to expand into the area directly south of the Cosumnes River or that mining operations

8   were to expand beyond the excavation of dredger tailings.

9                  The Schneiders' motion for summary judgment on this question is denied.

10                  4.        Whether the County Deprived the Schneiders of a Property Interest

11                  The Schneiders also move for summary judgment that the County deprived them

12   of a vested right to mine without due process.  Because the Schneiders have not shown as a

13   threshold matter that they possessed a vested right to mine, this motion cannot be granted.  This

14   leaves the question of the County's cross-motion on the same claim.  The County argues the

15   Schneiders have cited no evidence to show they have a vested right.  With respect to the due

16   process aspect of this claim, the County relies on the hearings it conducted in 2010.

17                  The Supreme Court has taken care to note that district courts should act "with

18   caution in granting summary judgment," and have authority to "deny summary judgment in a case

19   where there is reason to believe the better course would be to proceed to a full trial."  *Anderson*,

20   477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of terminating

21   the case before trial."  *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507

22   (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be

23   the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna,*

24   *Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d

25   at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).  Given

26   the fact-bound context of a due-process claim, which concerns the plaintiff's "opportunity to be

27   heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333, an uncertain

28   factual record on summary judgment may simply necessitate a trial.

1     Here, two basic concerns prevent the court from granting the County defendants'

2   motion.  First, it is unclear when the alleged deprivation occurred and which hearings or appeals

3   were devoted to which actions or decisions.  For example, in April 2009, the County wrote to

4   Schneider to explain its opinion that the Mine no longer had a vested right under SMARA.  *See*

5   O'Dea Decl. Ex. A, at 1–2, ECF No. 218-5.  But there is no evidence the County attempted to

6   prevent any continued mining operations for the next year.  Moreover, during that year, the

7   County appeared to have assumed the Mine needed no permit because it had a vested right.  *See*

8   Schneider Decl. ¶ 28, ECF No. 219-2; *id.* Ex. 22, at 1 ECF No. 219-24.  When the County took

9   up the issue again in April 2010, its notice referred to violations of the County's Zoning Code, not

10   to SMARA.  *See* O'Dea Decl. Ex. B, at 1–2, ECF No. 218-5.  The County also took apparently

11   contradictory positions during the 2010 appeal.  Its attorney argued both that the County was not

12   "attempting to revoke some vested right," Sacramento Cty. Bd. Supervisors Hr'g Tr. 60 (Sept. 14,

13   2010), and that Schneider had no vested right to mine, *see, e.g.*, *id.* at 11 (Deputy County Counsel

14   explains, "The relevant case is *Hanson*," 12 Cal. 4th 533 (1996), discussed above, "So what the

15   Board needs to look at is: Did the operator have an objective manifestation of an intent to mine

16   the area as of 1956? . . . So we're looking for initia [sic] that he did or did not show he intended to

17   mine what is now being minded [sic]").

18     The court's second concern surrounds the procedure itself.  Schneider has filed a

19   detailed declaration describing several procedures he considers questionable that the Board of

20   Supervisors employed during his 2010 appeal.  *See generally* Schneider Decl., ECF No. 220-2.

21   Were his claims to go to trial, Schneider could be expected to testify, for example, that the

22   County did not tell him what evidence it would rely on in his appeal and that the County

23   forwarded its evidence to HSG's competitors, but not to him.  *See id.* ¶¶ 5–16, 23–25, 31–32.  He

24   would also testify that the County's attorney received technical assistance from HSG's

25   competitors but did not inform Schneider of this assistance.  *Id.* ¶¶ 14, 38–39.

26     In these circumstances, the wiser course is to proceed to trial.  The County's cross-

27   motion is denied.

28   /////

1    X.      SUBSTANTIVE DUE PROCESS

2             The Due Process Clause prohibits government officials from arbitrarily depriving

3    a person of her constitutionally protected property or liberty interests.  *See, e.g.*, *Action Apartment*

4    *Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025–26 (9th Cir. 2007).  This

5    includes the right to devote land to any legitimate use, *Harris v. Cty. of Riverside*, 904 F.2d 497,

6    503 (9th Cir. 1990), and to pursue a given profession, *Greene v. McElroy*, 360 U.S. 474, 492

7    (1959).  But "only 'egregious official conduct can be said to be arbitrary in the constitutional

8    sense': it must amount to an 'abuse of power' lacking any 'reasonable justification in the service

9    of a legitimate governmental objective.'"  *Shanks*, 540 F.3d at 1088 (quoting *Cty. of Sacramento*

10   *v. Lewis*, 523 U.S. 833, 846 (1998)); *accord N. Pacifica*, 526 F.3d at 484 ("The irreducible

11   minimum of a substantive due process claim challenging land use regulation is failure to advance

12   any governmental purpose.").  Only conduct that "shocks the conscience" violates the Due

13   Process Clause.  *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987).

14           A.      The Hardestys' Claims against Taras

15           "To state a substantive due process claim, the plaintiff must show as a threshold

16   matter that a state actor deprived it of a constitutionally protected life, liberty or property

17   interest."  *Shanks*, 540 F.3d at 1087.  Because the plaintiffs have not shown that Taras's cease-

18   and-desist letter deprived them of any property interest, as discussed above, in the context of the

19   Hardestys' procedural due process claim against Taras, summary judgment is granted as to this

20   claim.

21           B.      The Hardestys' Claims against Gregory

22           The Hardestys allege Gregory "engaged in a politically-motivated scheme" with

23   the other defendants to drive the Hardestys out of business.  *See* Opp'n Gregory Mot. at 13.  They

24   expressly disclaim any allegations of a conspiracy, *see id.* at 12–13 n.3; Gregory's liability

25   therefore depends on her own actions, not the actions of others.  The only evidence the Hardestys

26   cite to support their claim is that before Gregory's inspection she may or may not have known

27   that Simmons visited the Mine before and was expelled, and she became aware a legislator was

28   interested in the case, albeit immediately before entering onto the Mine site at which point she

63

1  checked with her supervisor before proceeding.  These facts could not allow a jury to decide she

2  was part of a politically motivated scheme or that she deprived the Hardestys of their interests in

3  engaging in their chosen profession.

4  Gregory's motion for summary judgment is granted as to this claim.

5  C.  The Schneiders' Claims against Bieber

6  David Bieber is a registered Professional Geologist, Geophysicist, Engineering

7  Geologist, and Hydro-Geologist in the State of California.  Bieber Decl. ¶ 1, Case No. 12-2457,

8  ECF No. 105-2.  He worked as a senior geologist for Geocon Consultants between March 2001

9  and June 2013.  *Id.* ¶ 2.

10  Geocon provided consulting services to the County during its investigation of the

11  Mine.  *See, e.g.*, *id.* ¶ 5.  In 2009, Bieber and Geocon were retained by the County of Sacramento

12  in anticipation of litigation and hearings about the Mine.  *Id.* ¶ 4.  Geocon entered a contract with

13  the County in each year between 2009 and 2012.  *Id.* ¶ 5.  Between 2009 and 2012, Bieber

14  accompanied County inspectors on their annual inspection of the Mine, and after each inspection,

15  he was directed to draft a report.  *Id.* ¶ 7.  His reports were to include a description of the

16  conditions at the Mine and evaluate an annual adjustment to the FACE.  *Id.*  Based on his report,

17  County personnel would complete a formal inspection report and determine the appropriate

18  FACE.  *Id.*; JSUF no. 58.  Bieber also testified as an expert on the County's behalf.  Bieber Decl.

19  ¶ 10.

20  As relevant here, the County asked Bieber to calculate a 2012 FACE for the Mine.

21  *See id.* ¶ 11.  The County directed him to assume the pits south of the Cosumnes River would be

22  backfilled to be consistent with the surrounding topography.  *Id.*  Bieber determined a depression

23  of ten or fifteen feet below the original, pre-mining ground level would be consistent with the

24  surrounding topography.  *Id.* ¶ 12.  This assumption was based on his observation that ten to

25  fifteen feet below ground level was above the 100-year floodwater level of the Cosumnes River.

26  *Id.*  He calculated that more than one million cubic yards of material would be required to backfill

27  the pit areas to this elevation.  *Id.*  County Counsel told Bieber it was unclear whether stockpiles

28  of aggregate at the Mine could be used to fill the pits.  *Id.* ¶ 13.  He therefore performed two

calculations: (1) the cost of reclamation if fill materials were imported; and (2) the cost of reclamation should on-site materials be available for the County to use. *Id.* He calculated a FACE value of $8,817,074 if soil were imported and $901,336 if on-site materials were used. *Id.*; *see also id.* Ex. D, Case No. 12-2457, ECF No. 105-6 (Bieber's report); JSUF no. 65. The difference was attributable to his estimate that the cost of importing soil would exceed $6 million. *See* Bieber Decl. ¶¶ 13–14; *see also* JSUF nos. 61, 62.

The Schneiders' claim against Bieber is founded on 42 U.S.C. § 1983, which prohibits the denial of a federal right "under color of law." *See* Schneider Compl. ¶¶ 263–80; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 946 (1982). Assuming without deciding that Bieber can be said to have acted "under color of law," the evidence before the court would not allow a rational trier of fact to conclude his actions "shock the conscience." The undisputed facts show Bieber prepared a report in line with the County's instructions, performed inspections and calculations, gave testimony to explain his conclusions, and otherwise followed through on the assignment for which he was hired. The Schneiders' complaint, at its core, has little to do with Bieber's actions and everything to do with the County's decisions about the Mine's reclamation plan and financial assurances.

Bieber's motion for summary judgment is granted as to this claim, and the court does not reach his other arguments.

D.      Sacramento County Defendants

The Hardestys and Schneiders claim the County defendants stripped them of their vested right to operate a surface mine, which deprived them of their right to pursue their chosen profession and to devote their land to a legitimate use. The Constitution protects both of these interests. *See, e.g.*, *Greene*, 360 U.S. at 492; *Harris*, 904 F.2d at 503. Plaintiffs' substantive due process claims may proceed if the evidence, viewed in the light most favorable to their case, shows the County lacked any legitimate government purpose for its actions. *Shanks*, 540 F.3d at 1088.

The Hardestys and Schneiders argue the County defendants were motivated by political pressure rather than a legitimate government purpose. Several years ago, the Ninth

1   Circuit opined that a local government's arbitrary land use decisions, if motivated by "political

2   pressure from neighbors," could support a substantive due process claim.  *Del Monte Dunes at*

3   *Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).  More recently, in an

4   unpublished memorandum disposition, the Ninth Circuit cited *Del Monte Dunes* and confirmed

5   that a substantive due process claim may proceed to trial if the evidence could show the

6   government's regulatory decisions were motivated by "political or other considerations."

7   *Swenson v. Siskiyou Cty.*, 498 F. App'x 719, 721 (9th Cir. 2012).

8            The defendants do not dispute these general conclusions, but argue instead that a

9   jury could not find, on this record, that they intended to drive HSG out of business and were

10  motivated by political pressure.  The evidence highlighted above, in the discussion of the

11  Hardestys' equal protection claim, could allow a rational trier of fact to conclude that Sacramento

12  County and its officers were motivated by political pressure from HSG's competitors rather than

13  a legitimate intent to enforce SMARA and the County's Zoning Code.

14           The County defendants' motion is denied as to this claim.

15       E.     The Hardestys' Claims against O'Bryant

16           The Ninth Circuit also has held that "excessive and unreasonable" enforcement

17  schemes may violate the Due Process Clause.  *See Benigni v. City of Hemet*, 879 F.2d 473, 478

18  (9th Cir. 1988) (allowing  Due Process claim to go forward where jury could have found that

19  police harassed bar's customers and staff and conducted frequent and unjustified inspections or

20  surveillance in effort to harm bar's business).  Here, a jury could conclude that O'Bryant directed

21  "excessive and unreasonable" enforcement actions at the Mine at the behest of legislators and

22  competitors.  Whether O'Bryant intended to drive HSG out of business or merely to enforce the

23  law is a question not for this court, but a jury.  *See, e.g.*, *Newman v. Checkrite Cal., Inc.*, 912 F.

24  Supp. 1354, 1380 (E.D. Cal. 1995) (citing authority for proposition that "[o]rdinarily, intent and

25  motive are paradigmatic issues for resolution by the trier of fact at trial").

26  /////

27  /////

28  /////

1    XI.    FIRST AMENDMENT RETALIATION

2              The First Amendment prohibits government officials from retaliating against a

3    person for "speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  To succeed in a First

4    Amendment retaliation claim, a plaintiff must present evidence to establish three facts.  First, the

5    plaintiff must have engaged in an activity the First Amendment protects.  *See Coszalter v. City of*

6    *Salem*, 320 F.3d 968, 973 (9th Cir. 2003).  Second, the defendants' actions must be shown to have

7    deterred a "person of ordinary firmness" from engaging in that activity.  *Lacey v. Maricopa Cty.*,

8    693 F.3d 896, 916 (9th Cir. 2012) (en banc).  The plaintiff is not required to show she was herself

9    deterred.  *See id.*  Third, the plaintiff must show the defendant's actions were motivated by an

10   intent to deter her from asserting her First Amendment rights.  *Mendocino Envt'l Ctr. v.*

11   *Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  The defendant's "retaliatory animus" must

12   be the but-for cause of its actions; if, without any intent to retaliate, the defendant would have

13   done the same thing, the plaintiff cannot succeed.  *See Hartman*, 547 U.S. at 260.  The

14   defendant's intent to deter may be demonstrated by either direct or circumstantial evidence.

15   *Mendocino*, 192 F.3d at 1300–01.

16             Here, the Schneiders allege that after they filed this lawsuit in this court in

17   September 2012, Sacramento County, several of its officials, and its consultant, David Bieber,

18   retaliated against them by demanding much larger financial assurances for the Mine.  *See*

19   Schneider Compl. ¶¶ 284–86.  They also allege the County intended to prevent them from filing

20   any lawsuit at all by crippling them financially.  *See id.* ¶ 282.

21        A.    Bieber

22             The claims against Bieber have no evidentiary support.  The Schneiders argue

23   Bieber retaliated against them by calculating a higher FACE in November 2012, but Bieber was

24   not served with notice of this lawsuit until April 2013.  JSUF no. 66; *see also* Summons, Case

25   No. 12-2457, ECF No. 11.  Based on the record before the court, Bieber would testify at trial that

26   he did not know the Schneiders had filed their complaint until after he finished his report.  Bieber

27   Decl. ¶ 15.  He could not have retaliated against them for filing this lawsuit if he did not know the

28   lawsuit had been filed.  The Schneiders cannot avoid summary judgment of this claim by arguing

1    Bieber must have known, given the Hardestys' pre-existing civil rights lawsuit filed in this court

2    in 2010, that he would be named as a defendant in the Schneiders' complaint.  This theory does

3    not establish a cause-and-effect relationship between the Schneiders' complaint and Bieber's

4    decision, let alone a but-for causal relationship.

5                        Summary judgment is granted as to the First Amendment claims against Bieber.

6            B.        County Defendants

7                        This leaves the claims against the County defendants.  Unlike Bieber, the County

8    defendants do not argue they were unaware of the Schneiders' lawsuit here when they increased

9    the Schneiders' FACE requirement.  Their motion rests on two alternative arguments.  First, they

10   argue a person of "ordinary firmness" in the Schneiders' position would not have been deterred

11   from filing a civil rights lawsuit because, as it turns out, the Schneiders were not deterred.

12   County Mot. Pt. 3 at 18–19.  But the Schneiders can succeed even if they were not deterred from

13   continuing in this case.  *Lacey*, 693 F.3d at 916.  "[I]t would be unjust to allow a defendant to

14   escape liability for a First Amendment violation merely because an unusually determined plaintiff

15   persists in his protected activity."  *Mendocino*, 192 F.3d at 1300.  A jury could reasonably

16   conclude that a mine operator of ordinary firmness would be deterred from pursuing a civil rights

17   lawsuit if a County official demanded several hundred thousand dollars more in financial

18   assurances.

19                        The County also argues the Schneiders have not established a logical connection

20   between its late-2012 FACE calculations and their civil rights action.  It points out that by the

21   time the Schneiders filed their complaint, the Hardestys had been pursuing very similar claims for

22   about two years.  County Mot. Pt. 3 at 19.  This interpretation of the evidence is reasonable, and

23   could support a verdict in the County's favor.  But the evidence could also support the

24   Schneiders' case.  Before the Schneiders' complaint was filed, the County had required them to

25   post financial assurances of less than $200,000.  A few months after they filed their complaint,

26   the County demanded financial assurances of between $0.8 million and $8 million.

27   Circumstantial evidence such as this is enough to survive summary judgment.  *See, e.g.*,

28   *Mendocino*, 192 F.3d at 1300–01 (citing *Hines v. Gomes*, 108 F.3d 265 (9th Cir. 1997)).  The

1  County defendants may yet prevail at trial by showing they would have done exactly the same

2  thing had the Schneiders never filed a civil rights action.  *See Hartman*, 547 U.S. at 260.  But that

3  is not the only reasonable conclusion a jury could draw from this evidence.

4      That said, the Schneiders' other theory of the County defendants' liability, that the

5  County intended to avoid a civil rights lawsuit by financially ruining the Mine, is supported by

6  nothing but speculation.  It is unclear what the Schneiders would present to the jury to support

7  this claim.

8      The County defendants' motion is denied as to the Schneiders' allegation that the

9  Mine's FACE was increased in retaliation for filing a civil rights lawsuit, and granted on the

10  allegation that the County intended to prevent a civil rights lawsuit by financially ruining the

11  Mine.

12  XII.   <u>CONCLUSION</u>

13      This order resolves the pending motions for summary judgment in Case

14  No. 10-2414 (the *Hardesty* case), ECF Nos. 217, 218, 219, 220, and 222, and in Case No. 12-

15  2457 (the *Schneider* case), ECF No. 105, as follows:

16              <u>The Defendants' Motions in the *Hardesty* Case</u>

17          Summary judgment is GRANTED as to the following claims:

18  (1) The second claim, under the Equal Protection Clause, against defendants Norris and Testa,

19      and against O'Bryant to the extent this claim is based on the allegations that O'Bryant

20      selectively denied any right to appeal HSG's removal from the AB 3098 list and selectively

21      provided no guidance on reinstatement on the AB 3098 list;

22  (2) The fourth claim, under the Fourth Amendment, against defendant Gregory;

23  (3) The fifth claim, under the Due Process Clause, against defendant Taras;

24  (4) The sixth claim, under the Equal Protection Clause, against the County and defendant Sherry;

25  (5) The seventh claim, under the Equal Protection Clause, against the County and defendants

26      Storelli and Moffitt; and

27  (6) The ninth claim, under the Due Process Clause, against defendants Taras and Norris.

28  /////

1    Summary judgment is DENIED as to the following claims:

2    (1) The second claim, under the Equal Protection Clause, as to defendant O'Bryant, to the extent

3    this claim is based on the allegation that O'Bryant selectively removed HSG from the AB

4    3098 list without advance notice;

5    (2) The sixth claim, under the Due Process Clause, against the County and defendant Sherry.

6    (3) The ninth claim, under the Due Process Clause, against the County and defendants Storelli,

7    Moffitt, Sherry, and O'Bryant.

8    The Defendants' Motions in the *Schneider* Case

9    Summary judgment is GRANTED as to the following claims:

10   (1) The second claim, under the Due Process Clause, against defendant Bieber;

11   (2) The third claim, under the Due Process Clause, against defendant Bieber;

12   (3) The fourth claim, under the First Amendment, against defendant Bieber, and against the other

13   defendants to the extent this claim is based on the Schneiders' allegation that the defendants

14   intended to prevent a civil rights lawsuit by financially ruining the Mine; and

15   (4) The fifth claim, under the Equal Protection Clause.

16   Summary judgment is DENIED as to the following claims:

17   (1) The first claim, under the Due Process Clause, against all defendants except Bieber

18   (2) The fourth claim, under the First Amendment, against all defendants except Bieber, to the

19   extent this claim is based on the Schneiders' allegation the defendants intended to retaliate for

20   the filing of the complaint in the *Schneider* case.

21   The Plaintiffs' Motions in the *Schneider* Case

22   The motions are DENIED.

23   *        *        *

24   Additionally, the unconsolidated portion of the *Schneider* case, against defendant Bieber, is

25   CLOSED.

26   IT IS SO ORDERED.

27   DATED: June 8, 2016.

28   _____
     UNITED STATES DISTRICT JUDGE