1    IN THE UNITED STATES DISTRICT COURT; SACRAMENTO, CALIFORNIA
            FOR THE EASTERN DISTRICT OF CALIFORNIA
2         BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

3    JOSEPH HARDESTY, et al.,

4                        Plaintiffs,

5              vs.                        No. 2:10-cv-02414

6    SACRAMENTO METROPOLITAN AIR
     QUALITY MANAGEMENT DISTRICT,
7    et al.,

8                        Defendants.
     _____
9

10                    REPORTER'S TRANSCRIPT

11              TRIAL TESTIMONY OF JEFF GAMEL

12              FEBRUARY 23, 2017; 8:30 A.M.

13


14
     APPEARANCES (See next page)
15

16

17

18

19

20

21   Court Reporter:        MICHELLE L. BABBITT, CSR#6357
                            Official Court Reporter, USDC
22                          501 I Street, Suite 4-200
                            Sacramento, California 95814
23                          916-448-7938

24

25        Transcript produced by computer-aided transcription

```
 1                          APPEARANCES

 2                          ---o0o---

 3    For the Plaintiffs:

 4    YETTER COLEMAN, LLP
      909 Fannin, Suite 3600
 5    Houston, Texas 77010
      R. PAUL YETTER, PHV
 6    -and-
      COLLIN COX, PHV
 7    -and-
      ROBERT ELLIS, PHV
 8    Attorneys at Law

 9    ROBERTSON, JOHNSON, MILLER & WILLIAMSON
      250 West Liberty Street, Suite 600
10    Reno, Nevada 89501
      GEORGE ROBERTSON
11    Attorney at Law

12    MILLSTONE, PETERSON & WATTS, LLP
      2267 Lava Ridge Court, Suite 210
13    Roseville, California 95661
      GLENN PETERSON
14    Attorney at Law

15    RICHARD M. ROSS
      Attorney at Law
16    8081 North Forbes Road
      Lincoln, California 95648
17

18    For Defendants Sacramento County and individual plaintiffs:

19    LONGYEAR, O'DEA & LAVRA, LLP
      3620 American River Drive, Suite 230
20    Sacramento, California 95864
      GREGORY O'DEA
21    -and-
      MARK O'DEA
22    Attorneys at Law

23    HAIGHT BROWN & BONESTEEL LLP
      5 Hutton Centre Boulevard, Suite 900
24    Santa Ana, California 92707
      RICHARD MORTON
25    Attorney at Law
```

```
1
                              INDEX
2                            ---o0o---

3
     WITNESS
4
     JEFF GAMEL
5    Direct Ex. By Mr. Yetter                     Pg. 6
     Cross Ex. By Mr. Mark O'Dea                  Pg. 109
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, THURSDAY, FEBRUARY 23, 2017

2                              ---o0o---

3          (Jury out.  8:31 a.m.)

4          THE CLERK:  Calling for the record civil case

5  Case 10-cv-2414, Hardesty et al., versus Sacramento

6  Metropolitan Air Quality Management District, et al.  Jury

7  trial, day four, Your Honor.

8          THE COURT:  Ready for the jury?

9          MR. GREGORY O'DEA:  A couple of quick matters.

10  Yesterday after we left court we got a notice or request to

11  produce three additional county witnesses which we believe is

12  impractical if not impossible because we don't have the

13  48 hours we agreed to.

14     As a matter of trial logistics, we are trying to produce

15  them, but we can't make any promises.

16          THE COURT:  I understand that.  We'll proceed and

17  plaintiffs are expected to fill in.  You can meet and confer

18  on breaks and give me statuses, but we will expect -- my

19  plan -- I really don't like doing this -- if we really get to

20  a point where someone says a witness is not available to fill

21  the time we have, I'll ask who is on the witness list who is

22  in the courtroom and ask that they go on.

23          MR. GREGORY O'DEA:  Yes, Your Honor.  One other

24  point.  The plaintiffs are calling two defendants today, Rob

25  Sherry and Jeff Gamel, and there are requests for punitive

1   damages against these defendants.  I would ask that there not

2   be any questions into their net worth until the plaintiffs

3   establish a prima facie case that would entitle them to an

4   award of punitive damages.

5       Until such time, that testimony is irrelevant and

6   prejudicial.

7           THE COURT:  Have I previously considered bifurcation?

8   Have I ever previously?

9           MR. GREGORY O'DEA:  I don't think that's been raised.

10          THE COURT:  So plaintiffs' response to that request?

11          MR. YETTER:  I don't think we were going to try to

12  elicit net worth evidence from either of these defendants

13  anyway.

14          THE COURT:  So it's moot.  This is where it would

15  help if you talked to each other.  Just observing.

16          MR. GREGORY O'DEA:  Thank you, Your Honor.

17          THE COURT:  Anything else, Mr. Yetter?

18          MR. YETTER:  No.  We're ready to go.

19          THE COURT:  Just a reminder that with depositions,

20  assuming that there are objections I need to rule on, I need

21  marked up transcripts.

22          MR. YETTER:  I don't think we'll have a problem

23  today.  We have tried hard to make it packed today and plenty

24  of witnesses, and I don't think we'll have a problem.

25          THE COURT:  Very good.  Let's bring the jury in.

1          (Jury in. 8:33 a.m.)

2          THE COURT:  Welcome back, ladies and gentlemen.

3   We're ready to proceed with presentation of evidence.

4     Mr. Yetter, who are you calling now?

5          MR. YETTER:  May it please the court, the plaintiff

6   would call as their next witness former county employee Jeff

7   Gamel.

8          THE COURT:  Mr. Gamel, please come forward.

9                    JEFF GAMEL, SWORN

10         THE WITNESS:  I do.

11         THE CLERK:  Have a seat, state and spell your full

12  name for the record and speak into the microphone.

13         THE WITNESS:  Jeff Gamel, J-E-F-F, G-A-M-E-L.

14         THE COURT:  You may proceed.

15         MR. PETERSON:  The audio on the video is not on.  I

16  would ask that the staff activate it.

17         THE COURT:  Okay.

18                  DIRECT EXAMINATION

19  BY MR. YETTER:

20  Q.  Good morning, Mr. Gamel.  You and I have -- I don't know

21  if we formally met.  I've been in the courtroom.  My name is

22  Paul Yetter and I'm one of the lawyers that represent the

23  Hardesty plaintiffs.

24  A.  Yes.

25  Q.  Thank you for testifying.  You were -- just to get some

1   framework, you were the Aggregate Resource Manager covering

2   all the different mines in Sacramento County for four years,

3   weren't you?

4   A.   Yes, that is correct.  Although there were other duties to

5   that position, the Aggregate Resource Manager.  In fact, the

6   agreement covered other duties.

7   Q.   Before we get into the meat of what we're going to talk

8   about today, let's get a little background, including your

9   education.

10       You have a college degree, do you not?

11  A.   That's correct.

12  Q.   You have a bachelor's degree in economics as well as a

13  second degree in government?

14  A.   Correct.

15  Q.   You also have a year in law school?

16  A.   That's correct.

17  Q.   Now, you started back in 1983 with the County Planning

18  Department, didn't you?

19  A.   Yes, that's correct.

20  Q.   You were with the County Planning Department for pretty

21  much your whole career, were you not?

22  A.   Correct.

23  Q.   The planning department, you've heard the testimony so

24  far, is one of the government agencies that does have

25  authority over mining operations here in the county, doesn't

1   it?

2   A.   That's correct.   That's the lead agency.

3   Q.   As lead agency, that means within the state, the County of

4   Sacramento is the top one that governs within the county

5   mining operations; true?

6   A.   That's correct.

7   Q.   Now, you started at the bottom of the department and you

8   worked your way up to a senior position, did you not?

9   A.   Correct.

10   Q.   By 2000, 17 years ago, you became a senior official called

11   senior planner in the planning department, didn't you?

12   A.   That's correct.

13   Q.   So as a senior planner and senior official, you supervise

14   other staff; right?

15   A.   Yes, that's typically the case.

16   Q.   Because that's what senior officials do?

17   A.   That's correct.

18   Q.   That doesn't mean you had a boss.   You had a supervisor;

19   right?

20   A.   Correct.

21   Q.   You reported to your supervisor, closely updated on the

22   things you were doing even as a senior official, didn't you?

23   A.   That was one of my duties, correct.

24   Q.   At the time throughout that whole timeframe you were

25   involved with mining operation for the county, the top

1    decisionmaking group for the county was the Board of

2    Supervisors, wasn't it?

3    A.   That's correct.

4    Q.   You would come in person and make presentations to the

5    Board of Supervisors, didn't you?

6    A.   Correct.

7    Q.   Some of those presentations actually involved the

8    Schneider Historic Mine?

9    A.   I participated in a presentation, that is correct.

10           THE COURT:  You're using "supervisor" in two

11    different ways.  When you asked earlier if this person had a

12    supervisor, you were not referring to a member of the Board of

13    Supervisors?

14           MR. YETTER:  I'll clear that up right now, Your

15    Honor.

16    Q.   So even as a senior official, you had a personal

17    supervisor back at the time by the name of Cindy Storelli?

18    A.   That is correct.

19    Q.   At the top of the chain of command, so to speak, was the

20    Board of Supervisors, and that's a group of county officers

21    that basically run the entire county?

22    A.   The legislative body, the way I would characterize them,

23    yeah.

24    Q.   And all the things you did with regard to your job as an

25    Aggregate Resource Manager and in particular with regard to

1    the Schneider Historic Mine, you kept your supervisor, Ms.

2    Storelli, updated.

3        That was one of your jobs; right?

4    A.   Correct.

5    Q.   And, ultimately, neither you or Ms. Storelli did anything

6    that the Board of Supervisors -- anything significant, as to

7    the Schneider Historic Mine that the Board of Supervisors

8    didn't itself approve?

9            MR. MARK O'DEA:  Objection.

10           THE COURT:  Can you rephrase?

11   BY MR. YETTER:

12   Q.   You didn't make any major decisions as to the Schneider

13   Historic Mine that the Board of Supervisors -- like shutting

14   it down -- that the Board of Supervisors didn't approve?

15           MR. MARK O'DEA:  Misstates facts as to shutting down.

16           THE COURT:  Rephrase.

17   BY MR. YETTER:

18   Q.   You didn't make any major decision as to the Schneider

19   Historic Mine that the board didn't approve?

20           MR. MARK O'DEA:  Objection.  Vague, lacks foundation.

21   What is he talking about?

22           THE COURT:  Overruled.  You may answer to the extent

23   you're able.  It's a fairly general question.

24           THE WITNESS:  The Board of Supervisors was our

25   ultimate boss in the case of the planning department.  We made

1    decisions, we exercised judgment as best we could.  We felt we

2    were representing the Board of Supervisors; however, unless we

3    went before the Board of Supervisors or informed the Board of

4    Supervisors in our decision as to our decision, they would not

5    be aware of that decision.  That's the best way I can answer

6    it.

7    BY MR. YETTER:

8    Q.   You're saying there are very big decisions that you went

9    to the board and got their approval on; right?

10   A.   Correct.

11   Q.   But there are other decisions that the board gave you and

12   the planning department authority to make with regard to

13   mining operations; true?

14   A.   That's correct.  They gave us the ability to exercise

15   discretion.

16   Q.   As to those decisions, the planning department was the

17   ultimate decisionmaker, wasn't it?

18   A.   In some cases.

19            MR. MARK O'DEA:  Vague as to which decisions.

20            THE COURT:  Overruled.

21   BY MR. YETTER:

22   Q.   You were talking a minute ago about your ultimate boss.  I

23   want to turn to another topic before we get into the further

24   events here, and that is the funding contract.

25        Do you know what I'm talking about?

1    A.   Yes, I do.

2    Q.   By the "funding contract," I think the formal name was

3    memorandum of understanding, wasn't it?

4    A.   That is correct.

5    Q.   I'm going to hand you a notebook, with the court's

6    permission, so that you have the documents right at your

7    fingertips.

8         THE COURT:  Do you have copies for defense and the

9    court?

10        MR. YETTER:  I do, Your Honor.  I'll get a copy right

11   now.  I'm handing a copy to defense counsel and I'm going to

12   hand to your clerk, Your Honor, a third copy of the notebook.

13        THE COURT:  All right.  Thank you.

14   BY MR. YETTER:

15   Q.   Tab 1 -- one of the things when you became the Aggregate

16   Resource Manager in 2008 I'm sure that you were familiar with

17   was the memorandum of understanding?

18   A.   Yes, that's correct.

19        MR. YETTER:  This is Joint Exhibit 508.  It's already

20   in evidence, Your Honor.  We've seen this before.

21   Q.   I'm not going to go into anything we talked about before,

22   but you knew about this contract when you became the Aggregate

23   Resource Manager for the country, didn't you?

24   A.   Yes, we had many contracts like this.

25   Q.   You knew about it before you became the Aggregate Resource

1    Manager for the county, didn't you?

2    A.   Again, we had many contracts and I knew of this one, yes.

3    Q.   And so this contract is the fifth amendment.  It's dated

4    October 6, 2010.  Let's go down to the recitals.  Let's blow

5    up the first three.

6         Without going over each one of those, you know that this

7    funding contract was first created in 2004; right?

8    A.   That's correct.

9    Q.   It was amended in 2006; true?

10   A.   Correct.

11   Q.   Then in 2008?

12   A.   Correct.

13   Q.   Let's go down a little farther.  2009?

14   A.   Correct.

15   Q.   Then twice in 2010?

16   A.   Correct.

17   Q.   Actually, a third time when this one here, Joint

18   Exhibit 508, was signed, wasn't it?

19   A.   Correct.

20   Q.   We've already heard that this Aggregate Resource Manager's

21   fully loaded cost was -- let's go to page 2, number 1D -- you

22   see that?

23        Fully loaded cost for a senior planner staff position of

24   $235,400 was paid by the funders of this contract; right?

25   A.   Well, that's not correct.  If you look at the subsection

1   right before that, they talk about putting a deposit up at the

2   beginning of the fiscal year July 1st.  That deposit was to

3   pre-fund planning work.  They may never have to provide the

4   ultimate fee that's cited there, the 235,000.  Depends on the

5   work necessary for this agreement.

6        I think one of the facts that was not mentioned when you

7   spoke of this agreement with Mr. Winter yesterday was the fact

8   that the primary purpose of it was to designate planning staff

9   to work on the large scale mining projects of the parties to

10  this agreement.

11       Originally there were three.  All three had large scale

12  mining projects.  In the end when I left in 2012, there were

13  six parties to the agreement.  They all had large scale

14  mining.  So I wanted to clarify that was really the primary

15  purpose for this agreement.

16  Q.   Mr. Gamel, my question was under this paragraph D, these

17  funding corporations could pay up to $235,400, which was the

18  fully loaded senior planner staff position; true?

19  A.   That is true.

20  Q.   And by "fully loaded cost," that means not just salary,

21  but also benefits for that level of an employee; correct?

22  A.   Correct.

23  Q.   "Benefits" meaning insurance, retirement, things like

24  that; true?

25  A.   Correct.

1    Q.   Now, that wasn't the only position that this funded

2    because there was also, for example, on page 5, paragraph 6,

3    consultant assistants, these funding corporations, these big

4    mining companies also agreed to pay to fund consultants up to,

5    not to exceed, $25,000 per consultant; right?

6    A.   That is correct, if they felt that they were needed.

7    Q.   On paragraph 5, right above that, student interns,

8    originally three big corporations agreed to fund to the county

9    a student intern up to 25,000 a year; right?

10   A.   That's correct if they felt it was needed.

11   Q.   And on page 6, paragraph 7, the funding corporations

12   agreed to pay to fund at least part of the work of an employee

13   called a principal planner up to $58,000 per year; true?

14   A.   Correct.

15   Q.   And in paragraph 8, these funding corporations said they

16   would also pay up to $40,000 a year for other staff?

17   A.   That's correct.

18   Q.   Now, we already heard from Mr. Winter that this funding

19   contract was exclusive to the members of the contract; right?

20            MR. MARK O'DEA:  Objection.  Misstates the testimony.

21            THE COURT:  Overruled.  You may answer.

22            THE WITNESS:  That is correct, because, as I

23   indicated, they all had large scale mining operations and they

24   wanted their applications prioritized.

25   /////

1    BY MR. YETTER:

2    Q.   In fact, let's go to page 3 at the top.  If originally all

3    three of the big funding producers did not all agree to

4    continue to fund the Resource Manager, the contract expired;

5    right?

6    A.   That is correct.

7    Q.   It would come up every year.  It would automatically renew

8    every year unless one of the three corporations, the funding

9    corporations, said, "I don't want to participate any more."

10       Correct?

11   A.   And we had that occur.  That is correct.

12   Q.   Now, you had to keep time and give records and reports to

13   the funding corporations on a regular basis too, didn't you?

14   A.   Yes, that is correct.

15   Q.   In fact, that's paragraph 2B, as we come down, the second

16   sentence:

17       County shall provide the producers a monthly and annual

18   accounting of the Resource Manager's hourly workload

19   distribution.

20       Do you see that?

21   A.   Yes, I do.

22   Q.   In other words, to see if we all understand how this

23   works, originally, three big mining companies said to the

24   county, we want to pay for a senior level guy or woman who is

25   going to be called the Aggregate Resource Manager; true?

1    A.   Correct.

2    Q.   That Aggregate Resource Manager that these three big

3    companies are going to be funding the county for is going to

4    be the one, the county official, that goes to their mines and

5    inspects them; true?

6    A.   That was a secondary purpose, duty, that's covered by the

7    agreement.   That's correct.

8    Q.   Another duty would be when these three big mining

9    companies wanted to open a new mine or get a new permit, this

10   Aggregate Resource Manager that the three companies are

11   funding the county for, he would be the one that would look at

12   the application?

13   A.   That would prioritize the application, that's correct.

14   Q.   He would give it priority; true?

15   A.   That was the primary purpose for the agreement, to

16   prioritize their large scale applications.

17   Q.   And these three companies, since they were giving the

18   money, they wanted to know what it was for, so this manager

19   had to report on an hourly basis what he was doing under the

20   funding contract to the three big companies; true?

21   A.   Correct.

22   Q.   And if they didn't like what was happening, they could

23   turn the contract off any year they wanted; right?

24   A.   That's the way these contracts are set up, that's correct.

25   Q.   Now, it is clear that you were getting your paycheck and

1   your retirement and your life and health insurance from the

2   county.

3        That's who you would get it from; right?

4   A.   That's correct.

5   Q.   But you knew that the money for that funding from the

6   county was coming from these big companies; correct?

7   A.   Not all of the money, but a portion of it, of course.

8   That's correct.

9   Q.   That's the funding contract.  I think you've told us that

10  you started in 2008 as an Aggregate Resource Manager; right?

11  A.   That's correct.

12  Q.   The fellow that was there before you we heard testify, as

13  did you, was Mike Winter; true?

14  A.   Correct.

15  Q.   He was formally in the position of Aggregate Resource

16  Manager from 2004 to 2008, wasn't he?

17  A.   That's correct.

18  Q.   In that position, he was the county employee who had, as

19  he told us yesterday, the authority over all the different

20  mines in the county, not just the mines that the funding

21  corporations had; true?

22  A.   That's correct.

23  Q.   So I'm assuming, Mr. Gamel, you're going to tell us that

24  before you became the official Aggregate Resource Manager, you

25  didn't try to get involved in these other mines that Mr.

1   Winter was in charge of, did you?

2   A.   No, that was not my duty.   I was working on other

3   projects.

4   Q.   That would have been, at least the way the county was set

5   up, that would not have been appropriate for you to be doing

6   things on mining operations that Mr. Winter was in charge of;

7   true?

8            MR. MARK O'DEA:   Objection.   Lacks foundation.

9            THE COURT:   Overruled.   You may answer.

10           THE WITNESS:   I would assume, yes, that would be the

11  case.   I would refer things to Mr. Winter because he was the

12  Aggregate Resource Manager, the one in charge of the mines.

13  BY MR. YETTER:

14  Q.   Now, before you became Aggregate Resource Manager, let's

15  focus on 2007.   You were still a senior planner, you were

16  still a senior official within the planning group within the

17  County of Sacramento, were you not?

18  A.   Yes.

19  Q.   I'm sure there were rules and ethics that county officials

20  like yourself at the time had to comply with, weren't there?

21  A.   Yes.

22  Q.   In other words, county officials can have conflicts of

23  interest that they have to be careful of, don't they?

24  A.   Yes, that's correct.

25  Q.   Because at least as I see it, and I'm going to ask

1    Mr. Gamel if you think that if this was your attitude at the

2    time or is this what you knew at the time, was that county

3    officials are supposed to be, for example, fair to the people

4    that come before them; right?

5    A.   That's correct.

6    Q.   And not biased; true?

7    A.   Correct.

8    Q.   And evenhanded when there's a dispute between two

9    constituents or companies within their jurisdiction; right?

10   A.   I would assume so.  At the time I didn't know of any

11   conflict or competitors, the way you stated that question.

12   Q.   You knew at the time, Mr. Gamel, that it would be a

13   conflict if you had two, for example, mining companies come

14   before you when you were the Aggregate Resource Manager and

15   you weren't evenhanded, you treated one of them with

16   favoritism, that would be a conflict, wouldn't it?

17   A.   Yes.

18   Q.   It would be a conflict if you were sharing information

19   from one competitor and giving it to the other competitor

20   secretly, wouldn't it?

21   A.   The way you stated the question, I believe that's true,

22   unless the information was public record.

23   Q.   Now, you have -- as a county official, because you have to

24   be unbiased and fair and evenhanded, you have to actually make

25   sure that you're careful to stay independent, don't you?

1   A.   Yes.

2   Q.   So back in 2007, 2008, you were getting gifts from

3   Teichert every year, weren't you?

4   A.   What type of gifts?  Rephrase that.

5   Q.   How about Christmas gifts?

6   A.   No, I was not receiving any Christmas gifts.  I think the

7   reference you're making is to the cookies.  Every year around

8   the holidays, we would have engineers or developers come in

9   with a box of See's chocolates or cookies or a tin of almonds.

10      Those would typically go in our break room and we would

11  send out an e-mail to all staff that says, so and so brought

12  in a box of See's candy, help yourself, that type of thing.

13  It was just something that occurred around the holidays, so,

14  no, I would not characterize that as a gift to me personally.

15  Q.   What about the olive oil?

16  A.   That went into our break room as well.

17  Q.   What would people do with it in the break room?  I get

18  eating a cookie, but what do you do with olive oil?

19  A.   They had lunch -- typically, a lot of people had lunch in

20  our break room.  It's not unusual to see a bottle of olive

21  oil.

22  Q.   And you got these -- I'm saying "you" now.  If you want to

23  say collectively, the planning department, got these every

24  year, didn't they?

25  A.   There were a few.  We didn't have a lot.  I mean, it

1    varied.  With the recession, the holiday treats certainly

2    dropped off, but when business was good, there were treats

3    around the holidays.  I think that's fairly common for every

4    public jurisdiction.

5    Q.   In fact, you looked forward to getting them, didn't you?

6    A.   I did, especially the See's candy.

7    Q.   You would send, for example, an e-mail to Teichert

8    thanking them for the cookies and olive oil because you looked

9    forward to getting them every year, didn't you?

10   A.   I thought that was the courtesy thing to do.

11   Q.   Plaintiffs' 676 is one of those e-mails you would send

12   thanking Teichert for the goodies, wasn't it?

13   A.   What exhibit did you say?

14           THE COURT:  What binder would it be in?

15           MR. YETTER:  It's behind tab 3.

16           THE WITNESS:  Yes, I see that.

17   BY MR. YETTER:

18   Q.   That is one of your e-mails thanking Teichert for the

19   goodies, isn't it?

20   A.   I believe so.

21           MR. YETTER:  Plaintiffs' Exhibit 676PX.

22           THE COURT:  Any objection?

23           MR. MARK O'DEA:  No objection, Your Honor.

24           THE COURT:  All right.  Exhibit 676 is admitted.

25       (Plaintiff Exhibit 676 was received into evidence.)

1   BY MR. YETTER:

2   Q.   Here it is December 3rd, 2008, three weeks before

3   Christmas and it's from you, Jeff Gamel.

4        That's you, isn't it?

5   A.   Yes.

6   Q.   Can we blow up the signature block at this point.  It

7   says:  Senior planner mining and vineyard team.

8        That is what you were doing as of December 3rd, 2008;

9   true?

10  A.   I was the Aggregate Resource Manager in 2008.  The

11  signature block needed to be updated.

12  Q.   At this point in 2008, you were the person whose salary

13  and benefits was being funded by some big corporations,

14  including Teichert; right?

15  A.   Well, I would say that my salary and benefits was being

16  funded by the county.  It was being paid by the county.  The

17  large aggregate producers were the agreement providing the

18  source of funding to prioritize their applications.  I think

19  it's maybe a mischaracterization to say I was being paid by

20  the large aggregate producers.

21  Q.   Fair enough.  They were funding the payments by the

22  county; right?

23  A.   I think that's correct.

24  Q.   And you sent this e-mail to John Lane, he's a Teichert

25  executive, isn't he?

1    A.    Yes.

2    Q.    You knew him well at that point, didn't you?

3    A.    I knew him.  I don't know if I would say well, but I knew

4    him.

5    Q.    Well enough to call him John, his first name?

6    A.    Correct.

7    Q.    (Reading:)

8          Thanks for the cookies and olive oil.  I'm getting so I

9    look forward to these each year!

10         Because you had had them before; right?

11   A.    They brought them by every year.  I think that was the

12   case.

13   Q.    Now, a minute ago you said it would be wrong,

14   "inappropriate," I think you said, for you to be talking to

15   one competitor about another competitor confidentially.  I use

16   the word "secretly."  I'll use the word "confidentially" now;

17   right?

18   A.    I think that would be the case.

19   Q.    In this same e-mail where you're thanking John Lane about

20   the goodies, you talk to him about another competitor?

21   A.    That's true.

22   Q.    After the second paragraph, after the thank you paragraph,

23   you say:

24         Regarding the Schneider Hardesty mining follow-up.

25         Do you see that?

1    A.   I do.

2    Q.   At this point, Mr. Gamel, in December 2008, you had

3    actually had been talking with Teichert about Hardesty

4    Schneider for sometime, hadn't you?

5    A.   There had been a couple of meetings in my office that I

6    participated in that involved Teichert, Mr. Lane, and Teichert

7    attorneys, my supervisor.  I think the Planning Director was

8    at those meetings.  There were a couple of meetings.  I think

9    this is one where I followed up from a meeting.

10   Q.   Let's make sure we all understand what you're talking

11   about.

12        As of December 2008, there had been at least a couple of

13   meetings where Teichert officials had come to the county and

14   the County Planning Director and your boss in the County

15   Planning Department and you as the Aggregate Resource Manager,

16   had met with the Teichert executives to talk about another

17   competitor.

18        Is that right?

19   A.   That's correct.  We had many meetings where we would be

20   lobbied on one position or the other, so it was not that

21   unusual.

22   Q.   And you talked about the Schneider Hardesty Mine,

23   Schneider Historic Mine; right?

24   A.   That's true.

25   Q.   And the Hardesty Sand and Gravel operation; true?

1    A.    Correct.

2    Q.    In this paragraph, what you share with the Teichert fellow

3    is that:

4         You had contacted our agency contracts desk as well as the

5    general services purchasing.

6         Those are the people within the county that know who the

7    county does business with; is that correct?

8    A.    That's correct.

9    Q.    Because Teichert had asked you:  Is the County of

10   Sacramento doing business with Hardesty Sand and Gravel,

11   hadn't he?

12   A.    I believe it was more of an accusation that he believed

13   the county was purchasing material from the Schneider Historic

14   Mine and their mine was not on the 3098 list.  We haven't

15   talked about that.  That's a list maintained by the state and

16   then prohibits public agencies from purchasing mine material

17   from anyone not on that list.

18        So I think that was a fairly significant accusation, and

19   my supervisor and I felt we needed to look into it and provide

20   information so it wouldn't get back to the state that that's

21   what we were doing.  We did discover that that was not the

22   case.  We were not purchasing material.

23   Q.    What you say in this e-mail is you are telling Teichert, a

24   major competitor for gravel in the Sacramento County, who

25   Hardesty Sand and Gravel does business with; aren't you?

1              MR. MARK O'DEA:  Objection --

2              THE WITNESS:  No, that's not correct.

3    BY MR. YETTER:

4    Q.  Because you're telling them --

5              THE COURT:  That objection is sustained.

6    BY MR. YETTER:

7    Q.  You're telling them that Hardesty Sand and Gravel doesn't

8    do business with the county?

9    A.  Or the county doesn't do business with Hardesty Sand and

10   Gravel.

11   Q.  Why is that any of Teichert's business?

12   A.  Well, I didn't want Teichert to go back to the state and

13   tell them we were doing that, because then we would be subject

14   to probably administrative penalties.

15       I didn't want Teichert to tell any other producers that

16   that's what we were doing because we are a responsible agency

17   and we should be upholding the state requirements, such as the

18   3098 list.

19   Q.  You go on to say:

20       I have forwarded the attached letter to provide notice of

21   the purchasing restrictions.  It appears that OMR --

22       That is the State Mining Agency, isn't it?

23   A.  That's correct.

24   Q.  -- is attempting to gain access to the property.

25       That's the Schneider Historic Ranch; true?

```
1    A.   Correct.

2    Q.   -- in response to some photos that the Fish and Game

3    group --

4         That's the State Fish and Game Department; right?

5    A.   That's correct.

6    Q.   -- took during their site visit in September; right?

7    A.   Correct.

8    Q.   So now you're sharing with Teichert what a state agency

9    has told you that they're going to do as to the Schneider

10   Historic Mine; right?

11   A.   I believe Mr. Lane already knew this information.  He

12   presented it to us in the meeting.

13   Q.   That is not public information, is it?

14   A.   No, it's not public information.

15   Q.   You go on to say to Teichert:

16        I am working with OMR -- the state agency -- to see if we

17   can partner on the site inspection.

18        Now what you do with the state agency is not public

19   information either, is it?

20   A.   That is correct.  That's not public record.

21   Q.   If we can partner on the site inspection --

22        That's the site inspection of the Schneider Historic Mine;

23   correct?

24   A.   True.

25   Q.   -- and any potential SMARA violations; right?
```

1   A.   Correct.

2   Q.   Now, you knew because Mr. Winter had been your

3   predecessor, that he had been out there and done inspections

4   of the Schneider Historic Mine in 2005, 2006, 2007, and 2008?

5        You knew that, didn't you?

6   A.   That's correct.

7   Q.   He had found zero violations; true?

8   A.   Correct.

9   Q.   So what you're now sharing with Teichert is your internal

10  conversations with the state agency to see if you all can

11  partner and go on a site inspection on Schneider Historic Mine

12  and see if there is any potential violations out there; true?

13  A.   Well, I wanted to make sure that we were a part of that

14  effort, that we would not let OMR take the lead and identify

15  their own violations because that was our job as a lead agency

16  to conduct those inspections and identify violations, so I

17  think I'm telling Mr. Lane here that we are going to do our

18  job.

19       Now, unfortunately, that's not what happened.  OMR got out

20  there ahead of us --

21  Q.   I'm asking you what you're telling Teichert in this e-mail

22  is what you discussed in the state agency about what you're

23  planning to do on a site visit to Schneider Historic Mine;

24  true?

25  A.   Correct.

1          MR. MARK O'DEA:  Counsel, did you say "Mr. Teichert"?

2          THE COURT:  There was a question.

3          MR. YETTER:  I didn't understand.

4          THE COURT:  The question did include Teichert.

5          MR. MARK O'DEA:  Objection.  Misstates his testimony

6    as to Mr. Teichert.

7          THE COURT:  He did not say that.  He said "Teichert"

8    not "Mr. Teichert."  The record is clarified.  The answer

9    stands.

10   BY MR. YETTER:

11   Q.   Now, Mr. Gamel, you know at this point in December 2008,

12   what you were doing to Teichert was exactly what they've been

13   asking you and imploring you to do for months and months,

14   wasn't it?

15   A.   I'm not sure I understand the question.

16   Q.   We'll get to those.  The last thing you say:

17        Will let you know -- in other words, Teichert -- of any

18   new developments.

19        Do you see that?

20   A.   I do see that.

21   Q.   What you're telling the Teichert folks, so we all

22   understand:

23        Here's what I'm planning.  Here's what I've been

24   discussing with the state agency, and I'll let -- I'll keep

25   you updated on developments all about another competitor;

1   true?

2   A.   That was not my intent.  I think I was trying to be

3   noncommittal in all this.  I didn't want Teichert involved in

4   our decisionmaking, in our inspections, that type of thing,

5   but I still wanted to maintain good relationships with

6   Teichert because we had to work with them.

7        So I didn't want to be off-putting to Mr. Lane.  It may

8   have been a poor choice of words there, but I had no intention

9   of keeping him informed, and I think the action we took on

10  this will demonstrate that.

11  Q.   We'll get to all that.

12  A.   All right.

13  Q.   We asked you about all this, these conversations with John

14  Lane, the Teichert executive, in your deposition in this case,

15  didn't we?

16  A.   I don't recall what questions you asked.

17  Q.   Let me ask it again then.

18       Is it true, Mr. Gamel, for you to say that you had no

19  communication in person or by e-mail with Jonathan Lane

20  regarding the Schneider Mine, would that be true for you to

21  say?

22  A.   No, that would not.  In fact, I do recall saying in the

23  deposition that we had a couple of meetings with them from

24  time to time where they would come in to lobby us on their

25  position.  Mr. Lane was quite passionate how he felt.

1   Q.   In fact, what you said -- let me ask it again.

2        Would it be true for you to say that you never initiated

3   or responded to any e-mails from John Lane about Schneider

4   Historic Mine?

5   A.   I may have responded to a couple e-mails.  I did have to

6   work with Mr. Lane on Teichert matters.  It's fair to say I

7   did correspond with him.

8   Q.   This e-mail, Plaintiffs' Exhibit 676, was from you to

9   Mr. Lane about Schneider Historic Mine, wasn't it?

10  A.   It was a follow-up to a meeting.

11  Q.   And you told us in your deposition that you never

12  initiated any communication by e-mail with John Lane regarding

13  the Schneider Mine, didn't you?

14  A.   I don't recall that.

15  Q.   Can we pull up deposition, page 115, and we will put the

16  whole page on the screen.

17       This is your deposition on June 4, 2015, about a year and

18  a half ago?

19            THE COURT:  The deposition should not displayed.

20            MR. MARK O'DEA:  Thank you, Your Honor.

21            MR. YETTER:  Would you like him to just look at it?

22            THE COURT:  You can use it for impeachment.

23  Typically, you can read portions.

24            MR. YETTER:  I'm going to read this to you.

25            MR. MARK O'DEA:  Could we have page and lines,

1  please?

2          THE COURT:  There are two volumes.

3          MR. YETTER:  I'm only using the first volume.

4          THE COURT:  What line?

5          MR. YETTER:  Line 4 through line 8.

6          THE COURT:  Any objection to reading that excerpt,

7  Mr. O'Dea?

8          MR. MARK O'DEA:  No objection, Your Honor.

9          THE COURT:  You may read that.

10  BY MR. YETTER:

11  Q.  Line 4.

12      Question:  And so did you ever have any communication in

13  person or by e-mail with Jonathan Lane regarding the Schneider

14  Mine?

15      Answer:  I did not.  I can't say that he did send me

16  something.  I never initiated anything or responded.

17      Is that true testimony, Mr. Gamel?

18  A.  I think that may be.  I most likely did not recall these

19  e-mails nor did you show them to me.

20          THE COURT:  We're not locating a copy of that

21  deposition.  The court should have sealed copies of the

22  original transcript.

23          MR. YETTER:  We will find another copy.

24          THE COURT:  If there's an objection, I'll need to

25  make certain I locate my copy.  All right.

1   BY MR. YETTER:

2   Q.   Now, you had lots of conversations with the folks at

3   Teichert, didn't you, Mr. Gamel?

4   A.   They came in a couple of times, as I indicated, to lobby

5   us on their position regarding the Schneider Historic Mine and

6   then I did have lots of conversation with them regarding their

7   own mines.

8   Q.   And this conversation that you had with -- this e-mail

9   conversation in Plaintiffs' Exhibit 676 was directly with one

10  of the senior executives, John Lane; correct?

11  A.   That's correct.

12  Q.   You also had conversations with their lawyers, like Kate

13  Wheatley; true?

14  A.   That's correct.

15  Q.   But before we get to Kate Wheatley, you told us that you

16  became Aggregate Resource Manager in 2008; right?

17  A.   Correct.

18  Q.   But you were talking to the Teichert folks about Schneider

19  Historic Mine in 2007, weren't you?

20  A.   I don't recall any conversations in 2007.  I wasn't the

21  Aggregate Resource Manager so --

22  Q.   You shouldn't have been talking to them about Schneider

23  Historic Mine; right?

24  A.   I don't know why I would be.

25  Q.   Let's go to tab 5, Joint Exhibit 143.

1           THE COURT:  Are we getting some interference?

2           MR. YETTER:  It stopped.

3   Q.   Let's start with the bottom e-mail.

4   A.   Okay.

5   Q.   All the way down.  Okay.  So tell us, this is an e-mail

6   that you're involved in, isn't it, Mr. Gamel?  You're the

7   "Jeff," aren't you?

8   A.   Yes, I see that.  Mr. Lane has sent me something regarding

9   the Schneider Historic Mine.

10  Q.   This is from John Lane, the Teichert executive; is that

11  correct?

12  A.   That's correct.

13  Q.   Dated September 24, 2007, before you became Aggregate

14  Resource Manager; right?

15  A.   Right.

16  Q.   To Jeff Gamel?

17  A.   Yes.

18  Q.   And Kate Wheatley.

19       Who is she?

20  A.   An attorney representing the Teichert individuals.  She

21  works for John Taylor's office.

22  Q.   Here you have a Teichert executive and the Teichert

23  attorney talking to you who is not -- Jeff Gamel -- who is not

24  the Aggregate Resource Manager and doesn't have authority over

25  the Schneider Historic Mine; right?

1    A.   That's correct.

2    Q.   And the subject of the e-mail is "Hardesty."  True?

3    A.   That's what it appears to be, yes.

4    Q.   We're not going to get into the whole e-mail, but it's

5    "Jeff."  Obviously, you all knew each other at that point,

6    didn't you?

7    A.   I knew Mr. Lane from other Teichert mining applications.

8    That's correct.

9    Q.   So what he says:

10        Jeff, attached are four aerial photographs.

11        So he's sending you photographs of the Schneider Historic

12   Mine, the Hardesty mining operation, isn't he?

13   A.   It would appear so.

14   Q.   Then he goes on to say, and we can read the whole thing,

15   but I'll leave it for us to read.  He goes on to basically

16   complain about Hardesty Sand and Gravel, doesn't he?

17   A.   Yes.  It sounds like the same argument he made to us when

18   he came in to meet with us.

19   Q.   Okay.  But we're talking about 2007 before you become the

20   Aggregate Resource Manager and before you had any authority

21   over these mines around the county, Teichert is going to you,

22   isn't it, Mr. Gamel?

23   A.   I don't know why they would be coming to me, but I see

24   they sent this e-mail to me, correct.

25   Q.   At the bottom he says:

1        Hardesty is selling so far below market.

2        He was complaining that their prices were too low, wasn't

3   he?

4   A.   That appears to be the case.

5   Q.   When he sent you these photographs, the last sentence he

6   said:

7        Oh, by the way, if you share the photographs, be discrete.

8   Can you please be discrete if you share these photos on their

9   source.

10       Right?

11  A.   I see that.

12  Q.   So what what he was asking you, and this is what you

13  understood, that the Teichert executive with the Teichert

14  lawyer was giving you information about a competitor, Hardesty

15  Sand and Gravel, and he was telling you:  Don't tell people

16  where you got these photos.

17       Is that what you understood?

18  A.   That appears to be the case.

19  Q.   Does that sound like on the up and up to you, Mr. Gamel?

20  A.   I didn't really give this much thought.  I may have turned

21  it over to Mike Winter.

22  Q.   Let's see what you did.  Let's go to the top and see if

23  you responded.

24       By the way, you said you never responded to his e-mails,

25  but you did, didn't you?

1   A.   I did respond to this one.

2   Q.   You responded even before you became the Aggregate

3   Resource Manager.  September 24th, same day, three hours

4   later, less than three hours later, you responded, didn't you?

5   A.   Yes, I can see that.

6   Q.   You said, "Thanks."

7        That was thanks for the photographs of Hardesty Sand and

8   Gravel; true?

9   A.   I would assume so.

10  Q.   (Reading:)

11       I can appreciate your level of concern looking at these

12  photos.  We will see what we can do.

13       That's what you told him, isn't it?

14  A.   Appears to be the case.

15  Q.   Signed, "Jeff"?

16  A.   Uh-huh.

17  Q.   True?

18  A.   Yes, that's true.

19  Q.   And "we" was the county, wasn't it?

20  A.   I would assume that would be the county, yes.

21  Q.   Now, you told us just a minute ago -- well, you had

22  ongoing conversations not just with Mr. Lane, but with the

23  lawyers from Teichert, didn't you?

24  A.   They came in for the meetings with Teichert, that's

25  correct.  I may have followed up, exchanged some e-mails with

1   them.

2   Q.   One of the e-mails is on tab 4, Joint Exhibit 275.

3        We're going to go forward in time to 2009.

4   A.   Want me to turn to that one?

5   Q.   Yes.  Of tab 4?

6   A.   Okay.  (Witness complies.)

7            MR. MARK O'DEA:  I object to the exhibit being shown

8   before it's admitted into evidence.

9            THE COURT:  It's a Joint Exhibit 275; agreed?  It's

10  behind tab 4 in the excerpts?

11           MR. MARK O'DEA:  Agreed, Your Honor.

12           THE COURT:  Okay.

13  BY MR. YETTER:

14  Q.   Start with the Kate Wheatley e-mail at the bottom.  She's

15  the lawyer for Teichert.  On March 18, 2009, she is asking you

16  about other aerial photos.

17       Do you see that?

18  A.   I do.

19  Q.   They are of the Schneider Historic Mine and Joe Hardesty's

20  operations out there, aren't they?

21  A.   That's correct.

22  Q.   She says:

23       Hello, Jeff.  Would it be possible for us -- meaning

24  Teichert's attorneys -- to get copies of the aerial

25  photographs you brought to our meeting last week?

1        Do you see that?

2    A.   I do.

3    Q.   We'd be happy to get a copy service, et cetera, et cetera.

4        Let's see how you responded at the top.

5        Here's the county, and, evidently, the county took some

6    aerial photographs of the Schneider Historic Mine; right?

7    A.   This was the -- we had a large collection of aerial

8    photographs that we had contracted to have flown every couple

9    of years, so, yes, we had those photographs in-house.  They're

10   public record.

11   Q.   So your response to Ms. Wheatley about three hours later:

12       I will be happy to share these with you.

13       See where I'm referring?

14   A.   I do.

15   Q.   And you tell her that you've made copies for 1953, 1973,

16   1986, 1995, 2004, and 2007.

17       Do you see that?

18   A.   Yes.

19   Q.   Again, this is of a competitor to Teichert; true?

20   A.   That is true.

21   Q.   We had a reason to prepare those, however, and it took a

22   long time to put them together; it took about three or

23   four hours to put together each of these big maps of

24   photographs, didn't it?

25   A.   I think I was exaggerating a bit because I didn't want to

1   have to do any more as far as putting additional maps

2   together.  I think that's what Ms. Wheatley is suggesting

3   here.  We had put these maps together for a specific reason.

4   We haven't covered that yet, but that prompted us to put some

5   maps together.

6   Q.   Let's look at the last three sentences.  You're telling

7   the Teichert attorney:

8        Not sure we can allocate any more time to this task.  I

9   probably should note that this was not something that we

10  included in our mining-related invoices to the producers.

11       The producers are the three or four at the time big

12  companies that were funding the funding contract; true?

13  A.   That's true.

14  Q.   (Reading:)

15       I billed the time to the other sources.

16       That's what you told the Teichert attorney; right?

17  A.   I'm trying to dissuade her not to prepare any additional

18  maps because I knew Teichert would only pay for Teichert work

19  and Granite would pay for Granite work.  We didn't have a

20  funding source and didn't have the resources to prepare these

21  maps.  They were time consuming, but we did prepare a few in

22  response to a complaint we had received.

23  Q.   What you're telling her, you're not going to put the time

24  that you said that you allocated to this job for Teichert onto

25  the invoices to Teichert and the other big corporate

1  producers; right?

2  A.   That's correct.

3  Q.   Because you billed it to other sources; true?

4  A.   Correct.

5  Q.   Now, because you have daily time records, I guess that

6  could show later to people what you were doing for the big

7  producers; right?

8  A.   That's correct.  As I indicated, Teichert would only pay

9  for a billed invoice for Teichert work.  Same with other

10 parties to the agreement, so if we were doing enforcement work

11 or work for some of the other mining interests, we would bill

12 it directly to them or to other sources.

13 Q.   But if you don't put the work you're doing for Teichert on

14 the work records, then no one knows what you're doing for

15 Teichert; true?

16 A.   I'm not sure I follow you.

17 Q.   Now, even though in 2007 Mike Winter was the Aggregate

18 Resource Manager, you know that Teichert was telling other

19 agencies to contact you, Jeff Gamel; right?

20 A.   Before I was the Aggregate Resource Manager in 2008?

21 Q.   Correct.

22 A.   I did not know that.

23 Q.   Tab 7, Joint Exhibit 144.  The very top e-mail is from

24 this fellow that we've been talking about, John Lane; right?

25 A.   I see that.

1  Q.   And it's November 26, 2007.  That's before you were the

2  Aggregate Resource Manager, isn't it?

3  A.   Yes.

4  Q.   This is after you told him:  "Will see what we can do,"

5  isn't it?

6  A.   I believe that is correct.

7  Q.   Because you told him that on September 24, 2007?

8  A.   Okay.

9  Q.   So this is about two months later.  In the first sentence,

10 John Lane is talking to another agency that Mike Finan is at;

11 true?

12 A.   I think that's the case.

13 Q.   The U.S. Army Corps of Engineers guy?

14 A.   Uh-huh.

15 Q.   In the first paragraph he says:

16      Mike, thank you for your work on this.  As it stands, you

17 have everything that I can provide to you.

18      The contact person at Sacramento County is who?

19 A.   That would be me.

20 Q.   Jeff Gamel.

21      And he was aware of the situation and may be able to

22 provide the Army Corps of Engineers more information.

23      So he gives this guy your e-mail.  That's your correct

24 e-mail at the time?

25 A.   Yes, it is.

1   Q.   He says his phone number, and that's your correct phone

2   number, isn't it?

3   A.   That's correct.

4   Q.   This is in 2007 before you even became the Aggregate

5   Resource Manager; true?

6   A.   Yes.  Interesting.  True.

7   Q.   Now, the Army Corps of Engineers is one of the folks that

8   you talked to about Schneider Historic Mine, isn't it?

9   A.   I returned a call from someone with the Army Corps of

10  Engineers, that's correct.  They called me.

11  Q.   In 2008, a few months after Teichert was telling everybody

12  you were the contact person, you talked to the Army Corps of

13  Engineers guy, didn't you?

14  A.   As I indicated, they called me.  I merely returned their

15  call.  I think what logically flows from this e-mail is that

16  he has asked someone to contact me.

17  Q.   Teichert is telling people to call Jeff Gamel.

18       Tab number 8, Joint Exhibit 152, is a record of the Army

19  Corps of Engineers' conversation with you, Jeff Gamel, isn't

20  it?

21  A.   Quite a few months later.

22  Q.   This is May 28, 2008; correct?

23  A.   That's when I would be the Aggregate Resource Manager,

24  that's correct.

25  Q.   It says, "Conversation Record" at the top; right?

1   A.   Correct.

2   Q.   The person contacted is who?  Jeff Gamel?  You see that?

3   A.   Yes.

4   Q.   The subject matter is, "Hardesty Sand and Gravel Mine."

5   Right?

6   A.   Yes.

7   Q.   Now, the summary of the conversation:

8        We spoke about what the county is doing on the Hardesty

9   violation.

10       Well, what violation is he talking about?  Because Mike

11  Winter had found no violations at this point.

12  A.   I don't know what he's talking about.

13  Q.   He said the county had a very large file on this; isn't

14  that true?

15  A.   That's true.

16  Q.   The land owner, Jay Schneider, claimed to have vested

17  rights to mining the property without a county use permit

18  because the operation has been ongoing prior to the county

19  code.  The county required a reclamation plan and is not

20  planning any other action on this site.

21       Do you see that?

22  A.   I do.

23  Q.   That's what you told the Army Corps of Engineers, isn't

24  it?

25  A.   That's not necessarily what I told him.  That's his

1  interpretation of our conversation, so I can't say whether or
2  not this is true, but it sounds reasonable.
3  Q.   Okay.  That's interesting.  So as of May 2008, the county
4  wasn't going to do anything else.
5       The next paragraph says -- he's talking about what you
6  said:
7       He said other mining companies have shown interest in this
8  project alleging that Hardesty has won contracts based on
9  artificially lower prices due to not spending any money on
10 environmental compliance.
11      That's what he said you told him; right?
12 A.   That is correct.
13 Q.   And the other mining companies you told him about included
14 Teichert, didn't they?
15 A.   I don't know which companies they were.  These aren't my
16 words.  This is his recollection of the conversation.
17          THE COURT:  Just so the parties agree, Zachary
18 Simmons worked for the Army Corps of Engineers?
19          MR. YETTER:  Yes, he did, Your Honor.
20          MR. MARK O'DEA:  Yes.
21          THE COURT:  So that's agreed.
22 BY MR. YETTER:
23 Q.   Now, five days later, five days after your conversation
24 with the Army Corps of Engineers fellow, Zach Simmons, they
25 issued a letter to Hardesty Sand and Gravel and Schneider

1   Historic Mine, didn't they?

2   A.   I think I recall that.

3   Q.   Five days later; true?

4   A.   Could be.  I don't remember the exact date.

5   Q.   This fellow, Zach Simmons, never even went to the mine, to

6   your knowledge, did he, at this time?

7   A.   I have no idea.

8   Q.   Let's go to tab 10, Joint Exhibit 155.  If we go to

9   page 3, you recognize this, don't you?

10  A.   The e-mail at the bottom?  Yes, I recognize this.

11  Q.   This is June 2, 2008, five days later at your conversation

12  with Mr. Simmons; true?

13  A.   It appears that, yes.

14  Q.   And if you look at the top right-hand corner, this was

15  received by the planning department and the county two days

16  later on June 4, 2008; right?

17  A.   Yes.

18  Q.   This is to Hardesty Sand and Gravel talking about supposed

19  wetlands on the Schneider Historic Mine; right?

20  A.   That appears to be what the letter is based on.  It also

21  appears that it's an unauthorized discharge into waters,

22  probably the Consumnes River.

23  Q.   Let's go to the last page of this exhibit, page 4.

24       See the last paragraph and the signature?

25  A.   I see that.

1    Q.   The signature is by a fellow by the name of Michael

2    Jewell, who is the chief, but he says if you have any

3    questions, who should you contact?

4    A.   Zachary Simmons.

5    Q.   That's the guy you talked to?

6    A.   That's correct.

7    Q.   Who does Zach Simmons and Michael Jewell put a copy of

8    this letter to at the bottom?

9    A.   Put a copy to me.

10   Q.   Jeff Gamel?

11   A.   Uh-huh.

12   Q.   Yes?

13   A.   That's correct.

14   Q.   When you got this on June the 4th, this was a private

15   letter from the Army Corps of Engineers to Hardesty Sand and

16   Gravel and copied some other government agencies, but this is

17   not public information --

18           MR. MARK O'DEA:   Objection.   Lacks foundation as to

19   "private."

20           THE COURT:   Sustained.

21   BY MR. YETTER:

22   Q.   This is not public information, is it, Mr. Gamel?

23   A.   I would say it is.   Any documents we have in our office is

24   public information; furthermore, this document indicates that

25   they are copying it to my office, planning, to solicit

1  comments from the local jurisdiction on page 2, so I assume

2  that's why I am listed.  I'm the local jurisdiction.  They're

3  soliciting comments from me.

4  Q.   And the first thing you did with this letter was send it

5  to Teichert, wasn't it?

6  A.   Are we talking about the other e-mail, the first

7  Exhibit 155?

8  Q.   Yes.

9  A.   Mr. Lane asked for this exhibit.  He knew it was coming.

10  Q.   Bottom of page 1, let's look at the e-mail at the bottom

11  of page 1.  This is from Jeff Gamel.

12      Again, in your deposition, you said you never initiated

13  any conversations with John Lane about Hardesty Sand and

14  Gravel or Schneider Historic Mine.

15      Here's another one, isn't it, in June of 2008?

16  A.   Again, I think this is a follow-up to a meeting where

17  Mr. Lane had requested a copy of the letter and also indicated

18  that he was going to file a written complaint against the

19  Hardesty operation.

20  Q.   In one of your earlier letters you said:  I'll keep you

21  posted on developments, and that what you were doing?

22  A.   I intended to be noncommittal on that and never intended

23  to follow through.  I just wanted to keep a good relationship

24  with Mr. Lane and Teichert.

25  Q.   So when you sent this letter from the Army Corps of

1   Engineers, the very next day you got it, you said to Michael

2   and John:  Here is something interesting from the corps.

3        That's what you said; right?

4   A.   I thought it was interesting, yes.

5   Q.   What is the status of the Teichert letter regarding the

6   Hardesty operation; true?

7   A.   Yes.

8   Q.   So now you're asking Mr. Teichert:

9        What are you guys going to be doing to object to Joe

10  Hardesty's operation?  Keep me updated.

11       Right?

12  A.   No.  At the meeting they said they were going to file a

13  written complaint.  I'm asking what the status of that

14  complaint was.

15  Q.   You wanted to be updated.  Just like he had asked you to

16  update him, you wanted him to update you; true?

17            MR. MARK O'DEA:  Objection.  Misstates the testimony.

18            THE COURT:  Sustained.

19  BY MR. YETTER:

20  Q.   Now, at this point in 2008 -- this is June the 5th,

21  2008 -- you're still not the Aggregate Resource Manager, are

22  you?

23  A.   In 2008 I would be the Aggregate Resource Manager.

24  Q.   In June of 2008 you were not the Aggregate Resource

25  Manager, were you?

1   A.   I was the Aggregate Resource Manager the beginning of

2   2008.

3   Q.   In June of 2008, three weeks after the Army Corps of

4   Engineers' letter, the Aggregate Resource Manager did an

5   inspection of the Schneider Historic Mine, didn't he?

6   A.   Mr. Winter did the inspection.  I asked him to do the

7   inspection because he was familiar with that operation.  I did

8   many of the other inspections that year.  In fact, I did all

9   the other inspections.

10  Q.   Let's make sure we understand.  As of June 2008, you're

11  not even doing inspections of the Schneider Historic Mine, yet

12  you're talking with Teichert about the Schneider Historic

13  Mine; right?

14  A.   That's correct.  I was the Aggregate Resource Manager.

15  Q.   Let's go to tab 2 in your notebook, Joint Exhibit 157.

16  It's already in evidence.  Let's make sure we understand the

17  date.

18      This is June 26th.  On the third page at the bottom,

19  June 26, 2008, this is an inspection of the Schneider Historic

20  Mine and it's by Mike Winter; right?

21  A.   That's correct.

22  Q.   It finds no violation, doesn't it?

23  A.   That's correct.

24  Q.   Did you tell the fellow at the Army Corps of Engineers

25  that you weren't even inspecting the Schneider Historic Mine;

1    that you never inspected it when you had this conversation

2    with him five days after he sent the letter?

3    A.   I don't think that was relevant to our discussion.   I

4    believe he wanted general information, what type of

5    entitlements, the history, that type of thing.  I don't think

6    I needed to disclose who inspected the mine.  I didn't think

7    it was germane to our conversation.

8    Q.   Do you think after you found out for the third year in the

9    row there were no violations that you disclosed that to the

10   Army Corp of Engineers?

11   A.   No, I did not disclose that.

12   Q.   Now, you knew -- let's turn to a little bit of history.

13   You knew about the Schneider Historic Mine for a number of

14   years before you became the Aggregate Resource Manager, didn't

15   you?

16   A.   I'm not sure that I knew about it.

17   Q.   Because you were involved way back in the 1990s when the

18   county first recognized the vested right of the Schneider

19   Historic Mine.

20   A.   I was not.

21   Q.   Let's go to tab 11, which is Joint Exhibit 14.

22   A.   I see that.

23   Q.   This is -- let's just give a little context to help the

24   ladies and gentlemen.  This is a county document.  It's an

25   inter-department memo August 5, 1992, is it not?

1   A.   That is correct.

2   Q.   And Toby Johnson, supervisor, is sending it to Tom

3   Hutchings, the Director of Planning; true?

4   A.   That's correct.

5   Q.   This is the same planning department that you were in --

6          THE COURT:   I think you got that switched.  You said

7   Toby Johnson is sending it to --

8          MR. YETTER:   I'm sorry.  I did get it switched.

9   Q.   The planning guy, Tom Hutchings, is sending to Toby

10  Johnson, a supervisor, in the County of Sacramento; true?

11  A.   That's correct.

12  Q.   The subject matter is, "gravel mining activity on

13  Schneider Ranch."

14       Right?

15  A.   Correct.

16  Q.   This is 1992, before 1994 when the county said that

17  Schneider Historic Mine is vested.  This is part of the

18  beginning of that discussion.

19       You see where he says in the second paragraph:

20       In summary, Mr. Schneider may have a vested right for

21  surface mining?

22       Do you see that?

23  A.   Yes, I do.

24  Q.   And then there's a paragraph about vested rights further

25  down?

1   A.   I see that.

2   Q.   Your boss at the time -- Tom Hutchings was your boss at

3   the time, your boss's boss, wasn't he?

4   A.   That's correct.

5   Q.   As Director of Planning, he said:

6        According to Mr. Schneider, the existing mining operations

7   began in the late 1920s and became a principle source of

8   income for the ranch in the mid 1930s.

9        From this information, it appears that Mr. Schneider may

10  have vested rights to continue his mining operations.

11       Do you see what your boss's boss said there?

12  A.   Yes, I do.

13  Q.   Let's go to the end and go to the last paragraph.

14  A.   I see that.

15  Q.   Please let me know if you have any questions.

16       He's saying this to the Board of Supervisors member:

17       We will follow up with a letter to Mr. Schneider.  The

18  main contact people on my staff --

19       Are who?

20  A.   Jeff Gamel and Tricia Richards.

21  Q.   And who does he copy with this memo?

22  A.   The two of us, Tricia Richards and Jeff Gamel, along with

23  Cindy Storelli.

24  Q.   And Cindy Storelli, when you were Aggregate Resource

25  Manager, was your boss?

1    A.   True.

2    Q.   Robert Sherry, when you were Aggregate Resource Manager,

3    was your boss's boss; right?

4    A.   I believe that's the case.

5    Q.   You obviously knew about it at the time, 1992, that there

6    was an issue about Schneider Historic Mine becoming vested;

7    right?

8    A.   I did not know about it at the time.  I believe my name

9    was added because I was familiar with mining issues, and

10   Ms. Richards, who prepared this letter, felt that if anyone

11   could handle the questions, it would probably be me, so she

12   added my name to her letter.

13        I did not participate in any meetings or the decision of

14   whether or not there was a vested right on the property.  I

15   acknowledged that I received a copy of this letter, but not

16   having a role in this, I probably just tossed it aside.

17   Q.   Tab 13, Joint Exhibit 21, two years later after lots of

18   discussions, the County of Sacramento recognized that the

19   Schneider Historic Mine:

20        It has been accepted as evidence of vested interest, and,

21   therefore, we are not requiring a use permit.

22        You know that, right?

23   A.   I am familiar with this letter, that's correct.  Was not

24   familiar with it at the time.

25             THE COURT:  Clarify that.  When did he become

1    familiar?

2          MR. YETTER:  Yes, Your Honor.

3    Q.  Well, you obviously got the original memo; you know you're

4    copied on it?

5    A.  Right.

6    Q.  You're telling us you don't remember any discussions about

7    it; true?

8    A.  Yes.

9    Q.  But you know in the years -- you're familiar with that

10   1994 letter today, obviously, aren't you?

11   A.  Only because of my involvement in the Resource Manager

12   position in 2008 to 2012.

13   Q.  And you know that in the years since 1994 and the 2000s,

14   there were lots of discussion about a reclamation plan and

15   vested rights with the Schneider Historic Mine, don't you?

16   A.  I do because of my involvement in the Resource Manager

17   position, again, 2008, 2012.

18   Q.  Let's go to tab 17.  This is Joint Exhibit 55.

19         When you become the Resource Manager, you needed to

20   understand the status of the 12 or so mines in Sacramento

21   County; correct?

22   A.  Correct.

23   Q.  And so Joint Exhibit 55 is one of the county letters.

24   This is in July 28, 2000.

25         Do you see that, a county letter to Mr. Schneider?

1    A.   Yes, I see that.

2    Q.   Let's go to page 2 at the bottom, the last section,

3    Section 2, the first paragraph.  The county is telling

4    Mr. Schneider:

5         Your concern on this issue -- and this is all about the

6    reclamation plan -- the reclamation plan review process will

7    somehow be used to take away or restrict the right to continue

8    mining on the Schneider Ranch; however, the county has

9    repeatedly stated that the reclamation plan review process is

10   not a means to diminish the vested right to mine.

11   A.   I'm sorry?  What page are you on?

12   Q.   Bottom of page 2, the section called "two."

13   A.   I see that.  Okay.

14   Q.   Let's go to tab 18, Joint Exhibit 71.  This is about

15   four months later -- a year and a half later.  This is from --

16   let's go to the top first.  Let's see the top.  There you go.

17   This is from the County of Sacramento.

18        County counsel are the lawyers for Sacramento, aren't

19   they?

20   A.   That's true.

21   Q.   This is dated November 13, 2001, about a year and a half

22   later.  Let's go down to the discussion about the Schneider

23   Historic Mine.

24        Because the Schneider Mine has a vested right to conduct

25   mining, a use permit is not required under SMARA.

1          Do you see that?

2     A.   Yes.

3     Q.   This is part of the information that you had to be aware

4     of when you became Aggregate Resource Manager, isn't it?

5     A.   That's correct.

6     Q.   Let's go to tab 18, Joint Exhibit 72.  This is two months

7     later.  It's dated December 28, 2001.

8          This is to the Board of Supervisors of the entire County

9     of Sacramento; true?

10    A.   That's true.  Correct.

11    Q.   Let's go to the overview.  This is talking about the

12    reclamation plan.

13         The proposed project is a reclamation plan intended to

14    provide slope restoration revegetation of mined land for a

15    vested mining operation on the Schneider Ranch.

16         Do you see where I'm reading?

17    A.   Yes.

18    Q.   Due to a long established practice of mining, the county

19    and state have formally recognized Schneider's vested right to

20    mine without approval of a use permit.

21         Right?

22    A.   That's correct.

23    Q.   Let's go to page 2 at the top, top paragraph.  There you

24    go.  They talk about the mined land for a vested mine.  Very

25    first sentence, a vested mine on the Schneider Ranch -- and

1   the next sentence says:

2       The Schneider Ranch has a long established mining

3   operation such that the county and the state have formally

4   recognized Schneider's vested rights to mine.

5       True?

6   A.   That's correct.  I see that.

7   Q.   This is a memo by the county's lawyers, isn't it?  This is

8   a memo to the County Board of Supervisors?

9   A.   Yes.

10          THE COURT:  Are you looking at tab 18?

11          MR. YETTER:  I misspoke, Your Honor.  Tab 18 was from

12  the county lawyers.

13      Tab 19 is to the Board of Supervisors.

14          THE COURT:  So it's JX72.  That's in.

15          MR. YETTER:  JX71 and 72 are in.

16          THE COURT:  Agreed, Mr. O'Dea?

17          MR. MARK O'DEA:  Yes.

18  BY MR. YETTER:

19  Q.   Tab 20, Joint Exhibit 61, this is appearing with regard to

20  the Hardesty Sand and Gravel Schneider Historic Mine, and the

21  date is October 2002 -- I'm sorry -- October 2000.

22      Let's go to page 27 of the transcript.  Very bottom

23  paragraph.  These are comments by Mr. Floyd, Deputy County

24  Counsel with the County of Sacramento.  He's telling the

25  administrative board:

1          As you will see in the letter I wrote July 28th, we are

2     still talking about whether or not there's a vested right to

3     mine on the property at all, and that's something that the

4     county, I would just like to make clear for the record, has

5     repeatedly said to Mr. Schneider and the state as well, that

6     in our opinion, there certainly is a vested right to mine on

7     the property, and we do -- we have not disputed that at all

8     since 1994.

9          You see that language in that transcript, Mr. Gamel?

10    A.   Yes, I do.

11    Q.   This is something you needed to know as Aggregate Resource

12    Manager; right?

13    A.   I don't believe I've ever seen this transcript.  I'm not

14    sure we have access or had access to it.

15    Q.   Tab 16 is Joint Exhibit 85.  This is dated August 8th --

16              THE COURT:  Can we clarify the context?  The

17    transcript is what?

18              MR. YETTER:  And administrative hearing with Hardesty

19    Sand and Gravel Schneider Historic Mine.  It was held at the

20    Department of Consumer Affairs, Sacramento County.  It was

21    transcribed --

22              THE COURT:  Sacramento County?

23              MR. YETTER:  I'm sorry.  Sacramento, California.  The

24    board members were Mr. Grundwald, Muro, Buckley, Regal, and

25    Jones.

1            THE COURT:  Hearing before a state body?

2            MR. YETTER:  The Department of Conservation, yes,

3   Your Honor.

4            THE COURT:  The Department of Consumer Affairs?

5            MR. YETTER:  This says it was attended by the

6   Department of Conservation.  It was held at the Department of

7   Consumer Affairs.

8            THE COURT:  All right.  Is that a stipulation?  Just

9   to provide context for the jury, it was a Department of

10  Conservation State Mining and Geology Board hearing held at

11  the Department of Consumer Affairs.

12            MR. MARK O'DEA:  Agreed.  That's what it is, Your

13  Honor.

14            THE COURT:  You're moving on to the next tab?

15  BY MR. YETTER:

16  Q.   I am.  Tab 16, Joint Exhibit 85.  This is a transcript of

17  the Board of Supervisors' meeting on August the 8th, 2002.

18       Do you see that, Mr. Gamel?

19  A.   Yes.

20  Q.   That is the Board of Supervisors' meeting in which the

21  reclamation plan for Schneider Historic Mine was approved?

22  A.   The date looks familiar, so, yes.

23  Q.   Let's go to page 3.  This is -- we can start at page 2 to

24  give it some context.  The board clerk essentially calls

25  things to order, and Mr. Hutchings, who is the director of the

1  planning group at the time, says that one of his colleagues,

2  Rob, is going to make the presentation this morning.

3       Do you see that?

4  A.   What page?

5  Q.   I'm on page 2.  It's highlighted on the screen, if you

6  want to look at that.

7  A.   I'm not seeing it on my copy.  It starts at page 1.

8  Q.   Page 2 --

9           THE COURT:  Page 2 is identified on the bottom of the

10  page.  Page 1 is the upper right-hand corner.

11          THE WITNESS:  I see that now.

12  BY MR. YETTER:

13  Q.   Do you see where I'm referring?

14  A.   Yes.

15  Q.   Let's see who Rob is.  At the bottom it says -- somebody

16  new starts talking all the way to the bottom.  It's Rob

17  Burness.

18       You know him, don't you?

19  A.   Yes, I do.  He's a previous employee of Sacramento

20  planning.

21  Q.   He is a planning department employee and he discusses --

22  let's go to page 3, line 7 to the bottom.  This is 2002 -- the

23  approval of the reclamation plan, and the planning department

24  employee is telling the Board of Supervisors:

25       The property is located immediately south on both sides of

1    Meiss Road immediately south of Rancho Murieta Consumnes River

2    opposite the airport, covers about 3,000 acres.  The mining

3    area is not all of that area, but it is a good portion of it.

4    This particular application is an application for a

5    reclamation plan only.

6        Are you with me where I'm reading, Mr. Gamel?

7    A.   Yes.

8    Q.   It is not a mining use permit application.  It is the

9    result of initially a complaint from a neighboring property

10   owner regarding a lack of a county approval for ongoing mining

11   operations and as a result of a number of long discussions

12   with the county counsel, the lawyers; right?

13   A.   That's correct.

14   Q.   Planning staff, that's your group, isn't it, Mr. Gamel?

15   A.   Yes, it is.

16   Q.   And the State Division of Mines and Reclamation -- that's

17   the state equivalent for mining regulation?

18   A.   True.

19   Q.   Mines and geology.

20       As a result of a number of long discussions, it was

21   determined that the Schneider Historic Mine is what, Mr.

22   Gamel?

23            MR. MARK O'DEA:  Are you asking him to read the

24   transcripts?  Has the witness even seen this before?

25            THE WITNESS:  I have not.

1    BY MR. YETTER:

2    Q.   It's a vested mine; correct?

3    A.   Yes, I see that.

4    Q.   You looked at the reclamation plan at some point after you

5    became the Aggregate Resource Manager, didn't you?

6    A.   That's correct.

7    Q.   And you know the reclamation plan in the plan specifically

8    notes that this is a vested mine, don't you?

9    A.   I believe that's true, yes.

10   Q.   Let's confirm that at tab 21, Joint Exhibit 571, this is a

11   submittal later, years later, in the context of all of the

12   disputes by Mr. Schneider to the planning board in August of

13   2011.

14        What he is submitting, if we go to page 2, is the

15   reclamation plan approval papers from the Board of

16   Supervisors.

17        Do you see page 2 at the top?  It is the Board of

18   Supervisors, November 6, 2002?

19   A.   I see that.

20   Q.   That is the meeting at which the Board of Supervisors

21   approved the reclamation plan from the Schneider Historic

22   Mine; true?

23   A.   That's correct.

24   Q.   On the board at that time was Roger Dickinson, wasn't it?

25   A.   Yes, I can see that.

```
1   Q.   Now, let's go forward in these long papers.  It's a long
2   document --
3              THE COURT:  Did you characterize this exhibit as a
4   submittal letter?
5              MR. YETTER:  The first page is a submittal letter.
6   The submittal starts on the second page.  The first page is
7   the planning group given to the Board of Zoning Appeals, and
8   it's information that Mr. Schneider had submitted for the
9   appeal.
10             THE COURT:  I'm not seeing a submittal letter.
11             MR. YETTER:  I may have mischaracterized it a little
12  bit.  The planning group sending materials that Mr. Schneider
13  was submitting to the board.
14             THE COURT:  We've reached a good time for our
15  mid-morning break.  Let's take a 15-minute break.  During that
16  break, bear in mind all my admonitions.  We will start up in
17  15 minutes.
18        (Jury out.  10:01 a.m.)
19             THE COURT:  Mr. Yetter, yesterday you were estimating
20  75 minutes with this witness.  You are beyond that.  How much
21  longer do you need?
22             MR. YETTER:  It's slower than I expected, Your Honor.
23  I should probably be another 45 minutes I think.
24             THE COURT:  All right.  Is Mr. Peterson going to need
25  additional time?
```

1          MR. PETERSON:  I don't think so.  I don't want to

2     rule it out, but I don't anticipate that.

3          THE COURT:  All right.  15 minutes.

4      (A break was taken at 10:02 a.m.)

5      (Jury in. 10:23 a.m.)

6          THE COURT:  Welcome back, ladies and gentlemen.  You

7     may be seated.  Mr. Yetter advises he has about 45 minutes

8     more before we give Mr. O'Dea a chance to examine.

9          MR. YETTER:  Thank you.

10    Q.  We were last, when we broke, talking about the approval of

11    the reclamation plan in 2002, tab 21, Joint Exhibit 571 in

12    your notebook.

13    A.  I see that.

14    Q.  Let's go to page -- we've talked a bit about this

15    document.  We'll jump forward a little bit.  Page 8 is the

16    first page that shows the decision by the board.

17        You see in the middle where the board approved the

18    reclamation plan, right there, found --

19    A.  I'm not sure.

20    Q.  We're on the wrong page.  My fault.  I apologize.

21        Approved the reclamation plan subject to the findings and

22    recommended by staff.

23    A.  Yes, I see that.

24    Q.  Now, let's move forward to page 13.  This is:  The staff

25    made recommendations.

1          This is the planning staff, Mr. Gamel?

2     A.   Yes.

3     Q.   That's your group as of 2002?

4     A.   Yes.

5     Q.   The bottom part B, it says:

6          Justification the staff recommends.  Recommendations are

7     based on the following recommendations.

8          Let's focus on the fifth one:

9          Schneider Historic Mine has been in existence since the

10    19th Century and it is a vested mine under the provisions of

11    SMARA.  Areas mined for gold prior to 1976 included stockpiles

12    of aggregates -- that's sand and gravel.

13         That's what "aggregates" mean?

14    A.   That's right.

15    Q.   Let go to the next page at the top and go ahead and do the

16    top half of the page.  Specifically set aside for future sale.

17         That's the sand and gravel.

18         This type of historical vested mining operation is unique

19    from all other mining operations in Sacramento County.

20    Similar mining operations do not have the historical context

21    and are not vested.

22         Do you see where I was reading, Mr. Gamel?

23    A.   Yes, I see that.  This is the only vested mine in

24    Sacramento County.

25    Q.   You anticipated my next question.

1      You knew when you became Aggregate Resource Manager in

2  2008 that there was only one mine in the entire county that

3  had had that historical mining operation, and, thus, under the

4  law, was vested.

5      You knew that, didn't you?

6  A.   I knew that the Schneider Historic Mine had been vested by

7  Mr. Maddox' letter in 1994.  That's correct.

8  Q.   And it was the only mine in the entire county with that

9  status; true?

10  A.   True.  There were some clay pits out on Mr. Van Flex ranch

11  that is right next door that had been grandfathered or vested,

12  depends how you want to interpret that.  That was a provision

13  in our zoning code.  It was kind of a similar circumstance,

14  but this was the only aggregate mine that had that title

15  vested.

16  Q.   Let's go to the next discussion, C, and blow up that

17  discussion, a couple of pieces we want to look at.

18      In the discussion -- this is the staff, the planning group

19  talking to the Board of Supervisors.  The third sentence said:

20      You also directed staff to develop findings for approval

21  that reflect the unique circumstances of the ranch.

22      Do you see that, Mr. Gamel?

23  A.   I see that.

24  Q.   At the very bottom it says, the last, second to the last

25  sentence:

1      Please note also justification number five -- that's the

2    one we just read that was in bold highlighting -- identifying

3    the unique circumstances associated with the Schneider

4    Historic Mine, that this type of historical vested mining

5    operation is unique from all other mining operations in

6    Sacramento County.

7      True?

8    A.   I see that.  That's correct.

9    Q.   The last sentence is talking about the cash deposit, is it

10   not?

11   A.   Yes, it is.

12   Q.   In 2002 the staff told the Board of Supervisors finally

13   the financial assurances are now in order; correct?

14   A.   I see that, yes.  That's correct.

15   Q.   Let's turn to a couple other topics.

16     You told us just a minute ago that when you became

17   Aggregate Resource Manager, you knew that Hardesty Sand and

18   Gravel had a right to mine on the Schneider Historic Mine

19   because it was vested.

20     You knew that; right?

21   A.   Given the research that I had conducted at the time, yes,

22   I knew of the Rich Maddox letter and granted them a vested

23   right to mine on the ranch.  That is correct.

24   Q.   You told that to Roger Dickinson's office when they called

25   you and e-mailed you in 2008 about the Schneider Historic

1    Mine, didn't you?

2    A.   I may have.  I don't recall the specifics of that e-mail.

3    Q.   Let's go to tab 23, Joint Exhibit 214, and start on

4    page 3.  Because it's an e-mail, it goes backwards.  Let's

5    start on the last page.

6         Are you with me?

7    A.   Yes, I am.

8    Q.   This is from Dana Booth.  This is an internal e-mail that

9    says:  "Roger Dickinson's office."

10        Roger Dickinson at the time was on the Board of

11   Supervisors, was he not, in 2008?

12   A.   Yes, that's correct.

13   Q.   He was the chair, wasn't he?

14   A.   He could have been.

15   Q.   Roger Dickinson's office is inquiring.  Then they attach

16   an e-mail that we apparently don't have about -- and then the

17   subject of the e-mail says:  15000 Meiss, parentheses, Meiss

18   Road, parentheses, Hardesty mining.

19        Roger Dickinson's office is inquiring about Hardesty

20   mining on October 31, 2008; correct?

21   A.   Correct.

22   Q.   Let's go to page 2.  And so that e-mail gets forwarded to

23   the planning group to get an answer, doesn't it?

24   A.   Yes.

25   Q.   Let's go to page 2 at the top.  It eventually gets to you,

1  does it not, Mr. Gamel?

2  A.   Yes, it does.

3  Q.   The very one at the top?

4  A.   I see that.

5  Q.   That's your answer on the same day, October 31, 2008.

6  Maybe we could go back to page 1 at the bottom, just to get

7  some clarity.

8       Your answer at the very bottom:

9       Jeff Gamel, October 31, 2008, answering their question.

10      And you've copied Mike Winter.

11      You see where I'm referring?

12  A.   Yes, I do.

13  Q.   Page 2, let's see what your answer is.  This is about

14  Hardesty mining.  First paragraph.  The Dickinson e-mail was

15  asking about a code violation.  You say in your e-mail:

16      I believe that we are probably talking about two different

17  individuals.

18      You see where I'm referring?

19  A.   I do.

20  Q.   There is Joe Hardesty that is vested to mine -- this is

21  October 2008 -- vested to mine on Jay Schneider's property,

22  which is located on Meiss Road.  As far as I know, there is no

23  active code enforcement case on the Meiss Road property.

24      Right?

25  A.   That's correct.

1   Q.   In other words, what you're saying when Roger Dickinson's

2   office came and said, "I want to know about Hardesty mining

3   violations," you said, "You must be thinking about somebody

4   else."

5        True?

6   A.   I think we had another Hardesty we were looking at.

7   Q.   This is no relation?

8   A.   No relation, as far as I know.

9   Q.   There's a Steven Hardesty, no relation, and he had some

10  issues?

11  A.   Correct.

12  Q.   But the Joe Hardesty of Hardesty Sand and Gravel has no

13  violations as of late 2008; that's what you told Roger

14  Dickinson's office; true?

15  A.   I think that's the case.

16  Q.   Let's go to page 1.  Mike Winter, your predecessor, he was

17  on the e-mails, and his first sentence to answer the question

18  is:  Jeff is correct.

19       You see where I'm referring?

20  A.   Yes, I do.

21  Q.   Now, once you became the -- we've seen that you were

22  talking to the Teichert people even in 2007.  But once you

23  became the Aggregate Resource Manager, you talked to them even

24  more, didn't you?

25  A.   I think that was true, yes.

1   Q.   For example, going forward -- this is October 2008.  Going

2   forward just a couple months to January 2009, you're starting

3   to meet in person with the Teichert team, aren't you?

4   A.   I'm not sure.  Where are you referencing?

5   Q.   Tab 24.  This is Joint Exhibit 234.  This is January 2009.

6   This is a string of e-mails that actually starts in December,

7   a string of e-mails that will start on page 4 with the first

8   e-mail.

9       At the bottom, if we blow up that last piece, the first

10  e-mail is from Kate Wheatley.

11      Remind us, she's the Teichert lawyer; correct?

12  A.   Right.

13  Q.   And it's to Jeff Gamel and Mike Winter, December 29, four

14  days after Christmas 2008; correct?

15  A.   Correct.

16  Q.   And then the next page where her e-mail is, the subject

17  is, "Having a meeting about Hardesty operation"?

18  A.   Yes.  I think I indicated earlier there were a couple of

19  meetings.  This is obviously in reference to those.

20  Q.   Hello, Jeff and Mike.

21      John Taylor.  John Taylor is another lawyer, a colleague

22  of Kate Wheatley; is that true?

23  A.   I think he's head of the firm that she works for.

24  Q.   He's the named partner of the firm she works for?

25  A.   That's my understanding.

1   Q.   John Taylor asked me to set up a meeting with you two

2   representatives of Teichert, Michael Smith and John Lane and

3   John Taylor to discuss the Hardesty Sand and Grave operation

4   in Sloughhouse.

5        Did I pronounce that correctly?

6   A.   Sloughhouse.

7   Q.   They expect this meeting to take about an hour.

8        She says:  Thanks.  Hope you had a wonderful holiday.

9        Do you see that?

10  A.   Yes.

11  Q.   The very latest e-mail on page 1 at the top from you, and

12  you say to Ms. Wheatley and copy Mike Winter:

13       Okay.  We are all set.  Same meeting location, conference

14  room 250 on the 21st floor.

15       That is the county building; is that correct, Mr. Gamel?

16  A.   Yes.

17  Q.   You have other in-person meetings with Teichert in 2009

18  and 2010, do you not?

19  A.   Yes.  As I indicated, there were a couple of meetings.  I

20  don't remember the dates, but the purpose of lobbying us as to

21  their position.

22  Q.   More meetings than you probably could count for us right

23  off the top of your head?

24  A.   I don't remember the number.

25  Q.   Now at this point, Mr. Gamel, because you were the

1  Aggregate Resource Manager, it was important for you to know

2  whether the county needed sand and gravel, wasn't it?

3  A.   Yes.

4  Q.   Because if you're the guy that's in charge of the 12 or so

5  sand and gravel mines around the county, it's a good part of

6  your job to know whether those are important or not important

7  to the business and economy of the county, isn't it?

8  A.   Yes.  We had provisions in our general plan that speak to

9  the need for aggregate resources.

10 Q.   And it is fair to say at a very high level that Sacramento

11 County very much needed sand and gravel in 2008 and 2009;

12 didn't it?

13 A.   Yes.  I think I would agree with Dr. Blye-Chester

14 yesterday, the report she cited, the important resources and

15 the diminishing amount of those in Sacramento County.

16 Q.   Mr. Gamel, what Dr. Blye-Chester described to us yesterday

17 was a critical shortage in this timeframe of sand and gravel

18 in the county.

19      You would agree with that, wouldn't you?

20 A.   Yes.  I've seen the report she was referencing.

21 Q.   You were looking at the same state report back at that

22 time that showed 9 percent supply going all the way down to

23 only 6 percent supply in 2012; true?

24 A.   That's true.

25 Q.   And you know this as part of your job and you also have to

1   give presentations to people about sand and gravel and its

2   role in the economy, don't you, or didn't you while you were

3   still on the planning staff?

4   A.   Presentations to perhaps the Board of Supervisors.  I

5   don't know of any other official body that I would have given

6   that type of presentation to, but there were a couple of

7   presentations to the Board of Supervisors.

8   Q.   Let's go to tab 26, Joint Exhibit 671.

9        This is one of your presentations?

10  A.   Yes, it is.

11  Q.   This is a presentation called:  "Responsible Management

12  For Our Natural Resources."

13       It focuses on sand and gravel, doesn't it?

14  A.   Yes, it does.

15  Q.   The top says:  "Aggregate Mining in Sacramento County, a

16  staff presentation" by you and one of your colleagues

17  March 23, 2009; true?

18  A.   Yes.  That's true.

19  Q.   I'm not going to go through the whole thing.  It's a

20  number of pages, but it's a Power Point presentation that you

21  were using to describe for the staff current need for

22  aggregate in Sacramento County.

23  A.   Give me a minute to look at it.

24  Q.   Feel free to take your time.

25  A.   (Witness reviews document.)

1      I'm familiar with it now.  I think that was part of the

2   purpose of the presentation, to convey to the Board of

3   Supervisors the need for aggregates within Sacramento County

4   and the decrease in supply and also to familiarize them with

5   the large quarry applications, again, that I referenced

6   earlier that were cited in the funding agreement that we could

7   prioritize.

8      There were three of them:  Teichert Quarry, the Tsakopulos

9   Quarry and the Milgate Family Quarry.  There might have been

10  different names in the presentation here.

11  Q.   Let's help us all understand what's going on in 2008,

12  2009, 2010 in the county with regard to needing aggregate, and

13  this Power Point presentation was one of the ways you helped

14  explain it?

15  A.   Yes.

16  Q.   You did this one to the Board of Supervisors, didn't you?

17  A.   Yes.

18  Q.   We'll go through some of the details, but the bottom line,

19  you were saying this county needs local sand and gravel mines;

20  right?

21  A.   That's correct.

22  Q.   So, of course, at this time in 2008, 2009, 2010, Schneider

23  Historic Mine was one of the local sand and gravel mines in

24  eastern Sacramento County, wasn't it?

25  A.   That's true, and we've certainly appreciated that.  That

1   was noted on our map.  I think it was actually part of the

2   presentation.

3   Q.   It was a mine at the time when you did this Power Point,

4   wasn't it?

5   A.   I didn't follow you.

6   Q.   It was an operating mine at the time you did this Power

7   Point, wasn't it?

8   A.   That's correct.

9   Q.   One of the new mines that you were just telling us about

10  which was going to be just to the east of Hardesty Sand and

11  Gravel was going to be a Teichert Mine, wasn't it?

12  A.   Teichert Quarry.

13  Q.   Pilliken Ranch Quarry?

14  A.   Quite a bit east of this, but it was not adjoining this

15  property.

16  Q.   I didn't mean to suggest it was next door.  It was just to

17  the east, same general eastern part of Sacramento County?

18  A.   That's correct.

19  Q.   This was going to be a much bigger sand and gravel

20  operation in terms of output, wasn't it?

21  A.   Night and day.  It was a tremendously large mine.

22  Q.   So you have Hardesty Sand and Gravel with the production

23  here and you have at this time, 2008, 2009, 2010, to the east

24  of it you have this new application by Teichert for a

25  tremendously big sand and gravel mine; true?

1    A.   That's true.

2    Q.   Let's see what you knew and what you told the Board of

3    Supervisors at that time, page 2.  You gave the board an

4    overview, much like we heard in opening statement and from Dr.

5    Blye-Chester about the early days, didn't you?

6    A.   Yes.

7    Q.   Then page 3, you talked about actually dredging in the

8    rivers for gold; true?

9    A.   Not necessarily in the river.

10   Q.   In the ponds and things?

11   A.   Close.

12   Q.   Page 4, you have a picture of what the dredger tailings,

13   the leftovers of gold mining looks like?

14   A.   Right.

15   Q.   These can be big pebbles like cobblestones or gravel or

16   sand; true?

17            REPORTER BABBITT:  I'm sorry.  I didn't hear.

18            THE WITNESS:  That is correct what he stated.

19   BY MR. YETTER:

20   Q.   Pull that mic so Ms. Babbitt can hear everything we're

21   saying.

22        Slide 5, you talk about the growth in the county we all

23   know about; true?

24   A.   Correct.

25   Q.   On page 6, you give a very simple explanation what is

1    aggregates, and that is sand, gravel, and crushed stone?

2    A.   That's correct.

3    Q.   And you say they are used in roads and buildings,

4    hospitals, et cetera, et cetera, at the very bottom, that last

5    bullet?

6    A.   Yes, that's correct.

7    Q.   Now, on slide 7, you talk about how about important sand

8    and gravel is.  Here are a couple statistics I thought were

9    interesting that you shared.

10        In the second bullet, you say that an average house uses

11   100 tons of aggregates.  Seems like a lot.

12            THE COURT:  Is that a question for the witness?

13            MR. YETTER:  It is.

14   Q.   Is that accurate, Mr. Gamel?

15   A.   I think it is.  It's from various aggregate publications.

16   Q.   The county itself needs over 11 million tons a year for

17   its construction needs; true?

18   A.   Yes.  I believe that, again, came from some recent

19   publication.

20   Q.   The very first bullet kind of sums it up:

21        A convenient source of aggregate aggravates is vital to a

22   healthy and prosperous economy.

23        Isn't it?

24   A.   I think that is probably right out our County General

25   Plan.

1   Q.   And boiling that down to our situation here, Mr. Gamel,

2   having a local mine that provides sand and gravel in eastern

3   Sacramento County is vital to the health and the prosperity of

4   the economy in eastern Sacramento County, isn't it?

5   A.   I think anywhere in Sacramento County would be correct.  I

6   don't want to specify a certain area, east, west, north,

7   south.

8   Q.   Certainly.  I don't mean to suggest that.

9        Slide 8, you're talking about where these aggregates come

10  from.  Let's jump ahead to slide 11.

11       You're saying the places you can mine for sand and gravel

12  are getting smaller because of urbanization; true?

13  A.   Correct.

14  Q.   On slide 13, you have a map.  This is a map that you got

15  from a state report in 2006, isn't it?

16  A.   Correct.

17  Q.   That was a government issued report that Dr. Blye-Chester

18  talked a little bit about yesterday, did she not?

19  A.   Yes.  I recognize her comments, yes.

20  Q.   The map is from the report and it shows all the different

21  communities, major communities in the state, and has a legend

22  for how much they need aggregate, doesn't it?

23  A.   I think the scale of it is such that it's difficult to

24  read.

25  Q.   It is very difficult, but at the time you were the guy in

1   charge of these dozen or so aggregate mines in Sacramento
2   County, you needed to know where the county fell in that
3   ranking of need, whether it was really bad or less bad?
4   A.   That's correct.
5   Q.   And you knew that the county was one of four communities
6   in the entire state that had a dire shortage of aggregate in
7   2008, 2009, 2010, didn't you?
8   A.   Yes.  That's in our general plan as well, County General
9   Plan.
10  Q.   It had less than 10 percent of the need that it was going
11  to use in the coming 50 years, didn't it?
12  A.   Yes.
13  Q.   So if there was ever a time in the county's history that
14  it really wanted a local sand and gravel operation, it was
15  right here in 2008, 2009, 2010, wasn't it?
16  A.   I would hope that we would start planning for something
17  like that in advance so we won't have to wait until the last
18  minute, but, yes, the need is very critical.  You're right.
19  Q.   Slide 15, it's not a good alternative to say, well, I can
20  get aggregate from Placer County or other counties far away.
21  That's not a good alternative for a government to be looking
22  at, is it?
23  A.   No, because of the cost of transportation.
24  Q.   Because as you say on the first line:
25       Every mile that you transport a dump truck full of sand

1    and gravel is very expensive over the long term.

2          Isn't it?

3    A.   It is.

4    Q.   It can cost -- just the transportation cost can end up

5    being more than the cost of the gravel; right?

6    A.   That's correct.

7    Q.   Even worse, you have all these big heavy dump trucks of

8    gravel traveling on our roads which tear them up; isn't that

9    true?

10   A.   Yes, that is true.

11   Q.   In addition, because gravel and sand can become dusty,

12   it's worse for the environment to have big heavy gravel trucks

13   driving around the county; true?

14   A.   That's true.

15   Q.   All of this tells us and you and the Board of Supervisors

16   in 2008, 2009, 2010, you want to make sure you preserve your

17   local mine and gravel operations; correct?

18   A.   Well, again, as I indicated, the presentation was to not

19   only emphasize the need for additional aggregates and the need

20   to protect our existing aggregates, the purpose of the

21   presentation was to give the Board of Supervisors some

22   introduction to these large quarry applications that were

23   located in our east county that were something new to

24   Sacramento County.

25         We did not have hard rock quarries.  These would be the

1    first hard rock quarries, so we wanted to give the Board of

2    Supervisors an introduction before they actually saw the

3    applications for those quarries.

4    Q.   I see what you're saying.  We're trying to plan ahead so

5    we had potential new sources of gravel that we were looking

6    at; right?

7    A.   That's correct.

8    Q.   But the last thing you want to do is lose an actual

9    existing source of sand and gravel in Sacramento County; true?

10   A.   I would say that's true, yes.

11   Q.   In slide 16, you said:

12        At a very high level, here is the regulatory structure for

13   sand and gravel mining gravel in Sacramento County.

14        Right?

15   A.   Yes.

16   Q.   And it starts in 1974, doesn't it?

17   A.   Yes.  1974 was a report that Sacramento County initiated

18   preceding SMARA adoption in 1975 to look at the resources we

19   had available and try to come up with some kind of mechanism

20   to preserve those resources.  I think there were a number of

21   plan amendments made at that time as a result of the study.

22   Q.   The point of this slide was to help the Board of

23   Supervisors understand one of the important relevant legal

24   issues for regulating mines in Sacramento County; true?

25   A.   Our documents that we look to to regulate aggregate

1    resources.

2    Q.   One more slide, slide 31.  We were talking a minute ago

3    about you had other big potential mines coming on board, and

4    maybe not coincidently, the funding corporations for the

5    funding contract were the ones that had the applications for

6    the big new potential mines; correct?

7    A.   That's correct.

8    Q.   On slide 31, you told the Board of Supervisors about the

9    Teichert quarry, and this was the sand and gravel mine that we

10   talked about a minute ago which would be to the east of

11   Hardesty Sand and Gravel and the Schneider Historic Mine;

12   true?

13   A.   Yes, that's true.

14   Q.   This was super way bigger than Hardesty Sand and Gravel,

15   wasn't it?

16   A.   I think all of these quarries were much, much larger.

17   They were a different type of mining.  As I indicated, it was

18   hard rock mining.  They would blast the hard rock and scoop it

19   and up transport it.  They were going down hundreds of feet

20   and it was going to be hundreds of acres surface disturbance,

21   so much, much different.

22   Q.   They were using things like dynamite to blow up rock?

23   A.   Correct.

24   Q.   They were going down as much as 200 feet into the ground;

25   true?

1   A.   Yes.  The other ones went down even further.

2   Q.   So what the county at the time in 2009 was looking at was

3   these huge, big, massive gravel mines that were going to have

4   pits to 200 and more feet into the ground using dynamite to

5   dislodge the sand and gravel; true?

6   A.   Uh-huh.  That's true.

7   Q.   And these mines were going to take millions of millions of

8   dollars to build, and as this one showed, it would play out in

9   25 years?

10  A.   That's true.  It would also take many years to come online

11  because of the planning efforts and the cost.  This wasn't

12  something that was going to be developed over the next couple

13  of years.  This would take 10 or 20 years to develop it.

14  Q.   One of the things they had to do to develop it was get a

15  use permit because these were new mines; right?

16  A.   They had several entitlements to obtain, a general plan

17  amendment, a rezone, a use permit, reclamation plan.  Those

18  were the planning entitlements.  They had to get numerous

19  permits from other agencies.

20  Q.   When you say "entitlements," you're talking about licenses

21  and permits they have to get?

22  A.   "Entitlements" reference to our zoning code, our

23  documents, in-house planning documents.

24  Q.   Now, these licenses and permits take a long time to get,

25  don't they?

1    A.   That's correct.

2    Q.   And they're very costly to get, aren't they?

3    A.   Well, they can be.  It depends what type of project.

4    Obviously, these types of projects where they go down several

5    hundred feet and they involve millions of tons of excavation

6    each year, thousands of trucks on the local roadway system

7    would generate more permits than a small scale mine and take

8    much longer to obtain approval and begin construction.

9    Q.   In fact, I think this particular mine, once it came

10   online, when it says 135 million tons over 25 years -- I've

11   done the math -- that's over 5 million tons of gravel a year?

12   A.   Roughly 7 million tons.

13   Q.   That's a major huge mine, isn't it?

14   A.   It is.  That was one of three.  If you take them

15   together --

16   Q.   Far, far larger than the Schneider Historic Mine?

17   A.   Yes.

18   Q.   Like my estimate, 22 times larger; does that sound about

19   right?

20   A.   Perhaps.

21   Q.   Now, if you go to tab 25, Plaintiffs' Exhibit 124, that

22   was the state study demand for aggregate that you relied on

23   and took one of the maps out of to put into your presentation

24   to the Board of Supervisors, isn't it?

25   A.   I'm not sure.  What tab was this?

1    Q.   I believe tab 25.

2    A.   Exhibit 124?

3          MR. YETTER:  Plaintiffs' Exhibit 24.

4          THE COURT:  Plaintiffs' Exhibit 124, so it's not in

5    evidence?

6          MR. YETTER:  Not at this time.

7          THE WITNESS:  That is one of the studies, yes.

8    BY MR. YETTER:

9    Q.   You can look to page 33 and find a map that you used.

10   A.   I see that map.

11         MR. YETTER:  We offer Plaintiffs' Exhibit 124.

12         THE COURT:  Any objection?

13         MR. MARK O'DEA:  We object as hearsay.

14         MR. YETTER:  He used it as a reference included in

15   his Power Point.

16         MR. MARK O'DEA:  We don't object to the diagram --

17   just the diagram, Your Honor.

18         MR. YETTER:  We offer it as notice, Your Honor, if

19   hearsay is the objection, that the county had this in their

20   files.

21         THE COURT:  All right.  So with that clarification?

22         MR. MARK O'DEA:  Agreed, Your Honor.

23         THE COURT:  All right.  So Plaintiffs' Exhibit 124 is

24   admitted for the purposes of the plaintiffs being able to

25   argue the county was on notice of information in the report.

1          (Plaintiff Exhibit 124 was received into evidence.)

2     BY MR. YETTER:

3     Q.   Now, your presentation to the Board of Supervisors was

4     March 23, 2009, and just a few months later, six months later,

5     you went and did your first inspection of the Hardesty Sand

6     and Gravel operations, did you not?

7     A.   Yes.  We retained a consultant to conduct that inspection,

8     and I went along with him.

9     Q.   Now, unlike Mr. Winter, you managed to find violations,

10    didn't you?

11    A.   Our consultant found a couple of violations and we also

12    tasked him with looking at the violations that the Office of

13    Mine Reclamation had identified.

14    Q.   One of the things you did, tab 28 -- excuse me for not

15    telling you before.  Joint Exhibit 341 --

16         Are you with me on that?

17    A.   Yes.

18    Q.   One of the things you did do is you answered the question

19    about whether Schneider Historic Mine in 2009, November 2009,

20    needed a permit to mine.

21         You answered that question, didn't you?

22    A.   I'm not sure I follow you.

23    Q.   The inspection report in Section 4, which is highlighted

24    on the screen, has a question that says:  Permit to mine,

25    question mark.

1        Do you see where I'm referring?

2   A.   There's a box, a standard box on the form.  Is that what

3   you're talking about?  Okay.  I see that.  The first page,

4   yes.

5   Q.   The first page, Roman numeral IV, the first question says:

6   Does the operation have as permit to mine?

7        Then there's three columns that either says "yes" on one

8   side, "no," on the other side, or in the middle it says "NR,"

9   not required?

10  A.   Yes.  That was an error because we had already sent

11  Mr. Schneider a letter in April informing him that he needed a

12  use permit to continue mining.  This was obviously an error on

13  our part.  We will do better next time.

14  Q.   So seven months after you told Mr. Schneider that, forget

15  about that vested right, you need a permit, you did an

16  inspection report that said:  Permit not required --

17            MR. MARK O'DEA:  Objection.  Argumentative.

18  BY MR. YETTER:

19  Q.   -- didn't you?

20            THE COURT:  Overruled.  You may answer.

21            THE WITNESS:  I would argue simply checking a box on

22  an inspection report, especially a small box like this, that's

23  like a typo.  I don't know how somebody could say -- okay.

24  We've spent a lot of time sending them this letter in April.

25  I don't know how this would negate our letter, this simple

1   mistake.

2   BY MR. YETTER:

3   Q.   You took your inspection report and you signed it on the

4   third page, didn't you?

5   A.   Yes.

6   Q.   Meaning you reviewed it before you signed it; right?

7   A.   Yes, that's correct.

8   Q.   You didn't just put it your file, you sent it to the state

9   mining regulators, didn't you?

10  A.   Yes, and to the operator.

11  Q.   You sent it to Mr. Schneider, didn't you?

12  A.   Yes, and Mr. Hardesty.

13  Q.   And Mr. Hardesty and the state never came back and told

14  you:  You must have had a mistake on that, did they?

15  A.   They did not.

16  Q.   The county never once sent a retraction of this inspection

17  report after you filed it, did they?

18  A.   No, we did not.

19  Q.   In fact, to today, as of November 2009, the only record

20  that the county has an inspection report says:  Permit not

21  required; true?

22  A.   It would appear that that littler error there is what we

23  have today, yes.  That has never been corrected.

24  Q.   Because what happened after you sent the letter in

25  April 2009 saying forget about that vested right is that Mr.

1  Schneider responded to the letter, didn't he?

2  A.   He did respond to the letter as well as his attorney.

3  Q.   He said, "You can't do that under California law because

4  it's vested."

5       Didn't he say that?

6  A.   He had some things to say about it.  I don't know if he

7  disputed every claim we made.  We really haven't talked about

8  the April letter yet.

9  Q.   Good time to talk about it.  Let's turn to that.  It's tab

10  27, Joint Exhibit 287.

11       This is the letter you were talking about, April 2, 2009?

12  A.   That's correct.

13  Q.   To Jay Schneider with regard to the Schneider Historic

14  Mine.  Without getting into all the back and forth, you know

15  this letter, don't you, Mr. Gamel?

16  A.   I do.

17  Q.   Because although you didn't sign it, you wrote it, didn't

18  you?

19  A.   I drafted it, correct.

20  Q.   And when you drafted it, you drafted it to say:  Forget

21  about the vested right, you have to get a permit,

22  Mr. Schneider, didn't you?

23            MR. MARK O'DEA:  Objection.  Misstates the document.

24            THE COURT:  Overruled.  You may answer.

25            THE WITNESS:  Well, what we're saying in the letter

1    is this operation, this mining operation, has evolved into

2    something which is very, very different, a significantly

3    different operation than that which existed in 1994 when Mr.

4    Maddox made his determination that we had a vested mine --

5    BY MR. YETTER:

6    Q.  So what you said in this letter --

7            MR. MARK O'DEA:  The witness has not finished his

8    answer.

9            THE COURT:  One at a time.

10   BY MR. YETTER:

11   Q.  Finish your answer.

12   A.  We looked at a couple factors.  You see where we included

13   the increase in production and the reference to the

14   relocation.  We looked at a couple of factors, the Hansen

15   case.  Our counsel helped us evaluate that.  It's the Doctrine

16   of Diminishing Assets where a vested right, just because of

17   its nature where the materials are exhausted, it can move

18   around on the property.

19       We looked at a couple of factors that were in the Hansen

20   case as far as how the operation could move, was there a

21   manifest intent back when the mine was operating prior to the

22   zoning code requirements in 1956, was there a manifest intent

23   to relocate to the areas it was now located in, and also the

24   intensity, normal ramp-up intensity would normally be

25   permissible, and if it could be tied to market factors.

1        And in this case, we showed it was such a dramatic

2    increase in production -- I think it was tenfold over maybe

3    four, five, six years -- and that didn't seem to be tied to a

4    reasonable market factor increase in population or anything

5    like that because we were at the height of a recession in

6    2007, 2008.  That factor, those factors did not seem to help

7    retain that vested status for what was occurring out there in

8    2009.

9        Now we had photographs.  We did a field investigation and

10   we also had information from the Office of Mine Reclamation

11   which proceeded this tickler.

12       We didn't talk about that yet where the Office of Mine

13   Reclamation sent us a letter saying:  There's violations out

14   there.  You have 15 days to address them.  I think that

15   prompted us to sit down, take a close look at this operation

16   and try to figure out what's going on today.  Is it still a

17   vested operation?

18       We came to a conclusion it was not.  They needed to file

19   for a use permit.  We did not aggressively enforce this until,

20   I think, sometime the following year.  We did receive

21   Mr. Schneider's letter and his letter from his attorney, but

22   that did not change our opinion.

23   Q.   All done?  I don't want to interrupt.

24   A.   I think I covered this, unless there are questions.

25   Q.   I have questions.

1    A.   Good.

2    Q.   When was the hearing that you invited Mr. Schneider and

3    Mr. Hardesty on this issue whether you could do away with

4    their vested right before April 2, 2009?

5         What was the date of that hearing?

6    A.   We did not have a hearing.  This was an internal matter.

7    Q.   So the county basically said:  The Schneider Historic Mine

8    has been in operation for decades and decades.  We've said

9    it's vested.  We've said it's vested over and over again.

10        And at some point prior to April 2, 2009, with no public

11   hearing, you told Mr. Schneider and Mr. Hardesty:  You don't

12   have a vested right any more.

13        Is that true?

14   A.   That would be true based on field inspections and input

15   from the Office of Mine Reclamation.

16   Q.   What you told them is:  You now have to go, even though

17   you've been mining for years and years, go get a use permit;

18   right?

19   A.   That would be the remedy under the zoning code.

20   Q.   Let's go to the top of page 2, the very top paragraph

21   which sums up what you guys decided to tell them,

22   Mr. Schneider and Mr. Hardesty:

23        Therefore, based on this finding, the mining that is

24   presently occurring on your property is not protected by your

25   vested right and the only remedy to permit you to continue

1   mining on the property is to file for and receive approval of

2   a use permit and rezone.

3       True?

4   A.   That's the determination we came to.

5   Q.   Do you recall, can you tell us -- since you wrote this

6   letter, you obviously knew this was a big deal, didn't you,

7   Mr. Gamel?

8   A.   Yes, it was a fairly large deal.

9   Q.   When you wrote this letter, can you tell us whether you

10  had found any letter in the file of the county that had ever

11  before this letter said that Schneider Historic Mine is not

12  vested?

13  A.   Is not vested.  I don't think we have anything in our

14  files, an official county document that says that.  There are

15  complaints --

16  Q.   Did you warn Mr. Hardesty or Mr. Schneider that:  Hey,

17  we're about to send a letter saying you don't have any vested

18  rights?

19  A.   No, we did not give them any advance notice.  This was our

20  first letter to them regarding that issue.

21  Q.   Is it fair to say, from their perspective, pretty much out

22  of the blue, the County of Sacramento April 2, 2009, sent the

23  letter to Mr. Schneider and a copy to Mr. Hardesty and told

24  them for the first time in decades and decades:  You don't

25  have a vested right to mine on this property; true?

1   A.   I believe that would be the case.  We did go out there a

2   couple weeks or maybe a couple of weeks before the letter with

3   the Office of Mine Reclamation to inspect the property.  I

4   don't believe we disclosed at that time that there was a

5   problem with the vested determination.  It was a decision we

6   made in-house.

7   Q.   Sure.  It was decision you made without really asking Mr.

8   Hardesty or Mr. Schneider to comment on.  You just told them

9   you had made the decision; true?

10  A.   That's correct.

11  Q.   Now, these men didn't take that lying down, did they?

12  A.   Well, if you meant --

13  Q.   They objected --

14  A.   -- they continued to mine.  They basically ignored the

15  letter, and Mr. Schneider and his attorney sent a response, if

16  that's what you're referring to.

17  Q.   They objected to the letter, didn't they?

18  A.   I believe that's the case from the tone of Mr. Schneider's

19  letter and his attorney's letter.

20          THE COURT:  Just letting you know you've been going

21  about 45 minutes.

22          MR. YETTER:  I'm almost to the end, Your Honor.

23          THE COURT:  All right.

24  BY MR. YETTER:

25  Q.   Then a year later in April 2010, the county sent another

1    letter, didn't they?

2    A.   That could be the code enforcement notice of violation

3    you're referring to.

4    Q.   Let's look at it quickly.  Tab 29, Joint Exhibit 421.

5         You're familiar with this letter, April 14, 2010?

6    A.   Yes, sent by our Code Enforcement Department.

7    Q.   A different department sends a letter saying basically

8    again:  You have to get a use permit and a rezone or you have

9    to shut down; true?

10   A.   We -- well, it does say shut down, yes.  This letter came

11   from our Code Enforcement Department.

12   Q.   And during all this time there was back and forth, and

13   then after this letter, there was an appeal, was there not,

14   that you knew of?

15   A.   Yes, there was an appeal to this finding, this notice of

16   violation.

17   Q.   And, Mr. Gamel, isn't it true, that during all this time

18   you continued to communicate with Teichert about what was

19   going on at Schneider Historic Mine and what the county was

20   doing throughout this period; true?

21   A.   Well, they did -- as I indicated earlier, they had a

22   couple of meetings where they came in and wanted to talk about

23   the issue.  I don't know what you mean by "communicate."

24   Q.   On the phone or in person or by e-mail.  You were doing

25   this --

1   A.   We tried to talk to them in these meetings.  I don't think

2   we gave them any information as to our position.  We would

3   share the letters that went out to Mr. Schneider and Mr.

4   Hardesty because that was public record at that point, but as

5   far as being a party to our decisionmaking process, that is

6   not something that Teichert was ever a party to.

7   Q.   Let's talk about that.  Now, the second letter got

8   appealed and there was an appeal hearing in September 2010,

9   wasn't there?

10  A.   Yes, I believe that's the correct date.

11  Q.   It got delayed and delayed and delayed and you kept

12  Teichert informed of the various developments in that appeal

13  process, didn't you?

14  A.   Only insofar as they were public record.

15  Q.   Let's go to tab 30, Joint Exhibit 443.  This is an e-mail

16  from Jeff Gamel dated May 19, 2010.

17       This is about a month after the second shutdown letter

18  from the county, isn't it?

19  A.   I believe the timing is correct, yes.

20  Q.   The subject is:  "Schneider/Hardesty appeal hearing."

21       I -- meaning Jeff Gamel -- have just learned -- you

22  literally just found out about it apparently; true?

23  A.   Actually, these individuals were calling earlier in the

24  day to inquire as to whether or not they had or they should

25  plan on attending the meeting.  I was simply returning their

1    call by sending this e-mail.

2    Q.   I have just learned that the Schneider Hardesty appeal

3    hearing before the Board of Supervisors will be continued.

4         That means delayed?

5    A.   They had inquired whether or not that item would be heard

6    that evening.  I called over to the clerk's office and was

7    told this information, so I'm returning their call.  I'm

8    returning their request as to whether or not it would be

9    heard.  This is what I learned from our clerk's office, so I

10   believe this is public record.

11   Q.   Fair enough.

12        Teichert calls Jeff Gamel and says:  What's the status?

13        So Jeff Gamel calls the clerk's office, finds out the

14   status, and sends an e-mail to Teichert updating them; fair?

15   A.   They were not only calling me, they were calling Cindy

16   Storelli, and she asked me to get back to them once I learned

17   whether or not the item would be heard that evening.

18   Q.   Good point.  I just want to confirm this one more time.

19        Mr. Gamel, throughout this whole timeframe, you were not

20   acting all by yourself.  You kept your supervisor, and to the

21   extent it was important, the Board of Supervisors updated on

22   everything you were doing with regard to the Schneider

23   Historic Mine; true?

24   A.   I don't think we ever informed the Board of Supervisors.

25   There was a team of staff that met prior to the April letter

1   that we just discussed.  The Planning Director, Cindy

2   Storelli, myself, perhaps Tammy Derby from code enforcement to

3   discuss how to proceed with those letters that went out in

4   April.

5       There was a team of people that helped in making certain

6   decisions.  I don't think we ever reported to the Board of

7   Supervisors our actions other than copied them on the letters

8   that went out to Mr. Schneider and Mr. Hardesty in April.

9   Q.  Your e-mail here on May 19, 2010, what you're telling to

10  the Teichert folks is:

11      The reason for the delay, apparently, pertains to the

12  noticing provided to landowners that comprise the Schneider

13  Historic Mine tract.  No staff report yet due to the delay,

14  the continuance, but I will let you know once it is available.

15      That's what you're telling them; right?

16  A.  It also asks for the staff report.  Once it becomes

17  available to the public, we provide it to anyone who asks,

18  such as Teichert.

19  Q.  That's what planning did, as soon as the staff report was

20  public they gave it right to Teichert, didn't they?

21  A.  I believe Teichert asked for it.

22  Q.  Let's go to tab 31, Joint Exhibit 457.  Let's go to page 2

23  and blow up that e-mail.

24      The person that actually immediately provided the staff

25  report, that gave them notice that the staff report was

1  available, was the lawyer for the county, Sarah Britton,

2  wasn't it?

3  A.   I'm not familiar with this e-mail, writing to Matthew

4  Keasling, the lawyer.

5          THE COURT:   You have your answer, unless you can

6  establish some awareness of this e-mail.

7  BY MR. YETTER:

8  Q.   Do you know who Sarah Britton is?

9  A.   Yes, she's the county's attorney.

10  Q.   And do you know Matthew Keasling is the Teichert attorney?

11  A.   He works for Mr. Taylor's office, that's correct.

12  Q.   Schneider Historic Mine appeal is what is going on during

13  this timeframe; right?

14  A.   Uh-huh.

15  Q.   I am informed that the staff report is now available.

16      That's what she says.

17          MR. MARK O'DEA:   Objection.   Lacks foundation.   Calls

18  for speculation.

19          THE COURT:   The exhibit is in, but this witness does

20  not appear to have the knowledge to testify about its

21  contents.

22          MR. YETTER:   Fair enough.

23  Q.   That's June of 2010.   Three months later, the appeal

24  finally comes up, doesn't it, in September 2010?

25  A.   Yes.

 1  Q.  Let's go to tab 32, Joint Exhibit 487.

 2      Are you with me?

 3  A.  Yes.

 4  Q.  Now, this is Kate Wheatley.  She's one of Teichert's

 5  lawyers; right?

 6  A.  Yes.

 7  Q.  It's about the Hardesty findings, and the first photograph

 8  talks about you, doesn't it?

 9  A.  It appears to.

10  Q.  Jeff Gamel may have left a word out and wanted me to let

11  you know that Sarah Britton -- maybe you misspelled it -- will

12  be preparing the findings for Hardesty.

13      Now, when the Board of Supervisors or a Board of Zoning

14  Appeals rules on an appeal, they make findings, don't they?

15  A.  Yes.

16          MR. MARK O'DEA:  Objection.  Lacks foundation.  It

17  hasn't been established the witness has any knowledge of this

18  e-mail.

19          THE COURT:  This is not about the e-mail.  This is a

20  more general question.  I'm overruling that objection.

21      You may answer if you're able.

22          THE WITNESS:  At the hearing itself, the Board of

23  Supervisors, when they take final action, they will ask

24  counsel's office to prepare the findings, so that's part of

25  the record.

1    BY MR. YETTER:

2    Q.   The fines are the details of the ruling; is that correct?

3    A.   That is true.

4    Q.   In fact, you called the Teichert lawyer to tell them that

5    the county attorney, Sara Britton, would be preparing the

6    findings and you told them to coordinate directly with her

7    since you were going to be gone, didn't you?

8    A.   I don't recall the phone call or how -- actually, this is

9    from Jesse Yang who also works for Mr. Taylor's office.  I

10   don't know where he got his information.

11   Q.   He's a Teichert lawyer --

12          THE COURT:  The attorney is not testifying.  You have

13   his answer.  He doesn't recall.

14   BY MR. YETTER:

15   Q.   You know, don't you, Mr. Gamel, that the Teichert lawyers

16   drafted findings and provided them confidentially to the Board

17   of Zoning Appeals staff to rule on the Schneider Historic Mine

18   appeal?

19      You know that, don't you?

20          MR. MARK O'DEA:  Misstates the evidence as to Board

21   of Zoning Appeals.

22          THE WITNESS:  I had heard something like that.  I

23   never had any firsthand knowledge.

24          THE COURT:  The objection is overruled in any event.

25   /////

1   BY MR. YETTER:

2   Q.   Now, Mr. Gamel, we've gone through lots of e-mails, many

3   of which you probably didn't remember that you had sent or

4   received.

5        I think that's probably fair to say, isn't that true,

6   Mr. Gamel?

7   A.   There were a few I didn't recall, yes.

8   Q.   Is there anything you handled about the Schneider Historic

9   Mine looking back today you would do differently?

10  A.   I don't think so.  I always tried to keep Teichert at

11  arm's length.  It's a difficult position balancing various

12  interests and agendas and whatnot.

13       No, I don't think I would have done anything different.  I

14  think we did have conversations with Teichert, but we kept

15  everything public records.  We never let them influence our

16  decision, never let them be a part of the decisionmaking

17  process.

18       It was unfortunate.  I don't like to see competitors go at

19  each other, but even then I think Schneider went after

20  Teichert during their quarry hearings, so I think you saw some

21  of that, competitors going at one other.  I thought that

22  aspect of it was unfortunate.

23  Q.   Last topic, Mr. Gamel.  If the county had convinced or

24  persuaded the Schneider Historic Mine to get a use permit,

25  then the county could charge the mine a whole lot of the costs

1   of different things that the county does, like road

2   improvements, couldn't it?

3   A.   Not necessarily.  Some of the smaller mining operations,

4   for example, one directly to the south of Mr. Schneider's

5   Ranch and the Pilliken Ranch property was doing something

6   similar at a similar scale, mining the cobbles, the dredger

7   tailings, obtained a couple of customer permits that were

8   fairly simple to obtain, not particularly costly.  I think

9   they were maybe were 40 or $50,000 to obtain at that time.

10       They didn't have a lot of conditions of approval, maybe 10

11   or 11 conditions of approval.  I think the most onerous

12   condition was that they provide a resurfacing of Meiss Road

13   because of the trucks.  They tore it up.  Meiss Road was in

14   poor shape.  If he had obtained a use permit, he would

15   probably have had to put some kind of surface on the roadway

16   as well.

17       So it depends.  The complexities, the size of the

18   operation -- I've heard reference to $25 million, and I think

19   that was in the opening statements, but that's something

20   totally different.  That's in conjunction with all three of

21   these quarries and the large quarries in east county and the

22   thousands of trucks they would run over the streets in the

23   City of Folsom, the City of Rancho Cordova, and the county.

24   That was mitigation which was necessary for those quarries.

25       I don't think the cost or the obligations, as far as

1   permits or mitigation, would be anywhere near those.  You are

2   almost comparing apples to oranges.

3   Q.  Let's go to tab 33, last document.  This is Plaintiffs'

4   Exhibit 680.  Before we put it on the screen, tell me when

5   you're there.

6   A.  I'm there.

7   Q.  Go to the last page of that document, page 16, and tell us

8   who prepared the report.

9   A.  I did.

10  Q.  What was the date of the report?

11  A.  1999.

12  Q.  Who was the report to?

13  A.  The Board of supervisors.

14          MR. YETTER:  Your Honor, we offer Exhibit 680.

15          THE COURT:  Any objection?

16          MR. MARK O'DEA:  No objection.

17          THE COURT:  Plaintiffs' 680 is admitted.

18     (Plaintiff Exhibit 680 was received into evidence.)

19  BY MR. YETTER:

20  Q.  This is to the Board of Supervisors and it's about a

21  different mining operation called River City Aggregates; true?

22  A.  True.

23  Q.  And that became the Pilliken Ranch operation for Teichert,

24  didn't it?

25  A.  River City Aggregates lost their lease shortly after this

1  approval and Teichert may have picked up the lease.

2  Q.  Let's go to the last page, page 16.  Let's confirm you

3  wrote this 16-page report on April 1, '99; right?

4  A.  That's correct.

5  Q.  Now, let's go to the bottom of page 6.  This is about a

6  different mine site to the east that now Teichert has taken

7  over.  The very last sentence it says:

8      Currently -- are you with me?

9  A.  Yes.

10  Q.  Currently planning staff has a pending code enforcement

11  case against Hardesty Sand and Gravel and it is hoped that

12  eventually the operator will be persuaded to file for a use

13  permit and reclamation plan.  At such time, it may be possible

14  to apportion some of the cost of the Meiss Road improvements

15  among the various mining operators.

16      Do you see where you wrote that?

17  A.  I see that as included.

18  Q.  That was your recommendation or your notation to the Board

19  of Supervisors in April of 1999, wasn't it?

20  A.  Uh-huh.  I think that's correct.

21          MR. YETTER:  Thank you, Mr. Gamel.  I appreciate your

22  patience.

23      We pass the witness.

24          THE COURT:  All right.  Any questions from the

25  defense?  Mr. O'Dea?

 1           MR. MARK O'DEA:  Yes, Your Honor, we have some
 2    limited cross at this time and I think we will save the rest
 3    of the examination for our case.
 4           THE COURT:  All right.  We can take up to 15 minutes
 5    and then take our second break of the day.  Use whatever time
 6    you can before the break.
 7       In situations like this, cross and direct exam isn't
 8    necessarily the right word because this is a defendant being
 9    examined by his own attorney.
10       You may proceed.
11           MR. MARK O'DEA:  Thank you, Your Honor.
12                          CROSS-EXAMINATION
13    BY MR. MARK O'DEA:
14    Q.   Good morning, Mr. Gamel.
15    A.   Good morning.
16    Q.   You were asked some questions by counsel about the funding
17    agreement that provided the funding to the county for the
18    Aggregate Resource Manager Program.
19       Do you remember that?
20    A.   Yes, I do.
21    Q.   If this agreement hadn't been reached between these
22    producers who anticipated submitting large applications to the
23    county, they would have had to pay the county fees to have all
24    of these applications processed anyway, wouldn't they have?
25    A.   Yes.  Any application submitted pays a fee to cover

1   planning fees cost.

2   Q.   So if this agreement wasn't in place, you would have had

3   to bill them for the time for staff to review the application

4   and do whatever work would be necessary to process the

5   application; is that correct?

6   A.   That's correct.  Any additional time necessary would be

7   billed on a time and material basis.

8   Q.   So isn't this a way of the funders or these participants

9   to the agreement having a way to prepay for those kinds of

10  fees that they would incur anyway and have a guarantee that

11  someone would be available to review their applications and

12  process them?

13  A.   Yes.  The intent there was to prioritize the applications.

14  The normal application process, sometimes they get delayed

15  because there's applications in front of them and they wait

16  their turn, basically.

17  Q.   During your testimony, you made a comment about this kind

18  of agreement not being unusual for the county.

19      Do you remember that?

20  A.   Yes, I do.  These were commonly use agreements in our

21  office over the years.  Probably 20 or 30 of them that have

22  been used for large scale planning applications, projects that

23  require a lot of special handling because of their

24  complexities and the length of time they take to go through

25  the process and the coordination necessary with other agencies

1    and whatnot.

2    Q.   These other agreements that you're referring to, would

3    they work the same way?  Are you having developers or property

4    owners prepay fees to the department and then have an

5    expectation that their matters will be attended to on a timely

6    basis?

7    A.   Yes, they're structured the same.  In this case, there

8    might be a couple additional duties like mine inspections or

9    that type of thing.  They're all the same structure.

10   Q.   And if those other agreements weren't in place, you would

11   still do the work, but you would also bill those applicants

12   separately like you would have if this funding agreement

13   weren't in place.

14        Is that correct?

15   A.   That's correct.

16   Q.   If this funding agreement weren't in place, you would

17   still receive your salary, wouldn't you?

18   A.   Yes, of course.

19   Q.   All of your benefits; right?

20   A.   Yes.  I've been with planning 32 years.  The Aggregate

21   Resource Manager was just a temporary position for me.  We

22   rotated several people in and out of that position.  I think

23   we're on the fifth person, fourth or fifth person.

24   Q.   The revenue that the county received that ultimately would

25   pay for a portion of your salary and benefits would be derived

1  from the individual fees that were being billed as opposed to

2  this prepaid arrangement that these producers agreed on.

3      Is that correct?

4  A.  That's correct.

5  Q.  I'd like to show you an exhibit you were examined on

6  earlier.  If I can ask you to show 144 please?

7          THE COURT:  Is there a tab number?

8          MR. MARK O'DEA:  Tab number 7.

9          THE COURT:  JX144.

10          MR. MARK O'DEA:  Could you highlight the second

11  paragraph, please.

12          THE COURT:  Is that what you mean?

13          MR. MARK O'DEA:  Would you enlarge that, please.

14  Q.  Counsel read the first portion of this e-mail to you.  I'd

15  like to read the second:

16      As I have expressed, I am extremely disappointed in the

17  agencies on this one.  As a person representing a company that

18  spends a lot of time and resources to do the right thing and

19  abide by the rules, I would hope that enforcement and a level

20  playing field would be the core of any enforcement program --

21          THE COURT:  Environmental program.

22          MR. MARK O'DEA:  Excuse me.  Thank you.

23  Q.  -- as it stands, they continue operating with their new

24  plant located on a greenfield site loaded with wetlands with

25  no permits while we enter our fourth year working diligently

1    and openly to acquire permits for the site next door.  To give

2    perspective, last week our construction division lost a very

3    large multi-million dollar job due principally to the price of

4    gravel in the project.  We would use our rock, which includes

5    substantial permitting costs, as with the cost of the other

6    local major producers while our competitor based their bid on

7    rock, artificially low priced material from Hardesty which has

8    chosen to exploit the lack of agency enforcement.  Expect this

9    type of situation to get worse and the economy and budgets

10   tighten and rock users seek the artificially low priced

11   operator.  The bad guys get busier while the good guys lay off

12   workers.

13        Mr. Gamel, is this your understanding of the kinds of

14   complaints that Teichert was making to you when they talked to

15   you about issues related to the Hardesty operation?

16   A.   Yes, this is consistent with what Mr. Lane told us again

17   and again, that he wanted a level playing field.  He thought

18   everybody should be subject to the same rules and they should

19   be able to compete freely for contracts.

20        This was consistent.  He was frustrated at our lack of

21   ability to do anything about the matter, I guess.

22   Q.   You understand that part of the reason they were upset,

23   because in their view, they were required to obtain expensive

24   permits that, apparently, the Hardesty operation didn't need

25   to obtain?

```
 1        Is that correct?
 2             MR. PETERSON:  Objection.  Leading.
 3             THE COURT:  Sustained.  Ask the open-ended question.
 4   BY MR. MARK O'DEA:
 5   Q.   What did Teichert tell you about their concerns with
 6   respect to having to acquire permits?
 7   A.   Well, that they had to jump through all the hoops as far
 8   as getting the right permits and the mitigation costs and
 9   whatnot, and because of all of that, the cost of X amount of
10   money to sell their gravel, they didn't feel that the
11   Schneider Historic Mine was operating with all the same rules,
12   particularly all the permits that were necessary and whatnot.
13   Q.   Okay.  Thank you for that.
14             THE COURT:  My understanding is that Mr. Yetter would
15   be lodging any objections?
16             MR. YETTER:  I will in the future, Your Honor.
17             THE COURT:  All right.
18   BY MR. MARK O'DEA:
19   Q.   I'd like to ask you about another exhibit counsel asked
20   you about.  This is on tab 18, Joint Exhibit Number 71.
21   Please highlight the first paragraph under the discussion
22   section and enlarge that.
23        You may recall you were asked about this earlier, the
24   memorandum prepared by is county counsel, Michelle Bach.
25        Do you remember that?
```

1   A.   Yes.

2   Q.   Counsel read you a portion of this paragraph:

3        Because the Schneider Mine has a vested right to conduct

4   mining, a use permit is not required under the Surface Mining

5   and Reclamation Act, SMARA.   Thus, the only application before

6   the county is a reclamation plan that pertains to the

7   reclamation of land previously mined or land that will be

8   mined in the future.

9        Mr. Gamel, when you read this document, did you understand

10  that what Ms. Bach was saying here was the reason that she's

11  making these comments is that the only issue before the board

12  at this time was whether or not the reclamation plan should be

13  approved?

14           MR. YETTER:   Leading, Your Honor.

15           THE COURT:   Sustained.   Again, the open-ended:   Who?

16  What?   Where?   When?   How?

17  BY MR. MARK O'DEA:

18  Q.   Did you have an understanding at any time as to what

19  issues the Board of Supervisors considered in 2002 when the

20  reclamation plan for Schneider Historic Mine was submitted to

21  them?

22  A.   Well, I think that it is subject to the provisions of

23  CEQA.   I think that was primary to this and what level of CEQA

24  analysis would be necessary.   In the end, it was considered an

25  exemption.   I think Mr. Schneider had argued that no CEQA

1   review was necessary, and Ms. Bach is just trying to clarify

2   the provisions of SMARA as it went to a reclamation plan.

3   Q.   You were asked about OMR.   There was a suggestion that you

4   and OMR were exchanging secret information.

5        Do you remember that question?

6   A.   I think so.   There were -- we had some conversations with

7   OMR, particularly with respect to the inspection they were

8   going out to conduct in December.

9   Q.   Isn't it true that any conversations you had with OMR and

10   any information that you exchanged with them would, in fact,

11   be a matter of public record and not private?

12            MR. YETTER:   Leading.

13            THE COURT:   Sustained.

14   BY MR. MARK O'DEA:

15   Q.   Mr. Gamel, did you believe that when you discussed

16   information with OMR about any upcoming inspections they were

17   planning to do, that that was private information?

18   A.   No.   We did not discuss any information that I would

19   consider privileged or -- it -- we were talking about doing

20   our job as far as the inspections, identifying violations and

21   that type of thing and coordinating on those inspections, when

22   they were going to go out there and if we could go out with

23   them.   And, hopefully, as I indicated earlier, we would take

24   the lead on those, identifying the violations.

25   Q.   And if a member of the public had asked for copies of your

1   e-mails between you and OMR about these inspections, would you

2   have agreed they are public documents and should be made

3   available to anybody who makes the request?

4   A.   Well, that was my understanding, that public records

5   requests could be made in all e-mails.  Those are basically

6   public record.  Yes, public documents.

7           MR. MARK O'DEA:  Thank you.  Nothing further at this

8   time, Your Honor.

9           THE COURT:  All right.

10          MR. YETTER:  We'll pass.

11          MR. PETERSON:  Nothing here.

12          THE COURT:  You may step down for now.  I'm assuming

13  you are not excused because you will be recalled in the

14  defense case.

15      Let's go ahead and take our break, 15-minute break, and

16  start up again at 12 and go for our last hour and a half.

17      Thank you for your service so far.

18      (Testimony concluded of Jeff Gamel.  11:44 a.m.)

19                      CERTIFICATION

20          I, Michelle L. Babbitt, certify that the foregoing is

21  a correct transcript from the record of proceedings in the

22  above-entitled matter.

23          Dated:  March 1, 2017.

24                          /s/ MICHELLE L. BABBITT
                            MICHELLE L. BABBITT CSR #6357
25                          Official Court Reporter
                            United States District Court