LONGYEAR O'DEA AND LAVRA, LLP
GREGORY P. O'DEA, Bar No. 110966
MARK P. O'DEA, Bar No. 186061
3620 American River Drive - Suite 230
Sacramento, CA  95864-5923
odea@longyearlaw.com
Telephone: (916) 974-8500
Facsimile:  (916) 974-8510

Attorney for Defendants
SACRAMENTO COUNTY, ROBERT
SHERRY, ROGER DICKINSON, and JEFF
GAMEL

DEREK P. COLE, Bar No. 204250
dcole@cotalawfirm.com
COTA COLE & HUBER LLP
2261 Lava Ridge Court
Roseville, CA  95661
Telephone:  (916) 780-9009
Facsimile:   (916) 780-9050

Co-Counsel for Defendants
SACRAMENTO COUNTY, ROBERT
SHERRY, ROGER DICKINSON, and JEFF
GAMEL

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| JOSEPH HARDESTY, et al., | Case No. 2:10-cv-02414-KJM-KJN |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT AFTER TRIAL** |
| v. | |
| SACRAMENTO METROPOLITAN AIR QUALITY MANAGEMENT DISTRICT, et al., | Judge: Hon. Kimberly J. Mueller: Magistrate: Hon. Kendall J. Newman |
| Defendants. | Date and Time:  TBA Courtroom : 3, 15th Floor |
| | Trial Date:  February 16, 2017 Action Filed:  September 8, 2010 |

{DPC/00052406. }

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    SUMMARY OF ARGUMENTS ................................................................... 2

III.   STANDARD FOR RENEWED MOTION FOR JUDGMENT ....................... 4

IV.    ARGUMENT ................................................................................................. 5

    A.   Neither the Hardestys Nor Schneiders Offered Sufficient Evidence to
        Prove They Possessed Any Interest the Due Process Clause Protects ..................... 5

        1.   Standards for Proving the Existence of Liberty and Property Interests ............ 5

        2.   The Schneiders Do Not Possess Cognizable Liberty or Property Interest ........ 6

        3.   The Hardestys Do Not Possess a Valid Liberty or Property Interest ............... 8

    B.   Because the County's Actions Toward the Plaintiffs Were Inherently
        Rational, the Jury Could Not Properly Conclude the County Deprived
        Them of Substantive Due Process ..................................................................... 10

        1.   As a Starting Point, It Must Be Recognized the Plaintiffs Assert
            Economic Rights for which Federal Jurisdiction is Rarely Justified ............. 10

        2.   Under the Applicable Legal Standard, the County Is Entitled to
            Judgment if it Could Have Had a Rational Basis for Its Actions .................. 12

        3.   Applying the Correct Standard, the Plaintiffs Failed to Produce
            Evidence that Could Allow the Jury to Have Found the County's
            Actions Lacked Any Conceivable Rational Basis .......................................... 13

        4.   The Court Must Enter Judgment for the County and Individual
            Defendants and Against Plaintiffs on the Substantive Due
            Process Claims .............................................................................................. 30

    C.   As a Matter of Law, the Plaintiffs were Provided Procedural Due
        Process Before the Board of Supervisors and Board of Zoning Appeals ............... 30

        1.   Summary of the Evidence Regarding the Process Provided in
            Association with the 2010 Board of Supervisors Hearings ........................... 30

        2.   The Schneiders Were Provided Ample Process in Connection
            with the 2010 Board of Supervisors Hearings ................................................ 34

        3.   The Hardestys Were Not Deprived of Procedural Due Process
            Concerning the Notices that Led to the 2010 Board of Supervisors
            Proceedings ................................................................................................... 36

        4.   No Competent Evidence Was Offered at Trial to Establish
            Defendant Dickinson Engaged in Improper Conduct, Acted
            with Bias, or Had a Conflict of Interest During the 2010
            Board of Supervisors Hearings ..................................................................... 38

1

**TABLE OF CONTENTS (cont.)**

2

**Page**

3
4

      5.   The Evidence at Trial Was Insufficient to Support any Finding that the 2010 Board of Supervisors Hearings Resulted in the Revocation of any Vested Right ........................................................... 40

5

      6.   The April 2, 2009 Letter Did Not Deprive the Plaintiffs of Their Procedural Due Process Rights ............................................. 42

6
7

      7.   Plaintiffs Were Provided Due Process in Connection with the Board of Zoning Appeals Hearings ..................................... 43

8
9

      8.   As a Matter of Law, there Can Be No Due Process Violations Where Adequate State Process Exists to Remedy the Decision of the Local Body............................................................. 46

10

      9.   The Remedy for a Due Process Violation Is to Order the Process that Was Due........................................................... 48

11
12
13

   D.   Because the Evidence is Undisputed Plaintiffs Failed to Conclude Challenges to the Board of Supervisors and Board of Zoning Appeals Determinations by Mandamus, their Due Process Claims Are Barred as a Matter of Law ............................................................. 49

14
15

      1.   The Unreviewed Board of Supervisors and Board of Zoning Appeals' Determinations Must Be Given Preclusive Effective Under California Law ....................................................... 50

16
17

      2.   Plaintiffs' Failure to Overturn the Board of Supervisors' and Board of Zoning Appeals' Determinations by Mandamus Precludes All Claims Brought In this Case........................... 54

18
19

      3.   Plaintiffs' Claims Against the Individual Defendants Are Also Barred ..................................................................... 56

20

      4.   The Assertion of the Preclusive Effect of Plaintiffs' Failure to Obtain Relief in State Court, Which the County Asserted in Its Motion for Summary Judgment, Was Timely ................... 56

21
22

   E.   As a Matter of Law, No Reasonable Jury Could Conclude the County Retaliated Against the Schneiders for Filing Their Federal Action ........................ 56

23
24

   F.   The Individual Defendants Could Not Be Found Liable for the Plaintiffs' Substantive Due Process Claims............................................................. 62

25

      1.   The Evidence Could Only Allow a Reasonable Jury to Conclude Defendants Sherry and Gamel Were Entitled to Qualified Immunity ........... 62

26
27

      2.   Defendant Dickinson Is Entitled to Absolute and Qualified Immunity........................................................................ 64

28

   G.   The Jury's Substantive Due Process Awards Were Based on Legally Inadequate Measure of Damages ................................................ 65

1

**TABLE OF CONTENTS (cont.)**

2

<span style="text-decoration: underline;">Page</span>

3        H.    Judgment Should Be Entered in Favor of the Individual Defendants
4           as to Plaintiffs' Claims for Punitive Damages ........................................................ 68

5            1.    The Punitive Damages Were Not Supported by the Evidence ...................... 68

6            2.    The Punitive Damages Were Excessive as a Matter of Federal
                Common Law ................................................................................................ 68

7            3.    The Jury's Punitive Damages Awards Transgress Upon
                Constitutional Limitations ......................................................................... 69

8

9        I.     Judgment Must Be Entered in Favor of All Defendants on the
           Schneiders' Williamson Act Claim ........................................................................... 72

10            1.    The Schneiders Failed to Present a Government Tort Claim
                to the County ................................................................................................. 72

11

12            2.    The Requirements of the County Zoning Code Prevail Over
                any Matters Addressed in the Schneiders' Williamson Act Contract............. 73

13            3.    Plaintiffs Have No Property Interest Protected by the Due
                Process Clause in a Williamson Act Contract ................................................ 74

14
15   V.      CONCLUSION ............................................................................................................ 74

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

4

**Federal Cases**

5

*Ace v. Aetna Life Ins. Co.*,
   139 F.3d 1241 (9th Cir. 1998)............................................................ 4
6
*Allen v. City of Beverly Hills*,
   911 F.2d 367 (9th Cir. 1990)............................................................. 6
7
*Almota Farmers Elevator & Warehouse Co. v. United States*,
   409 U.S. 470 (1973) ........................................................................ 66
8
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................... 4
9
*Arroyo Vista Partners v. Cty. of Santa Barbara*,
   732 F. Supp. 1046 (C.D. Cal. 1990) ........................................... 47, 48
10
*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) .................................................................... 62, 64
11
*Bateson v. Geisse*,
   857 F.2d 1300 (9th Cir. 1988).......................................................... 5, 6
12
*Bd. of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972) .......................................................................... 5
13
*Bello v. Walker*,
   840 F.2d 1124 (3d Cir. 1988)...................................................... 34, 46
14
*Bituminous Materials, Inc. v. Rice Cty., Minn.*,
   126 F.3d 1068 (8th Cir. 1997).......................................................... 11
15
*Blair v. Bethel Sch. Dist.*,
   608 F.3d 540 (9th Cir. 2010)............................................................ 57
16
*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ........................................................................ 71
17
*Brady v. Gebbie*,
   859 F.2d 1543 (9th Cir. 1988).......................................................... 49
18
*Brady v. Town of Colchester*,
   863 F.2d 205 (2d Cir. 1988)............................................................. 46
19
*Brooks v. New Hampshire Supreme Court*,
   80 F.3d 633 (1st Cir. 1996).............................................................. 40
20
*Buckles v. King Cty.*,
   191 F.3d 1127 (9th Cir. 1999)........................................................... 6
21
*Buckley v. Valeo*,
   424 U.S. 1 (1976).............................................................................. 39
22
*CarePartners, LLC v. Lashway*,
   545 F.3d 867 (9th Cir. 2008)............................................................ 57
23
*Carey v. Piphus*,
   435 U.S. 247 (1978) .................................................................... 49, 65
24
*Chalmers v. City of Los Angeles*,
   762 F.2d 753 (9th Cir. 1985)............................................................ 66
25
*Cinevision Corp. v. City of Burbank*,
   745 F.2d 560 (9th Cir. 1984)............................................................ 64
26
*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ........................................................................ 39
27
*City & Cty. of San Francisco, Calif. v. Sheehan*,
   135 S. Ct. 1765 (2015) .................................................................... 62

28

1

**TABLE OF AUTHORITIES (cont.)**

2

<u>Page(s)</u>

3

*City Sols., Inc. v. Clear Channel Commc'ns*,
  365 F.3d 835 (9th Cir. 2004)........................................................................................ 4

4

*Conn v. Gabbert*,
  526 U.S. 286 (1999) ...................................................................................................... 5

5

*Conner v. Heiman*,
  672 F.3d 1126 (9th Cir. 2012)...................................................................................... 62

6

*Creative Environments, Inc. v. Estabrook*,
  680 F.2d 822 (1st Cir. 1982) ........................................................................................ 12

7

*DeKalb Stone, Inc. v. Cty. of DeKalb, Ga.*,
  106 F.3d 956 (11th Cir. 1997)...................................................................................... 11

8

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001)...................................................................................... 62

9

*Dittman v. California*,
  191 F.3d 1020 (9th Cir. 1999)................................................................................... 5, 6

10

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...................................................................................................... 29

11

*Eichenlaub v. Twp. of Indiana*,
  385 F.3d 274 (3d Cir. 2004).......................................................................................... 12

12

*Eilrich v. Remas*,
  839 F.2d 630 (9th Cir. 1988)............................................................................. 51, 55, 56

13

*Engquist v. Oregon Dep't of Agric.*,
  478 F.3d 985 (9th Cir. 2007)...................................................................................... 5, 6

14

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ............................................................................................... 68, 69

15

*Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*,
  470 U.S. 480 (1985) ...................................................................................................... 39

16

*FM Properties Operating Co. v. City of Austin*,
  93 F.3d 167 (5th Cir. 1996)........................................................................................... 14

17

*Gardner v. City of Baltimore Mayor & City Council*,
  969 F.2d 63 (4th Cir. 1992)........................................................................................... 11

18

*Georgia Kaolin Co. v. United States*,
  214 F.2d 284 (5th Cir. 1954)........................................................................................ 67

19

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ...................................................................................................... 10

20

*Guatay Christian Fellowship v. Cty. of San Diego*,
  670 F.3d 957 (9th Cir. 2011)................................................................................... 42, 43

21

*Guzman v. Shewry*,
  544 F.3d 1073 (9th Cir. 2008)..................................................................................... 5, 6

22

*Halverson v. Skagit Cty.*,
  42 F.3d 1257 (9th Cir. 1994)........................................................................................ 13

23

*Hamby v. Hammond*,
  821 F.3d 1085 (9th Cir. 2016)...................................................................................... 62

24

*Hamilton v. Brown*,
  39 F.3d 1574 (Fed. Cir. 1994)...................................................................................... 55

25

*Hendrix v. Novartis Pharm. Corp.*,
  975 F. Supp. 2d 1100 (C.D. Cal. 2013)........................................................................ 56

26

*Herrington v. Cty. of Sonoma*,
  12 F.3d 901 (9th Cir. 1993).......................................................................................... 66

27

*Herrington v. Sonoma Cty.*,
  834 F.2d 1488 (9th Cir. 1987)...................................................................................... 66

28

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Hoeck v. City of Portland*,
  57 F.3d 781 (9th Cir. 1995).................................................................. 13
*Hoffman v. Tonnemacher*,
  593 F.3d 908 (9th Cir. 2010).................................................................. 4
*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012).................................................................. 4
*Hunter v. Bryant*,
  502 U.S. 224 (1991).................................................................. 62
*Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*,
  181 F.3d 446 (3d Cir. 1999).................................................................. 72
*J.W. v. City of Tacoma, Wash.*,
  720 F.2d 1126 (9th Cir. 1983).................................................................. 11, 12
*Jacobson v. Hannifin*,
  627 F.2d 177 (9th Cir. 1980).................................................................. 6
*Johnson v. United States*,
  135 S. Ct. 2551 (2015).................................................................. 11
*Kimball Laundry Co. v. United States*,
  338 U.S. 1 (1949).................................................................. 66
*Kriss v. Fayette Cty.*,
  827 F. Supp. 2d 477 (W.D. Pa. 2011).................................................................. 27
*Kuzinich v. Santa Clara Cty.*,
  689 F.2d 1345 (9th Cir. 1982).................................................................. 64
*Lair v. Bullock*,
  798 F.3d 736 (9th Cir. 2015).................................................................. 39
*Lake Nacimiento Ranch Co. v. San Luis Obispo Cty.*,
  841 F.2d 872 (9th Cir. 1987).................................................................. 46, 47
*Lakeside-Scott v. Multnomah Cty.*,
  556 F.3d 797 (9th Cir. 2009).................................................................. 4
*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*,
  285 F.3d 1146 (9th Cir. 2002).................................................................. 69
*Lochner v. N.Y.*,
  198 U.S. 45 (1905).................................................................. 10
*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982).................................................................. 34
*Los Angeles Police Protective League v. Gates*,
  995 F.2d 1469 (9th Cir. 1993).................................................................. 55
*Loving v. Virginia*,
  388 U.S. 1 (1967).................................................................. 10
*Mathews v. Eldridge*,
  424 U.S. 319 (1976).................................................................. 34
*Mayfair Dev. Corp. v. City of Dallas*,
  121 F.3d 705 (5th Cir. 1997).................................................................. 14
*McConnell v. Fed. Election Comm'n*,
  540 U.S. 93 (2003).................................................................. 39
*Memphis Cmty. Sch. Dist. v. Stachura*,
  477 U.S. 299 (1986).................................................................. 65
*Memphis Light, Gas & Water Div. v. Craft*,
  436 U.S. 1 (1978).................................................................. 34
*Miller v. Cty. of Santa Cruz*,
  39 F.3d 1030 (9th Cir. 1994).................................................................. 50, 55, 56

1

**TABLE OF AUTHORITIES (cont.)**

2

<u>Page(s)</u>

3    *Moore v. City of E. Cleveland, Ohio,*
        431 U.S. 494 (1977) ................................................................................................. 10
4    *Morrissey v. Brewer,*
        408 U.S. 471 (1972) ................................................................................................. 34
5    *N. Pacifica LLC v. City of Pacifica,*
        526 F.3d 478 (9th Cir. 2008) ................................................................................... 13
6    *N. Pacifica, LLC. v. City of Pacifica,*
        366 F. Supp. 2d 927 (N.D. Cal. 2005) ..................................................................... 56
7    *Nestor Colon Medina & Sucesores, Inc. v. Custodio,*
        964 F.2d 32 (1st Cir. 1992) ...................................................................................... 12
8    *Obergefell v. Hodges,*
        135 S. Ct. 2584 (2015) ............................................................................................. 10
9    *Parks v. Watson,*
        716 F.2d 646 (9th Cir. 1983) ..................................................................................... 6
10   *Parratt v. Taylor,*
        451 U.S. 527 (1981) ........................................................................................... 46, 47
11   *Paul v. Davis,*
        424 U.S. 693 (1976) ................................................................................................... 5
12   *Pearson v. Callahan,*
        555 U.S. 223 (2009) ................................................................................................. 62
13   *Piecknick v. Com. of Pa.,*
        36 F.3d 1250 (3d Cir. 1994) ...................................................................................... 5
14   *Plaine v. McCabe,*
        797 F.2d 713 (9th Cir. 1986) ............................................................................. 50, 55
15   *Roe v. Wade,*
        410 U.S. 113 (1973) ................................................................................................. 10
16   *S. Cty. Sand & Gravel Co. v. Town of S. Kingstown,*
        160 F.3d 834 (1st Cir. 1998) .................................................................................... 11
17   *Schad v. Borough of Mount Ephraim,*
        452 U.S. 61 (1981) ................................................................................................... 11
18   *Shanks v. Dressel,*
        540 F.3d 1082 (9th Cir. 2008) ................................................................. 12, 13, 62, 63
19   *Sinaloa Lake Owners Ass'n v. City of Simi Valley,*
        882 F.2d 1398 (9th Cir. 1989) ................................................................................. 13
20   *Squaw Valley Dev. Co. v. Goldberg,*
        375 F.3d 936 (9th Cir. 2004) ................................................................................... 27
21   *State Farm Mut. Auto. Ins. Co. v. Campbell,*
        538 U.S. 408 (2003) ..................................................................................... 69, 70, 71
22   *Stivers v. Pierce,*
        71 F.3d 732 (9th Cir. 1995) ..................................................................................... 40
23   *Takahashi v. Bd. of Trustees of Livingston Union Sch. Dist.,*
        783 F.2d 848 (9th Cir. 1986) ................................................................................... 53
24   *Teresi Investments III v. City of Mountain View,*
        609 F. App'x 928 (9th Cir. 2015) ............................................................................ 63
25   *Thalheimer v. City of San Diego,*
        645 F.3d 1109 (9th Cir. 2011) ................................................................................. 40
26   *Troxel v. Granville,*
        530 U.S. 57 (2000) ................................................................................................... 10
27   *U.S. ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.,*
        40 F. Supp. 811 (E.D. Tenn. 1941) ......................................................................... 67

28

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*United States v. 13.40 Acres of Land in City of Richmond, Contra Costa Cty.,*
  56 F. Supp. 535 (N.D. Cal. 1944) ........................................................................... 67

*United States v. 91.90 Acres of Land, Situate in Monroe Cty., Mo.,*
  586 F.2d 79 (8th Cir. 1978)..................................................................................... 67

*United States v. Carolene Prod. Co.,*
  304 U.S. 144 (1938) ......................................................................................... 10, 11

*United States v. Sowards,*
  370 F.2d 87 (10th Cir. 1966)................................................................................... 67

*United States v. State of Or.,*
  44 F.3d 758 (9th Cir. 1994).................................................................................... 40

*United States v. Utah Const. & Min. Co.,*
  384 U.S. 394 (1966) ............................................................................................... 50

*Univ. of Tennessee v. Elliott,*
  478 U.S. 788 (1986) ............................................................................................... 50

*Valley Wood Preserving, Inc. v. Paul,*
  785 F.2d 751 (9th Cir. 1986).............................................................................. 34, 35

*Vanelli v. Reynolds Sch. Dist. No. 7,*
  667 F.2d 773 (9th Cir. 1982)................................................................................... 49

*Vill. of Belle Terre v. Boraas,*
  416 U.S. 1 (1974)................................................................................................... 11

*Vill. of Euclid, Ohio v. Ambler Realty Co.,*
  272 U.S. 365 (1926) ......................................................................................... 11, 12

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.,*
  24 F.3d 56 (9th Cir. 1994)......................................................................................... 5

*Wheeler v. City of Pleasant Grove,*
  833 F.2d 267 (11th Cir. 1987)................................................................................. 66

*White v. City of Pasadena,*
  671 F.3d 918 (9th Cir. 2012)................................................................................... 53

*Wroblewski v. City of Washburn,*
  965 F.2d 452 (7th Cir. 1992)..................................................................................... 5

*Yuba Nat. Res., Inc. v. United States,*
  904 F.2d 1577 (Fed. Cir. 1990)............................................................................... 66

*Zinermon v. Burch,*
  494 U.S. 113 (1990) ............................................................................................... 34

**State Cases**

*Avco Cmty. Developers, Inc. v. S. Coast Reg'l Com.,*
  17 Cal. 3d 785 (1976) ............................................................................................. 15

*BMW of N. Am., Inc. v. New Motor Vehicle Bd.,*
  162 Cal. App. 3d 980 (Cal. Ct. App. 1984) ...................................................... 48, 52

*Breakzone Billiards v. City of Torrance,*
  81 Cal. App. 4th 1205 (2000)............................................................................ 39, 40

*Briggs v. City of Rolling Hills Estates,*
  40 Cal. App. 4th 637 (1995)................................................................................... 55

*Calvert v. Cty. of Yuba,*
  145 Cal. App. 4th 613 (2006)........................................................... 14, 16, 17, 19

*City of Los Angeles v. Gage,*
  127 Cal. App. 2d 442 (1954)............................................................................ 15, 16

*Crane v. Bd. of Sup'rs of Los Angeles Cty.,*
  17 Cal. App. 2d 360 (1936)..................................................................................... 51

**TABLE OF AUTHORITIES (cont.)**

<u>Page(s)</u>

*Edmonds v. Los Angeles Cty.*,
  40 Cal. 2d 642 (1953) ..................................................................................... 7, 16
*Endara v. City of Culver City*,
  140 Cal. App. 2d 33 (1956) ................................................................................... 17
*Hansen Bros. Enterprises, Inc. v. Bd. of Supervisors*,
  12 Cal. 4th 533 (1996) ................................................................... 9, 16, 17, 41
*Hardesty v. State Mining & Geology Bd.*,
  11 Cal. App. 5th 790 (Cal. Ct. App. 2017) .............................................................. 8
*Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr.*,
  62 Cal. App. 4th 1123 (1998) ................................................................................ 40
*Howard v. Cty. of Amador*,
  220 Cal. App. 3d 962 (Cal. Ct. App. 1990) .............................................................. 9
*Janis v. California State Lottery Com.*,
  68 Cal. App. 4th 824 (1998) .................................................................................. 73
*Kennecott Corp. v. Union Oil Co.*,
  196 Cal. App. 3d 1179 (Cal. Ct. App. 1987) ............................................................ 9
*Lucido v. Superior Court*,
  51 Cal. 3d 335 (1990) ........................................................................................... 53
*Malibu Mountains Recreation, Inc. v. Cty. of Los Angeles*,
  67 Cal. App. 4th 359 (1998) .................................................................................. 15
*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*,
  191 Cal. App. 4th 435 (2010) ................................................................................ 15
*Mineral Associations Coal. v. State Mining & Geology Bd.*,
  138 Cal. App. 4th 574 (2006) ................................................................................ 25
*Mola Dev. Corp. v. City of Seal Beach*,
  57 Cal. App. 4th 405 (1997) ............................................................................ 48, 52
*Paramount Rock Co. v. San Diego Cty.*,
  180 Cal. App. 2d 217 (1960) .......................................................................... 17, 18
*People ex rel. Dep't of Conservation v. El Dorado Cty.*,
  36 Cal. 4th 971 (2005) .................................................................................... 21, 24
*Pomona Valley Hosp. Med. Ctr. v. Superior Court*,
  55 Cal. App. 4th 93 (1997) .............................................................................. 48, 52
*San Diego Cty. v. McClurken*,
  37 Cal. 2d 683 (1951) ...................................................................................... 7, 16
*Save the Plastic Bag Coal. v. City of Manhattan Beach*,
  52 Cal. 4th 155 (2011) .......................................................................................... 29
*Spencer v. Merced Cty. Office of Educ.*,
  59 Cal. App. 4th 1429 (1997) ................................................................................ 73
*Swartzendruber v. City of San Diego*,
  3 Cal. App. 4th 896 (1992) ............................................................................. 55, 56
*Takahashi v. Board of Education*,
  (1988) 202 Cal. App. 3d 1464, 1476 ...................................................................... 56
*Woodland Hills Residents Assn., Inc. v. City Council*,
  26 Cal. 3d 938 (1980) ..................................................................................... 38, 39

**Federal Statutes**

42 U.S.C. § 1983 .................................................................................................. 1, 65

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

**State Statutes**

Cal. Civ. Proc. Code § 1094.5...................................................................... 47, 48, 49, 55
Cal. Civ. Proc. Code § 1094.5(a)-(b) ................................................................ 48, 52
Cal. Civ. Proc. Code § 1094.6........................................................................... 47, 52
Cal. Civ. Proc. Code § 1263.310......................................................................... 67
Cal. Gov't Code § 945.4 ..................................................................................... 72
Cal. Gov't Code § 65804(c).................................................................................. 36
Cal. Gov't Code § 81000 ..................................................................................... 38
Cal. Gov't Code § 81002(a).................................................................................. 38
Cal. Gov't Code § 87100 ..................................................................................... 38
Cal. Gov't Code § 87103, subd. (c), 82030, subd. (b)......................................... 38
Cal. Pub. Res. Code § 2710 ................................................................................. 2
Cal. Pub. Res. Code § 2711(a) ............................................................................. 20
Cal. Pub. Res. Code § 2728 ................................................................................. 12
Cal. Pub. Res. Code § 2729 ................................................................................. 22
Cal. Pub. Res. Code §§ 2770(d), 2773.1(a)(3)-(4)............................................... 21
Cal. Pub. Res. Code § 2772(b)(6) ....................................................................... 21
Cal. Pub. Res. Code § 2772(c)(5)-(7) .................................................................. 22
Cal. Pub. Res. Code § 2772(c)(7) ....................................................................... 23
Cal. Pub. Res. Code §§ 2772-2773 ..................................................................... 21
Cal. Pub. Res. Code § 2773.1 ............................................................................. 21
Cal. Pub. Res. Code § 2773.1(a)(3) ..................................................................... 21
Cal. Pub. Res. Code § 2774(c)-(d) ....................................................................... 25
Cal. Pub. Res. Code § 2774.1(a) ......................................................................... 58
Cal. Pub. Res. Code § 2774.1(f) .......................................................................... 25
Cal. Pub. Res. Code § 2774.1-2774.2 ............................................................. 22, 44
Cal. Pub. Res. Code § 2774.4 ............................................................................. 25
Cal. Pub. Res. Code § 2776 ................................................................................. 9
Cal. Pub. Res. Code § 2777 ......................................................................... 7, 22, 23
Cal. Pub. Res. Code § 21000 .............................................................................. 15

**Federal Rules**

Fed. R. Civ. P. 50(a)............................................................................................ 4
Fed. R. Civ. P. 50(b) ....................................................................................... 1, 4

**State Regulations**

Cal. Code Regs. tit. 14, § 3502 ...................................................................... 59, 60
Cal. Code Regs. tit. 14, § 3502(a)....................................................................... 21
Cal. Code Regs. tit. 14, § 3502(c)....................................................................... 22
Cal. Code Regs. tit. 14, § 3502(d)..................................................................... 7, 22
Cal. Code Regs. tit. 14, § 3502(d)(1).................................................................. 21
Cal. Code Regs. tit. 14, § 3502(d)(1), (3) ........................................................... 24
Cal. Code Regs. tit. 14, § 3502(e)....................................................................... 21
Cal. Code Regs. tit. 14, § 3502(e), (g) ................................................................ 24
Cal. Code Regs. tit. 14, § 3704 .......................................................................... 60
Cal. Code Regs. tit. 14, § 3704(a)....................................................................... 23
Cal. Code Regs. tit. 14, § 3704(d)....................................................................... 24

1

**TABLE OF AUTHORITIES (cont.)**

2

<u>Page(s)</u>

3

Cal. Code Regs. tit. 14, § 3708 .................................................................................................. 24
Cal. Code Regs. tit. 14, § 3804 .................................................................................................. 23
Cal. Code Regs. tit. 14, § 3804(c) ............................................................................................. 21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT AFTER TRIAL**

2  **I.   INTRODUCTION**

3      Defendants, County of Sacramento ("County"), Roger Dickenson, Robert Sherry, and

4  Jeff Gamel, renew their Motion for Judgment as a Matter of Law per Fed. R. Civ. P. 50(b).  For

5  the reasons described within, all defendants request this Court enter judgment against all the

6  Hardestys' and Schneiders' claims.  As will be detailed, these Plaintiffs failed at trial to

7  demonstrate actual deprivations of their constitutional rights under California law, as *correctly*

8  interpreted, and as it applies to the heavily regulated industry of surface mining.  The evidence

9  at trial established that the County and individual defendants did nothing more than what

10  California law *required* them to do.

11      If this Court does not overturn the Jury's verdicts, it will sanction a grave injustice.  The

12  Court will effectively reward the Plaintiffs for the unlawful manner in which they conducted

13  their mining operation and the obstructionist and dilatory behavior in which they engaged in the

14  challenged administrative proceedings.  If such behavior can be parlayed into a multi-million-

15  dollar judgment, one can only wonder how other local agencies will be able to effectively carry

16  out their statutory and regulatory duties concerning mining without fear of succumbing to the

17  same result that has occurred here.

18      Ultimately, the Plaintiffs presented claims that did not belong in this forum.  Federal

19  courts have repeatedly admonished against the practice of litigating planning and zoning

20  disputes under 42 U.S.C. § 1983.  Such disputes nearly always present issues that best belong

21  before local planning bodies or in state court.  Rarely do they rise to the level in which federal

22  intervention is justified.

23      This was not such a rare case.  Stripped of the constitutional garb in which they were

24  cloaked, the Plaintiffs' claims were effectively an assertion they could ignore the laws that

25  govern their highly regulated industry.  This clearly was not the type of case for which 42

26  U.S.C. § 1983, a civil rights statute enacted in the Reconstruction Era, was intended.

27      To avoid the manifest injustice that would be perpetuated were the Jury's verdicts

28  allowed to stand, the Court must grant judgment for the County defendants as explained within.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

## II.    **SUMMARY OF ARGUMENTS**

The County and individual Defendants are entitled to judgment on all of the Plaintiffs' claims on the following grounds:

(1)    *No Liberty or Property Interest*.  Plaintiffs did not produce sufficient evidence to allow the Jury to conclude they possessed any type of interest the Due Process Clause protects. Neither the Hardestys nor Schneiders offered sufficient evidence to establish the County's actions *completely* prohibited them from any liberty interest to engage in the occupation of mining.  In addition, neither set of Plaintiffs could demonstrate a valid property interest as they had no legitimate expectation under California law to operate an expanded nonconforming use or to violate Surface Mining and Reclamation Act ("SMARA," Cal. Pub. Res. Code § 2710 *et seq.*) requirements.  The Hardestys, who had no ownership interest in the Schneider Historical Mine ("SHM") or written mining lease with the Schneiders, also did not have a sufficient real property interest in SHM to claim a valid property interest.  *See infra* Section IV.A.

(2)    *Substantive Due Process*.  Plaintiffs failed to create any triable issue of fact sufficient to allow the Jury to properly determine the County and individual Defendants acted arbitrarily.  The facts could only allow the trier of fact to conclude Defendants reasonably applied California law in light of the credible evidence of (i) the unlawful expansion of the SHM nonconforming use, and (ii) the Plaintiffs' "substantial deviation" from the SHM reclamation plan in violation of SMARA.  Evidence of Teichert Aggregates' ("Teichert") requests that the County take enforcement against SHM could not have allowed the Jury to find the Defendants acted without a rational basis.  Plaintiffs produced *no* evidence to establish the County decision-makers who took final action on the SHM enforcement matters were influenced by Teichert's interests concerning SHM.  *See infra* Section IV.B.

(3)    *Procedural Due Process*.  Plaintiffs were provided due process as a matter of law in the Board of Supervisors hearing concerning the SHM nonconforming use and the Board of Zoning Appeals hearings concerning their SMARA compliance.  The undisputed evidence regarding both proceedings indicated the Plaintiffs had ample notice of the issues to be decided and were able to present extensive documentary and testimonial evidence.  Because the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

procedures the Plaintiffs received far exceeded the minimum standards of due process, the Jury could not properly find in Plaintiffs' favor. *See infra* Section IV.C.

(4)     *Res Judicata and Collateral Estoppel*. The undisputed evidence confirms Plaintiffs did not overturn the Board of Supervisors or Board of Zoning Appeals determinations they now claim to have deprived them of their right to mine SHM.   The record of those proceedings confirms that the Plaintiffs had substantial opportunities to present oral and testimonial evidence on all disputed issues.   To the extent the Plaintiffs believed those proceedings were inadequate or unfair, they also had the ability to pursue the administrative mandamus remedy California law plainly provides (and which they initially pursued as to the Board of Supervisors determination, but ultimately abandoned).   Clear Ninth Circuit Court of Appeals precedent forbade the Plaintiffs from bypassing this state-law remedy. *See infra* Section IV.D.

(5)     *Retaliation Claim*. No evidence could allow a reasonable jury to conclude the County violated the Schneiders' First Amendment rights by retaliating against them for filing their federal lawsuit in September 2012.   The process that led to the demand for a greater financial assurance had begun almost *two years* before that action was filed.   The demand was also the result of a proper finding under SMARA that the Plaintiffs had "substantially deviated" from the SHM reclamation plan principally because of their creation of new pits near the Cosumnes River.   Plaintiffs chose not to amend this plan, *requiring* the County to determine the significant cost necessary to "backfill" the pits to achieve the "grazing" end use the reclamation plan specified. *See infra* Section IV.E.

(6)     *Qualified Immunity*.   Qualified immunity precludes liability against any individual defendants as there was no evidence any such defendant took any final action concerning the SHM matters or violated any "clearly established" constitutional right the Plaintiffs possessed. *See infra* Section IV.F.

(7)     *Excessive Damages*.   The Jury's substantive due process awards were based on an improper measure of damages, specifically, the valuation of the Plaintiffs' business losses, as opposed to the diminution in the value of the SHM land. *See infra* Section IV.G.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                                              -3-

(8) *Punitive Damages*. No evidence was offered at trial that would allow a reasonable jury to conclude the individual defendants acted in conscious disregard of the Plaintiffs' rights or with fraud, malice, or oppression. The Jury's awards of punitive damages against the individual defendants also exceeded common-law and constitutional limitations. *See infra* Section IV.H.

(9) *Williamson Act*. The Schneiders failed to present evidence to support their assertion the County violated its Williamson Act contract with them or that they presented this claim to the County in accordance with the California Government Claims Act. *See infra* Section IV.I.

## III.   STANDARD FOR RENEWED MOTION FOR JUDGMENT

Following the entry of jury verdict, a defendant that previously moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) may renew its motion under Fed. R. Civ. P. 50(b). The renewed motion may be granted as to any or all of the claims or issues on which the defendant moves. *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1247 (9th Cir. 1998).

Under Fed. R. Civ. P. 50(b), judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, allows only one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986). The court should review all the evidence, and draw all reasonable inferences in favor of the moving party. *Id.* But neither a "mere scintilla" of evidence nor speculation is sufficient to sustain a verdict for the prevailing party. *See Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802–03 (9th Cir. 2009). Effectively, the standard for a renewed motion for judgment is the same that governs a pretrial motion for summary judgment. *Hoffman v. Tonnemacher*, 593 F.3d 908, 912 (9th Cir. 2010).

In ruling on a renewed motion for judgment, the Court must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence. *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 841 (9th Cir. 2004). However, the Court still must independently evaluate the evidence to determine its sufficiency and may not rely on the Jury's findings. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724–25 (11th Cir. 2012).

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1    IV.    **ARGUMENT**

2         A.    **Neither the Hardestys Nor Schneiders Offered Sufficient Evidence to Prove**
           **They Possessed Any Interest the Due Process Clause Protects**
3

4              As a threshold for maintaining either a substantive or procedural due process claim, the

5    Plaintiffs were required to identify a type of interest the federal Due Process Clause protects.

6    This required them to show they possessed a "liberty" or "property" interest.  *Bd. of Regents of*

7    *State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  At trial, neither the Hardestys nor Schneiders

8    presented evidence sufficient to allow the Jury to determine they had either.

9              **1.    Standards for Proving the Existence of Liberty and Property Interests**

10             Among the rights that may constitute a protected liberty interest is "some generalized

11   due process right to choose one's field of private employment."  *Conn v. Gabbert*, 526 U.S.

12   286, 291–92 (1999).  The Ninth Circuit Court of Appeals has described this right as involving

13   the ability to pursue an occupation or profession.  *Wedges/Ledges of California, Inc. v. City of*

14   *Phoenix, Ariz.*, 24 F.3d 56, 65 n.4 (9th Cir. 1994).  But to demonstrate a deprivation of such a

15   right, the plaintiff must show a *complete* prohibition on his or her right to engage in a chosen

16   vocation.  *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999).  This may occur when

17   legislation or regulations bars entry of some into a profession or executive action which

18   effectively acts as a "blacklist" to a particular person obtaining public employment.  *Guzman v.*

19   *Shewry*, 544 F.3d 1073, 1085 (9th Cir. 2008), *opinion amended and superseded on denial of*

20   *reh'g* 552 F.3d 941 (9th Cir. 2009); *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997–98

21   (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).

22   Effectively, the protected liberty is the right "to pursue a *calling or occupation*, and not the right

23   to the specific job."  *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992)

24   (emphasis in original); *see also Piecknick v. Com. of Pa.*, 36 F.3d 1250, 1262 (3d Cir. 1994).

25             Regarding property interests, courts look to independent sources, such as state law, to

26   identify those interests that are accorded due process protections.  *Paul v. Davis*, 424 U.S. 693,

27   710–12 (1976).  To possess a property interest, a plaintiff must have a "legitimate claim of

28   entitlement" under state law.  *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988).  In analyzing

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

whether such an interest exists, courts examine applicable law to determine whether it operates as a "significant substantive restriction" on an agency's ability to grant or deny a benefit or authorization. *Parks v. Watson*, 716 F.2d 646, 656–57 (9th Cir. 1983). Generally, a statute, regulation, or other provision must speak with mandatory language to support the conclusion it vests the plaintiff with a valid claim of entitlement. *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990). Regulations that grant discretion to decision-makers do not create property interests. *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980). Generally, because zoning and land use matters involve discretionary and policy-based decision-making, plaintiffs cannot claim a legitimate expectation to any particular entitlement. *See Buckles v. King Cty.*, 191 F.3d 1127, 1137 (9th Cir. 1999); *Bateson*, 857 F.2d at 1305.

### 2. The Schneiders Do Not Possess Cognizable Liberty or Property Interest

Under the above standards, the Schneiders failed at trial to present evidence capable of supporting a finding they possessed a liberty or property interest. As to the former, the Schneiders asserted the County effectively destroyed their ability to operate the SHM, and thus deprived them of their right to carry on the mining operation they had long operated on the SHM property. As a matter of law, this contention could not have supported a finding the County had deprived them of any liberty interest. A person claiming such an interest in the right to carry on a profession must show he or she was deprived altogether from engaging in the profession because of some *legislative* or *regulatory* act. *Guzman*, 544 F.3d at 1085. The Ninth Circuit has recognized that executive or administrative actions may only deprive one's right to carry on a profession in the context of *public* employment. *Engquist*, 478 F.3d at 997–98. But even if such acts could deprive one's right to engage in private employment, they must still amount to a *total* prohibition on the right carry on a profession. *Dittman*, 191 F.3d at 1029.

The Schneiders could not make such a showing. There is no evidence the Schneiders operated the SHM mine; they simply owned the land and orally permitted Hardesty to conduct mining on their land. At best, the Schneiders could show that the County required them to obtain a discretionary land use permit as a condition for further mining the SHM operation to

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

the extent that it had been mined after 2005 or 2006.  This is far from evidence of a total prohibition on their ability to engage in the occupation of mining, whether on their own property or elsewhere.  Effectively, the County permit requirement is akin to the licensing requirements that are required as a prerequisite for carrying on many occupations, which do not amount to a complete bar such as to deprive one's liberty interest.

The Schneiders also cannot demonstrate they possessed a property interest as a matter of law.  Even assuming they had a vested right because of the 1994 staff-level letter they received (Joint Exhibit, "JX" 21), they never had a right to expand that right beyond its permissible scope.  That is, as more fully described below in Section IV.B.3.a, they never had the right to mine outside of areas intended to be mined when the SHM use became nonconforming, employ new mining methods not used at the inception of the nonconforming use, or increase production levels.[1]  As will be discussed in more detail in Section IV.B.3.a, a vested right in a nonconforming use carries with it the strict requirement to operate the use in a manner similar to that which existed at the inception of the nonconformity.  *See San Diego Cty. v. McClurken*, 37 Cal. 2d 683, 687 (1951); *Edmonds v. Los Angeles Cty.*, 40 Cal. 2d 642, 651 (1953); *see generally* 6 Norman Williams, Jr. & John M. Taylor, *American Land Planning Law* § 117-121 (rev. ed. 2003).  For this reason, the Schneiders could never have had a legitimate expectation under California law that they could engage in the ramped-up mining that began at SHM around 2005 or 2006.

Further, even if the Schneiders could surmount that obstacle, they still could not have demonstrated a valid right to mine in any manner contrary to that which is specified in their reclamation plan. As will be explained in depth in Section IV.B.3.b, even vested-right mining operations are subject to SMARA's prohibition on substantially deviating from a reclamation plan *until* lead agency approval is obtained.  Cal. Pub. Res. Code § 2777.  SMARA is clear that a reclamation plan amendment and updated financial assurance must be approved *before* any new working areas, pits, or excavations are created.   Cal. Code Regs. tit. 14, § 3502(d).

---

[1] *See infra* footnotes 13-15 for the authorities confirming these types of expansion are prohibited.

1    Consequently, even if the SHM vested right allowed the mining of all the areas being mined,

2    including the new pits near the Cosumnes River, the Schneiders *never* had the right to start

3    mining to an extent not clearly specified in their reclamation plan.

4          Because the evidence at trial failed as a matter of law to justify the finding the

5    Schneiders had either a liberty or property interest, no reasonable jury could conclude their

6    substantive or procedural due process rights had been violated.

7                 **3.      The Hardestys Do Not Possess a Valid Liberty or Property Interest**

8          For similar reasons, no evidence could have allowed the Jury to find the Hardestys had

9    been deprived of a liberty or property interest.  The Hardestys were not precluded altogether

10   from engaging in the occupation of mining because of the County's requirement they obtain a

11   conditional use permit.  Indeed, the Hardestys operate another mine in El Dorado County,

12   which alone establishes nothing the County did could have affected their ability to engage in the

13   profession of mining.  *See Hardesty v. State Mining & Geology Bd.*, 11 Cal. App. 5th 790 (Cal.

14   Ct. App. 2017).  Like the Schneiders, to the extent the Hardestys wished to operate a mine in

15   Sacramento County, they were subject to the same anti-expansion prohibition and SMARA

16   requirements that apply to all mining operations.

17         The Hardestys' claim to possess a property interest also suffers from an additional and

18   fundamental defect.  The evidence at trial indicated that, at most, whatever real property rights

19   the Hardestys possessed in SHM were *derivative* of any rights the Schneiders possessed.  In

20   other words, it could not have been possible for the Jury to conclude that the Hardestys and

21   Schneiders possessed *independent* property interests that could be separately redressed.  If a

22   property interest in the SHM did in fact exist, the Jury could only have found that the

23   Schneiders could possess that interest.

24         The evidence at trial was undisputed the Hardestys had no fee interest in the SHM

25   property.  The evidence was also clear the Hardestys had no written agreement with the

26   Schneiders that specified the terms and conditions by which they were allowed to mine the

27   property.  Under California law, the Hardestys' interest in the SHM could only have been

28   characterized as a profit à prendre, an interest in real property that does not provide for

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                              -8-

1    exclusive possession or enjoyment of the land. *Howard v. Cty. of Amador*, 220 Cal. App. 3d

2    962, 972 (Cal. Ct. App. 1990). A profit is simply an incorporeal right to enter onto the land of

3    another to convert the surface or subsurface of the land to personal property (e.g., sand, gravel,

4    and rock). *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1186 (Cal. Ct. App.

5    1987).

6          That this was the extent of the right the Hardestys possessed precluded them from

7    possessing any type of interest entitled to due process protections. Because the Hardestys only

8    had a right to carry off material from and below the SHM surface, they could only borrow from

9    whatever right the Schneiders themselves had to do the same. To the extent the Schneiders

10   possessed a vested right, their right would run with the land, and would inure only to *their*

11   benefit. *Hansen Bros. Enterprises, Inc. v. Bd. of Supervisors*, 12 Cal. 4th 533, 540 (1996). As

12   owners, of course, the Schneiders could assign some of their real property rights to another,

13   such as through a mining lease in which they allow another party to mine SHM in exchange for

14   the payment of royalties or other compensation. But in that situation, there remains but one

15   vested right, and the Schneiders can only be said to have *temporarily* allowed the lessee to

16   receive the benefit of *their* vested right for the agreed upon term of the lease. Because the

17   lessee did not undertake the activities or incur the liabilities that led to the creation of that

18   vested right,[2] he cannot be said to possess his *own* vested right.

19         Thus, because of the limited nature of their real property interest under California law,

20   the Hardestys cannot assert any property interest founded on the notion *they* possessed a vested

21   right. If a valid property interest existed in the form of a vested right to mine SHM, that right

22   may only belong to the Schneiders and *only* the Schneiders may be allowed to assert procedural

23   or substantive due process claims. Judgment as a matter of law against the Hardestys would

24   need to be entered in this situation.

25   ///

26   ///

27

28         [2] *See* Cal. Pub. Res. Code § 2776, describing a vested mining right as being created if a party had undertaken activities and incurred substantial liabilities prior to SMARA's enactment.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1

2

**B.    Because the County's Actions Toward the Plaintiffs Were Inherently Rational, the Jury Could Not Properly Conclude the County Deprived Them of Substantive Due Process**

3

4

5

6

On the merits of their substantive due process claims, the Jury awarded the Schneiders $30 million and the Hardestys $75 million.  As explained in this section, no evidence could allow the Jury to reasonably determine the County lacked a rational basis for the enforcement activities the Plaintiffs challenged.

7

8

**1.    As a Starting Point, It Must Be Recognized the Plaintiffs Assert Economic Rights for which Federal Jurisdiction is Rarely Justified**

9

10

11

12

13

14

At the threshold, the County notes that $105 million was awarded to the Plaintiffs through a constitutional theory that, for several decades, has had as its objective the protection of rights vastly different from those involved in this case.  Although the United States Supreme Court has recognized that substantive due process has been a "treacherous field,"[3] there is no dispute its development has centered for many years on the protection of fundamental personal rights such as the rights to privacy,[4] reproductive choice,[5] marriage,[6] and rearing of children.[7]

15

16

17

18

19

20

21

22

23

24

25

During an earlier time in our nation's history, the doctrine of substantive due process was not so limited.  By the turn of the Twentieth Century, and for the next three decades, the doctrine was used regularly to strike down legislation on economic grounds in what has often been referred to as the "*Lochner* Era," after the infamous decision in *Lochner v. N.Y.*, 198 U.S. 45 (1905).  Virtually all constitutional scholars mark the end of the *Lochner* Era with the Supreme Court's decision in *United States v. Carolene Prod. Co.*, 304 U.S. 144 (1938).  In *Carolene*—and, in particular, in its "famous Footnote Four"—the Court signaled that the focus of substantive due process would no longer be on protecting economic interests, but would instead be on the protection of fundamental rights and of "discrete and insular" minorities. *Carolene Products Co.*, 304 U.S. at 152–53 n.4.  Following *Carolene*, the use of substantive due process for the protection of economic interests was relegated to an inferior status, with

26

27

28

[3] *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 502 (1977).
[4] *Griswold v. Connecticut*, 381 U.S. 479 (1965).
[5] *Roe v. Wade*, 410 U.S. 113 (1973).
[6] *Loving v. Virginia*, 388 U.S. 1 (1967); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).
[7] *Troxel v. Granville*, 530 U.S. 57 (2000).

{DPC/00052406. }                                           -10-

1  claims involving such rights becoming subject to the highly deferential "rational basis"

2  standard.  *See Johnson v. United States*, 135 S. Ct. 2551, 2570–71 (2015).

3        This brief summary of the development of substantive due process provides essential

4  context for this case.  As will be discussed, the facts comprising the Plaintiffs' substantive due

5  process claims revolve around two central subjects: (1) the economic right of SHM to operate as

6  a nonconforming land use, and (2) SHM's compliance with SMARA requirements regarding

7  reclamation plans and financial assurances for mining operations.  At bottom, these are subjects

8  that involve the Plaintiffs' economic rights to conduct a mining operation under California land

9  use laws and County zoning ordinances.  Ultimately, the plaintiffs assert property rights, which

10 federal courts have since (and even before) *Carolene* treated as a form of economic rights*.  See

11 Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).  When such rights are

12 involved, "the courts generally have emphasized the breadth of the municipal power to control

13 land use" and have applied the highly deferential post-*Carolene* rational-basis standard.  *Schad

14 v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981); *see also Vill. of Belle Terre v. Boraas*,

15 416 U.S. 1, 7–8 (1974).  Consistent with the approach that has prevailed since *Carolene*, courts

16 considering substantive due process claims involving property rights have accorded such rights

17 only the *narrowest* protections.  *See, e.g., J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126, 1130

18 (9th Cir. 1983).

19       Indeed, in furtherance of the approach that has prevailed since *Carolene*, federal courts

20 have uniformly condemned the practice of raising land use claims as constitutional violations.[8]

21 As one Circuit Court of Appeals has explained, resolving land use disputes "simply is not the

22 business of the federal courts."  *Gardner v. City of Baltimore Mayor & City Council*, 969 F.2d

23 63, 67–68 (4th Cir. 1992).  Other circuits have stated that federal courts are not suited to "sit as

---

[8] This has been true in cases involving the right of "grandfathered" or existing mining and extractive use to expand or change their operations.  *See DeKalb Stone, Inc. v. Cty. of DeKalb, Ga.*, 106 F.3d 956, 960 (11th Cir. 1997) (purportedly nonconforming quarry could not enjoin county's effort to enforce zoning regulations); *S. Cty. Sand & Gravel Co. v. Town of S. Kingstown*, 160 F.3d 834, 839 (1st Cir. 1998) (ordinance prohibiting mines and quarries from horizontally expanding by more than 25% of their excavated areas did not deprive substantive due process*); Bituminous Materials, Inc. v. Rice Cty., Minn.*, 126 F.3d 1068, 1071 (8th Cir. 1997) (rejecting substantive due process challenge to conditions place on permit to operate asphalt plant that were allegedly motivated by the personal animus of county commissioners).

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  zoning board[s] of appeals." *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st

2  Cir. 1982); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004) (noting that federal

3  courts are not "super zoning tribunals"). Because local zoning decisions involve purely

4  parochial and political concerns, federal courts have routinely declined to intervene in local

5  zoning cases. They have instead "left the door slightly ajar" to intervene only in "truly

6  horrendous situations." *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45

7  (1st Cir. 1992).

8      That claims involving land use matters *rarely* merit federal court resolution is a point

9  that should not escape this Court when considering this Motion. As will be explained, far from

10  any "truly horrendous" situation, this case presents nothing more than a run-of-the-mill dispute

11  between a "lead agency"[9] and mine operators over the extent of their right to operate a

12  purportedly "grandfathered" mining operation. Because this type of dispute implicates only

13  property rights, a form of economic interests, it must be remembered that the *Lochner* doctrine

14  is long a relic of the past, and that, consistent with the approach that has prevailed for decades

15  since *Carolene*, the County's actions are entitled to be viewed with a very strong presumption

16  of reasonableness.

17          **2.    Under the Applicable Legal Standard, the County Is Entitled to
                    Judgment if it Could Have Had a Rational Basis for Its Actions**

18

19      Under the highly deferential standard to which the County is entitled, land use decisions

20  violate substantive due process *only* when they are "clearly arbitrary and unreasonable, having

21  no substantial relation to the public health, safety, morals, or general welfare." *Village of*

22  *Euclid, Ohio*, 272 U.S. at 395. A plaintiff alleging violation of substantive due process has an

23  "exceedingly high burden." *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008); *see also*

24  *J.W.*, 720 F.2d at 1130 ("[t]he scope of federal court review of zoning decisions generally is

25  extremely narrow.") Under Ninth Circuit Court of Appeals precedent, "[t]he irreducible

26  minimum of a substantive due process claim challenging land use regulation is a failure to

27  _____

28  [9] In mining parlance, the "lead agency" usually refers to the agency (here, the County) that
    has principal regulatory authority over a surface mining operation. *See* Cal. Pub. Res. Code
    § 2728.

{DPC/00052406. }                                  -12-

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

advance *any* governmental purpose." *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008) (emphasis added). Thus, when Plaintiffs claim their substantive due process rights have been violated, courts may look only to whether the agency *could have* had a legitimate reason for the actions it took. *Hoeck v. City of Portland*, 57 F.3d 781, 787 (9th Cir. 1995); *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1262 (9th Cir. 1994). Moreover, that actions taken may be based on erroneous interpretations of the law does not mean an agency violates substantive due process. *Shanks*, 540 F.3d at 1088; *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1409 (9th Cir. 1989). If it is at least "fairly debatable" that the agency's actions advance a legitimate governmental interest, no violation can be found. *Shanks*, 540 F.3d at 1089.

Applying this standard, if the evidence at trial showed the County *could have* had *any* valid reason for the actions it took, the Plaintiffs' claims *must* fail. As has been noted, this Court does not sit as a zoning board of appeals. Consequently, the trier of fact's function in this case was not to weigh the parties' competing positions on the disputed issues and to decide which party has the better positions. The trier's *only* role was to decide whether there was *any* reasonable basis for the County to have acted as it did. It is not even necessary that the trier have found the County's actions were legally correct (although, in this case, the County strongly believes they were, as will be explained). The standard is only whether the County had a "fairly debatable" basis for its actions. *Shanks*, 540 F.3d at 1089.

> **3.    Applying the Correct Standard, the Plaintiffs Failed to Produce Evidence that Could Allow the Jury to Have Found the County's Actions Lacked Any Conceivable Rational Basis**

Under the very deferential standard that applies, this Court should have little difficulty concluding the Plaintiffs failed to produce evidence that the County lacked *any* reasonable basis for its actions. At trial, the Plaintiffs claimed the County, through a series of arbitrary enforcement actions, effectively destroyed their abilities to continue operating SHM. To support this contention, the Plaintiffs claimed the County relied on two illegitimate means to compel the termination of their mining businesses. First, they claimed the County subjected them to public hearings and other enforcement mechanisms through which it took away their

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   vested mining right.[10]   Second, they asserted the County wrongly applied SMARA to find them

2   in violation of the SHM reclamation plan and especially to demand they post a financial

3   assurance far beyond what they could afford.

4           As has been discussed, the Plaintiffs bore the burden at trial to show the County *could*

5   *not* have had any legitimate reason for the actions that are alleged to have caused their injuries.

6   It was not simply the Plaintiffs' burden to support their positions concerning their vested rights

7   and SMARA compliance with sufficient evidence.  They were also required to show the County

8   could not have had *any conceivable* reason for its enforcement actions.  *See*, *e.g.*, *FM Properties*

9   *Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996); *Mayfair Dev. Corp. v. City of*

10  *Dallas*, 121 F.3d 705 (5th Cir. 1997).

11          At trial, the Plaintiffs did not present sufficient evidence to justify submission of their

12  claims to the Jury under this standard.  They instead offered only evidence that comported with

13  their jaundiced view of the applicable law.   As explained below, California law not only

14  supported the County's position, it *required* the County to have taken the enforcement actions it

15  did concerning SHM.  More specifically:

16      ●   The Plaintiffs' position concerning their vested rights is fundamentally at odds
            with key state-law precedent, particularly *Calvert v. Cty. of Yuba*, 145 Cal.
17          App. 4th 613, 629 (2006).  The County would have acted inconsistently with
            this precedent had it not held a hearing in light of the credible evidence it had
18          received of SHM's impermissible expansion.

19      ●   The Plaintiffs also cannot reasonably dispute that the SHM operation had
            "substantially deviated" from its approved reclamation plan.   Nor can they
20          validly dispute the approved plan did not provide for the reclamation of the
            new pits they had begun mining near the Cosumnes River.  Under SMARA,
21          the Plaintiffs were required to submit an amended reclamation plan and submit
            a greater financial assurance to account for *all* of the SHM's "disturbed"
22          acreage, including the new pits.  Because the Plaintiffs refused to comply with
            these obligations, SMARA *compelled* the County to institute the enforcement
23          proceedings that resulted in the setting of the revised financial assurance at
            issue.

24

25

26          [10] As discussed *supra* in Section IV.A.3, the County asserts that the only parties that could
    possess any vested right in the SHM were the Schneider parties.  Because the Court would only
27  consider the rational basis for the Hardestys' substantive due process claims if it concludes they
    too possess a valid property interest in SHM, the County refers in this section to both sets of
28  Plaintiffs as possessing a vested right.

{DPC/00052406. }                                           -14-

1

2

        **a.**      **Clear California Precedent Required the County to Determine Issues Concerning the Expansion of the Schneider Historical Mine in a Public Hearing**

3

4

5

6

7

8

9

      In evaluating the evidence supporting the Plaintiffs' substantive due process claim, the County begins by first identifying the actual right that was at stake. Throughout trial, the Plaintiffs repeatedly referred to their "vested right" in the SHM operation. The clear message they intended to convey was that they possessed some paramount right that strongly merited protection in this Court. But like overly persistent salespersons, the Plaintiffs greatly overhyped the nature of the right they possessed. In actuality, the right they had was only the right to operate SHM as a *nonconforming* land use.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

      Although a nonconforming use is a type of vested right, not all vested rights are equal. Under California land use law, the term "vested right" can have different significances depending on the types of rights involved. A property owner can have a vested right, for instance, when it obtains a conditional use permit. *Malibu Mountains Recreation, Inc. v. Cty. of Los Angeles*, 67 Cal. App. 4th 359, 367 (1998). A developer may also have a vested right in a development agreement it has negotiated with a city or county. *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 442 (2010). With these entitlements, a party's rights become vested because it has expended substantial sums to obtain public agency approval of its proposed land use. *Avco Cmty. Developers, Inc. v. S. Coast Reg'l Com.*, 17 Cal. 3d 785, 791 (1976). The party has also likely undergone a detailed and lengthy public review process, including review under the California Environmental Quality Act,[11] often resulting in several conditions of approval being required to mitigate the proposed use's impacts. The party's rights vest only after it has gone through a process that state law specifically authorizes and after it has satisfied all the standards state and local policies require.

24

25

26

27

      A nonconforming use, in contrast, is something California law *disfavors*. As one state court has observed, "[t]he presence of any nonconforming use endangers the benefits to be derived from a comprehensive zoning plan." *City of Los Angeles v. Gage*, 127 Cal. App. 2d 442, 459 (1954). For this reason, "[t]he general purpose of present-day zoning ordinances is to

28

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

---

[11] *See* Cal. Pub. Res. Code § 21000 *et seq.*

eventually *end* all nonconforming uses." *Id.* at 454, emphasis added. Nonetheless, zoning ordinances customarily exempt existing land uses "because of the hardship and doubtful constitutionality of compelling [their] *immediate* discontinuance…." *San Diego County*, 37 Cal. 2d at 686 (emphasis added). Effectively, California follows a policy of benign neglect when it comes to nonconforming uses. Although the goal of state law is to achieve uniform zoning compliance, it allows nonconforming uses to continue for a purely prophylactic reason—the avoidance of takings liability.

In considering the sufficiency of the evidence, it is important to keep in mind the relative unimportance of nonconforming uses within the pantheon of vested rights. Although the Plaintiffs have argued ad infinitum that the SHM vested right was confirmed in writing in 1994 (JX 21), the Plaintiffs ignore that, because the goal of California law is to *eliminate* nonconforming uses, state law places a key limitation on their continued existence. Importantly, there is a "strict policy" against their expansion. *San Diego County*, 37 Cal. 2d at 687. Under this policy, "the continued nonconforming use must be similar to the use existing at the time the zoning ordinance became effective...." *Edmonds*, 40 Cal. 2d at 651; *see also id.* (noting the increase from 20 to nearly 50 trailers unlawfully expanded a nonconforming mobile home park). Moreover, when an operator has impermissibly expanded a nonconforming use, California law authorizes an agency to order the operator to restrict the operation to its proper level and to seek injunctive relief to compel the operator's compliance. *Hansen Brothers Enterprises, Inc.*, 12 Cal. 4th at 575. Thus, regardless of whether the existence of a particular nonconforming use like SHM has been confirmed, the continuation of the use is *always* subject to an agency's right to determine if it has been expanded.

California law places another very important limitation on nonconforming mining uses. In *Calvert*, a 2007 decision of the State Third District Court of Appeals, the court held that agencies must resolve claims concerning vested rights in public hearings. *Calvert*, 145 Cal. App. 4th at 629. The hearings must follow procedures similar to those required for approval of land use permits. *Id.* at 626. The issues that must be determined in the hearings are the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1 "existence, nature *and scope*" of the asserted rights.[12] *Id.* at 629 (emphasis added). The reason

2 these claims must be decided in public hearings is to ensure the procedural due process rights of

3 third parties, such as neighboring property owners, who might be adversely affected by the

4 continuation of mining operations. *Id.* at 626.

5 In light of this state law framework, the Court should have little difficulty concluding

6 the evidence failed to allow the Jury to find the County engaged in arbitrary conduct. The

7 Plaintiffs cannot reasonably dispute that the County commenced enforcement proceedings only

8 after receiving credible evidence of the potential expansion of the SHM use. A nonconforming

9 mining use can impermissibly expand in any of three ways: by mining outside areas intended to

10 be mined when the use became nonconforming,[13] by employing new mining methods or

11 activities not used at the inception of the nonconforming use,[14] or by increasing production

12 levels.[15] The evidence at trial confirmed the County could reasonably have concluded the SHM

13 had expanded in all three ways.

14 Regarding the potential expansion in mining area, the historical record concerning what

15 was determined in 1994 was, at best, ambiguous. Although the Plaintiffs contended the entirety

16 of the SHM property was within the scope of their vested right, the Plaintiffs cannot dispute that

17 the 1994 letter referenced only *two* of the several SHM parcels, numbers 128-0090-035 and

18

19 [12] Further, state law places the burden of proof for these issues on the *operator*. *Hansen Brothers Enterprises, Inc.*, 12 Cal. 4th at 564.

20 [13] Geographically, nonconforming mining uses are subject to the "diminishing asset doctrine." Whereas other nonconforming land uses are prohibited from expanding beyond the

21 areas of land they occupy, mining uses are allowed to expand into new areas so long as their owners intended to mine such areas when their uses became nonconforming, *Hansen Brothers*

22 *Enterprises, Inc.*, 12 Cal. 4th at 553. But essential to the application of the doctrine is that: (1) the owners had manifested *objective* intentions to mine the new areas, and (2) such intentions existed at the time their uses became nonconforming. *Id.*

23 [14] California courts have held that a nonconforming mining use includes only those

24 activities that were integral components of the use at the time it became nonconforming. *Paramount Rock Co. v. San Diego Cty.*, 180 Cal. App. 2d 217, 230 (1960). Two different types

25 of mining—for instance, aggregate mining (rock, sand, or gravel) versus placer mining (precious metals)—may be part of the same nonconforming use only if both were underway at the inception

26 of the nonconformity. *Hansen Brothers Enterprises, Inc.*, 12 Cal. 4th at 567–68. New types of mining methods added after the nonconformity are prohibited. *Endara v. City of Culver City*, 140 Cal. App. 2d 33, 38 (1956).

27 [15] Volumetrically, nonconforming mining uses are only entitled to "gradual and natural"

28 increases in production. *Hansen Brothers Enterprises, Inc.*, 12 Cal. 4th at 573. They may accordingly increase production to meet the demands of population growth. *Id.*

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

037. These parcels (which have since been renumbered) comprise only 300 acres of the much larger SHM property. (JX 506/003, Finding 11.) Further, in County documents from the early 2000s—before the disputes that gave rise to this case arose—County staff expressed on multiple occasions their belief that the SHM vested right was confined to, or mostly involved, the mining of old dredger tailings. (JX 084/006:16-21; JX 099/002.) Those activities took place only south of Meiss Road, which traverses east-west through the SHM property. (JX 112.) By the late 2000s, in contrast, the Plaintiffs had begun excavating significant new pits near the Cosumnes River, well north of Meiss Road. (*Compare* JX 484/022, showing no pit near the river in 2004, *with* JX 484/023, showing a pit as of 2007.) The historical information Jay Schneider had provided the County prior to the 1994 letter did not expressly reference any intent to mine that area or to mine the area to the extent it was being excavation by 2010. (*See* JX 1, 11-12.) Mining of the river area did not appear to begin until in or around 2005, when the SHM processing plan was moved north of Meiss Road. (JX 111/002, referencing an intention to mine the new "Area 5" to a depth of 30 feet; JX 112, demonstrating the area of the new pit to be mined.)

The County was also reasonable in concluding riverbed mining was not a type of mining that was part of the SHM nonconforming use. (JX 506/003, Finding 14.) The historical material the County received prior to the 1994 letter did not explicitly indicate this type of mining had been employed or might be employed in the future. At best, Jay Schneider had given the County vague indications that mining methods at SHM had historically varied and might change depending on technological and market conditions. (JX 011/002-003.) But there was nothing specific about these references that compelled the County to conclude that riverbed mining had been an "integral component" of the SHM nonconforming use. *See Paramount Rock Co.*, 180 Cal. App. 2d at 230.

Concerning the volume of the SHM operation, the evidence the County had received strongly indicated an impermissible expansion. Following the issuance of the 1994 letter, SHM produced about 10,000 tons in 1995. By 2007, the production had increased to over 240,000 tons. (JX 28.) Between 2007 and 2008, production increased even more substantially to a point

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   where reported tonnage produce exceed the 1995 reported level by more than *6,000* percent.

2   (JX 484/024.)  In hearings in the early 2000s concerning the SHM reclamation plan, County

3   staff also had referred to the SHM as a "small scale operation."  (JX 84/006:22.)  At this time,

4   Jay Schneider had effectively agreed, noting SHM mining operations were expected to disturb

5   *three or four acres* per year.  (JX 084/006:24-007:2.)  The reclamation plan approved in 2002

6   also stated that a "*low* annual average of sand and gravel" could be expected to be mined each

7   year.  (JX 099/005, emphasis added.)  At trial, Jay Schneider testified the SHM operation

8   historically had produced between 5,000 and 25,000 tons per year.  (Reporters Transcript, "RT,"

9   1477:20-1478:12.)

10       Importantly, as an outcome of the 2010 Board of Supervisors proceeding, the County

11   did not determine SHM *never* had any vested right.  Although it is undisputed the 1994 letter

12   was not issued to Jay Schneider following a *Calvert*-like hearing,[16] County staff did not take the

13   position in its presentation to the Board that the letter was a nullity or that no vested right ever

14   existed at the SHM property.  Staff's position was only that the expanded activities the Plaintiffs

15   had conducted in the most recent years were not within the scope of the nonconforming use that

16   was contemplated by the 1994 letter.  (JX 483/007-008.)  The Board ultimately agreed.  (JX

17   510/003, Finding 17.)

18       As has been noted, the "fairly debatable" standard required the Plaintiffs to demonstrate

19   the County could not have had *any* valid reason for taking the actions it did.  Regarding the

20   SHM nonconforming use, the Plaintiffs failed to meet their burden to negate all conceivable

21   bases for the County's actions.  The evidence they offered merely attempted to support *their*

22   positions that the SHM nonconforming use covered the SHM property in its entirety, included

23   riverbed mining, and was not limited in volume of production.  The Plaintiffs' positions were,

24   however, constructed on a shaky foundation, one that misread controlling precedent.  In their

25   view, the County should have disregarded the clear limitations California places on the

26   _____

    [16] *Calvert*, of course, had not been decided in 1994, when County staff issued the vested-
27   right letter to Jay Schneider.  But it is noteworthy that a similar staff-level determination was
    found to be improper in *Calvert*, leading to that court's conclusion that due process concerns
28   require nonconforming use determinations to be made in public hearings.  *Calvert*, 145 Cal. App.
    4th at 618.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                        -19-

1
2
3
4

expansion of nonconforming uses and ignored its obligation to hold a public hearing to determine if the SHM use had expanded.  As this was the very starting point of the Plaintiffs' position, the evidence they offered simply buttressed a position that was already far off course by the time trial began.

5
6
7
8
9
10
11
12
13
14

Under a correct interpretation of governing California law, the evidence at trial was capable of supporting only one conclusion: the County's actions concerning the SHM nonconforming use were inherently reasonable.  The evidence at trial left no doubt that the County could reasonably have concluded SHM had expanded beyond its permissible operation areas, types of mining, and production levels.  The evidence also confirmed that the County believed *Calvert* required it to hold a public hearing to determine the expansion issues.  (JX 483/63:11-15).  Under the "fairly debatable" standard, the Plaintiffs were required to show there was no *conceivable* basis by which the County could have reached these conclusions.  Because the Plaintiffs did not produce sufficient evidence to meet this standard, it was not proper for the Jury to have considered any issues concerning the SHM nonconforming use.

15
16
17

**b.    Under SMARA, the County Had No Choice but to Seek to Compel the Amendment of the Schneider Historical Mine's Reclamation Plan and the Posting of a Greater Financial Assurance**

18
19
20
21
22
23
24
25

Just as the County was required to take enforcement actions concerning the expansion of the SHM use, it was mandated by SMARA to take enforcement actions concerning that operation's reclamation plan and financial assurance.  As to this subject, like the issue of the SHM nonconforming use, the Plaintiffs' myopic interpretation of California law stunted the sufficiency of the evidence they offered at trial.  The Plaintiffs contended the County had no authority to require them to amend the SHM reclamation plan or to demand a greater financial assurance to guarantee performance with that plan.  On these points, the Plaintiffs were completely wrong, and the evidence they offered was woefully insufficient as a result.

26
27
28

The Plaintiffs' interpretation of SMARA is greatly at odds with that Act's plain requirements.  A fundamental policy of SMARA is to "prevent or minimize adverse effects on the environment and to protect the public health and safety."  Cal. Pub. Res. Code § 2711(a).

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

Consistent with this policy, SMARA seeks to ensure "adverse environmental effects are prevented or minimized and that mined lands are reclaimed to a usable condition which is readily adaptable for alternative land uses." *Id.* § 2712(a). The principal device through which SMARA seeks to achieve this policy is the reclamation plan. *See generally* Cal. Pub. Res. Code §§ 2772-2773. This plan must be formulated to ensure SMARA's policies for returning mined land to a usable and environmentally sound condition. Cal. Code Regs. tit. 14, § 3502(a).

As the State Supreme Court has observed, "[a] fundamental purpose of SMARA is that surface mine operators, rather than the taxpaying public, bear the expense of reclaiming land disturbed by surface mining. *People ex rel. Dep't of Conservation v. El Dorado Cty.*, 36 Cal. 4th 971, 991 (2005). Accordingly, SMARA also requires operators to post financial assurances to guarantee their performance of their reclamation plans' obligations. *See generally* Cal. Pub. Res. Code § 2773.1.

In addition to requiring mine operators to have reclamation plans and post adequate financial assurances, SMARA imposes a number of additional duties on lead agencies. In particular, lead agencies must annually inspect all mining operations within their jurisdiction. *Id.* § 2774(b). As part of these inspections, lead agencies must review financial assurance cost estimates, or "FACEs," which operators must update each year. Cal. Code Regs. tit. 14, § 3804(c). Whenever lead agencies determine operators have "disturbed" new lands,[17] they *must* require the operators to revise their FACE amounts to account for such disturbance. Cal. Pub. Res. Code § 2773.1(a)(3). Further, agencies *must* require operators to submit an amended reclamation plan if, after an annual inspection, they determine an "operation can no longer be reclaimed in accordance with its approved reclamation plan." Cal. Code Regs. tit. 14, § 3502(e).

Maintaining a current reclamation plan that accounts for, and ensures the reclamation of, all disturbed lands is critical to SMARA's function. For this reason, the Act also places the

---

[17] The reclamation plan must provide for reclamation to commence "at the earliest possible time on those portions of the mined lands that will not be subject to further *disturbance* by the surface mining operation." Cal. Pub. Res. Code § 2772(b)(6), emphasis added. The financial assurances associated with each reclamation plan must account and be adjusted annually for lands "disturbed" during the year. *Id.*, §§ 2770(d), 2773.1(a)(3)-(4). Any substantial increase in the "disturbance" of a surface area requires amendment of a reclamation plan. Cal. Code Regs. tit. 14, § 3502(d)(1).

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   duty on operators to maintain updated plans.  Of critical importance to this case, the Act

2   provides that "[s]ubstantial deviations from the original plan shall not be undertaken *until such*

3   *amendment has been filed with, and approved by, the lead agency*."  Cal. Pub. Res. Code

4   § 2777; *see also* Cal. Code Regs. tit. 14, § 3502(d) ("An amended reclamation plan shall be

5   approved by the lead agency prior to the commencement of activities determined to be a

6   substantial deviation….")  Regulations implementing SMARA define a "substantial deviation"

7   to mean a "change or expansion … that substantially affects the completion of the previously

8   approved reclamation plan."  Cal. Code Regs. tit. 14, § 3502(d).

9        Thus, under SMARA, the Plaintiffs could not "substantially deviate" from the SHM

10   reclamation plan *unless* they obtained approval for an amended reclamation plan and post an

11   updated financial assurance.  This meant they could not start mining areas in ways their

12   reclamation plan did not cover *until* the County, as lead agency, approved a plan amendment

13   and a new financial assurance.  Further, once the County learned the Plaintiffs had expanded

14   their operations without first obtaining such approvals, SMARA *mandated* that the County

15   demand the Plaintiffs seek such approvals and take appropriate enforcement action if they did

16   not do so.

17        Because this was the governing regulatory framework, it is clear the Plaintiffs failed to

18   offer evidence that could have supported the conclusion the County had no reasonable basis

19   under SMARA for its actions.  The principal dispute between the Plaintiffs and County that led

20   to the issuance of an order to comply (JX 559)[18] was whether the SHM reclamation plan

21   covered the pits the Plaintiffs had recently begun mining near the Cosumnes River.  This

22   dispute accounted for the parties' greatly differing opinions about how much land the SHM

23   operation actually disturbed.[19]  The amount of disturbed acreage, in turn, was the principal

24   driver of the amount of the financial assurance the Plaintiffs were required to post.[20]  A related

25        [18] *See* Cal. Pub. Res. Code § 2774.1-2774.2.

26        [19] The County asserted the Plaintiffs had disturbed approximately 80 more acres than the
     Plaintiffs believed they had disturbed.  (PX 128/285:5-8.)

27        [20] SMARA requires reclamation plans to propose measures to ensure adequate
     reclamation of an operation's "mined lands."  Cal. Pub. Res. Code § 2772(c)(5)-(7); Cal. Code

28   Regs. tit. 14, § 3502(c).  SMARA defines "mined lands" to include all areas that the operation
     will in any way disturb.  Cal. Pub. Res. Code § 2729.  The financial assurance must, in addition to

factor was the extent to which the pit near the river required "backfilling" to support their intended post-mining uses.[21]   On these subjects, the County's positions were based on straightforward interpretations of SMARA.   (*See also infra* Section IV.D.7 for further discussion on this subject.)

The focal point for the County's interpretations was its determination that the Plaintiffs had substantially deviated from the SHM reclamation plan, as approved in 2002.  *See* Cal. Pub. Res. Code § 2777.  The parties disagree on whether this plan contemplated that the pits near the river could be converted to ponds following the conclusion of mining.[22]  But it is undisputed the reclamation plan describes its end uses[23] only as "recreation and open space" and references a Williamson Act Contract that allows for only agricultural and compatible uses on the property. (JX 571/016; JX 004/002-003.)  Notably, the exhibits attached to the reclamation plan depict nearly the entirety of the SHM property, *including* the pit areas near the river, as "grazing land."[24]  (Plaintiffs' Exhibit "PX" 571/024.)  Nowhere in the reclamation plan or any attached exhibit are there any references to water-filled pits remaining near the river as part of the SHM reclamation scheme.[25]

---

other things, cover the full cost of all the physical activities necessary to reclaim an operation in accordance with the reclamation plan. Cal. Code Regs. tit. 14, § 3804.

[21] When a reclamation plan proposes to convert a mining operation to resource conservation land, excavations must be "backfilled" with appropriate material to support the specific conservation use, such as open-space or agriculture. Cal. Code Regs. tit. 14, § 3704(a).

[22] Because the areas where the pits were located were shown as being reclaimed to grazing land—not ponds—the County concluded that these pits needed to be backfilled with a substantial volume of material to support such an agricultural use. (PX 568/286:5-18.)  And if such material had to be imported from off-site, rather than taken from existing stockpiles, the cost of reclaiming the areas would be substantially greater.  (PX 568/285:19-286:4, 287:11-21.)  Plaintiffs, in contrast, proposed to simply fill these pits with water and leave them as ponds after mining, thereby avoiding the need to account for the substantial cost of backfilling the pits in their financial assurance.  (JX 537/025.)

[23] In SMARA parlance, the "end use" is the "proposed use or potential use[] of the mined land after reclamation.…" Cal. Pub. Res. Code § 2772(c)(7).

[24] When the reclamation plan was approved in 2002, County's staff's presentation to Board of Supervisors indicated their understanding the reclamation would be to "grazing uses." (JX 084/007:13.)

[25] Cross-sections included with the reclamation plan refute any possibility that ponds had been intended as end uses.  Exhibits I through L, attached to that plan, reflected how mining outside of pre-excavated stockpiles (i.e., mining of areas that did not include old dredger tailings, such as the area near the Cosumnes River) would appear following reclamation.  (PX 571/017, 030-032.)  All these drawings reflect reclaimed slopes that would be "blended to conform to surroundings"; *none* shows the cross-sections of any pond.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }

-23-

1    Under SMARA, an operator substantially deviates from its reclamation plan by, among

2    other things, increasing or deepening disturbed areas to a greater extent than mentioned in the

3    plan or by undertaking changes that would "substantially affect the approved end use" for the

4    operation. Cal. Code Regs. tit. 14, § 3502(d)(1), (3). Plaintiffs cannot reasonably dispute that

5    the SHM reclamation plan does not *expressly* identify the excavation of pits near the Cosumnes

6    River nor identify that ponds would be left near there at the conclusion of mining. They also

7    cannot reasonably dispute that the County could have properly concluded they had mined

8    deeper than the reclamation plan specifies[26] and in a way that "substantially affects" the end use

9    of the SHM operation.[27] The facts also are undisputed that the slopes of the mining pits

10   exceeded the ratios permitted in the reclamation plan and SMARA.[28] Accordingly, there is no

11   way to escape the conclusion the Plaintiffs substantially deviated from their reclamation plan

12   and were required to submit an amended plan, which it is undisputed they did not do. Cal. Code

13   Regs. tit. 14, § 3502(e), (g).

14   That Plaintiffs were plainly required to submit an amended reclamation plan should

15   refute any notion the County could have violated their substantive due process rights. The

16   County is aware of no authority by which a public agency can violate substantive due process

17   when it correctly applies state law. But for sake of argument, even if the need for an amended

18   plan were not so clear, it would still not be possible for the trier of fact to have concluded the

19   _____

20   [26] Importantly, the reclamation plan further specifies that no slopes in the "non-exempt
     area" (i.e., the areas of excavation outside the dredger tailing piles, including the areas near the
21   Cosumnes River) will exceed 30 feet. (PX 571/017.) Reasonable evidence indicated that depths
     below 30 feet had been exceeded in portions of the pits. (PX 568/29:15-25, 269:22-270:16.)

22   [27] Because the SHM reclamation plan designated the area near the river as "grazing land,"
     SMARA requires that it be reclaimed in accordance with the performance standard for
23   agricultural land. That standard required, among other things, that the land be reclaimed to a
     condition "capable of sustaining economically viable production of crops…" Cal. Code Regs. tit.
24   14, § 3708. The only way to accomplish this for a pit that has been excavated is to backfill the pit
     to a level at which crops can grow. (PX 568/286:16-18.)

25   [28] It is also unclear whether the slopes are meant to be "cut" slopes of "fill" slopes. (PX
     568/15-17, 269.) *See* Cal. Code Regs. tit. 14, § 3704(d) (precluding fill slopes from exceeding a
26   2:1 ratio without an engineering or geologic analysis to support a greater slope); *Id.* § 3704(f)
     (requiring cut slopes to achieve a factor of safety consistent with the operation's end use). Yet,
27   whatever type of slope is intended, the reclamation plan indicates no slopes will exceed a 2:1
     (vertical to horizontal) ratio unless a specific reason for a steeper slope exists *and* is approved by
28   the County planning director. *Id.* The County documented that the pit walls were steeper than
     this. (PX 568/313:3-8.)

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                                    -24-

County lacked *any* conceivable basis to have reached the conclusions it did. Under the "fairly debatable" standard, the Plaintiffs had the burden to demonstrate the County could have had no reasonable basis to conclude a reclamation plan amendment and financial assurance were required. As to that burden, the fact that the State Office of Mine Reclamation ("OMR") shared the County's views is further proof of the paucity of support for the Plaintiffs' claims.

Under SMARA, OMR, a division within the California Department of Conservation, acts as the principal state oversight agency. Lead agencies like the County are required to consult with OMR prior to approving any reclamation plan or financial assurance. *See* Cal. Pub. Res. Code § 2774(c)-(d). OMR also has a number of powers to ensure that both operators and lead agencies comply with their SMARA mandates. *See Mineral Associations Coal. v. State Mining & Geology Bd.*, 138 Cal. App. 4th 574, 584 (2006).

OMR firmly agreed with the County that the Plaintiffs had substantially deviated from the SHM reclamation plan. Indeed, OMR asserted more aggressive enforcement positions than the County, particularly regarding the subject of "pit capture."[29] At one point, OMR also threatened to usurp the County's enforcement of the SHM reclamation issues by commencing its own order-to-comply process[30] and threatened to advocate that the State Mining and Geology Board take over the County's SMARA enforcement powers.[31] While the Plaintiffs certainly disagreed with OMR's positions, their contrary assertions were beside the point. That the County was being requested to act by the principal state SMARA agency only buttressed the inherent rationality for the County's actions. Within a complex statutory scheme such as SMARA, it was manifestly reasonable for a local agency like the County to respect and respond

---

[29] OMR strongly conveyed its concern that the proximity of new SHM mining pits near the Cosumnes River had the potential to cause a breach in the strip of land that separated the river from the outer pit walls. In the event of a breach, a channel could be created between the river and pits that would carry downriver the sandy material from the pit bottoms, adversely affecting water quality and harming aquatic wildlife. (PX 568/270:17-274:14.)

[30] (JX 568/039.) Ordinarily, the lead agency commences the order-to-comply process, but SMARA enables OMR to commence the process if, after giving the lead agency a 30-day notice (in 2010, the statute provided for 15 days), the lead agency fails to take appropriate action. Cal. Pub. Res. Code § 2774.1(f).

[31] SMARA empowers the State Mining and Geology Board to assume some or all of a lead agency's SMARA powers if the Board, following a public hearing, makes certain findings regarding the lead agency's deficient administration. *See generally* Cal. Pub. Res. Code § 2774.4.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                                    -25-

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  to the judgments of a state oversight agency, especially given the broad review and enforcement

2  powers SMARA vests in OMR.  Under a legal standard in which the County's actions must be

3  upheld if it could have had *any* valid reason for its actions, the fact the County acted in

4  accordance with a state oversight agency's directives only confirms the inherent rationality of

5  the County's actions.

6       In sum, as it concerns the SHM reclamation plan, the Plaintiffs' evidence utterly failed

7  to support any plausible basis for a substantive due process violation.  Far from supporting a

8  basis for liability, the evidence regarding this subject overwhelmingly indicated the County's

9  actions were the product of correct interpretations of SMARA—interpretations the state's

10  principal oversight agency in fact shared.

11         **c.**    **Teichert's Communications with County Officials Did Not**

12            **Undermine the Inherent Rational Bases for the Challenged County Actions**

13       Perhaps because they recognized the significant obstacles their positions faced under

14  California law, the Plaintiffs focused heavily at trial on Teichert's requests to the County and

15  other agencies for enforcement actions against the SHM operation. In the Plaintiffs' view,

16  Teichert made these requests solely because it wanted to put the SHM operation out of business.

17  Because SHM was a vested-right operation, they contended, it did not have to account for the

18  same regulatory costs Teichert's competing operations—approved after lengthy and expensive

19  permitting processes—had to bear.  Because this meant the Plaintiffs were able to sell aggregate

20  products at lower prices than Teichert, the Plaintiffs contend Teichert responded by using its

21  longstanding relationships with state and local politicians, including County officials, to

22  effectively shut SHM down.

23       To be sure, the evidence at trial confirmed that Teichert mounted a well-organized and

24  coordinated campaign to make its concerns regarding SHM known to public officials and

25  agencies, including the County.  For the sake of argument—and for the sake of this Motion—

26  the County will assume the Jury could properly have found that Teichert made its many

27  requests to these officials to advance its own competitive objectives.  Even if the Jury could

28  properly draw that inference, no evidence allowed it to conclude the County acted to further

1   Teichert's interests.[32]

2          The evidence at trial confirmed that no actions with *legal consequences* were taken until

3   the Plaintiffs had ample notice and an opportunity to be heard.  *See infra* Section IV.C.  It was

4   not until the Board of Supervisors determined in a public hearing in 2010 that the County made

5   a legally significant determination consistent with *Calvert* that the SHM operation had

6   impermissibly expanded. And it was not until 2011 that the County Planning Commission,

7   sitting as the Board of Zoning Appeals, issued a legally significant determination regarding the

8   Plaintiffs' reclamation plan compliance under the SMARA order-to-comply process.  At trial,

9   the Plaintiffs produced no evidence that the Board of Supervisors or Board of Zoning Appeals

10  decisions were actually influenced by Teichert's motivations.  The evidence indicated that only

11  one member of the Board of Supervisors, Defendant Dickinson,[33] had even had contact with

12  Teichert.  No evidence was offered to show any of the other four members of the Board had

13  discussed SHM with Teichert or that any of the five Board of Zoning Appeals members had

14  done so.

15

16

17          [32]  As discussed extensively above in Section IV.B.2, the standard for establishing a violation of substantive due process focuses solely on the arbitrariness of the governmental
18  *decision* or *action* that allegedly caused the plaintiff's injury.  Under controlling Ninth Circuit precedent, the claim that an otherwise rational basis for a particular action or decision was a
19  pretext for an improper motivation is cognizable only as an equal protection claim.  *See Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004).  Because the Plaintiffs' equal
20  protection claims have been dismissed from this action, the County does not believe it is proper for the trier of fact to have considered what its motivations may have been for the actions it took
21  concerning SHM.  Nonetheless, because the evidence regarding the County's supposed influence from Teichert's communications is so lacking in support, the outcome does not change should the
22  evidence be considered.
          [33]  That former Supervisors Dickinson had received campaign contributions from Teichert is not indicative of any arbitrary conduct on his part or the County's part. Dickinson was one of
23  five members of the Board of Supervisors and his only action related to the Plaintiffs was to cast a vote in favor of findings County Staff had recommended regarding the SHM nonconforming
24  use.  As one federal court has recognized:

25          "[M]ere identification of campaign contributions to winning candidates for county
          commissioner does not set forth a factual showing of entitlement to relief based on
26          corruption and self-dealing.   Merely asserting a causal link between such
          contributions and subsequent local zoning action is insufficient to establish an
27          ability to show personal gain or advantage.  Something more is required. … [T]his
          alleged conduct consists of nothing more than 'the politics and animosities that
28          often animate local decision-making.'"  *Kriss v. Fayette Cty.*, 827 F. Supp. 2d 477,
          484 (W.D. Pa. 2011).

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  Likewise, no evidence established any connection between Defendants Sherry and
2  Gamel and the outcomes of the Board of Supervisors or Board of Zoning Appeals hearings.
3  The evidence showed that Teichert had established a good working relationship with these
4  defendants and, for sake of this Motion, the County will assume the Jury would have been
5  justified in concluding those relationships gave Teichert an effective channel for communicating
6  its desires about SHM to these defendants.  (*See* PX 676.)  But even assuming this as true, these
7  defendants could not themselves take any legally binding action concerning SHM.  Only the
8  hearing bodies—the Board of Supervisors and Board of Zoning Appeals—could do that.

9  Essentially, the Plaintiffs contended at trial that, because Teichert had expressed its
10 views about SHM to *some* County staff and officials, *all* those officials who voted on or
11 participated in SHM matters must have intended to carry out Teichert's objectives.  The folly of
12 this contention more than speaks for itself.  First, it requires the inferential leap that County
13 officials' motives must necessarily become tainted whenever they communicate with a party
14 that makes any request about a business competitor.  Second, it requires the even greater
15 inferential leap that a competitor's communication with just a few County staff or officials
16 effectively conveys the competitor's message to the entire County organization.  At trial, no
17 evidence was introduced to support either inference.  At most, the evidence could have
18 established that because of Teichert's contacts with the County defendants, the County
19 commenced the enforcement proceedings that led to the hearing outcomes concerning the SHM
20 nonconforming use and reclamation plan.  Even if that were true, it does not follow that the
21 decision-makers who ultimately made the decisions regarding the SHM matters were
22 themselves influenced by Teichert's interests in the matters.  Again, the evidence at trial
23 revealed no contact between Teichert and four out of five members Board of Supervisors or
24 between Teichert and all five members of the Planning Commission.

25 Moreover, there is nothing constitutionally suspect when government officials consider
26 the interests of business competitors who advocate against the interests of other members of
27 their industries.  Indeed, as both the United States and California Supreme Courts have
28 recognized, the participation of competitors can sometimes be *beneficial* to government

decision-making. The former has in fact confirmed that the First Amendment right to petition *guarantees* the right of businesses to advocate for their competitive interests.  As the Court has observed, "it is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961).  This is so even though "[i]t is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed." *Id.* at 143.  "Indeed," the Court has recognized, "it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act." *Id.* at 139.

In a similar vein, the California Supreme Court has held that businesses have standing to assert claims under state environmental laws challenging permits and authorizations their competitors receive.  Like the United States Supreme Court, it recognized in so holding that in matters when businesses attempt to advance their own competitive interests, they "have particular expertise and thus may have an enhanced understanding of the public interests at stake." *Save the Plastic Bag Coal. v. City of Manhattan Beach*, 52 Cal. 4th 155, 169 (2011).  Stated differently, the State Supreme Court has recognized that the expression of anti-competitive sentiment can sometimes be helpful to government decision-making.  Business competitors have understandings about their industries that those in public service cannot always be expected to have. Thus, it is not unreasonable for agency staff and officials in an enforcement matter involving one industry member to rely on information provided by another industry member—even when the other's motivations may not be so pure.

In sum, the evidence concerning Teichert's motivations did not avail the Plaintiffs' positions at trial.  At best, such evidence could have allowed the Jury to conclude County staff would not have initiated code enforcement proceedings but for Teichert's requests.  However, for the reasons discussed in the preceding sections, such a conclusion could not detract from the manifest reasonableness of the County's ultimate decisions under California law. No evidence

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1    demonstrated that the hearing bodies that made those decisions were motivated by any factors

2    other than sincere desires to make reasoned, legally accurate determinations.

3          **4.      The Court Must Enter Judgment for the County and Individual Defendants and Against Plaintiffs on the Substantive Due Process Claims**

4

5          In concluding, the County returns to its observations at the outset of this section about

6    the demise of the *Lochner* Era.   At trial, a *Lochner*-ian theme ran throughout the Plaintiffs'

7    presentations and characterizations of the evidence.   They repeatedly spoke of their vested right

8    in the SHM as some substantial right that merited strong protection in this federal forum.   At the

9    same time, they took a very dim view of the County's ability to apply California land use and

10   environmental laws to the SHM operation.   Far from recognizing the broad authority local

11   agencies like the County have over the intensive types of industrial activities in which they

12   engage, the Plaintiffs effectively asserted the County was subject to a strict scrutiny-like

13   analysis in which the County could barely even question Plaintiffs' compliance with applicable

14   laws, let alone subject them to any enforcement mechanisms those same laws provide.   At trial,

15   it was as if Plaintiffs were stuck in a time warp, and that the present era were still one in which

16   the focus of substantive due process were on the protection of economic rights.

17         *Lochner*, of course, is no longer the law and has not been for several decades.   As the

18   County has taken great pains to point out, a federal court is not the proper forum for a case like

19   this.   The Plaintiffs assert what, at bottom, are disputes that belonged before planning bodies.

20   Under the highly deferential rational basis test, the standard was whether the County could have

21   had any valid reason for the actions it took.   The evidence failed as a matter of law to allow the

22   Jury to find the County lacked any such basis.   As a result, the Court must grant judgment for

23   the County and individual defendants on the Plaintiffs' substantive due process claims.

24         **C.    As a Matter of Law, the Plaintiffs were Provided Procedural Due Process Before the Board of Supervisors and Board of Zoning Appeals**

25

26         **1.      Summary of the Evidence Regarding the Process Provided in Association with the 2010 Board of Supervisors Hearings**

27         On April 14, 2010, the County sent a violation notice to Jake and Jay Schneider

28   asserting a violation of the Zoning Code as follows:

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1.  Sacramento Zoning Code §205-03: use prohibited in the agricultural land use zone without compliance with the code; and

2.  Sacramento Zoning Code §201-02(F)(4) requires compliance with Sacramento Zoning Code Title II, Chapter 35, Article 4, that requires surface mining combining zoning and a conditional use permit to conduct the mining operation in the AG-80 Zone. (See Sacramento Zoning Code §§ 235-43 (JX421).)

The Schneiders were directed to obtain a rezone and conditional use permit or cease their mining operation within 90 days. They were advised of their right to appeal within 15 days from the date of this letter to appear before the Board of Supervisors and appeal or contest the determination that a zoning violation exists on the property. (JX 421.) Jay Schneider appealed. (JX 428.) A hearing was set for May 26, 2010 in front of the Board of Supervisors. (P 448, JX 449.) Jay Schneider appeared at the May 26, 2010 hearing. (P 448.) But because not all of the property owners of the Schneider property had been noticed, the May 26, 2010 hearing was continued to July 13, 2010. (P 448, JX 449.)

Prior to July 13, 2010, a staff report was prepared that set forth the County's position regarding the Zoning Code violation. (Defendants Exhibit, "DX" A-80, JX 469.) Schneider and his attorney, Richard Ross, attended the July 13, 2010 hearing. (JX 469.) In response to a question from Supervisor Nottoli, attorney Ross acknowledged having downloaded the staff report for that meeting, which per Supervisor Nottoli, had been available publicly from the Board Clerk since June 28, 2010. (JX 469/008:22-009:4.) In response to a question from Supervisor Nottoli, Schneider acknowledged receiving the staff report in the mail the week before the July 13, 2010 hearing. (JX 469/008: 22- 009:16.) Schneider also confirmed receipt of the staff report in response to a question from Supervisor Dickinson. (JX 469/010:18-24.)

The staff report provided seven pages of information as to the basis for the zoning code violation and contained 13 attachments. (DX A-80.) The report stated the Board was being asked to "determine that the location, scale, and scope of the SHM mining operation has expanded, intensified, enlarged and/ or expanded significantly to exceed any historic, legal, non-conforming status as defined in Sacramento County Zoning Code 120-25." (DX A-80/001.) The report provided background information on the history of mining taking place on the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

property, including advising the Board that County staff had, in 1994, concluded that Mr. Schneider had a vested interest in a gravel mining operation on two specific parcels. The report also provided a description of and details about the reclamation plan approved in 2002, a discussion of Defendant Sherry's April 2, 2009 letter (JX 287), which the staff report described as addressing the need for a conditional use permit and a rezone because of expansion of the mining operation. The April 14, 2010 Notice of Violation letter (JX 421) was discussed, and it was pointed out that mining still continued and no application for a conditional use permit and rezone had been filed. Additional discussion was provided of the 1956 Sacramento County Zoning Code and its applicability to the issue before the Board, in particular, that under that code and current codes, surface mining on the plaintiffs' property is precluded absent a use permit, and the requirements for legal nonconforming use.

Referring to the County Zoning Code, the staff report stated, "[c]learly, if a nonconforming use is expanded, intensified, enlarged, extended or changed, its legal nonconforming use status is no longer applicable and the use of the property must come into conformance with current zoning restrictions." (DX A-80/002-004.) The staff report specifically addressed the issue of a "vested right" to mine and took the view that the mining operation had expanded, enlarged, and/or intensified to an extent not encompassed within any previous determination of nonconforming use status. (DX A-80/005-006.) The staff report made two recommendations to the Board: deny the appeal and order the Schneiders to obtain a conditional use permit and a rezone; or grant the appeal and order the Schneiders to obtain a Certificate of Legal Non-Conforming Use per Zoning Code 110-100 *et. seq.*" (DX A-80/006.)

The July 13, 2010 hearing was, like the May 26, 2010 hearing, continued upon request of Jay Schneider to September 14, 2010. (JX 469.) At the September 14, 2010 hearing, County staff made a presentation to the Board of Supervisors regarding the zoning code violation (JX 484, PowerPoint Staff Presentation by Jeff Gamel and Tammy Derby; JX 483, transcript of September 14, 2010 hearing.) Consistent with the information conveyed in the July 13, 2010 staff report (DX kellerA-80), staff provided details as to the issues before the Board, maps, aerial photographs, and discussion of the legal and factual issues. As to these issues, staff

1  discussed the applicable zoning codes, the prior recognition of a vested right on two SHM

2  parcels, the approval of the reclamation plan in 2002, and evidence of expansion and increase in

3  production of the mine (5,000 percent over 3 to 4 years in 2004 to 2007, *see* JX 484/024.)  After

4  making an extensive presentation along with an attorney from the County Counsel's office, staff

5  presented two alternatives for possible Board action: deny the appeal and require conditional

6  use permit and a rezone, or grant the appeal and require certificate of legal non-conforming use.

7  (JX 484, JX 483/005-030.)

8      Following staff's presentation, Schneider attorney Richard Ross was then provided the

9  opportunity to address the Board.  Ross raised issues about the County's prior recognition of a

10  vested right in 1994, the approval of the reclamation plan by the Board in 2002, the *Hansen*

11  *Brothers* decision and other case law, and the claim that Mr. Schneider had a vested right that

12  could not be taken away. (JX 483/032-041.) Jay Schneider next addressed the Board. (JX

13  483/041-057.)  Thereafter, the Board discussed the issues, with input from County staff, County

14  counsel, Mr. Schneider, and Mr. Ross. (JX 483/057-079.) Next, an attorney representing

15  Teichert addressed the Board. (JX 483/079- 082.)   Jay Schneider and attorney Ross again

16  addressed the Board and reiterated their positions. (JX 483/082-095.) The Board again

17  discussed the matter with further input from Schneider.  (JX 483/095–107.)

18      In all, the hearing lasted approximately 2 hours and 15 minutes.  At its conclusion, the

19  Board voted unanimously to determine that the location, scale, and scope of the SHM mining

20  operation had expanded to exceed any historic legal non-conforming use as defined in

21  Sacramento Zoning Code 120-25 and to deny the appeal and continue the matter to

22  September 28, 2010 for adoption of written findings. (JX 483/104-107.)

23      Prior to the September 28, 2010 hearing, Mr. Schneider *again* had the opportunity to

24  provide documentary material and argument in support of his position and against the proposed

25  findings. (JX501, JX502.) Attorney Ross also took the same opportunity.  (JX 505/006-008.) As

26  part of their presentation, the Schneiders made a PowerPoint presentation that included aerial

27  photographs and historical information regarding SHM mining activities. (JX 505/008-025.)

28  After public comment (JX 505/025-026), the Board considered the information presented and

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   adopted findings. (JX 505-506.) The Board vote was unanimous.  (JX 505/030.)  The findings

2   were provided to Mr. Schneider and the other SHM owners.  (JX 506, 510.)

3          **2.**        **The Schneiders Were Provided Ample Process in Connection with the**

4                  **2010 Board of Supervisors Hearings**

5         The fundamental requirement of due process is the opportunity to be heard at a

6   meaningful time and a meaningful manner.  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In

7   most circumstances, the Constitution requires a hearing before the government deprives a

8   person of liberty or property.  *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

9         "Due process is flexible and calls for such procedural protections as the particular

10  situation demands."  *Morrissey v. Brewer*, 408 U.S. 471 (1972).  "The timing and nature of the

11  required hearing will depend on the appropriate accommodation of the competing interests

12  involved."  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) (internal quotations

13  omitted).  "A state provides adequate [procedural] due process when it provides reasonable

14  remedies to rectify a legal error by a local administrative body."  *Bello v. Walker*, 840 F.2d

15  1124, 1128 (3d Cir. 1988).

16        The Supreme Court "consistently has held that 'some kind of hearing is required at some

17  time before a person is finally deprived of his property interests.'"  *Memphis Light, Gas &*

18  *Water Div. v. Craft*, 436 U.S. 1, 16 (1978).  But, the type of hearing required can be minimal.

19  For example, in *Memphis Light*, the Court held that the "opportunity for informal consultation

20  with designated personnel empowered to correct a mistaken determination constitutes a 'due

21  process' hearing in appropriate circumstances."  *Id.,* 436 U.S. at 16 n. 17.

22        Two cases are closely analogous to the facts of this case.  First, in *Valley Wood*

23  *Preserving, Inc. v. Paul*, 785 F.2d 751 (9th Cir. 1986), the Ninth Circuit Court of Appeals

24  affirmed the district court's granting of summary judgment in favor of a county and its board of

25  supervisors regarding claims that hearings before the board violated procedural due process

26  because they were inadequate and informal. In challenging the decision to revoke conditional

27  use permits, the plaintiffs complained the board had provided inadequate notice of the hearing,

28  allowed witnesses to speak who were not competent or sworn, received information casually

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   and on an ex-parte basis, and denied the appellants the opportunity to cross-examine witnesses.

2   The Ninth Circuit rejected these claims, noting the plaintiffs had opportunity to make its

3   concerns known to the board either by letter or orally at the hearings.  The court also found the

4   board had followed the notice and hearing procedures required by its local ordinance. *Id.* at 754.

5          Similarly, in *Club Moulin Rouge LLC v. City of Huntington Beach,* 2005 U.S. Dist. WL

6   5517234 (C.D. Cal. 2005), the court rejected claims analytically similar to Plaintiffs' claims

7   here regarding the opportunity to speak at a city council hearing, the length of time of the

8   hearing, and the process afforded by the hearing. There, an entertainment permit issued to

9   plaintiff was revoked, then appealed to the city council.  At the appeal hearing, the plaintiff and

10  its attorney were permitted to speak for a combined 9 minutes; city staff spoke for 9 minutes;

11  and members of the public spoke for 12 minutes.  After the city council affirmed the permit

12  revocation, the plaintiff filed suit alleging civil rights violations including the deprivation of

13  procedural due process.  Summary judgment was granted against the plaintiff.  Regarding how

14  the city council hearing was conducted, the court observed that the plaintiff had been provided

15  with enough time to detail its version of the events, explain its position, and make several

16  arguments regarding the merits of the revocation.

17         Here, the Schneiders received far more process than the plaintiffs had received in *Valley*

18  *Wood* and *Moulin Rouge*.  It is undisputed that the Schneiders were provided actual notice of

19  the notice of Zoning Code violation and the determination that they must apply for a conditional

20  use permit and a rezone. Jay Schneider in fact received the notice and timely appealed, causing

21  the series of Board of Supervisors hearings that ensued.  As noted above, the hearings were

22  scheduled and continued twice—first, to enable the County to provide the notice to the other

23  Schneider family members; and second, *at Mr. Schneider's specific request to enable him to*

24  *prepare to contest the determination*.

25         As detailed previously, the staff report for the July 13, 2010 Board of Supervisors

26  hearing was made available to Jay Schneider and his attorney in advance of the hearing.  The

27  notice the County provided thus met the minimum requirement of California's Planning and

28  Zoning Law, which requires staff reports in planning matters to be made "prior to or at the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  beginning of the hearing." Cal. Gov't Code § 65804(c). Schneider and his attorney also

2  appeared at both September 2010 hearings where the merits of the matter were heard by the

3  Board for over two hours.  As the transcripts of those hearings make clear, Schneider and his

4  counsel spoke several times, and provided extensive testimony.  Indeed, at the September 28,

5  2010 hearing, Schneider presented a 70-page PowerPoint presentation.  These hearings were

6  consistent with the County procedures for such hearings during Defendant Dickinson's 16 years

7  on the Board of Supervisors, during which he heard hundreds of zoning violation appeals, with

8  the exception that the hearings in this case were longer than most.  (RT 1236:12-19.)

9      In sum, the undisputed evidence is that, consistent with the applicable jury instruction,[34]

10  the Schneiders were provided with far more than an adequate notice and opportunity to be

11  heard.  Ultimately, the Schneiders were heard, and at length.  They simply did not agree with

12  the Board of Supervisors' decision.  But that their position was not ultimately accepted does not

13  mean the process that led to the outcome they challenge was deficient.  Because no evidence

14  could reasonably have allowed the Jury to determine the Schneiders' procedural due process

15  rights were violated, judgment must be entered in favor of the County on the Schneiders'

16  procedural due process claim.

17      **3.    The Hardestys Were Not Deprived of Procedural Due Process Concerning the Notices that Led to the 2010 Board of Supervisors Proceedings**

19      The Hardestys complain that they were not provided with notice of the April 14, 2010

20  and May 25, 2010 notices of Zoning Code violations that led to the above-described

21  proceedings.  However, under the Sacramento County Code, the Hardestys were not required to

22  be provided with any such notice because the Hardestys were not owners of the SHM property.

23      Under Sacramento County Zoning Code section 115-08, the Director of Building and

24  Code Enforcement is authorized to commence actions or proceedings for the abatement of any

25  _____

26  [34] As to procedural due process, the Jury was instructed pursuant to Final Instruction 18 (ECF 461/21-22) that "the fundamental requirement of procedural due process includes the right to notice of any proceedings that will affect a final determination of a plaintiff's property rights and the opportunity to be heard and present objections in any such proceeding. The notice must be reasonably calculated, under all the circumstances, to alert interested parties that the action is pending and afford them an opportunity to present their objections."

{DPC/00052406. }                -36-

use of land contrary to the provisions of the County Zoning Ordinance.  Additionally, the Director is authorized under section 115-09.1 to send notice to the *owner* of the property that costs of abatement may be assessed against the owner if the violation is not corrected.  The County Code further requires that if such notice is provided, it shall include a provision that the *owner* may, within 15 days from the date the notice was mailed, request in writing the opportunity to appear before the Board of Supervisors to contest the Director's determination.

At trial, the evidence was undisputed that the Hardestys have no ownership interest in the SHM property.  The Hardestys had no written lease or other agreement with the Schneiders. As noted previously in Section IV.A.3, the only interest the Hardestys could have possessed under California law is known as a "profit"—effectively an oral license that allowed them to remove materials from the SHM property. They mined that property under an arrangement whereby they paid the Schneiders a fixed price per ton or load of mined material. No evidence was introduced that the Hardestys were required to ensure that the property was compliant with all zoning requirements.

As non-owners of the property, the Hardestys had no ability to rectify any Zoning Code violation caused by the Schneiders' use of the property for illegal mining.  Only the owners could voluntarily achieve compliance with the violation or choose to challenge the violation.  In fact, it is undisputed that over the years, only the Schneiders were noticed and undertook actions intended to continue the use of the SHM property.  Between 1990 and 2002, the County sent notices to only the Schneiders about the requirements for a conditional use permit, a reclamation plan, and financial assurance.  Only the Schneiders provided the evidence in 1994 that resulted in the County issuing a letter referencing their vested right. And only the Schneiders worked toward obtaining the approval of the SHM reclamation plan in 2002.

Nonetheless, even though the Hardestys were not entitled to notice, the evidence cannot reasonably be disputed that they had actual notice of the Board of Supervisors proceedings. The Hardestys were well aware that the County was pursuing a Zoning Code violation against the Schneiders.  At trial, Jay Schneider testified that he had many discussions with Joe Hardesty about the County's notice of violation. (RT 1488:21-1491:24.) The Hardestys' federal

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  complaint, filed in 2010 prior to the September 2010 hearings, makes specific reference to the

2  Hardestys' awareness of the hearings on the Schneider appeal of the Zoning Code violation.

3  Thus, although the Hardestys were not actually entitled to notice of the Board of Supervisors

4  hearings, the undisputed evidence is that they in fact knew about the hearings and chose not to

5  participate, precluding any finding their right to procedural due process could have been denied

6  in association with the 2010 hearings.

7            **4.      No Competent Evidence Was Offered at Trial to Establish Defendant Dickinson Engaged in Improper Conduct, Acted with Bias, or Had a**

8                   **Conflict of Interest During the 2010 Board of Supervisors Hearings**

9       In association with their claims concerning the 2010 Board of Supervisors hearings, the

10  Plaintiffs' contentions their rights were compromised by any alleged conflict or bias by

11  Defendant Dickinson are specious and unsupported by law or evidence. *To repeat, there simply*

12  *was no evidence of any improper conduct, bias, or conflict of interest by Dickinson whatsoever.*

13  The only evidence the Plaintiffs introduced on this subject is evidence of the receipt of

14  campaign contributions and that Dickinson met with Teichert to hear Teichert's complaints

15  about the SHM mining operation. However, Dickinson's receipt of campaign contributions was

16  not only legal, but no inference, without evidence of a *quid pro quo*, could have been drawn that

17  Dickinson acted improperly.

18       Under California Law, the Political Reform Act of 1974, Cal. Gov't Code § 81000 *et.*

19  *seq.*, provides for *disclosures* of campaign contributions, not disqualification, in matters in

20  which contributions have been received.  Cal. Gov't Code § 81002(a); *see generally Id.* § 84200

21  *et seq.*  In *Woodland Hills Residents Assn., Inc. v. City Council*, 26 Cal. 3d 938 (1980), the

22  plaintiffs sought to disqualify members of the City Council who had received contributions

23  from parties having a financial interest in an application for approval of a subdivision map. The

24  California Supreme Court, in holding that no conflict of interest existed, noted that while the

25  Political Reform Act:

26            "[p]recludes an elected official from participating in a decision in which he has 'a financial interest' (Cal. Gov't Code § 87100), it

27            expressly excludes from definition of 'financial interest' the receipt of campaign contributions. Cal. Gov't Code § 87103, subd. (c),

28            82030, subd. (b). Thus, the Political Reform Act—dealing

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1
2
3

comprehensively with problems of campaign contributions and conflict of interest—does not prevent a city council member from acting upon a matter involving the contributor." *Woodland Hills Residents Assn., Inc.*, 26 Cal. 3d at 945–946.

4
5
6
7
8
9
10
11
12
13
14
15
16
17

Moreover, the disqualification of a member of the Board of Supervisors from acting in his or her role on the Board because of a campaign contribution he received would violate the First Amendment rights of campaign contributors.  Governmental restraint on political activity must be strictly scrutinized and justified only by a compelling state interest.  *Buckley v. Valeo*, 424 U.S. 1, 25 (1976).  As the California Supreme Court has recognized, "[p]ublic policy strongly encourages the giving and receiving of campaign contributions.  Such contributions do not automatically create an appearance of unfairness.  Adequate protection against corruption and bias is afforded through the Political Reform Act and criminal sanctions." *Woodland Hills Residents Assn., Inc.*, 26 Cal. 3d at 946–47.  As another California court has explained, "[w]hile disqualifying contribution recipients from voting would not prohibit contributions, it would curtail contributors' constitutional rights.  Representative government would be thwarted by depriving certain classes of voters (i.e., developers, builder, engineers, and attorneys who are related in some fashion to developers) of the constitutional right to participate in the electoral process." *Breakzone Billiards v. City of Torrance*, 81 Cal. App. 4th 1205, 1228 (2000).

18
19
20
21
22
23
24
25
26
27
28

Like the California Supreme Court, the United States Supreme Court has recognized that "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010), *citing Buckley*, 424 U.S. at 19.  The United States Supreme Court has extended First Amendment protection to corporations (such as Teichert).  *Citizens United*, 558 U.S. at 342.  Because of this protection, "[r]eliance on 'generic favoritism or influence theory ... is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'" *Citizens United*, 558 U.S. at 359, *quoting McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).  Thus, "[t]he hallmark of corruption is financial *quid pro quo*: dollars for political favors." *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985); *see also Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015) ("We must now

{DPC/00052406. }                                      -39-

follow *Citizens United*'s narrower analysis: 'corruption' means only *quid pro quo* corruption, or its appearance"). *Citizens United* acted to narrow anti-corruption rationale, and to only cover *quid pro quo* corruption. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 119 (9th Cir. 2011).

Thus, no conflict of interest could arise in connection with Dickinson's vote on the Schneider appeal and no impropriety could arise without evidence of any *quid pro quo*. Moreover, in order to succeed on a claim of bias violating the Plaintiffs' right to a fair hearing, the Plaintiffs had to establish "an unacceptable probability of actual bias on the part of those who have actual decision making power over their claims." See *United States v. State of Or.*, 44 F.3d 758, 772 (9th Cir. 1994). The mere suggestion of bias is not sufficient to overcome the presumption of integrity and honesty. *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 640 (1st Cir. 1996); *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). Consequently, a party seeking to show bias or prejudice on the part of an administrative decision-maker is required to prove the same "with concrete facts: 'bias and prejudice are never implied and must be established by clear averments.'" *Breakzone Billiards*, 81 Cal. App. 4th at 1236; *Honosathaviti v. Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr.*, 62 Cal. App. 4th 1123, 1142 (1998).

Notably, Dickinson was just one of five members on the Board of Supervisors, which voted unanimously to deny the Schneiders' appeal. Absolutely no evidence of bias was introduced, much less "concrete evidence," of any impermissible bias on Dickinson's part. Again, the only evidence upon which the Plaintiffs attempted to rely was evidence of Dickinson's receipt of campaign contributions from Teichert. But this evidence proved nothing; it could give rise to no inference of anything except purely lawful activity. The Plaintiffs utterly failed to offer evidence of a *quid pro quo* between Dickinson and Teichert. For this reason, the Jury could not properly rely on the campaign contributions Dickinson received as a basis for finding the County deprived the Plaintiffs of their rights to procedural due process.

**5.     The Evidence at Trial Was Insufficient to Support any Finding that the 2010 Board of Supervisors Hearings Resulted in the Revocation of any Vested Right**

As part of their procedural due process claim, the Plaintiffs also contend the County

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   deprived them of procedural due process by revoking their vested right to mine SHM, and that

2   they were provided no notice or hearing regarding the potential revocation of their vested right.

3   This assertion is an absolute misrepresentation of the nature of the hearings conducted before

4   the Board of Supervisors during the 2010 hearings.

5         Under California law, a vested right is simply a legal nonconforming use subject to the

6   zoning code of the local agency.  In *Hansen Bros.,* the California Supreme Court made clear

7   that the claim of vested right is analyzed under and is controlled by the local agency's zoning

8   code.  *Hansen Brothers Enterprises, Inc.*, 12 Cal. 4th at 551–552.  As discussed in Section

9   IV.B.3.a, *Hansen Bros*. makes clear that the County *always* possesses the discretion under its

10  zoning ordinances to prohibit expansion or intensification of nonconforming uses.  *Id.* at 575.

11  As the State Supreme Court made clear, "[a]s with any other nonconforming use, the county

12  may seek an injunction or other penalties authorized by the zoning ordinance, whenever it

13  believes that production of the mine has reached an impermissible intensification of the

14  nonconforming use for which Hansen Brothers has a vested right." *Id.* at 575.

15        That is exactly what the County did here.  The evidence is clear the Board of

16  Supervisors hearing focused on the expanded mining operations taking place on the SHM,

17  including the creation of large new pits near the Cosumnes River and production levels far in

18  excess of those underway when County staff issued the Schneiders the 1994 vested-rights letter.

19  While the Schneiders' vested right was acknowledged and discussed during these hearings, the

20  determination of the Board, as evidenced by the findings, was not to revoke the vested right or

21  declare the vested right to be void.  Rather, the Board found that only that the *current* mining

22  operations exceeded the scope of the vested right, and that a conditional use permit and rezone

23  were required to support the expanded operations.  (*See generally* JX 506.)

24        Thus, the Board action did not revoke any vested right.  Plaintiffs could only reasonably

25  have understood from the 2010 Board of Supervisors proceedings that the expansion of the

26  SHM mining operations was at issue.

27  ///

28  ///

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

6.      **The April 2, 2009 Letter Did Not Deprive the Plaintiffs of Their Procedural Due Process Rights**

The Plaintiffs further argue they were not provided due process in connection with the April 2, 2009 letter from Defendant Sherry to Jay Schneider in which the County's position regarding the expansion, intensification, and increase in production of SHM was first addressed. (JX 287.)  The Plaintiffs assert this letter was some type of deprivation as to which they had no notice and hearing. While this letter did convey the County staff's position that the mining currently being conducted on the property was not protected by a vested right, and that Mr. Schneider should "file an application for a conditional use permit and a rezone," *it is undisputed that no enforcement action was undertaken against the Plaintiffs in connection with this letter.* The letter was not intended be a notice of violation.  A notice of violation was sent to the Plaintiffs a year later, on April 14, 2010, which did assert that enforcement was being undertaken, and which notified the Plaintiffs they could appeal the notice to the Board of Supervisors. (JX 421.) Further, the undisputed evidence adduced at trial was that the Plaintiffs did not stop mining as the result of their receipt of this letter.  (JX287.) Thus, no enforcement action was undertaken and the Plaintiffs did not cease mining activity until after the Board of Supervisors' decision on the notice of violation occurred in September 2010.

This Court has previously found in connection with the Motions for Summary Judgment that a notice of violation that did not result in an enforcement action did not deprive the Plaintiffs of any property right. (See ECF No. 283, Order on Motions for Summary Judgment, "Order," at 52:19-26.)  Relying on *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 984 (9th Cir. 2011), this Court dismissed the Hardestys' Fifth Claim for Procedural Due Process Violation against former Defendant Curt Taras, noting that no enforcement action was taken in connection with a cease-and-desist letter sent by the Flood Board to the Plaintiffs, and thus the Plaintiffs were not deprived of any property right.  The Court found no authority to support the Plaintiffs' claim that hiring attorneys and paying for additional reports constituted a deprivation of procedural due process. (Order, at 52:19-26.)  In *Guatay*, the court held that local government officials did not deprive a plaintiff of any due process right by sending a notice of

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  violation and cease-and-desist letter because it never brought enforcement action. *Guatay*

2  *Christian Fellowship*, 670 F.3d at 984.

3      Here, no enforcement action was stated in the April 2, 2009 letter nor was any

4  enforcement action taken in connection with the April 2, 2009 letter. Plaintiffs continued to

5  mine the SHM property until after the Board of Supervisors' determination in September 2010.

6  (RT 690:20-692:21; RT 742:9-17; RT 1391:8-1392:14.)  When enforcement action was to be

7  taken, the Schneider Plaintiffs were provided with actual notice and hearings. For these reasons,

8  the April 2, 2009 letter did not deprive Plaintiffs of any property right as a matter of law.

9      **7.    Plaintiffs Were Provided Due Process in Connection with the Board of**
       **Zoning Appeals Hearings**
10

11      The Plaintiffs also raise procedural due process claims concerning the hearings before

12  the Board of Zoning Appeals, which heard appeals of the orders to comply under SMARA.

13  These hearings occurred in 2011, and copies of the transcripts for the hearings on July 25, 2011,

14  August 8, 2011, and December 12, 2011 have been admitted into evidence as PX 568.  The

15  transcripts provide the true story as to what transpired at these hearings. The transcripts

16  demonstrate that the Plaintiffs presented their positions to the Board numerous times and the

17  Plaintiffs' witnesses, Dr. Bly-Chester and Don Olsen, testified at length in the hearings.

18  Plaintiffs' counsels Ross, Morris, and Brewer also made detailed presentations before the Board

19  at these hearings.

20      The hearings were the result of uncorrected notices of SMARA violations described in

21  the reports provided to the Plaintiffs following the annual inspection of the SHM on

22  November 16, 2010.   On that date, the County conducted the annual inspection with its

23  consultant David Bieber of Geocon.  (JX 522, 526.)  In his review of the May 2010 FACE,

24  Bieber determined that the SHM reclamation plan was inadequate, based on changes between

25  the 2009 to 2010 inspections. (JX 526/008.)  Bieber's inspection determined there was a total of

26  176 acres of disturbed acres rather than the 90 acres identified in the 2009 inspection and upon

27  which the May 2010 FACE was based. (JX 526/008.)  Bieber also noted that the 2010 FACE

28  stated that "haul road and ponds will be left in place as part of the secondary use."  Bieber noted

1    that, since the approved SHM reclamation plan specifies that all mined lands will be reclaimed

2    for grazing, an amendment to the reclamation plan will need to be submitted for the ponds. (JX

3    522/008.)   Based on requirements for resloping, filling the pits to the depth stated in the

4    reclamation plan, increased revegetation costs, as well as other items, Bieber calculated that the

5    amount of the financial assurance for SHM would need to be $830,490.  (JX 526/008-009.)  The

6    November 16, 2010 report was provided to Joe Hardesty on December 16, 2010.  (JX 528.)

7          On January 24, 2011, the County wrote to Hardesty to identify and follow up on a

8    number of violations at the SHM noted in the November 16, 2010 inspection. There were

9    eleven violations. (JX534). Among other things, the letter stated the following:

10         3) The relocation of the industrialized processing and stockpile area
11         to Area IV from the location indicated on the approved reclamation
           plan is a substantial deviation in the operation and requires an
12         amendment of the current reclamation plan. You must seek an
           amendment to the approved reclamation plan to incorporate the
13         move of the industrialized processing and stockpile areas.

14         4) If you propose to leave the ponds in Area V rather than
           reclaiming the area as specified in the reclamation plan, it will
15         constitute a substantial deviation in the operation and will require
           an amendment of the current reclamation plan. You must seek an
16         amendment to the approved reclamation plan to keep the ponds that
           are currently in Area V. (JX534)

17         Thus, Plaintiffs were again notified of the determination of substantial deviations on the

18    SHM that required correction.  Plaintiffs were advised that they must seek an amendment to the

19    approved reclamation plan to keep the ponds in Area 5.

20         On June 10, 2011, another letter was sent to both Joe Hardesty and Jay Schneider

21    (JX559).  This letter was the Notice and Order to Comply under SMARA.  *See* Cal. Pub. Res.

22    Code § 2774.1.  It referred to the November 16, 2010 annual inspection and the subsequent

23    Notice of Violation, dated January 24, 2011.  (JX534.)  The letter noted that a re-inspection

24    occurred on May 20, 2011 to determine compliance and continuing violations were observed.

25    (JX559.)  Hardesty and Schneider were notified that a public hearing had been scheduled with

26    the Sacramento County Board of Zoning Appeals on July 11, 2011.  The letter attached a

27    "Notice and Order" that identified 21 matters.  (JX559.)

28         Thereafter, several hearings occurred on July 25, August 8, and December 12.  (*See*

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   *generally* PX 568.)  As reflected in the transcript from these hearings, a number of attorneys and

2   experts appeared for the Plaintiffs and provided extensive testimony and argument to the Board.

3   Plaintiffs attended and were provided the opportunity to speak as well.

4   Finally, on December 12, 2011, the Board, meeting in regular session, voted 4-1 to

5   approve the majority of the Order to Comply.  The corrective actions the Board upheld included

6   the requirements to:

7   2) Initiate an amended reclamation plan within seven days

8   3) Initiate a reclamation of pits along the Cosumnes River with
    SMARA requirements within thirty days (JX580)

9

10  A further hearing on the Order to Comply took place on February 6, 2012. (JX 587.)  In

11  addition to members of County staff, David Bieber, Bill Brewer, attorney for the Hardestys, Jay

12  Schneider and has attorney, Richard Ross, attended the hearing.  Presentations were made by

13  representatives of the Plaintiffs and representatives of the County at the hearing. The Board

14  adopted additional findings as a result of the hearing.

15  On February 29, 2012, Plaintiffs Schneider and Hardesty were provided copies of the

16  hearing memorandum from the Board of Zoning Appeals for the hearing actions taken on

17  December 12, 2011 and February 6, 2012.  As operators, Schneider and Hardesty were ordered

18  to correct violations as follows:

19  b. Initiate an application for an amended reclamation plan within
    seven days

20  c. initiate reclamation of pits along the Cosumnes River to comply
21  with SMARA requirements within thirty days.  (JX589)

22  From the foregoing, it is evident Plaintiffs were provided with considerable process in

23  connection with the hearings in front of the Board of Zoning Appeals.  Plaintiffs were provided

24  notice of the SMARA violations and several hearings ensued in which Plaintiffs were able to

25  participate both individually and with experts and counsel on their behalf.  In light of these

26  facts, which the Plaintiffs cannot reasonably dispute, there was no basis to allow the Jury to

27  consider any issues associated with the Board of Zoning Appeals hearings.  Indeed, no evidence

28

1    established the process that led to the Board's decisions were ones in which the Plaintiffs lacked

2    proper notice or an opportunity to be heard.

3    **8.    As a Matter of Law, there Can Be No Due Process Violations Where Adequate State Process Exists to Remedy the Decision of the Local Body**

4

5    "A state provides adequate [procedural] due process when it provides reasonable

6    remedies to rectify a legal error by a local administrative body." *Bello v. Walker*, 840 F.2d

7    1124, 1128 (3d Cir. 1988) (internal quotation omitted); *Lake Nacimiento Ranch Co. v. San Luis*

8    *Obispo Cty.*, 841 F.2d 872, 879 (9th Cir. 1987); *see also Parratt v. Taylor*, 451 U.S. 527, 543–

9    544 (1981) (deprivations of property attributable to unauthorized conduct of state officials do

10   not violate due process clause if state law provides adequate post-deprivation remedy).

11   In *Brady v. Town of Colchester*, 863 F.2d 205 (2d Cir. 1988), the Second Circuit Court

12   of Appeals upheld the district court's dismissal of plaintiffs' claims for procedural due process

13   violations based on the availability of state law proceedings which the plaintiffs did not utilize.

14   The *Brady* plaintiffs, who had purchased a building to be used for commercial purposes and

15   intended to lease it to the local borough, asserted violations of their constitutional rights,

16   including the rights to procedural due process, arising out of the actions and decisions of a town,

17   members of the zoning and planning commission, the building inspector, and a zoning

18   enforcement officer. The plaintiffs asserted that these officials conspired to deny them a

19   building permit, a zoning permit and necessary certificates of occupancy for the building.  The

20   district court dismissed the procedural due process claims, noting that the Bradys could have

21   sought meaningful review of the zoning commission's decisions within the state judicial

22   system, but had chosen instead to commence the civil rights action.  The district court had held

23   that the availability of such recourse, as a matter of law, precluded a finding that the defendants'

24   conduct violated the plaintiffs' rights to procedural due process under the Fourteenth

25   Amendment.  The plaintiffs appealed.  The Court of Appeals upheld the decision of the district

26   court, finding that the plaintiffs could have availed themselves of a state forum to review the

27   constitutionality of the defendants' actions, but chose not to do so.  Accordingly, the court

28   concluded that the procedural due process claim was without merit. *Id.* at 211.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

In *Arroyo Vista Partners v. Cty. of Santa Barbara*, 732 F. Supp. 1046 (C.D. Cal. 1990), the district court declined to entertain plaintiffs' claims of procedural due process violations because of the existence of state remedies which provide adequate procedural due process protection in that the state law offers reasonable remedies to rectify a legal error by a local administrative body. *Id.* at 1052.  The *Arroyo Vista* court based its conclusion, in part, on *Lake Nacimiento* and *Brady*.  In so doing, the *Arroyo Vista* court stated:

> "In *Lake Nacimiento*, the availability of adequate state remedies defeated the property owner's claim that a particular county supervisor's participation in and vote in denying an amendment sought by the property owner foreclosed his procedural due process challenge. Likewise, in the case at bar, relief pursuant to a writ of mandate under Cal. Civ. Proc. Code § 1094.5 is available to challenge the substance and evidentiary basis for a decision, and also extends to whether the board proceeded in a manner that denied the plaintiff a fair hearing or otherwise suffered from procedural deficiencies in rendering its administrative decisions." *Arroyo Vista Partners, supra,* 1052-1053.

The *Arroyo Vista Partners* court also noted, "In *Lake Nacimiento*, the Ninth Circuit affirmed the district court's determination that *Parratt*, 451 U.S. 527 required the plaintiff to first seek compensation, available under California law, before it could bring an action for deprivation of its right to procedural due process.  As stated in *Lake Nacimiento*, the plaintiff "is essentially claiming that this process was tainted by a voting supervisor's conflict of interest. This type of procedural claim is governed by *Parrat*." *Id.* at 879.  The Ninth Circuit held that *Parrat* applies whenever a procedure for redress of a deprivation of procedural due process is available under state law. The court concluded "The [plaintiff's] §1983 claim is barred because there is an available state remedy."  *Id.*

Consistent with these authorities, Sacramento County Code § 1.06.010, "State Law Applicable," provides as follows:

> "Pursuant to the provisions of Cal. Civ. Proc. Code § 1094.6, the provisions of said section are made applicable to the decisions of the Board of Retirement of the Sacramento County Employees Retirement Association, and to the decisions of all other commissions, boards, officers and agents of the County of Sacramento...."

The procedures under the California Code of Civil Procedure, which permit a challenge of any

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

final administrative order allow the court reviewing the matter to examine not only the decision at issue, but also the manner in which it was rendered, including the procedure utilized. The court can consider the questions of whether the local agency proceeded without or in excess of jurisdiction, whether there was a fair trial, and whether there was any prejudicial abuse of discretion. The court may also consider the question of whether or not an order or decision was not supported by the findings, or whether the findings themselves were not supported by the evidence. Cal. Civ. Proc. Code § 1094.5(a)-(b).

In *Arroyo Vista Partners, supra*, the court held that relief pursuant to a writ of mandate under Cal. Civ. Proc. Code § 1094.5 is available to challenge the substance and evidentiary basis for a decision, and also extends to whether a Board of Supervisors proceeded in a manner that denied the plaintiff a fair hearing or otherwise suffered from procedural deficiencies in rendering its administrative decisions. *Arroyo Vista Partners*, 732 F. Supp. at 1053. Thus, the court found that the availability of the state remedies defeated the property owners' claim for procedural due process.

Here, the mandamus procedure under Cal. Civ. Proc. Code § 1094.5 would have permitted review of issues of procedural fairness and the Boards' authority to act as it did. *See Mola Dev. Corp. v. City of Seal Beach*, 57 Cal. App. 4th 405, 411 (1997); *BMW of N. Am., Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 983 (Cal. Ct. App. 1984). Moreover, California law clearly permits augmentation of the administrative record and post-hearing discovery. *See Pomona Valley Hosp. Med. Ctr. v. Superior Court*, 55 Cal. App. 4th 93, 102 (1997). Thus, Plaintiffs could have litigated all claims before the state courts and the existence of such adequate state procedure is a bar to the Plaintiffs' claims here of procedural due process violations.

9.      **The Remedy for a Due Process Violation Is to Order the Process that Was Due**

Finally, in the event that this Court were to conclude that the Plaintiffs were deprived of procedural due process, the remedy is not to present the case to the Jury for an award of damages premised upon the loss of mining revenue claimed by Plaintiffs. Rather, the remedy

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  "is to order the process that was due and any attendant damages which directly resulted from the

2  failure to give the proper procedure." *Brady v. Gebbie*, 859 F.2d 1543, 1551 (9th Cir. 1988).  In

3  *Brady,* the court stated, "[t]his court and the Supreme Court have repeatedly held that the

4  appropriate remedy for deprivation of liberty and/or property interest without due process is to

5  order the process that was due…" *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 778 n. 8

6  (9th Cir. 1982); *see also Carey v. Piphus*, 435 U.S. 247, 259–264 (1978).

7      In *Carey,* the Court stated that "[p]rocedural due process rules are meant to protect

8  persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty

9  or property." *Id.* at 259.  As the Carey Court explained:

10     "In this case, the Court of Appeals held that if petitioners can prove
       on remand that "respondents would have been suspended even if a
11     proper hearing had been held," 545 F.2d, at 32, then respondents
       will not be entitled to recover damages to compensate them for
12     injuries caused by the suspensions. The court thought that in such a
       case, the failure to accord procedural due process could not
13     properly be viewed as the cause of the suspensions. (citations) The
       court suggested that in such circumstances, an award of damages
14     for injuries caused by the suspensions would constitute a windfall,
       rather than compensation to respondents. 545 F. 2d, at 32." *Carey* at
15     260. The court further held that nominal or presumed damages
       should not be awarded for a violation of procedural due process.
16     Rather, any compensatory damages would require proof of actual
       injury." *Carey* at 264.

17

18     Thus, in this case, should the Court conclude that a procedural due process violation

19  exists with respect to the hearings before the Board of Supervisors on the zoning violation, or

20  the Board of Zoning Appeals determination on the SMARA violations, the Plaintiffs' remedy is

21  a re-hearing or re-hearings by the respective boards, not the award of damages for the

22  deprivation of the property interest, which is what occurred here.

23     **D.     Because the Evidence is Undisputed Plaintiffs Failed to Conclude Challenges
               to the Board of Supervisors and Board of Zoning Appeals Determinations by
24             Mandamus, their Due Process Claims Are Barred as a Matter of Law**

25     The doctrines of res judicata and collateral estoppel bar re-litigation in this Court of the

26  determinations of the Board of Supervisors and Board of Zoning Appeals.  Plaintiffs do not

27  dispute that they did not pursue or bring to conclusion state-court mandamus actions under Cal.

28

Civ. Proc. Code § 1094.5 regarding those determinations.  As a matter of law, their failure to have done so is fatal to their civil rights claims.

<div align="right" style="writing-mode: vertical-rl">COTA COLE & HUBER LLP<br>2261 LAVA RIDGE COURT<br>ROSEVILLE, CALIFORNIA 95661</div>

      **1.**       **The Unreviewed Board of Supervisors and Board of Zoning Appeals' Determinations Must Be Given Preclusive Effective Under California Law**

In an attempted end run around clear precedent, the Plaintiffs argue they are not barred from re-litigating their claims in this case because they could not have raised challenges to the fairness of or alleged procedural irregularities in the boards' proceedings.  In this, the Plaintiffs are wrong.  As demonstrated above, the Plaintiffs had more than adequate opportunities to present their many positions in opposition to the actions County staff had proposed concerning the SHM nonconforming use and their reclamation plan and financial assurance.  No evidence was offered to allow the Jury to conclude they were in fact deprived of fair procedures.  The only assertion Plaintiffs made in this regard concerned the campaign contributions Defendant Dickinson—just one member of a five-member board—had received from Teichert.  As explained, their assertions about these contributions were facially defective as they made no attempt to demonstrate the *quid pro quo* relationship that would be required to demonstrate legally impermissible bias.

Federal courts may give preclusive effect to the findings of state administrative bodies as a matter of federal common law.  *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 794 (1986).  But before giving unreviewed administrative decisions preclusive effect, federal courts must first ensure that the *Utah Construction* factors are met: i.e., that the administrative body "[1] acted in a judicial capacity; [2] resolved disputed issues of fact properly before it; and [3] the parties had an adequate opportunity to litigate."  *Id.* at 800, *citing United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 422 (1966).  The Ninth Circuit Court of Appeals has determined that in light of California's adoption of the *Utah Construction* standard, the only question federal courts must determine when deciding whether to give preclusive effect to unreviewed California administrative findings is whether California courts would have accorded it preclusive effect.  *See Miller v. Cty. of Santa Cruz*, 39 F.3d 1030, 1033 (9th Cir. 1994); *Plaine v. McCabe*, 797 F.2d 713, 719 n.13 (9th Cir. 1986).

The *Utah Construction* factors were plainly satisfied in this case. The Board of Supervisors and Board of Zoning Appeals both (1) acted in a judicial capacity; (2) resolved disputed issues of fact properly before it; and (3) the parties had an adequate opportunity to litigate.

With respect to the first *Utah Construction* factor, both boards acted in a judicial or quasi-judicial capacity. The hearings conducted before the Board of Supervisors included the presentation of testimony and evidence by the Schneiders and others, including County staff. The issues before the Board involved the application of the County Zoning Code to the specific facts before the Board. Ultimately, the Board adopted factual findings and voted to deny the appeal and uphold the finding that there had been a violation of the Zoning Code. Similarly, with respect to the SMARA violations and order to submit an amended reclamation plan, the Board of Zoning Appeals conducted hearings, took detailed evidence from County staff, the Plaintiffs, and the Plaintiffs' experts and applied SMARA to the specific facts before them.

In conducting these hearings, both boards were exercising a judicial or quasi-judicial function. "An administrative agency ... acts in a judicial capacity when it applies an established rule to specific existing facts rather than establishing a new rule of law applicable to future cases." *See Moulin Rouge*, WL 5517234 (C.D. Cal. 2005), *citing Eilrich v. Remas*, 839 F.2d 630, 634 (9th Cir. 1988). In *Eilrich*, the Ninth Circuit held that a city's hearing officer acted in a judicial capacity when he considered the party's oral arguments and written memoranda and applied the appropriate legal standards to the facts surrounding the plaintiff's statements and discharge.839 F.2d at 634. As a California court has also explained, "[w]here in a proceeding before such a board a public notice is required to be given, and a hearing of objections or protests to the contemplated action is provided for, and the order to be made thereon is one which affects the property or rights of a citizen, the proceeding is usually held to be judicial...." *Crane v. Bd. of Sup'rs of Los Angeles Cty.*, 17 Cal. App. 2d 360, 365 (1936).

With respect to the second *Utah Construction* factor, the boards resolved disputed issues of fact presented in the proceedings and provided an adequate opportunity for the parties to litigate the issues. The hearings before both boards involved detailed presentation of the facts

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }

-51-

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

by County staff and the Plaintiffs. In the Board of Supervisors hearings, Jay Schneider and his attorney presented evidence and objections to the factual presentations made by the County staff.  In the Board of Zoning Appeal hearings, both the Schneiders and Hardestys presented facts through experts and other witnesses regarding the SMARA violations existing on the SHM property. Both sets of hearings spanned many months, and permitted the parties a full opportunity to provide their positions on the issues the boards considered.

As to the third *Utah Construction* factor, the determinations of both boards could have been litigated to final determinations before the Sacramento Superior Court and Third District Court of Appeal, had plaintiffs sought and obtained such review. Sacramento County Code section 1.06.010 plainly provides as follows:

> "Pursuant to the provisions of Cal. Civ. Proc. Code § 1094.6, the provisions of said section are made applicable to the decisions of the Board of Retirement of the Sacramento County Employees Retirement Association, and to the decisions of all other commissions, boards, officers and agents of the County of Sacramento...."

Plaintiffs cannot reasonably assert that California's administrative mandamus remedy would not have allowed them to raise all their challenges, including those regarding the fairness of the County's procedures.  In a mandamus proceeding, a California state court can consider whether the local agency proceeded without or in excess of jurisdiction, *whether it provided a fair trial*, and whether it committed prejudicial abuse of discretion. The court may also consider whether order or decision was not supported by the findings, or whether the findings themselves were not supported by the evidence.  Cal. Civ. Proc. Code § 1094.5(a)-(b). Case law interpreting the administrative mandamus statute confirms state courts have broad grounds to review claims of procedural fairness in association with administrative decisions. *See Mola Development Corp.*, 57 Cal. App. 4th at 411; *BMW of North America, Inc.*, 162 Cal. App. 3d at 983.  Moreover, California law clearly permits augmentation of the administrative record and post-hearing discovery in mandamus proceedings.  See *Pomona Valley Hospital Medical Center*, 55 Cal. App. 4th at 102. Thus, the Plaintiffs could have challenged the fairness of the Board of Supervisors and Board of Zoning Appeals proceedings and could have attempted to

1   elicit additional facts and evidence to support their claims, had they chosen to pursue their

2   mandamus remedies to completion.

3        As there is no dispute all of the *Utah Construction* factors are met, the next question is

4   whether California courts would afford the Board of Supervisors and Board of Zoning Appeals'

5   determinations preclusive effect. Under California law, issue preclusion applies to

6   administrative decisions when the following criteria are met:

7        "First, the issue sought to be precluded must be identical to that
     decided in a former proceeding. Second, this issue must have been
8        actually litigated in the former proceeding. Third, it must have been
     necessarily decided in the former proceeding. Fourth, the decision
9        in the former proceeding must be final and on the merits. Finally,
     the party against whom preclusion is sought must be the same as, or
10       in privity with, the party to the former proceeding." *Lucido v.
     Superior Court*, 51 Cal. 3d 335, 341 (1990).

11

12       These criteria are amply met here.  First, the primary issue in this case is the right of the

13  Plaintiffs to conduct mining on the SHM property without being subject to zoning requirements,

14  the need to amend their reclamation plan, or the duty to post a greater financial assurance.

15  Plaintiffs contend that the imposition of these requirements deprived them of their property

16  right to conduct mining.   California follows the "primary rights theory" under which the

17  invasion of one primary right gives rise to a single cause of action. *White v. City of Pasadena*,

18  671 F.3d 918, 927 (9th Cir. 2012).  "In determining the primary right at stake, 'the significant

19  factor is the harm suffered.'"  *Takahashi v. Bd. of Trustees of Livingston Union Sch. Dist.*, 783

20  F.2d 848 (9th Cir. 1986).  Here, the harm the Plaintiff allege is the deprivation of their right to

21  mine SHM in light of the additional regulatory requirement the County indicated it would

22  require and the economic damages they claim to have suffered as a result.

23       Second, the issue of the Plaintiffs' right to mine was actually litigated in the proceeding

24  before the Board of Supervisors and Board of Zoning Appeals. The requirements for a

25  conditional use permit, rezone, amended reclamation plan, and greater financial assurance were

26  all requirements to which the Plaintiffs, their lawyers, and their witnesses strenuously objected.

27       Third, the issue of the Plaintiffs' right to mine was necessarily decided in the Board of

28  Supervisors and Board of Zoning Appeals proceedings as demonstrated by the outcomes of the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                    -53-

1   proceedings themselves.  As a consequence of both boards' determinations, the Plaintiffs were

2   precluded from continuing to mine at their expanded levels without obtaining a conditional use

3   permit and rezone, amending their reclamation plan, and updating the associated financial

4   assurance.

5       Fourth, the decision of both boards was final and on the merits.  And fifth, the Plaintiffs

6   and the County are the same parties in this litigation as in the Board proceeding.

7       Accordingly, the California requirements for the application of preclusive effect are met

8   in this case.

9           **2.      Plaintiffs' Failure to Overturn the Board of Supervisors' and Board of
                   Zoning Appeals' Determinations by Mandamus Precludes All Claims
10                  Brought In this Case**

11      On May 12, 2011, the Schneiders filed an action for writ of mandamus in the

12  Sacramento County Superior Court challenging the validity of the Board of Supervisors'

13  decision.  (Request for Judicial Notice, "RJN," Exh. A.)  In the pleadings filed in support of that

14  action, the Schneiders asserted that the Board's decision was contrary to law and was invalid

15  because procedural due process had not been provided in connection with the decision.

16  However, after filing the action, the Schneiders failed to prosecute the action to its conclusion,

17  in particular, by failing to file any kind of a brief in support of their position, despite having

18  scheduled a hearing on the writ.  As a result, the Superior Court never took any action regarding

19  the Schneiders' petition and never issued any finding or order that the action taken by the Board

20  of Supervisors was improper or in contravention of law.  As set forth below, the Schneiders'

21  failure to prosecute the writ petition to its conclusion and to overturn the Board's decision is a

22  bar to the pursuit of relief regarding the Board of Supervisors' action in the instant case.

23      On May 9, 2012, the Hardestys also filed a petition for writ of mandamus in Sacramento

24  County Superior Court.  (RJN, Exh. E.)  In the pleadings filed in support of that action, the

25  Hardestys alleged that the County's determination which extinguished the vested right to mine

26  at SHM is void because the County did not provide due process to Hardesty.  After a hearing on

27  the Hardestys' request for a preliminary injunction to preclude enforcement of the County's

28  order, which was denied, the Hardestys abandoned the action and failed to obtain any relief by

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                          -54-

1    way of the state court action.  The Hardestys' failure to overturn the County's decision in state

2    court likewise precludes their civil rights claims here.

3          The Plaintiffs' abandonment of their petitions for writ of mandamus cannot be used as a

4    pretext to attempt to create federal jurisdiction.  The Ninth Circuit Court of Appeals ruled in

5    *Miller*, 39 F.3d 1030 that "California has made it quite clear" that a plaintiff must succeed in

6    overturning the administrative decision through the judicial mandamus review procedures of

7    Cal. Civ. Proc. Code § 1094.5 prior to filing a federal suit for damages.  *Hamilton v. Brown*, 39

8    F.3d 1574, 1938 (Fed. Cir. 1994), *citing Swartzendruber v. City of San Diego*, 3 Cal. App. 4th

9    896 (1992).  "If an adequate opportunity for review is available, a losing party cannot obstruct

10   the preclusive use of the state administrative decision simply by foregoing [the] right to appeal."

11   *Plaine*, 797 F.2d at 719 n.12.  Federal courts must "defer to the considered judgment of the

12   courts of California that an unreviewed agency determination … is equivalent to a state court

13   judgment entitled to *res judicata* and collateral estoppel effect."  *Miller*, 39 F.3d at 1038.  "If an

14   adequate opportunity for review is available, a losing party cannot obstruct the preclusive effect

15   of the state administrative decision simply by foregoing the right to appeal."  *Eilrich*, 839 F.2d

16   at 633; *see also Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1474–75 (9th

17   Cir. 1993) (holding that plaintiff was "obligated" to challenge findings of administrative agency

18   by direct appeal to state court under Cal. Civ. Proc. Code § 1094.5); *Briggs v. City of Rolling

19   Hills Estates*, 40 Cal. App. 4th 637, 649–650 (1995) (applying the preclusive effect of failure to

20   seek mandamus to a land use case).

21         Here, the Plaintiffs initiated and abandoned proceedings for writs of mandate under Cal.

22   Civ. Proc. Code § 1094.5.  As a result, the Plaintiffs failed to overturn the decision of the Board

23   of Supervisors after initially seeking mandamus, and the Board's determination has attained

24   preclusive effect.  Thus, in addition to the preclusive effect the administrative determinations

25   have on this litigation (as discussed in the preceding section), the civil actions the Plaintiffs

26   commenced and abandoned also have a preclusive effect on all the Plaintiffs' claims in this

27   case.  In other words, both the *administrative* and *judicial* outcomes of the previous proceedings

28   and actions bar the Plaintiffs' claims.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3.      Plaintiffs' Claims Against the Individual Defendants Are Also Barred**

The doctrines of res judicata and collateral estoppel also bar those claims the Plaintiffs assert against the individual defendants.  *Miller*, 39 F.3d at 1038.  Because the individuals are sued solely because of their involvement in the process which resulted in the Board's decision, they are also entitled to the protections of the doctrines of res judicata and collateral estoppel. *Swartzendruber*, 3 Cal. App. 4th 896;  *Takahashi v. Board of Education* (1988) 202 Cal. App. 3d 1464, 1476.

**4.      The Assertion of the Preclusive Effect of Plaintiffs' Failure to Obtain Relief in State Court, Which the County Asserted in Its Motion for Summary Judgment, Was Timely**

In denying the County's motion for Summary Judgment, the Court found that the County Defendants "waited far too long … to argue for the issue of claim preclusion." (ECF 283 p. 59:9-10.)  The Court cited to *N. Pacifica, LLC. v. City of Pacifica*, 366 F. Supp. 2d 927 (N.D. Cal. 2005).  However, the *N. Pacifica* case is distinguishable from this case because the defendant in *N. Pacifica* raised this issue for the first time one year after the case had already proceeded to trial on the issue of liability, during the bifurcated damages portion of the case. Ninth Circuit Court of Appeals precedent plainly confirms the County could raise its affirmative defenses of res judicata and collateral estoppel through a motion for summary judgment. *See*, *e.g.*, *Miller*, 39 F.3d at 1032; *Eilrich*, 839 F.2d at 631; *see also Hendrix v. Novartis Pharm. Corp.*, 975 F. Supp. 2d 1100, 1106 (C.D. Cal. 2013) (finding that there is no authority that the court may deem a properly pleaded defense waived before trial, or even before the pretrial conference).   As the County timely raised the defenses, it is entitled to substantive determinations as to whether the Plaintiffs' claims are in fact barred.

**E.      <u>As a Matter of Law, No Reasonable Jury Could Conclude the County Retaliated Against the Schneiders for Filing Their Federal Action</u>**

The Schneiders assert a claim against the County under the First Amendment on the ground they were retaliated against by the County's demand for an increased financial assurance following their filing of their federal lawsuit in November 2012.  At trial, the Schneiders offered no evidence demonstrating the County's demand was made in retaliation for this filing. To the

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

contrary, the undisputed evidence shows that the demand for the greater financial assurance was the result of a process that had begun almost *two years* before, when SMARA inspections indicated the Plaintiffs had substantially deviated from the SHM reclamation plan.  (This process is described in more detail in Section IV.B.3.b and below.)  The County's actions were the direct result of its legal obligations under SMARA to take enforcement action when it has become clear a mine operation can no longer be reclaimed in accordance with its approved reclamation plan.

To support a First Amendment retaliation claim, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  The key criterion in this test is often the causal relationship, which *requires* that a plaintiff show that the alleged retaliation was a "substantial or motivating factor" in a decision of the defendants adverse to the plaintiffs.  *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).

Regarding the evidence supporting this claim, it must first be noted that *the County* did not increase its financial assurance demand $8.8 million, as the Schneiders contend. An increased demand for a financial assurance was made because of the substantial deviation created by the very large water-filled pit (pond) the Plaintiffs had *recently* created near the Cosumnes River.  But the actual determination of cost depended for reclaiming that pit depended on how *the Plaintiffs* would choose to "backfill" the pond.  As to this requirement, they had two alternatives: import the fill from offsite, by far the most expensive option, the cost of which was calculated at $8,817,074.  *Or* if the fill could be obtained from the SHM property itself, which the County clearly communicated was an option it would support, the amount of the financial assurance was calculated to be $901,336.  (JX 605/021.)

In addition, there was utterly no temporal connection between the Schneiders' filing of their lawsuit in late 2012 and the demand for the increased financial assurance.  The demand for

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

the greater financial assurance was the culmination of a long process arising from the County's performance of its legal obligations under SMARA.  On November 16, 2010, almost *two years prior* to the filing of the Schneider federal complaint, the County conducted the annual inspection of the SHM with its consultant, David Bieber.  (JX 522, 526.)  In his review of the Schneiders' May 2010 FACE, Bieber determined the SHM reclamation plan could no longer be implemented based on changes between the 2009 to 2010 inspections.  (JX 526/008.) As Bieber determined, the Plaintiffs had disturbed a total of 176 acres rather than the 90 acres identified in the 2009 inspection report (which is what their May 2010 FACE was based upon).   (JX 526/008.)  Bieber also noted that the 2010 FACE stated that "haul road and ponds will be left in place as part of the secondary use."  Because the approved SHM reclamation plan specifies that mined lands will be reclaimed for *grazing*, not water-filled pits, Bieber determined an amendment would be needed to provide for the reclamation of the ponds. (JX 522/008.)  Thus, in November 2010, Bieber reported that if the Plaintiffs wished to allow the excavations to remain as ponds, they would need to seek approval of an amendment to the reclamation plan, because the plan did not contain any provision for such.

On January 24, 2011, the County wrote to Joe Hardesty to follow up on the violations noted during the November 16, 2010 inspection. (JX 534.) The violations observed during the November 2010 inspection were listed and identified, and Hardesty was requested to correct them within 30 days of the date of the letter, per Cal. Pub. Res. Code § 2774.1(a).  (JX 534/001-003.)  Among other things, the letter stated the following:

> "3) The relocation of the industrialized processing and stockpile area to Area IV from the location indicated on the approved reclamation plan is a *substantial deviation* in the operation and *requires an amendment of the current reclamation plan. You must seek an amendment to the approved reclamation plan to incorporate the move of the industrialized processing and stockpile area*s.

> 4) *If you propose to leave the ponds in Area V rather than reclaiming the area as specified in the reclamation plan, it will constitute a substantial deviation in the operation and will require an amendment of the current reclamation plan. You must seek an amendment to the approved reclamation plan to keep the ponds that are currently in Area V.*"  (JX 534, emphasis added.)

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1  Here again, in January 2011, approximately *20 months* before the Schneiders filed suit, the

2  Plaintiffs were notified of the violations, the determination of substantial deviations from the

3  reclamation plan, and that their need to amend the reclamation plan.

4      On June 10, 2011, another letter was sent to both Joe Hardesty and Jay Schneider (JX

5  559.)  This letter was a formal "Notice and Order to Comply" under SMARA.  It referred to the

6  November 16, 2010 annual inspection and the follow-up letter dated January 24, 2011 (JX 534).

7  The letter noted that a re-inspection occurred on May 20, 2011 to determine compliance and

8  continuing violations were observed. (JX 559.)   Thereafter, hearings occurred on July 25,

9  August 8, and December 12.  On December 12, 2011, the Board of Zoning Appeals, meeting in

10  regular session, voted 4-1 to approve the majority of the Order to Comply. (PX 568.) The

11  corrective actions upheld by the BZA included:

12          "2) Initiate an amended reclamation plan within seven days.

13          3) Initiate a reclamation of pits along the Cosumnes River with
            SMARA requirements within thirty days." (JX 580.)

14

15  A further hearing on the SMARA Order to Comply took place on February 6, 2012.  (JX 587.)

16      In correspondence dated February 29, 2012, Tammy Derby, Division Chief for County

17  Code Enforcement, provided Schneider and Hardesty with copies of the hearing memorandum

18  from the Board of Zoning Appeals for the hearing actions on December 12, 2011 and

19  February 6, 2012.  (JX 589.)  These operators were advised that the Board had found that the

20  last financial assurance in the amount of $164,233 was inadequate to reclaim the mine in its

21  current condition.  (JX 589/002.)  Schneider and Hardesty were directed to provide an updated

22  financial assurance to ensure the ability to reclaim the SHM operation. (JX 589/002.)  Both

23  operators were further informed that the Board adopted several findings, including the

24  following:

25          "13. The relocation of the Industrialized Processing and Stockpile
            Area from the location indicated on the approved reclamation plan
26          is a substantial deviation in the operation, in that it substantially
            affects the completion of the previously approved reclamation plan.
27          This relocation was undertaken without the necessary amendment
            to the reclamation plan (PRC Section 2777, Cal. Code Regs. tit. 14,
28          § 3502). (JX 589-003, JX 559- 003.)

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

14. The ponds (previously the pits) adjacent to the Cosumnes River in Area 5, as identified the 2010 Lead Agency Annual Inspection Report for Schneider Historic Mine, Geocon Figure 2, Annotated Mining Activity Map, constitute a substantial deviation to the approved reclamation plan, and are retained without the necessary amendment to the reclamation Plan (PRC Section 2777, Cal. Code Regs. tit. 14, § 3502). (JX 589-003, JX 559-003.)

15. The pit slopes in Area 5 are not re-sloped, compacted, and re-vegetated to achieve stable condition, are steeper than a 2:1 ration (horizontal to vertical) in some location, and reportedly exceed thirty (30) feet in depth in some locations in violation of the reclamation plan and Regulations (Schneider Historic Mine Reclamation Plan, Paragraphs D & E; Cal. Code Regs. tit. 14, § 3704) (JX 589-003, JX 559-003.)

16. The Annual Reclamation Plan Update Map due November 1, 2010 has not been submitted in violation of the reclamation plan (Schneider Historic Mine Reclamation Plan, Paragraph C)." (JX 589-003, JX 559-003.)

Hardesty and Schneider were ordered to the correct violations as follows:

"b. Initiate an application for an amended reclamation plan within seven days

c. Initiate reclamation of pits along the Cosumnes River to comply with SMARA requirements within thirty days

d. Submit an Updated Annual Reclamation Plan Map within seven days."  (JX 589-003.)

Neither operator has to this date initiated an application for an amended reclamation plan, initiated reclamation of pits along the Cosumnes River, or submitted an updated Annual Reclamation Plan Map.

In August 2012, the County again retained Bieber to conduct the annual compliance inspection.  In a report dated November 27, 2012, Bieber, as the result of the inspection and the review of the adequacy of the FACE, concluded that the FACE would need to be raised to either $8,817,074 *or* $901,336, depending on the source of soil to backfill the pits. (JX 605/021.) Bieber noted that "the Sacramento County Board of Zoning Appeal (BZA) subsequently ruled that final reclamation of the pits area would require the pits to be backfilled and regraded to be consistent with the surrounding topography, *unless Hardesty or Jay Schneider obtain an approved Reclamation Plan amendment.* Therefore, the current FACE evaluation anticipates

1    backfilling the pits to substantially conform to the regional topography." (JX 605/018, emphasis

2    added.)  In his analysis of the costs to backfill the pits, Bieber included the costs for backfilling

3    the pits in Area 5 to conform to the restoration configuration shown in Exhibit K of the

4    reclamation plan.  (JX 605/019.)  Bieber also assumed a post-reclamation elevation for the pit

5    area to average approximately 10 to 15 feet lower than the pre-mining topography, and that

6    would allow for the tillage of crops. (JX 605/019.)  Bieber calculated the amount of fill that

7    would be necessary to backfill the pit area, and provided two different cost estimates to backfill

8    the pits, depending on whether the fill had to be imported to the site or onsite fill could be used.

9    (JX 605/019-020.)

10   In correspondence dated November 28, 2012, the County provided Hardesty and

11   Schneider with the inspection report and Bieber's November 27, 2012 report. (JX 605.)

12   Critically, the County informed both operators of the two alternative calculations of the

13   financial assurance, and advised that the financial assurance could be set at $901,336 if the

14   County was provided with authority to use stockpiled materials located in Area 2. (JX 605.)

15   Thus, the undisputed evidence is that the FACE calculations were premised upon the

16   requirement that the excavated pits be reclaimed by backfilling.  Schneider failed to offer any

17   evidence that the calculations by Bieber were inaccurate as to the values, quantities, or any other

18   matters.

19   Consequently, there was no evidence upon which a reasonable jury could conclude that

20   the increase of the financial assurance amount was in retaliation for the Schneiders' filing of

21   their complaint.  There was no a temporal connection between the filing of that complaint and

22   the financial assurance demand and, in any event, the very large financial assurance estimate

23   Schneider complained of was the product of his unwillingness to amend the SHM reclamation

24   plan despite the clear obligation to do so.  Judgment on the retaliation claim must accordingly

25   be rendered in favor of the County.

26   ///

27   ///

28   ///

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

F.    **The Individual Defendants Could Not Be Found Liable for the Plaintiffs' Substantive Due Process Claims**

1.    **The Evidence Could Only Allow a Reasonable Jury to Conclude Defendants Sherry and Gamel Were Entitled to Qualified Immunity**

When individual government defendants assert the defense of qualified immunity, courts must examine "(1) whether a plaintiff has produced evidence showing that the official violated a constitutional right and (2) whether that right was 'clearly established' at the time of the alleged misconduct." *Conner v. Heiman*, 672 F.3d 1126, 1131–32 (9th Cir. 2012) (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"To be clearly established, a right must sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016). The clearly established standard is an exacting one that "gives government officials breathing room to make reasonable but mistaken judgments," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[W]hat is required is that government officials have 'fair and clear warning' that their conduct is unlawful." *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Accordingly, the requirement is not established "at a high level of generality." *Ashcroft*, 563 U.S. at 741. The United States Supreme Court does not "require a case directly on point, but existing precedent must have placed statutory or constitutional question beyond debate." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015).

As to the first element of the qualified immunity, there is no evidence that Defendants Sherry or Gamel violated any constitutional right of the Plaintiffs. To prove Defendants violated their substantive due process rights, Plaintiffs must show that Defendants "deprived [them] of a constitutionally protected life, liberty or property interest." *Shanks*, 540 F.3d at 1087. "[O]nly the most egregious official conduct" is sufficiently arbitrary to satisfy that test. *Id.* Accordingly, the burden on Plaintiffs is "exceedingly high." *Shanks*, 540 F.3d at 1088 (quotations omitted). "If it is at least fairly debatable that the [defendants'] conduct is rationally

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                    -62-

1  related to a legitimate governmental interest, there has been no violation of substantive due

2  process." *Id.* (quotations and citation omitted).  In such a situation, "whether [defendants] also

3  acted for ulterior motives is immaterial." *Teresi Investments III v. City of Mountain View*, 609

4  F. App'x 928, 930 (9th Cir. 2015).

5         As discussed above, Plaintiffs' evidence failed as a matter of law to establish a violation

6  of substantive due process.  Further, as also discussed above, the conduct of Defendants Sherry

7  and Gamel could not, as a matter of law, violate substantive due process because these

8  Defendants did not make any *final* determination regarding either vested rights or the

9  requirement for a conditional use permit and a rezone.  That determination was made by the

10  Board of Supervisors.  In any event, and setting aside the complete absence of any evidence in

11  the record that Sherry and Gamel engaged in egregious conduct, it is *at least* fairly debatable

12  that the conduct of these defendants was rationally related to a legitimate governmental interest.

13  Indeed, even if it were established that Defendants acted with some ulterior motive, which has

14  not been established, that would be immaterial, where the conduct could be rationally related to

15  a legitimate governmental interest.  Here, enforcement of the Zoning Code with respect to a use

16  (mining) that is not permitted under the Zoning Code is conduct that is squarely within the

17  realm of acting in furtherance of legitimate governmental interests.

18         As to the second element of qualified immunity, the constitutional rights of Plaintiffs

19  with respect to their substantive due process claims do not implicate clearly established

20  constitutional rights of which a reasonable person would have known.  Here, the right in issue is

21  not merely the right to be afforded substantive due process as a general matter.  The purported

22  substantive due process violation in this case is that Defendants wrongfully engaged in

23  egregious conduct without any conceivable legitimate basis which purportedly revoked

24  Plaintiffs' vested right and imposed a requirement that Plaintiffs comply with the Zoning Code

25  or SMARA.  Analyzing and determining whether a vested right permits the type of expansion

26  and intensification of use and substantial increase in production of a mining operation such as

27  has indisputably occurred in this case would violate substantive due process rights is hardly

28  clearly established and is subject to considerable debate. Here, the County employees

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

considered the evidence regarding the prior acknowledgment of a vested right based on evidence presented as to mining activities occurring prior to 1994 and 1956, considered the evidence as to the substantial increase in production and the enlargement, enhancement and intensification of the SHM mining operation, and reached the determination under applicable state law that such operation of the expanded and intensified business, producing the high volumes of production identified, is no longer protected by the vested right and must be subject to the County Zoning Code, such that Plaintiffs are required to apply for a conditional use permit and a rezone. Defendants also advised the County regarding the highly regulated and complex area of surface mining reclamation under SMARA. The fact their positions were consistent with OMR's positions, as lead state oversight agency, precludes any reasonable argument they were on clear notice their actions could have deprived Plaintiffs of clearly established rights concerning their reclamation plan and financial assurance. Even if the Defendants were mistaken about the conclusions they reached, they are protected by the qualified immunity. As noted, the qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Ashcroft*, 563 U.S. at 741.

For these reasons, as a matter of law, Defendants Sherry and Gamel are entitled to qualified immunity for the substantive due process claims alleged in this matter.

### 2.     Defendant Dickinson Is Entitled to Absolute and Qualified Immunity

At all relevant times in this action, Defendant Dickinson was a member **of** the County Board of Supervisors. To the extent that Plaintiffs predicate the liability of Dickinson on his legislative acts while participating in decisions of the Board of Supervisors, he is entitled to absolute immunity. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 577 (9th Cir. 1984); *Kuzinich v. Santa Clara Cty.*, 689 F.2d 1345, 1349 (9th Cir. 1982).

When, on the other hand, a member of a legislative body acts in an executive capacity, then the member of the legislative body "enjoys a qualified rather than an absolute immunity." *Kuzinich*, 689 F.2d at 1350. As noted above, the qualified immunity of officials acting in an executive capacity protects them from asserting Section 1983 claims concerning good faith actions taken within the scope of their authority.

{DPC/00052406. }                                    -64-

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1    The allegations against Defendant Dickinson pertain to two areas of conduct.  First, the

2  Plaintiffs challenge his actions as a member of the Board of Supervisors in the 2010 hearing

3  regarding the expansion of the SHM nonconforming use.  In this capacity, Defendant Dickinson

4  voted, *along with every other member of the Board*, to deny the Schneiders' appeal and uphold

5  the staff's determination that any mining then occurring on the SHM property exceeded the

6  scope of any previously recognized vested right.  Second, Plaintiffs' attempt to base liability on

7  Dickinson's meetings with Teichert to hear that corporate constituent's complaints about the

8  Plaintiffs' mining operation.  But as to those discussions, as detailed previously, Plaintiffs

9  offered no evidence at trial of any *quid pro quo* arrangement between Teichert's requests and

10  any actions Dickinson took or any votes he made regarding the SHM matter.

11    Under these facts, Defendant Dickinson was plainly entitled to qualified immunity as a

12  matter of law.  Plaintiffs offered no evidence that he acted in bad faith or with the knowing

13  intention to violate their constitutional rights.  To the contrary, the evidence could only establish

14  that Defendant Dickinson engaged in conduct rationally related to legitimate governmental

15  purposes, such as meeting with constituents to hear their concerns, following up with County

16  staff regarding the issues of concern, and ensuring the proper enforcement of County zoning

17  requirements.  The County is aware of no precedent that could have clearly indicated to an

18  elected official that he was forbidden to engage in conduct such as this.

19    **G.    The Jury's Substantive Due Process Awards Were Based on Legally
       Inadequate Measure of Damages**
20

21    The Jury's substantive due process awards, totaling $105 million, were based on an

22  improper measure of damages.  This incorrect methodology allowed the Jury to award damages

23  that were excessive as a matter of law.

24    Generally, damages under 42 U.S.C. § 1983 borrow from the law of torts to furnish the

25  appropriate measure of damages.  Courts must employ the most analogous tort measure for

26  redress of the particular constitutional right at issue.  *Carey*, 435 U.S. at 258–59.  Damages are

27  not awarded based on the perceived value of the right at issue.  *Memphis Cmty. Sch. Dist. v.*

28  *Stachura*, 477 U.S. 299, 308 (1986).  Moreover, federal courts may set aside an award of

{DPC/00052406. }                              -65-

1  damages that is "grossly excessive," "monstrous," or that "shocks the conscience." *Chalmers v.*
2  *City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985).

3      The specifics of how the Jury arrived at the specific awards to the Schneiders and
4  Hardestys are discussed in more detail in Section III.C of the accompanying Motion for New
5  Trial.  But, generally speaking, the Jury awarded damages to the Plaintiffs based on the existing
6  and future values of the mineral assets Plaintiffs could no longer exploit because of the
7  County's enforcement actions.  Essentially, the Jury awarded damages to Plaintiffs as if the
8  SHM property had been permanently and inversely condemned.  But in doing so, the Jury
9  awarded Plaintiffs for their *business* losses, not the diminution in the value of the *land* that
10  resulted from the deprivations of substantive due process.

11      In substantive due process cases, the Ninth Circuit Court of Appeals has endorsed the
12  use of a condemnation measure of damages in land use and zoning cases.  *See Herrington v.*
13  *Sonoma Cty.*, 834 F.2d 1488 (9th Cir. 1987); *see also Wheeler v. City of Pleasant Grove*, 833
14  F.2d 267, 271 n.3 (11th Cir. 1987) (stating the measure of damages in land use cases involving
15  substantive due process and takings is the same).  In *Herrington*, a county was found to have
16  acted arbitrarily in adopting a specific plan that precluded the plaintiffs from subdividing and
17  developing their property.  *Id.* at 1501.  On the issue of damages, the court granted a new trial,
18  finding the jury had not awarded compensation based on the difference in the value of the
19  plaintiff's *property* without the invalid conditions and with such conditions.  *Id.* at 1504–06.
20  The Court rejected the use of lost profits alone as an appropriate measure of damages.  *Id.* at
21  1506; *see also Herrington v. Cty. of Sonoma*, 12 F.3d 901, 905–06 (9th Cir. 1993) (affirming
22  the district court's calculation of damages following remand).

23      The *Herrington* Court's adoption of a condemnation approach is noteworthy because, in
24  takings cases, property owners are entitled only to the *fair market value* of their *properties* at
25  the time of the taking.  *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949); *Almota*
26  *Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973); *Yuba Nat.*
27  *Res., Inc. v. United States*, 904 F.2d 1577, 1580 (Fed. Cir. 1990).  More importantly, in cases in
28  which properties with mineral interests have been condemned, courts have routinely

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                                    -66-

emphasized that in determining fair market value, the trier-of-fact may not consider the value of the mineral deposit *apart from* the value of the land. *See United States v. 91.90 Acres of Land, Situate in Monroe Cty., Mo.*, 586 F.2d 79, 87 (8th Cir. 1978); *United States v. Sowards*, 370 F.2d 87, 90 (10th Cir. 1966); *Georgia Kaolin Co. v. United States*, 214 F.2d 284, 286 (5th Cir. 1954). Compensation based on "the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself" is not a proper measure. *United States v. 13.40 Acres of Land in City of Richmond, Contra Costa Cty.*, 56 F. Supp. 535, 538 (N.D. Cal. 1944). Such a valuation method is "practically worthless," as:

> "[S]uch valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production .... It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business." *U.S. ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 822 (E.D. Tenn. 1941).

The substantive due process damages the Jury awarded the Plaintiffs were based on the testimony of Gilbert Coleman, Plaintiffs' damages expert. The many deficiencies, exaggerations, and flaws in Coleman's testimony are discussed in Section III.C of the accompanying Motion for New Trial. Here, the County notes that Coleman's methodology in valuing the Plaintiffs' damages was legally incorrect. Coleman effectively valued the Plaintiffs' *business* losses based on the values of the aggregate stockpiles that remained on the SHM property and the value of the many years of profits they would not be able to realize from the property's mineral reserves. It is undisputed Coleman did not value *the land* before and after the deprivation of substantive due process occurred to arrive at a fair market valuation for Plaintiffs' damages. *See* Cal. Civ. Proc. Code § 1263.310 (requiring that a condemnation award under California law be set at the fair market value of the property taken).

On this ground alone, Plaintiffs' damages must be found excessive as a matter of law.

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

**H.      Judgment Should Be Entered in Favor of the Individual Defendants as to Plaintiffs' Claims for Punitive Damages**

In this case, the Jury awarded $25,000 in punitive damages against Defendant Dickinson, $750,000 in punitive damages against Defendant Sherry, and $1,000,000 in punitive damages against Defendant Gamel.  These awards were not supported by the evidence and were excessive as a matter of federal common law and due process limitations.

### 1.      The Punitive Damages Were Not Supported by the Evidence

Here, the Jury was instructed that punitive damages may be awarded if it finds that a "defendant's conduct that harmed a set of plaintiffs was malicious, oppressive or in reckless disregard of the plaintiffs' rights."  (ECF 461 Final Instruction No. 25, pp 32-33.)

There is no evidence in the record upon which a reasonable jury could base an award of punitive damages. The claim for which the jury found the three individual defendants liable was the substantive due process claim only.  As discussed above at length, there is no evidence in the record that would allow a reasonable jury to conclude that the individual defendants violated the substantive due process rights of the Plaintiffs.  Defendants will not repeat the arguments and recitation of the evidence here, but refers the Court to the arguments above, which it incorporates by this reference.  There being a complete absence of evidence upon which to base liability of the individual Defendants, there is a complete absence of evidence upon which an award of punitive damages can rest.  Plaintiffs have failed to introduce any evidence of conduct constituting malice, oppression or fraud.  Consequently, the Court should enter judgment in favor of Defendants Sherry, Gamel, and Dickinson on all claims for punitive damages.

### 2.      The Punitive Damages Were Excessive as a Matter of Federal Common Law

The United States Supreme Court has held there is a "'common-law standard of excessiveness.'" in punitive damages awards *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008).  Applying this standard, the Court has held federal courts may "regulat[e] [awards] as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute." *Id.*

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1       For the reasons described in the many sections above, which the Defendants will not

2 repeat here, the Jury's awards were manifestly excessive.  The evidence could only establish

3 that the two employee individual defendants were carrying out regulatory responsibilities under

4 the County Zoning Code, SMARA, and other applicable law in the service of legitimate

5 governmental interests.  Mr. Dickinson simply performed his responsibilities as a member of

6 the County Board of Supervisors.  The substantial and, frankly, shocking amounts imposed on

7 each individual defendant were grossly out of line with any culpability any of those defendants

8 could reasonably be found to have had and are inconsistent with the analysis of the Supreme

9 Court in *Exxon* regarding imposing reasonable standards for the imposition of punitive damages

10 as a matter of federal common law.  *See Exxon Shipping Co.*, 554 U.S. 471.

11       **3.**       **The Jury's Punitive Damages Awards Transgress Upon Constitutional**

12              **Limitations**

13       As a matter of law, the punitive damages awards were also constitutionally excessive

14 and must be reduced to no more than nominal levels for each defendant if they are not stricken

15 on the grounds above.

16              **a.**       **Legal Standard**

17       Due Process limits the size of a punitive damages award. *State Farm Mut. Auto. Ins. Co.*

18 *v. Campbell*, 538 U.S. 408, 416 (2003). The Supreme Court has "instructed courts reviewing

19 punitive damages to consider three guideposts: (1) the degree of reprehensibility of the

20 defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the

21 plaintiff and the punitive damages award; and (3) the difference between the punitive damages

22 awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at

23 418.

24       Because the excessiveness of an award presents a question of law, *id.* at 437, this Court

25 may reduce an excessive award to its constitutional limit without ordering a new trial or

26 remittitur. *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151 (9th Cir.

27 2002).

28

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

**b.      Defendants' Conduct Was Minimally Reprehensible, If at All**

Courts "determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419.

These six factors tip sharply in the individual Defendants' favor here:

*Physical versus economic harm*.  The harm to Plaintiffs in this case was not physical, so this factor strongly supports the Defendants.

*Reckless disregard of others' health or safety*.  This factor also strongly favors the Defendants because their conduct did not affect the health or safety of Plaintiffs.  If anything, the individual Defendants acted to enhance the safety of County citizens through its enforcement efforts.

*Financial vulnerability*.  This factor does not favor Plaintiffs because there is no evidence they were financially vulnerable.  Quite the contrary, Plaintiffs owned vast tracts of land and/or operated profitable businesses.

*Repeated actions or isolated incident*.   This factor is largely inapplicable to this case.  The Supreme Court intended this factor to apply when a defendant's repeated bad conduct exposes many persons to harm (like a product manufacturer continuing to sell a product it knows is unsafe or defective). This case does not present a repeated-versus-isolated type of dispute, however. Indeed, it would be difficult to discern whether the County's efforts to enforce mining laws should be viewed as a single course of conduct stretching over a period of years, or alternatively as a series of events.

*Harm resulting from intentional or accidental conduct*.  This factor is a wash.  On one hand, the Jury found the Defendants liable on the substantive due process claims, which did not involve accidental conduct.   On the other hand, as explained above, the jury found *no* deprivations of Plaintiffs' property rights (hence it awarded only nominal damages for procedural

due process violations).   Viewed in their totality, this conduct is low on the scale of reprehensibility. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–76 (1996) ("[S]ome wrongs are more blameworthy than others.... [t]rickery and deceit are more reprehensible than negligence." (quotation and citation omitted)).

Because these factors favor Defendants by a wide margin, this Court should reduce the substantial awards of punitive damages.

### c.      The Ratio of Punitive to Compensatory Damages Is Excessive

"[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425.  "[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

In this case, although the Jury awarded substantial compensatory damages for the Plaintiffs' injuries, the Verdict Form did not require the Jury to specify to what extent each individual defendant was responsible for the total damages awarded.  But given the nature of the harm the Plaintiffs claimed they suffered—the loss of their ability to mine SHM as a result of a *series* of *several* regulatory and enforcement actions ultimately taken by County *hearing bodies*—it is only appropriate to infer that the Jury believed each individual defendant played only a small and discrete role in causing the overall harms the Jury believed the Plaintiffs suffered.   The most logical inference is that the Jury believed the County as a *collective organization* was principally responsible for Plaintiffs' harms.  For this reason, it is appropriate to infer the Jury believed each individual's responsibility was relatively minor compared to the County's overall organizational actions.

### d.      Comparable Civil Penalties

"The third guidepost in *Gore* is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 428.  Here, no such comparable cases exist as the defendants in this case are governmental

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

defendants. *Cf. Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 468 (3d Cir. 1999) ("[A] violation of common law tort duties [may] not lend [itself] to a comparison with statutory penalties." (quotation omitted).)  This guidepost accordingly does not detract from the conclusion that, in light of the other guideposts, the individual Defendants' role in the overall the Plaintiffs suffered were minor, at most.  To the extent Plaintiffs suffered harm, their harms were the result of actions the County took in its capacity as a municipal corporation.  Plaintiffs' harms were not the result of specific actions of individual defendants who, at most, could only make recommendations to duly constituted hearing bodies.

Consequently, should the Court not grant judgment as requested here, or new trial as requested in the County's alternative motion, it should at least reduce the punitive damages against the individual defendants to no more than nominal amounts.

**I.      Judgment Must Be Entered in Favor of All Defendants on the Schneiders' Williamson Act Claim**

The Schneiders claim that they entered into a Williamson Act contract with the County in 1968, for which they contend the parties agreed that the County would not change the use of the property without their written consent as property owners.  Pursuant to the agreement, a compatible use for the property was sand and gravel mining.  This claim fails for three reasons: (1) it is a disguised breach of contract claim barred by the failure to present a timely government claim; (2) as a matter of law, the resolution authorizing the entry into the Williamson Act contract as well as the language in the contract itself clearly provides that all uses on the property are subject to the County Zoning Code and that, when restrictive Zoning Code provisions are enacted, the Code prevails; and (3) the Schneiders have no property interest in their Williamson Act Contract.

**1.      The Schneiders Failed to Present a Government Tort Claim to the County**

Cal. Gov't Code § 945.4 provides that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented ...  until a written claim therefore has been presented to the public entity" and has been rejected in whole

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   or in part.  Presentation of a claim is thus a mandatory prerequisite to maintaining a cause of

2   action against a public entity, and failure to file a claim is fatal to the claimant's cause of action.

3   *Janis v. California State Lottery Com.*, 68 Cal. App. 4th 824, 832 (1998); *Spencer v. Merced*

4   *Cty. Office of Educ.*, 59 Cal. App. 4th 1429, 1495 (1997).

5       Here, the Schneiders introduced no evidence that they presented a claim to the County

6   alleging a breach of the Williamson Act contract with the County, and that the County has

7   rejected the same.  As such, their failure to comply with the Government Claims Act is fatal to

8   their Williamson Act claim.

9       **2.     The Requirements of the County Zoning Code Prevail Over any**
          **Matters Addressed in the Schneiders' Williamson Act Contract**

10

11      It is undisputed that the Sacramento County Zoning Code prohibits sand and gravel

12  mining on the Schneiders' property in the absence of conditional use permit and a rezone. Here,

13  the Schneiders contend that the Williamson Act contract with the County constitutes some type

14  of permit with the County that allows for sand and gravel mining unless they agree otherwise.

15  This assertion is directly contradicted by the express term of the resolution authorizing entry

16  into the Williamson Act contract and the Williamson Act contract itself.

17      The resolution authorizing entry into the Williamson Act contract provides in pertinent

18  part as follows:

19          "If an agreement is entered into, incorporating the agricultural and
            compatible uses specified in exhibits "B" "C" hereto, the property
20          owner shall be limited to said uses even though the zoning
            ordinances or other land use regulations authorize different uses. In
21          the event the zoning ordinance or other land use regulations are or
            should become more restrictive than the uses specified herein as
22          amended by the agreement, the zoning ordinance or other land use
            regulations shall prevail."  (JX 3.)
23
            The Williamson Act contract contains and identical provision as
24          follows:

25          "Owner shall be limited to the uses specified in the aforementioned
            resolution even though the zoning ordinance or other land use
26          ordinances or regulations authorize different uses. In the event the
            zoning ordinance or other land use ordinances or regulations are or
27          should become more restrictive than the uses authorized by the
            aforementioned resolution and this agreement, the zoning ordinance
28          or other land use ordinances or regulations shall prevail."   (JX 4.)

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

1   |   The language in the resolution and the Williamson Act contract could not be more clear.

2   |   Where the zoning ordinance or other land use ordinances or regulations "are or should become

3   |   more restrictive ... the zoning ordinance or other land use ordinances or regulations shall

4   |   prevail."

5   |   Interpretation of the resolution and the Williamson Act contract is a question of law for

6   |   the Court, not the jury.  The plain meaning of the resolution and the Williamson Act contract is

7   |   that the Zoning Code provisions prevail over any uses authorized by the Williamson Act

8   |   contract.

9   |   **3.   Plaintiffs Have No Property Interest Protected by the Due Process Clause in a Williamson Act Contract**

10  |

11  |   The Schneiders' claim to a due process violation arising out of the Williamson Act

12  |   contract fails as plaintiffs have no property interest in a Williamson Act contract.  *Anselmo v.*

13  |   *Mull,* No. F025520, WL 4863661, p. 28 (E.D. Cal. 2012).

14  |   For these reasons, the Schneiders' assertion that the Williamson Act contract provides

15  |   them with some type of permit or right to conduct sand and gravel mining on the property until

16  |   and unless they consent otherwise, is entirely without merit and judgment must be entered in

17  |   favor of the County.

18  |   **V.   CONCLUSION**

19  |   For the reasons stated above, Defendants County of Sacramento, Dickinson, Sherry and

20  |   Gamel request entry of judgment in their favor and against Plaintiffs on all claims in this action.

21  |   Dated:  July 7, 2017                    LONGYEAR O'DEA AND LAVRA

22  |

23  |                                          By: /s/ Gregory P. O'Dea

24  |                                              Gregory P. O'Dea
    |                                              Attorneys for Defendants
    |                                              Sacramento County, Robert Sherry, Roger
    |                                              Dickinson, and Jeff Gamel

25  |

26  |

27  |   ///

28  |   ///

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                    -74-

1   Dated:  July 7, 2017                        COTA COLE & HUBER LLP

2

3                                      By: /s/ Derek P. Cole
                                          _____
4                                          Derek P. Cole
                                           Co-Counsel for Defendants
5                                          Sacramento County, Robert Sherry, Roger
                                           Dickinson, and Jeff Gamel
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COTA COLE & HUBER LLP
2261 LAVA RIDGE COURT
ROSEVILLE, CALIFORNIA 95661

{DPC/00052406. }                        -75-