1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JOSEPH HARDESTY, et al.,                    No.  2:10-cv-02414-KJM-KJN

12              Plaintiffs,

13        v.                                      ORDER

14    SACRAMENTO METROPOLITAN AIR
      QUALITY MANAGEMENT DISTRICT,
15    et al.,

16              Defendants.

17

18              After a lengthy jury trial, the Hardesty and Schneider plaintiffs obtained a verdict

19    exceeding $100 million against defendant Sacramento County and three defendant county

20    officials based on defendants' actions the jury determined caused the closure of the Hardestys'

21    sand and gravel mine and violated plaintiffs' constitutional rights under the First, Fourth and

22    Fourteenth Amendments.  Defendants' Renewed Motion for Judgment as a Matter of Law

23    ("Renewed JMOL Mot."), ECF No. 537, and Motion for a New Trial ("New Trial Mot."), ECF

24    No. 538, are before the court.  Plaintiffs oppose the motions, ECF Nos. 547-48, and defendants

25    have replied, ECF Nos. 550-51.  The court heard oral argument on the motions on October 31,

26    2017, and then submitted the matters.  *See* ECF No. 554.  After careful consideration, for the

27    reasons below, the court DENIES both motions.

28

                                                1

I.        BACKGROUND

         A.       Factual Background

         Between 2008 and 2012, California and Sacramento County regulators investigated reports that the Hardesty family was operating a sand and gravel mine illegally on the Schneider family's ranch.  As a result of the investigations, regulators ordered the Hardesty and Schneider families to cease the mining operation; the Hardesty and Schneider families eventually complied. What happened during the four years from initial reports to closure of the mine forms the core of the case that went to trial.

         According to plaintiffs, after a long period of regulatory disinterest, government officials were spurred to action not by their discovery of any actual legal violations, but by their desire to appease plaintiffs' competitors as well as state legislators and local politicians motivated by campaign contributions.  Plaintiffs centrally allege the County recognized the Schneiders' historical right to continue mining on their property, also called a "vested right," as early as 1994, but that defendants then revoked that right in 2009 without any process and in violation of the Schneiders' procedural and due process rights.  The regulatory action that followed culminated in the permanent shutdown of the mining operation.  The Schneiders also allege defendants retaliated against them by dramatically increasing in 2012 the financial deposit necessary to continue operating the mine, after they filed this case in 2010.

         Defendants' theory of the case was that the County never revoked plaintiffs' vested right, if they had any such right.  Instead, in a series of hearings in 2010 and 2011, defendants merely determined that plaintiffs had expanded the mining operation beyond its permissible scope.  The subsequent regulatory action, including requiring an amended reclamation plan and greater financial assurances, were required under state law and none of these actions were improperly motivated.

         B.       Procedural Background

         Following extensive summary judgment practice, plaintiffs' case proceeded to trial against the following defendants: Sacramento County; Robert Sherry, a former Planning Director for the County; Roger Dickinson, a former member of the Sacramento County Board of

2

Supervisors; and Jeff Gamel, a former Sacramento County Senior Planner and Aggregate Resources Manager.  After a sixteen-day trial held from February 16 to March 16, 2017, the jury returned a unanimous verdict on plaintiffs' Fourteenth Amendment procedural and substantive due process claims and the Schneiders' additional claim resting on the First Amendment's right to petition clause.  *See* Jury Verdict, ECF No. 469.  The jury found the County, but not the individual defendants, violated plaintiffs' procedural due process rights, and awarded nominal damages of $1 to each set of plaintiffs on these claims.  *Id.* at 2-3.  The jury found all defendants violated plaintiffs' substantive due process rights, and awarded $75 million to the Hardestys and $30 million to the Schneiders.  *Id.* at 4-5.  The jury found the County, but not the individual defendants, violated the Schneiders' right to petition the government for redress, and awarded the Schneiders $30,000 on this claim.  *Id*. at 6.  The jury also found each individual defendant's conduct was "malicious, oppressive, or in reckless disregard" of plaintiffs' rights, and awarded punitive damages in the following amounts: $25,000 against Dickinson, $1 million against Gamel, and $750,000 against Sherry, with Sherry's payment broken down as $500,000 for the Hardestys and $250,000 for the Schneiders.  *Id.* at 7-8.

After plaintiffs had rested their case but before the jury returned its verdict, defendants filed three motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  ECF Nos. 350, 353, 443.  In the first motion, defendants asserted they were entitled to judgment as a matter of law because plaintiffs failed to pursue relief by way of writ in state court, the County Board of Supervisors' decision and Board of Zoning Appeals ("BZA") decisions had preclusive effect, the Hardesty plaintiffs were not entitled to notice related to the Hardestys' procedural due process claims, the Board of Supervisors' hearings complied with procedural due process, and plaintiffs' substantive due process claims failed.  ECF No. 350 at 2-20.

In the second motion, defendants asserted defendants Dickinson and Sherry were not liable for conduct after 2010 and Dickinson was entitled to absolute immunity for his legislative acts and qualified immunity for his executive acts.  ECF No. 353 at 2-4.

In the third and final Rule 50(a) motion, defendants contended plaintiffs lacked a federally protected property interest, plaintiffs received procedural due process, adequate state process precluded finding a violation of procedural due process, the only remedy for a due process violation was to order the process due, the Hardestys were not entitled to notice or alternately received actual notice of certain hearings, plaintiffs failed to exhaust remedies in state court, board determinations were entitled to preclusive effect, plaintiffs' substantive due process claims failed, all defendants were entitled to qualified immunity and Dickinson was entitled to absolute immunity for some of his conduct, no evidence permitted a reasonable jury to conclude defendants retaliated against plaintiffs, no evidence supported awarding punitive damages, and defendants are entitled to judgment as a matter of law on a Williamson Act Claim. ECF No. 443 at 17-88. These three motions preserved defendants' right to file a renewed motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a)-(b).

On July 7, 2017, defendants filed a renewed motion for judgment as a matter of law and, in the alternative, for a new trial. *See* Renewed JMOL Mot., ECF No. 537; New Trial Mot., ECF No. 538. As noted, plaintiffs jointly opposed the motions. Renewed JMOL Opp'n, ECF No. 547; New Trial Opp'n, ECF No. 548. Defendants filed replies. Renewed JMOL Reply, ECF No. 550; New Trial Reply, ECF No. 551. On October 31, 2017, the court heard both motions: Derek P. Cole, Gregory P. O'Dea and Mark O'Dea appeared for defendants; R. Paul Yetter, Christian J. Ward and George D. Robertson appeared for the Hardestys; and Glenn W. Peterson appeared for the Schneiders. H'rg Mins., ECF No. 554; *see* Hr'g Tr., ECF No. 556.

II.      LEGAL STANDARD

A.      Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) governs renewed motions for judgment as a matter of law ("JMOL"), which may be raised only after the court denies a Rule 50(a) motion for judgment made during trial. Rule 50(b) provides in pertinent part that the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 52(b)(1)-(3). In rendering a Rule 50 motion decision, the court views the evidence in the light most favorable to the non-moving party and

4

draws all reasonable inferences in favor of the non-moving party. *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (citing *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)). The court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

A Rule 50(b) motion for JMOL is not treated as a separate motion; instead, it is a renewed Rule 50(a) motion. *Go Daddy Software*, 581 F.3d at 961. Before the court submits a case to the jury, a party must make a Rule 50(a) motion for JMOL. *Id.* If the court denies the motion, and if the jury returns a verdict against the movant, the movant may renew its motion under Rule 50(b). *Id.* As that motion is a renewed motion, it must be limited to the same grounds as asserted in the prior Rule 50(a) motion; a party cannot properly "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id.* (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)). The Ninth Circuit strictly construes the procedural requirements of Rule 50, because failing to move for JMOL before submission to the jury may "lull the opposing party into believing that the moving party has abandoned any challenge to the sufficiency of the evidence, and thereby prejudice the opposing party." *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 887 (9th Cir. 2002) (quoting *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1346 (9th Cir. 1986)). Accordingly, a party completely waives an issue that it failed to first raise in a Rule 50(a) motion. *Wei Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003).

"The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). The verdict will be upheld if it is supported by "substantial evidence." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009)

5

(international quotations omitted), "even if it is also possible to draw a contrary conclusion." *First Nat'l.*, 631 F.3d at 1067 (international quotations omitted).  Judgment as a matter of law is appropriate, however, when the jury "could have relied only on speculation to reach its verdict." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009); *id.* (citing *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680-81 (9th Cir. 1985) ( reasonable inference "cannot be supported by only threadbare conclusory statements instead of significant probative evidence")).

B.     Motion for New Trial

The court may grant a motion for a new trial for any historically recognized grounds for permitting a new trial. Fed. R. Civ. P. 59(a)(1)(A); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  A grant may be based on claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  The Ninth Circuit has held that a trial court may grant a new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000); *cf. Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 845-46 (9th Cir. 2014) ("Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice.").

Courts hold movants to a lower standard of proof on motions for a new trial than they do on motions for judgment as a matter of law.  Thus, even if the court declines to grant judgment as a matter of law, it may order a new trial under Rule 59; in other words, a verdict may be supported by substantial evidence, yet still be against the clear weight of the evidence. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987).  Unlike a motion for judgment as a matter of law, in addressing a motion for a new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.*  Instead, if, "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction

6

that a mistake has been committed," then the motion should be granted. *Id.* (quoting 11 C.

Wright & A. Miller, Federal Practice and Procedure § 2806, at 48-49 (1973)).

However, a motion for new trial should not be granted "simply because the court would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *United States v. 40 Acres,* 175 F.3d 1133, 1139 (9th Cir. 1999). When a motion for a new trial is based on insufficiency of the evidence, "a stringent standard applies" and a "new trial may be granted . . . only if the verdict is against the great weight of the evidence" or "it is quite clear that the jury has reached a seriously erroneous result." *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984) (internal quotations and citations omitted). Further, the court should uphold a jury's award of damages unless the award is based on speculation or guesswork. *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992). Finally, the "denial of a motion for a new trial is reversible 'only if the record contains no evidence in support of the verdict' or if the district court 'made a mistake of law.'" *Go Daddy Software, Inc.*, 581 F.3d at 962 (citing *Molski*, 481 F.3d at 729).

Because defendants move both for renewed judgment as a matter of law and a new trial on many of the same issues, the court applies the standards applicable to each motion respectively, with its analysis organized by each claim implicated by the defense motions.

III.     SUBSTANTIVE DUE PROCESS

Defendants contend plaintiffs did not offer sufficient evidence to prove they possessed any liberty or property interests protected by the substantive due process clause of the Fourteenth Amendment. Renewed JMOL Mot. at 5-9. Defendants also contend the County's actions were rational, and plaintiffs failed to produce sufficient evidence to permit the jury to find the County's actions lacked a rational basis, a necessary finding to establish a substantive due process violation. *Id.* at 10-30.

The Due Process Clause prohibits government officials from arbitrarily depriving a person of her constitutionally protected liberty or property interests. *See, e.g.*, *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025-26 (9th Cir. 2007). But "only 'egregious official conduct can be said to be arbitrary in the constitutional sense': it must amount

7

to an 'abuse of power' lacking any 'reasonable justification in the service of a legitimate governmental objective.'" *Shanks*, 540 F.3d at 1088 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *accord N. Pacifica*, 526 F.3d at 484 ("The irreducible minimum of a substantive due process claim challenging land use regulation is failure to advance any governmental purpose."). Only conduct that "shocks the conscience" violates the Due Process Clause. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987).

In their motions, defendants dispute: (1) the existence of a protected liberty interest; (2) the existence of some property interests; (3) the sufficiency of the evidence to support a finding that these two interests are present in this case; and (4) the existence of a vested right to conduct surface mining operations. The court addresses these four disputes below.

A.     Liberty Interest and Waiver

Defendants contend no plaintiff possessed a liberty or property interest. Renewed JMOL Mot. 6-9. Plaintiffs contend defendants have waived this argument. Renewed JMOL Opp'n at 5-7. The court agrees; defendants waived this argument as explained below.

The right to "follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of" substantive due process. *Greene v. McElroy*, 360 U.S. 474, 492 (1959). Plaintiffs contend defendants waived the claim that plaintiffs lacked any protectable liberty interests by not raising the claim in their original motions for judgment as a matter of law, as required by Federal Rule of Civil Procedure 50. Renewed JMOL Opp'n at 5-8. As discussed above, a Rule 50(b) motion is limited to the grounds first raised before the matter was submitted to the jury in a Rule 50(a) motion, and a party waives any issue not first asserted in a Rule 50(a) motion. *GoDaddy Software*, 581 F.3d at 961; *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003) ("The failure to raise this issue prior to the return of the verdict results in a complete waiver, precluding our consideration of the merits of the issue.").

Because defendants addressed only a substantive due process interest in a vested right to mine in one of their Rule 50(a) motions, ECF No. 443 at 17-30, defendants have waived the claim that plaintiffs lacked any cognizable liberty interest, including one based on their right

to pursue a chosen occupation.  Defendants had notice at summary judgment that the court

specifically found the Constitution protects two rights the plaintiffs asserted: "The Hardestys and

Schneiders claim the County defendants stripped them of their vested right to operate a surface

mine, which deprived them of their right to pursue their chosen profession and to devote their

land to a legitimate use.  The Constitution protects both of these interests."  ECF No. 283 at 65.

Further, defendants filed three Rule 50(a) motions, supported by more than 100 pages of briefing.

*See* ECF Nos. 350, 353, 443.  Defendants had ample opportunity to raise and preserve any issues

in their Rule 50(a) motions and the record reflects they took full advantage of that opportunity.

Defendants did not claim in their Rule 50(a) motions that plaintiffs lacked any protectable liberty

interests. *See* ECF Nos. 350, 353, 443 at 17-30 (asserting only that plaintiffs have no "federally

protected property interest").  Accordingly, defendants have waived the argument that plaintiffs

lacked any cognizable liberty interest.

In reply, defendants cite *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir.

2013), and *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004), to argue waiver

rules apply only to "the assertion of new *claims*, not new *arguments* regarding a claim that was

already asserted."  Renewed JMOL Reply at 24-25 (emphasis in original).  But neither case

addresses Rule 50 motions.  *See Pallares-Galan*, 359 F.3d at 1095 (addressing waiver of

appellate claims to determine whether to apply the plain error or the de novo standard of review);

*Thompson*, 70 F.3d at 1098 (addressing waiver of new arguments albeit in habeas context).  Nor

does either case account for the importance of first raising issues in the Rule 50(a) motion.  *See,*

*e.g.*, *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (explaining one purpose

of first raising issues in a Rule 50(a) motion is that "it calls to the court's and the parties' attention

any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity

to correct them"); *Janes*, 279 F.3d at 887 (observing that "failing to make a motion for JMOL at

the close of *all* the evidence may lull the opposing party into believing that the moving party has

abandoned any challenge . . . .") (original emphasis, internal quotation marks and citation

omitted).

Defendants themselves proposed instructing the jury that "the Constitution protects plaintiffs' interests in the right to pursue their chosen profession," further evincing defendants' waiver of this argument. ECF No. 317 at 8. Their proposed instruction also stated "plaintiffs allege that defendants . . . deprived them of their Substantive Due Process Rights under the Fourteenth Amendment to the Constitution by stripping them of their right to operate a vested mine, which deprived them of their right to pursue their own chosen profession." *Id.* Defendants cannot now complain that plaintiffs lacked the right to stand on a claim based on their asserted right to pursue their chosen profession. Despite objecting to a draft final jury instruction on substantive due process, ECF No. 427 at 35, defendants did not object to the court's instructing the jury "that the Constitution protects plaintiffs' interests in the right to pursue their chosen occupation or profession." *Id.*; *see* ECF No. 461 at 23-24 (final jury instruction given, stating "the Constitution protects a plaintiff's legitimate interests in his or her property and in the right to pursue his or her legitimate, chosen occupation or profession").*see United States v. Perez*, 116 F.3d 840, 845 n. 7 (9th Cir.1997) (holding jury instruction issues may be waived by defendant's attorney); *United States v. Baldwin,* 987 F.2d 1432, 1437 (9th Cir.1993) ("Where the defendant himself proposes the jury instruction he later challenges on appeal, we deny review under the invited error doctrine."); *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1493 (9th Cir. 1986) ("A party who requests an instruction invites any error contained therein and, absent an objection before the instruction is given, waives appellate review of the correctness of the instruction."); *United States v. Sumner*, 125 F. App'x 118, 120 (9th Cir. 2005) (denying review under invited error doctrine where defendant's counsel proposed jury instruction that mirrored model jury instruction defendant claimed on appeal was error).

Because the court instructed the jury using wording that was substantively similar to that defendants proposed, defendants have waived their argument based on liberty interest under Rule 50 as well as the invited error doctrine.

B.    Property Interest and Waiver

Defendants also contend no plaintiff possessed a protected property interest. Renewed JMOL Mot. 6-9. Plaintiffs contend defendants also have waived this argument.

10

1    Renewed JMOL Opp'n at 5-8.  Generally, '[t] he right of [an owner] to devote [his] land to any

2    legitimate use is properly within the protection of the Constitution.'"  *Harris v. Cty. Of Riverside*,

3    904 F.2d 497, 503 (9th Cir. 1990) (quoting *Washington ex rel. Seattle Title Trust Co. v. Roberge*,

4    278 U.S. 116, 121 (1928)).

5                Defendants have waived their claim that the Hardestys lacked a property interest

6    independent of the Schneiders.  Defendants argued in their Rule 50(a) motion only that the

7    Hardestys were not entitled to notice under the Surface Mining and Reclamation Act (SMARA)

8    based on the Hardestys' inability to cure a zoning violation.  ECF No. 443 at 55-59.  Defendants'

9    claims, that plaintiffs lacked a property interest because they "have not applied for and been

10   denied a conditional use permit" or otherwise failed to comply with zoning laws, ECF No. 443 at

11   17-30, do not logically extend to the claim that the Hardestys lacked a property interest

12   independent of the Schneiders because contending only one party can have that property interest

13   is distinct from contending only one party could have had a property interest.  Contending neither

14   party had a property interest in the Rule 50(a) motion would not have "call[ed] to the court's and

15   parties' attention" the "alleged deficiencies in the evidence" about the Hardestys' lacking a

16   separate property interest distinct from the Schneiders that defendants now raise.  *Freund*, 347

17   F.3d at 761; *see Go Daddy*, 581 F.3d at 962-63.  Defendants waived this new claim.

18               But defendants have not waived their claim that the Schneiders lacked a property

19   interest absent lead agency approval.  Defendants raised the following argument in their Rule

20   50(a) motion: "Plaintiffs' claim of a vested right does not create an entitlement to mine without

21   complying with zoning laws."  ECF No. 443 at 17-19.  This argument logically extends to

22   defendants' Rule 50(b) argument that the Schneiders not only exceeded the scope of any vested

23   right they might have, but also that the Schneiders could not act upon such a right until a lead

24   agency approved their reclamation plan, meaning the Schneiders lacked a property interest absent

25   that approval.  Renewed JMOL Mot. at 18-22.  Thus, the court will address the merits of this

26   argument.

27               That said, defendants' claim fails on the merits.  Defendants assert the Schneider

28   plaintiffs "could not have demonstrated a valid right to mine in any manner contrary to" their

reclamation plan because "even vested-right mining operations are subject to [a statutory] prohibition on substantially deviating from a reclamation plan *until* lead agency approval is obtained."  Renewed JMOL Mot. at 7 (original emphasis, citing Cal. Pub. Res. Code § 2777).  However, as explained immediately below, *infra* III.C., the evidence at trial permitted the jury to infer that the vested right recognized in the 2002 reclamation plan as attaching to the Schneider Historical Mine (SHM ) covered the entire SHM tract without limits on production method or production amount.  JX099 Exs. A-G (maps showing areas covering almost all land within the perimeter of the SHM tract and maps showing where mining was projected to occur in the future).  In reply, defendants appear to implicitly concede this argument with respect to lead agency approval in asserting plaintiffs "could never have had valid expectations to mine SHM outside of the mining use recognized in the 2004 County staff letter to Jay Schneider or outside of the parameters established in the reclamation plan approved in 2002."  Renewed JMOL Reply at 27.  Moreover, "[v]ested rights [in mining], if established and continued, generally cannot be conditioned."  *Calvert v. Cty. of Yuba*, 145 Cal. App. 4th 613, 626 (2006).  In any event, the mandatory language of California Public Resources Code section 2776—that a person "shall be deemed to have vested rights" when meeting certain requirements—undermines the assertion that plaintiffs required lead agency approval for their asserted property rights.  Unless defendants could show an impermissible expansion of the property rights at issue here, or a "substantial deviati[on] from" the 2002 reclamation plan, *see infra* III.D., the jury's finding of a property right is supported by substantial evidence.

C.    Evidence of Liberty or Property Interests

Even assuming waiver of some of its Rule 50 arguments, defendants maintain "the [c]ourt does still have authority to rule" given defendants' motion for a new trial.  Hr'g Tr.at 20:1-15.  The court therefore examines whether the verdict respecting plaintiffs' liberty or property interests was against the clear weight of the evidence.  *Passantino*, 212 F.3d at 510 n.15.

1.    Liberty Interest in Pursuing a Chosen Occupation

The clear weight of the evidence admitted at trial supports the conclusion plaintiffs had liberty interests in pursuing their chosen occupations.  Evidence shows the Hardestys had a

12

liberty interest in their chosen occupation as SHM mine operators, *e.g.*, Rep.'s Tr. (RT)1672:13-1675:13, 1677:20-24, 1678:3-6 (Hardesty Test.), and the Schneiders had a liberty interest in their occupation of owning and maintaining their ranch property and selling aggregate from their land to the mining operator and customers. *See, e.g.*, RT 1266:8-1267:6; 1272:23-1274:5 (Schneider Test.). As part of pursuing their occupation, the Schneiders handled issues such as establishing recognition of their vested right to mine, negotiating the reclamation plan and filing annual reports. *E.g.*, JX021; JX099; RT 1294:18-22, 1373:20-1374:20, 1443:25-1444:1, 1499:11-16 (Schneider Test.). The jury heard unrebutted testimony that selling mining aggregate to a mining operator has been the Schneiders' family plan "since 1935." RT 1273:14-1274:4 (Schneider Test.). And that sale of aggregate was "fundamental to the survival of the ranch" because "the mining income supplemented the income of the older generation and put the infrastructure back into the ranch to keep the building and the roads and everything repaired." *Id.* 1285:2-22.

The court finds the clear weight of the evidence supports a jury determination that plaintiffs had liberty interests in pursuing their chosen occupations. *See* ECF No. 469 at 4 (jury verdict finding violation of Hardesty and Schneider plaintiffs' substantive due process rights, which requires finding a federally protected liberty or property interest); ECF No. 461 at 23-24 (final jury instructions requiring a finding of either a "liberty or property interest protected by the Constitution").

### 2. Property Interest as Operators and Landowners

The clear weight of the evidence also supports plaintiffs' claim to have property interests in the land as mine operators and for the Schneiders also, as landowners. For instance, the Hardestys invested 30 years and millions of dollars into conducting their mining operations, re-investing earnings, at times millions of dollars, back into the operation. RT 1673:9-1674:8, 1684:4-18 (Hardesty Test.); 1351:18-24, 1354:11-14 (Schneider testifying to the "well developed financial relationship" between the Schneiders and the Hardestys and the Schneiders' informed belief that the Hardestys would have continued their mining operation well into the future). California Public Resources Code section 2776 supports the existence of a property right belonging to the Hardestys because that statute recognizes vested rights for any person "to

13

conduct surface mining operations," not just landowners, and it vests that right in a person who

has "diligently commenced surface mining operations and incurred substantial liabilities for work

and materials necessary for the surface mining operations." *See Calvert*, 145 Cal. App. 4th at

630-31 (discussing "property rights" that "have been founded and deemed vested . . . under

SMARA").

        The court finds the clear weight of the evidence supports plaintiffs' claim to hold

property interests as mine operators, and the Schneiders' additional claim to a property interest as

landowners.

        3.        <u>Property Interest in Goodwill of Mining Business.</u>

        The clear weight of evidence shows the Hardestys also had a property interest in

the goodwill of their mining operation. "The goodwill of one's business is a property interest

entitled to protection; the owner cannot be deprived of it without due process." *Soranno's Gasco,*

*Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). Here, plaintiffs presented evidence of Joe

Hardesty's building up his mining business over 30 years and accumulating "over 300

customers." RT 1677:20-1678:6 (Hardesty Test.). Hardesty developed "a good working business

relationship" with the Schneiders and their ranching business. *Id.* 1678:19-24. Furthermore, the

Hardestys were positioned to meet high demand during the economic boom of the mid-2000s. *Id.*

1679:4-7. Hardesty testified credibly that he developed new techniques that allowed him to get

the sand and gravel cleaner more easily and otherwise grow the business, improving its efficiency

and allowing for sale of additional products. *Id.* 1680:15-17; 1688:19-1689:1. According to

Hardesty, he "had so many" customers because they were satisfied with the work he did for them.

*Id.* 1688:3-5. This evidence supports a jury determination that the Hardestys held a property

interest in the goodwill of their mining operation. *See* ECF No. 469 at 4 (jury verdict finding

violation of Hardesty and Schneider plaintiffs' substantive due process rights, which requires

finding a federally protected liberty or property interest); ECF No. 461 at 23-24 (final jury

instructions requiring a finding of either a "liberty or property interest protected by the

Constitution").

1          4.      Property Interest in Devoting Land to Legitimate Uses

The clear weight of the evidence cited above supports the finding of a property interest in devoting land to legitimate uses as well—notably here, mining operations. Courts have long recognized a property interest in devoting one's land to a legitimate use. *See, e.g.*, *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121 (1928); *Harris v. County of Riverside*, 904 F.2d 497, 503 (9th Cir. 1990. And "[m]ineral rights have long been regarded as an interest in land" under California law. *CCPA No. 1 v. Cty. of Sonoma*, 122 Cal. App. 4th 1614, 1634 (2004).

D.      Meaning of Vested Right, Nonconforming Use, and Scope of Right

Defendants contend they had a legitimate government objective in addressing an impermissibly expanding nonconforming use at the SHM. Renewed JMOL Mot. at 17-19. Plaintiffs contend substantial evidence supports and the clear weight of the evidence is not against the finding that plaintiffs had a vested right to mine the entire SHM tract, and that vested right did not limit method or production levels. Renewed JMOL Opp'n at 23-29. Plaintiffs are correct. As the first step in explaining this conclusion, the court explains the nature of a vested right to mine under California law.

In California, a person has a "vested right to conduct surface mining operations" if, "prior to January 1, 1976, the person has, in good faith and in reliance upon a permit or other authorization, if the permit or other authorization was required, diligently commenced surface mining operations and incurred substantial liabilities for work and materials necessary for the surface mining operations." Cal. Pub. Res. Code § 2776(a). This vested right requires no permit "as long as no substantial changes are made in the operation except in accordance with this chapter." *Id.* A surface mining operation with vested rights must still obtain approval of a reclamation plan and provide financial assurances. *Calvert v. Cty. of Yuba*, 145 Cal. App. 4th 613, 617 (2006).

As recognized by the California Court of Appeals, "In light of the state and federal constitutional takings clauses, when zoning ordinances or similar land use regulations are enacted, they customarily exempt existing land uses (or amortize them over time) to avoid

questions as to the constitutionality of their application to those uses." *Id.* at 623 (citing *Hansen Bros. Enterp., Inc. v. Bd. of Supervisors*, 12 Cal. 4th 533, 551-52 (1996)). These "exempted uses are known as nonconforming uses and provide the basis for vested rights to such uses." *Id.* (citing *Hansen Bros.*, 12 Cal. 4th at 551-52).

Here, in 1994, the Sacramento County Senior Planner, Richard Maddox, accepted evidence of a vested right to mining on the SHM from Jay Schneider. JX021. The county did not require Schneider to obtain a permit, but it did require a reclamation plan and financial assurances for all mining activities that had occurred since January 1, 1976. JX025; *see* JX072 (inter-department correspondence, dated December 28, 2001, from Environmental Coordinator Dennis Yeast stating, "Due to a long established practice of mining the County and State have formally recognized Schneider's vested right to mine without approval of a Use Permit."); JX071 (inter-department correspondence, dated November 13, 2001, from the Office of the County Counsel to Mr. Yeast, the Environmental Coordinator, stating, "Because the Schneider mine has a vested right to conduct mining, a use permit is not required under the Surface Mining and Reclamation Act (SMARA).").

The County Board of Supervisors approved a final reclamation plan for SHM November 2002, and the plan has not been amended since. JX099.

The reclamation plan describes the mining operation this way:

> Material is excavated and classified, processed and stockpiled in anticipation of market demand and seasonal considerations. When the stockpiles are sufficiently diminished to justify further excavation or when there is an actual or anticipated market demand for a particular material, then such material is excavated, classified or processed as necessary and prudent, thus avoiding unnecessary excavation.

*Id.*, Ex. 099 at 5. The plan anticipated a "low annual average of sand and gravel mined," so reclamation was determined to proceed in annual phases. *Id.* It also anticipated mining would proceed in three phases. *Id.* The first area would be mined between 2003 and 2023, the second between 2023 and 2063 and the third after 2063. *Id.*

Defendants contend they had a legitimate government objective in addressing nonconforming use at the SHM based on three impermissibly expanding uses: (1) "mining

16

outside areas intended to be mined when the use became nonconforming"; (2) "employing new

mining methods or activities not used at the inception of the nonconforming use"; and

(3) "increasing production levels." Renewed JMOL Mot. at 17. The court addresses these three

contentions below.

1.    <u>Mining Outside the Area of the Original Nonconforming Use</u>

Defendants contend plaintiffs impermissibly expanded their nonconforming use by

mining outside areas intended to be mined when the use became nonconforming—that is, when

the use no longer was inconformity with a zoning restriction. Renewed JMOL Mot. at 17-18; *see*

*Hansen Bros.*, 12 Cal. 4th at 540 n.1. Plaintiffs insist the jury "was entitled to understand"

evidence that plaintiffs' vested right encompassed "all mining activity on the entire [SHM] tract."

Renewed JMOL Opp'n at 25. A jury finding that plaintiffs' vested right to mine encompassed the

entire SHM tract is not against the clear weight of the evidence, given the state of the law.

Nonconforming mining uses are subject to the "diminishing asset doctrine," which permits

mining uses to expand into new areas as long as their owners intended to mine these new areas

when the mining uses became nonconforming. *Hansen Brothers*, 12 Cal. 4th at 553. The

diminishing asset doctrine requires: (1) the owners' manifested objective intentions to mine the

new areas; and (2) those intentions existing at the time their uses became nonconforming. *Id.* As

the California Supreme Court recognized, "'[s]uch a business must operate, if at all, where the

resources are found.' If it may not expand, it cannot continue." *Id.* (citing *Lockard v. City of Los*

*Angeles*, 33 Cal.2d 453, 467 (1949)). "Were the diminishing asset doctrine inapplicable, a mining

enterprise would be required to immediately initiate mining on all areas of its property lest, under

a subsequent zoning change, its right to further mining be extinguished." *Id.* at 559.

Defendants concede that "the historical record concerning what was determined

with respect to SHM in 1994 was, at best, ambiguous." Renewed JMOL Mot. at 17. Against this

backdrop, this is precisely the type of determination a jury was entitled to make as the factfinder.

Although defendants observe that a 1994 letter from Richard Maddox to Jay Schneider (JX021)

referenced only two of the SHM parcels, comprising "only 300 acres of the much larger SHM

property," Renewed JMOL Mot. at 17-18, the 1994 letter also refers broadly to the "Gravel

Mining Operation and "the mining operation." The jury was entitled to read this letter as encompassing all mining activity at SHM. On cross-examination, defendant Jeff Gamel acknowledged the lack of limitations in the 1994 letter, discussed more fully below. *See* RT 2060:25-2061:11 (agreeing that nothing in 1994 letter limited amount of production at SHM, the quantity of ore or gravel SHM could develop, the type of excavation or mining operation at SHM, or nothing that would limit the various kinds of aggregate, sand, gravel, pebbles, etc.). His testimony as to a lack of limitations also permitted the jury to conclude the vested right here extended to the entirety of SHM.

Additionally, the approved 2002 reclamation plan arguably contemplates expansion into new areas at the time the mining uses became nonconforming. *See* JX099. Jay Schneider testified to his understanding that the County "completely acknowledged our vested rights." RT 1319:4-15. Evidence before the jury reflected the County's understanding was similar. *E.g.*, JX141 (e-mail from Aggregate Resources Manager Mike Winter describing 2002 reclamation plan proceeding as "the hearing to declare the mine's vested status and to approve the reclamation plan"); PX568 at 145:21-24 (BZA hearing transcript in which County Counsel stated the "Reclamation Plan and that issue of what is vested pursuant to SMARA was decided at the time that the current Reclamation Plan was approved by the Board of Supervisors in 2002.").

Maps attached to the 2002 reclamation plan also permitted the jury to infer plaintiffs' vested right to mine at the SHM encompassed the entire tract, including expansion into new areas. These maps featured a bold-dotted line for the entire "PERIMETER OF THE SCHNEIDER HISTORIC MINING TRACT" and show areas covering almost all land within the perimeter of the SHM tract. JX099, Exs. A-G. Additionally, other maps show areas where mining was projected to occur in the future. *Id.*, Exs. F-G; *see also, e.g.*, JX071 (internal memorandum from Michele Bach, Supervising Deputy at Office of County Counsel, to Dennis Yeast, Environmental Coordinator, noting 2002 reclamation plan showed areas to be mined in the future); RT 387:8-13, 400:10-17 (testimony of plaintiffs' expert Bly-Chester about reclamation plan maps distinguishing "pre-1976 mined areas" from "things that had intended to be mined" and that "the Hardesty operations" were "[c]ompletely within" areas covered by the 2002

reclamation plan); RT 674:17-675:5 (defendant Sherry testimony acknowledging reclamation plan map shows areas that have been mined and areas not yet mined).

Defendants' own lack of clarity about the maps associated with the 2002 reclamation plan supports the conclusion that a jury finding that plaintiffs' vested right encompassed the entire SHM tract was not against the clear weight of the evidence. For instance, defendant Dickinson testified that "[i]t looks like a good portion of that map has been shaded" when asked if the shaded areas of the map looked limited to Dickinson. RT 1196:19-21. Although Dickinson testified that he "would eyeball it at less than half," Dickinson also testified that he did not know "what it [the shading] means." *Id.* 1196:22-1197:1. Defendant Gamel testified the maps were "very confusing because of the color overlay." RT 2063:17-19. And defendant Sherry testified that he "can't tell" and did not "know what the colors mean" in reference to maps with legends indicating estimates as to where mining likely would occur in the next 20, 40, and 100 years at the time the plan was adopted. RT 701:6-704:20.

To support their contention that plaintiffs impermissibly expanded their nonconforming use, defendants refer to evidence that County staff had referred to SHM as a "small scale operation." Renewed JMOL Mot. at 19 (citing JX084 at 6:22). But the jury also heard and saw evidence that the Hardesty mining operation remained a relatively "small operation" compared with competitors such as Teichert, Vulcan and Granite. *Compare, e.g.*, JX 484 at 24 (reported tonnage level for SHM at above 610,000 tons per year), *with* JX671 at 31-33 (describing Teichert quarry in Sacramento County producing 135 million tons from pits up to 200 feet deep and Granite quarry producing 354 million tons from a pit up to 400 feet); RT 508:9-509:1, 515:2-516:6 (Gamel Test.); RT 551:6-16 (Wheatley Test.). Thus, the jury could reasonably infer the SHM mining operation was still a relatively small-scale operation despite any expansion within the SHM tract.

In support of their impermissible expansion contention, defendants also observe "[t]he historical information Jay Schneider had provided the County prior to the 1994 letter did not expressly reference any intent to mine" the area near the Cosumnes River, "well north of Meiss Road," or "to mine the area to the extent it was being excavat[ed] by 2010." Renewed

JMOL Mot. at 18.  Defendants also point to evidence of plaintiffs' excavating new pits near the Cosumnes River, north of Meiss Road.  *Id.* (citing JX 484 at 22, showing no pit near the river in 2004, and JX 484 at 23, showing pit as of 2007).  Defendant Gamel also testified to his opinion that some of plaintiffs' mining in 2009 was not located in the area set out for mining between 2002 and 2022 in the 2002 Reclamation plan.  RT 2164:18-2165:17; *see* JX099 at 15-16.  But none of this evidence necessarily undercut the substantial evidence elsewhere in the record-- notably, the 2002 reclamation plan maps and related testimony--, as discussed above, that plaintiffs' vested right included the areas plaintiffs mined in 2009 at the time they were mining. Nor are Gamel's opinion combined with a lack of historical evidence originally submitted by Schneider against the clear weight of the evidence in support of the verdict here:  the County's 1994 letter spoke broadly about the SHM tract, the 2002 reclamation plan and its various maps were before the jury as evidence, and defendants themselves testified to a lack of clarity about the various maps in the 2002 reclamation plan.  In sum, the evidence defendants cite does not shift the clear weight of the evidence.

Altogether, there was substantial evidence to support a jury finding that the plaintiffs' vested right to mine encompassed the entire SHM tract.  And in light of defendants' own uncertain testimony and the other evidence of record, it is not for this court to override the jury's verdict given that the jury's finding that the vested right to mine encompassed the mining plaintiffs engaged in at the time was not against the clear weight of the evidence.

2.    Employing New Mining Methods

Defendants rely on *Endara v. City of Culver City*, 140 Cal. App. 2d 33, 38 (1956), to assert that "[n]ew types of mining methods added after the nonconformity are prohibited," including as relevant here plaintiffs' excavating riverbed aggregate near the banks of the Cosumnes River.  Renewed JMOL Mot. at 17 n.14, 18.  Here again, it is the court's job to review the evidence of record in light of the law, rather than to write on a clean slate.  Performing this exercise, the court concludes that substantial evidence supports a finding that the vested right incorporates mining methods in place through 2010.

As noted above, Sacramento County's 1994 letter stated that information submitted by Jay Schneider "has been accepted as evidence of vested interest and therefore, we are not requiring a use permit for the mining operation." JX021. That letter does not impose any limitations on production methods. *Id.* In fact, Jay Schneider informed the county by submitting historical drill logs (JX001), with historical materials submitted by letter (JX011), that mining methods at SHM had historically varied and might change depending on technological and market conditions; at times in the 1940s, mining areas were located along the river and river terrace. RT 1302:22-25, 1308:3-15, 1312:21-1313:16. Although defendants refer to this historical material as providing only "vague indications," Renewed JMOL Mot. at 18, the jury heard Schneider's testimony and the historical material was admitted into evidence; it was for the jury to weigh the information in the context of the complete trial record. Defendant Gamel also testified the 1994 letter contained nothing that would limit the type of excavation or mining operation on SHM. RT 2061:6-8. Nor does the 2002 reclamation plan contain limits on the type of mining. JX099. Taking all of the evidence of record into account, the clear weight of the evidence does not contravene a finding that plaintiffs' vested right incorporates the mining methods plaintiffs used through 2010.

### 3. Increasing Mining Production Levels

Substantial evidence supports the jury's finding that plaintiffs' vested right included varying production levels based on demand. The defendants' argument that plaintiffs' increased production in subsequent years was an impermissible expansion of a nonconforming use is unavailing. *See* Renewed JMOL Mot. at 18-19.

According to defendants, "nonconforming mining uses are only entitled to 'gradual and natural' increases in production" to "meet the demands of population growth." Renewed JMOL Mot. at 17 (citing *Hansen Brothers*, 12 Cal. 4th at 573). That plaintiffs expanded, enlarged, relocated, and increased annual production by over ten times over fifteen years was not disputed. JX287; JX483; JX484; DXA at 80. The dispute, however, is whether this increase was such that it exceeded plaintiffs' vested right. Defendants argue plaintiffs increased production too rapidly, specifically pointing to the increase from 10,000 tons in 1995 to

"over 240,000 tons" by 2007. Renewed JMOL Mot. at 18-19. Defendants cite Jay Schneider's trial testimony that the SHM operation historically had produced between 5,000 and 25,000 tons per year. RT 1477:20-1478:12. Additionally, defendants note when plaintiffs sought approval of their reclamation plan in 2002, the mining operation was described as a "small scale tailing mining operation"— a mining operation separating the valuable fraction of an ore from the uneconomic fraction—that at the time mining ceased there would be at most a "maximum of 4.5 acres" per year of disturbed area and from which they expected "low annual production." JX080 at 5, 11. Defendants contrast those stated 4.5 acres per year with an inspection finding a total of 90 acres disturbed as of 2009 and 176 acres disturbed as of 2010, JX526 at 8, three to five times the 4.5 acre yearly projection.

Yet other substantial evidence supported a jury finding that the production increase was limited to meeting population increases such that the increase remained within the scope of plaintiffs' vested right. Much of the evidence shows no volume-based limitation on the vested interest. For instance, as noted above as well, evidence permitted the jury's finding that the vested right was not limited in production levels except by the boundaries of the SHM tract. The 1994 letter from the County's Richard Maddox describing the vested right says nothing at all about production volume. JX021. Defendant Gamel conceded it was correct that nothing in the 1994 letter limited the amount of production from the SHM, nothing limited the quantity of ore or gravel that the mine could develop and nothing would limit the various kinds of aggregate. RT 2060:25-2061:11. Schneider testified that the historical use of SHM showed variation in how much "material was excavated in a short period of time." RT 1302:22-25. Intensity in mining also varied over time. *Id.* 1308:6-15, 1314:7-1315:23. Even the 2002 reclamation plan does not state a limit on the quantity of production. JX099. In fact, the reclamation plan specifically observes, ""Material is excavated and classified, processed and stockpiled in anticipation of market demand and seasonal considerations." JX099, Ex.099, at 5.

Furthermore, as stated in *Hansen Brothers*, 12 Cal. 4th at 573, "where increased population creates an increased demand for the aggregate used in road construction, an increase in production to meet that demand would not be construed as an enlargement or intensification of

22

the use." *See id.* ("Neither an increase in the number of patrons or in the volume of goods sold [for a hypothetical grocery store operating as a lawful, nonconforming use] would be considered an enlargement or intensification of the use").  Between 2003 and 2008, demand for mining aggregate increased.  JX131, 139, 157, 230, 341.  The jury heard testimony and received evidence that there was a critical shortage of local aggregate for Sacramento County.  RT 395:11-396:2 (Bly-Chester Test.); RT 505:1-24 (Gamel Test.).  On March 23, 2009, Gamel, who was then Aggregate Resources Manager for the County, made a presentation to the Board of Supervisors about the "Importance of Aggregate Materials," especially the importance of having a local supply, and noted the critical shortage of local supply in the Sacramento region, which he reported was "Less than 10% of the 50-Year Need."  JX671.  In this same presentation, Gamel urged the County to prioritize huge quarries operated by large operators Teichert, Granite and other participants who entered into a funding agreement with the County to meet the critical need for local aggregate.  *Id.* at 30-32; RT 507:1-10 (Gamel Test.).

This substantial evidence supports the implicit jury finding that the vested right included varying production levels based on demand, and the clear weight of the evidence is not against such a finding.  *See* ECF No. 469 at 4 (jury verdict finding violation of Hardesty and Schneider plaintiffs' substantive due process rights, which requires finding a federally protected liberty or property interest); ECF No. 461 at 14 (final jury instruction stating "[t]he Schneiders' claimed right to mine or allow mining on their land is based on their ownership of the land and the history of mining on the land, which they say gave rise to the vested right to mine").

Because substantial evidence supports a jury finding that plaintiffs had a vested right to mine the entire SHM tract without limitation as to method or production levels, defendants' argument they had a legitimate government objective in addressing an impermissibly expanding nonconforming use also is unavailing.

The court now turns to the parties' contentions regarding defendants' violation of plaintiffs' substantive due process rights.

E.	Violation of Substantive Due Process Rights

As discussed above, substantial evidence supported the conclusion that plaintiffs had a vested right to mine the SHM tract without limits on methods or production. A substantive due process claim requires a showing of government officials' arbitrarily depriving a person of her constitutionally protected liberty or property interests—here, the vested right to mine. *See, e.g.*, *Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d at 1025-26. This deprivation must lack a legitimate governmental objective. *Shanks*, 540 F.3d at 1088. If plaintiffs' vested right has not impermissibly expanded, then defendants have no legitimate governmental interest in curtailing that vested right. But the parties dispute whether an improper motivation can show lack of a legitimate governmental objective and whether plaintiffs suffered a complete deprivation of their vested right. The court addresses these remaining disputes below.

1.	Improper Motivation

Defendants contend improper motivation alone is insufficient to establish lack of a legitimate governmental purpose. Renewed JMOL Mot. at 27 n.32; Renewed JMOL Reply at 8. The court disagrees. Numerous cases detail the relevance of improper motivations in the context of substantive due process claims. For instance, in *Del Monte Dunes v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990), the Ninth Circuit determined a substantive due process claim must be heard at trial where plaintiffs asserted that a city council "abruptly changed course" and rejected a plan motivated "not by legitimate regulatory concern but by political pressure from neighbors and other residents of the city to preserve the property as open space." The appellate court ruled this substantive due process claim must go to trial despite the district court's previous reliance on "the affidavits and exhibits the parties had submitted" to dismiss plaintiffs' due process claim. *Id.* at 1507. Like defendants in *Del Monte Dunes*, defendants here changed course in their vested rights determinations after being the subject of political pressure. Substantial evidence showed defendants recognized plaintiffs' vested right in operating the SHM for years before abruptly changing course and taking steps to deprive plaintiffs of their vested right. *See e.g.*, JX021 (1994 letter recognizing vested right); JX 099 (2002 reclamation plan recognizing vested right); JX287 (April 2009 letter asserting plaintiffs' mining was "not protected by

24

[plaintiffs'] vested right" without notice or a hearing).  Substantial evidence of record was available to support the jury's decision:  there was information on political influence brought to bear from at least one competitor mining company, Teichert, in the form of contributions to funding a County employee position; holding multiple meetings with County employees and discussing the *Hansen Brothers* decision as it relates to plaintiffs; drafting findings and providing them to County staff for use in the County's ruling on the SHM; and signing a renewed funding contract with the County the day after the Board rejected the Schneiders' appeal.  *See* JX506; JX508 .  *See, e.g.*, JX 356; JX363; JX392; JX487; JX506-JX508; RT 341:23-343:7, 370:11-19 (Winter Test.); RT 534:15-23; RT 1232:7-1233:13.  This substantial evidence supports the jury's implicit finding that defendants lacked a legitimate governmental interest in depriving plaintiffs of their vested right to mine.  *See* ECF No. 469 at 4 (jury verdict finding violation of plaintiffs' substantive due process rights); ECF No. 461 at 23-24 (requiring finding defendants' conduct lacked "any reasonable justification in the service of a legitimate governmental purpose" to establish defendants' conduct was arbitrary as a required element of plaintiffs' substantive due process claim); *Swenson v. Siskiyou Cty.*, 498 F. App'x. 719, 721 (9th Cir. 2012) (holding summary judgment was not proper "because, viewing the evidence most favorably to [the plaintiff], he raised a genuine dispute of material fact as to whether defendants acted in an arbitrary and irrational manner when they invalidated a vested property interest due to political or other considerations").

In *Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir. 1990), the Ninth Circuit held "the rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary."  Despite acknowledging that "a water moratorium may be rationally related to a legitimate state interest in controlling a water shortage, [plaintiffs] ha[d] raised triable issues of fact surrounding the very existence of a water shortage." *Id.*  Like the *Lockary* plaintiffs, the Schneider and Hardesty plaintiffs presented substantial evidence—discussed above—to support their position that they had engaged in no impermissible expansion of a vested right to mine at the SHM.  Even if defendants' actions could be rationally related to a legitimate state interest in regulating vested rights in mining operations, substantial evidence supported the conclusion there

was no impermissible expansion of the plaintiffs' vested right.  The *Lockary* defendants' refusal to issue water hookups to plaintiffs is analogous to defendants here refusing to affirm plaintiffs' vested right.

Ninth Circuit case law also details a violation of substantive due process rights where a defendant singles out "one individual to be treated discriminatorily." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988).  Here, substantial evidence was available in the record to support a conclusion plaintiffs were singled out in contrast to other vested right holders.  *See* RT 990:23-25 (Storelli testifying she had "never heard of [a vested mine] that lost its vested right").

Contrary to defendants' contentions, Renewed JMOL Mot. at 20-26, acting "simply to ensure compliance with all the applicable rules" may not be sufficient on its own to defeat claims the defendants acted "in an arbitrary and unreasonable manner" and with "improper" motives, especially where demands and burdens placed on the plaintiff "were unique to that plaintiff." *David Hill Dev., LLC v. City of Forest Grove*, No. 3:08-CV-266-AC, 2012 WL 5381555, at *25 (D. Or. Oct. 30, 2012).  At least one court in this district has recognized "that a defendant's 'invention' of an illegitimate reason to support a land use action and regulation can be arbitrary and capricious." *Merrill v. Cty. of Madera*, No. 1:05-CV-0195 AWI SMS, 2013 WL 1326542 at *7 (E.D. Cal. Mar. 29, 2013).  Here, substantial evidence indicates the burdens defendants placed on plaintiffs were unique—again, as a county official testified, she had "never heard of [a vested mine] that lost its vested right."  RT 999:23-25 (Storelli Test.).

Defendants still contend any conceivable basis for their legitimate conduct defeats plaintiff's substantive due process claims as a matter of law.  Renewed JMOL Mot. at 19.  Defendant relies on *Shanks v. Dressel*, 540 F.3d 1082, 1089 (9th Cir. 2008), in which the Ninth Circuit found it "fairly debatable" that the city "rationally furthered its legitimate interest in facilitating residential housing in a residential neighborhood by issuing a building permit to the [plaintiff]s." *Id.*  Yet the court also observed there was "no suggestion . . . of a sudden change in course, malice, bias, pretext, or, indeed, anything more than a lack of due care on [city defendant's] part." *Id.*  In contrast here, there was significant evidence on which the jury could have relied of defendants' improper motive and abrupt change from recognizing plaintiffs' vested

right from 1994 to 2009 until defendants' April 2009 letter changing course. JX021 (1994 letter); JX099 (2002 reclamation plan); JX288 (April 2009 letter informing plaintiffs they do not have a vested right to mine and ordering plaintiffs to cease mining operations).

Defendant also cites *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944, 946 (9th Cir. 2004), to argue evidence of "improper motive" or an "impermissible motive" is limited to equal protection claims. But the cited case made no such pronouncement. Considering all of the authority cited above, the court observes an improper motivation may undercut a showing of some legitimate governmental interest under Ninth Circuit law sufficient to establish a substantive due process violation. Substantial evidence supported the jury's finding of improper motivation by defendants here.

### 2. Evidence of Improper Motivation

Because defendants argue in their motion for a new trial that plaintiffs "failed to offer sufficient evidence that the County and individual [d]efendants acted arbitrarily," New Trial Mot. at 3, the court addresses the clear weight of the evidence as to defendants' improper motivation. The court finds the clear weight of evidence of improper motivation does not run counter to the jury's finding of defendants' liability for substantive due process violations.

Upon careful review, the trial record is replete with evidence that permitted the jury to conclude defendants ceased to recognize plaintiffs' vested right based on improper motivation, and not a legitimate governmental interest. For instance, the jury could reasonably have concluded this decision was based on an improper motivation in the form of political pressure from donors. As part of a funding contract negotiated with a select few, competitor Teichert and two other large mining competitors committed large sums of money to finance the County's regulation of mining, including funding the salary and benefits of a full-time Aggregate Resources Manager to inspect all mining operations in the County; this full-time position was ultimately filled by defendant Jeff Gamel. *E.g.*, JX508; RT 341:23-343:7, 370:11-19 (Winter Test.). No other mining company could join the funding contract without the consent of all parties, including the large mining companies who were original signatories. JX508 at 6, §9. Evidence also shows Teichert's taking concerted steps to inform various government officials and

27

agencies about Hardesty, one of its competitors. *E.g.*, JX507 (Teichert Strategy Matrix about Hardesty Sand and Gravel and including Teichert interactions with the County); JX375 at 2 (detailing importance of County, which, as lead agency, "ha[d] the biggest handle," and stating that "everything else will pile on top of it"; *see also, e.g.*, RT 438:2-6 (Gamel testifying that County, as lead agency, governs mining operations within County). The jury did receive in evidence in an email from Teichert employee John Lane to defendant Gamel, copying Teichert attorney Kate Wheatley, stating Teichert's motivation was simply "a call for fairness and level playing field." JX143. Wheatley testified she had the same understanding as to Teichert's intentions with respect to the SHM. RT 622:2-11. It was for the jury to weigh this evidence, and the jury was entitled to disregard it and credit the other evidence before it.

Evidence also permitted the jury's implicit finding that political pressure was applied through multiple meetings involving Teichert, Dickinson, Gamel, Sherry and others from 2009 through 2010. *E.g.*, JX363; JX392; JX487; JX507. Counsel for Teichert even informed County counsel of its view that the *Hansen Brothers* decision "did not sanction the substantial increase in production" occurring at SHM in response to County counsel's concerns that *Hansen Brothers* prevented the County from requiring a permit. JX356 (December 2009 email chain). Gamel also acknowledged having "heard something like that" in connection with Teichert's lawyers drafting findings and providing them confidentially to the BZA staff for the Board of Supervisor's ruling on the SHM. RT 534:15-23. Gamel acknowledged a conflict of interest if Teichert provided draft findings for the Board to use in rejecting the appeal of the SHM, even if the final findings did not track Teichert's proposed language. *Id.* 2082:12-19. The clear weight of this evidence does not run counter to a jury finding of political pressure exerted by Teichert.

A conclusion that Teichert exerted political pressure may also have been supported by evidence of the timing of campaign contributions to Dickinson and funding contributions to the County. RT 1229:9-1232:6 (Dickinson Test.). Although Dickinson testified he did not pay attention to when contributions were made and did not know immediately if a contribution was made, Dickinson did confirm an entry in his campaign finance records, which "are a matter of public record," showed Teichert made a contribution to him the day before the September 28,

2010 hearing at which the Board rejected the Schneiders' appeal. *Id.* 1231:8-19. On a separate note, the day after that hearing denying the SHM appeal, Teichert signed a renewed funding contract with the County for the Aggregate Resources Manager position. *Id.* 1232:7-1233:13; *see* JX506; JX508.

The jury also could have given weight to additional evidence in finding that County decisions were based on personal or political loyalties to Teichert. For instance, after the first full-time Aggregate Resources Manager, Mike Winter, took another position within Sacramento County, defendant Gamel replaced Winter. RT 370:11-19. Before Winter took his new position, he had conferred with Teichert's attorney and asserted the SHM was a vested mine. RT 369:6-25; JX141; JX143. Gamel, Winter's replacement, had already engaged in communication with Teichert about the SHM: Before attaining the Aggregate Resources Manager position, Gamel had responded to Teichert's complaint that "[t]he Hardesty operation continues to expand its [sic] operations and sales without any federal, state, or local permits and operate under the thinly veiled guise of vested rights," by informing Teichert, "We will see what we can do." JX143 (September 2007 e-mail chain).

Evidence of other close communications with Teichert is not scarce in this record. For instance, in the same e-mail in which he thanked Teichert for the holiday gifts of cookies and olive oil, to which he "look[ed] forward each year," Gamel informed Teichert he was working with the Office of Mining and Reclamation (OMR) to partner on the site inspection of the SHM and stated, "We will let you know of any new developments." PX676. Soon after, on December 23, 2008, OMR inspected the mine, looking for potential violations. PX676; RT 457:20-459:25, 546:3-24 (Gamel Test.); RT 1769:21-1770:12 (Hardesty Test.).

The jury also may have given weight to Gamel's at times conflicting testimony about his interactions with Teichert. He denied, in his deposition before trial, of any 2007 communications with Teichert. RT 463:12-16 (Gamel Test.). At trial, Gamel did not "recall any conversations in 2007" with Teichert about the SHM, and he stated, "I don't know why I would be" when asked if he should not have been talking to Teichert about SHM. *Id.* 464:18-24. Yet an email chain and Gamel's testimony eventually revealed Teichert's sending Gamel aerial

photographs of the SHM and complaining about Hardesty Sand & Gravel while telling Gamel to be discrete—all before Gamel was appointed as Aggregate Resources Manager. JX143; RT 465:3-467:18 (Gamel Test.). As noted, Gamel had informed Teichert, "We will see what we can do." JX143; RT 468:10-14 (Gamel Test.). Contrary to his earlier deposition testimony, Gamel eventually admitted at trial that he had been talking with Teichert about Hardesty Sand & Gravel since 2007. RT 468:1-20. By 2008, Gamel had called the Army Corps of Engineers and told them about Teichert's interest in the Hardesty mining operation. JX152. While the jury was reminded in standard jury instructions that naturally people sometimes forget things, it also was charged with ultimately making decisions regarding credibility. ECF No. 461 at 8 (Final Jury Instruction No. 7, instructing the jury in part that "You may believe everything a witness says, or part of it, or none of it" and instructing the jury it may account for "the witness's memory"). Gamel's vacillating about his communications with Teichert permitted the jury to infer some level of improper motivation in the context of the other evidence of political ties and pressure reviewed above.

Teichert communicated with other County employees as well. Even if those communications in themselves were a common practice of a large company doing business in the County, the jury was entitled them to consider them in the context of all the evidence presented in resolving plaintiffs' claims. As noted, Teichert communicated its concerns about competition from Hardesty to the County. *E.g.*, JX507 at 9-11 (Teichert Strategy Matrix detailing contacts with County officials); RT 580:1-20, 587:4-589:4 (Wheatley Test. about Teichert Strategy Matrix, including "tactics or developments" to pursue for "the [SHM]" and list including Dickinson, Gamel, and Sherry as contacts); RT 585:7-15 (Wheatley Test. of multiple meetings between Teichert and the County, including Gamel); JX132 (John Lane complaining that Hardesty was "now attempting to steal our customers through the sale of very cheaply priced product"); JX141 (August 2007 e-mail chain between Winter and Teichert lawyer Wheatley about vested status of Hardesty Sand & Gravel operation at SHM); JX143; JX234 (January 2009 e-mail chain setting up meeting between Gamel, Winter, and lawyers for Teichert); JX392; JX434. Defendants Dickinson, Sherry and Gamel were among the "primary contacts" between

Teichert and the County. JX507; RT 587:16-588:11 (Wheatley Test.). These regular contacts and the open communication lines between Teichert, County employees and defendants themselves demonstrate the clear weight of the evidence is not against a jury finding of defendants having an improper motivation in determining plaintiffs lacked a vested right.

The jury's conclusion was further supported by the County's repeatedly ordering plaintiffs to stop mining altogether despite an increased demand for mining aggregate in Sacramento County. *Compare* JX287, JX421, JX447, RT 528:10 (Gamel acknowledging the April 2010 letter "does say shut down" if plaintiffs do not get a use permit and rezone), RT 714:17-20 (Sherry acknowledging "[w]e did not" tell plaintiffs they could scale back their mining operation to their original vested right and continue mining), *and* RT 1461:9-14 (Schneider testifying about an order saying "cease mining operations immediately, initiate an application for an amended reclamation plan within seven days, initiate reclamation of pits"), *with* JX131, JX139, JX157, JX230, JX341, JX671 (Gamel presentation on shortage of local supply), RT 395:11-396:2 (Bly-Chester Test.), *and* RT 505:1-24 (Gamel Test.). In his presentation discussing a shortage of local supply, Gamel specifically urged the County to prioritize huge quarries operated by Teichert, Granite and other participants in the funding agreement with the County to meet the critical need for local aggregate. JX671 at 30-32; RT 507:1-10 (Gamel Test.). But on cross-examination during trial, Gamel was asked: "But the last thing you want to do is lose an actual existing source of sand and gravel in Sacramento County, true?" He answered: "I would say that's true, yes." RT 514:8-10. Yet significantly, neither Gamel nor Sherry ever suggested – or apparently considered suggesting – the option of plaintiffs' paring back their mining during a permitting process to some smaller scale tied to the County's initial recognition of their vested right, consistent with *Hansen Brothers*, 12 Cal. 4th at 575.

Taken together, the evidence reviewed here provided substantial support for a conclusion that defendants operated with an improper motive. It is not the only conclusion the jury could have reached, but it is not the court's job to reweigh the evidence and superimpose its own conclusions after the fact. When considered together with the substantial evidence supporting the conclusion that plaintiffs had a vested right to mine and did not impermissibly

31

1    expand that vested right, the court cannot rule as a matter of law that defendants should have

2    prevailed on plaintiffs' substantive due process claims because defendants had a legitimate

3    governmental objective.  Nor can the court find the clear weight of the evidence above weighs

4    against the jury verdict in favor of plaintiffs on substantive due process claims.  *See* ECF No. 469

5    at 4 (jury verdict finding County and Sherry liable for violation of Hardesty plaintiffs' substantive

6    due process rights and County, Sherry, Dickinson and Gamel liable for violation of Schneider

7    plaintiffs' substantive due process rights).

8

9                    3.    Complete Deprivation

10           Notwithstanding the evidence that could have supported the jury's conclusion of

11   an improper motivation, defendants contend there was no "complete" or "total" substantive due

12   process violation and the verdict therefore conflicts with *Dittman v. California*, 191 F.3d 1020,

13   1029 (9th Cir. 1999).  Renewed JMOL Mot. at 5-6.  In *Dittman*, the plaintiff challenged a

14   requirement to disclose his social security number as part of an application for an acupuncture

15   license and the court deemed this requirement a "'complete prohibition' on entry into a profession

16   that implicates a person's liberty interest in pursuing an occupation or profession of her own

17   choice." *Id.*

18           Here, substantial evidence supported the jury's finding the plaintiffs experienced a

19   complete deprivation of their substantive due process rights.  Although defendants contend the

20   County's later permit requirement was not a complete or "total prohibition on their ability to

21   engage in the occupation of mining," Renewed JMOL Mot. at 6-7, case law is clear that "[a]

22   mineral extractive operation is susceptible of use and has value only in the place where the

23   resources are found, and once the minerals are extracted it cannot again be used for that purpose."

24   *Hansen Bros.*, 12 Cal. 4th at 553.  Thus, action prohibiting mining at SHM is a total prohibition

25   or complete deprivation of any associated substantive due process rights.  Even requiring a permit

26   to mine is a complete deprivation of the vested right to mine because that permit is not necessary

27   when one has a vested right to mine.  *See* Cal. Pub. Res. Code § 2776(a) ("No person who has

28

                                                    32

obtained a vested right to conduct surface mining operations . . . shall be required to secure a permit . . . .").

The April 2009 letter sent to plaintiffs evinces a complete deprivation because the letter did not provide the option for plaintiffs to scale back their mining operations to "its former level," with the County then "seek[ing] an injunction if the owner does not obey" as dictated by *Hansen Brothers*. 12 Cal. 4th at 575. Instead, that letter ordered plaintiffs to cease mining operations completely until they obtained a permit, which required meeting conditions that had the effect of ending the mining operation as explained below. JX287. As defendant Gamel admitted, this letter informed plaintiffs they did not have a vested right in the property. RT 526:21-527:1 (Gamel Test.). The letter stated the County had found that "the mining that is presently occurring on your property is not protected by your vested right, and the only remedy to permit you to continue mining on the property is to file for and receive approval of a conditional use permit and rezone." JX287. Gamel, who authored the letter, testified that the County "came to a conclusion that" SHM was not "still a vested operation" before April 2, 2009. RT 524:16-18. Gamel further testified that this determination was entirely unilateral, with no notice or hearing to plaintiffs: "We did not have a hearing. This was an internal matter." *Id.* 525:6. Gamel ultimately agreed that, with no public hearing, the County simply told Schneider and Hardesty they did not have a vested right any more. *Id.* 525:10-15.

The deprivation stemming from the April 2009 letter remained a complete or total deprivation because subsequent hearings about the SHM did not permit adjudication of plaintiffs' claim to an underlying vested right. *E.g.*, RT 2081:9-11 (Gamel testifying that vested right "was not the issue before the Board of Supervisors"); RT 2257:14-19 (Derby testifying that hearings before Board of Supervisors and BZA concerned the notices of alleged zoning violations, not reaffirmation of the vested right); RT 1214:8-24 (Dickinson testifying that 2010 appeal to Board was about a violation of the zoning code and "was not focused or directed to whatever vested right there may have been"); RT 999:12-19 (Storelli testifying that if one needs a conditional use permit, one by definition would not be in possession of a vested right). In the County hearings, Dickinson proclaimed his view that the vested right simply did not exist. *E.g.*, JX483-101:17.

1  During trial, however, as noted above, a County official testified, she had "never heard of [a

2  vested mine] that lost its vested right."  RT 999:23-25 (Storelli Test.).

3        Hardesty's own testimony about the dismantling of his mining business and his

4  loss of livelihood provided strong evidence from which the jury could have concluded the

5  Hardestys in particular suffered a complete and total deprivation.  Hardesty testified that

6  defendants' conduct forced him to sell off his expensive, handcrafted equipment for scrap, let all

7  his employees go and incur $5 million in debt, borrowed from family and friends.  RT 1739:6-17,

8  1746:15-24, 1748:19-1752:10.  Hardesty explained his equipment was "not so movable" because

9  it included "big conveyor belts," so he felt he had no choice but to have "sold and scrapped it."

10  *Id.* 1789:16-1790:3.

11        Schneider's testimony also provided the jury with information it could reasonably

12  have relied on to conclude he suffered a complete deprivation.  Schneider testified he attempted

13  to have another mine operator take over after defendants shut down the Hardesty operation.  RT

14  1140:22-25 (Light Test.); 1333:7-1336:4 (Schneider Test.).  But it was not feasible for another

15  operator to resume mining in light of the County's refusal to continue recognizing the vested right

16  and its requirement that Schneider obtain a conditional use permit, rezone his land, and post a

17  large bond before allow mining to continue, a process that witnesses testified could take ten years

18  and cost millions of dollars.  *E.g.*, RT 1140:22-25 (Light Test.); 1333:7-1336:4, 1337:25-1338:3

19  (Schneider Test.); 1707:21-1708:5 (Hardesty Test.); 2255:22-25 (Derby Test.).

20        The evidence reviewed above is substantial and supports the jury's determination

21  that Hardesty and Schneider each experienced a complete deprivation of their vested right to

22  operate the SHM, resulting in the destruction of their respective leasehold interest, mining

23  operation and livelihoods connected with the mine.  Based on the above, the clear weight of the

24  evidence also does not run counter to the jury's verdict finding substantive due process violations.

25        F.     Jury Instructions on Vested Right

26        At hearing defendants asserted the court cannot find that the jury properly found a

27  vested right without the court's having provided a jury instruction clarifying that the *Hansen*

28  *Brothers* case "allow[s] a local public entity to make a decision" about the impermissible

34

expansion of the vested right, "which is allowed to have some degree of expansion by its very nature." Hr'g Tr. at 55:20-56:4. Defendants did not raise this issue in their briefing. *See* Renewed JMOL Mot.; Renewed JMOL Reply; New Trial Mot.; New Trial Reply. Nevertheless, the court addresses this argument because the vested rights issue is at the heart of this case.

Defendants' belated contention conflicts with their objection at trial "to any instructions to the jury on procedural and substantive due process that are in any way premised on the theory that the defendants improperly and impermissibly revoked plaintiffs' alleged vested right to mine." ECF No. 427 at 1. Defendants in fact proposed striking an entire set of proposed instructions on "California Mining Law and Vested Rights," including instructions on the *Hansen* standard. *Id.* at 29-32. The court ultimately did not instruct the jury on the *Hansen Brothers* case, though the court did instruct the jury that the Schneiders claimed a "vested right to mine." ECF No. 461 at 14. The court finds defendants have waived this argument under the invited error doctrine.

Regardless, the jury did not need instruction on the *Hansen Brothers* case to understand the factual dispute between the parties about a vested right to mine, and the law applicable to it. Resolving that factual dispute based on the instructions the court did give permitted the jury to make the legal determination about the existence of a legitimate governmental interest asserted by defendants—that the plaintiffs' lack of vested right, or expansion beyond that vested right, permitted the assertion of a legitimate governmental interest in regulating mining activity and avoiding environmental damage and attendant costs shouldered by the public. The jury found, based on the evidence before it, that this asserted interest was not a legitimate interest. Defendants' own testimony on the confusing nature of the 2002 reclamation plan maps and the County's prior 1994 determination of plaintiffs' rights provided the jury with a factual basis to disbelieve defendants' assertion of having only a legitimate interest, offered in the face of plaintiffs' claims; the jury was free to weigh the County's position along with the totality of the evidence, including the evidence that could support the conclusion of improper motive. It was, as noted elsewhere, for the jury to make credibility determinations among conflicting narratives. On the trial record, the jury was entitled to determine whether the County staff

actually concluded the SHM nonconforming use had impermissibly expanded or if County staff instead reached that conclusion pretextually in response to political pressure from plaintiffs' competitor.

G.     Excessive Damages

Defendants also contend a new trial must be granted because the jury's award of $105 million for substantive due process violations was based on an improper measure of damages.  New Trial Mot. at 4-5.  According to defendants, "The proper measure of damage should have taken into account the difference in the fair market value of the SHM property as a result of the [p]laintiffs' loss of the right to continue their mining operation."  *Id.*  Additionally, defendants contend plaintiffs relied on the inherently unreliable testimony of expert witness Gilbert Coleman to justify asking for excessive substantive due process damages.  *Id.* at 5-6.

At hearing, defendants conceded their excessive damages challenge was limited to "[their] Rule 59 motion" and was "not a basis for [their] Rule 50(b) motion . . . ."  Hr'g Tr. at 46:9-21.  The court therefore addresses defendants' excessive damages claims under Rule 59 only.  Courts "will not disturb an award of damages on appeal unless it is clearly unsupported by the evidence."  *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985).  "An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'"  *Id.*  (citation omitted).  Under Rule 59, having carefully considered this question, the court does not find the damages awarded excessive, monstrous or shocking to the conscience.

1.     Proper Measure of Damages

According to defendants, as noted, "The proper measure of damage should have taken into account the difference in the fair market value of the SHM property as a result of the [p]laintiffs' loss of the right to continue their mining operation."  New Trial Mot. at 4-5.  The court disagrees.

The jury was instructed that "[d]amages means the amount of money that will reasonably and fairly compensate the plaintiffs for any injury or loss you find was caused by the defendants."  ECF No. 461 at 28.  Lost profits and business expenses, a form of injury or loss, are

36

an appropriate measure of damages in cases involving violations of due process rights. For instance, in *Chalmers*, plaintiff was entitled to a damages award including "initial cost" and "net profit" when the defendant city violated plaintiff's due process rights by preventing her from operating her T-shirt vending business. 762 F.2d at 755-56, 760. Additionally, in *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 817-19 (9th Cir. 2001), the Ninth Circuit concluded a jury award of damages, including lost profits, was not against the clear weight of the evidence when the defendant city council failed to approve plaintiff's mobile home park project.

Here, plaintiffs face a situation not unlike that of the plaintiff in *Chalmers* although the size of the two businesses appears quite different. Here, municipal defendants violated plaintiffs' due process rights by shutting down and preventing operation of the SHM. *See also Benigni v. City of Hemet*, 879 F.2d 473, 475, 480 (9th Cir. 1988) (refusing to disturb jury award of compensatory and punitive damages where police officers harassed bar owner, eventually forcing him to sell at a loss). The jury was instructed to apply—and is presumed to correctly apply—this measure of compensation "for any injury or loss," which would include lost profits and business expenses. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("[A] jury is presumed to follow its instructions."). Such a measure is appropriate and serves the purpose of awarding damages in § 1983 actions, to compensate the aggrieved party. *Chalmers*, 762 F.2d at 760 (citing *Carey v. Piphus*, 435 U.S. 247, 254-55 (1978))

Defendants instead cite to *Herrington v. Sonoma County*, 834 F.2d 1488, 1498 (9th Cir. 1987), contending the appropriate measure of damages is inverse condemnation based on a denial of all viable use of the land. In that case, plaintiffs owned a parcel of farmland they wished to develop into a residential subdivision, and their substantive due process claim arose from a preliminary decision by defendant county that temporarily thwarted the planned development. *Id.* at 1490. Unlike the plaintiffs here, the plaintiffs in *Herrington* did not have a long-running, successful business operation tied to an occupational liberty interest. The loss suffered by plaintiffs here was not merely the lost value of the land itself, but instead the lost value of the dismantled mining operation that had sustained plaintiffs for many years. In other

words, a difference in the value of the land itself does not capture the harm suffered by the aggrieved parties. Damages based on losses from plaintiffs' dismantled mining operation—the loss of a liberty interest, not solely a property interest—appropriately measure the damages in this case. In arriving at a dollar amount, the jury had before it evidence that supported the conclusion defendants' conduct forced SHM to permanently close, and Hardesty to sell his expensive handcrafted equipment for scrap at a loss of "[a]pproximately $1.7 million." RT 1791:1-2. This case is therefore closer to *Chalmers*, 762 F.2d at 755-56, 760, and *Benigni*, 879 F.2d at 475, 480, than to *Herrington*. And, unlike there plaintiffs in *Herrington*, who "never had the 'right' to construct a 32-unit subdivision," 834 F.2d at 1504, the plaintiffs here originally had a recognized vested right to conduct the mining operation.

## 2. Reliable Expert Testimony

Defendants contend the substantive due process damages were excessive, in part because they were based on Gilbert Coleman's "inherently unreliable" expert testimony. New Trial Mot. at 5-6. Here as well, the court disagrees. The substantive due process damages are supportable by evidence before the jury, including Coleman's testimony. Although defendants correctly identify problems with Coleman's testimony, including Coleman's contradictions in relying on different sets of tax returns, defendants themselves highlight Coleman's other testimony that supports the jury verdict.

Coleman's testimony bore some indicia of reliability. For instance, Coleman testified that he determines value by looking at profitability and other factors. RT 1521:4-24. Coleman considers the track record of a business to make his calculations, which here included Hardesty Sand & Gravel's success for 30 years as a profitable business with a strong local demand for aggregate. RT 2369:2-23; *see also* JX671 (Gamel presentation on critical shortage of aggregate in Sacramento County).

Although Coleman's testimony about his reliance on tax returns was not reliable (*see* RT 1622:24-1623:21, 1624:12-1626:20, 1627:21-1628:3, 1628:4-1634:18), the jury was exposed to the unreliability and able to weigh it subject to proper instruction. Defendants admit Coleman provided a revised valuation based on a $1-per-ton payment the Schneiders were

supposed to receive. RT 1654:1-25, RT 2104:14-23. Moreover, Coleman testified that, based on the information he had seen, he had no doubt there was enough sand and gravel at the SHM to last for the next 100 years at the production levels he had observed. RT 1576:1-5. Coleman based this testimony on discussions with Hardesty and Schneider. RT 1575:19-22. Coleman's conclusion is consistent with Hardesty's testimony, based on Hardesty's excavating "hundreds of test holes on th[e] [Schneider] ranch," that he "could easily mine at the rate of pace that [he] was for another 75 or 100 years real easy." RT 1747:1-20, 1748:2-5 (Hardesty Test.); *see also* JX11; JX 13 (test holes excavated by Schneider family); *Silver Sage*, 251 F.3d at 819-21 (concluding damages expert's assumption was supported by "fully consistent" testimony from plaintiff partner).

Schneider's testimony also supports Coleman's conclusion about the quantity of sand and gravel at the SHM. For instance, Schneider testified there were at least "27 million tons of material that we know is in reserves," which has "been mapped out" and known "for years and years and years." RT 1348:18-21. And Schneider also testified that one can sell aggregate to purchasers "from stockpiles . . . or from reserve areas that haven't been mined yet." RT 1273:11-13. Those stockpiles have existed since the 1930s, with "[a] great deal of them in the Forties and early Fifties." RT 1309:25-1310:3.

Contrary to defendants' suggestion, Coleman was not restricted to the testimony of expert Jeff Light as the basis for forming his conclusions about the aggregate reserves and their ability to sustain the Hardesty mining business over the coming decades. Light testified only as to certain areas, comprising only a part of the total acreage of the Schneider ranch, and not the entire SHM tract. *See* RT 1117:21-1121:8. The jury was entitled to assess the testimony of Hardesty and Schneider independently, as well as Coleman's reliance on their testimony in his calculations.

Observing all of these facts, the court does not find the substantive due process damages awarded to the Schneiders excessive or against the clear weight of the evidence. If the jury applied the $1-per-ton price for the Schneiders, considered by Coleman during his testimony, to Schneiders' testimony of at least 27 million tons in reserves, the jury would have arrived at a

1   calculation of $27 million in damages, discounted to $21.6 million using Coleman's methodology

2   of multiplying $27 million by 0.8.  *See* RT 2383:15-21 (Coleman Test.).  After adding the $6.43

3   million in past losses deemed admitted by the court (RT 2392:10-13), a total damages calculation

4   for the Schneiders' substantive due process claim would be $28.03 million.  In light of

5   Schneider's testimony and Hardesty and Coleman's testimony on mining for another 75-100

6   years, a jury crediting those statements and calculating damages based on 30 million tons—

7   establishing a total of $30.43 million in damages after discounting—is not excessive.

8   Defendants' own suggested average tax return values for the Schneider family—$404,776 per

9   year, New Trial Mot. at 7 n.2, and an alternative measure from the $1-per-ton measure of

10  damages—would still permit a jury award of $30,716,560 after discounting Coleman's

11  methodology and including the $6.43 million in past losses, if the jury credited as it could have at

12  least 75 more years of operation of the SHM based on the collective testimony of Hardesty,

13  Schneider, and Coleman.

14  IV.    <u>PROCEDURAL DUE PROCESS</u>

15          Defendants contend plaintiffs were provided procedural due process as a matter of

16  law, and insufficient evidence supported the jury verdict that the County violated the due process

17  rights of the Hardesty and Schneider plaintiffs.  Renewed JMOL Mot. at 30; New Trial Mot. at

18  18.  The court disagrees.

19          Due process requires not just notice but also, crucially, the "opportunity to be

20  heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319,

21  333 (1976) (internal quotation marks omitted).  In most circumstances, the Constitution requires a

22  hearing before the government deprives a person of liberty or property.  *Zinermon*, 494 U.S. at

23  127.

24          California law requires agencies to resolve claims of vested rights to conduct a

25  surface mining operation through public hearings.  *Calvert*, 145 Cal. App. 4th at 629 (citing Cal.

26  Pub. Res. Code § 2776).  The hearings must follow procedures similar to those required for

27  approval of land use permits.  *Id.* at 626.  These hearings must determine the issues of "existence,

28  nature and scope" of the asserted rights under a constitutional procedure.  *Id.* at 629.  The *Calvert*

40

court held "that if an entity claims a vested right pursuant to SMARA to conduct a surface mining operation that is subject to the diminishing asset doctrine, that claim must be determined in a public adjudicatory hearing that meets procedural due process requirements of reasonable notice and an opportunity to be heard." *Id.* at 617. In the *Hansen* case referenced above as well, the California Supreme Court has outlined the proper process in a case in which a county believes a mining operator has exceeded the scope of their vested right: "the county may order the operator to restrict the operation to its former level, and seek an injunction if the owner does not obey." *Hansen Bros.*, 12 Cal. 4th at 575. These "[v]ested rights, if established and continued, generally cannot be conditioned." *Calvert*, 145 Cal. App. at 626. Once a vested rights determination under SMARA is final and no longer subject to review, "property rights [] have been founded and deemed vested." *Id.* at 630.

A.     Initial Vested Right Determination

Because the procedural due process violation here involves a claim of deprivation of plaintiffs' right to due process before the County deprived plaintiffs of their vested right to mine, the court first addresses the evidence establishing plaintiffs' vested right.

As discussed previously, the evidence at trial permitted the jury to find that the County recognized a broad-ranging vested right in a 1994 letter and reaffirmed it in the 2002 reclamation plan. *See* JX021; JX099. Approval of the vested right determination involved a formal proceeding in connection with approving the reclamation plan in 2002. *See, e.g.*, JX141 (August 2007 e-mail from Winter to Teichert lawyer Wheatley describing 2002 reclamation plan proceeding as "the hearing to declare the mine's vested status and to approve the reclamation plan"). County counsel later advised the BZA that the scope of the vesting had been determined by the Board of Supervisors in 2002 and could not be revisited: "That Reclamation Plan and that issue of what is vested pursuant to SMARA was decided at the time that the current Reclamation Plan was approved by the Board of Supervisors in 2002." PX568 at 145:21-24. In its 2002 adoption of the reclamation plan, at a noticed public hearing, the Board of Supervisors expressly noted the reclamation plan's appealability. JX71 at 2. No one ever appealed the 2002 reclamation plan approval. Substantial evidence therefore permitted the jury to infer plaintiffs' vested right

41

existed as early as 1994 or at least by 2002, and the clear weight of the evidence is not against a finding that plaintiffs had a vested right to mine at SHM by 2002.

B.    Deprivation without Process: The April 2009 Letter

Defendants contend the County's April 2, 2009 letter asserting plaintiffs' mining was "not protected by [plaintiffs'] vested right" (JX 287) was not self-executing and therefore did not deprive plaintiffs of a vested right. Renewed JMOL Reply at 22-23; Hr'g Tr. at 13:1-3. Substantial evidence permitted the jury to infer the opposite—that the April 2, 2009 letter deprived plaintiffs of their vested right to mine without any hearing—and the clear weight of the evidence is not against such a finding.

Substantial evidence supports the conclusion the letter did not contemplate any process related to a determination of plaintiffs' vested right. As defendant Gamel testified, the 2009 letter informed Schneider and Hardesty they did not have a vested right to mine on the Schneider property. RT 526:21-527:1 (Gamel Test.). The letter, penned by defendant Gamel and signed by defendant Sherry (JX287; RT 685:11-20, 687:7-19, 687:24-25), stated the County had found that "the mining that is presently occurring on your property is not protected by your vested right, and the only remedy to permit you to continue mining on the property is to file for and receive approval of a conditional use permit and rezone." JX287.

Defendants direct the court to Sherry's testimony that the April 2009 letter, instead of being a unilateral deprivation of a vested right, was a request for plaintiffs "to contact Jeff Gamel" for a "further dialogue . . . about this situation." RT 691:18-19. However, when asked about the 2009 letter's content with respect to an enforcement action, Sherry responded "[t]here was no specific enforcement action intended." *Id.* 752:5-14. Sherry contended the letter only threatened an enforcement action for failing to file a permit within 30 days "to convey to Mr. Schneider that it was important to respond to this letter." *Id.* 752:15-19. That no one from the County replied to a response letter sent by Schneider's counsel reinforces Sherry's testimony that no enforcement action, with attendant procedures, was intended based on the April 2009 letter. *See* JX302; RT 752:22-755:7 (Sherry Test.). Thus, this letter and the related testimony permitted

the jury to infer the County made a vested rights determination prior to sending the letter, without any form of hearing. Such a determination was in direct conflict with the holding in *Calvert*.

Defendants also suggest a September 14, 2010 presentation by Gamel and Derby to the Board of Supervisors is evidence that the April 2009 letter was not self-executing. There, Gamel and Derby characterized "Code Enforcement" zoning violation notices issued in April and May 2010 as enforcing the "April 2009" determination by the "Planning Director . . . that a Use Permit and a Re-zone was required" and the "continuing operation" of the Mine following that April 2009 determination as "in violation of the Sacramento Zoning Code." JX484 at 4. This evidence was before the jury; the jury reasonably could have found it lended further support to a determination that the April 2009 letter communicated a decision that plaintiffs no longer had any vested right to mine and had no way to contest the decision.

Additional testimony supports the conclusion the County made its vested rights determination without any form of process. Gamel, who authored the letter, testified that he and others "came to a conclusion that it was not" "still a vested operation" before April 2, 2009. RT 524:16-18 (Gamel Test.). Gamel further testified that this determination was entirely unilateral, with no notice or hearing to plaintiffs: "We did not have a hearing. This was an internal matter." *Id.* 525:6. Gamel agreed that, with no public hearing, the County simply told Schneider and Hardesty they no longer had a vested right. RT 525:10-15. Gamel confirmed the County "did not give them any advance notice," explaining "[t]his was our first letter to them regarding that issue." RT 526:19-20.

The jury was therefore entitled to infer that defendants never had any intention of opening a dialogue and that the April 2, 2009 letter operated as a deprivation of plaintiffs' vested right to mine without any form of process, much less the process prescribed by *Hansen Brothers*, 12 Cal. 4th at 575: ordering restriction of mining to a defined level of vested right and seeking an injunction if plaintiffs did not obey. Furthermore, the clear weight of the evidence is not against the jury's finding that the County violated plaintiffs' due process rights by depriving them of their vested right to mine without the required process under *Calvert*, *Hansen Brothers*, and the U.S. Constitution.

C.      Opportunity to Be Heard

Defendants contend plaintiffs had sufficient opportunity to be heard at Board of Supervisors hearings in 2010.  Renewed JMOL Mot. at 30-36.  But this argument is unavailing because those hearings pre-supposed plaintiffs' lack of a vested right to mine at the SHM tract.

Substantial evidence permitted the jury to conclude that the Board of Supervisors hearings in 2010 did not involve a vested rights determination.  For instance, when asked whether the Board in September 2010 "affirmed the vested rights of the Schneider Historic Mine," Gamel testified, "That was not the issue before the Board of Supervisors." RT 2081:9-11.  Similarly, Tammy Derby testified that the hearings before the Board and BZA concerned notices of alleged zoning violations, not reaffirmation of the vested right.  RT 2257:14-19.  Defendant Dickinson testified that the 2010 appeal to the Board was about a violation of the zoning code and "was not focused or directed to whatever vested right there may have been."  RT 1214:8-24.  Additionally, Cindy Storelli testified that if one needs a conditional use permit, one by definition is not vested. RT 999:12-19.  In the course of the hearings, Jay Schneider "asked more than once why the board would not deal with the issue of" the vested right. RT 1495:6-10 (Schneider Test.).  In response to his questions, "They would say things like, you just lost it. They would say things— Mr. Dickinson would say things like, I don't know if you had that vested right.  The same one he voted for. . . .  The different staff members would have different reasons to say we're not recognizing it.  You lost it." *Id.* 1495:11-19. And "all of the hearings . . . based on . . . alleged zoning violations" followed because of the County's position that the vested right it had recognized in 1994 and reaffirmed in 2002 no longer existed. *Id.* 1498:4-13.  This evidence permitted the jury to infer that the Board of Supervisors hearings did not address at all plaintiffs' vested rights.  Thus, these hearings could not serve as an opportunity to be heard as required to satisfy due process and *Calvert*.

Substantial evidence from the County hearing transcripts themselves supports a jury finding that the 2010 hearings did not provide post-deprivation process addressing the County's vested right determination.  Supervisor Notolli and County counsel clarified the September 14, 2010 hearing was "not on a vested right determination . . . just on whether a

zoning code violation" occurred," and County counsel informed the Board of Supervisors that Schneider would need to "go across the street to the courts" to argue the vested right determination. JX483 at 69:14-70:23. County counsel also informed the BZA during its hearings that the vested rights determination was not at issue there: "That Reclamation Plan and that issue of what is vested pursuant to SMARA was decided at the time that the current Reclamation Plan was approved by the Board of Supervisors in 2002." PX568 at 145:21-24. Despite this staff report and the transcripts of past proceedings, defendant Dickinson stated in the hearings his view that the vested right simply did not exist. *E.g.*, JX483-101:17. Although plaintiffs presented some discussion at the hearings through counsel about vested rights and the effect of *Hansen Brothers*, (*e.g.* PX 568 at 17-18, 100-02, 140, 170, 418), their counsel's statements were not considered on the merits. The court does not find the clear weight of the evidence is against a jury finding that the 2010 hearings did not provide a form of post-deprivation process addressing the County's deprivation of plaintiffs' vested right to mine.

Evidence from the hearing transcripts themselves also supports a finding that plaintiffs did not have an opportunity to be heard in other ways during these hearings. *See, e.g.*, PX 568 at 364-367 (Board of Supervisors voting without permitting testimony from plaintiffs); *see also* RT 1341:16-1342:20 (Schneider Test.); RT 1344:11-1345:2 (Schneider testimony that his attorneys were denied opportunities to cross-examine other witnesses or ask their own witnesses questions at a hearing); RT 1450:19-23 (Schneider testimony that they were not allowed to answer the County's argument). At other times, evidence showed plaintiffs did not have access to notice of the charges or relevant documentary evidence. *See, e.g.*, RT 811:1-3, 811:17-812:4 (Carl Simpson, code enforcement official, testifying Schneider was unable to obtain file underlying a violation notice despite other cases having such a file); JX289 at 12:21-23; *see also* JX289 at 13:19-14:2; JX 469 at 8:10-21 (Dickinson stating "all those things in the record . . will be made available to you" when they were not available at that time to plaintiffs). The jury therefore had substantial evidence to infer plaintiffs were denied procedural due process rights throughout the 2010 hearings, and the clear weight of the evidence is not against such a finding.

D.      Remedy

        1.      Waiver

According to plaintiffs, defendants waived argument as to the appropriate remedy for a procedural due process violation because they "conceded that a procedural due process violation can support an award for compensatory 'damages for the actual injury occasioned by the violation of plaintiffs' right to due process.'"  Renewed JMOL Opp'n at 64 (citing ECF No. 443 at 13, 16).  However, defendants expressly asserted "[e]ven if plaintiffs were not provided due process, the remedy is for plaintiffs to be provided the process they were due."  ECF No. 443 at 13, 16.  Defendants have therefore preserved their argument as to the appropriate remedy for a procedural due process violation here.

        2.      Appropriate Remedy

Defendants contend the remedy for a procedural due process violation is to order the process due, not to present the case to the jury for an award of damages.  Renewed JMOL Mot. at 48-49.  But the Supreme Court authority defendants cite underscores that nominal damages are a correct result, if not the automatic minimum, when a plaintiff proves denial of procedural due process but not actual injury resulting from the procedural denial itself.  *Carey*, 435 U.S. at 266 ("[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.").  "By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed . . . ."  *Id.* at 266.  Defendants' citation to *Brady v. Gebbie*, 859 F.2d 1543, 1551 (9th Cir. 1988), supports the possibility of ordering "the process that was due" only in addition to "any attendant damages which directly resulted from the failure to give the proper procedure."  Defendants have not shown plaintiffs are not entitled to nominal damages as a matter of law, and the clear weight of the evidence is not against the jury verdict awarding nominal damages.

V.      FIRST AMENDMENT RETALIATION

Defendants contend "undisputed evidence shows that the demand for [a] greater financial assurance [from plaintiffs to fund reclamation at their mining operation] was the result

46

of a process that had begun almost two years before" the Schneider plaintiffs first brought this case. Renewed JMOL Mot. at 56. Defendant asserts that process was based on inspections indicating plaintiffs "had substantially deviated from the SHM reclamation plan." *Id.* In other words, "there was utterly no temporal connection between the Schneiders' filing of their lawsuit in late 2012 and the demand for the increased financial assurance." *Id.* at 57. Defendants' argument is unavailing given the totality of the record before the jury. Substantial evidence permitted a jury inference that defendants took action against the Schneider plaintiffs for filing suit against defendants and the clear weight of the evidence is not against such a finding.

A First Amendment retaliation claim has three elements: (1) plaintiff was engaged in protected activity; (2) defendant's actions injured plaintiff in a way that would chill a person of ordinary firmness from further protected activities; and (3) defendant's actions were a response to plaintiff's exercise of constitutionally protected conduct. *Corales v. Bennett,* 567 F.3d 554, 563 (9th Cir.2009). These elements were captured in the court's Final Jury Instruction 21, ECF No. 461 at 26-27, which told the jury the Schneiders were required to prove that: (1) their rights to petition for redress to the County and the courts were protected under the First Amendment; (2) the County took action against the Schneider Plaintiffs; and (3) chilling or punishing the Schneider Plaintiffs' protected conduct was a substantial or motivating factor for the County's action. Defendants do not contest the sufficiency of the evidence as to the first or third element, but only as to the second. *See generally* Renewed JMOL Mot.; Renewed JMOL Reply; New Trial Mot.; New Trial Reply.

Substantial evidence supported the jury's finding that the County took action against the Schneider Plaintiffs in response to the plaintiffs' filing suit, and that the action came in the form of dramatically increasing a Financial Assurance Cost Estimate (FACE) that plaintiffs would need to provide to maintain their mining activity. The FACE for SHM was historically low until June 10, 2011, when it briefly was increased from $164,223 to $830,490 before being reduced again to $177,942 in February 2012 . *Compare* PX568 at 165:9, *and* JX463 *with* JX559 at 3, *and* JX 589 at 7. Specifically, the BZA lowered the FACE back to historic levels after  a BZA hearing on December 21, 2011, at which the County presented testimony from its consulting

geologist, although plaintiffs were not given a chance to present their case. *Compare* PX568 at 309:21-310:3, 303:23-306:5, *with id.* at 364:19-365:10. Nonetheless, after the December 2011 hearing, the BZA set the FACE at $177,942 as adequate to reclaim the mine based on its order to fill mine pits to no more than 30 feet deep. PX568 at 87:2-9, 382:10; JX 589 at 7. Defendants' consulting geologist even suggested plaintiffs might receive some money back at their next inspection. PX568 at 401:11.

But the FACE dramatically increased after the Schneider plaintiffs filed suit on September 27, 2012. Despite defendants' delivering a letter on October 9, 2012 to the Schneiders notifying them their required FACE deposit of $177,942 was final and approved (JX604 at 41; JX 605 at 9), defendants conducted an annual inspection of the mine the next day. JX605. Defendants then issued an inspection report increasing the FACE deposit to $8,817,074 or in the alternative $901,336 if the plaintiffs filled their mine pits with fill from the SHM property itself. JX604; JX 605 at 21. The jury heard testimony from Schneider that even the $901,336 alternative would have involved using "several million dollars of [their] stockpile material." RT 1338:18-21.

Substantial evidence provided support for the jury's inference that the increase in the FACE was not justified. Although the October 2012 inspection report states the BZA "ruled that final reclamation of the pit area would require the pits to be [completely] backfilled," JX 605 at18, the BZA actually had ordered the pits filled to 30 feet or less. JX589 at 7. Additionally, defendants' consulting geologist testified at trial that the SHM reclamation plan required only 30-foot pits, RT 2181:18-2182:3 (Bieber Test.), and plaintiffs' consulting engineer testified as well that filling the pits completely was inconsistent with both the reclamation plan and common mining practice. RT 963:1-967:20. Additionally, defendants' consulting geologist testified at trial there had been no change in conditions at the SHM despite the inspection report's stating its ruling was based on "changes in condition" between the 2011 and 2012 inspections of the closed mine. RT 2206:9-10; JX 605 at 21; *see also* RT 950:11-20 (Olsen testimony that "[b]ecause there hadn't been any mining activities done . . . the site really hadn't changed.").

Substantial evidence also supported a jury inference that defendants themselves caused the unjustified FACE increase. Defendants approached their consulting geologist and asked him to "determine what the cost would be if we have to import material to bring the site into . . . substantial conformity to surrounding topography" based on a BZA determination "that the 30-foot does not apply to the depths of the pits." RT 2207:14-2208:2 (Bieber Test.). Yet defendants knew the mine had material on hand to use as fill, and the BZA had not determined the 30-foot standard did not apply. PX568 at 379:3. The consulting geologist testified that, had the County not directed him to calculate the costs of completely refilling pits, he would have continued interpreting the reclamation plan to allow 30-foot deep pits. RT 2210:25 (Bieber Test.).

The clear weight of the evidence here does not run counter to the jury verdict finding a First Amendment violation by the County. Although defendant Gamel testified the BZA had ordered the pits needed to be refilled if the reclamation plan was not amended, RT 2090:17-2092:22, a compliance table adopted by that Board on December 12, 2011 mentions only filling pits to 30 feet deep. JX589 at 6-8. Gamel's statements made in his letter of November 28, 2012, which was attached to an inspection report, that the BZA ordered the pits completely filled, JX605, simply are not consistent with the record of the Board's actions in December 2011, at a hearing Gamel attended. PX 568 at 302. Additionally, this evidence, along with the timeline of events cited above, permitted while not requiring the jury to infer that the County intentionally took action against the Schneiders for filing suit.

Defendants' reliance on plaintiffs' refusal to file an amended reclamation plan, Renewed JMOL Mot. at 60-61, does not shift the clear weight of the evidence either. First, an amended reclamation plan is needed only where there is a substantial deviation from the previously approved reclamation plan. Cal. Code Regs. tit. 14, § 3502(d). But the substantial evidence cited throughout this order shows no substantial deviation. Second, requiring plaintiffs to file an amended reclamation plan for approval would conflict directly with plaintiffs' claims in their lawsuit, and the alternative involved was to pay a price of at least $901,336 and perhaps as high as $8,817,074. Third, this rationale even if given some weight does not rebut defendant

49

Gamel's statements misreporting on BZA orders or the relatively sudden and dramatic increase in the FACE very shortly after the Schneiders filed suit.

VI.     MANDAMUS AND PRECLUSION

Defendants contend plaintiffs' due process claims are barred as a matter of law for two reasons. First, they say this court must give preclusive effect to the Board of Supervisors' and BZA's determinations. Renewed JMOL Mot. at 50-54. Second, plaintiffs did not first pursue or conclude state-court mandamus actions as required by California Code of Civil Procedure § 1094.5. Renewed JMOL Mot. at 49, 52-53The court rejects both contentions.

Preclusion law "is, of course, subject to due process limitations." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). The Ninth Circuit has made clear that administrative proceedings including legal adjudications receive preclusive effect only where "the state proceeding satisfies the requirements of fairness outlined in" *United States v. Utah Construction & Mining Co.*, 384 U.S. 394 (1994). *Miller v. Cty. of Santa Cruz*, 39 F.3d 1030, 1032-33 (9th Cir. 1994). "The fairness requirements of *Utah Construction* are: (1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate." *Id.* at 1033.

Because plaintiffs lacked an adequate opportunity to litigate, the court need not give preclusive effect to the Board of Supervisors' or BZA's decisions. The court has already discussed the evidence on plaintiffs' opportunity to litigate and declines to repeat it here. *See supra*, at IV.C. In any event, the court instructed the jury that it was not to consider the correctness or incorrectness of the Board of Supervisors' or BZA's determinations. ECF No. 461 at 25. And of course "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Even if plaintiffs had a full opportunity to litigate in the Board of Supervisors and BZA hearings, the court does not find any preclusion of plaintiffs' due process claims. As the court has discussed above, the County's deprivation of plaintiffs' vested right to mine occurred without the required *Calvert* hearing, and the subsequent 2010 hearings did not permit plaintiffs to put defendants' deprivation at issue. *See supra*, at IV.B-C. For this same reason, defendants'

reliance on California Code of Civil Procedure § 1094.5 fails. *See Embury v. King*, 191 F. Supp. 2d 1071, 1084 (N.D. Cal. 2001), *aff'd,* 361 F.3d 562 (9th Cir. 2004), *as amended and aff'd,* No. 02-15030, 2004 WL 1088297 (9th Cir. May 17, 2004) ("Although section 1094.5 may provide an adequate opportunity to challenge a procedurally flawed administrative hearing, it does not provide an adequate opportunity to challenge an administrative decision rendered without any process at all.").

VII.    REMAINING ISSUES

      A.    Inconsistent Verdicts

      Defendants argue a new trial must be granted because the jury verdicts are inconsistent. New Trial Mot. at 14-15. Defendants cite Jury Instruction 22, which addressed damages for procedural due process violations and explained "only nominal damages are recoverable for a deprivation of a property interest determined to be otherwise justified." JI 22. According to defendants, because the jury awarded nominal damages for a violation of procedural due process, the jury necessarily determined the deprivation was "otherwise justified." And because the procedural due process violation was otherwise justified, the jury's verdict regarding procedural due process thus conflicted with the jury's verdict finding a substantive due process violation based on an "arbitrary" violation of plaintiffs' liberty or property interests. New Trial Mot. at 15 ("Thus, on the procedural due process claim, the Jury found that the deprivation of Plaintiffs' property interest was justified, and in the substantive due process claim, the Jury found the deprivation of Plaintiffs' property interest was unjustified, in that it was arbitrary. These two verdicts are inconsistent, and cannot be reconciled.").

      The court has a duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence. *Pierce v. S. Pacific Transp. Co.*, 823 F.2d 1366, 1369 (9th Cir. 1987) (citing, *inter alia*, *Gallick v. Baltimore & O. R.R.*, 372 U.S. 108, 119-22 (1963)). A court may not disregard a jury's verdict and order a new trial until it "attempt[s] to reconcile the jury's findings, by exegesis if necessary." *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058-59 (9th Cir. 2003) (quoting *Gallick*, 372 U.S. at 119). "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that

way," because to do otherwise "results in a collision with the Seventh Amendment." *Id.* (quoting

*Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). The court "must

accept any reasonable interpretation of the jury's actions." *Zhang v. Am. Gem Seafoods, Inc.*, 339

F.3d 1020, 1038 (9th Cir. 2003).

Upon careful review, the court finds the record provides a reasonable

interpretation for the jury's actions: the jury could have found plaintiffs were unjustifiably

deprived of their protected interests in violation of procedural due process, the unjustified

deprivation did not proximately cause them actual damages, but defendants' subsequent conduct

violating their substantive due process rights did. Indeed, that is what plaintiffs asserted in

closing argument. RT 2493:5-24 (asking only for "nominal damages" after asserting that

procedural due process "is not the claim we believe all of the damages came from, but the county

has to be called for that. They have to know what they did was wrong."). Plaintiffs asserted they

believed both substantive and procedural due process rights were violated, one "carried enormous

consequences," and "that the core issue in this case is substantive due process." RT 2466:8-9,

2496:21-22. When discussing substantive due process damages, plaintiffs asserted "the county

refused to recognize the vested right, it shut the mine down." RT 2498:3-4. This view, which

takes account of the jury instructions as a complete package, makes the two verdicts consistent,

and so they must be resolved this way. *Duk*, 320 F.3d at 1058-59 (quoting *Ellerman Lines*, 369

U.S. at 364). Because the verdicts are not inconsistent, the court DENIES the request to grant a

new trial on this ground.

B.    Immunity

1.    Absolute Immunity

Defendant Dickinson contends he is entitled to absolute immunity for his

legislative acts and qualified immunity for his executive acts. Renewed JMOL Mot. at 64.

Courts in the Ninth Circuit examine four factors to determine whether an act may

qualify for legislative immunity: (1) "whether the act involves ad hoc decisionmaking, or the

formulation of policy"; (2) "whether the act applies to a few individuals, or to the public at large";

(3) "whether the act is 'formally legislative [in] in character'"; and (4) "whether it bears 'all the

hallmarks of traditional legislation.'" *Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002) (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)).

In *Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1219-24 (9th Cir. 2003), the Ninth Circuit applied this four-factor analysis to a county council's denial of plaintiff's application for a conditional use permit. There, the Ninth Circuit upheld the district court's conclusion that the council's decision was "ad hoc" because the decision was "based on the circumstances of the particular case and did not effectuate policy or create a binding rule of conduct." *Id.* at 1220. Nor did the decision "apply to the public at large in Maui County," either. *Id.* at 1222. Although the council decision was formally legislative in character, this fact alone "does not in itself decide the issue." *Id.* at 1223. The Ninth Circuit found the fourth factor weighed against finding that legislative immunity was available because the decision "was ad hoc rather than one of policy," it "did not change Maui's comprehensive zoning ordinance or the policies underlying it," and it did not "affect the County's budgetary priorities or the services the County provides to residents." *Id.* at 1223-24. Thus, "[d]espite its formally legislative character, the decision was administrative and the individual members of the Maui City Council are therefore not entitled to legislative immunity." *Id.* at 1224.

Like the council's decision in *Kaahumanu*, defendant Dickinson's voting decisions in this case are not entitled to legislative immunity: they were ad hoc, they affected the Hardestys and the Schneiders as individuals, and they were based on the particular circumstances involving the SHM. Thus, Dickinson is not entitled to absolute immunity.

2.    Qualified Immunity

Defendants also contend they are entitled to qualified immunity. As to Dickinson, defendants contend "[p]laintiffs offered no evidence that he acted in bad faith or with the knowing intention to violate their constitutional rights." Renewed JMOL Mot. at 65. As to defendants Sherry and Gamel, defendants contend "there is no evidence" that these defendants "violated any constitutional rights of the [p]laintiffs." *Id.* at 62-63. In part, defendants contend Sherry and Gamel could not violate substantive due process because these defendants "did not make any *final* determination regarding either vested rights or the requirement for a conditional

53

use permit and a rezone." *Id.* at 63 (original emphasis). Defendants also contend plaintiff's due process claims "do not implicate clearly established constitutional rights of which a reasonable person would have known." Renewed JMOL Mot. at 63.

a) <u>Standard</u>

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Two factors determine whether the defense of qualified immunity applies: (1) whether the facts "make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citation omitted). The court is not required to consider the two steps in sequential order, and may find a defendant entitled to qualified immunity if either factor is absent, i.e., if either the alleged facts do not make out the violation of a constitutional right, or the right at issue was not "clearly established" at the relevant time. *Id.* at 236-37.

A right is "clearly established," if under case law existing at the time of the conduct at issue, a reasonable official would have understood that what he is doing violates that right. *Mullenix*, 136 S. Ct. at 308. While "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "existing precedent must have placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

b) <u>Clearly Established Law</u>

Here, plaintiffs' constitutional rights were clearly established at the time of the alleged misconduct, which began in 2009. California Public Resources Code § 2776(a) has been in place since 1975 and in its current form since January 1, 2007. *See* Stats. 1975, c. 1131, p. 2793, § 11; Stats. 2006, c. 538 (S.B. 1852), § 560. The *Hansen Brothers* decision was decided in 1996. 12 Cal.4th at 533. There, the California Supreme Court clearly held that nonconforming mining uses are subject to the "diminishing asset doctrine," which permits mining uses to expand

54

into new areas as long as their owners intended to mine these new areas when the mining uses became nonconforming. *Id.* The state Court expressly stated the appropriate remedy "[w]hen it appears that a nonconforming use is being expanded": "the county may order the operator to restrict the operation to its former level, and seek an injunction if the owner does not obey." *Hansen Bros.*, 12 Cal. 4th 533 at 575.

Additionally, at least since 1990, it has been clearly established in this Circuit that action by government officials may be found to be arbitrary and irrational when it "was motivated, not by legitimate regulatory concerns, but by political pressure" or an improper motivation. *Del Monte Dunes*, 920 F.2d at 1508; *Benigni*, 879 F.2d at 478; *Bateson*, 857 F.2d at 1303 (detailing violation of substantive due process rights where defendant singles out "one individual to be treated discriminatorily").

c) <u>Dickinson</u>

Defendants contend "[p]laintiffs offered no evidence that [Dickinson] acted in bad faith or with the knowing intention to violate their constitutional rights." Renewed JMOL Mot. at 65. But this is not the test for qualified immunity. Because clearly established law existed at the time of the violation of plaintiffs' substantive due process rights, the court need only address whether or not Dickinson participated in the violation the jury found.

Substantial evidence supported the conclusion Dickinson engaged in affirmative acts causing deprivation of plaintiffs' substantive due process rights—namely, the deprivation of their vested right to mine. *See Lacey v. Maricopa Cty.*, 963 F.3d 896, 916 (9th Cir. 2012). For instance, Dickinson's office contacted County staff about potential violations at SHM as early as October 2008. JX214; JX157 at 3. Dickinson met with Teichert and other defendants multiple times, including to discuss SHM. JX363; JX392; JX507. At a September 14, 2010 hearing, Dickinson announced he did not believe there was a vested right, JX483-014:23- 15:17, and he disavowed the County's recognition of the vested rights in 1994. JX483-019:16-020:12. During a Board of Supervisors hearing, Dickinson called on one of Teichert's attorneys to not only testify but also to introduce an "extensive letter, a whole series of exhibits attached to it which cover virtually every issue which was discussed here this afternoon." JX483-079:15-21. Dickinson

55

1   also denied Schneider's requested time to review evidence from Teichert. JX483-100:10-101:10.

2   And Dickinson voted to close the SHM on September 28, 2010.  JX483 at 104-07.  At trial,

3   Dickinson affirmed documentation showing Teichert made a campaign contribution to him the

4   day before the critical hearing, although he also noted he would not have known of the donation

5   at the time.  As noted, Teichert agreed to help fund the County's aggregate enforcement program

6   the day after the hearing.  RT 1231:15-24, 1232:9-1233:13.  From this evidence, weighing it as

7   instructed, it was not the jury's only option but the jury could infer Dickinson engaged in

8   affirmative acts causing the SHM to eventually permanently close without any legitimate

9   governmental objective, but instead to satisfy Teichert as a donor.

10                              d)      Sherry and Gamel

11              Defendants contend "there is no evidence" that Sherry or Gamel "violated any

12  constitutional rights of the [p]laintiffs."  *Id.* at 62-63.  In part, defendants contend Sherry and

13  Gamel could not violate substantive due process rights because these defendants "did not make

14  any *final* determination regarding either vested rights or the requirement for a conditional use

15  permit and a rezone."  *Id.* at 63 (original emphasis).

16              First, the court notes Sherry and Gamel would not be entitled to qualified

17  immunity for acts in their official capacity, which qualify as acts of the County.  *Owen v. City of

18  Independence, Mo.*, 445 U.S. 622, 638 (1980); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124

19  (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion).  Thus, contentions

20  about Sherry or Gamel acting in their official capacity as final policymakers—a form of

21  municipal liability—are not relevant to a qualified immunity analysis.  *See, e.g.*, RT 2279:2-5, 15-

22  22 (Derby testimony that the planning department—of which Sherry was the director as of April

23  2, 2009—had final decision-making authority "to determine whether there was a vested right or

24  not," and the code enforcement department would then follow the planning department's

25  directives to enforce zoning violations).

26              Regardless, both Sherry and Gamel engaged in affirmative acts that the jury could

27  find caused a deprivation of plaintiffs' substantive due process rights.  For instance, Sherry

28  transmitted to plaintiffs the April 2009 letter, which was drafted by Gamel and copied to

                                          56

Dickinson. JX287; JX288. Gamel communicated via email with Teichert lawyer Wheatley about SHM two weeks before the April 2, 2009 letter was issued, and Gamel met with Wheatley a week before sending the e-mail. JX275; 649:12-650:10. Gamel had also responded to a complaint by Teichert about the SHM operating without permits under vested rights by stating to Teichert, "We will see what we can do." JX143. Gamel then provided updates to Teichert, including in a "Teichert goodies" email to Teichert's John Lane. PX676. From this substantial evidence, the jury was permitted to infer that Sherry and Gamel's actions in communicating with Dickinson and Teichert about SHM, and in issuing the letter to plaintiffs declaring plaintiffs' mining was "not protected by [plaintiffs'] vested right," caused the deprivation of plaintiffs' vested right to mine. To the extent a factual dispute remained as to the parties' motives, a threshold resolution of that dispute remained an appropriate task of the jury in the context of a claim of qualified immunity. *See Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003); *Wilkins v. City of Oakland*, 350 F.3d 949, 955-56 (9th Cir. 2003).

C.     Punitive Damages

Defendants argue the punitive damages awarded against the individual defendants are excessive and a new trial must be granted. New Trial Mot. 11-13. Defendants' argument lacks merit.

At hearing, defendants conceded excessive damages "would have to be reserved for [their] Rule 59 motion" and was "not a basis for [their] Rule 50(b) motion . . . ." Hr'g Tr. at 46:9-21. The court therefore addresses defendants' excessive damages claims under Rule 59 only.

When reviewing a punitive damages award for constitutional excessiveness a court should "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). "Single-digit multipliers are more likely to comport with due process." *Id.* at 425. Defendant contends no comparable cases exist for the

third guidepost—the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Renewed JMOL Mot. at 71. The court therefore addresses the first two guideposts below.

Here, the jury awarded punitive damages against Dickinson of $25,000, Gamel of $1,000,000 and Sherry of $250,000, all to Schneider plaintiffs. ECF No. 469 at 7-8. The jury also awarded $500,00 in punitive damages against Sherry to Hardesty plaintiffs, for a total of $750,000 in punitive damages awarded against Sherry. *Id.*

Substantial evidence permitted the jury to infer a significant degree of reprehensibility of defendants' misconduct. First, as previously discussed, ample evidence shows defendants communicating and coordinating with Teichert about the investigation of SHM's vested right. *E.g.*, JX363; JX392; JX487; JX507. Campaign reporting records show Dickinson's campaign fund received a contribution the day before his vote to close SHM, and Teichert agreed to help fund the County's aggregate enforcement program the day after that hearing. RT 1231:15-24, 1232:9-1233:13 (Teichert Test.). Gamel authored the April 2009 letter, and Sherry signed it, declaring plaintiffs' mining was "not protected by [plaintiffs'] vested right." JX287. Sherry signed this letter despite acknowledging the County never told plaintiffs they could scale back their mining operation to some "original" vested right. RT 714:17-20. Sherry also signed this letter apparently without understanding the maps attached to the 2002 reclamation plan. *See* RT 701:6-704:20 (testifying he "can't tell" and did not "know what the colors mean" in reference to maps with legends indicating estimates as to where mining likely will occur in the next 20, 40, and 100 years). And Gamel testified to the County's unilateral determination without a hearing. RT 524:16-18, 525:6. The sum total of this conduct resulted in the closure of SHM and plaintiffs' loss of livelihood. This evidence supports a jury finding that defendants' conduct involved targets who "had financial vulnerability," involved "repeated actions," was "the result of intentional malice, trickery, or deceit," or involved a "callous indifference to the constitutional rights of others." *State Farm*, 538 U.S. at 419; *Dang v. Cross,* 422 F.3d 800, 807 (9th Cir.2005); *see also* ECF No. 461 (instructing jury they "may award punitive damages only if [they] find that a defendant's conduct that harmed a set of plaintiffs was malicious, oppressive, or in reckless

1  disregard of the plaintiffs' rights" and defining reckless disregard as "complete indifference to the

2  plaintiffs' safety or rights, or if the defendant acts in the face of a perceived risk that its actions

3  will violate the plaintiffs' rights under federal law").

4        Examining the disparity between the actual harm suffered by plaintiffs and the

5  punitive damages awarded  reveals the punitive damages were not constitutionally excessive.

6  The largest multiplier here is 3.33 percent—the value of Gamel's punitive damages award

7  divided by the substantive due process damages awarded to Schneider plaintiffs.  The remaining

8  punitive damages awards as to each defendant, when divided by their respective compensatory

9  damages awards, do not reach even a single-digit multiplier.  *See State Farm*, 538 U.S. at 425

10  ("Single-digit multipliers are more likely to comport with due process.").

11        The court finds the punitive damages awarded here were not excessive as to any

12  defendant, given the applicable legal standards.

13        D.    Williamson Act Claim

14        Defendants also contend the court must enter judgment as a matter of law as to a

15  Williamson Act claim.  Renewed JMOL Mot. at 72-74.  But plaintiffs made no such claim or any

16  related "disguised breach of contract claim," Renewed JMOL Mot. at 72, and no claim of this

17  kind was before the jury.  *See* ECF Nos. 74 (Second Amended Complaint), 461 (final jury

18  instructions).  Only claims for violations of procedural due process, substantive due process, and

19  right to petition the government were submitted to the jury.  ECF No. 461 at 15, 21-24, 26-27

20  (final jury instructions 14, 18, 19, 21).  The court DENIES defendants' request for renewed

21  judgment as a matter of law on a non-existent claim.

22  VIII.   CONCLUSION

23        For the reasons above, the court DENIES defendants' motions for renewed

24  judgment as a matter of law and for a new trial.  This order resolves ECF Nos. 537 and 538.

25        IT IS SO ORDERED.

26  DATED:  March 31, 2018.

27

28  _____
                    UNITED STATES DISTRICT JUDGE