G. DAVID ROBERTSON
California State Bar No. 111984
Robertson, Johnson, Miller & Williamson
50 West Liberty Street, Suite 600
Reno, Nevada 89501
(775) 329-5600

R. PAUL YETTER (*pro hac vice*)
JUSTIN P. TSCHOEPE (*pro hac vice*)
CHRISTIAN J. WARD (*pro hac vice*)
ALEXANDER R. ADES (*pro hac vice*)
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

DAVID A. DIEPENBROCK
Weintraub Tobin Chediak Coleman Grodin
Law Corporation
400 Capital Mall, 11th Floor
Sacramento, California 95814
(916) 558-6000

Attorneys for Plaintiffs
JOSEPH and YVETTE HARDESTY

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| JOSEPH HARDESTY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SACRAMENTO METROPOLITAN AIR QUALITY MANAGEMENT DISTRICT, et al., <br><br> Defendants. | Case No.: 2:10-cv-02414-KJM-KJN <br> Consolidated with: 2:12-cv-2457-KJM-KJN <br><br> Judge:   Hon. Kimberly J. Mueller <br> Magistrate:  Hon. Kendall J. Newman <br><br> Trial Date:   October 10, 2023 <br> Action Filed: September 8, 2010 |

## HARDESTY PLAINTIFFS' TRIAL BRIEF

Pursuant to Fed. R. Civ. P. 16, Local Rule 285, and court orders, plaintiffs respectfully submit their trial brief.

## STATEMENT OF FACTS

As this second trial begins, the County's liability for violating the Hardestys' civil rights and the underlying facts are established. This statement includes background facts that are not disputed or have been adjudicated to be true in the judgment affirmed on appeal. Those facts are followed by facts relevant to the damages calculations at issue in this retrial.

### A.     Established Background Facts

Joe and Yvette Hardesty, a husband and wife, operated a sand and gravel mining business on a property known as the Schneider Historic Mine. *See Hardesty v. Sacramento Metro. Air Qual. Mgmt. Dist.*, 307 F.Supp.3d 1010, 1027 (E.D. Cal. 2018), *aff'd in part, rev'd in part and remanded*, *Hardesty v. Sacramento Cnty.*, 824 F. App'x 474 (9th Cir. 2020). The property is owned by the Schneider family. *Id.* The Mine covers about 3,600 acres in eastern Sacramento County.

Around 1980, the Hardestys began operating at the Mine by agreement with the Schneiders. The Hardestys ran their business under the name Hardesty Sand & Gravel. Operating the Mine was their chosen occupation and supplied their livelihood for some 30 years. *Id.* at 1028.

By its actions starting around 2007, the County "caused the closure of the Hardestys' sand and gravel mine and violated [their] constitutional rights" under the Fourteenth Amendment. *Id.* at 1020. The County caused the permanent shutdown of the Hardesty business at the Mine, completely depriving them of their lifelong occupation. *Id.* at 1040.

The Mine was covered by a vested right so that no use permit was required for its operations. Getting and complying with a permit can be costly. The costs can make mining at small mines or for smaller operators uneconomical. *Id.* at 1040-41. The "vested right to mine encompassed the entire [Mine] tract." *Id.* at 1032. The County acknowledged the vested right for years, including in a 1994 letter to Jay Schneider. *Id.* at 1029-35. Although a vested mine does not require a permit, an approved reclamation plan and a cash deposit to fund reclamation are required.

- 2 -
HARDESTY PLAINTIFFS' TRIAL BRIEF / 10-cv-02414

In 2002, the County approved a 100-year reclamation plan for the Mine. The plan had "maps showing areas covering almost all land within the perimeter of the [Mine] tract and maps showing where mining was projected to occur in the future." *Id.* at 1026-27. The vested right "covered the entire [Mine] tract without limits on production method or production amount." *Id.* It "encompassed the mining [that the Hardestys] engaged in at the time," and it "incorporates mining methods in place through 2010." *Id.* at 1031-32.

Between 2001 and 2007, the County confirmed the Mine is subject to a vested right. *Id.* at 1046. It did yearly inspections of the Hardesty operation. Inspection reports showed no violations and noted the vested right. Before 2009, the County never accused the Hardestys of mining violations.

In March 2009, the County resource manager described a critical shortage of local aggregate to the County Board of Supervisors and urged it to prioritize applications by large mining companies for three huge quarries. *Id.* at 1039. He also reinspected the Hardesty operation and claimed to be surprised by the operation's size. *Id.* at 1031-32. He said it had grown beyond the scope of the vested right, even though the County noted earlier that the vested right covered almost all land in the Schneider ranch, including far more land than had been mined by the Hardestys. *Id.*

In April 2009, the County sent a letter to Jay Schneider stating that the Mine was not covered by a vested right. *Id.* at 1035. It ordered mining to cease until the Schneiders secured a permit. It also sent a letter to Hardesty alleging regulatory violations at their operation. Neither family got notice or an opportunity to be heard before the letters were issued. *Id.* at 1046-48.

The Hardestys continued operating the Mine in 2009. In late 2009, the County inspection report noted that the Mine was vested and mining could continue without a permit. In April and May 2010, the County sent violation notices ordering the Mine to close in 90 days unless the Schneiders got a permit. *Id.* at 1039. It intended for the notices to "aggressively enforce" its earlier decision that the Mine was no longer covered by a vested right. *See id.* at 1047.

The Schneiders tried to appeal, in a series of hearings before the Board of Supervisors. Board members and County staff said that restoring the vested right was not an option. *Id.* at 1048-49. The County focused on its allegation that the Hardesty business had expanded beyond the vested right. *Id.* at 1020, 1030-32. At no time did the County offer that the Hardestys scale back their operation to fit what it considered the scope of the vested right. Rather, it demanded the Hardestys to shut down their business entirely or get a permit and rezoning. *Id.* at 1039-40.

At a final hearing in September 2010, the Board denied the Schneider appeal and ordered the Mine to close. *Id.* at 1038, 1056. The next month, the County ordered "all surface mining operations" at the Mine to "immediately cease." The Hardestys closed their operation. After the shutdown, they sold limited amounts of earlier-mined stockpiles at the Mine. In 2012, the County ordered that these sales must stop. It also ordered the Hardestys to start reclaiming the property or face penalties.

The County's two rationales at the time for closing the Mine—environmental violations and expansion beyond the vested right—were pretextual and false. *Id.* at 1042. The Hardestys violated no mining regs and posed no risks to the environment. In particular, the County's false claim that the operation endangered the Consumnes River by posing a risk of "pit capture" was completely debunked. And the vested right covered the whole Mine property with no limits on production. The County's real reason for shutting the Mine was to satisfy the wishes of big competitors. *Id.* The Hardestys were a threat because they had good products, sold at low prices, had attracted new customers, and were growing quickly. *Id.* at 1039.

In addition to revoking the vested right, requiring a permit, and alleging fake violations, the County demanded revisions to the existing 100-year reclamation plan and hiked the required cash deposit to $8.8 million. *Id.* at 1020, 1039, 1049-52. Its arbitrary acts ensured that the shutdown was permanent. *Id.* at 1044. Until then, the Hardestys had a thriving business with 300+ customers and profits of $1 million or more every year. *Id.* at 1028.

The Ninth Circuit affirmed the "judgment of liability against the County" and remanded for a new trial on damages. 824 F. App'x at 476. Thus, as the parties agree, "The focus of this trial is the Hardestys' damages. That is, the jury will decide the amount of monetary loss that the Hardestys suffered from being unable to pursue their chosen mining occupation from the time that their business was shut down until today and continuing until the end of their work lives." Dkt. 717 at 2.

### B. Damages Facts

Had the County not deprived them of pursuing their chosen occupation, the Hardestys would have earned up to $136 million, in present value, over their working lives after the shutdown.

The Mine has ample reserves. There are 36.1 million tons of aggregate material left there. That includes 33.7 million tons of material to be mined and 2.4 million tons of mined material in stockpiles. Most of the reserves can be mined profitably at the average Hardesty operating costs for the four years before the shutdown.

The Hardestys' business was distinctive in selling a broad array of products, like fill dirt, top soil, concrete sand, and broad range of gravel and other rock products. They produced different materials based on what was in demand. Absent a shutdown, they would have continued to meet the demand for products sought by their broad customer base. A conservative average sales price for all products that they could expect to sell over the years is $7.70/ton.

As competitors and regulators documented (and complained about) at the time, the Hardestys had built a successful, expanding, low-cost/low-price mining business. Moderate projections, which account for actual changes in the local construction aggregates market for 2010-22, indicate that the Hardesty sales would have grown by at least 3% per year from 2023 to 2040.

The Hardestys would have benefitted from strong, persistent demand for their products. At the time of the shutdown, the Sacramento area had permitted less than 10% of its 50-year projected need for aggregate resources. And demand in the region has continued to be strong. After the Hardesty shutdown, the County has permitted more than 60 million tons of aggregate to be mined in the area. And this pales in comparison to the latest projections for demand in this area: state regulators estimate

aggregate demand of 724 million tons through 2068, with currently permitted reserves accounting for only 45% of that need. In short, ample demand would continue fueling robust Hardesty sales.

The Hardestys' strong track record confirms that projected 3% future annual growth is a conservative assumption when compared to past actual growth. It results in a 3.5x increase in annual tons sold over the course of 30 years. The Hardestys adapted and grew their business to meet demand over the years, investing millions of dollars in the operation, reinvesting earnings, and opportunistically adding equipment. The business had expanded rapidly, increasing production 3.8x in just six years (1995-2000) and nearly 40x over 15 years (1995-2009) according to numbers cited by the County.

Indeed, one of the County's pretexts for the shutdown was based on a dramatic expansion of the Hardestys' operation and "significant increase in production levels" of sand/gravel. Competitors stressed this point to County officials. In 2007, for example, Teichert Aggregates sent to the County aerial photos of the Hardesty operations. It complained of "significant expansion both in total production as well as operationally and equipment on the ground." It said, "Hardesty is selling so far below market value that none of the other major producer[s] can compete under the current regulatory climate." The Hardesty business was thriving, even during the Great Recession years.

It was unlawful to shut the Hardestys' business based on its growth and competitive activity. The Hardestys had every right to expand their operations at the Mine, with no limitations on production volume or methods. There is no real doubt they would have continued doing so but for the shutdown.

One of the Hardestys' damages experts, Crystal Howard, accounted for these factors and made projections of sales volumes based on the Hardestys' track record before the shutdown. Applying an accepted discount rate, she calculated damages in current dollars ranging from $72 million to $136 million depending on how long the Hardestys would have worked. The lower figure assumes Joe Hardesty—a proven hard worker, determined to keep mining as long as he could—would retire early at age 73. If he kept working until 83, the family would have earned the higher sum.

**ADMISSIONS AND STIPULATIONS**

The Hardestys incorporate by reference the parties' so-ordered Stipulation Regarding Motions in Limine. Dkt. 703. In addition, the parties agree that the Hardestys are entitled to recover their past and future lost income from their chosen work at the Mine over the course of their likely work life. The parties do not expect any substantive or procedural issues to be in controversy.

**POINTS OF LAW**

**1. The Court should admit Crystal Howard's expert testimony.**

The Court deferred ruling on the County's motion to exclude the testimony of damages expert Howard. Dkt. 708 at 7. The Court should deny the motion to exclude her testimony, which is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Hardestys incorporate by reference their response to the County's motion, Dkt. 698, which more fully details why the motion fails. Here, we briefly summarize why her testimony is admissible.

Howard calculates income lost due to the unlawful shutdown. Her calculations use production and sales data from Hardesty's actual income from the Mine in 2009 as the base year for her model. That was the last full year that they were allowed to operate before the shutdown. She also researched data from similar mining activity in the County in 2010-21 to project demand and activity at the Mine during that time and in the future. Using this and other data, she created a model of income that the Hardestys would have earned but for the shutdown in 2010.

The County does not challenge Howard's qualifications but seeks to exclude her opinions as "unreliably speculative." It has made two main arguments. First, it claims that she "identifies neither principles nor substantive reasons" for choosing 2009 as the base year in her model. Dkt. 686 at 5-6. Second, it claims that she "merely speculates" that Mine production would grow over the next two decades. *Id*. at 6-7. Both arguments are wrong.

Howard chose 2009 because it was the last full year that the Hardestys were allowed to operate. It also most accurately reflects the relevant economic conditions. As she has testified, it reflects the conditions at the time of the shutdown when local industry was coming out of a recession that greatly impacted demand from 2006 through 2010.

Her model of future production is reliable. As she has explained, she studied historical data from state regulators in 2010-21. The data is reliable in the industry because it correlates to recognized factors that influence sand and gravel production like population growth, infrastructure construction, housing, and activity from quarries. She gave other reasons why a projected annual production increase of 3% is reliable, like projected population growth which drives local demand for aggregate. Moreover, permitted aggregate reserves in the area are projected to decrease. By operating a vested mine, the Hardestys would have been well-positioned to fill the critical demand.

Finally, the criticisms of Howard's assumptions amount, at best, to credibility issues for a jury to weigh. A court is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 968-69 (9th Cir. 2013). Before trial, a court is to decide whether the "testimony has substance such that it would be helpful to the jury." *Id.* at 968-70. "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon [its] credibility, rather than the judge." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (cleaned up).

**2.   Damages evidence should come in even if it also may relate to liability.**

The County says it will object to evidence if it relates to liability. The Court should overrule such objections to proof relevant to the Hardestys' damages, even if it *also* could relate to liability.

Of course, under the Ninth Circuit's mandate, liability is established and cannot be reopened, and the new trial is limited to recalculating damages. *See* 824 F. App'x at 476. But some contextual evidence is necessary, as this jury cannot decide damages in a vacuum.

As the Court well knows from its long experience in this complex case, many facts that may pertain to liability also pertain to damages. The jury will be asked to value the income the Hardestys would have earned pursuing their occupation of operating the Mine but for the shutdown. To do that, the jury will need to understand the history of the Mine and the Hardestys' business, how quickly it was shut down, what it was like before it was shut down, how the Hardestys won business, and the like. Evidence of such matters may relate to liability but also relates to damages.

The Court properly denied the County's motion in limine on this topic, which was "vague and overbroad." *McCoy v. Kazi*, 2010 WL 11465179, at *12 (C.D. Cal. 2010). *See also Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc.*, 2010 WL 2035800, at *1 (C.D. Cal. 2010); *Baxter Diags., Inc. v. Novatek Med., Inc.*, 1998 WL 665138, *3 (S.D.N.Y. 1998). Likewise, it should overrule the County's objections at trial to evidence that may pertain to liability if it also pertains to damages.

Dated: September 19, 2023

By:    */s/ R. Paul Yetter*
G. David Robertson
ROBERTSON, JOHNSON,
MILLER & WILLIAMSON
50 W. Liberty Street, Suite 600
Reno, Nevada 89501

R. Paul Yetter (*pro hac vice*)
Justin P. Tschoepe (*pro hac vice*)
Christian J. Ward (*pro hac vice*)
Alexander R. Ades (*pro hac vice*)
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002

David A. Diepenbrock
WEINTRAUB TOBIN CHEDIAK COLEMAN
GRODIN LAW CORPORATION
400 Capital Mall, 11th Floor
Sacramento, California 95814

*Attorneys for Plaintiffs Joseph and Yvette Hardesty*

### CERTIFICATE OF SERVICE

I certify that on September 19, 2023, all counsel of record were served a true and correct copy of this document by e-filing, e-mail, and/or hand-delivery.

   */s/ R. Paul Yetter*
R. Paul Yetter